**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | |
| LAUREN HANDY, ET AL, | : | **NO. 1:22-cr-00096(1)CKK** |

**DEFENDANT HANDY'S REPLY IN SUPPORT OF HER MOTION TO DISMISS**
**ORAL ARGUMENT REQUESTED**

Defendant Lauren Handy ("Ms. Handy"), by and through undersigned counsel, respectfully submits this Reply in support of her Motion to Dismiss Counts One and Two of the Indictment.

**INTRODUCTION**

In its *sua sponte* Order dated February 6, 2023 [ECF 167], the Court has directed the parties to address the following issues:

I.      Whether the scope of *Dobbs* is in fact confined to the Fourteenth Amendment;

II.     Whether, if so, any other provision of the Constitution could confer a right to abortion as an original matter, which may or may not be addressed in *Dobbs*, such that *Dobbs* may or may not be the final pronouncement on the issue, leaving an open question; and

III.    The current crux of this case, the scope of the statutes charged, and any other issues the parties may intend to raise.

Prior to addressing these issues, undersigned counsel would like to make a correction to Ms. Handy's memorandum in support of her motion. Specifically, Ms. Handy's memorandum included the following:

> The separate FACE statute does not predicate itself on any congressional finding (such as an effect on interstate commerce) or upon any other provision of the U.S. Constitution.

Motion at 1.  This is incorrect.  The U. S. Code promulgated by the House of Representatives reveals no specific basis for the Act.  But Public Law 103-259 (S 636) (1994) appears to be a more complete version.  A copy is attached hereto as Exhibit "A".  The full text of that document contains a Section 2 expressing a basis in the Commerce Clause and the Fourteenth Amendment. Only Section 3 of the document appears in the U.S. Code as the FACE Act.

An inconspicuous heading on the U. S. Code website maintained by the House of Representatives states:

> The United States Code is a consolidation and codification by subject matter of the general and permanent laws of the United States.  It is prepared by the Office of the Law Revision Counsel of the United States House of Representatives.

Office of the Law Revision Counsel, United States Code, available at: uscode.house.gov (last accessed March 17, 2023) (emphasis added).  It appears that the Office of Law Revision Counsel, in the interest of consolidation, includes only the operative sections of a bill in the U. S. Code. Public Law 103-259 (S 636) (1994) provides in its heading that "Additions and Deletions are not identified in this document."  This does not suggest it does not reflect the bill's final form.  Rather, it does not track the changes made prior to passage.  It appears that Congress has asserted authority under the Fourteenth Amendment and the Interstate Commerce Clause for enactment of the FACE Act.

## ARGUMENT

### I.   *Dobbs* is not confined to the Fourteenth Amendment.

The *Dobbs* court points out that the *Roe* opinion was predicated on the First, Fourth, Fifth, Ninth and Fourteenth Amendments, and that *Casey* was entirely predicated on the Fourteenth Amendment.  It then expressly overrules each of them, and in those respects.  *Dobbs* bindingly holds that the Constitution as a whole provides no explicit or implicit right to abortion.

A.    ***Dobbs* considered whether the Constitution confers a right to abortion.**

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ____, 142 S.Ct. 2228 (2022), did not determine whether the Fourteenth Amendment to the United States Constitution provides a right to abortion; it considered "whether *the Constitution, properly understood*, confers a right to obtain an abortion," and answered the question in the negative. *Dobbs*, 142 S.Ct. at 2244 (emphasis added); *see also id.* at 2242, 2279. Its holding comprehends the entire Constitution: "The Constitution makes no reference to abortion, and *no such right is implicitly protected by any constitutional provision.*" *Id.* at 2242 (emphasis added).

The Court's analysis focused primarily on the Fourteenth Amendment, but the reason for that is explicit: "[t]hat provision has been held to guarantee some rights that are not mentioned in the Constitution." *Id.* Further, the Due Process Clause of the Fourteenth Amendment is "the [provision] on which the defenders of *Roe* and *Casey* . . . chiefly rely." *Id.* Despite this focus on the Fourteenth Amendment, it would not be accurate to state that the Court did not consider and reject the possibility that a right to abortion might be present elsewhere in the Constitution. In fact, the Court explicitly addressed five different constitutional provisions in discussing the imprecision of *Roe*'s constitutional analysis:

> *Roe*, however, was remarkably loose in its treatment of the constitutional text. It held that the abortion right, which is not mentioned in the Constitution, is part of a right to privacy, which is also not mentioned. See 410 U. S., at 152–153. And that privacy right, Roe observed, had been found to spring from no fewer than five different constitutional provisions—the First, Fourth, Fifth, Ninth, and Fourteenth Amendments. *Id.*, at 152.
>
> The Court's discussion left open at least three ways in which some combination of these provisions could protect the abortion right. One possibility was that the right was "founded . . . in the Ninth

Amendment's reservation of rights to the people." *Id.*, at 153. Another was that the right was rooted in the First, Fourth, or Fifth Amendment, or in some combination of those provisions, and that this right had been "incorporated" into the Due Process Clause of the Fourteenth Amendment just as many other Bill of Rights provisions had by then been incorporated. *Ibid*; see also *McDonald v. Chicago*, 561 U. S. 742, 763–766 (2010) (majority opinion) (discussing incorporation). And a third path was that the First, Fourth, and Fifth Amendments played no role and that the right was simply a component of the "liberty" protected by the Fourteenth Amendment's Due Process Clause. *Roe*, 410 U. S., at 153. *Roe* expressed the "feel[ing]" that the Fourteenth Amendment was the provision that did the work, but its message seemed to be that the abortion right could be found *somewhere* in the Constitution and that specifying its exact location was not of paramount importance.

*Dobbs*, 142 S.Ct. at 2245. *Casey* narrowed its analysis to the concept of "liberty" protected by the Due Process Clause of the Fourteenth Amendment, but the *Dobbs* court made clear that its specific reversals of *Roe* (with its holding that the Constitution generally includes a right to abortion) and *Casey* (with its holding that it is squarely in the Fourteenth Amendment) are predicated on a general holding that the Constitution includes no right to abortion, explicit or implicit: "We therefore hold that the Constitution does not confer a right to abortion." *Id.* at 2279.

### B.    Rational basis review of abortion regulations is the controlling standard.

The *Dobbs* court ruled that rational basis review of abortion regulations is the controlling standard:

Under our precedents, rational-basis review is the appropriate standard for such challenges. As we have explained, procuring an abortion is not a fundamental constitutional right because such a right has no basis in the Constitution's text or in our Nation's history.

*Id*. at 2283.  As appellate courts are prone to do, the Court could have ruled that while there is no abortion right under the five amendments addressed, it could not decide on other sources of a right

since those had not been presented, and could then have let the Mississippi statute stand.  Had it

done so, it would have necessarily declined to impose a new standard of review.  But after rejecting

all constitutional bases that had been addressed in *Roe* and its progeny, it affirmatively held that

abortion regulations would henceforth be reviewed for rational basis. This precludes other

constitutional rights.

## II.      No other provision of the Constitution could confer a right to abortion as an original matter.

Neither *Roe*, *Casey* nor *Dobbs* addressed the Thirteenth Amendment.  But the Court here

has noted references to it in a law review article by Andrew Koppelman and an appellate court

case, *Jane L. vs. Bangerter*, 61 F.3rd 1505 (10th Cir. 1995).

The Thirteenth Amendment provides:

> **Section 1.** Neither slavery nor involuntary servitude, except as a
> punishment for a crime whereof the party shall have been duly
> convicted, shall exist within the United States, or any place subject
> to their jurisdiction.

> **Section 2.** Congress shall have power to enforce this article by
> appropriate legislation.

### A.      The Thirteenth Amendment's prohibition on involuntary servitude does not imply a constitutional right to abortion.

Even if the *Dobbs* holding had left open the possibility of a right to abortion being implicit

in a constitutional provision other than the Fourteenth Amendment, the Court's reversal of *Roe*

and *Casey*'s purported right to abortion equally forecloses any argument that a right to abortion is

implicit in the Thirteenth Amendment.  In fact, the argument that the Thirteenth Amendment's

prohibition against involuntary servitude implies a right to abortion is simply a mutated version of

arguments advanced in *Roe* and *Casey* to the effect that, lacking any historical basis in itself, "the

abortion right is an integral part of a broader entrenched right." *Dobbs*, 142 S.Ct. at 2257.  "*Roe*

termed this a right to privacy, and *Casey* described it as the freedom to make 'intimate and personal choices' that are 'central to personal dignity and autonomy.'" *Id.* (citations omitted).  The *Dobbs* Court devoted an entire section of its opinion to rejecting the Court's tactic in *Roe* and *Casey* of trying to shoehorn the right to abortion into a broader right. *Id*. at 2257-59.  For the same reasons, the Court would reject an attempt to shoehorn abortion within the freedom from forced labor guaranteed by the Thirteenth Amendment.[1]

Fundamentally, the *Dobbs* Court pointed out that no broadly framed rights such as "privacy" and "intimate choice" could be absolute; instead, "ordered liberty sets limits and defines the boundaries between competing interests." *Id.* at 2257.  For example, a family's right to privacy is limited by the state's right to protect children in cases of suspected child abuse. *See, e.g.*, *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994) (acknowledging "the amorphous boundaries between the Scylla of familial privacy and the Charybdis of legitimate governmental interests").  The liberty to make "intimate and personal choices" is limited by laws protecting public safety. *See, e.g.*, *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1376 (9th Cir. 1990) ("The police may therefore limit access to dangerous places and otherwise interfere with personal autonomy if such action is reasonably calculated to promote public safety.").  And, any general right to be free from involuntary servitude is abridged when necessary to implement selective service.  *See, e.g.*, *United States v. Holmes*, 387 F.2d 781, 784 (7th Cir. 1967) (internal citation omitted) ("The power of

---

[1] Although the Thirteenth Amendment's prohibition on involuntary servitude, unlike "privacy" and "freedom to make intimate and personal choices," is actually included in the text of the Constitution, no one could argue that the drafters or ratifiers of the Thirteenth Amendment either granted or intended to grant a right to abortion to all American women. *See Dobbs*, 142 S.Ct. at 2252-53 (outlining that abortion was a criminal offense in most of the United States in 1868, three years after the ratification of the Thirteenth Amendment); *see also id.* at 2255-56 (rejecting arguments from legislative motive in any case).  Thus, any argument based on the Thirteenth Amendment would be as atextual and ahistorical as *Roe* and *Casey*.

Congress to raise armies and to take effective measures to preserve their efficiency, is not limited by either the Thirteenth Amendment or the absence of a military emergency.").

Thus, any proposed new interpretation of an imputed constitutional right to privacy or intimate choice – and likewise of the explicit constitutional right to be free from involuntary servitude – must take into account competing interests. This is where previous constitutional holdings (such as those involving choice of marriage partner, contraception, right to guide the education of children, right to be free from involuntary sterilization) fail as analogs to abortion. Specifically, they fail because they do not involve the "competing interest" involved in a woman's decision to have an abortion: namely, the rights of an innocent, unborn human life:

> What sharply distinguishes the abortion right from the rights recognized in the cases on which *Roe* and *Casey* rely is something that both those decisions acknowledged: Abortion destroys what those decisions call "potential life" and what the law at issue in this case regards as the life of an "unborn human being." See *Roe*, 410 U. S., at 159 (abortion is "inherently different"); *Casey*, 505 U. S., at 852 (abortion is "a unique act"). *None of the other decisions cited by* Roe *and* Casey *involved the critical moral question posed by abortion. They are therefore inapposite.*

*Dobbs*, 142 S.Ct. at 2258 (emphasis added). Any attempt to read a right to abortion into the freedom from involuntary servitude guaranteed by the Thirteenth Amendment must fail for the same reason that the Court rejected abortion as an implication of "privacy" or "intimate choice." By its terms, the Thirteenth Amendment prohibits "involuntary servitude," or "enforced compulsory service of one to another." *Hodges v. United States*, 203 U. S. 1, 16 (1906). A slaveowner forces a slave to serve the financial interests of the slaveowner. By (extreme) contrast, in the case of abortion, a mother's body is necessary to allow the continued existence of an innocent, unborn human being. By equating a slaveowner with an unborn baby and the destruction of innocent, unborn human beings with emancipation from slavery, the Thirteenth Amendment

argument fails to grapple with what the *Dobbs* Court calls "the critical moral question posed by abortion": *i.e.*, that abortion destroys what millions recognize as an already existing, innocent, unborn, human life. *Dobbs*, 142 S.Ct. at 2258; *see also id.* at 2261 (faulting the dissenting opinion for failing to include "any serious discussion of the legitimacy of the States' interest in protecting fetal life.").

Of course, the *Dobbs* decision did not require United States citizens to endow the life of an innocent, unborn human being with any greater significance than the unjustly asserted financial interest of a slaveowner or, in a closer case, than his own mother's right to physical autonomy. *See, e.g.*, *Dobbs*, 142 S.Ct. at 2256 (clarifying that "our decision is not based on any view about when a State should regard pre-natal life as having rights or legally cognizable interests"); 2261 ("Our opinion is not based on any view about if and when prenatal life is entitled to any of the rights enjoyed after birth."). Instead, *Dobbs* acknowledged that weighing competing interests is the province of citizens and their legislatures, and refused to allow the Supreme Court to continue to substitute its own weighing of interests for that of each State's voters. *See, e.g.*, *id.* at 2257 ("Our Nation's historical understanding of ordered liberty does not prevent the people's elected representatives from deciding how abortion should be regulated."); 2259 ("Both sides make important policy arguments, but supporters of *Roe* and *Casey* must show that this Court has the authority to weigh those arguments and decide how abortion may be regulated in the States. They have failed to make that showing, and we thus return the power to weigh those arguments to the people and their elected representatives."). Hence, the Court's conclusion that no "right" to abortion is even "implicitly protected *by any constitutional provision*." *Dobbs*, 142 S.Ct. at 2242 (emphasis added).

B.    **The *Bangerter* Case**

In the 10th Circuit *Bangerter* case, Plaintiffs had challenged a Utah law restricting abortion. They made predictable arguments about its conflict with *Roe* and *Casey*, but also argued involuntary servitude under the Thirteenth Amendment, as well as Establishment Clause and equal protection claims.

The trial court considered the Thirteenth Amendment, Establishment Clause, and equal protection claims, found them frivolous, and awarded fees to the defendants. But the 10th Circuit Court of Appeals addressed the issue of frivolity at some length and reversed the trial court's ruling. It did not do so because it found merit to the claims, but only because it found that they were not frivolous. The court pointed out what we all know, which is that a litigant need not argue only on existing law, but may also argue in good faith for a change to it.

When it addressed the attorney fees at length in its opinion, the appellate court stated in pertinent part:

> DEFENDANTS' ATTORNEYS FEES
>
> The district court awarded defendants attorneys fees against plaintiffs upon holding that the involuntary servitude, Establishment Clause, and equal protection claims were frivolous. Jane L. IV, 828 F. Supp. at 1554-56. Plaintiffs vehemently dispute this conclusion.
>
> [ ]
>
> At the time this lawsuit was filed, at least one Supreme Court Justice favored overturning Roe v. Wade, see Webster v. Reproductive Health Servs., 492 U.S. 490 at 532-37, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (Scalia, J., concurring), and several Justices had questioned the strict scrutiny review mandated by Roe, see id. at 513-22 (Rehnquist, C.J., joined by White and Kennedy, JJ.); id. at 530 (O'Connor, J., concurring). The Utah abortion law was designed to test Roe in this time of great uncertainty, attempting to force [*1514] a sharp turn in abortion jurisprudence that would permit a state to ban abortions pre-viability. Plaintiffs framed the present lawsuit against this backdrop of expressed hostility toward Roe. Just as defendants may have hoped to chart a new course for abortion

jurisprudence, plaintiffs hoped to preserve a woman's right to an abortion. Plaintiffs therefore reached for alternative theories that the Supreme Court had not squarely rejected.

We initially note that the district court in Jane L. II gave the involuntary servitude, Establishment Clause, and equal protection arguments more than cursory review. While it granted defendants' motion for summary judgment on these claims, it did not at that stage label any of the arguments frivolous. If these alternative theories were truly frivolous, the district court would have had no need to engage in prolonged and fact-specific inquiries. See Hughes v. Rowe, 449 U.S. at 15-16.

Defendants explicitly note that the Supreme Court has chosen not to address the equal protection and involuntary servitude arguments on various occasions, but at the same time implicitly concede that the Court has not rejected these arguments.

[ ]

Plaintiffs argued below that Utah's ban on abortions throughout pregnancy constituted involuntary servitude in violation of the Thirteenth Amendment. The district court rejected this argument, holding as a matter of law that the Utah abortion statute does not violate the Thirteenth Amendment. Jane L. II, 794 F. Supp. at 1548-49. In Jane L. IV, the district court labeled this argument frivolous. 828 F. Supp. at 1554-55.

[ ]

Without expressing a view on the merits of the involuntary servitude argument, we hold that it is not frivolous.

*Jane L. v. Bangerter*, 61 F.3d 1505, 1514 (10th Cir. 1995) (emphasis added).  As the court here knows, a finding that an argument is not frivolous is nowhere near a finding that it has merit.  When it actually addressed the Thirteenth Amendment argument and affirmatively rejected it, the trial court in Jane L. II had stated:

INVOLUNTARY SERVITUDE

In their Sixth Cause of Action, plaintiffs allege that the Utah Act violates the Thirteenth Amendment of the United States Constitution.  The Thirteenth Amendment declares that "neither slavery nor involuntary servitude, except as punishment for a crime

10

whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

The Supreme Court recently observed that "while the general spirit of the phrase "involuntary servitude" is easily comprehended, the exact range of conditions it prohibits is harder to define." United States v. Kozminski, 487 U.S. 931, 942, 101 L. Ed. 2d 788, 108 S. Ct. 2751 (1988). Turning to prior decisions involving the Thirteenth Amendment, the Court concluded in Kozminski that "in every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." Id. at 943 (emphasis added).

In an early case, the Supreme Court described the parameters of the Thirteenth Amendment thusly:

The amendment was not intended to introduce any novel doctrine with respect to certain descriptions of service which have always been treated as exceptional; such as military and naval enlistments, or to disturb the right of parents and guardians to the custody of their minor children or wards."

Robertson v. Baldwin, 165 U.S. 275, 282, 41 L. Ed. 715, 17 S. Ct. 326 (1897) (emphasis added).

At the time of the ratification of the Thirteenth Amendment, December 18, 1865, 27 of the 36 states had enacted statutes prohibiting abortion, including 21 of the 27 ratifying states. U.S.C.A., Amendment XIII, Historical Notes; Roe v. Wade, 410 U.S. 113, 175, 35 L. Ed. 2d 147, 93 S. Ct. 705 and 176 n.1 (Rehnquist, J., dissenting) (1973). Given this historical context, the contention that one of the purposes of the Thirteenth Amendment was to secure the right of elective abortion totally lacks merit.

Plaintiffs argue that prohibiting elective abortions forces women into "slavery" or "involuntary servitude" by carrying a child to term. It strains credulity to equate the carrying of a child to term with "compulsory labor," and the argument borders on the frivolous. Accordingly, this court finds that the Utah Act's requirements, as a matter of law, do not violate the Thirteenth Amendment.

<u>Jane L. II</u>, 794 F. Supp.1537, 1547 (D. Utah 1992).  The court later found that the argument was frivolous and ordered fees.  As set forth above, the appellate court that reversed that ruling reversed only the finding of frivolity, not the finding as to the merits.

### C.   Law Review Article by Andrew Koppelman

The court draws attention to the law review article by Andrew Koppelman.

In *Forced Labor: A Thirteenth Amendment Defense of Abortion*, 84 Nw. U. L. Rev. 480 (1990), Mr. Koppelman readily acknowledges the flawed efforts to conjure an abortion right from elsewhere in the Constitution, insisting it resides more explicitly in the Thirteenth Amendment's prohibition of involuntary servitude.

Thirty years before *Dobbs*, <u>he dismisses the important idea that *Dobbs* has turned upon</u>: That unlike other rights the court has found are protected by the Constitution, a right to abortion would arguably recognize a right of one person to take the life of another.

Mr. Koppelman anticipates the problem and deals with it directly. He cites *Roe* for the idea that a pregnant woman "cannot be isolated in her privacy." He cites *Thornburgh vs. American College of Obstetricians and Gynecologists*, 476 U.S 747 (1986) (White, J. dissenting) for the acknowledgement that "the termination of a pregnancy typically involves the destruction of another entity: the fetus." He criticizes a privacy based defense of abortion because "it seems to depend on the premise that the woman's choice affects only herself - in other words, that the fetus is not a person. And this premise is, of course, impossible to prove."  He even acknowledges at footnote 12 that "the reasons the [*Roe*] court provided for concluding that a fetus is not a person are hardly persuasive."

Mr. Koppelman has two responses to the possible personhood of the fetus, beginning at page 484: First, that it doesn't matter. That the right to the aid of the mother doesn't follow from it. That giving the person of the fetus the right to the use of the mother's body, even to save its

own life, is just what the Thirteenth Amendment forbids. His second response puts a burden on the state and neatly asserts it can never be met: The constitutional right to be free of involuntary servitude requires the state to prove the justification for an imposition upon it. He says this is impossible because "no one knows how to prove (or disprove) that the fetus is, or should be considered, a person. The mere possibility that it *might* be is not enough to justify violating women's Thirteenth Amendment rights by forcing them to be mothers." He implicitly acknowledges here that if the proof went beyond the "might", and personhood were established or legislated, the imposition of pregnancy would be justified. He overlooks the fact that it is the legislatures, and only the legislatures, that can appropriately pass law on that subject.

But the flaw in his position is more fundamental, and he cannot escape it while acknowledging that the fetus is, or may be, a person: The imposition of pregnancy on one person and the imposition of death on another are hardly comparable. If the baby must <u>die</u> before imposing <u>pregnancy</u> on the mother, why shouldn't the mother <u>endure pregnancy</u> before imposing <u>death</u> on the baby? Wouldn't uncertainty around personhood require the less draconian choice that preserves both? Analogizing the pregnant woman to a slave analogizes the baby to the slaveholder. But no slaveholder had to die to free his slave.

There is a final flaw in Mr. Koppelman's idea. His sees involuntary servitude as the unjust dominion over another person's body. But most Americans have probably seen the moving ultrasounds of living babies, or even photographs of aborted babies. Can there be any better example than abortion of unjust dominion over another person's body? If the Thirteenth Amendment applies anywhere outside of slavery, it not only does not protect abortion, it prohibits it.

Mr. Koppelman's argument, and the predictable responses to it here, illustrate the overarching problem his position would usher in. The definitions of murder in its various degrees, the prohibition and punishment of it, and even the exceptions, have for good reason been the prerogative of the state legislatures. By finding an unexpressed right to abortion in the Constitution, <u>Roe</u> took this fundamental moral issue, central to the self-governance of a free people, away from the deliberative bodies uniquely suited to debate the matter and vote on the question. Fifty years of discord and eventual reversal have demonstrated the error in the effort. **By reading the same right into the Thirteenth Amendment that plainly doesn't contemplate it, Mr. Koppelman would have us repeat the very same mistake.**

### III.    The current crux of this case and the scope of the statutes charged.

Unlike *Dobbs*, the FACE Act <u>is</u> confined to the Fourteenth Amendment and the Interstate Commerce Clause. The Fourteenth Amendment has been fully addressed in *Dobbs*. The Commerce Clause has been relied upon exclusively by the United States here.

**A.    The Supreme Court's decision In *Dobbs*, that there is no constitutional or other federal right to abortion, deprives Congress of Commerce Clause authority for the FACE Act and removes abortion from the "rights" protected by the conspiracy statute.**

1.    The FACE Act as applied against Handy cannot be upheld as a proper exercise of congressional power based on the Commerce Clause.

The Government argues that the *Dobbs* decision does not impact the validity of the FACE Act because the FACE Act is not limited "by statute or otherwise to abortion care." (DOJ Resp., p. 3). The Government advances essentially the same argument with respect to the Section 241 conspiracy charge brought against Handy. ("The FACE Act creates a federal right to obtain and provide, and to seek to obtain and provide, available reproductive health services free from force, threats, and physical obstruction, see 18 U.S.C §248 (c)(1), and it is *this* right against which the

Defendant and her co-defendants conspired in violation of §241." (DOJ Resp., p. 8).   The Government maintains that post-*Dobbs* the commerce clause remains a basis for upholding the FACE Act as a proper exercise of Congressional power because FACE is not limited to abortion but encompasses "reproductive health care".  (DOJ Resp., pp. 3).

As discussed *infra*, the Government's suggestion that, in enacting FACE, Congress intended to regulate a broader class of "reproductive health  care" and not abortion, is belied by FACE's legislative history.  Moreover, Handy has challenged the application of FACE *to her* on the basis that an anti-abortion sit-in at an abortion clinic constitutes, at most, a noneconomic local offense that has no connection to interstate commerce.  (See Dkt 159, p. 6).  A defendant may challenge "a defect in the indictment or information"—including its constitutionality—as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). In making such a challenge, a defendant may challenge a statute as unconstitutional on its face or as applied to the conduct alleged. *See Hodge v. Talkin*, 799 F.3d 1145, 1156–57 (D.C. Cir. 2015). In order to show that a statute is facially unconstitutional, a defendant must demonstrate that the statute is unconstitutional in all of its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013). In contrast, an as-applied challenge need only show that the statute is "an unconstitutional exercise of congressional power" as applied to the defendant's alleged conduct. See *Speet*, 726 F.3d at 871.

In this case, Handy has asserted an as-applied challenge.  (*Id.*, p. 3).  In response to that as-applied challenge, the Government argues that Handy has not established that, in all instances, the application of FACE would violate the commerce clause.  The Government argues that FACE is a valid exercise of Congressional power under the commerce clause because it applies to

"reproductive health care" and is not limited to "abortion care." (Dkt 198, pp. 3-4). But "abortion care" is the only conduct at issue in this case.

2.    In enacting FACE, Congress intended to regulate abortion, not a general class of "Reproductive Health Care."

Contrary to the Government's suggestion that Congress predicated its authority under the commerce clause on the impact of "reproductive health care" (rather than "abortion care") on interstate commerce, the legislative history of the FACE Act makes clear it was enacted to regulate "abortion care". FACE was not enacted to generally regulate conduct relating to "reproductive health care." As introduced by Senator Kennedy on March 23, 1993, FACE was explicit in its purpose of protecting abortion and abortion alone. Senate Bill 636 recited that it was introduced in response to the Supreme Court's decision two months earlier in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). *Bray* held that pro-life activists could not be held liable under 42 U.S.C. §1985(3), the civil counterpart to 18 U.S.C. § 241, for their actions in trespassing and obstructing access to abortion facilities. In *Bray*, the plaintiff abortion facilities had originally succeeded in obtaining a permanent injunction against Operation Rescue and certain individuals for "conspiring to deprive women seeking abortion of their right to interstate travel" and enjoining them "from trespassing on, or obstructing access to abortion clinics in specified Virginia counties and cities in the Washington, D.C. metropolitan area" *Bray*, 506 U.S. 263 at 267.

In Section 2 of the bill, Statement of Findings and Purpose, for example, it recited:

(a) Findings. Congress finds that –

(1) medical clinics and other facilities **offering abortion services** have been targeted in recent years by an interstate campaign of violence and obstruction aimed at closing the facilities or physically blocking ingress to them, and intimidating **those seeking to obtain abortion services**;

[ ]

(8) in the *Bray* decision, the Court denied a remedy under such section to persons injured **by the obstruction of access to abortion services**;

(9) **legislation is necessary to prohibit the obstruction of access by women to abortion services** and to ensure that persons injured by such conduct, as well as the Attorney General, can seek redress in the Federal courts;

(10) **the obstruction of access to abortion services can be prohibited**, and the right of injured parties to seek redress in the courts can be established without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or other law….

(Emphasis added).  Senate Bill 636 - - Freedom of Access to Clinic Entrances Act of 1994,

103rd   Congress   (1993-1994),   https://www.congress.gov/bill/103rd-congress/senate-

bill/636/text/is?r=29.  The purpose of the Act was also explicitly stated:

(b) Purpose.  It is the purpose of this Act to protect and promote the public health and safety by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with **a person seeking to obtain or provide abortion services**, and the destruction **of property of facilities providing abortion services**, and by establishing the right of private parties injured by such conduct, as well as the Attorney General in appropriate cases, to bring actions for appropriate relief.  *Id*. at Sec. 2(b).  [Emphasis added.].

Similarly, the operative section setting forth the prohibited conduct (which eventually

became Sec. 248 (a)(a) and (2) explicitly referred to abortion:

(a) Prohibited Activities.  Whoever –

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from –

(A)    **obtaining abortion services**;

(B)    lawfully aiding another person **to obtain abortion services**; or

17

> (2) intentionally damages or destroys the property of a medical facility or in which a medical facility is located or **attempts** to do so, **because such facility provides abortion services**, shall be subject to the penalties provided in subsection (b) and the civil remedy provided in subsection (e).

*Id.* at Sec. 3 (emphasis added).  As reported out of the Senate Committee on Labor and Human Resources on July 29, 1993, the language referring to "abortion" or "abortion services" was modified to "abortion-related services." S. REP. 103-117, 50 (1993), attached hereto as Exhibit "B".  Eventually, of course, "abortion-related services" became "reproductive health services" in the final version.  That these explicit references to abortion and abortion services were later softened to refer to "reproductive health service" does not change the fact that the underlying purpose of the Act , from its inception, was to protect abortion.

Congress ultimately adopted the FACE Act via Public Law 103-259, which provides in Section 2 that it was enacted "[p]ursuant to" both the Commerce Clause *and* "section 5 of the fourteenth amendment to the Constitution." PL 103-259, May 26, 1994, 108 Stat 106. The Senate Committee Report further clarified that the Act "*seeks to protect the right to terminate pregnancy, a right that falls squarely within the rights guaranteed by the Fourteenth Amendment*"; it also noted that the Supreme Court had recently "reaffirmed its longstanding holding that a woman's decision to terminate her pregnancy prior to fetal viability is protected from state interference by the Fourteenth Amendment's liberty clause. S. Rep. 103-117 (1993), at 32 (emphasis added); *see also id.* (stating that "the Committee concludes that Congress has the authority under the Fourteenth Amendment to reach the private conduct prohibited by" the Senate bill).  Attorney General Reno advised that "there is no other Federal law that would be generally applicable to private interference with a woman's *right to choose*," rendering the FACE Act "*therefore necessary*." S. Rep. 103-117, at 18 (emphasis added).  In turn, the House Committee Report stated

that the Act sought to remedy a "campaign of violence" that "has resulted, as intended, in access to the *constitutionally protected right to choose* being denied to thousands of women nationwide against their will," and found "that Federal legislation is needed to put a stop to the violence and disorder and to *restore access to constitutionally protected rights*." H.R. Rep. 103-306 (1993), at *703. A copy is attached hereto as <u>Exhibit "C"</u>.

The legislative debates, too, are filled with supporters' statements that the FACE Act was *necessary* to protect and facilitate the so-called constitutional "right to choose." As bill sponsor Senate Kennedy put it, the FACE Act sought to restrict "protestors [from] seeking to block exercise of *constitutional rights*," S 15667, and noted that "[e]ven where the blockades and invasions do remain peaceful, they still obstruct access to the facility *depriving women of the ability to exercise their constitutional right to choose* or to obtain other health care offered by the facility." 139 Cong. Rec. S15667, S15669;[2] *see also id.* at S 15667 (Sen. Sen. Wellstone) ("having been a small part of th[e] civil rights movement, we were involved in trying to make sure . . . every citizen had a constitutional right"; "I think the civil rights analogy is precisely the opposite [sic]. *It is the law of the land that women have a right to go to the clinic and have a right to choose to have an abortion*," and "that constitutional right is being blocked much like the right to be able to eat at a lunch counter regardless of the color of one's skin was really being denied a group of citizens. *Thus, there is a need for a federal role*"); 15670 (Sen. Boxer) (similar); 15672 (Sen. Feinstein) (similar); 15678 (Sen. Lautenberg) ("women of this country must have a real right to choose, not an abstract one"; FACE is necessary to protect "this constitutional right"); 15679 (Sen. Harkin) ("The right to

---

[2] While the views of a bill sponsor are not "controlling," *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012) they are still material to a law's meaning and purpose, *United States v. Cong. of Indus. Organizations*, 335 U.S. 106, 138 (1948); *Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*, 300 U.S. 440, 464 n.8 (1937).

choose is protected under the Constitution . . . and this measure is intended to ensure that women may exercise that right"); *id.* (Sen. Packwood) ("This act would provide a critical safeguard to the right of all women . . . to choose to have an abortion"); 15681-82 (Sen. Bryan) (Act "necessary to guarantee the right to choose can be exercised"); 15682 (Sen. Durenberger) (Act remedies conduct "directed at denying women their constitutionally protected right to choose"). *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976) (recognizing that "[t]he debate on the Senate floor" can "lend[] further support to" a given "reading of the" of the bill at issue).

The House debate was no different. *See* 139 Cong. Rec. H10073, attached hereto as <u>Exhibit "D"</u> (Rep. Schumer, *chief sponsor of the House bill*) ("This is a very simple bill that says, if there is a concerted effort to take away a *Federal right, then should the Federal Government step in* or [else] . . . let that Federal right continue to be violated time after time after time. That is what this bill is all about."); H10076 (Schumer) ("Our great system of individual rights means nothing if we cannot exercise our rights peacefully . . . this bill is first and last a civil rights bill. And it shares the common purpose of all great civil rights legislation.  It simply ensures that American can exercise their [underlying] *rights*—free from terror, free from violence, and free from intimidation"); H10069 (Rep. Schroeder) (This "is about . . . citizens able to have constitutional rights and able to exercise them in the way that anyone with an American citizenship birthright should be able to . . . Let us guarantee women their constitutional rights to health care"). H10071 (Rep. Furse) ("[W]e must pass H.R. 796 to protect a woman's right to choose, a right which is guaranteed by the U.S. Constitution."); H10074 (Rep. Brooks) ("Federal Government is obliged to step in and protect the free exercise of constitutional rights" where local law enforcement unable . . . "[t]he history of the labor and the civil rights movements bear witness to this fact"; "it is incumbent upon the Federal Government to do so again, for today women are being prevented

from [] freely exercising their constitutional rights to privacy"); H10087 (Rep. Collins) ("It protects . . . the right to choose your doctor without fear of violence"); H10089 (Rep. Andrews) (must "enact legislation to protect a woman's ability to exercise her constitutional right to an abortion"); H10090 (Rep. Skaggs) ("We must ensure that people with a constitutional right to choose an abortion have the necessary freedom from harassment to exercise that right."); H10107 (Rep. Moran) ("the right to choose will be a right in theory only" without the Act; urges colleagues to "take a stand against violence, and reaffirm our Constitution"); H10108 (Slattery) ("[A] woman's right to choose as defined by the U.S. Supreme Court would be preserved by this legislation.").

Accordingly, the FACE Act was unquestionably predicated on, and enacted to protect and facilitate, what Congress then believed to be the "civil right" of abortion. But that "civil right" was a nullity.

The decision in *Terry v. Reno*, 191 F.3d 1412, 1415-1416 (D.C. Cir. 1996), upon which the Government heavily relies (DOJ Resp., pp. 5-7), is supportive.  In *Terry*, the Court found that the legislative record supported "Congress's finding that the activities *of anti-abortion activists* affect interstate commerce" (*Terry*, 191 F.3d at 1416; emphasis added).  But as the Court noted, that finding presupposed the existence of a national market for abortions, that no longer exists in the wake of *Dobbs*.

"'It is this *threat to a national market,*'" the Seventh Circuit observed, 'which Congress found to be scarce and declining in availability, that distinguishes Congress's authority to regulate in this case from its probable lack of authority to regulate, for example, shoplifting....'" *Terry*, 191 F.3d at 1418, citing *United States v. Wilson*, 73 F.3d 675, 682 (7th Cir. 1995) (with emphasis added in *Terry*)).

3.      After *Dobbs*, abortion is no longer a proper consideration.

In *Norton v. Ashcroft,* 298 F.3d 547, 558 (6th Cir. 2002), the Sixth Circuit expressly acknowledged that it was abortion, specifically, not "reproductive health services" generally, that undergirded FACE: "Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude the activities prohibited by the Act **disrupted the national market for abortion related services** and decreased the availability of such services." (Emphasis added.) After *Dobbs*, however, protection of access to abortion and "abortion-related services" is no longer a proper concern in federal law, and FACE cannot be sustained on the basis that it is.   See *e.g.*, *U.S. v. McMillan*, 946 F. Supp. 1254, 1259 (S. D. Miss. 1995) ("Congress passed FACE to enforce protection of both the substantive right of women to obtain abortion-related services and equal protection of the law where state officials are either unable or unwilling to provide that protection", summarizing position of the plaintiff, U.S. Government); *U.S. v. Wilson*, 880 F.Supp. 621, 636 (E.D. Wis. 1995), *rev'd*, 73 F. 3d 675  (7th Cir. 1995) ("Finally, the Government argues that FACE is a valid exercise of **Congress' inherent power to pass laws that protect the exercise of fundamental rights, including the right to an abortion** recognized by the Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1993) [Emphasis added]).

4.      After Dobbs, the Conspiracy Against Rights statute cannot apply to Defendants' conduct.

Contrary to the Government's argument (Resp. 8), *Dobbs* has *direct* "bearing" on Defendants' charges under 18 U.S.C. § 241 and requires dismissing them. Indeed, § 241 prohibits only conspiracies only against *federal civil rights*, as its background and interpretative caselaw make clear. And here, the FACE Act's enacting law and legislative history both explain that it was adopted pursuant to Section 5 of the Fourteenth Amendment, to protect the now defunct federal civil right to abortion. But after *Dobbs*, accessing reproductive health facilities *for the purpose of*

*obtaining an abortion* is no longer a federal civil right—indeed, it is now illegal in many states.[3] Moreover, the Government does not attempt to show, and the superseding indictment does not show, that Defendants had any intent other than to hinder access *to abortion*, not other reproductive health services. Thus Defendants cannot be held to have engaged in a "conspiracy against rights" under § 241 (which requires showing specific intent to violate a federal civil right), rendering the conspiracy charges entirely and utterly meritless.

**Section 241 prohibits conspiracies against federal civil rights.**

Section 241 was adopted in 1870 in response to "the doings of the Ku Klux [Klan] and the like," after "much agitated criticism in the Congress and in the Nation because of the continued denial of rights to Negroes, sometimes accompanied by violent assaults." *United States v. Price*, 383 U.S. 787, 800, 802 (1966). Thus "from [its] original enactment" § 241 "was intended to deal . . . with conspiracies to interfere with *Federal rights*." *Id.* at 803 (emphasis added). The Supreme Court has also declared that "[t]he purpose and scope of [§ 241] must be viewed against the events and passions of the time," including the "increasingly turbulent" "[r]elations between" black and "white" people, evidenced by the emergence of the "K[lu] Klux Klan . . . by southern whites in 1866"; and should be seen in light of the only statement of legislative history explaining the law's purpose (by Senator Pool of North Carolina), "urg[ing] that the Section was needed in order to punish invasions of the newly adopted Fourteenth and Fifteenth Amendments to the Constitution." *Id.* at 804-05.

Critically, while § 241 has also been held to reach conspiracies against other rights, *see id.*, at 805 n.18, it is not without limits. In *Price*, for instance, the Supreme Court had little trouble applying

---

[3] New York Times, "tracking the States Where Abortion Is Now Banned," Updated Feb. 10, 2023, https://www.nytimes.com/interactive/2022/us/abortion-laws-roe-v-wade.html.

the conspiracy statute to three Mississippi police officers and a gang of 15 conspiring individuals who, at varying points, falsely arrested, released, re-captured, and then murdered three African Americans who had been civil rights workers. *Id.* at 789-80. The Supreme Court held that the conspiracy at issue, including the participation of the private individuals who acted jointly with the police officers, was "within the ambit of the Fourteenth Amendment," and that § 241 applied to violations of the Fourteenth Amendment by state actors. *Id.* at 794-95, 799. But the Supreme Court qualified its ruling in important ways.

Specifically, in the final paragraph of this landmark decision, the Supreme Court specified that "[t]he present application of the statutes at issue" was permissible because it "does not raise *fundamental questions of federal-state relationships*." *Id.* at 806 (emphasis added). It noted also that the defendants' conspiracy to blatantly (and outrageously) violate the African American victims' Fourteenth Amendment rights was "a *direct, traditional concern of the Federal Government*," as it pertained to "an *area in which the federal interest has existed for at least a century*, and in which *federal participation has intensified as part a renewed emphasis upon **civil rights***." *Id.* (emphasis added). The Supreme Court also pointed up the importance of § 241's link to "the *federal role* in the establishment and vindication of *fundamental rights*," and that the holding in *Price* was "a decision interpreting [§ 241] *in accordance with its historical design*." *Id.* (emphasis added).

     5.    After Dobbs, there is no federal civil right to access abortion facilities for the purpose of obtaining an abortion.

In *Dobbs*, the Supreme Court held that its decision in *Roe v. Wade* recognizing a fundamental right to abortion "was on a collision course with the Constitution from the day it was decided." *Dobbs*, 142 S.Ct. at 2265. It stated that the Court in *Roe* "wield[ed] nothing but 'raw judicial power,'" and "usurped the power to address a question of profound moral and social

importance that the Constitution unequivocally leaves for the people." *Id.* (quoting *Roe v. Wade*, 410 U.S. 179, 222 (White, J., dissenting)). The Supreme Court also held that a right to abortion is not "deeply rooted in this Nation's history and tradition," including because "such a right was entirely unknown in American law" until the 20th Century, with "three quarters of the States [having] made abortion a crime at all stages of pregnancy" at the time of the Fourteenth Amendment's adoption. *Id.* at 2242-43. *Dobbs* thus makes clear that there never was any "constitutional right to choose [abortion]" in the first place.

Accordingly, there is no longer (and never was) a *federal civil right* to unimpeded access reproductive health care facilities (whatever one's *state and local rights* to be free from assaults and obstructions on public rights-of-way and in accessing clinics, etc.) to exercise a supposed (but not actual) civil right to obtain an abortion. Indeed, even if the FACE Act is supported by the Commerce Clause, it does not validly "protect the right to terminate pregnancy, a right that" Congress mistakenly believed "falls squarely within the rights guaranteed by the Fourteenth Amendment" at the time of the Act's adoption. S. Rep. 103-117 (1993), at 32. This mistaken belief is why Congress had characterized the Act as "a civil rights bill." 139 Cong. Rec. H10076 (Rep.Schumer); *accord* S15667 (Sen. Sen. Wellstone);  H.R. Rep. 103-306 (1993), at *703. But the Court in *Dobbs* specifically held that the "profound moral question" involved in abortion— and thus in accessing abortion—is necessarily reserved to "the citizens of each State" who may "regulat[e] or prohibit[] abortion." *Dobbs*, 142 S.Ct. at 2228. Thus in states now prohibiting abortion, there is no "right" at all to access reproductive health care facilities to obtain an abortion. It follows that because there is no federal civil right to abortion under *Dobbs*, there can be no *federal civil right* to unimpeded access to reproductive health care facilities for the purpose of

obtaining an abortion. *Accord* 139 Cong. Rec. H10073 (Rep. Schumer) ("[I]f there is a concerted effort to take away a Federal right, *then* [] the Federal Government [should] step in.").

This brings into clear relief why the federal conspiracy charges under § 241 here are wholly invalid. As noted, the Supreme Court has held that § 241 "was intended to deal [only] with conspiracies to interfere with *Federal rights*." *Price*, 383 U.S. at 803 (emphasis added, internal quotes omitted). But accessing abortion—the FACE Act's *raison d'être*—is no longer a *federal right*, but is rather a "profound moral question" that has "return[ed] . . . to the people and their elective representatives." *Dobbs*, 142 S. Ct. at 2284. Thus, unlike previously upheld applications of § 241, applying it to conduct that intentionally impedes access to abortion plainly "raise[s] fundamental questions of federal-state relationships," *Price*, 383 U.S. at 806, as states and localities now have primary authority over this issue. It can also no longer be deemed "a *direct, traditional concern* of the Federal Government," in "an area in which the federal interest has existed for at least a century." *Id.* In *Dobbs* the Supreme Court made clear that there was no historical right to abortion *at all*, given its "unlawful[ness]" under the common law and its criminal prohibition at all stages by 28 out of 37 states by 1868, and 36 of 37 states by 1910. *Dobbs*, 142 S. Ct. at 2248, 2253. *Cf. United States v. Waddell*, 112 U.S. 76, (1884) (upholding application of § 241 to conspiracy to violate federal rights under the Homestead Act of 1862 as authorized by Art. 4, § 3 of the Constitution "vest[ing] in congress 'the power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States.'"). Accordingly, here application of § 241 does not "vindicate[e] [] fundamental rights" that are *historically* the *direct* "concern of the Federal Government." *Price*, 383 U.S. at 806. Thus the § 241 charges here are plainly invalid.

6.    The Government does not and cannot show that Defendants had specific intent to impede access to non-abortion services.

While it's true the FACE Act protects access to "reproductive health services" beyond abortion, *see* 18 U.S.C. § 248(e)(5), it also blackletter law that violation of § 241 (as a federal conspiracy statute) requires that a "specific intent to interfere with [a] Federal right must be proved." *United States v. Guest*, 383 U.S. 745, 760 (1966); *see also United States v. Ehrlichman*, 546 F.2d 910, 921-22 (D.C. Cir. 1976). Thus "a conspiracy to rob an interstate traveler would not, of itself, violate s 241[,] [b]ut if *the predominant purpose* of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then . . . the conspiracy becomes the proper object of the federal law." *Id.* (emphasis added). The Supreme Court recently clarified this precedent in interpreting 42 U.S.C. § 1985(3), since "42 U.S.C. § 241[ is] [its] criminal counterpart," in a civil suit by abortion facilities and organizations seeking an injunction against those obstructing access to abortion facility access. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993). The Supreme Court rejected the plaintiffs' argument that the defendants had conspired to violate the right to travel because "it does not suffice for application of § 1985(3)"—and thus of § 241—"that a protected right be *incidentally affected*." *Id.* (emphasis added). "The right must be *aimed at*; its impairment must be a conscious objective of the enterprise"; and the defendant must "do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part *for the very purpose of producing it*." *Id.* at 275-76 (internal quotes omitted, second emphasis added). Thus the Court rejected the civil conspiracy claim because the defendants "oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel." *Id.* at 276.

So too here with respect to Defendants' possible incidental impact on other "reproductive health services" beyond abortion. While the Superseding Indictment (SI) charges Defendants under § 241 for an alleged conspiracy to obstruct the provision of "reproductive health services," Doc. 113 at ¶¶8-9, it makes clear that the "Overt Acts" giving rise to the conspiracy charges were *aimed at* impeding access to *abortion*, not other reproductive health services. The SI alleges that Defendant Jonathan Darnell was involved from the beginning of the alleged conspiracy, and that, on the day in question and while he was outside of the building where the abortion facility was located, he created a Facebook event titled "*No one dies today*," with the captions: "Starting soon! Tune in!" *Id.* ¶¶13, 20 (emphasis added).  The remaining alleged co-conspirators "gathered in the hallway and stairwell outside of the Clinic's front door" "as [Darnell] announced [the] imminent Facebook event." *Id.* ¶21.  When the facility opened and the alleged co-conspirators began to variously obstruct access to the facility's main entrance and treatment area, Darnell started the Facebook livestream video by saying: "[W]e have people intervening physically with their bodies *to prevent women from entering the clinic to murder their children*." *Id.* ¶35 (emphasis added). He then entered the building and began broadcasting alleged co-conspirators obstructing the facility's entrances and stated that "[T]he *rescuers* are doing their job" by "not allowing women to enter the abortion clinic"; "As long as they're in there, no women can go in to *kill their children*." *Id.* ¶36 (alteration in original, emphasis added).

The superseding indictment shows that Defendants' specifically intended only to impede access to abortion, as revealed by Defendant Darnell's Facebook event and his express descriptions of the *purpose* of Defendants' actions, which was specifically to prevent *abortion* and not other "reproductive health services."

Even assuming arguendo that other, non-abortion "reproductive health services" can be the proper object of a § 241 conspiracy, "it does not suffice for application of [§ 241] that a protected right be incidentally affected" or "simply because [conduct] has an effect upon a protected right." *Bray*, 506 U.S. at 275. Here the SI confirms that the "conscious objective of the [alleged] enterprise," *id.*, and its "predominant purpose," *Guest*, 383 U.S. at 760, was to prevent women from obtaining abortion (i.e., that "No one dies today"), "*in spite of* its adverse effects upon" other services, *Bray*, 506 U.S. at 275 (emphasis added).

And as noted, after *Dobbs* an alleged conspiracy to interfere with access to abortion is not cognizable under § 241 because it does not involve deprivation of a *federal civil right*. Accordingly the Government has failed to plead, and the SI shows that it cannot prove, that Defendants had the requisite specific intent to be charged for federal conspiracy under § 241.

All the cases upholding FACE under the Commerce Clause arose prior to *Dobbs*. There remains a federal right to engage in interstate commerce. But where there is no federal right to abortion, and states are free to prohibit it, there is no federal right to engage in that particular interstate commerce.

Accordingly, Defendants' charges under § 241 and § 248 lack federal basis and must be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendant Lauren Handy respectfully requests that the indictment be dismissed.

**Respectfully submitted,**

*/s/ Martin A. Cannon*
Martin A. Cannon, Esquire (Admitted *Pro Hac Vice*)

Thomas More Society
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
Email: mcannonlaw@gmail.com
Phone: (402) 690-1484


*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire
Blerina Jasari, Esquire
Boyle & Jasari
1050 Connecticut Ave, Suite 500
Washington, D.C., 20036
Email:  dboyle@dennisboylelegal.com
        bjasari@dennisboylelegal.com
Phone: (202) 430-1900

*Counsel for Defendant Lauren Handy*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of March 2023, I electronically filed the foregoing

Motion and proposed Order with the Clerk of Court using the CM/ECF system, which will send

an electronic notification of such filing to all counsel of record.


*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire