# EXHIBIT B

S. REP. 103-117, S. Rep. No. 117, 103RD Cong., 1ST Sess. 1993, 1993 WL 286699 (Leg.Hist.)

P.L. 103–259, FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1994

**\*1** FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

DATES OF CONSIDERATION AND PASSAGE

Senate: November 16, 1993; May 12, 1994

House: November 18, 1993; March 17, May 5, 1994

Cong. Record Vol. 139 (1993)

Cong. Record Vol. 140 (1994)

Senate Report (Labor and Human Resources Committee) No. 103–117,

July 29, 1993 (To accompany S. 636)

House Report (Judiciary Committee) No. 103–306,

Oct. 22, 1993 (To accompany H.R. 796)

House Conference Report No. 103–488,

May 2, 1994 (To accompany S. 636)

SENATE REPORT NO. 103–117

July 29, 1993

[To accompany S. 636]

   The Committee on Labor and Human Resources, to which was referred the bill (S. 636) to permit individuals to have freedom of access to certain medical clinics and facilities, and for other purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| I. Introduction | 2 |
| II. Summary of the legislation | 2 |
| III. Hearings | 2 |
| IV. Need for the legislation | 3 |
| a. Anti-abortion violence, blockades and related activities are increasing in severity | 3 |
| b. The avowed purpose of this conduct is to eliminate access to abortion services | 11 |
| c. The Act addresses a problem that is nationwide in scope | 12 |
| d. Anti-abortion violence, blockades and related activities are having serious adverse effects on patients and providers | 14 |
| e. Existing laws are inadequate to protect patients and providers and keep clinics open | 17 |
| V. Explanation of the legislation | 22 |
| a. S.636 will protect health care providers and patients | 22 |
| b. The Act is fully consistent with the first amendment | 28 |

c. Congress has constitutional authority to enact the act............................................................. 30

VI. Summary of committee action.......................................................................................................... 33

VII. Regulatory impact statement.......................................................................................................... 35

VIII. Cost estimate statement................................................................................................................ 35

IX. Minority Views................................................................................................................................. 37

X. Changes in existing law.................................................................................................................... 50

**\*2** I. INTRODUCTION

On June 23, 1993 the Committee on Labor and Human Resources, by a vote of 13–4, ordered favorably reported S. 636, the Freedom of Access to Clinic Entrances Act of 1993, with an amendment in the nature of a substitute. Senators voting in favor of the bill were Senators Kennedy, Pell, Metzenbaum, Dodd, Simon, Harkin, Mikulski, Bingaman, Wellstone, Wofford, Kassebaum, Jeffords and Durenberger. Voting against were Senators Hatch, Coats, Gregg, and Thurmond.

The bill is cosponsored by Senators Boxer, Campbell, Feinstein, Harkin, Metzenbaum, Mikulski, Simon, Robb, Wellstone, Pell, Moseley-Braun, Feingold, Murray, Packwood, Lautenberg, Riegle, Inouye, Baucus, Kerry, Kassebaum, DeConcini, Specter, Reid, Leahy, Chafee, and Bryan.

II. SUMMARY OF THE LEGISLATION

The purpose of the Freedom of Access to Clinic Entrances Act of 1993 is to prevent the use of blockades, violence and other forceful or threatening tactics against medical facilities and health care personnel who provide abortion-related services, and provide appropriate criminal penalties and civil remedies for such conduct when it occurs.

The Act will accomplish this objective by amending the Public Health Service Act to prohibit the use or threat of force, or physical obstruction, to intentionally injure, intimidate or interfere with any person (or attempting to do so) because that person is or has been, or in order to intimidate such person or any other person or class of persons from, obtaining or providing abortion-related services; to prohibit the intentional damaging or destruction of the property of a facility (or attempting to do so) because it provides abortion-related services; to establish a civil cause of action for persons aggrieved by such conduct; and to authorize the Attorney General of the United States, as well as State Attorneys General, to bring civil actions for injunctive relief, compensatory damages for injured persons, and civil penalties.

III. HEARINGS

S. 636, the Freedom of Access to Clinic Entrances Act of 1993, was introduced on March 23, 1993. A hearing was held on May 12, 1993. The following persons presented testimony: Janet Reno, Attorney General of the United States; Dr. Pablo Rodriguez, Medical Director of Planned Parenthood of Rhode Island, Providence, RI; Willa Craig, Executive Director, Blue Mountain Clinic, Missoula, MT; David Lasso, City Manager, Falls Church, Va; Laurence H. Tribe, Tyler Professor of Constitutional Law, Harvard Law School; Joan Appleton, Pro-Life Action Ministries, St. Paul, MN; Carol **\*3** Crossed, Rochester, NY; and Nicholas Nikas, American Family Association, Tupelo, MS.

Written statements were provided by: the American Civil Liberties Union; Robert Abrams, Attorney General of the State of New York; the American Medical Association; the Religious Coalition for Abortion Rights; Elizabeth Eytchison, Freedom of Choice Action League; Diane Wahto, Wichita, KS; Vincent Cianci, Jr., Mayor of Providence, RI; Planned Parenthood of Rhode

Island; Dr. Curtis Boyd, Fairmount Center, Dallas, TX; Michael Stokes Paulsen, University of Minnesota Law School and Michael W. McConnell, University of Chicago Law School; David M. Smolin, Cumberland Law School, Samford University; and Donald Mckinney, Wichita, KS.

### IV. NEED FOR THE LEGISLATION

A nationwide campaign of anti-abortion blockades, invasions, vandalism and outright violence is barring access to facilities that provide abortion services and endangering the lives and well-being of the health care providers who work there and the patients who seek their services. This conduct is interfering with the exercise of the constitutional right of a woman to choose to terminate her pregnancy, and threatens to exacerbate an already severe shortage of qualified providers available to perform safe and legal abortions in this country.

From 1977 to April 1993, more than 1,000 acts of violence against abortion providers were reported in the United States. These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, and one murder. In addition, over 6,000 clinic blockades and other disruptions have been reported since 1977. [1]  The record before the Committee establishes that state and local law enforcement is inadequate to handle this situation, and that Federal legislation is urgently needed.

### A. ANTI-ABORTION VIOLENCE, BLOCKADES AND RELATED ACTIVITIES ARE INCREASING IN SEVERITY

1. The murder of Dr. David Gunn and other acts of violence against health care personnel

Violent tactics are being used increasingly across the country in order to deny women access to abortion. Since 1977, at least 84 incidents of assault and battery against abortion providers have been reported. [2]

One violent incident resulted in a doctor's death. On March 10, 1993, Dr. David Gunn, a physician who performed abortions at several clinics in northern Florida and neighboring States, was shot and killed during an anti-abortion demonstration outside a health clinic in Pensacola. An anti-abortion activist has been charged with first degree murder in the case. Dr. Gunn's death was a tragic end to years of threats, blockades, and personal attacks he had endured.  **4**  During the summer of 1992 at a rally sponsored by Operation Rescue in Montgomery, AL, "Wanted" posters bearing his photograph, home address and telephone number, and daily work schedule were distributed. After Dr. Gunn's death, the organizer of the Pensacola demonstration promised that "[m]ore babies are going to die, so we are going to try to stop that from happening. *** If it causes trouble, so be it." "Volunteer Doctors Step in for Gunn" Washington Times, Mar. 14, 1993, A3.

Other anti-abortion activists have shown a similar disregard for the life and well-being of physicians and other health care providers. An Operation Rescue coordinator in the Washington, D.C. area made this clear in his testimony before a House subcommittee:

Mr. LEVINE. *** Mr. Bray, you are quoted *** in the Washington Post on Tuesday, December 3, 1991, in the following way: "'Is there a legitimate use of force on behalf of the unborn?' Michael Bray asks rhetorically. 'I say, yes, it is justified to destroy the abortion facilities and yes, it is justified to–what kind of word should I use here? Well, they use terminate a pregnancy,' Jane Bray says. 'Yeah, terminate an abortionist,' he says." Are you suggesting that you believe it would be appropriate to kill somebody who is involved in the delivery of abortion services by the statement that you are quoted as having made in the Washington Post?

Mr. BRAY. Clearly. As far as an ethical question goes, yes.

Mr. LEVINE. Thank you. That's what I read it to mean, and I wanted to see whether, in fact, that was testimony you would provide to the U.S. Congress here today.

Mr. BRAY. That's it.

Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, May 6, 1992, at 170 (emphasis added).

Violent incidents against abortion providers have in fact occurred all across the country. In December 1991, a man in a ski mask opened fire with a sawed-off shotgun at an abortion clinic in Springfield, MO. Two clinic workers were wounded, one of whom was left paralyzed as a result. [3] In February 1988, five shots were fired through the front window of a clinic in Boulder, CO. A Florida nurse suffered neck injuries when the regional director of Rescue America broke into the clinic in which she worked and slammed her against a wall. [4]

The director of a Tennessee clinic testified that she was "pinched, hit, grabbed, kicked, and jammed against the door repeatedly" during a clinic blockade. Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218, 221 (6th Cir. 1991). In another incident, a lab technician was injured when blockaders stormed the clinic. American College of Obstetricians and Gynecologists, Pennsylvania Section v. Thornburgh, 613 F. Supp. 656 (D.C. Pa. 1985). "She had been repeatedly hit by the door which she tried to keep closed and  **5**  sustained injuries to her legs and back which caused her to miss two weeks of work." Id. at 661. The director of a Detroit clinic was dragged out of the clinic by her ankle and crushed by blockaders as she attempted to free the clinic's assistant director, who was pinned against the door. Brief of 29 Organizations Committed to Women's Health and Women's Equality as Amici Curiae in support of Respondents, Bray v. Alexandria Women's Health Clinic, No. 90–985 (U.S., filed May 13, 1991), pp. 58a–59a. In Michigan, a women's health clinic director, injured during an Operation Rescue attack, had to undergo extensive knee surgery as a result of the incident, and was unable to walk for seven weeks. Id., p.3.

These incidents demonstrate that all health care personnel involved in the provision of abortion services–physicians, physicians assistants, nurse practitioners, counselors, administrators and other clinic staff–face the risk of violent attack by abortion opponents.

2. Arson, bombings, firebombings, chemical attacks and other vandalism

Facilities at which abortion services are provided have increasingly been the target of arson fires, bombings, firebombings and chemical attacks. These incidents have not only destroyed millions of dollars worth of property, they have endangered lives and sharply curtailed access to health care for many women, particularly women living in rural areas.

Since 1977 there have been nearly 200 attempted or completed arsons, bombings and firebombings targeted at abortion providers. [5] In addition to destroying clinics and severely limiting access to health care, arson and bombings have resulted in injuries to firefighters and caused millions of dollars of property damage. [6] From January through May 1993 alone, three reported acts of arson in Florida, Texas, and Montana caused over $1.5 million in damages. [7]

Willa Craig, Executive Director of the Blue Mountain Clinic in Missoula, MT, described for the Committee the devastating effects of an arson fire that totally destroyed her clinic on March 29, 1993, following several years of escalating blockades and demonstrations aimed at the clinic. Blue Mountain is a non-profit facility that, before the fire, offered a wide range of health care services including prenatal care and delivery, childhood immunizations, diagnosis and treatment of sexually transmitted infection, and contraceptive services, as well as first trimester abortions. Seventy percent of the clinic's prenatal program was comprised of Medicaid patients who would have difficulty obtaining obstetrics care elsewhere. Many of the clinic's patients travelled an average of 120 miles for their appointments due to lack of services in their own areas. Testimony of Willa Craig, Senate Committee on Labor and Human Services, May 12, 1993.

**\*6**  The arson fire drastically curtailed the ability of Blue Mountain Clinic to meet the health needs of its patients, including "Western Montana's growing population of uninsured, working poor, and Medicare/Medicaid dependent citizens." Id. Ms. Craig told the Committee:

Since the fire, we have been able to re-establish only a fraction of our previous services. *** [O]ur internist is able to see only about 40 percent of her usual patients. We are unable to accept any new patients, particularly new prenatal patients, and our pediatric care is completely on hold. The demand for abortion services in our area is not being met by the few physicians accepting our referrals.

Id. Ms. Craig also testified that a similar 1992 arson fire caused extensive damage to a Planned Parenthood clinic in Helena, MT. Id.

Anti-abortion extremists have recently added to their arsenal the introduction of noxious chemicals into clinic facilities in an effort to render them unusable. Since January, 1992, 71 chemical attacks have been reported in at least 15 states, causing at least $500,000 in damage. [8] One chemical used with increasing frequency is butyric acid, which creates an intolerable stench and causes nausea, vomiting, headaches, dizziness, inflamed eyes and skin, and difficulty in breathing. Butyric acid has been poured through holes drilled in clinic walls, sprayed through locks and under doors, and left in bathrooms by people entering the facilities posing as patients.

In May 1993, an axe was used to chop out a mail slot at an Indiana Clinic that had been sealed as a precaution against vandalism; a hose was then attached to the clinic's outdoor spigot and water was sprayed into the building along with the acid in powder form. [9] After acid was sprayed through a mail slot of a Memphis clinic in May 1992, it was forced to close for two weeks while a clean-up crew took the measures necessary to remove the stench, including the disposal of all furniture and carpets. [10] In September 1992, a clinic in Chico, CA was forced to close temporarily when a noxious substance was injected through a hole drilled in the wall, making staff and patients ill. [11]

In an apparent effort to make abortion services unavailable in an entire region, on some occasions a concerted series of attacks has occurred in one area within a short period of time. For example, fourteen Michigan clinics were hit with butyric acid within a two-week period in September 1992. [12] And on March 9, 1993, five clinics in San Diego were sprayed with butyric acid, causing four people to be taken to hospitals and treated for exposure to the fumes. [13]

**\*7**  Vandalism is on the rise not only against abortion facilities, but also against the homes and property of health care personnel. Dr. Pablo Rodriguez, Medical Director of Planned Parenthood of Rhode Island, testified that he discovered over 40 nails in his tires after his car began steering poorly on the highway. Subsequently, he said, his wife:

painfully discovered with her foot that [the] driveway was "boobytrapped" with roofing nails cleverly buried under the snow. An image of my young children running and skinning their knees on that same section of driveway has filled my heart with fear that, until this day, I have not been able to shake off.

Testimony of Pablo Rodriguez, M.D., Committee on Labor and Human Services, May 12, 1993. Anti-abortion activists have also blocked the driveways of the homes of staff and physicians with cement-filled barrels. See, e.g., testimony of Susan Hill, House Subcommittee on Crime and Criminal Justice, Committee on the Judiciary, April 1, 1993.

3. Clinic blockades

Throughout the country, anti-abortion groups have organized blockades designed to bar access to abortion facilities and overwhelm local law enforcement. From 1977 to April 1993, over 6,000 clinic blockades and related disruptions have been reported. [14]

Clinic blockades disrupt a wide range of health services, terrorize patients and staff, and impose upon clinics, individuals and responding jurisdictions millions of dollars in costs for law enforcement, prosecutions, staff overtime, medical expenses and property damage. [15] Typically, dozens of persons–and in some cases hundreds or even thousands–trespass onto clinic property and physically barricade entrances and exits by sitting or lying down or by standing and interlocking their arms. These human barricades often involve pushing, shoving, destruction of equipment and other violent acts as blockaders try to keep patients and staff from entering the clinic.

Willa Craig, Executive Director of the Blue Mountain Clinic in Missoula, MT, described for the Committee how over the past four years anti-abortion activity at her clinic has changed from peaceful picketing to this kind of forceful interference with access to the clinic:

The number of protesters has increased and the character of the demonstrations has consistently required police involvement. Picketers who once appeared satisfied to walk back and forth in front of our office with signs were joined by individuals who on a weekly basis blocked driveways, screamed at staff, and interfered with patients attempting to enter out facility.

   **\*8**   Testimony of Willa Craig, Senate Committee on Labor and Human Resources, May 12, 1993.

The blockaders often do more than block the facility's entrances and exits. Reported judicial decisions in cases throughout the country document the forceful tactics they have used. For example, they have invaded the clinics, chained themselves to medical equipment, blocked clinic parking lots, and sabotaged the clinics' locks. [16]

Willa Craig described for the Committee an anti-abortion blockade preceding the arson fire that destroyed the Blue Mountain Clinic:

In November of 1991, "Rescue Montana" announced publicly that it would blockade a clinic that week. **\*\*\*** The demonstration and blockade that took place that week involved approximately 80 protesters, 31 of which were eventually arrested. Few were from our community.

During the protest the clinic was very nearly invaded by a group of large men and a staff person received minor injuries in the scuffle to prevent the invasion. Ending the blockade required the fire department, including the "jaws of life," six units of the city police, and the county sheriffs department. The resulting trial in municipal court lasted more than five days and cost the city thousands of dollars. In the time period between these convictions and the arson that destroyed our clinic, many of those convicted returned, and participated in further disturbances.

Testimony of Willa Craig, Senate Committee on Labor and Human Resources, May 12, 1993.

David R. Lasso, City Manager and Former City Attorney of Falls Church, VA, described the blockades waged against a clinic located in his jurisdiction:

In my ten years in office, hundreds of cases involving military-style assaults on medical facilities have been brought in Falls Church. Called "rescues"–these unlawful activities made women and men hostages in the health facility and in cars on parking lots. While captive and in fear, they were taunted and vilified. Police were hurt as blockaders of even second-floor fire escapes refused to leave and had to be carried–mostly as limp **\*\*\*** weights, but some throwing elbows, fracturing the eye socket of one officer.

Testimony of David R. Lasso Senate Committee on Labor and Human Resources, May 12, 1993. A Federal Court describing the same incidents also noted that the blockaders:

defaced clinic signs, damaged fences and blocked ingress into and egress from the Clinic's parking lot by parking a **\*9** car in the center of the parking lot entrance and deflating its tires. On this and other occasions, "rescuers" have strewn nails on the parking lots and public streets abutting the clinics to prevent the passage of any cars.

National Organization for Women v. Operation Rescue, 726. F. Supp. 1483, 1489–1490 (E.D. Va. 1989), aff'd 914 F. 2d 582 (4th Cir. 1990), rev'd in part on other grounds, vacated in part, Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753 (1993).

In 1991, a two-year campaign of blockades and invasions was launched against the only medical facility offering abortion services in North Dakota. Within the first seven months, arrests were made on ten separate occasions. On one occasion, "26 people stormed the clinic, broke down a door, occupied its rooms, and locked themselves together using bicycle locks." Fargo Women's Health Organization v. Lambs of Christ, 488 N.W. 2d 401, 404 (N.D. 1992). During other attacks, blockaders "struck, pushed and threatened escorts and guards with physical harm. *** Protestors stood in the way of cars, climbed onto the vehicles' hoods or under the cars." Id. at 405. One invader was arrested as he climbed the clinic's fence to reach a patient using the clinic's rear entrance. Id.

In Wichita, KS, abortion clinics were attacked repeatedly by Operation Rescue from July through August of 1991. A Federal district court found that "[d]uring these [two] months, hundreds and perhaps thousands of persons came to Wichita from across the nation to engage in *** activity" including "acts of trespass and obstruction" aimed at blocking access to the clinics. United States v. Cooley, 787 F. Supp. 977, 980 (D. Kan. 1992). According to the court, which called in approximately 100 Federal marshals to help control the blockades, "[b]y targeting Wichita as the focus of its national efforts, Operation Rescue has virtually overwhelmed the resources of the city's relatively small police forces to respond with dispatch and effectiveness." Women's Health Care Services v. Operation Rescue, 773 F. Supp. 258, 265–66 (D. Kan. 1991). The court provided the following description of one of the Wichita blockades:

On August 20, 1991, *** a large number of persons simultaneously charged the driveway gate protected by marshals from the outside. At the same instant, a crowd of perhaps 40 persons *** scaled the fences and walls surrounding the parking lot and then charged the marshals protecting the gate. ***

U.S. v. Cooley, 787 F. Supp. at 980–81. The six-week protest is estimated to have cost the city one million dollars, and led to over 2,741 arrests. [17]

In April 1992, Operation Rescue targeted Buffalo, NY, as the site for its "Spring of Life." During the two-week siege, Buffalo police arrested 605 blockaders and trespassers who were attempting to close the city's abortion clinics. [18] The siege cost the city and county over $383,250. [19] Another Operation Rescue campaign, targeted at health care facilities in seven cities–Philadelphia, PA; Cleveland, **\*10** OH; Minneapolis, MN; Dallas, TX; San Jose, CA; Orlando, FL; and Jackson, MS–is under way as this report is being prepared.

4. Threats of force

A number of abortion providers have been subjected to death threats and other threats of violence. Dr. Warren Hern, a Colorado physician, has said that "[d]eath threats are so common they are not remarkable." [20] Testimony submitted to the Committee describes one of the many death threats Dr. Curtis Boyd has received, some of which have been hand-placed in his home mailbox. A recent letter states:

Hey, *** Boyd. Those babies didn't know when they were dying by your butcher knife. So now you will die by my gun in your head very very soon–and you won't know when–like the babies don't. Get ready your [sic] dead.

Statement of Fairmount Center, Senate Committee on Labor and Human Resources Committee, June 2, 1993 (emphasis in original).

In Dallas, Dr. Norman Tompkins, who performs abortions as part of a private obstetrics/gynecological practice, has been threatened repeatedly at home and at work. One message left on his answering machine said: "I'm going to cut your wife's liver out and make you eat it. Then I'm going to cut your head off. ***" Written Testimony of Norman T. Tompkins, M.D., House Subcommittee on Crime and Criminal Justice, Committee on the Judiciary, April 1, 1993, Exhibit 9. A letter he received at his office states: "[o]bviously, you don't know what a real 'terrorist' is. Perhaps, someday soon you will." Id., Exhibit 14. A member of the Dallas Pro-Life Action Network confronted Dr. Tompkins' wife, Carolyn, and shouted "Aren't you afraid I'm going to kill you?" Statement of Facts, Tompkins v. Cyr, No. 93–L337–F (D. Dallas County, Tex.) (filed Mar. 30, 1993), p. 3 (submitted as written testimony of Norman T. Tompkins, M.D.). In addition, Carolyn Tompkins has received threatening voice mail messages at work. One caller left a message stating: "I'm just very thankful that you weren't killed by that car that you pulled out in front of the other day, cause you certainly are not ready to meet your maker." Written Testimony of Norman T. Tompkins, M.D., House Subcommittee on Crime and Criminal Justice, Committee on the Judiciary, April 1, 1993, Exhibit 8.

Dr. Pablo Rodriguez is featured on a "Wanted" poster, a copy of which was submitted to the Committee with his testimony. Dr. Rodriguez also told the Committee of a fraudulent application for an insurance policy that was taken out on his wife's life, and he t4estified that:

Most recently, I received an I.D. card for a catastrophic health and dismemberment policy that would cover my medical costs in case the circumstances should arise.

Testimony of Dr. Pablo Rodriguez, Senate Labor and Human Resources Committee, May 12, 1993.

 **11**  As noted above, before he was killed Dr. David Gunn had also been the subject of "Wanted" posters bearing his name, address, and work itinerary.

## B. THE AVOWED PURPOSE OF THIS CONDUCT IS TO ELIMINATE ACCESS TO ABORTION SERVICES

The express purpose of the violent and threatening activity described above is to deny women access to safe and legal abortion services. Anti-abortion activists have made it plain that this conduct is part of a deliberate campaign to eliminate access by closing clinics and intimidating doctors.

At a House subcommittee hearing, the director of Operation Rescue National testified that "My desire would be to see abortion clinics stopped, closed. *** I would like to see them closed down. *** Yes, absolutely." Hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee, May 6, 1992, at 171–72. And the field director of Operation Rescue National has declared that "We may not get laws changed or be able to change people's minds, *** [b]ut if there is no one willing to conduct abortions, there are no abortions." [21]

Operation Rescue's founder, Randall Terry, has exhorted his followers to disregard lawful court orders and embarrass the judiciary:

The pro-aborts are completely misusing the justice system. *** Judges need to know they should not capitulate. They also need to know very clearly that we will not be intimidated. *** If a judge bows to the pressure of pro-abortion forces, he must

know [that] *** [t]hese cases will take up precious time on an already overcrowded docket. *** He will look foolish to the public for issuing an order because rescuers won't obey.

See Testimony of N.Y. Attorney General Robert Abrams to the Senate Labor and Human Resources Committee, May 12, 1993 (citations omitted). As Mr. Abrams noted, Mr. Terry encourages mass disregard for the law so that judicial resources will become overtaxed and fail. See, e.g., R. Terry, "To Rescue the Children" 49 (1986) ("You should check how overloaded the city's jail and court systems are. In many, many cities, the courts and jails are too overloaded to deal with rescue missions."). Id.

Numerous Federal courts have entered findings confirming the objectives of these activities. The Federal district court in Wichita, for example, in its opinion granting an injunction against clinic blockades, stated that the "avowed intent" of the blockaders was to shut down clinics and prevent abortions. Women's Health Care Services v. Operation Rescue, 773 F. Supp. 258, 261–2 (D. Kan. 1991). The court found that Operation Rescue participants sought to realize this goal either by denying access to the clinic through a blockade or by "abus[ing], harass[ing] or intimidat[ing] women patients" to deter them from entering the clinic. Id. at 261. [22]

**\*12  C. THE ACT ADDRESSES A PROBLEM THAT IS NATIONWIDE IN SCOPE**

1. Anti-abortion blockades, violence and related conduct are occurring across the country

Attacks aimed at abortion providers, including bombings, arson, death threats, shootings, chemical attacks, clinic blockades and invasions, and the other activities described above, are occurring throughout the United States. Attorney General Janet Reno testified before the Committee:

This is a problem that is national in scope. It is occurring throughout the country; on the doorstep of the Nation's capital in Alexandria and Falls Church in Northern Virginia; in Pensacola and Melbourne in Florida; in West Hartford, Connecticut; in Wichita, Kansas; in Fargo, North Dakota; and in Dallas, Texas, just to name a few of the more visible incidents.

Testimony of Janet Reno, Attorney General, Senate Labor and Human Resources Committee, May 12, 1993.

The most extreme types of anti-abortion activity–including arson, bombings, chemical vandalism, and massive blockades–have been documented in every part of the United States, including California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Missouri, Montana, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Oregon, Tennessee, Texas, Virginia and Wisconsin. [23] Arson, bombings and firebombings alone have been documented in at least 28 States and the District of Columbia. [24] And massive clinic blockades, assaults and invasions have been waged in dozens of cities across the country. [25]

The nationwide pattern of anti-abortion violence, blockades and related conduct is well documented in the published decisions of numerous Federal courts. In National Organization for Women v. Operation Rescue, the district court found that:

Defendants use of "rescue" demonstrations as an anti-abortion protest is also widespread geographically. "Rescues" have taken place in many places across the country and have been enjoined in New York, Pennsylvania, Washington, Connecticut, and California, as well as the Washington Metropolitan area. Recent "rescue" demonstrations  **\*13**  in the District of Columbia and Maryland were carried out in violation of federal injunctions.

726 F.Supp 1483, 1490 (E.D.Va. 1989), aff'd, 914 F.2d 581 (4th Cir. 1990), rev'd in part, vacated in part, Bray v. Alexandria Women's Health Clinic, 113 S.Ct. 753 (1993). In this case in the Supreme Court, the dissenting opinion of Justices Stevens and Blackmun noted that "the scope of petitioners' conspiracy is nationwide." 113 S.Ct. at 780

2. Anti-abortion blockades, violence and related conduct are often organized and conducted across state lines

Many of the activities described above have been organized and directed across State lines. Attorney General Reno testified before the Committee that "much of the activity has been orchestrated by groups functioning on a nationwide scale, including, but not limited to, Operation Rescue, whose members and leadership have been involved in litigation in numerous areas of the country." Testimony of Janet Reno, Attorney General, Senate Committee on Labor and Human Resources, May 12, 1993.

David R. Lasso, City Manager and former City Attorney of Falls Church, VA, testified that because many attacks against abortion providers have been organized as part of a national campaign, and many of the blockaders have come to Virginia from out of state, the ability of his jurisdiction to control them is limited:

[T]he City has no practical ability to charge or seek injunctions against persons in other states who may have planned the disturbance; even if the states involved were willing to extradite, the process would consume months. The injunctive powers of Virginia courts end at Virginia boundaries. Activities like [clinic blockades] are usually multi-state activities and the ability of localities like Falls Church to prevent them is all but non-existent.

Testimony of David R. Lasso, Committee on Labor and Human Resources, May 12, 1993; see also, Brief for Falls Church, Virginia, Amicus Curiae in Support of Respondents, Bray v. Alexandria Women's Clinic, No. 90–985 (U.S.), p. ii.

New York Attorney General Robert Abrams also provided detailed information about the extent to which national anti-abortion leaders direct blockades and related activities across state lines. Mr. Abrams' testimony describes litigation his office has brought challenging conduct that took place in New York but was directed by Operation Rescue leaders from California, Georgia, Virginia and elsewhere. One defendant flew in from Milwaukee, where he was organizing blockades, and spent his time in New York participating in additional activities prohibited by a court injunction. Another defendant, a South Carolina resident, organized blockades in both New York and Baton Rouge, LA. Testimony of Robert Abrams, Committee on Labor and Human Resources, May 12, 1993.

The courts have also recognized the extent to which these activities are directed across State lines. In Women's Health Care Services v. Operation Rescue, the Court made the following finding about the massive blockades waged in Wichita:

*14  [T]he individual and collective acts of lawlessness consistently occur at the behest or direction of either the named defendants *** or another of a small group of leaders of the organization. *** To the extent that they are identifiable by the court, all of the leaders supervising the operations of the tortious and criminal actions appear to be national participants in Operation Rescue and are not from Wichita; none of the site leaders are women.

773 F. Supp. 258, 262 (D. Kan. 1991). Similarly, in National Organization for Women v. Operation Rescue, the court found:

There is uncontradicted evidence that defendants Operation Rescue and Project Rescue have been the motivating force behind other blockades similar to those presently threatened. In a letter on Operation Rescue letterhead, defendant Terry explains "the growth of this movement": On April 29th, the National Day of Rescue II, rescue groups in 46 cities participated in rescue missions.

726 F. Supp. 300, 301 (D.D.C. 1989). [26]

D. ANTI-ABORTION VIOLENCE, BLOCKADES, AND RELATED ACTIVITIES ARE HAVING SERIOUS ADVERSE EFFECTS ON PATIENTS AND PROVIDERS, AND LIMITING ACCESS TO SAFE AND LEGAL ABORTION

The Committee finds that the activities described above are having a significant adverse impact not only on abortion patients and providers, but also on the delivery of a wide range of health care services. This conduct has forced clinics to close, caused serious and harmful delays in the provision of medical services, and increased health risks to patients. It has also taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers.

1. Harm to patients

By making clinics inaccessible to patients and staff alike, blockades and invasions deprive people of needed health care services. As noted above, many of the blockades have closed the facilities down, at least temporarily. Arson and the most severe forms of vandalism, including chemical attacks, have had the same result.

Many facilities targeted by this conduct provide a broad range of health care services in addition to abortion and counseling and referral for abortion. For example, as noted above, before an arson fire destroyed the Blue Mountain Clinic, the facility provided a wide variety of services for the Missoula, MT community and its outlying areas. The arson that destroyed this clinic deprived its patients of all of these services. Ms. Craig testified that after the fire, which rendered the clinic structure a total loss, the providers who **15** had worked there were able to re-establish only a fraction of their previous services.

In addition, blockades that make access to a health care facility difficult or hazardous can have traumatic effects on patients by delaying their access to urgent medical care and by exacerbating their medical conditions. In Bering v. Share, the Washington Supreme Court found that anti-abortion blockaders:

interfered with ill patients, placing a pregnant woman possibly suffering from toxemia in acute medical danger, and delaying a patient who was miscarrying a wanted pregnancy and bleeding heavily.

721 P.2d 918, 923 (Wash. 1986). By blocking the only walkway to the main entrance to the building, the blockaders were also "interfering with parents bringing young patients to see their respiratory allergist." Id.

For patients seeking abortion services, the adverse effects of a clinic blockade can be particularly serious. Dr. Pablo Rodriguez described the effects on patient health:

Our patients are the ones who suffer. Women who do make it in have a heightened level of anxiety and a greater risk of complications. The delay caused by the invasions has forced some patients to seek care elsewhere due to the fact that their gestational age has gone beyond the first trimester. The risk to these women is unnecessarily increased.

Testimony of Dr. Pablo Rodriguez, Senator Labor and Human Resources Committee, May 12, 1993.

In Pro-Choice Network v. Project Rescue, the court found that blockades can have serious adverse health effects on abortion patients:

[T]he risks associated with an abortion increase if the patient suffers from additional stress and anxiety. Increased stress and anxiety can cause patients to: (1) have elevated blood pressure; (2) hyperventilate; (3) require sedation; or (4) require special counseling and attention before they are able to obtain health care. Patients may become so agitated that they are unable to lie still in the operating room thereby increasing the risks associated with surgery.

799 F. Supp. 1417, 1427 (W.D.N.Y. 1992). The court also recognized that after confronting a blockade, patients often are too upset to undergo the procedure that day, and that if the procedure is postponed the delay can increase the risks associated with it. Id. at 1427.

Clinic blockades and invasions can be particularly dangerous for women who are mid-way through a multi-day abortion procedure when their access is blocked. Some abortion procedures involve the insertion of laminaria sticks, which slowly dilate the cervix overnight. The patient must return to the doctor the next day to complete the procedure, or she will risk serious infection. As one court found:

**\*16** [T]imely removal of the laminaria is necessary to avoid infection, bleeding and other potentially serious complications. If a woman \*\*\* finds that her access to the clinic entrance is blocked or impeded \*\*\* complications may result.

Pro-Choice Network v. Project Recsue, supra, 799 F. Supp. at 1427. In 1989, a court found that as a result of the closing of a District of Columbia clinic for 11 hours by anti-abortion blockaders:

Five (5) women who had earlier commenced the abortion process at the clinic by having laminaria inserted were prevented by "rescuers" from entering the clinic to undergo timely laminaria removal.

National Organization for Women v. Operation Rescue, 726 F. Supp. 1483, 1490 (E.D. Va. 1989), aff'd 914 F.2d 582 (4th Cir. 1990), rev'd on other grounds, 113 S. Ct. 753 (1993).

Dr. Curtis Boyd's testimony recounts the experience of one patient whose life was placed in grave danger by a clinic blockade. The patient, who spoke only limited English, had visited the clinic to have laminaria inserted. When she arrived at the clinic the next day to complete the procedure, she was surrounded by demonstrators–

who told her the clinic was closed and they would take her to another doctor. Frightened, she went with them and saw a physician who removed all but one of the dilators and told her she could continue the pregnancy! Our staff was quite alarmed when this patient did not show up for her appointment. We \*\*\* sent a Spanish speaking counselor to her address. The patient was not there, but a message was left for her. She called and told us what had happened. She came into the clinic and was able to have her pregnancy terminated.

Written statement of Fairmount Center, Senate Labor and Human Resources Committee, June 2, 1993. Dr. Boyd concluded that, had the dilator not been removed, "this situation was potentially life-threatening" for the patient. Id.

## 2. Impact on providers

The American Medical Association has emphasized the severity of the problem facing health care professionals:

Due to the growing violence against physicians and health care professionals generally, the AMA believes that S. 636 represents a critical step in permitting dedicated health care professionals to deliver lawful medical services without fear of harassment, threats or violence. \*\*\* Unless the issue of continued violence at health care facilities is directly confronted, the practice of medicine will be severely affected.

Testimony of Dr. James S. Todd, Executive Vice President, American Medical Association, Senate Labor and Human Resources Committee, May 11, 1993.

**\*17** Violence and the threat of violence–made all the more real by Dr. Gunn's death–have forced abortion providers to take extreme measures to protect their lives. Many physicians now wear bulletproof vests; Dr. Rodriguez testified that the police recommended he do so. In Colorado, Dr. Warren Hern installed four layers of bullet-proof glass for protection after having five shots fired into the front of his office in 1988.

Some providers have succumbed to the intimidation and threats. At least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group.[27] In early 1993, after receiving death threats, two doctors

stopped working at an abortion clinic in Melbourne, FL. And since Dr. Gunn was shot in March 1993, at least eight more doctors have stopped offering abortion services. [28]

The availability of abortion services is already very limited in many parts of the United States. [29] At least one study has concluded that anti-abortion violence and intimidation have contributed to this shortage. [30] It is evident to the Committee, therefore, that continued anti-abortion violence and intimidation threaten to exacerbate the shortage of providers who are qualified and willing to perform safe and legal abortions. As Dr. Rodriguez told the Committee:

The results of this intimidation campaign are plain to see. Abortion may remain a legal option in this country, but there will be so few providers that access will become limited and in some cases unavailable. *** [P]hysicians are discontinuing the provision of a needed medical service simply out of fear.

Testimony of Dr. Pablo Rodriguez, Senate Labor and Human Resources Committee, May 12, 1993.

E. EXISTING LAWS ARE INADEQUATE TO PROTECT PATIENTS AND PROVIDERS AND KEEP CLINICS OPEN

The laws currently in place at the Federal, State and local levels have proved inadequate to prevent the conduct described above. Injunctive relief to restrain this conduct is no longer readily available under Federal civil rights laws, as a result of a ruling by the Supreme Court in January 1993, and existing criminal laws at the State and local levels have failed to provide the certainty of prosecution, **18** conviction and punishment necessary to deter these activities on a nationwide scale.

1. Federal injunctive relief is not readily available after Bray v. Alexandria Women's Health Clinic

Numerous cases seeking to restrain anti-abortion violence and blockades have been brought under a Reconstruction era civil rights law known as the Ku Klux Klan Act, 42 U.S.C. S 1985(3). That law prohibits, intera alia, conspiracies for the purpose of depriving a person or class of persons of the equal protection of the laws. The plaintiffs in these cases have argued that although the law was enacted in response to the race-based violence that erupted following the Civil War, it is equally applicable to present-day anti-abortion violation and intimidation.

In the overwhelming majority of these cases, the Federal courts have agreed with the plaintiffs, and issued injunctions under section 1985(3) to restrain the anti-abortion activities that are at issue here. [31] However, in January 1993, the Supreme Court rules in such a case that the plaintiffs were not entitled to relief from anti-abortion activities under the first clause of section 1985(3). Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753 (Jan. 13, 1993). The Court held, 6–3, that opposition to abortion does not qualify alongside race discrimination as the sort of class-based, invidious discriminatory animus underlying the defendants' actions that is required by the statute. [32]

This ruling now leaves a serious gap in the Federal laws, by severely limiting section 1985(3) as a basis for issuance of Federal court injunctions against anti-abortion violence and blockades, if not removing it altogether. [33] As Attorney General Reno testified, there is no other Federal law that would be generally applicable to **19** private interference with a woman's right to choose. S. 636 is therefore necessary to fill the gap in the law left by the Bray decision, and to ensure that federal civil remedies, including injunctive relief, will be available to victims of anti-abortion violence and intimidation.

2. State and local law enforcement is inadequate

State and local law enforcement authorities have failed to effectively address the systemic and nationwide assault that is being waged against health care providers and patients. Enforcement of applicable local laws, such as those against trespass, vandalism, and assault, has proved inadequate for several reasons.

First, in some localities, local officials have willfully refused to act in response to anti-abortion violence and blockades. In Wichita, for example, the court concluded that "significant questions exist as to the lack of zeal displayed by the City of Wichita in defending the legal rights of the plaintiffs and their patients." Women's Health Care Services v. Operation Rescue, 773 F. Supp. 258, 266 (D. Kan. 1991). Willa Craig testified that in one Montana community, local police refused to respond at all to a clinic invasion. Testimony of Willa Craig, Senate Labor and Human Resources Committee, May 12, 1993.

In some instances, the lack of response by local law enforcement authorities appears to be a result of sympathy by local officials for the objectives of the blockades. This is illustrated by the testimony of James T. Hickey, Sheriff of Nueces County, Texas, before a House subcommittee. Sheriff Hickey testified that because he opposes abortion, he does not believe the law should be enforced against those attempting to stop abortions, even if their conduct violates the law. When asked directly whether he would enforce the law in these circumstances, Sheriff Hickey replies as follows:

Mr. HICKEY. The law of the Supreme Court, and in this case the United States of America and any other State in the Union that makes it legal to murder babies, is wrong.

Mr. LEVINE. And you will not enforce it?

Mr. HICKEY. I will not.

Mr. LEVINE. You do not find that to be in any conflict with your oath of office as the chief law enforcement officer of your county?

Mr. HICKEY. Certainly not.

Hearing Before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee, May 6, 1992, at 169–70. [34]

But even where local authorities are willing to conscientiously enforce the applicable State and local laws, they are often unable to do so effectively. One reason is that a patchwork of State and local laws is inherently inadequate to address what is a nationwide, interstate phenomenon. State court injunction powers end at **\*20** State lines, and a State cannot easily reach persons in other States who may have planned the illegal acts.

Mr. Lasso, City Manager of Falls Church, VA, explained, for example, that because the blockades against clinics in his jurisdiction were planned outside of Virginia, the perpetrators were to a large degree beyond the reach of Virginia law and Virginia State court injunctions. See also the testimony of New York Attorney General Robert Abrams, which, as noted above, cites examples of assaults on New York clinics by activists from Georgia, California, Virginia and elsewhere. Willa Craig noted in her testimony that few of those who were arrested for blockading her clinic in Missoula, MT were from that community.

In these circumstances, as Attorney General Reno noted, local law enforcement efforts in different regions are impeded by difficulties in sharing information and coordinating responses. That is why, as the Attorney General testified, it is "important that Federal agencies be able to step in immediately in a systematic way. ***" Testimony of Attorney General Janet Reno, Senate Labor and Human Resources Committee, May 12, 1993.

Case 1:22-cr-00096-CKK    Document 197-2    Filed 03/17/23    Page 16 of 43

In addition, local law enforcement authorities are frequently overwhelmed by the sheer numbers of the blockaders. In Falls Church, for example, the city's entire police force of 30 uniformed officers faced blockades involving as many as 240 persons, and the city could not effectively combat the blockaders' military-style tactics. As Mr. Lasso explained:

[E]ven with warning, getting these forces to the scene and organizing them in a way that the response can be well-measured and not counterproductive take hours. Once organized, it further takes hours to remove the trespassers. In short, and despite the City's best efforts, for a substantial period the blockade effectively closes the clinic and women are denied their state and federal rights.

And the problem does not end with the arrest. For example, over 200 arrests were made after the October 29, 1988, blockade. The City prosecutes all misdemeanors through the City Attorney and his part-time assistant. There were so many defendants that the trials had to be consolidated and held at one time. The only available site large enough was the community center gymnasium, which lacked a certain decorum.

Testimony of David R. Lasso, Senator Labor and Human Resources Committee, May 12, 1993. [35]

Another problem with reliance on State and local laws is that the penalties for violations of these laws are often so low as to provide little if any deterrent effect. Several witnesses before the Committee testified that the offenders frequently return to the blockade or invasion immediately after their arrest, having been charged with **\*21** fines equivalent to those for a speeding ticket; few, even repeat offenders, receive jail sentences. See, e.g., the testimony of Willa Craig, Pablo Rodriguez, and Planned Parenthood of Rhode Island. As Planned Parenthood of Rhode Island noted, those arrested for one invasion of their Providence clinic settled out of court for $50 fines to be paid over time.

For all of these reasons, Congress has been urged to enact new Federal legislation not only by victims of the conduct addressed by S. 636, but also by law enforcement authorities at the Federal level (Attorney General Reno), the State level (the National Association of Attorneys General, [36] and the local level (City Manager David Lasso, and others) [37] As Attorney General Reno concluded, the national scope of the offensive conduct, and the fact that much of the activity has been orchestrated by groups functioning across State lines, means that "the problem transcends the ability of any single local jurisdiction to address it."

These circumstances closely parallel those that led to the enactment of the civil rights laws on which S. 636 is modeled. As discussed below, those laws prohibit force or threat of force to willfully injure, intimidate or interfere with those seeking to exercise certain fundamental rights, such as the right to vote. The legislative history of these laws makes clear that they were enacted because State and local law enforcement had been inadequate to prevent acts of violence committed against those seeking to exercise their civil rights. As the Senate Committee Report for the Civil Rights Act of 1968 stated:

Under the Federal system, the keeping of the peace is, for the most part, a matter of local and not Federal concern. **\*\*\*** In some places, however, local officials either have been unable or unwilling to solve and prosecute crimes of racial violence or to obtain convictions in such cases–even where the facts seemed to warrant. As a result, there is need for Federal action to compensate for the lack of effective protection and prosecution on the local level.

S. Rpt. No. 721, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. & Ad. News, at 1838–39.

Thus, as Attorney General Reno concluded in her testimony on S. 636, "The reluctance of local authorities to protect the rights of individuals provides a powerful justification for the enactment of federal protections that has been invoked previously by Congress in passing laws to protect civil rights." Here too, the Committee concludes that new Federal legislation is essential in light of the inability, and in some cases unwillingness, of local authorities to protect those seeking to exercise or assist others in exercising the constitutional right to choose.

**\*22**  V. EXPLANATION OF THE LEGISLATION

A. S. 636 WILL PROTECT HEALTH CARE PROVIDERS AND PATIENTS

The Freedom of Access to Clinic Entrances Act is designed to protect health care providers and patients from violent attacks, blockades, threats of force, and related conduct intended to interfere with the exercise of the constitutional right to terminate pregnancy. It establishes new Federal criminal offenses for this conduct, as well as a civil cause of action that may be asserted by private injured parties, the Attorney General of the United States, and State Attorneys General. By establishing criminal penalties as well as civil remedies, including both injunctive relief and compensatory and punitive damages, the Act will help to prevent and deter the prohibited conduct, and ensure that when it does occur the offenders will be appropriately punished and victims adequately compensated.

1. Prohibited conduct: Section 2715(a)

Proposed new section 2715(a) of the Public Health Service Act covers four categories of conduct: acts of force, threats of force, physical obstruction, and damage or destruction of property. Section 2715(a)(1) prohibits the use or threat of force, or physical obstruction, that intentionally injures, intimidates or interferes with any person (or attempts to do so) because that person is or has been obtaining or providing abortion-related services, or in order to intimidate that person (or another, or any class of persons) from obtaining or providing such services. Section 2715(a)(2) prohibits the intentional damage or destruction of property of a medical facility or in which a medical facility is located (or attempts to do so), because it provides abortion-related services.

Section 2715(a)(1) is modeled on several Federal civil rights laws. These include 18 U.S.C. S 245(b), which prohibits force or threat of force to willfully injure, intimidate or interfere with any person (or attempting to do so) because a person is or has been, or in order to intimidate such person or any other person or any class of persons from voting, engaging in activities related to voting or enjoying the benefits of Federal programs, inter alia. Another law with virtually identical operative language is 42 U.S.C. S 3631, a provision of the Fair Housing Act that prohibits force or threat of force to willfully injure, intimidate, or interfere with a person's housing opportunities because of his or her race, color, religion, sex or national origin.

Subsection 2715(a)(2) is modeled generally on 18 U.S.C. S 247, which prohibits, in certain circumstances, intentional damage or destruction of property because of the religious character of the property.

Examples of acts of "force" prohibited by section 2715(a)(1) would include physical assaults intended to injure or intimidate someone because that person (or another person or class of persons) is obtaining or providing abortion-related services. For example, the shooting death of Dr. David Gunn would have been covered by the Act. Other violent attacks on doctors and clinic personnel also would be covered in many cases, including when committed during clinic invasions. In addition, some acts of vandalism could constitute  **\*23**  prohibited force; for example, the tampering with an automobile of a physician who provides abortions, with the intent to cause an accident and because the physician provide abortions, would constitute prohibited force.

Prohibited "threats of force" would include genuine threats of harm intended to injure, intimidate, or interfere with someone because that person is obtaining or providing abortion-related services. Threats are covered by the Act where it is reasonably foreseeable that the threat would be interpreted as a serious expression of an intention to inflict bodily harm. Many of the death threats and other threats of violence experienced by abortion providers would be covered by the Act.

Prohibited acts of "physical obstruction" would include clinic blockades and invasions intended to injure, intimidate, or interfere with someone because the clinic provides abortion-related services. They would also include other conduct undertaken with the same intent that renders ingress to or egress from the facility impassable, or passage to the facility unreasonably difficult or hazardous, in accordance with the definition of "physical obstruction" provided in subsection 2715(e)(5). [38]  Many types of

vandalism or disruption could amount to "physical obstruction," including pouring glue into the locks of clinic doors, chaining people and cars to entrances with bicycle locks, strewing nails on public roads leading to clinics, and blocking entrances with immobilized cars. The imprisonment of a provider during a clinic invasion with the intent to interfere with his or her freedom of movement also could constitute prohibited "physical obstruction."

Examples of damage or destruction of clinic property (or property of a building which a clinic is located) prohibited by section 2715(a)(2) would include arson fires, bombings, firebombings, chemical attacks, and other forms of vandalism, if committed because the targeted facility provides abortion-related services.

Many anti-abortion tactics would fall under more than one of these four categories of prohibited conduct (acts of force, threats of force, physical obstruction, destruction of property). For example, sabotaging clinic entrances by pouring glue in the locks could constitute both unlawful physical obstruction under section 2715(a)(1) and unlawful damage to property under section 2715(a)(2). Physically restraining an abortion provider could constitute both unlawful physical obstruction and unlawful force.

The conduct prohibited by section 2715(a)(1)–force, threat of force, or physical obstruction–is not unlawful unless it is intended to injure, intimidate or interfere with someone because that person is obtaining or providing abortion-related services, or in order to intimidate someone from doing so. "Intimidate" is defined in section 2715(e)(3) to mean "to place a person in reasonable apprehension of bodily harm to him or herself or to another." It thus encompasses not only acts or threats that place someone in reasonable fear of harm not to him–or herself, but also those that induce reasonable fear of harm to someone else, like a family member. Whether such an apprehension is "reasonable" will depend on all **\*24** of the facts and circumstances presented. But there must be apprehension of bodily harm; other forms of psychological discomfort would not suffice.

"Interfere with" is defined in section 2715(e)(2) to mean to restrict a person's freedom of movement. This could occur, for example, by means of a human barricade, cement poured in a driveway, or blocking of a parking lot with a large object or roofing nails. Causing psychological discomfort, for example by words or photographs, would not suffice.

The conduct prohibited by section 2715(a)(1) constitutes a violation whether or not it occurs at or in the vicinity of a facility that provides abortion-related services. For example, the shooting of a doctor at her home could be an unlawful use of force if it is intended to intimidate her because she provides abortion-related services. The blockade of a provider's house or the placement of cement to block his driveway, if it makes passage to an abortion facility unreasonably difficult, could constitute an unlawful physical obstruction. Death threats to a doctor away from the clinic, whether made in person or, for example, by telephone or mail to the doctor's home, could constitute unlawful threats of force.

The Committee intends these examples of violations to be illustrative and not exhaustive. It should be emphasized, however, that section 2715(a) prohibits force, threat of force, or physical obstruction that intentionally injures, intimidates or interferes with someone only if the offender has acted with the requisite motive: i.e., only if the offender acts against the target "because" the target of the offender's conduct is or has been obtaining or providing abortion-related services, or it the offender acts against the target "in order to intimidate" the target (or another person or a class of persons) from obtaining or providing abortion-related services. By the same token, section 2715(a)(2) prohibits the intentional damage or destruction of property of a medical facility only if the offender has acted "because" the facility provides abortion-related services.[39]  Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not to its policy and practices on abortion-related services. The Committee has concluded that inclusion of the motive element is important to ensure that the Act is precisely targeted at the conduct that, as the Committee's record demonstrates, requires new Federal legislation: deliberate efforts to interfere with the delivery of abortion-related services.

The term "abortion-related services" is defined in section 2715(e)(1) to include medical, surgical, counselling or referral services, **\*25** provided in a medical facility, relating to pregnancy or the termination of a pregnancy. "Medical facility" is

defined in section 2715(e)(4) to include facilities that provide health or surgical services or counselling or referral related to health or surgical services. Under these definitions, facilities that do not offer abortions or counselling and referral for abortions, but offer only counselling about alternatives to abortion–sometimes referred to as "pro-life counselling centers" or "pregnancy care centers"–are covered. Thus, acts or threats of force against, or physical obstruction of, persons who work as providers in such facilities, and damage or destruction of the property of such facilities, violate this law if the requisite motive is established.

The Act contains a narrow exception for activities of a parent or legal guardian of a minor directed exclusively at that minor. Section 2715(a) provides that a parent or legal guardian of a minor shall not be subject to the penalties or civil remedies of this law for engaging in the prohibited activities insofar as they are directed exclusively at that minor. The Committee has included this provision only because it is confident that state and local laws are adequate to protect against and punish such conduct; the Committee does not condone, and does not mean to imply that it does, any abuse of minor children in the abortion context or any other. Further, because the exception applies only "insofar as [such activities] are directed exclusively" at the individual's own minor child, there will be no exemption from any of the penalties or remedies of the Act to the extent that an offender's conduct intentionally injures, intimidates or interferes with parties other than that minor.

The Act creates no civil or criminal liability for the enforcement by State or local law enforcement authorities of State or local laws, including those regulating the performance of abortion or the availability of abortion-related services.

## 2. Criminal penalties and civil remedies

Section 2715(b) sets out the maximum criminal penalties for the conduct prohibited in section 2715(a). They are: in the case of a first offense, fines in accordance with title 18 of the U.S. Code (18 U.S.C. S 3571) or imprisonment of not more than one year, or both; in the case of a second or subsequent offense after a prior conviction under this section, fines in accordance with title 18 or imprisonment of not more than three years, or both; for offenses resulting in bodily injury, 10 years imprisonment or such fines, or both; and for offenses resulting in death, any term of years or a life term or such fines, or both.

These penalties are consistent with those provided in the statutes upon which this Act is principally modeled (18 U.S.C. S 245; 42 U.S.C. S 3631).

These criminal provisions are necessary because, as explained above, existing State and local laws against this conduct have not adequately prevented it from occurring and recurring; as noted above, many offenders have shown no reluctance to repeat the offenses. The Committee believes that the fact that this law will make such conduct a Federal offense, subject to the panoply of Federal investigative and law enforcement resources and punishable by substantial penalties, will cause it to be taken more seriously, **\*26** and result in more successful deterrence and punishment of offenders.

Section 2715(c) establishes certain civil remedies as well. Subsection 2715(c)(1) provides that any person aggrieved by reason of the conduct prohibited by section 2715(a) may bring a civil action for injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. Subsection 2715(c)(2) authorizes the Attorney General of the United States to bring suit if she has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance. Subsection 2715(c)(3) authorizes State Attorneys General to bring suit under the same circumstances in which the U.S. Attorney General may sue, and for the same relief.

Accordingly, the Act will provide a clear basis on which to seek Federal court injunctions to restrain violative conduct, filling the gap left by the construction of 42 U.S.C. S 1985(3) rendered in the Bray decision. It will also enable victims to recover monetary damages for injuries they may suffer. Because of the expense and other difficulties of proving actual damages (for example, a clinic's lost income), the Act provides for statutory damages of $5,000 per violation, at the plaintiff's election.[40] Finally, as an additional deterrent, the law authorizes the award of punitive damages (in private cases) and civil penalties (in

cases brought by the Attorney General of the United States or of a State). The civil penalties may not exceed $15,000 for a first violation, or $25,000 for a subsequent violation. [41]

Those entitled to sue as "aggrieved persons" would include, for example, patients, physicians or clinic staff (or their families subjected to violence, threatened with harm, or physically blocked from entering a clinic, as well as clinics that have been blockaded, invaded, bombed, burned, damaged by chemical attacks or otherwise vandalized. Persons injured in the course of assisting patients or staff in gaining access to a facility, or injured bystanders, may also sue if they can establish that the conduct causing the injury was undertaken with the requisite motive–in order to intimidate some person or class of persons from obtaining or providing abortion-related services. Those with standing as an association representing injured parties would also be entitled to sue to the extent that existing principles of standing permit them to do so.

Attorney General Janet Reno emphasized in her testimony, and the Committee agrees, that both the criminal penalties and the civil remedies are critical features of the legislation. She testified:

The inclusion of both civil and criminal penalties is very important. The civil remedies of injunctions and damages are appropriate as a means of addressing massive blockades. Courts can fashion injunctive relief that will keep **\*27** clinics operating. \*\*\* Damages are important to compensate those individuals who, seeking to exercise their rights, suffer real harm, whether physical or psychological. And the authorization of statutory damages is appropriate to encourage victims to pursue violations and as a deterrent to violators.

Testimony of Attorney General Janet Reno, Senate Labor and Human Resources Committee, May 12, 1993.

Attorney General Reno also emphasized the importance of providing authority for the Attorney general to file civil actions:

[I]t is very important that the Attorney General have authority to file a civil action. This approach follows the model of other statutes protecting individual rights–notably the Fair Housing Act–by shifting the burden of civil enforcement from private victims to the government, which is often better able to pursue such cases and vindicate the enormous interest that our society has in protecting individual rights.

Id. It is for the same reasons that the Act authorizes State Attorneys General to bring civil suits in the same circumstances–where a State Attorney General has reasonable cause to believe that someone is, has been or may be injured by conducting constituting a violation of this Act, and concludes that such conduct raises an issue of general public importance. This provision was recommended by the National Association of Attorneys General (NAAG). See the testimony of New York Attorney General Robert Abrams, Senate Labor and Human Resources Committee, May 12, 1993, and the March 1993 Resolution of NAAG attached to it. [42]

3. Rules of construction

Section 2715(d) sets forth several rules of construction. Subsections 2715 (d)(1) through (d)(4) clarify that the States retain jurisdiction over any offense over which they could have jurisdiction absent this section; that State and local law enforcement authorities retain responsibility to prosecute acts that are violations of State or local law; that the Act does not establish exclusive penalties for conduct that may violate it; and that the Act does not limit the right of an aggrieved person to seek other civil remedies. This provision makes clear that the Act does not preempt a State or local law regulating the performance of abortions or the availability of abortion-related services.

In addition, subsection 2715(d)(5) makes clear that nothing in the Act is intended to prohibit expression protected by the First Amendment to the Constitution.

4. Effective date

The Act expressly provides (in section 4) that it will apply only to conduct occurring on or after the date of its enactment.

**\*28  B. THE ACT IS FULLY CONSISTENT WITH THE FIRST AMENDMENT**

1. In general

The Committee has carefully considered the First Amendment implications of the Act, and has concluded that the Act is clearly constitutional. Attorney General Reno, Harvard Law Professor Laurence H. Tribe, and the American Civil Liberties Union have reached the same conclusion and explained the bases for their views in their testimony before the Committee. Since their testimony was submitted, the soundness of this view has been confirmed by the Supreme Court's unanimous decision in Wisconsin v. Mitchell (No. 92–515, June 11, 1993).

The Act is carefully drafted so as not to prohibit expressive activities that are constitutionally protected, such as peacefully carrying picket signs, making speeches, handing out literature, or praying in front of a clinic (so long as these activities do not cause a "physical obstruction" making ingress to or egress from the facility impassible or rendering passage to it difficult or hazardous). Moreover, as noted, section 2715(d)(5) of the Act states expressly that nothing in it shall be construed or interpreted to prohibit expression protected by the First Amendment to the Constitution. [43]

The Committee expects the courts, in accordance with well established rules of construction, to construe the Act carefully to avoid any constitutional issue.

The conduct that is prohibited by S. 636 is not protected by the First Amendment–certain acts of force, threats of force, physical obstruction, and destruction of property. It is not even arguable that shootings, arson, death threats, vandalism or the other violent and destructive conduct addressed by the Act is protected by the First Amendment. In Mitchell, the Court reiterated the well settled rule that such conduct is not constitutionally protected merely because the person engaging in it "intends thereby to express an idea." Slip Op. at 6 (citation omitted). As the Court summarized:

"[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment. See Roberts v. United States Jaycees, 468 U.S. 609, 628 (1984) ("[V]iolence of other types of potentially expressive activities that produce special harms distinct from their communicative impact *** are entitled to no constitutional protection"); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence").

Id.

**\*29**  It is equally clear that physical obstruction of access to a clinic is not constitutionally protected conduct. As the Supreme Court said in Cox v. Louisiana, 379 U.S. 536, 555 (1965), "A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

Nor are "threats of force" constitutionally protected. Convictions under the "threat of force" clause of the statutes on which S. 636 is modeled have been upheld. See United States v. Gilbert, 884 F.2d 454 (9th Cir. 1989), cert denied, 493 U.S. 1082 (1990) (upholding against a First Amendment challenge the threat of force provision of 42 U.S.C. S 3631, and a conviction under that statute). The court in Gilbert applied the rule of Watts v. United States, 394 U.S. 705 (1969), that genuine or "true" threats of violence–as opposed to mere political hyperbole–are punishable. Under Watts, a threat is a "true" threat if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates it as a serious expression of an intention to inflict bodily harm. It is such "true" threats that are prohibited by S. 636.

In short, nothing in the Bill of Rights prevents Congress from requiring anti-abortion demonstrators to obey certain rules against violence, obstruction and threats of force in the manner adopted in S. 636.

2. Motive element

The Act's imposition of penalties based on the motive of the offender–that is, when the offender is acting because another person is or has been obtaining or providing abortion-related services, or in order to intimidate someone from doing so–is fully consistent with the First Amendment. This was made absolutely clear by the Supreme Court's unanimous decision in Mitchell. There the Court upheld a "hate crimes" statute that punishes "conduct motivated by a discriminatory point of view more severely than the same conduct engaged in for some other reason or for no reason." Slip Op. at 6. Similarly, S. 636 punishes certain conduct (use or threat of force, physical obstruction, destruction of property) when it is motivated by a desire to stop someone from obtaining or providing abortion-related services, while providing no punishment at all for the same conduct engaged in for some other reason or for no reason.

The result and analysis in Mitchell did not represent a new development in the law. As the Court noted in Mitchell, many laws upheld in the past make conduct unlawful based on the motive of the actor. The Court cited as an example the anti-discrimination laws which make an adverse employment action or the denial of housing unlawful only when it is done because of the person's race, religion, or other protected status.[44] The civil rights laws on which S. 636 is modeled include a motive element as well; 18 U.S.C. S 245, for example, prohibits force and threats of force intended to injure, intimidate or interfere with someone because another person  *30  is, or in order to intimidate someone from voting or engaging in activities related to voting, among other things.

Thus, S. 636 is not legislation of "viewpoint discrimination" or "thought crimes." In Mitchell, the Supreme Court unanimously rejected precisely that attack on the hate crimes law at issue there, even though the law penalized the defendant's discriminatorily motivated conduct. The Court noted that penalizing a motive for a crime is not the same as penalizing a person's abstract beliefs. (Slip Op. at 7). Likewise here, S. 636 would not punish anyone for holding the view that abortion is wrong, or for expressing opposition to abortion in peaceful, non-obstructive ways. Rather, it establishes penalties for engaging in certain constitutionally unprotected conduct based on a prohibited motive. The Court has made clear that this is permissible under the First Amendment.

3. Vagueness or overbreadth

In testimony before the Committee, concerns were raised that certain terms used in the Act–"physical obstruction," "intimidate," and "interfere with"–might be unconstitutionally vague or overboard. In the bill as reported by the Committee, however, each of these terms is clearly defined and limited. There can be no doubt that the bill suffers from no vagueness or overbreadth problem.

Indeed, the Committee believes that there is little merit to the argument that these terms would have been unconstitutionally vague or overbroad even without the inclusion of the definitions that are in S. 636 as reported. The terms "obstruct," "intimidate" and "interfere" are commonplace throughout the U.S. Code. As noted, the language of S. 636 that includes "intimidate" and "interfere with" is drawn directly from civil rights statutes that have long been enforced. And another statute prohibiting "intimidation" has specifically been held not to be unconstitutionally vague or overbroad. CISPES v. FBI, 770 F.2d 468 (5th Cir. 1985).

Likewise, "obstruction"–even without its limitation to "physical" obstruction–is found in numerous statutes. One such law, 43 U.S.C. S 1063, dates back to 1885.[45] In a challenge to another such law, the Supreme Court has held that "obstruct or unreasonably interfere"–language broader than that of S. 636–is not unconstitutionally vague or overbroad. Cameron v. Johnson, 390 U.S. 611 (1968). Clearly, then, "physical obstruction" is not vague or overbroad.

In summary, there is no basis for concluding that S. 636 violates the First Amendment to the Constitution.

## C. CONGRESS HAS CONSTITUTIONAL AUTHORITY TO ENACT THE ACT

Congress has two independent sources of constitutional authority to enact the Freedom of Access to Clinic Entrances Act: the Commerce Clause of Article I, section 8, clause 3 of the Constitution, and section 5 of the Fourteenth Amendment.

In their testimony before the Committee on May 12, 1993, Attorney General Reno and Professor Laurence Tribe set forth the bases for their conclusions that Congress has clear, affirmative authority to enact S. 636.

**\*31** 1. The commerce clause

Congress has clear constitutional authority to enact the Freedom of Access to Clinic Entrances Act under the Commerce Clause, which gives it authority to regulate interstate commerce.

Commerce Clause authority has been broadly interpreted, and an exercise of it will be sustained if Congress has a rational basis for finding that an activity affects interstate commerce, and its acts rationally in addressing the activity. Under the Commerce Clause, in conjunction with the Necessary and Proper Clause, Congress has authority to regulate activity that is purely local if that activity has an effect on interstate commerce. Further, once Congress finds that a class of activities affects interstate commerce, Congress may regulate all activities within that class, even if any of those activities, taken individually, has no demonstrable effect on interstate commerce. It has also been considered important to Commerce Clause analysis that the problem Congress is addressing is national in scope and exceeds the ability of a single state or local jurisdiction to solve. Under these principles, S. 636 falls easily within the commerce power.

Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the stream of interstate commerce.

In addition, many of the patients who seek services from these facilities engage in interstate commerce by traveling from one state to obtain services in another. In Bray, the Supreme Court accepted the district court's finding that substantial numbers of women travel interstate to seek abortion services. Bray v. Alexandria Women's Health Clinic, supra, 113 S. Ct. 753 at 762. Attorney General Reno pointed out that a Federal district court in Wichita, KS, found that 44 percent of the patients at a clinic there came from out-of-State. And Willa Craig testified before the Committee that many patients of her clinic in Montana came from Idaho, Washington, Wyoming and Canada.

Clinic employees sometimes travel across State lines to work as well. Like Dr. David Gunn, the physician who was killed in Pensacola, FL, some doctors who perform abortions work in facilities in more than one State. [46]

In addition, as Attorney General Reno noted, the types of activities that would be prohibited by S. 636 have a negative effect on interstate commerce. As the record before the Committee demonstrates, clinics have been closed because of blockades and sabotage and have been rendered unable to provide services. Abortion providers have been intimidated and frightened into ceasing to perform abortions. Clearly, the conduct prohibited by S. 636 results in the provision of fewer abortions and less interstate movement of people and goods. This situation is analogous to Congress's exercise **\*32** of the commerce power in passing Title II of the Civil Rights Act of 1964, which was premised on the conclusion that restaurants that discriminated served fewer customers, and therefore suppressed interstate commerce. See Heart of Atlanta Motel v. United States, 379 U.S. 241 (1964). Here, of course, the very purpose of those engaging in the conduct addressed by S. 636 is to suppress the provision of abortion services.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Accordingly, the Committee concludes that Congress clearly has the authority to enact this law pursuant to the Commerce Clause.

## 2. Section 5 of the fourteenth amendment

The Committee concludes that Congress also has independent authority to enact the Freedom of Access to Clinic Entrances Act under Section 5 of the Fourteenth Amendment. Under this section, Congress has the power "to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment, including the provisions dealing with "liberty," "equal protection of the laws," and "the privileges or immunities of citizens of the United States."

The Freedom of Access to Clinic Entrances Act seeks to protect the right to terminate a pregnancy, a right that falls squarely within the rights guaranteed by the Fourteenth Amendment. Recently, in Planned Parenthood of Southeastern Pennsylvania v. Casey, 112 S. Ct. 2791 (1992), the Supreme Court reaffirmed its longstanding holding that a woman's decision to terminate her pregnancy prior to fetal viability is protected from state interference by the Fourteenth Amendment's liberty clause.

Although the Fourteenth Amendment restricts only state action by its terms, the Committee concludes that Congress has the authority under the Fourteenth Amendment to reach the private conduct prohibited by S. 636. The basis for this conclusion, summarized below, is explained more fully in Professor Tribe's testimony.

In Katzenbach v. Morgan, 384 U.S. 641 (1966), the Supreme Court upheld, as a valid exercise of congressional power under Section 5, a provision of the Voting Rights Act of 1965 that effectively overrode an English literacy voting requirement imposed by New York, even though the Court had previously ruled that enforcing this requirement does not itself violate the Fourteenth or Fifteenth Amendment. The Court reasoned that Congress's power to enforce the Fourteenth Amendment is significantly broader than that of the Judiciary, because Congress may determine–on the basis of its superior fact-finding capabilities and the broader range of remedial options open to it–that certain measures are necessary to remove impediments to the political process, or to ensure that other Federal rights are fully secured. The Court noted that, by making it easier for those with a specified level of schooling to vote regardless of their English literacy, Congress facilitated Federal rights, like the right not to be discriminated against on grounds of their national origin in the delivery of municipal services.

That principle, first established in Katzenbach, is now well accepted. As Justice O'Connor wrote more recently for a majority of the Court, "[t]he power to 'enforce' [the provisions of the Fourteenth Amendment] may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations." **\*33** City of Richmond v. J. A. Croson Co., 488 U.S. 469, 490 (1989); see also City of Rome v. United States, 466 U.S. 156, 176 (1980) ( "legislation enacted under authority of S 5 of the Fourteenth Amendment [will] be upheld so long as the Court [can] find that the enactment, 'is plainly adapted to [the] end' of enforcing the Equal Protection Clause and 'is not prohibited by but is consistent with "the letter and spirit of the constitution,"' regardless of whether the practices outlawed by Congress in themselves violated the Equal Protection Clause") (citations omitted).

In addition, in United States v. Guest, 383 U.S. 745 91966), the Supreme Court intimated that Congress could in fact regulate at least some private conduct under the Fourteenth Amendment. In Guest, six Justices joined one or the other of two concurring opinions declaring that Congress possessed the power under Section 5 of the Fourteenth Amendment "to enact laws punishing all conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not State officers or others acting under the color of State law are implicated in the conspiracy." Id. at 782 (opinion of Brennan, J., joined by Warren, C.J., and Douglas, J.); id. at 762 (Clark, J., concurring, joined by Black and Fortas, JJ.). Justice Brennan's opinion utilized an approach identical to the one he subsequently applied in Katzenbach v. Morgan: "S 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created by and arising under that Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection." 383 U.S. at 782 (opinion of Brennan, J.).

In dictum in District of Columbia v. Carter, 409 U.S. 418 (1973), a unanimous Supreme Court subsequently reaffirmed the proposition that to say that "[t]he Fourteenth Amendment itself 'erects no shield against merely private conduct' *** is not to say *** that Congress may not proscribe purely private conduct under S 5 of the Fourteenth Amendment." 409 U.S. at 424 n.8.

Thus, Congress has the authority under Section 5 of the Fourteenth Amendment to read purely private conduct on the ground that states and municipalities, acting alone, will be unable to provide sufficient protection against private acts that threaten the full enjoyment of Federal constitutional rights such as the right to terminate a pregnancy, reaffirmed in Casey. Because the States have been overwhelmed in their efforts to prevent private obstruction of access to abortion clinics and private violence against abortion patients and providers, the Committee concludes that Congress must supplement those efforts with this legislation, and that it has the power to do so under the Fourteenth Amendment.

## VI. SUMMARY OF COMMITTEE ACTION

S. 636, the Freedom of Access to Clinic Entrances Act of 1993, was introduced on March 23, 1993. The committee met to consider it on June 23, 1993. The Committee agreed to an amendment in the nature of a substitute proposed by Senator Kennedy, after disapproving four other amendments.

**\*34**  The committee defeated an amendment in the nature of a substitute offered by Senator Coats, by a vote of 6–11. The vote on the Coats amendment was:

| YEAS 6 | NAYS 11 |
|---|---|
| Kassebaum | Pell |
| Coats | Metzenbaum |
| Gregg | Dodd |
| Thurmond | Simon |
| Hatch | Harkin |
| Durenberger | Mikulski |
| | Bingaman |
| | Wellstone |
| | Wofford |
| | Jeffords |
| | Kennedy |

The committee also defeated three amendments offered by Senator Hatch. The first would have replaced the term "abortion-related services" with "abortion, pregnancy and childbirth services" and supplied a definition for that term. This amendment was defeated by a vote of 8–9. This vote was as follows:

| YEAS 8 | NAYS 9 |
|---|---|

| Kassebaum | Pell |
| Jeffords | Metaenbaum |
| Coats | Dodd |
| Gregg | Simon |
| Thurmond | Harkin |
| Hatch | Mikulski |
| Durenberger | Bingaman |
| Wofford | Wellstone |
| | Kennedy |

   The second amendment would have added a new subpart to the bill prohibiting force or threat of force, or physical obstruction, intended to injure, intimidate or interfere with any person exercising the First Amendment freedom of speech within 300 feet of a facility providing abortion services. This amendment was modified by an amendment offered by Senator Gregg prohibiting force or threat of force or physical obstruction to intimidate or prevent any person from participating lawfully in speech or peaceful assembly regarding abortion-related services. This amendment was defeated by a vote of 6–11, as follows:

| YEAS 6 | NAYS 11 |
|---|---|
| Kassebaum | Pell |
| Coats | Metaenbaum |
| Gregg | Dodd |
| Thurmond | Simon |
| Hatch | Harkin |
| Durenberger | Mikulski |
| | Bingaman |
| | Wellstone |
| | Wofford |
| | Jeffords |
| | Kennedy |

   **\*35**  The third Hatch amendment would have added the word "lawful" between "providing" and "abortion-related services." This was defeated by a vote of 5–12, as follows:

| YEAS 5 | NAYS 12 |
|---|---|

| | |
|---|---|
| Coats | Pell |
| Gregg | Metzenbaum |
| Thurmond | Dodd |
| Hatch | Simon |
| Durenberger | Harkin |
| | Mikulski |
| | Bingaman |
| | Wellstone |
| | Wofford |
| | Kassebaum |
| | Jeffords |
| | Kennedy |

The Kennedy substitute was then approved on a voice vote, and the bill as amended was reported favorably to the full Senate by a vote of 13–4, as follows:

| **YEAS 13** | **NAYS 4** |
|---|---|
| Pell | Coats |
| Metzenbaum | Gregg |
| Dodd | Thurmond |
| Simon | Hatch |
| Harkin | |
| Mikulski | |
| Bingaman | |
| Wellstone | |
| Wofford | |
| Kassebaum | |
| Jeffords | |
| Durenberger | |
| Kennedy | |

## VII. REGULATORY IMPACT STATEMENT

The Committee has determined that there will be minimal increases in the regulatory burden imposed by this bill.

## VIII. COST ESTIMATE

U.S. Congress,
Congressional Budget Office,
Washington, DC, July 29, 1993.

Hon. Edward M. Kennedy,

Chairman, Committee on Labor and Human Resources,

U.S. Senate, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has reviewed S. 636, the Freedom of Access to Clinic Entrances Act of 1993, as ordered reported by the Senate Committee on Labor and Human Resources on June 23, 1993. CBO estimates that enactment of S. 636 would result in an increase in both federal receipts and direct spending of less than $500,000 annually. Because this **\*36** bill would affect receipts and direct spending, it would be subject to pay-as-you-go procedures under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985. CBO estimates that the bill would impose no costs on state or local governments.

S. 636 would amend the Public Health Service Act to make it a federal offense for protesters to use force or physical obstruction to intentionally injure, intimidate, or interfere with anyone seeking or providing abortion-related services. This bill also would prohibit an individual from intentionally damaging or destroying the property of a medical facility that provides abortion-related services or counseling on alternatives to abortion.

Enforcing this legislation would consume staff time and other resources of the federal government. The costs would depend on the number of offenses committed and the extent of the enforcement effort made by the Department of Justice. CBO expects that such costs would be less than $5 million a year.

The bill would provide for civil and criminal penalties for violations of its provisions. CBO estimates that fines or civil penalties paid to the government would total less than $500,000 a year, which would be recorded in the budget as governmental receipts, or revenues. The fines would be deposited in the Crime Victims Fund and spent in the following year. Thus, enactment of S. 636 would affect both receipts and direct spending. The increase in direct spending would be the same as the amount of fines collected with a one-year lag. Therefore, the additional direct spending would also be less than $500,000 a year.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Susanne Mehlman and Melissa Sampson.

Sincerely,

Robert D. Reischauer, Director.

## **\*37**  IX. ADDITIONAL AND MINORITY VIEWS

### ADDITIONAL VIEWS OF SENATOR KASSEBAUM

I strongly agree with the need to enact federal legislation which will enable the Justice Department and the federal judiciary to intervene when protests escalate to the level of violence and destruction that have been directed against abortion clinics in our country. The freedom of speech guaranteed by the constitution does not include bombings, vandalism, assault, arson, destruction of property, and physically preventing people from entering medical clinics. Unfortunately, it took the murder of

Dr. David Gunn in Pensacola, Florida, for many people to recognize the danger in the escalating pattern of violence that has been directed against abortion providers in this country.

Wichita, Kansas, was the site of one of the longest, most widely publicized clinic blockade actions. Operation Rescue's "Summer of Mercy" in 1991 tore Wichita apart–and deepened the divisions between pro-choice and pro-life citizens of that city. The protest created a climate of intolerance and anger which permeated Wichita. In the almost two years since the protest began, the effects can still be felt–tempers still flare, blockade actions are still attempted, wanted posters are distributed. The animosity between the two sides of this very divisive debate continues to deepen.

The federal government has a legitimate role to play in protests that are characterized by an escalating pattern of violence, an inability of local law enforcement officials to control the violence and actions designed to prevent people from accessing or providing services protected by the Constitution. The "Freedom of Access to Clinics Act of 1993" identifies an appropriate role for federal intervention into violent protests against abortion clinics.

Reviewing the legislation and listening to testimony at the public hearing reaffirmed my belief that the physical obstruction, violence, and destruction of property being described cannot be tolerated. It cannot be tolerated at abortion clinics, at biomedical research facilities where animals are used as research subjects, at companies as a part of labor disputes, or anywhere. With that recognition, I have explored the possibility of crafting an amendment to the legislation which would address my concern that Congress needs to broaden its view beyond the doors of abortion providers.

I may offer an amendment during the Senate debate on this legislation which would ensure that escalating levels of violence designed to prevent people from engaging in legal commercial activities will be treated the same under federal laws–and the protections sought for abortion clinics will be available to others if the need arises. I believe this is a serious issue that deserves to be discussed by the members of the Senate.

 **\*38**  One option is to provide the attorney general of the United States with the ability to seek temporary, preliminary, or permanent injunctive relief against the physical obstruction of any entrance to a commercial enterprise. Physical obstruction is defined as rendering impassable ingress to or egress from an entrance, or rendering passage to or from such a commercial enterprise unreasonably difficult or hazardous.

Under this option, the attorney general could seek the injunctive relief in U.S. district court if there is reasonable cause to believe that any person or group of persons is being denied lawful access by such obstructing conduct and that such obstruction raises an issue of general public importance.

Nothing in the legislation should prevent a state from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section. Nor should the amendment deprive state and local law enforcement the responsibility for prosecuting acts that are violations of state and local laws.

I believe that this approach to the problem incorporates an element of fundamental fairness with regard to the federal role in violent protests which clearly goes beyond any reasonable interpretation of free speech–regardless of the setting.

## **\*39**  ADDITIONAL VIEWS OF SENATOR DURENBERGER

### MY SUPPORT FOR S. 636

On June 23, 1993, I joined 12 of my colleagues on the Senate Labor and Human Resources Committee in voting to favorably report S. 636, the Freedom of Access to Clinic Entrances Act of 1993 ("Clinic Entrances Act"), with an amendment in the nature of a substitute.

Although I had some very serious concerns about S. 636 at the time of the vote, and continue to have concerns about the bill as currently drafted, my vote in Committee was intended to express the unity which exists across the entire political spectrum on the key goal of deterring violence and harassment against those exercising or attempting to exercise their constitutionally-protected rights.

Regardless of one's beliefs regarding the appropriateness of abortion, the Supreme Court has consistently held for over two decades that the right to terminate a pregnancy is protected by the U.S. Constitution. While I cannot morally or personally condone the taking of innocent unborn human lives, I strongly believe that harassment and violence against women, doctors, and innocent citizens who exercise or attempt to exercise the so-called right to choose should be prohibited. Unlike peaceful protests and acts of civil disobedience, violence done in the name of a cause accomplishes little more than to damage that cause. Therefore, I believe it is incumbent upon those of us who oppose the taking of innocent human also to oppose and deplore actions which harm others.

In addition, the bill's chief sponsor, Senator Kennedy, had made several important changes to the bill since its introduction in March 1993 that had gone a long way toward addressing my concerns and the concerns of some of my colleagues. He also indicated that he was willing to work with the members of the Committee following the Executive Session on June 23 to address remaining concerns about the legislation. My vote in Committee, therefore, was also intended to convey my recognition of Senator Kennedy's good faith offer, and to express my hope that he would in fact make further modifications to S. 636 that would address my remaining concerns about the legislation.

## PURPOSE OF THESE ADDITIONAL VIEWS

While I voted with the majority to report S. 636 favorably, I share many of the concerns expressed by my colleagues Senators Hatch, Coats, Gregg, and Thurmond in the Minority Views section of this Report. Because of this somewhat unique posture, I am filing these Additional Views in order to amplify my remaining concerns about the bill and to express, once again, my sincere hope that they will be addressed before S. 636 reaches the Senate floor.

## *40 SEVERAL IMPORTANT CHANGES HAVE BEEN MADE TO S. 636

I want to commend Senator Kennedy for the changes he has made to the Clinic Entrances Act in order to address some of the concerns that I and other members of the Labor Committee had raised about the bill. While we have not yet achieved all of the changes that I think would really improve this legislation, Senator Kennedy has, as I stated earlier, come a long way toward meeting my original objections about S. 636.

The spirit behind those modifications is consistent with my sincere hope that we can find common ground despite our disagreements about the larger issues that have dominated the abortion debate.

As S. 636 is now drafted:

It avoids First Amendment "overbreadth" and "void-for-vagueness" concerns by defining the key terms "physical obstruction," (meaning to make access to or from a medical facility impassable, unreasonably difficult, or hazardous), "intimidate" (meaning to place a person in reasonable apprehension of bodily harm to himself or another), and "interfere with" (meaning to restrict a person's freedom of movement);

It provides legal protection for parents and legal guardians by exempting them from criminal and civil penalties for trying to counsel their children not to have abortions;

It broadens the definition of "abortion-related services" so that the bill now protects those facilities providing a broad range of health and pregnancy-related services, including counselling about adoption and other alternatives to abortion; and

It no longer includes a section that would have given the Secretary of Health and Human Services broad investigative power to determine whether the provisions of S. 636 had been violated and, where appropriate to refer the matter to the Attorney General for civil action.

These changes are significant. I believe they demonstrate a good faith effort on Senator Kennedy's part to address some of the legitimate concerns that I have raised about this bill. I am convinced that S. 636 now strikes a more appropriate balance between protecting clinic clients and protecting the legitimate rights of clinic protestors.

## SEVERAL ADDITIONAL CHANGES MUST BE MADE

However, I want to stress once again that the bill is still far from perfect and that several additional changes should be made.

In particular, the bill's protections should be expanded to protect the First Amendment rights of those on both sides of this issue–by making it unlawful to intimidate, harm, interfere with, or prevent anyone from engaging in lawful speech and peaceful protest at "medical facilities," as defined by S. 636.

I joined six of my colleagues in voting for an amendment offered by my colleague, Senator Hatch, during Committee consideration of S. 636 that would have added a new subpart to the bill prohibiting force or threat of force, or physical obstruction, intended to injure, intimidate or interfere with any person exercising First Amendment freedom of speech within 300 feet of a facility providing abortion  *41  services. A similar provision also was included in the amendment in the nature of a substitute I also supported that was offered by my colleague, Senator Coats. Unfortunately, both amendments were defeated by a vote of 6–11.

This issued is very significant to me, and–I am sure–to many other Senators on both sides of the abortion question who believe that the First Amendment applies to all Americans. In a rush to outlaw violence, harassment, and physical blockades, we must be especially careful not trample the First Amendment rights of those who are engaging in legitimate, peaceful protest and civil disobedience.

I want to make clear that my efforts to address this free speech concern are not intended, in any way, to undermine or impugn the underlying objectives of this legislation. In fact, this amendment is highly consistent with those objectives: I believe that protecting the rights of protesters would help to further reduce violence, intimidation, and harassment by discouraging those on both sides of this issue from harming those with whom they do not agree. As Senator Hatch said during the Committee's consideration of S. 636, peace cannot be achieved by disarming only one side.

Recent events in my home State of Minnesota have demonstrated, once again, that the safeguards some of my colleagues and I have been seeking in this bill for protesters are absolutely necessary. Over the past several weeks, Minnesotans have received a forceful reminder over these past several weeks that harassment, vandalism and lack of respect for the rights of individuals are not the exclusive province of either extreme in the ongoing debate over abortion.

Operation Rescue has just concluded several weeks of demonstrations, prayer services and other events in the Twin Cities designed to call attention to the tragedy of abortion. And, while much of the attention has focused on fears that the kind of illegal activity associated with Operation Rescue in the past might be repeated in Minnesota, the events of recent weeks instead have been dominated by arrests of fringe pro-choice activists engaged in harassment and vandalism directed against law-abiding individuals with whom they disagree. Perhaps most disturbing, the arrests have included highly offensive harassment of individuals who were doing nothing more than attending church on a Sunday morning.

The Majority spends a great deal of time in its Report attempting to build the case that S. 636 is designed to combat a "nationwide campaign" of "blockades, invasions, vandalism," and "violence" by those opposed to abortion. There is no doubt that such events have occurred. Although we have not experienced the degree of tragedy that occurred in Pensacola, Florida, earlier this year, Minnesota has seen its share of violence and harassment directed at health care personnel and patients of abortion clinics. In the last year, for example, there have been two attempts to blow up an abortion clinic in Robbinsdale, Minnesota, and to damage other facilities. The people who work at these clinics–from doctors to directors to receptionists–have been illegally and repeatedly harassed, both at work and at their homes.

Yet, the Majority Report is entirely bereft of descriptions of violence and harassment against pro-life groups and those exercising **\*42** their legitimate First Amendment right to engage in lawful speech and peaceful assembly.

For example, the Report does not relate the testimony by Joan Appleton, from the Pro-Life Action Ministries in St. Paul, Minnesota that was presented at the May 12, 1993 hearing on S. 636. Ms. Appleton testified as follows: "The only violence I have ever witnessed at an abortion clinic was this part summer at an abortion clinic in the St. Paul-Minneapolis area where there was a large number of pro-abortion demonstrators invited by the director of the clinic. I witnessed elderly pro-lifers being mocked and spat upon by the demonstrators while they were praying. \*\*\* This past summer in Robbinsdale, Minnesota, there were three arrests by the local police department for physical and sexual assaults. All three of these arrests were of abortion advocates."

My point in highlighting Ms. Appleton's testimony and in offering this report on what has been happening in Minnesota in recent weeks is not to suggest that two wrongs make a right. Instead, I am offering these concrete examples to illustrate why I believe it is so important that we put aside our personal differences on the issue of abortion and work together to ensure that all citizens–pro-choice, pro-life, in-between, or disinterested–have the right to go about their legitimate business and exercise their constitutional rights without running the risk of being physically abused by zealots on either side.

All law-abiding citizens–regardless of their personal beliefs on this issue–deserve to be protected. And all of us–regardless of how we might feel about the issue of abortion itself–should be willing to find a common way in which that protection can be assured.

My second major concern with S. 636, as currently drafted, is that the bill provides corresponding enforcement authority to State Attorneys General. While there is legal precedent for granting state officers the authority to enforce federal laws, the civil rights law, 42 U.S.C. S 1985(3), upon which S. 636 is premised contains no such grant of authority. Furthermore, I firmly believe that granting state officers the full power to enforce the Clinic Entrances Act will even further politicize an issue that already has become too political.

This broad grant of authority is unwarranted and unnecessary. Nothing in the record even remotely suggests that the federal government is ill-equipped, ill-prepared, or unwilling to enforce the Clinic Entrances Act. In fact, in a letter to Senator Kennedy dated June 15, 1993, Attorney General Reno stated: "I write to express again the support of the Department of Justice for S. 636, the Freedom of Access to Clinic Entrances Act" (emphasis added). The Attorney General further states that this grant of federal authority was "essential," in part because the activities of pro-life protesters "have overwhelmed the ability of local law enforcement to respond." See June 15, 1993 Letter from Attorney General Janet Reno to the Honorable Edward M. Kennedy.

If the bill's author and chief sponsor has some concerns about the willingness and commitment of future Administrations to enforce this law, he should provide a more limited grant of authority to State Attorneys General consistent with those concerns.

**\*43** CONCLUSION

In conclusion, I want to emphasize again my sincere hope that this legislation will help create an environment in which we can work toward a more peaceful settlement and understanding on the issue of abortion. It is in this spirit of good faith–in

an appeal to reason on all sides–that I voted to report S. 636 out of Committee. Because of my continuing belief that persons holding divergent views on the central issue of abortion can–and should–settle their differences by discussion and expression rather than physical violence, I sincerely hope that we can resolve these few remaining obstacles I have outlined above before the Clinic Entrances Act reaches the Senate floor.

**\*44  ADDITIONAL VIEWS OF SENATOR COATS**

During Committee consideration of S. 636 I indicated my support for the general direction of this legislation, I was concerned, however, about several of its provisions. While the bill reported out of Committee addresses some of those concerns, I remain convinced that the Coats substitute provides a better method to address the problem of clinic violence.

As introduced, S. 636 was not limited to force or threat of force, but included an undefined term "physical obstruction" which could have covered entirely peaceful and lawful activity such as sidewalk counseling. The Kennedy substitute as reported from this Committee now include a definition of "physical obstruction" and I have indicated my support for that definition.

The committee reported substitute has also been amended to include definitions of "intimidate" and "interfere with". While these definitions are not identical to those contained in the Coats amendment they have essentially the same effect, and are therefore acceptable.

While noteworthy progress has been made modifying S. 636, the Coats and Kennedy substitutes continue to have at least three significant differences.

First, the Kennedy substitute unfairly discriminates against women seeking important and constitutionally protected health services that are not abortion services. While the Kennedy substitute has been amended to replace the term "abortion services" with "abortion related services" and includes facilities providing counselling and services on alternatives to abortion, the term "abortion related services" does not adequately protect women seeking to access services which are not directly related to abortion.

As Senator Wofford stated during the Committee markup of S. 636, to label all services related to pregnancy "abortion-related services" is insulting and offensive. Information about prenatal care, social service programs, treatment for sexually transmitted diseases are examples of information and treatment options that are not "abortion related services" and would therefore not be afforded protection under the Kennedy bill. Under the Coats substitute they would be protected as "reproductive health services."

The Coats substitute embodies a belief that women deserve to be protected when they enter a clinic regardless of whether they are there for prenatal care, for a morning after pill following a rape, for a pap smear, for treatment for a sexually transmitted disease, or for an abortion. The Court has stated on numerous occasions that all reproductive health choices, either to bear or not to bear a child are protected in the Constitution.

A second difference between the Kennedy and Coats substitutes is that the Coats substitute prohibits interference with a woman's **\*45**  right to reproductive health services regardless of the person's "motivation".

Before a person is afforded protection under S. 636 he or she must prove they have been targeted because they are seeking or have sought to obtain or provide abortion services. The Kennedy bill therefore requires that there be specific intent to deny a person access to abortion services. On the other hand, the Coats bill seeks first to assure women access to reproductive health services, and punishes interference with that access regardless of the motivation.

The Coats substitute addresses a conflict in which two groups are involved in a protest at the same facility. One is blocking access to the clinic because of their stand on abortion, the other is blocking access to the clinic because of some other reason (e.g.,

unfair labor practice objection). Under the Kennedy bill, only the group blocking access because of their pro-life motivation would be prosecuted and subject to the penalties of this act.

The Coats bill treats those who physically obstruct access to or from the clinic equally, regardless of their motivation or intent. It places an emphasis on assuring women access to health services rather than singling out a particular viewpoint for punishment.

The final main difference between the Coats and Kennedy substitutes is its treatment of First Amendment protected speech.

The Kennedy bill provides a "rule of construction" which states that "nothing in this section shall be construed or interpreted to prohibit expression protected by the First Amendment to the Constitution." Rules of construction cannot cure patent or latent un-constitutionality. One cannot simply write a bill that encroaches free speech rights and then add a disclaimer in this fashion.

The Coats substitute recognizes the delicate balance between First Amendment protections and "privacy" protections as enumerated by the Court. Therefore it includes separate cause of action for persons engaged in lawful speech or peaceful protest. If a person attempts to use force or threat of force or physical obstruction to deny a protester on either side of the issue his right to exercise First Amendment speech, that person will be subject to the penalties contained in this legislation.

We all agree that clinic violence must stop. But we must also protect legitimate free speech interests. The solution to clinic violence is not to disarm only one side of the controversy. We must reduce hostility on both sides of the issue. If we fail to address this issue we effectively condoned a form of content discrimination that silences one side of an important debate.

Dan Coats.

## *46  MINORITY VIEWS OF SENATORS COATS, GREGG, THURMOND, AND HATCH

Like millions and millions of other Americans opposed to abortion, we categorically condemn the March 1993 killing of Dr. David Gunn in Pensacola, Florida, and other acts of violence against abortion clinics and those providing abortion services. Such desperate acts of violence are no answer to the violence of abortion itself.

S. 636 is not, however, a well-honed or appropriate federal response to the problem of violence outside abortion clinics. We note in particular the following significant defects in the current version of S. 636:

1. S. 636 fails to differentiate between violent and nonviolent activities.–Our American tradition recognizes the fundamental distinction between acts of violent lawlessness and acts of peaceful civil disobedience. Acts of violent lawlessness appropriately invite severe penalties. But acts of peaceful civil disobedience. –mass sit-ins, for example, that draw on the tradition of Gandhi and Martin Luther King, Jr.–should not be subjected to such steep penalties.

Such acts are, of course, not privileged. Rather, civil disobedience is, by definition, unlawful. Acts of peaceful civil disobedience should, however, be punished roughly in the same manner and to the same extent as like conduct engaged in by anyone else. For example, if protesters commit unlawful trespass, they should be subjected to roughly the same penalties that other trespassers face. To impose a substantially more severe penalty presents the threat of viewpoint discrimination, no matter how cleverly disguised.

S. 636 indiscriminately lumps together violent and nonviolent activities and imposes severe penalties on both. Under S. 636, a person who commits an entirely peaceful violation–a person, for example, sitting silently with others on a sidewalk outside an abortion clinic–is treated the same as a person who acts violently (but fails to inflict bodily injury). The peaceful protester, like her violent counterpart, would face criminal penalties of one year in jail and a $100,000 fine for a first violation, and three years and a $250,000 fine for subsequent violations. The peaceful protester would likewise face civil damages of $5000 per violation and civil penalties of $15,000 per violation.

Had States during the 1950s and 1960s been able to impose and uphold such severe penalties on peaceful civil disobedience, the civil rights movement might well have been snuffed out in its infancy. A broad range of peaceful anti-abortion activity may well be disruptive and may interfere with the lawful rights of others. The same, it must be noted, was true of civil rights protests: they were (and were intended to be) disruptive, and they interfered with the then-lawful rights of others.

It is not our point to debate the relative moral standing of the anti-abortion and civil rights movements. Nor do we suggest that **\*47** peaceful civil disobedience should not be punished. We simply emphasize the grave danger of viewpoint discrimination inherent in imposing the same severe penalties on peaceful civil disobedience as on violent lawlessness.

The Committee report contends that S. 636 is modeled on federal civil rights laws. We note, however, that the federal civil rights laws cited do not contain the term "physical obstruction" and have been construed to apply only to acts of violence or threats of violence. (Written testimony of Professor David M. Smolin, May 18, 1993, at 14.) In extending its severe penalties to peaceful civil disobedience, S. 636 thus departs from the models on which it purports to reply.

2. S. 636 would protect illegal abortions.–Unlike the original version of S. 636, the current version extends its protections to illegal abortions. As a result, S. 636 could effectively cripple most or all state regulation of abortion, including regulation that serves solely to protect the health of those obtaining abortions. For example, an unlicensed late-term abortionist would have a civil cause of action for compensatory damages (or, alternatively, statutory damages of $5000) and punitive damages against state officials who attempted to prevent him from performing illegal abortions.

The Committee report claims that S. 636 would not create any liability for enforcement by state or local law enforcement authorities of state or local laws. This claim, however, appears contradicted by the unambiguous text of S. 636 itself, which would be recognized as controlling by the courts. Nothing in the provision defining prohibited activities exempts enforcement activities by state officials. Likewise, the relevant rule of construction set forth in S. 636 provides merely that S. 636 shall not be construed to "prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;" it does not provide that S. 636 shall not be construed to subject state officials to liability for enforcement activities.

In short, S. 636 would nominally permit enforcement of state laws regulating abortion, but it would give those subject to enforcement a separate, and extremely potent, civil cause of action against state officials. Moreover, S. 636 would also give illegal abortionists the same extremely potent civil cause of action against any Good Samaritan citizen who responsibly attempted to deter an imminent and dangerous illegal abortion.

The stated rationale for S. 636 is that those exercising a legally protected right should be protected in exercising that right. That rationale plainly does not extend to protection of unlawful conduct.

It has been suggested by the supporters of S. 636 that protection of illegal abortions is necessary to prevent the possibility of abusive litigation discovery. But the danger of abusive discovery exists in every piece of litigation, and our system has developed a workable method of preventing such abuses: the trial judge will control what discovery is and is not permissible. It is disturbing, to say the least, that S. 636 would protect illegal abortions in order to eliminate routine aspects of litigation that all other litigants in this country face.

3. S. 636 elevates the right to abortion above the First Amendment.–As the hearing testimony amply demonstrates, violence and **\*48** abuse at abortion clinics come from both sides. If this problem is to be dealt with, it must be dealt with evenhandedly.

If S. 636 in its current form were to become law, those persons confronting peaceful, lawful pro-life demonstrators would suddenly have a virtual license to harass and provoke them, since they would know that the slightest bit of retaliation would subject the pro-life demonstrators to the severe penalties under the bill. The clear lesson of history is that peace is not achieved

by disarming only one of the contestants. The way to achieve peace is to treat both sides equally and to make clear that conduct that is unacceptable by one side will be unacceptable by the other.

Consistent with these principles, it is imperative that those exercising their lawful First Amendment rights to speak out against abortion have the same protections from violence and abuse as those seeking abortion. Unless the right to abortion is to be elevated above even the First Amendment, the penalties under the bill should be extended to those who, by force or threat of force or by physical obstruction, injure, intimidate or interfere with persons lawfully exercising their First Amendment rights at abortion-related facilities.

4. The "abortion-centric" language of S. 636 may fail to deliver the promised protection of pro-life facilities.–According to the Committee report, "facilities that do not offer abortions or counselling and referral for abortions, but offer only counselling about alternatives to abortion–sometimes referred to as 'pro-life counselling centers' or 'pregnancy care centers'–are covered" by S. 636, because the services that they provide are defined to be "abortion[-]related services" under proposed section 2715(e)(1). As Senator Wofford stated at the Committee markup on S. 636, to label all services related to pregnancy "abortion[-]services" is insulting and offensive. Such a bizarre label not only betrays a distressing "abortion-centric" perspective (from which everything is defined in relation to abortion); it also offers the prospect of confused and inconsistent application of the protections of S. 636 to pro-life facilities. There is no good reason to relegate to legislative history a clarity that could easily be provided in the text of S. 636.

At the Committee markup, an amendment offered by Senator Hatch that would have remedied these problems was defeated by a 9-to-8 vote.

5. S. 636 discriminates against the pro-life viewpoint.–Unlike the original version of S. 636, the current version is now facially neutral in at least one respect: its protections (if properly understood) would extend to both abortion and pro-life facilities. As the Supreme Court recently reemphasized in Church of Lukumi Babalu Aye, Inc. v. Hialeah, slip op. (U.S. June 11, 1993), however, "[f]acial neutrality is not determinative" of a statute's compliance with the First Amendment. Id., at 12. While the Church of Lukumi case concerned the Free Exercise Clause of the First Amendment, there is every reason to believe that its analysis applies equally to the First Amendment's Free Speech Clause. Among the lessons of the Church of Lukumi case are that the First Amendment "protects against government hospitality which is masked, as well as overt," slip op., at 12, and that "the effect of a law in its real operation is strong evidence of its object," id. at 13.

**\*49** S. 636 masks a hostility to the pro-life viewpoint. This hostility was manifest in at least two features of the original version of S. 636. First, S. 636 singled out the pro-life cause for harsh penalties that would not apply to other causes engaged in similar conduct. Second, it carelessly used vague and overbroad terms that would have chilled core First Amendment prolife speech. See, e.g., Written testimony of Professor Michael Stokes Paulsen and Professor Michael W. McConnell, May 20, 1993.

The current version of S. 636 is more subtle, though the hostility to the pro-life viewpoint remains manifest in S. 636's Orwellian insistence on describing pro-life services as "abortion[-]related services." But, while facially neutral as between abortion facilities and pro-life facilities, S. 636 fails to provide pro-life demonstrators the same needed protection from violence and abuse as those seeking and providing abortion. The clearly intended effect of S. 636 in its real operation would be to disadvantage pro-life speech significantly.

6. S. 636 would chill constitutionally protected speech.–S. 636 can fairly be said to be modeled on existing statutes only in the sense that it takes the harshest features of each and combines them in a manner that is completely unprecedented. It is bad enough that S. 636 would punish entirely peaceful civil disobedience with criminal penalties of one year in jail and a $100,000 fine for a first violation and with three years in jail and a $250,000 fine for any subsequent violation. It is even worse that a peaceful protester would face private actions for civil damages of $5000 per violation and punitive damages, and government actions, by either the United States Attorney General or a state attorney general, for a civil penalty of $15,000 per violation.

Case 1:22-cr-00096-CKK   Document 197-2   Filed 03/17/23   Page 37 of 43

In practice, of course, those who would have to take account of the prospect of these draconian penalties are not simply those who would actually engage in the activities prohibited by S. 636, but those who might even possibly be alleged–rightly or wrongly–to have engaged in those activities. In light of the hefty statutory damages and civil penalty provisions of S. 636, the delegation to state attorneys general and private citizens of what is in essence prosecutorial authority virtually assures that innocent persons who have done nothing more than engage in the lawful exercise of their First Amendment rights will be targeted and pursued. The chilling effect on legitimate First Amendment speech is therefore likely to be intense. In addition, the delegation of so much enforcement authority to private and state entities undermines a stated rationale for S. 636: the asserted need for careful, coordinated federal action.

For all of the above reasons, we are opposed to S. 636 in its current form.

Orrin Hatch.

Strom Thurmond.

Dan Coats.

Judd Gregg.

**\*50  X. CHANGES IN EXISTING LAW**

In compliance with rule XXVI paragraph 12 of the Standing Rules of the Senate, the following provides a print of the statute or the part or section thereof to be amended or replaced (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

PUBLIC HEALTH SERVICE ACT

* * * * * * *

TITLE I–SHORT TITLE AND DEFINITIONS

SHORT TITLE

Section 1. ***

* * * * * * *

TITLE XXVII–MISCELLANEOUS

GIFTS

Sec. 2701. ***

* * * * * * *

SEC. 2715. FREEDOM OF ACCESS TO CLINIC ENTRANCES.

(a) Prohibited Activities.–Whoever–

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons, from obtaining or providing abortion related services; or

(2) intentionally damages or destroys the property of a medical facility or in which a medical facility is located, or attempts to do so, because such facility provides abortion related services,

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

(b) Penalties.–Whoever violates this section shall–

(1) in the case of a first offense, be fined in accordance with title 18 or imprisoned not more than 1 year, or both; and

(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18 or imprisoned not more than 3 years, or both;

**\*51** except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

(c) Civil Remedies.–

(1) Right of action.–

(A) In general.–Any person aggrieved by reason of the conduct prohibited by subsection (a) many commence a civil action for the relief set forth in subparagraph (B).

(B) Relief.–In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

(2) Action by attorney general of the United States.–

(A) In general.–If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

(B) Relief.–In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent–

(i) in an amount not exceeding $15,000, for a first violation; and
(ii) in an amount not exceeding $25,000, for any subsequent violation.
(3) Actions by state attorneys general.–

(A) In general.– If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States district Court.

(B) Relief.–In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties are decribed in paragraph (2)(B).

(d) Rules of Construction.–Nothing in this section shall be construed or interpreted to–

 **\*52**  (1) prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;

(2) deprive State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State or local law;

(3) provide exclusive authority to prosecute, or exclusive penalties for, acts that may be violations of this section and that are violations of other Federal laws.

(4) limit or otherwise affect the right of a person aggrieved by acts that may be violations of this section to seek other available civil remedies; or

(5) prohibit expression protected by the First Amendment to the Constitution.

(e) Definitions–As used in this section:

(1) Abortion related services.–The term "abortion related services" includes medical, surgical counselling or referral services, provided in a medical facility, relating to pregnancy or the termination of a pregnancy.

(2) Interfere with.–The term "interfere with" means to restrict a person's freedom of movement.

(3) Intimidate.–The term "intimidate" means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.

(4) Medical facility.–The term "medical facility" includes a hospital, clinic, physician's office, or other facility that provides health or surgical services or counselling or referral related to health or surgical services.

(5) Physical obstruction.–The term "physical obstruction" means rendering impassable ingress to or egress from a medical facility that provides abortion related services, or rendering passage to or from such a facility unreasonably difficult or hazardous.

(6) State.–The term "State" includes a State of the United States. the District of Columbia, and any commonwealth, territory, or possession of the United States.


 1 National Abortion Federation, "Incidents of Violence & Disruption Against Abortion Providers, 1993," Apr. 16, 1993 (summary submitted to the Committee with the testimony of Willa Craig).

 2 National Abortion Federation, "Incidents of Violence & Disruption Against Abortion Providers, 1993," Apr. 16, 1993.

3 Richard Lacayo, "One Doctor Down, How Many More?" Time, Mar. 22, 1993.

4 ABC, "Nightline," Mar. 12, 1993 (interview with Linda Taggert, Director, Ladies Center, Pensacola, FL).

5 National Abortion Federation, "Incidents of Violence & Disruption Against Abortion Providers, 1993," Apr. 16, 1993.

6 David A. Grimes, M.D., et al., "An epidemic of antiabortion violence in the United States," "Obstetrics and Gynecology," vol. 165, n. 5, pt. 1 (Nov. 1991): 1263–67 (submitted to the Committee with the testimony of Pablo Rodriguez, M.D.); UPI, "Suspicious Fire Destroys Abortion Clinic," Jan. 31, 1992.

7 National Abortion Federation, "Summary of Extreme Violence Against Abortion Providers as of April 15, 1993."

8 National Abortion Federation, "Noxious Chemical Vandalism Incidents at Abortion Clinics," May 1993.

9 "Abortion Clinic Seeks Federal Investigation," UPI, May 10, 1993.

10 ABC "World News Tonight with Peter Jennings," Mar. 3, 1993; Frank Fisher, "Acid Attacks," AP, Mar. 3, 1993.

11 Felicity Barringer, "Abortion Clinics Said To Be in Peril," New York Times, Mar. 3, 1993.

12 ABC "World News Tonight with Peter Jennings, Mar. 3, 1993.

13 "FBI Urged to Tackle Abortion-Clinic Unrest," New York Times, Mar. 23, 1993.

14 National Abortion Federation, "Incidents of Violence and Disruption Against Abortion Providers, 1993", April 16, 1993.

15 National Abortion Federation, "The Cost of Clinic Blockades," Mar. 1993; Testimony of David R. Lasso and of Willa Craig, Senate Committee on Labor and Human Resources, May 12, 1993.

16 See eg., Cousins v. Terry, 721 F. Supp 426, 430–431 (N.D.N.Y. 1989); Southwestern Medical Clinics v. Operation Rescue, 744 F. Supp. 230, 232 (D. Nev. 1989); Women's Health Care Services v. Operation Rescue, 773 F. Supp. 258, 262 (D. Kan. 1991); NOW v. Operation Rescue, 726 F. Supp. 300, 303 (D.D.C. 1989); Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F. 2d 218, 221 (6th Cir. 1991); Lucero v. Operation Rescue of Birmingham, 772 F. Supp. 1193, 1196–1197 (N.D. Ala. 1991); Town of West Hartford v. Operation Rescue, 726 F. Supp. 371, 373–374 (D. Conn. 1989). See also Brief for the National Abortion Federation and Planned Parenthood as Amici Curiae in Support of Respondents, pp. 10, 15, Bray v. Alexandria Women's Clinic, No. 90–985 (U.S., filed May 13, 1991).

17 National Abortion Federation, "The Cost of Clinic Blockades," Mar. 1993.

18 Id.

19 Id.

20 Felicity Barringer, "Slaying is a Call to Arms for Abortion Clinics," New York Times, Mar. 12, 1993.

21 Boodman, "The Death of Abortion Doctors," Washington Post, Apr. 20, 1993.

22 Another Federal district court noted that "Operation Rescue's literature defines 'rescues' as 'physically' blockading abortion mills with [human] bodies, to intervene between abortionists and the innocent victims." National Organization for Women v. Operation Rescue, 726 F. Supp. 1483, 1488 (E.D. Va. 1989), aff'd 914 F.2d 582 (4th Cir. 1990), rev'd in part on other grounds, vacated in part Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753 (1993) (emphasis in original). In the same case, the U.S. Supreme Court described the activities of Operation Rescue as intended to "obstruct general access to *** the premises of abortion clinics." Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753, 758 (1993). See also National Organization for Women v. Scheidler, 765 F. Supp. 937, 944 (N.D. Ill. 1991) ("[t]he motivation for destroying clinic property,

threatening clinic employees, and blocking access to clinics, among other alleged acts, was *** to *** further [the] anti-abortion cause by limiting the availability of abortion services"), cert. granted in part, 61 U.S.L.W. 3371 (U.S. June 14, 1993) (No. 92–780); Town of West Hartford v. Operation Rescue, 726 F. Supp. 371, 373 (D. Conn. 1989), vacated on other grounds and remanded, 915 F.2d 92 (2d Cir. 1990); Lucero v. Operation Rescue, 772 F. Supp. 1193, 1197 (N.D. Ala. 1991), aff'd 954 F.2d 624 (11th Cir. 1993).

23 National Abortion Federation, "Summary of Extreme Violence Against Abortion Providers as of April 15, 1992"; "Year End Summary of Extreme Violence Against Abortion Providers, 1992"; "Noxious Chemical Incidents at Abortion Clinics"; and "The Cost of Clinic Blockades."

24 David A. Grimes, M.D. et al., "An epidemic of antiabortion violence in the United States," "Obstetrics and Gynecology," vol. 165, n. 5, pt. 1 (Nov. 1991): 1264, fig. 2.

25 National Abortion Federation, "The Cost of Clinic Blockades," Mar. 1993.

26 There is evidence that the arsons and bombings are also being committed by a small group of offenders acting nationwide. One published study found that 38 percent of the arsons and bombings of abortion clinics were committed by repeat offenders consisting of fifteen individuals or groups. David A. Grimes, M.D., et al., "An epidemic of antiabortion violence in the United States," "Obstetrics and Gynecology," vol. 165, n. 5, pt. 1 (Nov. 1991): 1265 (submitted to the Committee with testimony of Dr. Pablo Rodriguez).

27 Sandra G. Goodman, "Abortion Foes Strike At Doctors' Home Lives, " Washington Post, Apr. 8, 1993, A1.

28 Sara Rimer, "Abortion Clinics Search for Doctors in Scarcity," New York Times, Mar. 31, 1993, A14; Andrea Stone, "Doctors Say Abortion Foes Intimidating," USA Today, Apr. 13, 1993, 2A.

29 Nationwide, 83% of counties have no abortion provider. Stanley K. Henshaw and Jennifer Van Vort, "Abortion services in the United States, 1987 and 1988," "Family Planning Perspectives," vol. 22, no. 3 (May/June 1990), 106. South Dakota has only one abortion provider for the entire state. In North Dakota, the only physician who performs abortions commutes from Minnesota. In Montana, as Willa Craig testified, only six of the State's 56 counties offer abortion services, and many patients travel over 100 miles to their appointments. In addition, a study by the Alan Guttmacher Institute found that in 34 States, the number of physicians providing abortion services declined between 1985 and 1988. Stanley K. Henshaw and Jennifer Van Vort, eds., "Abortion Factbook, 1992 Edition: Reading, Trends, and State and Local Data to 1988" (New York: Alan Guttmacher Institute, 1992), 190–195 (cited by Dr. Pablo Rodriguez in his testimony to the Committee, p. 6).

30 Grimes, "Clinicians Who Provide Abortions: The Thinning Ranks," "Obstetrics and Gynecology," vol. 80, no. 4 (Oct. 1992), 719.

31 See Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218 (6th Cir. 1991); National Organization for Women v. Operation Rescue, 914 F.2d 582 (4th Cir. 1990); New York State National Organization for Women v. Terry, 886 F.2d 1339 (2d Cir. 1989), cert. denied, 495 U.S. 947 (1990); Women's Health Care Services v. Operation Rescue-National, 773 F. Supp. 258 (D. Kan. 1991); Planned Parenthood Ass'n of San Mateo City v. Holy Angels Catholic Church, 765 F. Supp. 617 (N.D. Cal. 1991); National Organization for Women v. Operation Rescue, 747 F. Supp. 760 (D.D.C. 1990); Southwestern Medical Clinics of Nevada, Inc. v. Operation Rescue, 744 F. Supp. 230 (D. Nev. 1989); National Organization for Women v. Operation Rescue, 726 F. Supp. 1483 (E.D. Va. 1989); Portland Feminist Women's Health Center v. Advocates for Life, Inc, 712 F. Supp. 165 (D. Or. 1988); Roe v. Operation Rescue, 710 F. Supp. 577 (E.D. Pa. 1989); and New York State National Organization for Women v. Terry, 697 F. Supp. 1324 (S.D.N.Y. 1988).

32 The Court also held that this clause of section 1985(3) is inapplicable to anti-abortion activities because it applies only to conspiracies aimed at interfering with constitutional rights that are protected against private, as well as official, infringement, and the defendants had not acted with the conscious aim of interfering with the only right constitutionally protected against

private infringement that was alleged in the case–the right to travel interstate. The Court concluded that the right to an abortion is protected only against State infringement.

By a vote of 5–4, the Court declined to consider whether there had been a violation of the second clause of Section 1985(3), which prohibits conspiracies for the purpose of preventing or hindering state authorities from giving or securing to all persons within the state the equal protection of the laws. The majority expressed some doubts about the applicability of this clause to the allegations in the case, while four Justices would have read the clause to provide a cause of action for the abortion clinic plaintiffs.

33 As Attorney General Reno noted in her testimony, while section 1985(3) is not adequate to address this problem, it has not been rendered completely irrelevant. The Court's decision in Bray left open the possibility that the first clause of the section might apply in unusual situations, and it left the applicability of the second clause (the "hindrance" clause) an unsettled question of law. However, the Committee agrees with Attorney General Reno that Bray "doubtless limited the effectiveness of Section 1985(3) as a remedy for abortion clinic blockades and the restrictions placed by the Court on that statute warrant a congressional response." Testimony of Attorney General Janet Reno, Senate Labor and Human Resources Committee, May 12, 1993.

34 When Operation Rescue invaded Buffalo, NY, in April 1992, the mayor commented: "If they close down one abortion mill *** then I think they'll have done their job." David Treadwell, "Buffalo Braces for Massive Abortion Protests," Los Angeles Times, Apr. 21, 1992. It was only after the State Attorney General threatened suit that the mayor promised the Buffalo Police Department would take appropriate action against clinic blockaders. Testimony of New York Attorney General Robert Abrams, Senate Committee on Labor and Human Resources, May 12, 1993.

35 Similarly, in West Hartford, CT, 40 officers confronted over 200 clinic blockaders. Town of West Hartford v. Operation Rescue, 726 F. Supp. 371, 374 (D. Conn. 1989). These clinic "occupations required the Town to transfer numerous on-duty officers from other scheduled duties to the task of arresting and processing protectors. *** Correspondingly, the police department was not able to maintain the level of police visibility, presence and protection normally provided the Town. Had an emergency situation developed away from the Center, the department would not have been able to shift officers to that situation promptly." Id. at 379.

36 See the resolution of the National Association of Attorneys General submitted with the testimony of New York Attorney General Robert Abrams.

37 See also, e.g., the testimony of the chief of police of another small community at the Hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee, May 6, 1992, at 51–61, 114.

38 This definition is drawn in large measure from a Texas penal statute upheld against a vagueness challenge in Sherman v. State, 626 S.W.2d 502 (Tex. Crim. App. 1981); see also Gault v. Texas Rural Legal Aid, Inc., 848 F.2d 544, 558–9 (5th Cir. 1988).

39 This motive requirement is not simply a repetition of the scienter requirement–that the offender acted "intentionally," that is, intending to perform the act and aware of the natural and probable consequences of it. Rather, another element of the offense must be proven: that the offender acted out of an abortion-related motive. This construction of the "because" and "in order to" language in S. 636 is consistent with the weight of authority under 18 U.S.C.S 245 and 42 U.S.C. S 3631; however, the Committee is addressing only the meaning of these phrases in S. 636, and not their meaning as used in any other statute.

40 A number of federal statutes provide for statutory damages. See, e.g., the Copyright Act, 17 U.S.C. S 504; the Foreign Intelligence Surveillance Act, 58 U.S.C. S 1810; the Cable Communications Policy Act, 47 U.S.C. S 551; and the Privacy Protection Act, 42 U.S.C. S 2000aa–6.

41 These maximum civil penalties are lower than those provided in comparable statutes such as the Fair Housing Act, 42 U.S.C. S 3614 ($50,000 for a first violation, $100,000 for any subsequent violation).

42 As Attorney General Abrams' testimony notes, there is precedent for express statutory authorization for State Attorneys General to bring civil suits under Federal law. See 15 U.S.C. S 15c (authorizing State Attorneys General to sue under the Clayton Antitrust Act).

43 To the extent that the bill might indirectly affect some protest activity, it easily satisfies the rule of United States v. O'Brien, 391 U.S. 367 (1968), that a law regulating non-speech conduct is valid as long as (1) it serves an "important or substantial governmental interest [that] is unrelated to the suppression of free expression" and (2) the restriction on First Amendment freedoms "is no greater than is essential to the furtherance of [the important government] interest." 391 U.S. at 376–77. S. 636 clearly serves an important governmental interest: it is designed to stop a well-documented pattern of acts and threats of force, physical obstructions and destructions of property interfering with the exercise of a constitutional right. This interest is unrelated to the suppression of expression; as noted, the Act does not prohibit peaceful picketing or other forms of constitutionally protected speech. And it is clear that by addressing a limited and defined range of unprotected conduct, the Act affects First Amendment freedoms, if at all, no more than is essential to serving the Act's important objective.

44 The Court also emphasized that nothing in its decision in R.A.V. v. City of St. Paul, 112 S. Ct. 2538 (1992), required a different result. In that case, the Court struck down an ordinance explicitly directed at expression, whereas the Wisconsin statute at issue in Mitchell, like S. 636, is aimed at conduct unprotected by the First Amendment. (Slip Op. at 9.)

45 See also, e.g., 18 U.S.C. S 1507; 18 U.S.C. S 112; 18 U.S.C. S 1752.

46 Another example is a physician who provides abortion services in Minnesota, Montana, North Dakota, Wisconsin and parts of Canada. UPI, "Doctor Targeted by Anti-abortionists Moving to Montana," Jan. 29, 1993.

S. REP. 103-117, S. Rep. No. 117, 103RD Cong., 1ST Sess. 1993, 1993 WL 286699 (Leg.Hist.)

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.