# EXHIBIT C

H.R. REP. 103-306, H.R. Rep. No. 306, 103RD Cong., 1ST Sess.
1993, 1993 WL 465093, 1994 U.S.C.C.A.N. 699 (Leg.Hist.)
P.L. 103–259, **\*699** FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1994

FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

DATES OF CONSIDERATION AND PASSAGE

Senate: November 16, 1993; May 12, 1994
House: November 18, 1993; March 17, May 5, 1994
Cong. Record Vol. 139 (1993)
Cong. Record Vol. 140 (1994)
Senate Report (Labor and Human Resources Committee) No. 103–117,
July 29, 1993 (To accompany S. 636)
House Report (Judiciary Committee) No. 103–306,
Oct. 22, 1993 (To accompany H.R. 796)
House Conference Report No. 103–488,
May 2, 1994 (To accompany S. 636)

HOUSE REPORT NO. 103–306

October 22, 1993
[To accompany H.R. 796]

The Committee on the Judiciary, to whom was referred the bill (H.R. 796) to assure freedom of access to clinic entrances, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

**\*0** The amendments are as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION. l. SHORT TITLE.

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

SEC. 2. FREEDOM OF ACCESS TO REPRODUCTIVE HEALTH SERVICES.

Chapter 13 of title 18, United States Code, is amended by adding at the end the following:

"S 248. Blocking access to reproductive health services

"(a) Prohibited Activities.–Whoever–

"(1) by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person, or attempts to do so, because that person or any other person or class of persons is obtaining or providing reproductive health services; or

"(2) intentionally damages or destroys the property of a facility, or attempts to do so, because that facility provides reproductive health services;

shall be punished as provided in subsection (b) of this section and also be subject to the civil remedy provided in subsection (c) of this section.

"(b) Penalties.–Whoever violates subsection (a) of this section shall–

"(1) in the case of a first offense, be fined under this title or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined under this title or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) Civil Actions.–

"(1) Right of action generally.–Any person who is aggrieved by a violation of subsection (a) of this section may in a civil action obtain relief under this subsection.

"(2) Action by attorney general.–If the Attorney General has reasonable cause to believe that any person, or group of persons, is aggrieved by a violation of subsection (a) of this section, the Attorney General may in a civil action obtain relief under this subsection.

"(3) Actions by state attorneys general.–If an attorney general of a State has reasonable cause to believe that any person or group of persons is aggrieved by a violation of subsection (a) of this section, that attorney general may in a civil action obtain relief under this subsection.

"(4) Relief.–In any action under this subsection, the court may award any appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory and punitive damages for each person aggrieved by the violation. With respect to compensatory damages, the aggrieved person may elect, at any time before the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation. The court may award to the prevailing party, other than the United States, reasonable fees for attorneys and expert witnesses.

"(d) Rule of Construction.–Nothing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution.

"(e) Non-Preemption.–Congress does not intend this section to provide the exclusive remedies with respect to the conduct prohibited by it, nor to preempt the legislation of the States that may provide such remedies.

"(f) Definitions.–As used in this section, the following definitions apply:

"(1) Reproductive health services.–The term 'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system.

"(2) Facility.–The term 'facility' includes the building or structure in which the facility is located.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

"(3) Physical obstruction.–The term 'physical obstruction' means rendering impassable ingress to or egress from a facility that provides reproductive health services, or rendering passage to or from such facility unreasonably difficult.

"(4) State.–The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

## SEC. 3. EFFECTIVE DATE.

This Act takes effect on the date of the enactment of this Act, and shall apply only with respect to conduct occurring on or after such date.

## SEC. 4. CLERICAL AMENDMENT.

The table of sections at the beginning of chapter 13 of title 18, United States Code, is amended by adding at the end the following new item:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Amend the title so as to read:

A bill to amend title 18, United States Code, to assure freedom of access to reproductive services.

## SUMMARY AND PURPOSE

The purpose of the Freedom of Access to Clinic Entrances Act is to prevent the growing violence accompanying the debate over the continued legality and availability of abortion and other reproductive health services. The Act creates Federal criminal and civil remedies that may be invoked against those who use blockages, assaults, **\*700** and other violent and threatening tactics against the women who seek reproductive health services, the providers of such services, and their respective families.

The Act amends title 18 of the U.S. Code to prohibit the use of force, threat of force, or physical obstruction (or any attempts to do so) to intentionally injure, intimidate, or interfere with any person because that person, or any other person or class of persons, is obtaining or providing reproductive health services. The Act also prohibits the intentional damaging or destruction of a facility (or any attempt to do so) because reproductive health services are provided within the facility. The Act establishes criminal penalties for these prohibited acts. It also creates a private right of action in Federal court for appropriate relief, including injunctive relief and compensatory and punitive damages. The Act authorizes the U.S. Attorney General and State Attorneys General to bring civil causes of action on behalf of aggrieved persons for the same relief available in private actions; however, fees for attorneys and expert witnesses may not be awarded to the United States.

H.R. 796 is designed to be applied evenly to anyone who engages in the prohibited conduct, regardless of their views on the issue of abortion. For example, by covering reproductive health services and not merely abortion, the bill would apply to blockades by pro-choice activists–should such blockages occur–outside clinics engaged in pro-life counseling or providing abortion alternatives. Moreover, the bill specifically states that it shall not be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstration, as protected by the First Amendment. H.R. 796 is modeled after existing and well-established Federal civil rights statutes.[1]

## HEARINGS

## 102D CONGRESS

Committee consideration of this issue began in the 102d Congress when on Wednesday, May 6, 1992, the Subcommittee on Crime and Criminal Justice convened an oversight hearing on the issue of blockades of clinics providing abortion, reproductive and other medical services. A bill, H.R. 1703 (similar to H.R. 796), was pending at that time. The hearing explored the national scope of this problem and addressed the blockades and demonstrations that occurred in Wichita, Kansas, during the summer of 1991 and in Buffalo, New York, during the spring of 1992. Testimony also was presented about many lesser-known activities around the country that, like the larger orchestrated blockades, place a significant strain on local law enforcement and judicial resources and pose a substantial burden upon women seeking to exercise their constitutional rights in peace and privacy. Accordingly, the hearing considered the need for Federal legislation to help state and local law enforcement authorities deal with these organized and targeted activities.

**\*701** Testimony was heard from Sylvia "Doe," who was trapped in the middle of the Wichita blockade where she was virtually imprisoned for three days in cars outside the clinic;[2] Vicki Robinson, also blockaded outside a clinic; Kathryn Maxwell, who was seeking prenatal care during her pregnancy and was accompanied by her 12-year-old daughter when she was prevented by blockaders from keeping her appointment. As the record reflects, Ms. Maxwell fully intended to and did, in fact, carry her pregnancy to term. However, she was prevented from seeing her doctor because he performed abortions on other women.

The Subcommittee also heard testimony from Professor Cass Sunstein of the University of Chicago, a nationally know constitutional law expert who testified in support of the constitutionality of H.R. 796; John H. Schafer, from the law firm of Covington and Burling, who was co-counsel with the NOW Legal Defense and Education Fund and argued the case of Bray v. Alexandria Women's Health Clinic[3] on behalf of a number of women's rights groups; Sam Ellis, Chief of Police for Manassas, Virginia, which has been subject to repeated blockades that have created enormous budgetary and personnel problems for the local police department; and Dr. Neville Sender from Milwaukee, Wisconsin, and clinic administrator Marne Greening from South Bend, Indiana, both of whom described their ongoing experiences with blockades, threats, vandalism and other forms of intimidation because they offer abortion services.

Representing pro-life activists were the Executive Director of Operation Rescue, Keith Tucci; Operation Rescue's legal counsel, Jay Sekulow, who represented Operaion Rescue in the Wichita blockade and in the Bray case before the Supreme Court; Michael Bray, husband of the named defendant in the Bray case, who has participated in a variety of violent activities including bombings, blockades and other forms of intimidation; Joseph Scheidler, a leading pro-life advocate and author of the book, 99 Ways to Stop Abortions, which gives instructions on, inter alia, how to organize and execute blockades; and Sheriff Hickey from Corpus Christi, Texas, who, based on his pro-life beliefs, stated that he would not enforce local laws against blockaders.

## 103D CONGRESS

Committee consideration of the issue continued into the 103d Congress. On April 1, 1993, the Subcommittee on Crime and Criminal Justice held a hearing on the issue of intimidation and violence other than clinic blockades against providers of reproductive heath services, patients, and clinic facilities. This hearing focused on the extent to which doctors, clinic staff, and patients face attacks, threats, and harassment at places other than the clinic site. The nature, scope, and impact of these techniques were discussed by **\*702** victims, and by the representatives of groups that have targeted doctors and their families in an effort to convince doctors not to perform abortions. Attorneys who have represented parties on both sides discussed the constitutionality of extending federal protection of individuals targeted for such harassment.

The Subcommittee heard testimony from Mr. David Gunn, Jr., son of a doctor murdered outside the Florida clinic earlier in 1993 by a pro-life activist; Ms. Jeri Rasmussen, Executive Director of the Midwest Health Center for Women in Minneapolis, Minnesota, who testified about years of personal harassment and the inability of local police to assist her; Ms. Susan Hill,

President of National Women's Health Organization in Raleigh, North Carolina, who discussed years of attacks on her doctors, staff, patients and facilities; and Dr. Normal Tompkins, obstetrician and gynecologist at the Margot Perot Center in Dallas, Texas, who has been the victim of ongoing targeted intimidation because he does abortions.

The Subcommittee also heard testimony from Mr. Randall Terry, founder of Operation Rescue and active promoter of training in personal harassment techniques; Reverend Joseph Foreman, President of Missionaries to the Preborn, also a proponent of doctor-targeted harassment and intimidation; Mr. Jeff White, Director of Operation Rescue for California, and originator of the "No Place to Hide" campaign of harassment toward doctors; and Ms. Katherine Hudson, Director, American Women's Association for Rights and Education, a former pro-choice activist who has become active in the pro-life movement.

Finally, the Subcommittee heard from Mr. John Cowles, an attorney with McDonald, Tinker, Skaer, Quinn and Herrington in Wichita, Kansas, who has represented doctors and clinics in their efforts to obtain relief from harassment, attacks, and blockades; and Mr. Walter Weber, litigation counsel for the American Center for Law and Justice, one of Operation Rescue's counsel.

On June 10, 1993, the Subcommittee, at the request of its Minority Members, held an additional hearing on the issue of access to reproductive health facilities. This hearing examined the range of nonviolent pro-life activities, and whether, and if so, the extent to which pro-life activists have been the victims of retaliation by pro-choice defenders.

At the hearing, the Subcommittee heard testimony from pro-life activists. They included: the Most Reverend James T. McHugh, Bishop of Camden, New Jersey; Rabbi Yehuda Levin, Executive Director of "Get Free," a pro-life organization; Reverend Pat Mahoney, Director of the Christian Defense Coalition and Joshua Project; Ms. Katie Mahoney, National Spokesperson for Operation Rescue; Mr. Steven Wood, Director of the Family Life Center; and Mr. Victor Eliason, Vice President, WVCY Channel 30 Christian Broadcasting in Milwaukee, Wisconsin. All of these witnesses testified against the bill, arguing that it unfairly and unconstitutionally singled out and penalized pro-life activists, most of whom are engaging in legal activities. In addition, Mr. Joseph Helm, a partner at the law firm of Mclario and Helm, who represents pro-life activists, testified that the bill was unconstitutional because it singled out a particular point of view. Professor David Cole of Georgetown **\*703** University, disagreed and testified in strong support of the constitutionality of the bill.

## SUBCOMMITTEE ACTION

On March 25, 1993, the Subcommittee on Crime and Criminal Justice, by recorded vote, a quorum being present, ordered reported an amendment in the nature of a substitute, offered by Subcommittee Chairman Charles E. Schumer, to H.R. 796, the "Freedom of Access to Clinic Entrances Act of 1993." The vote on the motion to report favorably was 9 aye and 4 no.

## COMMITTEE ACTION

On September 14, 1993, the Committee, by recorded vote, a quorum being present, adopted an amendment in the nature of a substitute to H.R. 796 and ordered the bill reported favorably as amended. The vote to report favorably was 24 aye and 11 no.

## BACKGROUND AND DISCUSSION

Need for Federal remedies to protect patients and providers of reproductive health services

A nationwide campaign of blockades, invasions, vandalism, threats and other violence is barring access to facilities that provide reproductive health services, including services arising from the constitutionally protected right to choose. This dramatically escalating violence is endangering the lives and well being of patients, providers, and their respective families. Seemingly frustrated by lack of success in courts, state legislatures and public opinion, certain factions within the pro-life

movement have turned increasingly to violent means to stop clinics from operating, to prevent patients from gaining access to clinics, and to prevent doctors and other professionals from providing reproductive health care.

This campaign of violence has lead to death, injury, harassment, fear, and thousands of arrests all across the nation. It has resulted, as intended, in access to the constitutionally protected right to choose being denied to thousands of women nationwide against their will. The record before the Committee establishes that state and local law enforcement is often inadequate (and sometimes unwilling) to handle this situation; that this is a problem of national proportion–incidents have occurred all across the nation, large-scale operations have been and are continuing to be organized on an inter-state basis, and women travel interstate to obtain reproductive health services; and that Federal legislation is needed to put a stop to the violence and disorder and to restore access to constitutionally protected rights.

The activities to which H.R. 796 responds take many forms including blockades and invasions of clinics; violence and threats of violence against providers and their families; and vandalism and destruction of property at facilities. According to the National Abortion Federation, from 1977 to April 1993, more than 1,000 acts of violence against providers of reproductive health services were reported in the United States. These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, **\*704** 327 clinic "invasions," and one murder. In addition, over 6,000 clinic blockades and other disruptions have been reported since 1977.[4]

One violent incident resulted in a doctor's death. On March 10, 1993, Dr. David Gunn, a physician who performed abortions at several clinics in northern Florida and neighboring states, was shot and killed during an anti-abortion demonstration outside a clinic in Pensacola, Florida. A pro-life activist has been charged with first-degree murder. Dr. Gunn's murder was the tragic culmination of years of threats, blockades and personal attacks he had endured. In another incident, in August of 1993 in Wichita, Kansas, Dr. George Tiller was shot and wounded by a pro-life activist from Oregon because he performed abortions.

Throughout the country, pro-life groups have organized blockades designed to bar access to reproductive facilities and overwhelm local law enforcement. These blockades disrupt a wide range of services, terrorize patients and staff, and impose upon clinics, individuals and responding jurisdictions millions of dollars of costs for law enforcement, prosecutions, staff time, medical expenses, and property damage. Dozens and often hundreds of persons trespass onto clinic property and physically barricade entrances and exits by sitting or lying down, by standing and locking arms or by chaining themselves to fences, doors or other clinic property. Shoving, pushing and other violence often results as blockaders attempt to prevent access by patients and staff. Another technique, known as "invasions," involves a number of pro-life demonstrators storming and entering clinics that are in the process of offering services to patients.

Some examples illustrate the situation. In 1991, a two-year campaign of blockades and invasions was launched against the only medical facility offering abortion services in North Dakota. Arrests were made on ten occasions in the first seven months. On one of these occasions, 26 people stormed the clinic, broke down a door, and chained themselves together inside the facility. In Wichita, Kansas, clinics were targeted by Operation Rescue from July through August of 1991. Hundreds of people came from across the country and engaged in acts of trespass and obstruction that overwhelmed local law enforcement's ability to respond. This 46-day blockade resulted in more than 2,600 arrests and a cost of over half a million dollars to local government. In April 1992, Operation Rescue targeted Buffalo, New York, causing 605 arrests of blockaders and trespassers and almost $400,000 in government costs. Less publicized but more frequent blockades have taken place regularly for years in places like Dobbs Ferry, New York (1,000 arrests in four-year period for police force of 23 officers) and in northern Virginia.

Personal examples, such as the experience of Sylvia "Doe," also make a compelling case for the need for this legislation. As Ms. "Doe" testified, hers was a wanted pregnancy until she learned that the left side of the developing heart was not formed. As she stated, "I really feel that I could have had this baby naturally and let God's destiny take its course, but I was informed by the doctors **\*705** that I didn't have a choice; that I would have to go to a special hospital where they would hook my child up to artificial means of keeping it alive. Basically, this child would have a short life of suffering and pain before it would die anyhow, purely for experimentation. I just couldn't see my baby tortured in this manner. So I opted to go to Kansas to terminate my

Case 1:22-cr-00096-CKK   Document 197-3   Filed 03/17/23   Page 8 of 24

pregnancy." [5] Ms. "Doe" then traveled from her home in Virginia to a facility in Wichita capable of performing the procedure she required. There she encountered an ongoing blockade. She waited two weeks while the clinic was entirely shut down. Then she endured three full days of waiting outside the facility trapped in a car in 109-degree heat before finally getting access to the treatment she needed. Even then, she said she was "socked in ... they were surrounding us. They were trying to climb over the fences. There were bomb threats." [6] While enduring the wait, Ms. "Doe" met a number of other women who were also denied access to the facility. As she testified, "What I found especially horrible was that a lot of people that were there were either raped or they had fetal abnormalities or the mother's life was in danger." [7]

Certain groups and individuals have resorted to even more violent means to deny access to reproductive health care. Many providers have been subjected to death threats and other threats of violence, as well. Facilities providing reproductive health services have also increasingly been the subject of arson, bombings, firebombings, and chemical attacks. These incidents have destroyed millions of dollars worth of property, endangered lives and curtailed access to health care for women, especially in rural areas.

Many of the counties that have providers are urban centers. A rural provider is often the only provider in a large geographical area. Thus rural clinics and doctors have become the preferred targets for abortion foes because elimination of that single provider effectively eliminates service for many women.

The facts are that only 17 percent of U.S. counties have an abortion provider and that clinic owners face a shortage of doctors willing to perform abortions. These facts are at least partially attributable to the violence and intimidation described in this report. Doctors understandably are leaving the field, and new graduate have little desire to enter the field even as part of a wider obstetrics/gynecology practice.

As NAF statistics show [8], during 1984 through 1992, there have been 28 bombings, 62 arsons, 48 attempted bombings and arsons, 266 bomb threats, and 394 incidents of vandalism. Although there appeared to be some decrease in the numbers of these incidents during the period of 1987 to 1990, the pace of violence picked up in 1991 and increased significantly again in 1992. The total cost of such incidents to clinics in 1992 totaled almost $1.8 million in property damage alone.

The first three months of 1993 evidenced no decrease in the violence with three reported arsons, 11 acts of vandalism and one **\*706** bomb threat. The three reported arsons include an attack on a clinic in Corpus Christi, Texas, that destroyed not only the clinic but four other businesses in the building as well. The cost of that fire was over a million dollars. In Missoula, Montana, the Blue Mountain Clinic, the only facility providing reproductive health services of any kind in that city, was burned to the ground.

Such violence has continued throughout the year. In September of 1993, there were three firebombing arsons at clinics: in Bakersfield, California; Peoria, Illinois; and Lancaster, Pennsylvania. The fire in Bakersfield gutted the clinic and two nearby office buildings, resulting in $1.4 million in damage. Notably, the attack in Lancaster was on a facility that did not even provide abortions.

In addition to bombings, arson, and other types of vandalism, clinics have been hit more and more frequently with chemical attacks using butyric acid. This is a controlled substance with an extremely noxious odor that makes those who inhale the fumes sick and dizzy. Easily shot with a hypodermic needle through key holes, under doors, or holes drilled in the roofs or sides of clinic buildings, enough acid to cover one square foot of carpet is all that is needed to close a clinic for a week.

NAF has only recently begun collecting data on such acid attacks. In 1992, NAF recorded 57 of these attacks, with estimated clean-up costs of almost half a million dollars. From January 1, 1993, through May 5, 1993, there were 14 reported attacks, with clean-up costs alone totalling over $65,000. [9]

In addition, a national strategy has emerged, orchestrated largely by Operation Rescue and its affiliates, that has, as one of its goals, the goal of forcing doctors and others to stop performing abortions. Randall Terry, President of Operation Rescue, has been quoted as stating that doctors are the "weak link" in the provision of abortion services; and he has vowed to make doctors' lives "a living hell."

The violence has shut down facilities permanently or temporarily. Many of those facilities provided a wide range of reproductive health care services. By making clinics inaccessible to patients and staff alike, blockades and invasions deprive people of needed health care services. In addition, blockades have had traumatic effects on patients by delaying access to urgent medical care and by exacerbating medical conditions. [10]

Much of the violence has been organized and directed across state lines. Attorney General Janet Reno has testified that "much of the activity has been orchestrated by groups functioning on a nationwide scale, including, but not limited to, Operation Rescue, whose members and leadership have been involved in litigation in numerous areas of the country." [11] The experience of many jurisdictions indicates the extent to which activists from all over the country **707** are involved. In addition, patients often cross state lines to obtain services, as the testimony of Sylvia "Doe" illustrated. [12]

It is not the Committee's intent, nor does the Committee believe it will be the effect of H.R. 796, to prevent, punish, discourage, or in any way affect the lawful, peaceful exercise of First Amendment rights or expression of pro-life or any other views. The legislation addresses only physical obstruction, violence and threats and in no way infringes on the rights of pro-life demonstrators to pray, counsel, peacefully provide information on abortion alternatives, or otherwise express peaceful opposition to abortion. H.R. 796 clearly describes the prohibited activities it addresses: injury, intimidation or interference by force, threat of force or physical obstruction. The bill specifically states that it does not reach any expressive conduct protected from legal prohibition by the First Amendment

Absence of legal remedies

The laws currently in place at the Federal, state, and local level have proven inadequate to prevent the violent conduct described above. Injunctive relief to restrain this conduct is no longer available under Federal civil rights law as a result of a ruling by the Supreme Court of the United States in January of 1993. [13] Further, existing criminal laws at the state and local level have failed to provide the certainty of prosecution, conviction and punishment necessary to deter these activities on a nationwide scale. Moreover, the ability and sometimes the will of many state and local authorities to deal with what are often large-scale, inter-state operations have proven inadequate.

Prior to January of 1993, many cases had been brought under the so-called Ku Klux Klan statute [14] seeking to restrain blockades and other anti-abortion violence. However, in the Bray case, [15] the Supreme Court ruled that this Reconstruction era statute could not be used by the plaintiffs in this situation. This ruling leaves a serious gap in Federal law and, as Attorney General Reno testified, there is no other Federal law that would be generally applicable to private interference with a woman's right to choose. [16]

State and local law enforcement authorities have failed to address effectively the systematic and nationwide assault that is being waged against health care providers and patients. Enforcement of local laws such as trespass, vandalism and assault have proven inadequate. In some localities, local authorities have refused to act. In others, they have been unable to do so effectively, which is due partially to the inherent inability of state law to deal with interstate law enforcement issues. In addition, state and local criminal law is often unable to provide effective deterrence. Therefore, the Committee agrees with the Attorney General who has testified that, "The reluctance of local authorities to protect the rights of individuals provides a powerful justification for the enactment of federal protections that has been evoked previously by Congress in passing laws to protect civil rights." [17]

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:22-cr-00096-CKK   Document 197-3   Filed 03/17/23   Page 10 of 24

**\*708**  SECTION-BY-SECTION ANALYSIS

SECTION ONE: SHORT TITLE

Section one provides that the short title of the bill shall be the "Freedom of Access to Clinic Entrances Act."


SECTION TWO

Section 2 amends Chapter 13 of Title 18 by creating a new Section 248 that describes the prohibited conduct and penalties for such conduct. Proposed Section 248(a) covers five general categories of prohibited conduct: acts of force, threats of force, physical obstruction and damage or destruction of property.


Subsection 248(a)(1)

Subsection 248(a)(1) prohibits the use of force or threat of force, or physical obstruction that intentionally injures, intimidates or interferes with any person (or attempts to do so) because that person, or any other person or class of persons, is or has been obtaining or providing reproductive health services. This section is modeled on several Federal civil rights laws. These include 18 U.S.C. Section 245(b), which prohibits the use or threatened use of force to willfully injure, intimidate or interfere with (or attempting to do so) "any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from" [18] voting, engaging in activities related to voting or enjoying the benefits of Federal programs, inter alia. Another law with virtually identical operative language is 42 U.S.C. Section 3631, a provision of the Fair Housing Act that prohibits force or threat of force to willfully injure, intimidate, or interfere with a person's housing opportunities because of his or her race, color, religion, sex or national origin.

Subsection 248(a)(1) would cover acts of force, threats of force, and physical obstruction that intentionally injure, intimidate, or interfere with any person, but only if these actions are undertaken because the victim or others are obtaining or providing reproductive health services. In accordance with the rules of statutory construction set out in title 1 of the U.S. Code, Section 1, the concept of "obtaining or providing" is meant to include persons who have obtained or provided these services, and persons who intend to obtain or provide these services.

The types of acts of force that would be covered by Subsection 248(a)(1) include physical assaults such as the recent murder of a doctor in Florida and the shooting of a doctor in Kansas, and would include beatings and any other physical attack. In addition, some acts of vandalism could constitute prohibited force; for example, tampering with the car of a physician in order to cause an accident (if the action is undertaken with the requisite intent). The threats of force covered by the Act are those threats that are legitimately interpreted as serious expressions of an intention to inflict bodily harm. The threats must be real and meaningful, not merely rhetorical  **\*709**  or political hyperbole. [19]  Many of the death threats and threats of violence received by abortion providers are specific enough to be covered by the Act. Both force and threats of force would be covered wherever they occur, whether at the clinic site, at the victim's home, the service provider's home, or elsewhere in the community.

The acts of physical obstruction covered would include blockades and invasions rendering passage to or from a clinic or other facility impossible or unreasonably difficult, as required by the definition of this term in Subsection 248(f). Many types of vandalism and disruption could achieve this end, including but not limited to, pouring glue into the locks of clinic doors, chaining people to clinic entrances or equipment, strewing nails on clinic driveways or public access roads, and blocking driveway entrances with immobilized cars. The imprisonment of patients and providers in a facility could also constitute prohibited "physical obstruction" under this subsection.

To be covered by the Act, however, force, threats of force, or physical obstruction must result in either injury to, intimidation of, or interference with another person; or, the attempt to use any of these must be completed sufficiently to be recognized under the established legal standards governing actionable attempts.

In addition, in order to narrowly tailor this legislation to those activities found by the Committee to warrant new federal remedies, the Act requires that the offender be motivated by the involvement of the victim or others in obtaining or providing reproductive health services. Thus the Act covers attacks, threats and blockades used directly against a person who is obtaining or providing reproductive health services. The Act also covers attacks, threats, and blockades against a particular victim that are meant to intimidate other persons or classes of persons who may be obtaining or providing reproductive health services, or that are taken because others have obtained or provided reproductive health services.

Subsection 248(a)(2)

Subsection 248(a)(2) is modeled generally on 18 U.S.C. Section 247, which prohibits, in certain circumstances, intentional damage or destruction of property because of the religious character of that property. Damage or destruction of clinic property, or the property in which a clinic or doctor's office is located, would include arsons, bombings, fire-bombings, chemical attacks, and various forms of vandalism, if committed because the targeted facility provides reproductive health services.

Subsection 248(b)

Subsection 248(b) sets out the criminal penalties for the conduct prohibited in Subsection 248(a). These are: in the case of a first offense, fines in accordance with title 18 of the U.S. Code, [20] imprisonment of not more than one year, or both; in the case of a second or subsequent offense after a prior conviction under this section, fines in accordance with title 18, imprisonment of not more than three years, or both; for offenses resulting in bodily injury, 10 years  **\*710**  imprisonment, fines under title 18 or both; and for offenses resulting in death, any term of years including life imprisonment, fines under title 18, or both. These penalties are consistent with those provided in the statutes upon which this Act is principally modeled. [21]

Subsection 248(c)

Subsection 248(c) would allow any person aggrieved by a violation of Subsection 248(a) to bring a private civil suit for any appropriate relief. Subsection 248(c) also authorizes the U.S. Attorney General and the State Attorneys General to bring suit for the same relief if they believe that a person or group of persons have been aggrieved by violations of the Act. This subsection is meant to provide a clear basis on which Federal Courts may enjoin clinic blockades and other conduct prohibited by this legislation, filling the gap in Federal law left by the Supreme Court's decision in Bray. [22]

Appropriate relief includes, but is not limited to temporary, preliminary and permanent injunctions, and compensatory and punitive damages. Because damages could be difficult and expensive to prove in the situations covered by the Act (for example, the degree of trauma suffered by a woman blockaded at a clinic but not physically injured, or the terror suffered by a doctor stalked and repeatedly threatened), the Act allows the plaintiff to elect, prior to rendering of any final judgment, to recover statutory damages of $5,000 per violation instead of actual damages. In addition to the costs of suit awarded in accordance with title 28 of the U.S. Code, the Act authorizes the court to award to the prevailing party, other than the United States, reasonable attorneys fees and fees for expert witnesses.

Those entitled to sue as "aggrieved persons" include patients, doctors, clinic staff, or any other person (such as the families of patients, doctors, or staff) subjected to violence, threatened with harm, or physically blocked from entering or leaving a facility by someone acting with the requisite motive. The owners, operators, lessors of clinics, hospitals and other facilities also would be able to sue for damage done to these facilities because of the reproductive health services provided therein. Nothing in this act

would alter any established rules governing standing. Thus, associations representing aggrieved persons or classes of persons would only be entitled to sue to the extent that existing principles of standing permit them to do so.

Subsection 248(d)

Subsection 248(d) clearly states that nothing in the act shall be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstration, that is protected from legal prohibition by the First Amendment.

Subsection 248(e)

Subsection 248(e) makes clear that the Act is not meant to preempt either State legislation or action with regard to reproductive **711** health, nor to limit the remedies that may be sought by individuals aggrieved by the prohibited conduct under State law.

Subsection 248(f)

Subsection 248(f) provides definitions of terms used in the bill. The bill defines "reproductive health services" in Section 248(f)(1) to include all medical, surgical, counseling or referral services that relate to the human reproductive system. These services must be rendered in a hospital, clinic, physician's office, or other facility.

The definition of reproductive health services is meant to encompass pregnancy counseling and support services as well as abortion counseling and procedures, routine gynecological exams, and counseling and medical care regarding contraception, venereal disease, and other aspects of human reproduction. Thus, attacks against clinics or providers of abortion alternatives would be covered, as would attacks against clinics and providers of abortion.

Although the definition of reproductive health services may include teen pregnancy counseling done at school-based clinics, this definition is not meant to encompass mere sex education classes nor is this definition meant to extend to the distribution of literature, drugs, devices or products not done in conjunction with medical, surgical, counseling or referral services relating to human reproduction.

Subsection 248(f)(2) defines the term "facility" to include the building or structure in which the office or clinic is located. Thus the Act would cover a blockade that physically obstructed the entrance to a larger office building or medical complex in which a smaller abortion clinic or pregnancy counseling center is located.

Subsection 248(f)(3) defines "physical obstruction" as activity that would render ingress to or egress from a facility providing reproductive health services [23] impassable or unreasonably difficult.

## SECTION THREE

Section 3 of the bill sets the effective date of the bill as the date of enactment. It expressly applies only to conduct occurring on or after such date.

## SECTION FOUR

Section 4 amends the table of sections of Chapter 13 of title 18 to include new Section 248.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(1)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## *712  COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 796, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. Congress,
Congressional Budget Office,
Washington, DC, October 7, 1993.

Hon. Jack Brooks,
Chairman, Committee on the Judiciary,
House of Representatives, Washington, DC

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 796, the Freedom of Access to Clinic Entrances Act of 1993, as ordered reported by the House Committee on the Judiciary on September 14, 1993. CBO estimates that implementation of H.R. 796 would result in enforcement costs of less than $5 million a year, as well as an increase in both federal receipts and direct spending of less than $500,000 annually. Because this bill would affect receipts and direct spending, it would be subject to pay-as-you-go procedures under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985. CBO estimates that the bill would impose no costs on state or local governments.

H.R. 796 would make it a federal offense for protesters to use force or physical obstruction to intentionally injure, intimidate, or interfere with anyone seeking or providing reproductive health services. This bill also would prohibit an individual from intentionally damaging or destroying the property of a medical facility that provides reproductive health services.

Enforcing this legislation would consume staff time and other resources of the federal government. The costs would depend on the number of offenses committed and the extent of the enforcement effort made by the Department of Justice. CBO expects that such costs would be less than $5 million a year.

The bill would provide for civil and criminal penalties for violations of its provisions. CBO estimates that fines or civil penalties paid to the government would total less than $500,000 a year, which would be recorded in the budget as governmental receipts, or revenues. The fines would be deposited in the Crime Victims Fund and spent in the following year. Thus, enactment

of H.R. 796 would affect both receipts and direct spending. The increase in direct spending would be the same as the amount of fines collected **713** with a one-year lag. Therefore, the additional direct spending would also be less than $500,000 a year.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

James L. Blum.
(For Robert D. Reischauer, Director).

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 796 will have no significant inflationary impact on prices and costs in the national economy.

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (new matter is printed in italics, existing law in which no change is proposed is shown in roman):

## TITLE 18, UNITED STATES CODE

\* \* \* \* \* \* \*

## CHAPTER 13–CIVIL RIGHTS

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

\* \* \* \* \* \* \*

S 248. Blocking access to reproductive health services

(a) Prohibited Activities.–Whoever–

(1) by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person, or attempts to do so, because that person or any other person or class of persons is obtaining or providing reproductive health services; or

(2) intentionally damages or destroys the property of a facility, or attempts to do so, because that facility provides reproductive health services;

shall be punished as provided in subsection (b) of this section and also be subject to the civil remedy provided in subsection (c) of this section.

(b) Penalties.–Whoever violates subsection (a) of this section shall–

(1) in the case of a first offense, be fined under this title or imprisoned not more than 1 year, or both; and

(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined under this title or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

(c) Civil Actions.–

(1) Right of action generally.–Any person who is aggrieved by a violation of subsection (a) of this section may in a civil action obtain relief under this subsection.

(2) Action by attorney general.–If the Attorney General has reasonable cause to believe that any person, or group of persons, is aggrieved by a violation of subsection (a) of this section, the Attorney General may in a civil action obtain relief under this subsection.

(3) Actions by state attorneys general.–If an attorney general of a State has reasonable cause to believe that any person or group of persons is aggrieved by a violation of subsection (a) of this section, that attorney general may in a civil action obtain relief under this subsection.

(4) Relief.–In any action under this subsection, the court may award any appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory and punitive damages for each person aggrieved by the violation. With respect to compensatory damages, the aggrieved person may elect, at any time before the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation. The court may award to the prevailing party, other than the United States, reasonable fees for attorneys and expert witnesses.

(d) Rule of Construction.–Nothing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution.

(e) Non-Preemption.–Congress does not intend this section to provide the exclusive remedies with respect to the conduct prohibited by it, nor to preempt the legislation of the States that may provide such remedies.

(f) Definitions.–As used in this section, the following definitions apply:

(1) Reproductive health services.–The term "reproductive health services" means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system.

(2) Facility.–The term "facility" includes the building or structure in which the facility is located.

(3) Physical obstruction.–The term "physical obstruction" means rendering impassable ingress to or egress from a facility that provides reproductive health services, or rendering passage to or from such facility unreasonably difficult.

(4) State.–The term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

* * * * * * *

DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., CARLOS J. MOORHEAD,
HENRY J. HYDE, BILL MCCOLLUM, HOWARD COBLE, LAMAR S. SMITH, ELTON
GALLEGLY, CHARLES T. CANADY, BOB INGLIS, AND ROBERT W. GOODLATTE

INTRODUCTION

A fundamental principle of our nation's law is that government is prohibited from banning or regulating speech or preventing assembly based on the content of the speech or the ideas expressed. The First Amendment of the United States Constitution, states that "Congress shall make no law ... abridging freedom of speech..."

Of course, the right of free speech does not guarantee a receptive audience, nor does it in any way sanction the use of force or coercion to impose one's views on an unwilling listener. Likewise, the right to be free from government interference in obtaining an abortion does not mean that a woman has a right to be insulated from the views of her fellow citizens on the meaning and consequences of that act.

We unequivocally condemn the murder of Dr. Gunn in Florida and shooting of Dr. Tiller in Wichita. We recognize, however, that this is not the first time in our history legitimate expressions of ideas have crossed the line into violence by a few extremists.

Political protest has been at the forefront of social change. From the Boston Tea Party to the abolitionist movement, from the antiwar protests and to the activism of the civil rights movement, civil disobedience has been an intimate part of our history. This is perhaps the first time in our nation's history, however, that those in power have so openly sought to use the authority of government to broadly suppress the legitimate actions of a movement with which they do not agree. The legislation sweeps with a broad and heavy hand to target peaceful, non-violent, constitutionally protected activities on the same terms as violent or forceful acts, (even **\*714** though the latter occur outside of abortion clinics much more infrequently).

What would have been the result had a similar proposal become law during the Tea Party, the abolitionist movement, or during the antiwar and civil rights movements? How would history have changed?

In sum, H.R. 796, the "Freedom of Access to Clinic Entrances Act of 1993" [1] , fails to distinguish between nonviolent civil disobedience and violent conduct, while applying different rules of conduct to the two sides engaged in this emotional debate. At least one commentator points out that, "Congress has selected a single point of view–opposition to abortion–and subjected it to penalties applied to no other point of view." Prof. Michael W. McConnell, Rule of Law: Free Speech Outside Abortion Clinics Wall Street Journal, March 31, 1993, at A15. Likewise, the new federal tort created is duplicative of existing relief both criminal and civil provided for in the States. Threat of significant money damages, including punitive damages is likely to "chill" speech, much of which is protected under the First Amendment. Vagueness and ambiguity in H.R. 796 is further problematic given that the bill creates a new federal crime. H.R. 796 provides insufficient guidance to potential defendants seeking to tailor their behavior so as to act legally and avoid liability. H.R. 796 also all but ignores the fact that First Amendment protections attach to much of the speech and conduct found in the picketing, praying, sidewalk counseling, and mass gatherings around abortion clinics.

Our principal objections to the legislation follow.

UNEQUAL TREATMENT

A central problem with H.R. 796 is that it applies different rules of conduct to the two sides engaged in this emotional debate. One must ask whether H.R. 796 protects both the pro-life and the pro-choice sides or whether it exposes those two sides to different rules, protections and penalties. While facially the bill may appear to be fair in this regard, a closer examination reveals that H.R. 796 is intended to target the pro-life movement, without giving that movement the protections offered the other side under the bill.

This bill's supporters argue that H.R. 796 covers abortion and abortion alternative facilities equally. See Sec. 248(a)(1). This may be true given the definition of "Reproductive Health Services" in proposed section 248(f)(1), depending on what

the abortion alternative facility is. It is unclear if H.R. 796 proscribes intimidation, interference or violence against sidewalk counselors, priests, pastors, rabbis, Muslim clerics, etc., peaceful pro-life protestors, or addresses the disruption of religious services. In other words, H.R. 796 may superficially protect both sides. Upon closer examination, the core of the pro-life movement lacks the protection offered by this proposed new federal crime and federal civil tort. This is especially the case since most counselors, picketers, etc. will not be in  **\*715**  a "facility". [2]  (Sec. 248(f)(1)(2)). Supporters themselves have stated that "casual sidewalk counseling" is not covered. The Committee Report [3] speaks consistently in this regard. The Report's discussion of who has standing to sue reaffirms the conclusion that the supporters will do their best to see that the bill does not protect both sides of the debate equally and omits protection for core elements of the pro-life movement. Yet, as the Supreme Court has stated, "government has no 'authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules.'" R.A.V. v. City of St. Paul, Minnesota, 112 S. Ct. 2538, 120 L.Ed.2d 305, 323 (1992) quoted in written testimony of Nikolas T. Nikas, before Senate Committee on Labor & Human Resources, at pp. 21–25 (May 12, 1993).

Despite any assertions by this bill's supporters, the need for such protections was asserted by both sides, especially when testimony at the minority day of hearings is considered. Numerous examples of pro-choice violence have been provided to the House Judiciary Committee's Subcommittee on Crime & Criminal Justice. Not surprisingly, the Report's discussion of the hearings in the 102d Congress contains short descriptions of each pro-life witness and omits discussion of death threats, harassment, vandalism, arson, and exposure to violence faced by many in the pro-life movement. [4]  The Report also neglects to mention that more recent pro-life witnesses testified as to viewpoint discrimination they suffered at the hands of local law enforcement, local governments, and the media.

Members of Operation Rescue and others on that side of the debate cry foul and point out the unequal application of existing laws against them and other "pro-life" movements. [5]  What in their view has resulted is an (unequal) application of the laws with an eye toward political correctness. Still other "rescue" groups complain of arrests for merely picketing or solely praying, maltreatment by law enforcement, and note harassment by "pro-choice" or "pro-abortion" groups, without resulting arrests or substantial media attention.

## LUMPING TOGETHER VIOLENT CONDUCT AND NONVIOLENT CIVIL DISOBEDIENCE

In their efforts to discontinue the use of sit-ins by numerous middle Americans and pro-life supporters, the sponsors of H.R. 796 traverse a "slippery slope" which may [inadvertently?] reach those speaking out, praying and picketing on this important issue. H.R. 796 groups together–fails to distinguish between–nonviolent civil disobedience and violent conduct. H.R. 796 addresses acts by "... by force, threat of force, or physical obstruction ..." (Sec. 248(a)(1)). Yet, the physical obstruction need not be accompanied by violence or threats of violence. In fact, constitutionally-protected picketing by its very size and number of participants, even if peaceful–could  **\*716**  constitute "physical obstruction" under this bill. Americans engaging in nonviolent civil disobedience, a time-honored tradition evidenced in the U.S. Constitution, would risk facing many of the same draconian punishments as the few individuals engaging in violent conduct. While the latter deserve harsh sentences and/or fines, the same cannot be said of the modern-day equivalents of Gandhi and King. See also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S. Ct. 3409, 3427–28 (1982), reh. denied, 459 U.S. 898 (1982) (noting that acts of violence may be punished, but that "[w]hen such conduct occurs in the context of constitutionally protected activity," the government must respond with "precision of regulation," restricting liability to the unlawful acts while imposing no penalty on lawful protest.).

Drawing the line between nonviolent civil disobedience and violent conduct becomes all the more important given that the vast majority of those in the pro-life movement condemn the killing of Dr. David Gunn as well as any and all other violence purportedly in the name of the pro-life movement. National Right to Life Committee (NRLC) "condemns the violence against abortionist Dr. David Gunn, as NRLC condemns the violence of abortion that has killed 30 million unborn children in the last 20 years. NRLC is involved in peaceful, legal activities to protect human lives threatened by abortion, infanticide and euthanasia. We continue to oppose any form of violence to fight the violence of abortion." NRLC also notes, "[i]t is false and offensive to suggest, as some pro-abortion groups have done, that speaking in favor of the right to life somehow causes violence. Such

a suggestion is like blaming the civil rights movement–and all those who courageously spoke in favor of the rights of African Americans–for rioting or deaths that were a part of that era." The National Conference of Catholic Bishops has also stated that the "violence of killing in the name of pro-life makes a mockery of the pro-life cause. As we abhor the violence of abortion, we abhor violence as a dangerous and deplorable means to stop abortion." The Bishops Conference also points out the guilt by association present. Still one other commentator expressed that even someone who favors reasonable restrictions on abortion feels sickened by the acts of violence directed against abortion clinics, so tragically exemplified by the murder of Dr. David Gunn in Pensacola, Fla. Not only is violence counter to the ethical premises of the pro-life movement, but these tactics provide the best possible propaganda for those who wish to portray the movement as extremist and hypocritical. The commentator goes on to say that he feels much the way peace advocates must have felt when defense plants were bombed or civil rights workers must have felt when violence besmirched their movement in the 1960s.

   **\*717**  Additional evidence of the bill's supporters lumping together nonviolent civil disobedience and violent, criminal conduct can be found in statements in the Committee Report and by such supporters. The Report omits mention that members of Operation Rescue make a pledge of nonviolence "in both word and deed." The supporters often cite many purported examples of "harassment" or "threats of picketing." Several points can be mentioned in this regard: the harassment referred to is subjective and often refers to boycotts, picketing, surveillance or other constitutionally protected or legal conduct. Violence, while repeatedly mentioned in the Report, is altogether absent from H.R. 796 and is not a required statutory element of this new proposed offense. See Sec. 248(a). References by H.R. 796's supporters to "threats of picketing" give a whole, new, Orwellian meaning to picketing–an activity most Americans hold to be protected under the U.S. Constitution.


FEDERALISM

   An additional or perhaps initial question relates to federalism. Ought Congress to be legislating in this area. What need is there for a federal statute given the abundance of state and local laws addressing rescue conduct when it becomes illegal. In short, the question of the need for federal legislation aimed at guaranteeing access (i.e., access to or egress from) such clinics requires a look at existing state and federal statutes available to aggrieved parties. We must exercise caution in enlarging the federal criminal (and civil tort) jurisdiction.

   States have used a variety of traditional methods in an attempt to guarantee access or, in some instances, to punish actions by certain pro-life groups. Such statutes must not punish or inhibit ("chill") first amendment-protected expression. Criminal trespass, criminal contempt, disorderly conduct, resisting arrest, and unlawful assembly are examples of criminal statutes used to punish some clinic sit-ins or "rescues". Civil remedies, like injunctions, are often pursued by clinics or their patients.

   The Judiciary Committee's Subcommittee on Crime and Criminal Justice has grappled with the federalism issue before. As Rep. Sensenbrenner noted at last year's hearing, "[i]t's got to be clearly demonstrated that the State and local laws on issues like disorderly conduct are inadequate, and that the enforcement by State and local officials was inadequate." (Hearing, supra, at 3.) Rep. Schiff also noted the irony in pursuing federal legislation in this area, while the supporters of this legislation generally opposed a proposal last Congress allowing federal prosecutors to assist in the prosecution of certain gun-related violent felonies: "I heard from many of the same individuals who are speaking now. They said that the Federal Government didn't have the resources to intervene in criminal law, that the Federal Government had courts that were overloaded; that the Federal investigative agencies were overworked. It amazes me that suddenly we've found the resources to bring about federal investigation and prosecution in these kinds of situation when we didn't have those same resources to bring about  **\*718**  Federal intervention in the investigation and prosecution of murder and rape with an armed weapon...." (Hearing, supra, at 6).

   Supporters of new federal legislation also claim reluctance of some State and local officials to enforce existing laws and burdensome costs localities are exposed to by "rescue" movements which often move from one town or city to another, complicating enforcement and multiplying the costs of enforcement. In this regard, the testimony at last year's hearing was contradictory. Victims from the first panel criticized police attitudes, and enforcement in South Bend and Wichita. Yet, Mr. Sekulow testified about enforcement of State and local laws against pro-life demonstrators and that in Wichita

"2,700 arrests, prosecutions, criminal contempt proceedings, and people were put in jail for violating trespass and the court's injunctions." (Hearing, supra, at 162.) Mr. Sekulow also testified as to the numerous cases he has tried in this subject area where the courts applied the law and issued sentences and other remedies, including jail time. (Hearing, supra, at 118). Rep. Schumer's own memorandum for last year's Subcommittee hearing notes a similar number of arrests in Wichita and 500 arrests in Buffalo, also noting the resulting expenses to the municipalities. Sam Ellis, Chief of Police, City of Manassas, Virginia, testified to 68 arrests done in an orderly fashion, during a blockade in that community. (Hearing, supra, at 51 et seq.). Another witness, an OB/ GYN, seems to acknowledge appropriate enforcement of the existing local laws. (Hearing, supra, at 63, "The usual scenario...") Perhaps then monetary constraints and other resource limitations are more of a problem than reluctance. At least one witness last year though stated his unwillingness to enforce the law against rescue groups. Yet, the witness also affirmed that his fellow law enforcement officers, by and large are not reluctant. "I would like to be able to say that my fellow law enforcement officers share my convictions and refuse to help kill babies, but, by and large, they just don't, and they are doing a very efficient job of keeping the killing centers open." (Hearing, supra, at 156–57). Moreover, the witness explained: that the whole question was "moot" because the 2 abortion clinics were not in his jurisdiction; and that in other communities if officers are unwilling to enforce the laws, their supervisors find others in the department to do so. (Hearing, supra, at 166–67). In any event, Mr. Bruce Fein, in his triumph for Rule of Law wrote that, "[i]f states did default on their obligation to protect those seeking abortion under state law, that neglect would be a constitutional violation subject to federal court injunction." B. Fein Triumph for Rule of Law, The Washington Times, at F1, January 19, 1993 (citing Yick Wo v. Hopkins, 118 U.S. 356 (1886)). Mr. Fein also wrote, "[n]o federal court injunction regarding a clinic protest has rested on a finding that state or local officials had declined to enforce such laws on behalf of abortion patients. Indeed, experience proved the opposite." Fein likewise noted the availability of Article IV of the Constitution and related federal statutes.

Federal statutes currently on the books already allow state and local governments to request federal law enforcement assistance. **\*719** Justice Kennedy elaborates on this point in the watershed case on the subject of pro-life sit-ins and demonstrations, Bray v. Alexandria Women's Health Clinic, U.S., 113 S. Ct. 753 (1993):

For this reason, it is important to note that another federal statute offers the possibility of powerful federal assistance for persons who are injured or threatened by organized lawless conduct that falls within the primary jurisdiction of the States and their local governments.

Should state officials deem it necessary, law enforcement assistance is authorized upon request by the State to the Attorney General of the United States, pursuant to 42 U.S.C. Sec. 10501. In the event of a law enforcement emergency as to which 'State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law,' Sec. 10502(3), the Attorney General is empowered to put the full range of federal law enforcement resources at the disposal of the State, including the resources of the United States Marshals Service, which was presumably the principal practical advantage to respondents of seeking a federal injunction under Sec. 1985(3). See Sec. 10502(2).

... Indeed, the statute itself explicitly directs the Attorney General to consider 'the need to avoid unnecessary Federal involvement and intervention in matters primarily of State and local concern.' Sec. 10501(c)(5).

I do not suggest that this statute is the only remedy[6] available. It does illustrate, however, that Congress has provided a federal mechanism for ensuring that adequate law enforcement resources are available to protect federally guaranteed rights and that Congress, too, attaches great significance to the federal decision to intervene. 113 S. Ct. at 769 (Kennedy, J., concurring).

Finally, still other federal remedies may be available. Civil RICO has been used against anti-abortion sit-ins and is now the subject of U.S. Supreme Court litigation. See NOW v. Scheidler (92–780). As mentioned above, the case for inadequacy or reluctance at the state and local levels of law enforcement is not convincingly made. Indeed, approximately 70,000 arrests have been made in the last five years.

FIRST AMENDMENT

Even if a need for a federal statute is shown, additional limitations still exist. First Amendment protections attach to much of the speech and conduct, i.e., symbolic conduct, found in the picketing, sidewalk counseling, and mass gatherings around abortion clinics. Prayer is likewise protected. Violence, however, does not receive such free speech/expression/association protection.

Against this general backdrop, the specifics of H.R. 796 must be examined: The prohibition in H.R. 796 applies when a person "by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person, or attempts to do so, because  **\*720**  that person or any other person or class of persons is obtaining or providing reproductive health services...." (Sec. 248(a)(2)). The conduct need not occur at or near the clinic. [Yet, this is unclear depending on how one construes "is" and whether it includes a pattern of services, for example, or whether it is site specific.] The penalty for a first offense is a fine and/or imprisonment for not more than one year and for a repeat offense, a find and/or imprisonment for not more than three years. If serious bodily injury or death results, penalties are enhanced. There is no death penalty. (Sec. 248(b)). H.R. 796 also provides for civil causes of action by private plaintiffs, the U.S. Attorney General or State Attorneys General. (Sec. 248 (c)(1)(2)(3)). Available relief is quite broad. (Sec. 248(c)(4)). Section 248(d) notes that the proposed law shall not be construed to prohibit "any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution." There is no preemption of State law or remedies. (Sec. 248(e)).

H.R. 796 while more facially neutral than the bill as introduced still appears targeted at one debate and, in turn, to one side of that debate. Professor Tribe writes that "if governmental action neutral on its face was motivated by ... an intent to single out constitutionally protected speech for control or penalty" strict scrutiny attaches and that regardless in some cases regulations "might still be invalidated on first amendment principles if, in the process of enforcement, the regulation is not narrowed to deal with the non-communicative aspect of the conduct at issue." Laurence H. Tribe, American Constitutional Law Sec. 12–3, 12–7 (2d ed. 1988). See also Nimmer, The Meaning of Symbolic Speech Under the First Amendment, 21 U.C.L.A.L. Rev. 29, 41 (1973) cited in Tribe, supra at 819 n. 17. (noting that a statute with an overly narrow purpose or interest may create a conclusive presumption that the state interest advanced by the statute is actually an anti-speech interest or objective rather than a non-speech interest or objective.) Any "prior restraints" on speech, such as an injunction prohibiting speech before it is spoken, will be strictly scrutinized by a court. See Sec. 248(c)(4). Also noteworthy is that the speech and symbolic conduct found in abortion sit-ins, and rallies and picketing, expecially when emotional, are particularly difficult for a court to assess, for speech on issues like abortion lies at the core of first amendment protections. "There is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 3425 (1982), reh. denied, 459 U.S. 898 (1982) (quoting New York Times v. Sullivan, 376 U.S. 254, 270 (1964)).[7]

Another recent U.S. Supreme Court case in the area of hate crimes should shed some light on the first amendment question  **\*721**  and the problem of viewpoint discrimination inherent in H.R. 796. This bill punishes individuals differently because of what they say or because of the beliefs they hold. R.A.V. stuck down a St. Paul ordinance proscribing cross-burning and similar conduct–that one knows or has reasonable grounds to know "arouses anger, alarm, or resentment * * * on the basis of race, color, creed, religion, or gender. * * *" According to Professor McConnell of the Univ. of Chicago, School of Law, in R.A.V. the Court recognized that, as construed by the state court, the statute prohibited speech that is not constitutionally protected–just as acts of violence or trespass at abortion clinics are not constitutionally protected. But the Court held that the government may not single out speech on "specified disfavored topics." Hate speech based on race and gender was punished, yet hate speech based on union membership or political affiliation was not. McConnell, supra. In other words, the legislation was content-based and favored the expression or suppression of some viewpoints over others. In similar fashion, H.R. 796 does not address those who would block a doorway of a "facility" to protest for "animal rights" or similar activities by ACT-UP, protestors on health care issues, etc. "Congress has selected a single point of view–opposition to abortion–and subjected it to penalties applied to no other point of view." McConnell, supra. No criminal offense would occur unless the activities were done "because that person or any other person or class of persons is obtaining or providing reproductive health services. * * *" Sec. 248(a). NRLC also has pointed out hypothetical on the different criminal exposure facing pro-life protestors blocking

a doorway and abortion clinic nurses protesting low wages and blocking a doorway, and animal rights activists conducting a sit in to discourage the killing of cats.

Another hypothetical may be useful. Professor McConnell notes that "[i]f Congress had passed a law that anyone committing criminal trespass while protesting the Gulf War would be thrown in jail for up to three years, it immediately would be recognized as an infringement of speech. Congress may not punish expressive conduct differently based on the message if conveys." McConnell, supra.

The threat of significant money DAMAGES, including punitive damages is likely to "chill" speech, much of which is protected under the first amendment. A pro-life sidewalk counselor may be reluctant to exercise his/her constitutionally protected right to walk up to and peacefully talk to someone walking into a clinic for an abortion. The risk of damages and having to pay attorneys' fees for what could be construed as "physically obstructing" within the terms of H.R. 796 could chill protected first amendment rights. See Sec. 248(a)(1); (f)(3). Additionally, ambiguity in H.R. 796 could further chill free speech and expression: The bill does not define "intimidates", and "interferes" whose meaning remains unclear giving little guidance to potential defendants. Likewise, the definition of "physical obstruction" [Sec. 248(f)(3)] is unclear as to what duration is necessary.

**\*722**  The example of the sidewalk counselor also points out a potential constitutional problem in the area of overbreadth. The statute must not seep within its reach conduct or speech otherwise protected under the first amendment. Sidewalk counselors and peaceful protestors could come within the scope of "physical obstruction***intimidates***interferes***" Sec. 248(a). As noted above, acts of violence may be punished, but "[w]hen such conduct occurs in the context of constitutionally protected activity," the government must respond with "precision of regulation," restricting liability to the unlawful acts while imposing no penalty on lawful protest. See NAACP v. Claiborne Hardware Co., 102 S. Ct. at 3427–28. H.R. 796 lacks such precision.

Free exercise of religious beliefs associated with the pro-life movement are also summarily dismissed by H.R. 796's supporters who claim that the bill would not conflict with the free exercise of religious beliefs because government has a legally recognized compelling interest in maintaining public order even by regulating religiously motivated activities. Yet, absent from this "analysis" is recognition that even such government regulation must satisfy certain requirements or meet certain standards.

OTHER POINTS

Still other questions and problems are generated by the language of H.R. 796. It is unclear if "injury" includes psychological injury, pain and suffering, whether "physical obstruction***intimidates" improperly regulates protected speech and whether unlawful "reproductive health services" are protected, e.g., third trimester abortions. A state official enforcing state law on late-term abortion could be exposed to liability.

H.R. 796 is said to be modeled after two existing statutes which when more closely examined differ in important ways. H.R. 796 is purportedly modeled after 18 U.S.C. Sec. 245. Yet, that section does not proscribe "*** physical obstruction***." It covers "[w]hoever, whether or not acting under color of law, by force or threat of force willfully...." (18 U.S.C. Sec. 245(b)) (West Federal Crim. Code & Rules 1993). Section 245 also requires that no prosecution under that section may proceed until the Attorney General, or specified designee, certifies–in writing–that prosecution is in the public interest and necessary to secure substantial justice. This section is likewise more limited than H.R. 796 in the relief available. See 18 U.S.C. Sec. 245(a)(1); (b) (West Federal Crim. Code & Rules 1993). See also 18 U.S.C. Sec. 247 (West Federal Crim. Code & Rules 1993) (also requiring certification) (This section provides, "intentionally obstructs, by force or threat of force...") H.R. 796 is also modeled after 42 U.S.C. Section 3631 which according to the Majority contains virtually identical operative language. Upon inspection, however, that law provides: "Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with... (42 U.S.C.A. Sec. 3631) (West 1977 & Supp. 1993.). The troublesome phrase "physical obstruction" is again missing.

**\*723** H.R. 796 may also punish parents. Imagine the parent who momentarily stops his/her minor daughter on the daughter's way out the door and does so in an effort to talk over the daughter's decision to have an abortion. This conduct could make out a colorable claim of "physical obstruction". Sen. Kennedy's bill in the other body, S. 636 (as reported), therefore added a provision excepting from the penalties and civil remedies in the bill activities of a parent or legal guardian of a minor insofar as they are directed exclusively at that minor. H.R. 796 contains no such protections.

CONCLUSION

While we deplore the violence of the few in recent weeks connected with this emotional debate, H.R. 796 reported to the House by the Judiciary Committee represents a piece a legislation seeking to silence an unpopular minority and doing so in the best traditions of political correctness. As mentioned above, its failure to distinguish between nonviolent civil disobedience and violent conduct and the application of different rules of conduct to the two sides engaged in this emotional debate have led one commentator to conclude that, "Congress has selected a single point of view–opposition to abortion–and subjected it to penalties applied to no other point of view." McConnell, supra. The new federal tort created is duplicative of existing relief both criminal and civil provided for in the States. Threat of significant money damages, including punitive damages is likely to "CHILL" speech, much of which is protected under the first amendment, thereby discouraging participation by law-abiding middle Americans. H.R. 796 disregards the fact that First Amendment protections attach to much of the speech and conduct, i.e., symbolic conduct, found in the picketing, sidewalk counseling, and mass gatherings around abortion clinics. A savings clause in the "Rules of Construction" adds little and is "window dressing" stating that the bill may not be construed to prohibit that which it cannot [already] prohibit under the First Amendment. Vagueness and ambiguity in H.R. 796 are further problematic given that the bill creates a new federal crime. H.R. 796 provides insufficient guidance to potential defendants seeking to tailor their behavior so as to act legally and avoid liability.

We respectfully dissent.

> F. James Sensenbrenner, Jr.
> Henry J. Hyde.
> Howard Coble.
> Felton Gallegly.
> Bob Inglis.
> Carlos J. Moorhead.
> Bill McCollum.
> Lamar S. Smith.
> Charles T. Canady.
> Robert W. Goodlatte.

1 18 U.S.C. Section 245; 42 U.S.C. Section 3631.

2 Because of lingering fear caused by her experience, Ms. "Doe" requested that her full name not be used.

3 113 S. Ct. 753 (1993).

4 National Abortion Federation, "Incidents of Violence Against Abortion Providers, 1993" (April 16, 1993).

5 "Doe" testimony, House Judiciary Committee, Subcommittee on Crime and Criminal Justice, May 6, 1992.

6 Id.

7 Id.

8 National Abortion Federation, Fact Sheet, "Incidents of Violence Against Abortion Providers, 1992."

9 National Abortion Federation Report, "Noxious Chemical Vandalism Incidents at Abortion Clinics," May, 1993.

10 See e.g., Bering v. Share, 721 P.2d 918, 923 (Wash 1986) (blockade interfered with a range of patients seeking medical care).

11 Testimony of Janet Reno, Attorney General, Senate Committee on Labor and Human Resources, May 12, 1993, Hearings on S. 636, Freedom of Access to Clinic Entrances Act of 1993, Serial No. 103–138, p. 9.

12 Supra, n. 5.

13 Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753 (1993).

14 42 U.S.C. Sec. 1985(3).

15 Supra, n. 13.

16 Supra, n. 11.

17 Id.

18 18 U.S.C. Sec. 245(b)(1).

19 See United States v. Gilbert, 884 F.2d 454 (9th Cir. 1989) cert. denied, 493 U.S. 1082 (1990).

20 18 U.S.C. Sec. 3571.

21 18 U.S.C. Sec. 245; 42 U.S.C. Section 3631.

22 Supra, n. 13.

23 As defined in Subsection 248(f)(1).

1 As ordered reported (amended) from the House Committee on the Judiciary, on September 14, 1993.

2 However, an alternative reading of proposed Sec. 248(a)(1) would cover sidewalk counselors et al. given that such pro-life activists could be "any person" and "any other person or class of persons" could be those performing or receiving abortions, strained majority construction aside.

3 References to the Committee Report ("Report") are based on a recent draft received from the Majority.

4 The Report also omits mention of the testimony by those witnesses as to the adequacy of numerous state and local laws. See infra.

5 Clinic Blockades: Hearings Before the Subcomm. on Crime & Criminal Justice of the House Comm. on the Judiciary, 102d Cong., 2d Sess. (1992) 140–141 [hereinafter Hearing] (statement of Rev. Keith Tucci, Director, Operation Rescue National).

6 While the federal remedy or relief discussed by Justice Kennedy and found in 42 U.S.C. Sec. 10501–10502, may depend on the discretion of the U.S. Attorney General, the remedies mentioned previously supply additional, potential avenues of relief. Civil RICO may also be available to aggrieved parties.

7 Under this analysis, the statute is unconstitutional unless the government shows that the message being suppressed poses a clear and present danger, constitutes a defamatory falsehood or otherwise constitutes unprotected speech.

H.R. REP. 103-306, H.R. Rep. No. 306, 103RD Cong., 1ST Sess. 1993, 1993 WL 465093, 1994 U.S.C.C.A.N. 699 (Leg.Hist.)

**End of Document**                                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.