# EXHIBIT D

**CONGRESSIONAL RECORD**

**103RD CONGRESS**

**HOUSE**

| Bill | Date | Page(s) |
|---|---|---|
| H.R. 796 | Nov. 18, 1993 | H10063-10109 |

**Action:**

Freedom of Access to Clinic Entrances: House passed H.R. 796, to assure freedom of access to clinic entrances.

Pages H10063–H10109

Rejected the Sensenbrenner motion to recommit the bill to the Committee on the Judiciary with instructions to report it back forthwith containing an amendment that strikes the civil right of action provisions as applied to both individuals and State attorneys general (rejected by a recorded vote of 182 ayes to 246 noes, Roll No. 582).

Pages H10106–09

Agreed to the committee amendment in the nature of a substitute.

Page H10106

On a demand for a separate vote, agreed to the DeLay amendment that exempts any parent or legal guardian from penalties when their activities are directed at their minor child (agreed to by a recorded vote of 345 ayes to 80 noes, Roll No. 581). This amendment was agreed to earlier in the Committee of the Whole by a recorded vote of 350 ayes to 82 noes, Roll No. 579.

Pages H10094–98, H10106

Agreed To:

The McCollum amendment that clarifies that provisions prohibiting force, threats, and physical obstructions against people obtaining or providing legal reproductive health services; should not be construed as interfering with the authority of States to enforce State or local laws regulating the provision of such services; and

Pages H10093–94

The Schumer amendment that defines "intimidation" as actions that cause a reasonable fear of bodily harm.

Page H10098

Rejected the Smith of New Jersey amendment in the nature of a substitute that sought to specify that actions prohibited must occur near a clinic, or near the home of an individual affected by the crime; specify that people "lawfully engaged in activities protected by" the first amendment are exempt from penalties; exempt parents or legal guardians from penalties when their activities are directed at the minor child; make physical obstruction a crime only if it is accompanied by force or threats of force; provides that people harmed could not sue for punitive damages, but only for actual damages; set standards that must be met before a court can issue an injunction; and to not allow State attorney general to bring suits, so that only the affected party or the Justice Department could bring legal action (rejected by a recorded vote of 177 ayes to 255 noes, Roll No. 580).

Pages H10098–H10106

Agreed to amend the title.

Page H10109

H. Res. 313, the rule under which the bill was considered, was agreed to earlier by a yea-and-nay vote of 233 yeas to 192 nays, Roll No. 578).

Page H10073

## FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

Ms. SLAUGHTER. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 313 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. RES. 313

*Resolved*, That at any time after the adoption of this resolution the Speaker may, pursuant to clause 1(b) of rule XXIII, declare the House resolved into the Committee of the Whole House on the state of the Union for consideration of the bill (H.R. 796) to assure freedom of access to clinic entrances. The first reading of the bill shall be dispensed with. All points of order against consideration of the bill are waived. General debate shall be confined to the bill and the amendments made in order by this resolution and shall not exceed one hour equally divided and controlled by the chairman and ranking minority member of the Committee on the Judiciary. After general debate the bill shall be considered for amendment under the five-minute rule. It shall be in order to consider as an original bill for the purpose of amendment under the five-minute rule the amendment in the nature of a substitute recommended by the Committee on the Judiciary now printed in the bill. The committee amendment in the nature of a substitute shall be considered as read. All points of order against the committee amendment in the nature of a substitute are waived. No amendment to the committee amendment in the nature of a substitute shall be in order except those printed in the report of the Committee on Rules accompanying this resolution. Each amendment may be offered only in the order printed in the report, may be offered only by a Member designated in the report, shall be considered as read, shall be debatable for the time specified in the report equally divided and controlled by the proponent and an opponent, and shall not be subject to amendment. All points of order against the amendment numbered 4 in the report are waived. At the conclusion of consideration of the bill for amendment the Committee shall rise and report the bill to the House with such amendments as may have been adopted. Any Member may demand a separate vote in the House on any amendment adopted in the Committee of the Whole to the bill or to the committee amendment in the nature of a substitute. The previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit with or without instructions.

□ 1130

The SPEAKER pro tempore (Mr. TORRES). The gentlewoman from New York [Ms. SLAUGHTER] is recognized for 1 hour.

Ms. SLAUGHTER. Mr. Speaker, I yield the customary 30 minutes to the gentleman from Florida [Mr. GOSS], pending which I yield myself such time as I may consume. During consideration of this resolution, all time yielded is for the purpose of debate only.

(Ms. SLAUGHTER asked and was given permission to revise and extend her remarks.)

Ms. SLAUGHTER. Mr. Speaker, House Resolution 313 is the rule providing for the consideration of H.R. 796, the Freedom of Access to Clinic Entrances Act of 1993.

The rule provides for 1 hour of general debate to be equally divided and controlled by the chairman and ranking minority member of the Committee on the Judiciary.

The rule makes in order the Judiciary Committee amendment in the nature of a substitute now printed in the bill as an original bill for the purposes of amendment. The substitute shall be considered as read; all points of order against the committee substitute are waived.

No amendments to the substitute are to be in order except those printed in the report of the Committee on Rules. The amendments are to be considered in the order, manner, and for the time specified in the report. The amendments shall be considered as read and are not subject to further amendment.

Further the rule waives all points of order against the amendment to be offered by Representative SMITH of New Jersey.

Mr. Speaker, the four amendments made in order under this rule include a comprehensive substitute which pro-

vides an alternative approach to the problem addressed by the bill as well as three other amendments to perfect the bill's language.

Finally, the rule provides for one motion to recommit with or without instructions.

Mr. Speaker, H.R. 796, the bill for which the Rules Committee has recommended this rule, was developed in response to the growing problem of orchestrated violence at reproductive health clinics all across the Nation. In recent years, the level of this violence has escalated. The list is long and sad: vandalism, arson, bombing, gassing, physical attacks, death threats, shootings, and murder—against clinic staff, as well as their families and their children, and against the women who need the health services these clinics offer.

The statistics tell a horrible story: Between 1977 and April of this year, over 1,000 acts of violence were reported against clinics and health care providers. These include: 36 bombings; 81 arsons; 131 death threats; 84 assaults; 2 kidnappings; 327 clinic invasions; and 1 murder.

Over 6,000 clinic blockades and other disruptions of clinic activity were reported during that period.

Just this past March, Dr. David Gunn of Florida was shot and killed; murdered, by an antiabortion activist.

This past August, Dr. George Tiller was shot and wounded in Oregon, because he performed legal abortions at a reproductive health clinic.

And just last month, a 19-year-old youth set fire to a Texas clinic, causing $50,000 worth of damage. This was the ninth women's health center to be damaged by fire so far this year.

These acts of violence do not only hurt those directly hit; they also affect the thousands of women who need to use these clinics for their health care. More than 90 percent of the clinics that have experienced blockades or violence also provide other health services, in addition to abortions. And many of the clinics targeted for blockades and harassment are located in rural areas. They are frequently the only source of reproductive medical care for the women they serve. Disruptions in the operation of these clinics has therefore deprived many women of a wide range of badly needed medical services, including pregnancy and prenatal care.

While it is true that most State and local law enforcement have the authority to police such violations of their criminal codes, in reality this often does not happen. In some cases, the locality does not have the resources to battle large-scale, long-term interstate lawlessness, including trespass, vandalism, and assault. In other cases, they simply choose not to do so. Clearly, a Federal remedy is the only answer if we are standardize law enforcement and offer all clinics the same protection.

Until early this year, Federal courts could act to restrain clinic blockades. But once the Supreme Court ruled, in the Bray decision, that the Ku Klux Klan statute no longer offered protection to clinics and providers, we were left with no legal means of ending the disruptions; no way to keep these clinics open and safe for women, their doctors or nurses; and no way to guarantee this constitutionally protected right.

Attorney General Janet Reno has testified that no other Federal law is applicable in this situation. She noted that—

> The reluctance of local authorities to protect the rights of individuals provides a powerful justification for the enactment of Federal protections; protections that have been evoked previously by Congress in passing laws to protect civil rights.

This bill will fill the gap and provide these protections. The National Association of Attorneys General supports the bill, for just that reason. As does the American Medical Association, and the League of Women Voters, among many others.

It is important to note that this bill will not abridge anyone's right to conduct peaceful, lawful protests at clinics. What it will do, however, is make reproductive health clinics safe for the men and women who work there, as well as for the women who need their services. These health care professionals and their patients need our help, and I urge my colleagues to provide it for them by supporting this rule and this important legislation.

Mr. GOSS. Mr. Speaker, I yield such time as he may consume to the distinguished gentleman from Georgia [Mr. GINGRICH], the minority whip.

Mr. GINGRICH. Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, I strongly urge my colleagues to vote down this rule. I think this rule is a tragic, tragic mistake. It is a mistake, first of all, because we are dealing with freedom-of-speech rights that are central to America.

I think when you look back at the entire history of the civil rights movement, when you look back at the antiwar movement, if we had applied these kinds of restrictions and this kind of language, it would have distorted that entire experience and would have gravely threatened the rights and the liberties of Americans, and in that sense, I think this bill as it is currently written is explicitly dangerous to the right of Americans to dissent and the right of Americans to protest.

I strongly favor any actions that are needed to end violence. I believe anyone who is engaged in violence against a fellow American deserves jail and that every American deserves protection against violence. But there are free-speech issues here that are very, very important.

The use of words like "intimidation" is a judgmental word. If you are standing 3 feet away but staring at a person, are you intimidating them? If you are a father or a mother trying to talk to your daughter, are you intimidating them? Under what circumstances will this be applied?

I want to make two sets of points; the first is in urging a "no" vote, look at the amendments that were defeated. There was a Gekas-Stenholm amendment which would have extended the protection against demonstration to include other lawful activities. There was a Kennedy amendment which would extend the protection from assault or interference to individuals who engage in lawful activities in the vicinity of an abortion facility. There was an Inglis amendment to strike language allowing private citizens to bring suit under this bill. There was a Klink amendment to redefine the definition of physical obstruction in order to remove peaceful sit-ins and similar passive demonstrations from the scope of the bill.

Notice the way that this bill is designed. First of all, it is one more example of another trial-lawyer-enrichment bill. It is one more effort to extend to the private citizen the right to go to court, the incentive to show up and have one more trial lawyer file one more triple-damages suit, to have one more opportunity for legal blackmail, to have one more settlement out of court, to enrich the lawyers one more time.

□ 1140

So I understand why, if you are a trial lawyer, this might be a good bill, because you are going to have more business.

Second, notice that this particular rule blocks from amendment Democrat and Republican efforts to amend this bill. Third, notice that this bill would, in effect, stop precisely the kinds of civil disobedience which were at the heart of what the civil rights movement was all about.

Let me make a second point, and that is that there are significant threats here that are not clear. As I understand it, in the other body the bill was amended to provide a provision excepting from the penalties and civil remedies any parent or legal guardian of a minor. That is, in the bill as drafted in the other body, as I understand it, if you were a parent or a legal guardian and you had a 12-year-old, 13-year-old, 14-year-old about to walk into an abortion clinic, you would not be subject to these provisions if you were obstructing or intimidating your 12-, 13-, 14-year-old daughter. This bill in its current form will not protect parents, will in fact make them subject to a lawsuit so they could face the prospect of being sued by their daughter, with the trial lawyer taking the usual cut of the money, and they would be subject to triple damages.

Ms. SLAUGHTER. Mr. Speaker, will the gentleman yield?

Mr. GINGRICH. I yield to the gentlewoman from New York.

Ms. SLAUGHTER. I thank the gentleman for yielding.

Mr. Speaker, the DeLay amendment, which takes care of the problem of which the gentleman speaks, is in this rule.

Mr. GINGRICH. If my friend from New York would answer: Why did she then reject the Inglis amendment?

Ms. SLAUGHTER. We rejected some of the amendments because they were incorporated into the Smith amendment.

Mr. GINGRICH. I meant the Kennedy amendment.

Ms. SLAUGHTER. And some for nongermaneness.

Mr. GINGRICH. But I am correct, am I not, in saying the Kennedy amendment, No. 6, which specifically does what I just said, does not take care of it?

Ms. SLAUGHTER. I believe it is the DeLay amendment, I say to the gentleman from Georgia, that does specifically what he is talking about.

Mr. GINGRICH. Very well. I appreciate the gentlewoman's correcting me.

The Kennedy amendment in fact extended protection from assault or interference from individuals who engage in unlawful activities in the vicinity of an abortion clinic is afforded those seeking reproductive health services.

I would urge everyone to vote for the DeLay amendment in the bill.

Let me go on and point out that of the five amendments defeated, several were offered by Democrats and several were offered by Republicans. But my point would be twofold:

First, the bill, as it is currently written, extends to the words "obstruction" and "intimidation" a level of interpretation which I do not believe we have ever had in American legal tradition and which is a violation of free speech. It is one thing to say, as I would say, no one should engage in violence and we should protect people from violence; it is another thing to say the Federal Government is now going to put you at risk because of your free-speech activities and it is potentially going to put you in jail and is going to put you at risk for a lawsuit with triple damages by somebody who is out there trying to make a buck on what may well in fact be a nuisance lawsuit.

Second, there are legitimate amendments which should be made in order for both Democrats and Republicans. It is very unfortunate that the leadership of this House has gotten into the habit of strangling the rights of amendments for both Democrats and Republicans.

I think we should have a "no" vote on the rule and then support a rule to bring the same bill up with the full amendment capability so that this bill could be corrected so that it could be supported.

Ms. SLAUGHTER. Mr. Speaker, for purposes of debate only, I yield 4 minutes to the gentleman from Texas [Mr. STENHOLM].

(Mr. STENHOLM asked and was given permission to revise and extend his remarks.)

Mr. STENHOLM. I thank the gentlewoman for yielding this time to me.

Mr. Speaker, I rise today in opposition to this restrictive rule. Along with our colleague, Mr. GEKAS, I had wished to offer an amendment which would have extended the protections established in H.R. 796 to other equally important areas. Unfortunately, our amendment was not allowed to be debated on the floor and therefore I intend to vote against this rule and H.R. 796.

Although I oppose the bill, I support the stated intent of the authors in attempting to address the serious problem of violent and inappropriate activities by some extremist groups. Regardless of one's position on the reproductive health services debate, murder and violence cannot be condoned or allowed to go unpunished. If this bill did only what its supporters claim, I would be leading the fight for its passage.

For example, the authors of H.R. 796 claim the bill targets "* * * conduct that is not protected by the first amendment. Shootings, arson, vandalism, death threats and chemical attacks—that's the kind of violence and terror that H.R. 796 is intended to stop." This simply is not so. The bill goes much further by prohibiting conduct which "* * * intimidates, or interferes with any person, or attempts to do so * * *" And, it provides for a private right of action against a specific group of people, those who protest abortion rights.

You don't have to be a legal scholar to see the intent or the practical consequences of these loosely worded and legally undefined prohibitions. H.R. 796 would effectively abate peaceful anti-abortion protests as well as the allegedly targeted violent protests, because of the chilling effect of the private right of action triggered by such a nebulous legal standard. Most people will make the logical choice of not participating in peaceful protest for fear of being sued for damages of $5,000 per violation for actions which may be construed to intimidate or interfere with a woman attempting to obtain an abortion or a doctor who performs reproductive health services.

What is so frustrating to me is that the authors of this bill know this, despite what they may say. I know because I introduced legislation in the 101st Congress which addressed an equally serious problem of inappropriate and violent activities directed toward animal research laboratories and agri-business. Researchers were being threatened and vitally important research destroyed along with the facilities for the sake of animal rights.

I introduced a bill that paled in comparison to H.R. 796's prohibited activities, but like H.R. 796 did include a private right of action so that researchers whose life's work was destroyed by arson or theft could sue for damages from the violators. I was told by some of the primary supporters of H.R. 796 that my language was totally unacceptable on the grounds that it would violate these protestors' constitutional rights. In fact, I want to submit for the RECORD a copy of a letter I received from the ACLU which expressed their constitutional reservations to my Farm Animal and Research Facilities Protection Act.

Last year, my break-in bill was eventually enacted into law, but not without substantial amendment. The bill enacted into law prohibited only criminal acts and was stripped of its civil right of action. Even though my original bill had overwhelming support in the Congress, these changes had to be made to clear the House Judiciary Committee. Ironically the members of that committee are the authors and strongest supporters of H.R. 796.

As stated earlier, H.R. 796 has created an entirely new legal standard for one category of individuals, a legal standard that will be challenged as unconstitutional under the first amendment. There are valid questions that must and will be asked, and the attorneys and courts will hammer out many constitutional nuances if H.R. 796 is successfully signed into law.

This brings me to why I am here today. I believe that if we are going to set forth this new legal standard for protestors of reproductive health services, we should also apply it to other controversial activities. For example, if it is not appropriate for an abortion protestor to intimidate a woman seeking her legal choice to reproductive health services, then I believe it should also be inappropriate for a striking worker to intimidate another worker attempting to cross the picket line to exercise his or her right to work. What's the difference between an abortion protestor chaining himself or herself to a piece of office furniture in a clinic and an environmentalist chaining himself or herself to a tree that a logger is attempting to cut down. In both cases there is interference such as the bill references. How are the thousands of human lives which are lost from the destruction of years of biomedical research less valuable than the lives of doctors or young women threatened by force, threat of force, or physical obstruction at a reproductive health services clinic?

I have a folder with me this afternoon with just a small sampling of the extremely disturbing threats, intimidations, and outright deaths involved in cases of labor strikes, animal research, forestry production, and so forth. Just as I find the death of a doctor in a clinic or the bodily harm done to women seeking to enter such clinics extremely distressing and unacceptable, I find the story of deaths and death threats in these other situations equally alarming. In all cases there are already criminal penalties for criminal activity. What distinguishes the protections of this bill are the stated combination of criminal and civil penalties which come into play for whoever engages in "threat of force, * * * intimi-

dates, or interferes with any person or class of persons * * *" obtaining or providing reproductive health services.

Addressing these concerns is the intent of the amendment Mr. GEKAS and I had wished to offer during consideration of H.R. 796. While our amendment would not have dealt with the bill's constitutionality problems, it would have applied its new legal standard equally to other controversial and potentially egregious activities. By applying a what's-good-for-the-goose-is-good-for-the-gander rule to the bill, I believe we could have created a more valid bill to which everyone has a vested interest in developing the best and most just language and standards possible.

Unfortunately, our amendment is not allowed by this restrictive rule. Therefore, I will oppose it and encourage my colleagues to do the same. I regret having to do so because, as I said at the beginning of my remarks, I believe there is a very valid concern which was the original impetus for this legislation. I would embrace the opportunity to vote for the legislation which H.R. 796's promoters say they are bringing to the floor today. Unfortunately, the rhectoric does not match the legislative language of H.R. 796 and I thus must unfortunately oppose this bill.

Ms. SLAUGHTER. Mr. Speaker, will the gentleman yield?

Mr. STENHOLM. I yield to the gentlewoman from New York.

Ms. SLAUGHTER. I thank the gentleman for yielding to me.

Mr. Speaker, I want to point out to my colleague, Mr. STENHOLM, that the reason his amendment was not allowed is because it was nongermane to the bill.

Mr. STENHOLM. I would make a statement here again, a simple question: Why is it nongermane? What is the difference between an individual or a group of individuals that will chain themselves to a fence in front of a reproductive services clinic or those that would do the same thing in front of a research laboratory designed to provide research on the information necessary to protect the lives of countless thousands? What is the difference?

And I am not an attorney. That is why I get in trouble on arguments like this. I am not smart enough, you tell me, to come down and to look at the legal nuances. Whey you talk about germaneness, I am not smart enough, you tell me. I do not understand what is the difference.

All we are saying is, if the language that those of you who are smart enough to determine what is legal, what is constitutional, what goes back to 1964, why not just apply it to every instance? What are we afraid of? Why is it that we cannot have a simple amendment saying it should be applied to everything? We agree. I agree with everything the supporters are saying about this. But I am puzzled as to why we only apply it to one category. What is the difference between an environmentalist who chains themselves to a tree in protest of the cutting down of the tree, or spiking the tree that might cause an individual harm? What is the difference between the issues? We are talking about, we all agree—and that is why the gentlewoman who totally correct in the rule and the bill last year in which we did get almost unanimous support, we were able to come together.

But now we find new and different and unusual language, and all we say with our amendment is why not or should we not be allowed to have it apply to this, to have it adapted to this bill also? That is the simple question we ask. I do not understand it.

Perhaps some of you can understand it. In the meantime I would strongly urge all of my colleagues vote down this rule. Let us allow questions such as that which Mr. GEKAS and I are raising to be debated on the floor of the House and to have perhaps some of us who do not understand all the constitutional nuances understand—we can vote, we can make commonsense judgments to this question.

Please vote down this rule and give us a chance.

MONTANA SHOOTING SPORTS ASSOCIATION,
*Missoula, MT, November 16, 1993.*

RUSSELL MIDDLETON,
*c/o Congressman Stenholm, U.S. House of Representatives, Washington, DC.*

DEAR RUSSELL: On March 13, 1990, a well-publicized event occurred in Montana where several protestors interfered with a lawful bison hunt near the northern border of Yellowstone National Park.

On that day, three hunters were attempting to hunt bison, an activity authorized by the Montana Legislature. Professional protesters known to have connections with Earth First, Fund for Animals, and the Animal Liberation Front made several attempts to interfere with the hunt. These protesters are thought to have been paid, professional protesters.

First, the protesters attempted to herd the bison away from the hunters. Having failed in that objective, one protestor stabbed a bison hunter with a ski pole to prevent the hunter from shooting. This incident was filmed and carried on national television. Another protester stepped in front of the rifle of a hunter who was just about to squeeze off a shot at a bison. Both protesters were arrested and cited, the first with assault, the second with violations of Montana's hunter harassment law.

The second protester was convicted in Justice Court, and appealed to the District Court. The District Court dismissed charges on the grounds that the Montana hunter harassment law violated the protesters First Amendment freedom of expression. The State of Montana has appealed this dismissal to the Montana Supreme Court, the Montana Shooting Sports Association has entered an amicus appearance, and this matter is now pending before the Montana Supreme Court.

Please let me know if I can provide any further information.

Sincerely yours,

GARY S. MARBUT,
*President.*

---

STRIKE VIOLENCE

Mr. HATCH. Madam President, I rise to notify Members of the Senate that Eddie York died last week.

Who is Eddie York?

Eddie York was 35 years old. He was from Dingess, WV. Killed by a single shot to the back of his head, Eddie York is the latest victim of strike violence.

Madam President, the United Mine Workers of America have been on strike for almost three months against the members of the Bituminous Coal Operators Association [BOCA]. Today, some 16,000 miners are on strike and are affecting operators who produce approximately 15 percent of the coal mined in the United States.

Eddie York is the latest example of how violence is often threatened and executed as a negotiating tool by some unions.

In the past, UMWA strikes have been dominated by shootings, arson, property destruction, and the intimidation of employees.

As a result of the union's tactics in its strike against Pittston, the union was fined $52 million by a State court in Virginia for contempt.

This year, the strike has again been dominated by shootings, arson, and vandalism. Strikers have derailed trains, shot electrical transformers, and burned vehicles and property. They have damaged or destroyed millions of dollars worth of property. They have physically attacked company personnel. The lives of the spouses and children of supervisors and other employees have been endangered.

One community lost its entire electrical service when someone disabled the power station that provided service to the Old Ben mine in Indiana. 2,000 people were without electricity, including eight people who are on life support systems. Fortunately, the Red Cross and the local sheriff's department were able to provide temporary relief and shelter for these people, but it will cost more than $500,000 to fix the damage.

This latest tragedy is all the more senseless because Eddie York, a back-hoe operator, did not even work for the mining company. He worked for an independent contractor, and he was cleaning a reclamation pond on the property, which he had done for years. This was not work performed by the union.

He was shot and killed in Logan County, WV, as he attempted to leave the mine. I understand that it is extremely dangerous to enter or exit most of the mines that are being struck. This mine was no exemption. People have to be escorted on and off the property, and most individuals will only drive in convoys for safety.

Two security vehicles escorted Mr. York and another person off the property. After the vehicles left the property and were driving on a public road, strikers began hurling rocks. Shots were fired from a wooded area; several shots hit other vehicles in the convoy. Eddie York's truck was hit at least three times according to the police. It was the third that appeared to be the fatal bullet.

Madam President, there is no possible justification for such a crime.

As one of the few Members of this body who has belonged to a union, I firmly believe in the right of employees to organize, to join a union, and to exercise their right to strike.

But, a union should not be permitted to wage a campaign of terror during a strike. A labor dispute should not be an excuse for violence. The right to strike is not a right to vandalize, harass, or commit murder.

Unfortunately, labor violence continues to occur.

On July 1, 1993, several companies petitioned the National Labor Relations Board to enjoin the UMWA from continuing to break the law by engaging in violence and other prohibited acts. Unfortunately, the NLRB has now taken three weeks to consider this request and may take many more. If the

problem is as serious as many feel, then the Board should act immediately. If there is no truth to the petitioner's request, then the union has a right to have the petition rejected just as quickly. It is troubling to me that the NLRB drags its feet on this question. How much more time before someone else is killed?

For years, I have attempted to persuade this body to take the violence being committed during labor disputes more seriously. Unfortunately, my efforts have not been successful. Some have attempted to trivialize this issue, claiming that reports of violence are greatly exaggerated. Others have suggested that violence is simply part of the process, providing a kind of "boys will be boys" justification for this egregious behavior. These arguments are ridiculous.

Eddie York was not the first person to have died as a result of union violence. He was not the first person to have had rocks thrown at his car. He was not the first person to have been assaulted or to have had his family threatened. There are countless other American workers in other States who have been victims of these reprehensible union tactics whose names have never appeared in the newspaper.

Those of us in Congress must simply begin taking strike violence more seriously. We cannot justify it or sweep it under the rug.

Consequently, before this body considers new legislation to provide even greater powers to unions during a labor dispute, I urge that they take a careful look at the adequacy of current law to stop union violence. I hope Senators will remember Eddie York.

I have to say that this is serious stuff. I do not believe that union leaders want violence. I do not believe they can condone or justify the violence like what happened to Eddie York. I do not believe that good union leaders appreciate that type of conduct, but it is happening, and it is happening during what many feel is a legitimate strike. There are differences. People do have to fight it out from time to time, but there is no excuse for killing an innocent third party, like Eddie York. I, frankly, think we have to do something about it.

---

AUGUST 16, 1988.

**You are truly a fiend! And your so-called "research" is nothing less than torture and murder.**

**The only punishment that you are entitled to is to have your eyes gouged out and be bolted to a frame through your ——, then be smeared all over your body with cat food and turn all the hungry cats in Berkeley loose on you, to tear you limb from limb * * * slowly!**

**A hex on you and your family * * * you will all die slow horrible deaths! And then you will burn in Hell!**

DECENT HUMAN BEINGS.

---

MAY 1, 1990.

**People such as yourself make me sick! The experiments that you perform are ludicrious. They help none, but they do manage to maim and kill many cats. Animals were not put on this Earth for some insensitive a—— like yourself to exploit, maim, and kill them. I don't know how you are able to sleep at night being conscious of your actions. You must not care about anyone or anything but yourself. You are a no good mother —— and I am a very wealthy person with power. I'm going to pay through the nose to have some big, fat, slimy, —— capture you and experiment on you. Perhaps they will cut off your ——. At least you will get a taste of your own medicine.**

---

**Die you filthy ——, —— you and your parents for living—every bone inside my body yearns to smash your —— head in you low life maggot—if I ever meet you I swear to God I'll rip your —— —— off and stuff them down your throat—do you have the guts to write back to me—I don't think you do you —— worm.**

Mr. GOSS. Mr. Speaker, I yield 2 minutes to the distinguished gentleman from the Commonwealth of Pennsylvania [Mr. GEKAS] who had a hand in this amendment which was turned down, which is not germane but could have been made germane by the Committee on Rules.

(Mr. GEKAS asked and was given permission to revise and extend his remarks.)

Mr. GEKAS. Mr. Speaker and Members of the House, that is exactly correct. The gentleman from Texas [Mr. STENHOLM] quite properly raised a note of indignation that the Committee on Rules, in the person of the gentlewoman from New York, would say that the Gekas-Stenholm proposition should not be debated because it is not germane. That is an excuse that we can no longer tolerate.

The Committee on Rules time and time again, to suit its purposes or the leadership's, the Democratic leadership's purposes, waives germaneness like it is a wave of the hand. And when the minority, to try to protect the Gekas-Stenholm attempt the other day, refused to accept a request to waive germaneness. The question of the lady from New York is: Is the Rules Committee empowered to waive germaneness? The answer is "yes."

☐ 1150

So we cannot tolerate the excuse of nongermaneness. That is the explanation for the gentleman from Texas. They did not want to waive germaneness to allow our amendment to apply in the floor debate.

Ironically, I say to the gentlewoman from New York, I voted in favor of this proposition in committee. The gentlewoman from New York and her counterparts in the Rules Committee are violating or abusing me as a voter in favor of this piece of legislation.

The fact that they would not let us debate it, to allow it to apply to nuclear facility demonstrators, to animal rights demonstrators, to tree lumberjack demonstrators, to other kinds of facilities which also are recipients of the indignation of the public or groups of people who oppose that kind of action, we do not want to hear about germaneness anymore. It can be waived and it should have been waived.

I am a proponent of this legislation, and now I am constrained to vote against it because they did not allow me to help your cause by helping others to vote for the bill to allow constant and good and reasonable amendments to be offered to it.

I resent this germaneness bit, and I will vote "no" on the rule and ask everybody to vote "no" on the rule.

**Ms. SLAUGHTER. Mr. Speaker,** for purposes of debate only, I yield 5 minutes to the gentlewoman from Maryland [Mrs. MORELLA].

Mrs. MORELLA. Mr. Speaker, I thank the gentlewoman for yielding this time to me.

This bill before us is not like other bills. This is in response to an emergency. What the bill will do, it will protect gravely threatened rights. I heard that expression used earlier by the gentleman from Georgia, for whom I have great respect.

This legislation is in response to a nationally orchestrated campaign of violence and it protects gravely threatened rights.

H.R. 796 is legislation in response to a nationally orchestrated campaign of violence and vandalism against reproductive health clinics, as well as physical blockades and invasions of clinics. These illegal activities have been preventing women from obtaining health care services, and threatening the lives of health care providers.

From 1977 to April 1993, more than 1,000 acts of violence against reproductive health providers were reported in the United States, including 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnapings, 327 clinic invasions, and 1 murder. Since January 1992, 71 chemical attacks have been reported in 15 States as well. And in a recent nationwide survey, 50 percent of the clinics responding reported experiencing extreme violence—with 25 percent of those clinics having experienced physical invasions or chemical attacks in 1993 alone.

This is another reason why the amendment that was mentioned, the Stenholm-Gekas amendment, was not found in order. This is in response to a national emergency.

The bill is also in response to the January Supreme Court ruling in Bray versus Alexandria which created a gap in Federal law. Federal injunctive relief is no longer available for clinics under Federal civil rights laws.

H.R. 796 will give the Federal Government the power to act when State and local authorities cannot or will not act to guarantee access to these clinics where women, especially poor women, go for a wide range of services that include family planning, prenatal examinations, mammograms, Pap smears, as well as abortion services.

The bill applies only to the use of force, threat of force, or physical obstruction that intentionally injures, intimidates, or interferes with any person who is obtaining or providing reproductive health services.

The bill protects all expressive conduct, including peaceful picketing or other peaceful demonstration protected by the first amendment. We are talking about illegal conduct, not peaceful picketing.

This bill is not about abortion—it is about protecting women's access to reproductive health services.

And may I in response to comments made on the rule indicate that the bill, carefully crafted, does state that noth-

ing in this section shall be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstrations protected from legal prohibition by the first article, the first amendment to the Constitution. I would like to stress that, because you are going to hear from opponents of the rule and opponents of the bill that it infringes on first amendment rights. It could not be more explicit in the bill.

The bill is not about abortion. It is about protecting women's success to reproductive health services. It has been carefully crafted to protect the first amendment rights, as I mentioned. It has been narrowly drawn to specifically address this problem, without providing too broad a Federal role.

This is another response to the amendment that was considered not germane.

Changes were made in both the subcommittee and full committee in an effort to further clarify and improve the bill.

The rule is a fair rule. It allows a McCollum-Schumer amendment, a delay amendment, a Smith substitute, and a motion to recommit. The Smith substitute includes the substance of most of the remaining amendments offered at the Rules Committee.

This rule provides for an extensive debate on the bill, and I urge my colleagues to support it.

Mr. Speaker, I would like to comment in response to what was also stated with regard to one of the amendments offered that would redefine physical obstruction. Clinic blockades are preventing women from obtaining reproductive health services and denying them their rights to such care. It is important to remember that those who demonstrated in the sixties, these were attempts to obtain the rights of citizenship denied to African-Americans. The blockades of clinics now are attempts to deny persons their rights, to deny them medical services, and in some cases services that their lives depend on.

Mr. Speaker, I ask this body to approve the rule.

Mr. GOSS. Mr. Speaker, I yield 4 minutes to the distinguished gentleman from Kentucky [Mr. BUNNING].

(Mr. BUNNING asked and was given permission to revise and extend his remarks.)

Mr. BUNNING. Mr. Speaker, I thank the gentleman for yielding this time to me.

Mr. Speaker, I rise in strong opposition to this so-called freedom of access to clinic entrances bill. I oppose this bill because it is a blatant violation of the rights secured by the first amendment and because it punishes people, not for a crime, but for their viewpoint.

This bill is narrowly focused. It targets one single group—people who oppose abortion. The language in the bill, however, is so broad and vague that pro-lifers will have to live with the fear

of unknowingly violating Federal law, and facing the financial risk of having to defend themselves against phony allegations that they violated the act. This is insane.

Almost 30 years ago this body passed the Civil Rights Act of 1964. Before passage of this act, there were sit-ins and protests all around the country; some were peaceful and some were not. Civil rights groups then were as much or more potentially violent than today's pro-life groups. Yet, we did not outlaw civil rights protesters of the 1960's because of their viewpoint or motivation then—and we should not outlaw pro-lifers for the way they think now.

People have a right to have an opinion on abortion. People have a right to oppose abortion. I know it is not politically correct—but we have that right.

Accompanying that right is the right to organize peacefully and to protest peacefully. This bill would seriously damage that right.

No one should be afraid to exercise their right of free speech guaranteed under the first amendment. A right you cannot exercise is no right at all.

This bill is blatantly discriminatory. It would punish citizens not just for what they do—but for what they think. It would seem that big brother has released the thought police in the Halls of Congress.

The discriminatory features of face are all too obvious. It singles out pro-life groups because they protest abortions at abortion clinics. How can we justify it? How can we justify singling out this one single group of people when there are so many other groups doing the same things?

This bill slashes the first amendment to ribbons for one single group.

Yes, we should punish violence. Yes, we should punish threats of violence. But this bill goes beyond that. It would punish people engaged in nonviolent, free speech, which is perfectly lawful.

This bill comes close to home for me. My wife, two of my own daughters, and their families, and one of my sons-in-law are deeply involved in Operation Rescue. Not one of them poses any kind of threat of violence whatsoever. They truly are peaceful people. They just have strong feelings about the issue of abortion. And they are dedicating their lives to bringing an end to abortion. And that is not a crime—it should not be a crime.

My wife Mary, my daughters Joan and Bridget and their children should have the same right to express their beliefs as any other citizen who is willing to take a stand on an issue that is important to them. They should not be made Federal criminals because of the motivation or the beliefs behind their actions.

It will be a day of shame for the House if we decide to criminalize speech that we do not agree with. I urge my colleagues to look closely at this unconstitutional bill and to reject it.

□ 1200

Mr. GOSS. Mr. Speaker, I yield 3 minutes to the distinguished gentlewoman from Maine [Ms. SNOWE].

Ms. SNOWE. Mr. Speaker, as cochair of the Congressional Caucus for Women's Issues and a cosponsor of this bill, I rise in support of the Clinic Entrances Act. In 1774, John Adams said that "we are a government of laws, not of men". This is basic principle upon which our Government was founded. Of course, we are today a government of both men and women, with a diversity of views and ideas. But we are a nation of laws, and that is what distinguishes our democracy from other forms of government.

This legislation is designed to protect and strengthen existing laws which guarantee the women of our Nation the right to seek and obtain critical health care services, including reproductive health services. This bill also attempts to prevent the increasing violence which has permeated the debate about a woman's fundamental right to reproductive health services.

The debate has been transformed from one of words to one of bombings, arson, vandalism, death threats and murder. The women of America deserve better than this. They do not deserve harassment. They deserve respect. They do not deserve to face threats of violence, they deserve a safe haven for health services. And they do not deserve a renegotiation of their rights. Women deserve to have their rights and freedoms protected and preserved.

It is indeed regrettable that we have had to come to this point, that we must still fight to guarantee women equal and safe access to care services. "Is there a need for this legislation?" some might ask. Consider the facts: From 1977 to 1993, more than 1,000 acts of violence against providers of reproductive health services were reported. Sixteen reproductive health clinics were burned and more than 100 incidents of vandalism were reported last year alone, in each case more than double the previous record. Last year alone, 83 health facilities for women were blockaded. In addition, almost one-fourth of reproductive health clinics surveyed reported staff resignations as a direct result of the violence—staff that could not be replaced because of continued threats. Clearly, something must be done.

What kind of clinics have been targeted for these tactics? Clinics which provide not just reproductive health services such as abortion, but clinics which provide essential pediatric care, prenatal care, childhood immunizations, diagnosis and treatment of STD's, contraceptive services, pap smears, mammograms for breast cancer, and other forms of counseling for women—even for battered women seeking solace and refuge from abusive relationships. In fact, more than 90 percent of clinics provide these health services in addition to abortion.

What kind of women—and men—suffer most from threats of violence and vandalism at these health centers? The low-income women who depend on such clinics for their personal health care needs. The rural women who already face burdens and barriers by traveling long distances to seek health care in times of need, in times of stress. The men and women who provide these essential health services to those who seek them, nurses, doctors, and volunteers, many of whom are men and women who too often bravely risk their lives simply to guarantee women their fundamental, constitutional rights.

Today, just as in the days of John Adams and other guarantors of freedoms, our Government should be a nation of laws, not a people who are above the law, and who seek to harass, or threaten, others because of their beliefs or their personal choices. The first amendment of our constitutional guarantees—to everyone—the right of free speech. But it does not allow our citizens to commit senseless acts of violence.

Let us be clear about what this bill does not do. It does not prevent individuals from exercising their first amendment rights. It does not prevent lawful picketing or protest without force. It does not prevent citizens from free speech. And it does not prevent peaceful protest. What this bill does prevent is forceful, threatening acts which would clearly deny a woman her right to access to reproductive health services.

Passage of this bill sends an unmistakable message to our country: violence will not be tolerated, while women will continue to have access to the health care they need and deserve. It is a clear choice. It is a necessary choice.

I urge my colleagues to support this much needed and timely bill.

Ms. SLAUGHTER. Mr. Speaker, for purposes of debate only, I yield 5 minutes to the gentlewoman from Colorado [Mrs. SCHROEDER].

Mrs. SCHROEDER. Mr. Speaker, I thank the gentlewoman from New York [Ms. SLAUGHTER] for yielding this time to me, and I want to say I think this is a very, very important day. We have been waiting to have this bill come to the floor for a very long time, and I am sorry some of my friends on the other side would not yield when I was trying to intervene to tell them that their fears, or their misconceptions, are absolutely that, misconceptions.

Let me, first of all, say to the gentleman from Kentucky [Mr. BUNNING] that every one of his family members he is so concerned about can speak out, can think, can do anything they want because the first amendment of the Constitution says the Congress shall make no laws. So, if this law interfered with speech or any kind of peaceful protest, it would be thrown out on its face. It does not. What this is is in the grand American tradition of one's freedom ends where the other person's nose begins. I say to my colleagues, "In other words, you may speak, you may protest, you may do whatever you want, so long as it is peaceful. When it becomes violent, or when you begin to stop allowing anyone else to exercise their rights to certain actions, then it's gone." So, I certainly hope the gentleman hears that.

To my friend who came forward from the Committee on the Judiciary, yes, he did vote for this bill. We were very proud of his cosponsorship. He asked, "Why can't they add all these other things?" I think he knows the answer to that.

The Committee on the Judiciary does not believe in federalizing anything because the State and local area is supposed to take care of it unless it is overwhelming the State and local area or unless there appears to be groups that are going around through interstate commerce trying to shut down clinics, or whatever, or like the animal rights thing, or unless they find that there are certain localities where people will not enforce the law when it comes to constitutional principles. We do not sit around here and think, "Gee, what else could possibly happen," and add that to the bill. Mr. Speaker, we have waited, and waited and waited for this to come in, and I introduced a bill almost like this 10 years ago when we began to see this kind of violence come up against clinics.

Now let me add another thing that I think is so critical. We are not talking about property here. We are talking about women. We are talking about clinics where women get their primary care. Ninety-some percent of the women going to these clinics get their health care there during their reproductive years. They get cancer screening. They get physicals. They gets shots. They get all sorts of things. They may get their prenatal exams. They may get all sorts of care there. This is where they go. It is their one-stop shop.

Remember, under the whole new health care thing OB/GYN's are considered primary care givers, and what is happening? We have had groups of people who have tried to keep women from getting in to get a very primary, basic constitutional right; that is, access to health care, access to their health care and their physical needs, and that is what this says the Federal Government can move in and deal with if the local authorities cannot deal with it. That is what it is, if they are overwhelmed, or if they are not of a mind to deal with it because they feel basically women have this constitutional right.

□ 1210

Now, I cannot imagine why anybody wants the Federal Government to move out and take over law enforcement all over the country, and I do not think we do. I think we look very, very hesitantly at moving into these areas, and the Committee on the Judiciary, I think, is very, very keen on making sure that first amendment rights stand up, that everybody can have their American entitlement to protest, to say what they want, to continue on, but we cannot have somebody ordaining themselves to move forward and say, "I am not going to let anybody else have their rights."

That is what this is about. It is really very, very simple, and I think all women just want desperately to be treated as citizens, not as property, not as pawns, but as citizens able to have constitutional rights and able to exercise them in the way that anyone with an American citizenship birthright should be able to.

I am proud to be here to bring this bill to the floor, and I hope all the Members vote for this rule because I think with so much of what we are hearing today, we can answer every one of those issues.

Mr. Speaker, I ask the Members to please vote on the facts and not on our fears. Let us guarantee women their constitutional rights to health care.

Mr. GOSS. Mr. Speaker, I yield 3 minutes to the distinguished gentleman from California [Mr. DORNAN].

Mr. DORNAN. Mr. Speaker, I rise against the rule and against H.R. 796.

I agree with the analysis of the gentleman from Georgia [Mr. GINGRICH] that all of the amendments offered upstairs should have been found germane and made in order.

Mexico's budget is about 3 percent of our Gross Domestic Product, and yet we gave 8 hours to that debate. This is a debate about civil rights and freedom of expression and the right to peaceably assemble to redress ills in our country.

The distinguished gentlewoman who just spoke said that this is about women going for primary prenatal care. Believe me, no woman of any age who is excited about the growth of human life, a human life in her body, goes to an abortion clinic for prenatal care.

And why are the liberals so ashamed to use the word "abortion" in this well? My distinguished friend, the gentlewoman from Maine, who spoke just before the last speaker, just says, "health care" as a euphemism for "abortion." That it is simply called reproductive health care. But of course, it is anti-reproductive health care. It is stopping reproduction, not assisting it. My daughters, one of my sons, and my wife have all called me in the Cloakroom this morning after watching this debate, and they are asking why there is such shame attached to abortion that we have to use all these code words around here.

In all the history of this House, no woman who has ever served here has come to that lectern or to this one and said, "It's no big deal. I've had an abortion."

Rush Limbaugh, whether you like him or not, reaches every single acre of America. On 630 some stations yester-

day he said that "We are so cavalier about killing 1,600,000 little babies in their mothers' wombs for all 9 months, and for any reason whatsoever, or for no reason at all, that our society has become desensitized to the value of human life. Then we wonder why young kids are shooting one another." I have said as much myself on the House floor many times.

You cannot have this cavalier attitude about the destruction of human life with an immortal soul ordained by God in the womb and not expect a death cult to spread across this land.

When somebody spikes a tree and a lumberjack, loses his arm, as happened last year, as loathsome as that is, there is no rush to have a Federal law against the environmental extremist. We find these extremists in every movement in this country. Why pick on pro-lifers only?

When somebody is walking down Fifth Avenue and throws animal blood on a woman with a fur coat, who wants to make that a Federal crime? Is that not Intimidation? Is that not Conduct?

When homosexual activists came into the Cathedral where I was baptized, the beautiful St. Patrick's, and chained themselves to the pews and threw condoms and used every foul obscenity they could think of, I was personally outraged and offended, but I did not want to see Federal laws making this a crime.

Mr. Speaker, I want to put 14 points in the RECORD today, and I hope that I have time to do that during general debate, about the civil rights and the restriction of people who assemble peaceably.

I am a strong opponent of abortion. But I am also just as strong an opponent of anybody who would betray the pro-life movement by bombing a clinic or by shooting a human being, even if it is an abortionist who murders 50 babies a day. You do not shoot them. That betrays the movement.

Ms. SLAUGHTER. Mr. Speaker, I yield myself such time as I may consume just to make one comment, if I may.

Ninety-three percent of all the clinics that provide abortion services also provide services for menopause, breast/ovarian cancer, prenatal care, infertility problems, and adoption. That is 93 percent of all the clinics.

Mr. Speaker, for the purposes of debate only, I yield 2 minutes to the gentlewoman from Maryland [Mrs. MORELLA].

Mrs. MORELLA. Mr. Speaker, I thank the gentlewoman for yielding time to me again, because I just wanted to respond to some of the comments I have heard over and over again.

Again we have in print now a reproduction right from the bill which talks about first amendment rights being preserved. I commend this to my colleagues so they can see that nothing should be construed as prohibiting any expressive conduct, including peaceful picketing as protected by the first amendment, et cetera.

Second, I have a list of the Members of the United States Senate who have been antichoice, pro-life, whatever the term that we want to use is, who voted for this freedom of access to clinics entry bill, because they believe, like all of us do in this Chamber, that we cannot condone violence. It is very un-American, and it is cruel.

The gentleman who just spoke talked about the fact that these clinics provide only abortion services. We have had many people testify that they have gone there for Pap smears, mammograms, and for a series of tests. And I would like to call to his attention that unfortunately in Lancaster, PA, there was a health care clinic that was bombed that provided no abortion services at all. Evidently the people who did it thought it did.

Why is there a need for this? There is a need because we have an organization that has said that they defend the use of force to stop abortion, wherever force is necessary, and they have a declaration that says that.

Mr. Speaker, Americans need to be preserved. The first amendment needs to be preserved, and this is something all of us can come together on in our fight against violence.

Mr. GOSS. Mr. Speaker, I yield 1 minute to our distinguished colleague, the gentleman from Florida [Mr. MILLER].

(Mr. MILLER of Florida asked and was given permission to revise and extend his remarks.)

Mr. MILLER of Florida. Mr. Speaker, I rise in opposition to the rule and to the bill, the Freedom of Access to Clinic Entrances Act of 1993 [FACE]. This legislation is not about abortion rights. The relevant questions before us today deal with other, equally significant rights, particularly States' rights and first amendment rights under the Constitution.

Perhaps more fundamentally, why do we seek today to further criminalize activities that are already illegal.

Murder, the use of force, the threat of force and intentional injury are abhorrent offenses, and are already treated as such under existing laws.

I am gravely concerned about violent acts such as the murder of Dr. David Gunn in Pensacola earlier this year. I recognize the severity of this crime. Thankfully, our criminal justice system in Florida is already working to ensure that, if found guilty, Dr. Gunn's murderer could receive Florida's maximum punishment. I am not convinced of the need for a new Federal law. I believe that State and local laws are appropriate for handling these situations so that Federal legislation such as H.R. 796 is not required, and is inappropriate.

Mr. GOSS. Mr. Speaker, I yield 1 minute to the distinguished gentleman from New Jersey [Mr. SMITH], who has a great interest in this issue and in the amendment he will be offering.

Mr. SMITH of New Jersey. Mr. Speaker, I thank my good friend for yielding me this time.

Mr. Speaker, I just want to make a brief point, and we will get into this matter further. The substitute I will be offering focuses on the violence which all of us find to be absolutely abhorrent and imposes Federal penalties on those who commit acts of violence or who intend to commit acts of violence.

Earlier the gentlewoman from Colorado [Mrs. SCHROEDER] made a point that H.R. 796 does not affect any kind of peaceful protest. That is absolutely untrue. People who have engaged in nonviolent civil disobedience, which has been the hallmark of movement after movement and cause after cause in this country, including the civil rights cause, used nonviolent civil disobedience as a means to an end, perhaps sitting down, doing a sit-in, putting one's hands in one's pocket, or perhaps praying in front of a clinic or protesting that which you are against as a way of expressing a certain point of view. If that is done, one commits a misdemeanor and spends a night in jail or is fined or something along those lines.

The legislation the gentleman from New York [Mr. SCHUMER] will bring forward could throw that person into prison for 1 year, for 3 years for a second offense, and with fines of up to a quarter of a million dollars simply for nonviolent civil disobedience.

□ 1220

That is the fundamental difference between H.R. 796, which while it addresses and goes after violence, equally goes after those who engage in nonviolent civil disobedience. Apply this to any other movement, and it will be laughed right out of this Chamber.

Ms. SLAUGHTER. Mr. Speaker, for purposes of debate only, I yield 1½ minutes to the gentleman from California [Mr. FARR].

Mr. FARR of California. Mr. Speaker, I rise today to join my colleagues in voicing strong support for H.R. 796, the Freedom of Access of Clinic Entrances Act, and support the rule.

More than 400 bombings, arson, and other acts of violence and vandalism have been directed against family planning clinics since 1980.

Just recently, my own district experienced a random shooting at the Salinas Planned Parenthood Clinic and the spilling of gallons of fishguts and blood on the parking lot at Seaside Medical Facility.

If a woman cannot privately, freely, and safely choose abortion, she is being denied her constitutional right. If she cannot gain access to a clinic she is being denied her right to obtain other nonabortion related medical services.

We need this law in order to send a clear message to the American people that shootings, arson, and fishguts are neither appropriate nor legitimate means of expressing political and moral differences.

This bill does not discriminate against peaceful protest nor does it in any way remove the constitutional right of citizens to assemble.

The recent passage of a similar bill in the other body with strong bipartisan support clearly demonstrates that this is not a pro-choice versus pro-life issue.

Vote to uphold a woman's constitutional right to choose abortion.

Vote against the Smith amendment and for this important rule.

Mr. GOSS. Mr. Speaker, I yield 1½ minutes to the distinguished gentleman from South Carolina [Mr. INGLIS].

Mr. INGLIS of South Carolina. Mr. Speaker, I thank the gentleman for yielding.

Mr. Speaker, I rise in strong opposition to this rule. This rule is one of many that comes to the floor of this House that leaves out very important amendments.

Mr. Speaker, I think there is one that should have been included in this rule, and that is the amendment that I offered that would have stricken, given the Members of this body the opportunity to strike, the private cause of action under the statute. It is an amendment that is a simple strike amendment. It is germane. It violates no House rules. It is one that I offered in the committee, got a rollcall vote on in the committee, and I would have thought it was important enough to let every Member of this body vote on, rather than the Judiciary Committee, which is clearly biased against this legislation. Unfortunately, the Committee on Rules did not see fit to include this simple amendment in this legislation.

So I rise in strong opposition to this rule, and would encourage my colleagues to reject it so that we can have an opportunity to perfect this legislation.

Mr. Speaker, you will hear later from me about the need to strike out the private right of action under this statute. Why would we unleash a profit-making enterprise called an abortion clinic on an unsuspecting, nonviolent demonstrator at a clinic, who is simply standing there in a nonviolent way expressing their first amendment rights? Why would we unleash that profit-making enterprise to sue that poor person?

Ms. SLAUGHTER. Mr. Speaker, for the purpose of debate only, I yield 1¾ minutes to the gentlewoman from Oregon [Ms. FURSE].

(Ms. FURSE asked and was given permission to revise and extend her remarks.)

Ms. FURSE. Mr. Speaker, I rise today in support of the Freedom of Access to Clinic Entrances Act, H.R. 796.

Although opponents of this measure would like you to believe that this bill would infringe on an individual's right to peaceful protest, their claims are simply untrue. As an activist myself, and a participant in nonviolent protests, I am pleased that language in this bill ensures the right of peaceful protest.

We are all aware of the escalating violence in this country at health clinics. Currently a woman from my home State of Oregon is sitting in jail accused of shooting an abortion doctor. She has said, "it was the most holy, most righteous thing I've ever done."

When we have people who believe it is their moral duty to stop doctors from providing these services, and to use any means available—including threats, harassment, or murder—I say we must protect a woman's right to choose—and we must protect a physician's right to perform these services.

This violence must stop. We must take action today to send a message that violence—for any cause—is unacceptable.

We must pass H.R. 796 to protect a woman's right to choose, a right which is guaranteed by the U.S. Constitution. In addition, nurses, physicians, and other health care workers must feel safe that they can care for people without fear for their lives.

I urge my colleagues to support this important bill. The safety and peace of mind of so many are at stake.

Mr. GOSS. Mr. Speaker, I yield myself such time as I may consume.

(Mr. GOSS asked and was given permission to revise and extend his remarks and to include extraneous material.)

Mr. GOSS. Mr. Speaker, murder, causing intentional injury, obstructing our fellow citizens from carrying out their freedoms, and willful destruction of property are all reprehensible activities regardless of to whom, at what, or where they are directed—and they are all against the law.

The issue in this country today is whether this Congress, the people we serve, and the laws of this land, will remain committed to ensuring that we do not condone such behavior in any circumstance. That means full enforcement—not redundant legislation wrapped in litmus paper. This bill seeks to create a special category of behavior—and a privileged category of people.

Seeking services at a reproductive health clinic becomes a specially protected endeavor under this bill. That is hard to justify. Yes, there has been serious trouble and tragedy at some clinics, just like there has been serious trouble and tragedy in the schoolyards and on the streets in every city and almost every community throughout America because we refuse to get tough on crime and adopt real anticrime legislation.

Because of the incredibly broad language in this bill, certain behavior consistent with lawful free speech and the right of lawful assembly could become action punishable by severe extra penalty.

This legislation focuses unfairly on behavior targeted toward a certain group of people, a certain type of facility and on behalf of a certain philosophy and set of beliefs. The supporters of this legislation seem to believe that murder, violence, destruction or obstruction at a reproductive services clinic are somehow more terrible crimes than murder, violence, destruction or obstruction as acts of violence that take place by the hundreds for a whole host of reasons, in all walks of life across this country every day. I disagree. There are a plethora of laws on the books that mandate that murder, violence, harassment or intimidation be punished regardless of where or why they occur. It is enforcement that is the problem—and it is up to us to encourage enforcement of the adequate existing laws on the books; not make new laws that generate special privileged classes of people and special types of behavior based on emotional, philosophical, and political characterizations.

Mr. Speaker, the problem of violence at reproductive health clinics is a serious issue—deserving of a serious response. But this is not it. I know this—I am from Florida where we have seen and properly responded to these indefensible, inexcusable acts.

This bill obfuscates existing law—creates an eye-of-the-beholder test for intimidation which must have trial and constitutional lawyers looking forward to very lucrative rewards. In the Rules Committee we heard testimony on a host of amendments designed to bring this legislation back to reality and equal treatment under the law. Several of these proposals have been made in order by this rule—but I must note that we once again have a restrictive rule that precludes discussion on important amendments—including a bipartisan proposal designed to ensure that we are not violating our own Constitution by targeting one specific point of view for special protection under the law. Incredibly, we will not be allowed to debate that crucial point.

Likewise, we will not be allowed to debate an amendment designed to ensure that protections under this bill extend to those who engage in lawful protest.

We also heard about an amendment to tackle the Herculean task of keeping this bill from becoming another Federal boondoggle for attorneys—this too was not allowed.

If the supporters of this legislation truly believe that they are presenting a worthy product, then they should not fear free and open debate on such legitimate amendments.

Mr. Speaker, I oppose this restrictive rule and this well-intentioned, but badly crafted legislation. Nobody except lawyers profit when we layer confusing, contradictory, and vague laws on top of the good ones we already have. Nobody profits when we mix up the need for enforcement with the desire to make a political statement. America loses when we put those with one lawful point of view at greater risk than those with another. And that is precisely what this legislation will do.

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 12 of 49

I join with those who want all proper safeguards and protections at reproductive health clinics—but I cannot support the effort to silence those with whom some people might disagree. That is too high a price—too unfair a price.

☐ 1230

We have had presentation that this particular legislation will not allow that constitutional violation of right, because it prohibits any expressive conduct. Let me tell my colleagues, this is eye of the beholder. The test is intimidation. If somebody feels intimidated on their way or with some business to do at a reproductive health clinic, that becomes the test. And that is going to be a very difficult test to judge. Who will make it? It will be made in the courts. There will be no standard that we can use, because it is going to be the eye of the beholder. What to one person is intimidation to the other person is a joke or to the other person is a legal expression or to another person is a passionate cause. But somebody may feel intimidated.

Lord knows, I felt a little intimidated yesterday when I saw some of the demonstrations going on on one point of view. I even had my way blocked, but I was not going to a reproductive health clinic. I was just trying to get to my office.

I think we are going way, way far afield on this. And I hope the danger bells are sounding.

ROLLCALL VOTES IN THE RULES COMMITTEE ON AMENDMENTS TO THE PROPOSED RULE ON H.R. 796, THE FREEDOM OF ACCESS TO CLINICS ENTRANCES ACT OF 1993

1. Open rule—This amendment to the proposed rule provides for one-hour, open rule and makes the Judiciary Committee amendment in the nature of a substitute in order as an original bill for the purpose of amendment under the five-minute rule.

Vote (Defeated 2-8): Yeas—Quillen, Goss; Nays—Moakley, Beilenson, Frost, Hall, Slaughter. Not voting: Derrick, Bonior, Wheat, Gordon, Solomon, Dreier.

2. Gekas/Stenholm No. 5—Extends the protection under H.R. 796 beyond demonstration affecting reproductive health services to include other lawful commerce activities; nuclear energy, animal or medical research.

Vote (Defeated 2-5): Yeas—Quillen, Goss; Nays—Moakley, Beilenson, Frost, Hall, Slaughter. Not voting: Derrick, Bonior, Wheat, Gordon, Solomon, Dreier.

3. Canady (FL) No. 6—Extends the protection from assault or interference to individuals who engage in lawful activities in the vicinity of an abortion facility as is afforded those seeking reproductive health services.

Vote (Defeated 2-6): Yeas—Quillen, Goss; Nays—Moakley, Beilenson, Frost, Hall, Gordon, Slaughter. Not voting: Derrick, Bonior, Wheat, Solomon, Dreier.

4. Inglis (SC) No. 2—Strikes language allowing private citizens affected by clinic blockades or violence to bring suit under this bill.

Vote (Defeated 2-6): Yeas—Quillen, Goss; Nays—Moakley, Beilenson, Frost, Hall, Gordon, Slaughter. Not voting: Derrick, Bonior, Wheat, Solomon, Dreier.

5. Klink (PA) No. 4—Redefines the definition of "physical obstruction in order to remove peaceful sit-ins and similar passive demonstrations from the scope of the bill.

Vote (Defeated 2-6): Yeas—Quillen, Goss; Nays—Moakley, Beilenson, Frost, Hall, Gordon, Slaughter. Not voting: Derrick, Bonior, Wheat, Solomon, Dreier.

6. Adoption rule—

Vote (Adopted 6-2): Yeas—Moakley, Beilenson, Frost, Hall, Gordon, Slaughter; Nays—Quillen, Goss. Not voting: Derrick, Bonior, Wheat, Solomon, Dreier.

OPEN VERSUS RESTRICTIVE RULES 95TH–103D CONG.

| Congress (years) | Total rules granted[1] | Open rules: Number | Open rules: Percent[2] | Restrictive rules: Number | Restrictive rules: Percent[3] |
|---|---|---|---|---|---|
| 95th (1977–78) | 211 | 179 | 85 | 32 | 15 |
| 96th (1979–80) | 214 | 161 | 75 | 53 | 25 |
| 97th (1981–82) | 120 | 90 | 75 | 30 | 25 |
| 98th (1983–84) | 155 | 105 | 68 | 50 | 32 |
| 99th (1985–86) | 115 | 65 | 57 | 50 | 43 |
| 100th (1987–88) | 123 | 66 | 54 | 57 | 46 |
| 101st (1989–90) | 104 | 47 | 45 | 57 | 55 |
| 102d (1991–92) | 109 | 37 | 34 | 72 | 66 |
| 103d (1993–94) | 50 | 12 | 24 | 38 | 76 |

[1] Total rules counted are all order of business resolutions reported from the Rules Committee which provide for the initial consideration of legislation, except rules on appropriations bills which only waive points of order. Original jurisdiction measures reported as privileged are also not counted.

[2] Open rules are those which permit any Member to offer any germane amendment to a measure so long as it is otherwise in compliance with the rules of the House. The parenthetical percentages are open rules as a percent of total rules granted.

[3] Restrictive rules are those which limit the number of amendments which can be offered, and include so-called modified open and modified closed rules, as well as completely closed rule, and rules providing for consideration in the House as opposed to the Committee of the Whole. The parenthetical percentages are restrictive rules as a percent of total rules granted.

Sources: "Rules Committee Calendars & Surveys of Activities," 95th–102d Cong.; "Notices of Action Taken," Committee on Rules, 103d Cong., through Nov. 17, 1993.

OPEN VERSUS RESTRICTIVE RULES: 103D CONG.

| Rule number date reported | Rule type | Bill number and subject | Amendments submitted | Amendments allowed | Disposition of rule and date |
|---|---|---|---|---|---|
| H. Res. 58, Feb. 2, 1993 | MC | H.R. 1: Family and medical leave | 30 (D–5; R–25) | 3 (D–0; R–3) | PQ: 246–176. A: 259–164. (Feb. 3, 1993). |
| H. Res. 59, Feb. 3, 1993 | MC | H.R. 2: National Voter Registration Act | 19 (D–1; R–18) | 1 (D–0; R–1) | PQ: 248–171. A: 249–170. (Feb. 4, 1993). |
| H. Res. 103, Feb. 23, 1993 | C | H.R. 920: Unemployment compensation | 7 (D–2; R–5) | 0 (D–0; R–0) | PQ: 243–172. A: 237–178. (Feb. 24, 1993). |
| H. Res. 106, Mar. 2, 1993 | MC | H.R. 20: Hatch Act amendments | 9 (D–1; R–8) | 3 (D–0; R–3) | PQ: 248–166. A: 249–163. (Mar. 3, 1993). |
| H. Res. 119, Mar. 9, 1993 | MC | H.R. 4: NIH Revitalization Act of 1993 | 13 (d–4; R–9) | 8 (D–3; R–5) | PQ: 247–170. A: 248–170. (Mar. 10, 1993). |
| H. Res. 132, Mar. 17, 1993 | MC | H.R. 1335: Emergency supplemental Appropriations | 37 (D–8; R–29) | 1(not submitted) (D–1; R–0) | A: 240–185. (Mar. 18, 1993). |
| H. Res. 133, Mar. 17, 1993 | MC | H. Con. Res. 64: Budget resolution | 14 (D–2; R–12) | 4 (1-D not submitted) (D–2; R–2) | PQ: 250–172. A: 251–172. (Mar. 18, 1993). |
| H. Res. 138, Mar. 23, 1993 | MC | H.R. 670: Family planning amendments | 20 (D–8; R–12) | 9 (D–4; R–5) | PQ: 252–164. A: 247–169. (Mar. 24, 1993). |
| H. Res. 147, Mar. 31, 1993 | C | H.R. 1430: Increase Public debt limit | 6 (D–1; R–5) | 0 (D–0; R–0) | PQ: 244–168. A: 242–170. (Apr. 1, 1993). |
| H. Res. 149 Apr. 1, 1993 | MC | H.R. 1578: Expedited Rescission Act of 1993 | 8 (D–1; R–7) | 3 (D–1; R–2) | A: 212–208. (Apr. 28, 1993). |
| H. Res. 164, May 4, 1993 | O | H.R. 820: Nate Competitiveness Act | NA | NA | A: Voice Vote. (May 5, 1993). |
| H. Res. 171, May 18, 1993 | O | H.R. 873: Gallatin Range Act of 1993 | NA | NA | A: Voice Vote. (May 20, 1993). |
| H. Res. 172, May 18, 1993 | O | H.R. 1159: Passenger Vessel Safety Act | NA | NA | A: 308–0 (May 24, 1993). |
| H. Res. 173 May 18, 1993 | MC | S.J. Res. 45: United States forces in Somalia | 6 (D–1; R–5) | 6 (D–1; R–5) | A: Voice Vote (May 20, 1993). |
| H. Res. 183, May 25, 1993 | O | H.R. 2244: 2d supplemental appropriations | NA | NA | A: 251–174. (May 26, 1993). |
| H. Res. 186, May 27, 1993 | MC | H.R. 2264: Omnibus budget reconciliation | 51 (D–19; R–32) | 8 (D–7; R–1) | PQ: 252–178. A: 236–194 (May 27, 1993). |
| H. Res. 192, June 9, 1993 | MC | H.R. 2348: Legislative branch appropriations | 50 (D–6; R–44) | 6 (D–3; R–3) | PQ: 240–177. A: 226–185. (June 10, 1993). |
| H. Res. 193, June 10, 1993 | O | H.R. 2200: NASA authorization | NA | NA | A: Voice Vote. (June 14, 1993). |
| H. Res. 195, June 14, 1993 | MC | H.R. 5: Striker replacement | 7 (D–4; R–3) | 2 (D–1; R–1) | A: 244–176. (June 15, 1993). |
| H. Res. 197, June 15, 1993 | MO | H.R. 2333: State Department. H.R. 2404: Foreign aid | 53 (D–20; R–33) | 27 (D–12; R–15) | A: 294–129. (June 16, 1993). |
| H. Res. 199, June 16, 1993 | C | H.R. 1876: Ext. of "Fast Track" | NA | NA | A: Voice Vote. (June 22, 1993). |
| H. Res. 200, June 16, 1993 | MC | H.R. 2295: Foreign operations appropriations | 33 (D–11; R–22) | 5 (D–1; R–4) | A: 263–160. (June 17, 1993). |
| H. Res. 201, June 17, 1993 | O | H.R. 2403: Treasury-postal appropriations | NA | NA | A: Voice Vote. (June 17, 1993). |
| H. Res. 203 June 22, 1993 | MO | H.R. 2445: Energy and Water appropriations | NA | NA | A: Voice Vote. (June 23, 1993). |
| H. Res. 206, June 23, 1993 | O | H.R. 2150: Coast Guard authorization | NA | NA | A: 401–0. (July 30, 1993). |
| H. Res. 217, July 14, 1993 | MO | H.R. 2010: National Service Trust Act | NA | NA | A: 261–164. (July 21, 1993). |
| H. Res. 218, July 20, 1993 | O | H.R. 2530: BLM authorization, fiscal year 1994–95 | NA | NA | |
| H. Res. 220, July 21, 1993 | MC | H.R. 2667: Disaster assistance supplemental | 14 (D–8; R–6) | 2 (D–2; R–0) | PQ: 245–178. F: 205–216. (July 22, 1993). |
| H. Res. 226, July 23, 1993 | MC | H.R. 2667: Disaster assistance supplemental | 15 (D–8; R–7) | 2 (D–2; R–0) | A: 224–205. (July 27, 1993). |
| H. Res. 229, July 28, 1993 | MO | H.R. 2330: Intelligence Authority Act, fiscal year 1994 | NA | NA | A: Voice Vote. (Aug. 3, 1993). |
| H. Res. 230, July 28, 1993 | O | H.R. 1964: Maritime Administration authority | NA | NA | A: Voice Vote. (July 29, 1993). |
| H. Res. 246, Aug. 6, 1993 | MO | H.R. 2401: National Defense authority | 149 (D–109; R–40) | | A: 246–172. (Sept. 8, 1993). |
| H. Res. 248, Sept. 9, 1993 | MO | H.R. 2401: National defense authorization | | | PQ: 237–169. A: 234–169. (Sept. 13, 1993). |
| H. Res. 250, Sept. 13, 1993 | MC | H.R. 1340: RTC Completion Act | 12 (D–3; R–9) | 1 (D–1; R–0) | A: 213–191–1. (Sept. 14, 1993). |
| H. Res. 254, Sept. 22, 1993 | MO | H.R. 2401: National Defense authorization | | 91 (D–67; R–24) | A: 241–182. (Sept. 28, 1993). |
| H. Res. 262, Sept. 28, 1993 | O | H.R. 1845: National Biological Survey Act | NA | NA | A: 238–188 (10/06/93). |
| H. Res. 264, Sept. 28, 1993 | MC | H.R. 2351: Arts, humanities, museums | 7 (D–0; R–7) | 3 (D–0; R–3) | PQ: 240–185. A: 225–195. (Oct. 14, 1993). |
| H. Res. 265, Sept. 29, 1993 | MC | H.R. 3167: Unemployment compensation amendments | 3 (D–1; R–2) | 2 (D–1; R–1) | A: 239–150. (Oct. 15, 1993). |
| H. Res. 269, Oct. 6, 1993 | MO | H.R. 2739: Aviation infrastructure investment | N/A | N/A | A: Voice Vote. (Oct. 7, 1993). |
| H. Res. 273, Oct. 12, 1993 | MC | H.R. 3167: Unemployment compensation amendments | 3 (D–1; R–2) | 2 (D–1; R–1) | PQ: 235–187. F: 149–254. (Oct. 14, 1993). |
| H. Res. 274, Oct. 12, 1993 | MC | H.R. 1804: Goals 2000 Educate America Act | 15 (D–7; R–7; I–1) | 10 (D–7; R–3) | A: Voice Vote. (Oct. 13, 1993). |
| H. Res. 282, Oct. 20, 1993 | C | H.J. Res. 281: Continuing appropriations through Oct. 28, 1993 | N/A | N/A | A: Voice Vote. (Oct. 21, 1993). |
| H. Res. 286, Oct. 27, 1993 | O | H.R. 334: Lumbee Recognition Act | N/A | N/A | A: Voice Vote. (Oct. 28, 1993). |
| H. Res. 287, Oct. 27, 1993 | C | H.J. Res. 283: Continuing appropriations resolution | 1 (D–0; R–0) | 0 | A: 252–170. (Oct. 28, 1993). |
| H. Res. 289, Oct. 28, 1993 | O | H.R. 2151: Maritime Security Act of 1993 | N/A | N/A | A: Voice Vote. (Nov. 3, 1993). |
| H. Res. 293, Nov. 4, 1993 | MC | H. Con. Res. 170: Troop withdrawal Somalia | N/A | N/A | A: 390–8. (Nov. 8, 1993). |
| H. Res. 299, Nov. 8, 1993 | MO | H.R. 1036: Employee Retirement Act–1993 | 2 (D–1; R–1) | N/A | A: Voice Vote. (Nov. 9, 1993). |
| H. Res. 302, Nov. 9, 1993 | MC | H.R. 1025: Brady handgun bill | 17 (D–6; R–11) | 4 (D–1; R–3) | A: 238–182. (Nov. 10, 1993). |
| H. Res. 303, Nov. 9, 1993 | O | H.R. 322: Mineral exploration | N/A | N/A | A: Voice Vote. (Nov. 16, 1993). |
| H. Res. 304, Nov. 9, 1993 | C | H.J. Res. 288: Further CR, FY 1994 | N/A | N/A | |
| H. Res. 312, Nov. 17, 1993 | MC | H.R. 3425: EPA Cabinet Status | 27 (D–8; R–19) | 9 (D–1; R–8) | |
| H. Res. 313, Nov. 17, 1993 | MC | H.R. 796: Freedom Access to Clinics | 15 (D–9; R–6) | 4 (D–1; R–3) | |
| H. Res. 314, Nov. 17 1993 | MC | H.R. 3351: Alt Methods Young Offenders | 21 (D–7; R–14) | 6 (D–3; R–3) | |

Note.—Code: C-Closed; MC-Modified closed; MO-Modified open; O-Open; D-Democrat; R-Republican; PQ: Previous question; A-Adopted; F-Failed.

Mr. SCHUMER. Mr. Speaker, will the gentleman yield?

Mr. GOSS. I yield to the gentleman from New York.

Mr. SCHUMER. Mr. Speaker, I ask the gentleman if he would tell me, near intimidation is not a criteria in this bill. It is intimidation by force or threat of force. That is what the statute reads.

I would ask the gentleman if he is familiar with the United States Code, with the civil rights laws, 18 U.S.C. 245. That very language was used, and it has been in existence for 30 years, where any single person who simply protested, just as the people were protesting outside the gentleman's office, and perhaps produced a mental state of anxiety that might intimidate without force or threat of force, I ask him to cite me a single instance where that language, which has been on the books for 30 years, has stopped any peaceful protest?

Mr. GOSS. Mr. Speaker, reclaiming my time, I yield to the gentleman from New Jersey [Mr. SMITH].

Mr. SMITH of New Jersey. Mr. Speaker, I thank the gentleman from New York for just describing my substitute. What he left out, and I hope the membership takes careful note of this, the use of force or threat of force is what my amendment says, as does his underlying bill. But what he adds is "or physical obstruction." This is, someone physically standing on the sidewalk with their hands in their pockets, standing there or kneeling, praying the rosary, perhaps, or saying some other prayer.

The gentleman from New York has described my substitute. His bill H.R. 796 goes so far beyond that to captivate, to bring into this net those who are engaging in nonviolent civil disobedience.

If this were to apply to the civil rights laws, it would be a sham to our civil rights laws. But it does not.

We crafted our amendment in order to track the civil rights laws that the gentleman has referenced. So he has described my substitute, not his own.

The SPEAKER pro tempore (Mr. TORRES). The time of the gentleman from Florida [Mr. GOSS] has expired.

Ms. SLAUGHTER. Mr. Speaker, for the purposes of debate only, I yield the balance of my time to the gentleman from New York [Mr. SCHUMER].

Mr. SCHUMER. Mr. Speaker, I thank the gentlewoman for yielding time to me.

What I would say to my colleagues, first off, is this is not a pro-life or pro-choice bill. This is very simply a bill that says, if there is a concerted effort to take away a Federal right, then should the Federal Government step in or should the Federal Government stay there with its hands folded on its chest and let that Federal right continue to be violated time after time after time. That is what this bill is all about.

I would remind my colleagues, the exact same language that the gentleman from New Jersey and the gentleman from Florida would say would stop the peaceful right of protesters was approved in the Senate, not only 69 to 30, but by Senators who have, from what I am told, a 100-percent pro-life voting record, 9 of them, by many other Senators who often vote the pro-life side.

In our committee, this bill received the support of colleagues, both Democratic and Republican, who again were always pro-life.

I ask you, my colleagues, would they vote for a bill that would stop peaceful protests? No way.

I would ask all of my colleagues to read in the bill section 248(d). I will read it. I will read it carefully and I will read it slowly so all the misstatements that have occurred on that side of the aisle about taking away the peaceful right of protest, which I find to be so totally infactual that I think there is another agenda here, "Rule of construction, nothing in this section shall be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstrations protected from legal prohibition by the first article of the amendment to the Constitution."

The amendment is simple.

Mr. SANDERS. Mr. Speaker, will the gentleman yield?

Mr. SCHUMER. I yield to the gentleman from Vermont.

Mr. SANDERS. Mr. Speaker, under the Constitution, all people have the right to protest, to stand up and to fight for their rights. And there is no disagreement about that in this body.

But, Mr. Speaker, it is not just protesters who have constitutional rights. If a woman in this country chooses to have an abortion, she also has rights. And those rights include the right to have an abortion without harassment, without violence, and without having to fight her way into a health clinic. And today, that is what we are saying to the women of America. They have rights, too.

Mr. Speaker, I thank the gentleman for yielding to me.

☐ 1240

Mr. SCHUMER. Reclaiming my time, Mr. Speaker, I would just make one plaintive plea to those, like the gentleman from New Jersey [Mr. SMITH], who are vehemently pro-life, and I respect that. I respect my constituents who are. It comes out of deep moral belief. I do not consider myself or anyone on this side of the aisle morally superior or morally inferior to that.

However, I would say to the gentleman that there are those who believe that their beliefs, their pro-life beliefs, are so superior to everyone else's that they can take the law into their own hands. They besmirch the legitimate pro-life movement. They make it look like a movement of violence and a movement of moral superiority that claims that they can overrule our government.

This bill, by separating those who would legitimately protest from those who use violence and blockade and other physical force to protest, would do a favor to those who, however strongly they believe in pro-life, still believe in the Constitution and the laws of the United States and equal protection under the law.

This bill is good for those who are pro-choice and it is good for those who are pro-life. It is only bad for those who seek to take the law into their own hands.

The SPEAKER pro tempore (Mr. TORRES). All time has expired.

Ms. SLAUGHTER. Mr. Speaker, I move the previous question on the resolution.

The previous question was ordered.

The SPEAKER pro tempore. The question is on the resolution.

The question was taken; and the Speaker pro tempore announced that the nays appeared to have it.

Ms. SLAUGHTER. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 233, nays 192, not voting 8, as follows:

[Roll No. 578]

YEAS—233

| | | |
|---|---|---|
| Abercrombie | Bryant | Dellums |
| Ackerman | Byrne | Derrick |
| Andrews (ME) | Cantwell | Deutsch |
| Andrews (NJ) | Cardin | Dingell |
| Andrews (TX) | Carr | Dixon |
| Bacchus (FL) | Castle | Dooley |
| Baesler | Chapman | Durbin |
| Barca | Clay | Edwards (CA) |
| Barlow | Clayton | Edwards (TX) |
| Barrett (WI) | Clement | Engel |
| Becerra | Clyburn | English (AZ) |
| Beilenson | Coleman | English (OK) |
| Berman | Collins (IL) | Eshoo |
| Bevill | Collins (MI) | Evans |
| Bilbray | Condit | Ewing |
| Bishop | Conyers | Farr |
| Blackwell | Cooper | Fazio |
| Boehlert | Coppersmith | Fields (LA) |
| Bonior | Coyne | Filner |
| Boucher | Cramer | Fingerhut |
| Brooks | Danner | Flake |
| Browder | Darden | Foglietta |
| Brown (FL) | DeFazio | Ford (MI) |
| Brown (OH) | DeLauro | Ford (TN) |

Frank (MA)
Franks (CT)
Frost
Furse
Gallo
Gejdenson
Gephardt
Gibbons
Gilman
Glickman
Gonzalez
Gordon
Green
Gutierrez
Hall (OH)
Hamburg
Hamilton
Harman
Hastings
Hefner
Hilliard
Hinchey
Hoagland
Hochbrueckner
Horn
Hoyer
Hughes
Inslee
Jacobs
Jefferson
Johnson (CT)
Johnson (GA)
Johnson (SD)
Johnson, E. B.
Johnston
Kanjorski
Kennedy
Kennelly
Kleczka
Klein
Kopetski
Kreidler
Lambert
Lancaster
Lantos
LaRocco
Lehman
Levin
Lewis (GA)
Lloyd
Long
Lowey
Machtley
Maloney
Mann
Margolies-Mezvinsky
Markey
Martinez
Matsui
McCloskey
McCurdy
McDermott
McHale
McKinney
Meehan
Meek
Menendez
Meyers
Mfume
Miller (CA)
Mineta
Minge
Mink
Moakley
Molinari
Montgomery
Moran
Morella
Murtha
Nadler
Natcher
Neal (MA)
Neal (NC)
Olver
Owens
Pallone
Parker
Pastor
Payne (NJ)
Payne (VA)
Pelosi
Penny
Peterson (FL)
Pickett
Pickle
Pomeroy
Porter
Price (NC)
Rangel
Reed
Reynolds
Richardson
Ridge
Roemer
Rostenkowski
Roukema
Rowland
Roybal-Allard
Rush
Sabo
Sanders
Sangmeister
Sarpalius
Sawyer
Schenk
Schroeder
Schumer
Scott
Serrano
Sharp
Shays
Shepherd
Skaggs
Slattery
Slaughter
Smith (IA)
Snowe
Spratt
Stark
Stokes
Strickland
Studds
Swett
Swift
Synar
Tanner
Thompson
Thornton
Thurman
Torres
Torricelli
Towns
Traficant
Unsoeld
Valentine
Velazquez
Vento
Visclosky
Washington
Waters
Watt
Waxman
Wheat
Williams
Wilson
Wise
Woolsey
Wyden
Wynn
Yates
Zimmer

NAYS—192

Allard
Applegate
Archer
Armey
Bachus (AL)
Baker (CA)
Baker (LA)
Ballenger
Barcia
Barrett (NE)
Bartlett
Barton
Bateman
Bentley
Bereuter
Bilirakis
Bliley
Blute
Boehner
Bonilla
Borski
Brewster
Bunning
Burton
Buyer
Callahan
Calvert
Camp
Canady
Coble
Collins (GA)
Combest
Costello
Cox
Crane
Crapo
Cunningham
de la Garza
Deal
DeLay
Diaz-Balart
Dickey
Doolittle
Dornan
Dreier
Duncan
Dunn
Emerson
Everett
Fawell
Fields (TX)
Fish
Fowler
Franks (NJ)
Gallegly
Gekas
Gilchrest
Gillmor
Gingrich
Goodlatte
Goodling
Goss
Grams
Grandy
Greenwood
Gunderson
Hall (TX)
Hancock
Hansen
Hastert
Hayes
Hefley
Herger
Hobson
Hoekstra
Hoke
Holden
Houghton
Huffington
Hunter
Hutchinson
Hutto
Hyde
Inglis
Inhofe
Istook
Johnson, Sam
Kasich
Kildee
Kim
King
Kingston
Klink
Klug
Knollenberg
Kolbe
Kyl
LaFalce
Laughlin
Lazio
Leach
Levy
Lewis (CA)
Lewis (FL)
Lightfoot
Linder
Lipinski
Livingston
Manton
Manzullo
Mazzoli
McCandless
McCollum
McCrery
McDade
McHugh
McInnis
McKeon
McMillan
McNulty
Mica
Michel
Miller (FL)
Mollohan
Moorhead
Murphy
Myers
Nussle
Oberstar
Obey
Ortiz
Orton
Oxley
Packard
Paxon
Peterson (MN)
Petri
Pombo
Portman
Poshard
Pryce (OH)
Quillen
Quinn
Rahall
Ramstad
Ravenel
Regula
Roberts
Rogers
Rohrabacher
Ros-Lehtinen
Roth
Royce
Santorum
Saxton
Schaefer
Schiff
Sensenbrenner
Shaw
Shuster
Skeen
Skelton
Smith (MI)
Smith (NJ)
Smith (OR)
Smith (TX)
Solomon
Spence
Stearns
Stenholm
Stump
Stupak
Sundquist
Talent
Tauzin
Taylor (MS)
Taylor (NC)
Tejeda
Thomas (CA)
Thomas (WY)
Torkildsen
Tucker
Upton
Volkmer
Vucanovich
Walker
Walsh
Weldon
Wolf
Young (AK)
Young (FL)
Zeliff

NOT VOTING—8

Brown (CA)
Clinger
Dicks
Geren
Kaptur
Rose
Sisisky
Whitten

□ 1300

Mr. GREENWOOD, Mr. BARCIA of Michigan, and Mrs. FOWLER changed their vote from "yea" to "nay."

So the resolution was agreed to.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

The SPEAKER pro tempore (Mr. TORRES). Pursuant to House Resolution 313 and rule XXIII, the Chair declares the House in the Committee of the Whole House on the State of the Union for the consideration of the bill, H.R. 796.

□ 1301

IN THE COMMITTEE OF THE WHOLE

Accordingly, the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 796) to assure freedom of access to clinic entrances, with Mr. KOPETSKI in the chair.

The Chair read the title of the bill.

The CHAIRMAN. Pursuant to the rule, the bill is considered as having been read the first time.

Under the rule, the gentleman from Texas [Mr. BROOKS] will be recognized for 3 minutes, and the gentleman from Wisconsin [Mr. SENSENBRENNER] will be recognized for 30 minutes.

The Chair recognizes the distinguished gentleman from Texas [Mr. BROOKS].

Mr. BROOKS. Mr. Chairman, I yield myself such time as I may consume.

(Mr. BROOKS asked and was given permission to revise and extend his remarks.)

Mr. BROOKS. Mr. Chairman, I rise in strong support of H.R. 796, the Freedom of Access to Clinics Entrances Act. This bill prohibits the intentional use of force or physical obstruction to injure, intimidate, or interfere with another person's obtaining or providing reproductive health services. It also prohibits intentional damage or destruction of property because a facility provides reproductive health services.

Mr. Chairman, where local law enforcement authorities are overwhelmed or simply refuse to enforce the law, the Federal Government is obliged to step in and protect the free exercise of constitutional rights. Periodically in our country's history, the Federal Government has been called upon to take on such a role—and has done so with vigilance and honor. The history of the labor and the civil rights movements bear witness to this fact.

At this historical juncture in our Nation's life, it is incumbent upon the Federal Government to do so again, for today women are being prevented from peacefully and freely exercising their constitutional rights to privacy. Across the country, we all have seen far too often the drastic escalation of violence in misguided—and malicious—attempts to prevent them from doing so.

Women seeking reproductive services have faced physical attacks, physical obstruction, and worse; clinics providing services have been vandalized and firebombed; health professionals have been stalked, and now the violence against them has reached the despicable level of attempted murder, plain and simple. In the face of all of this, the Federal Government should not, cannot, and must not sit idly by.

In devising appropriate Federal legislation, we of course recognize the challenge of fully respecting our first amendment protections. A careful reading of H.R. 796 reveals that the bill before us carefully protects the exercise of the constitutional rights, on both sides of the question.

I want to commend Crime Subcommittee Chairman SCHUMER, Congresswoman SCHROEDER and the many other Members who have shown their leadership on this issue.

I urge my colleagues to support passage of H.R. 796, without any weakening amendments.

Mr. Chairman, I reserve the balance of my time.

Mr. SENSENBRENNER. Mr. Chairman, I yield myself 8 minutes.

(Mr. SENSENBRENNER asked and was given permission to revise and extend his remarks.)

Mr. SENSENBRENNER. Mr. Chairman, the purpose of this bill, even though the authors might not so state, is to put an end to demonstrations in front of abortion clinics around the country, whether they be peaceful or whether they be violent. They make no differentiation between peaceful protests, which are a part of the American fabric, and violent protests, where there are plenty of State and Federal laws to punish those who have committed felonies against either persons or property.

To demonstrate this point, the supporters of this legislation are passing out at the doorways a USA Today editorial that says, "USA Today supports FACE," and it lists various crimes that have taken place before abortion clinics: 1 murder, 1 attempted murder, 1 bombing, 8 arsons, 15 bomb threats, and 66 death threats.

No one in the pro-life movement who is responsible supports violating the law, killing, maiming, and arson, but this bill is broadly drafted so that those who use their rights to peaceful protest and who commit acts of peaceful civil disobedience will be made into Federal felons and will be subjected to civil lawsuits in Federal court, which means that the defendants will have to foot their own lawyers' bills which will be substantial.

How is this done? It is done through an overbroad definition in this statute so that someone who stands in the doorway of an abortion clinic with their arms folded, which might be a civil forfeiture or a misdemeanor under most State and local laws, will become a felony subject to a year in prison on the first offense and 3 years imprisonment on subsequent offenses.

But furthermore, the operators of that clinic will also be able to sue that person who is obstructing the entrance in a peaceful way with a civil suit in Federal court.

Now, I wonder what would happen if similar legislation were introduced in this Congress or in State legislatures 30 or 40 years ago to make felons out of people who were demonstrating for civil rights laws in segregated restaurants, and what would happen if someone introduced legislation to allow the operator of a segregated lunch counter to file suit in Federal court against the people who were sitting in, or what would happen in the late 1960's when the same types of civil disobedience occurred in opposition to the war in Vietnam.

This type of legislation, with just a different issue put in, would have been used by the Government to intimidate those who were objecting to Government policies.

□ 1310

During the early years of this century, this type of legislation with words "labor management dispute" would have been used to intimidate workers who were trying to form unions in order to better their economic life. And that is why it is so dangerous and such wrong policy to single out a single issue for this type of legislation.

My fear is that once the precedent is set in passing this type of legislation that is aimed at one side of one issue, then a majority of politically correct folks sometime in the future in the Congress of the United States will be able to pick up this legislation, change the issue and do exactly the same type of thing for others who wish to disobey civilly because they have got strong moral views on the subject matter.

I believe that the activities of the civil rights movement, the activities of those who opposed the war in Vietnam and the activities of those who wished to form unions in the early parts of this century because they were allowed to disagree civilly, made our country a better place and enriched the fabric of what we call America today.

The supporters of this legislation attempt to lump nonviolent protestors with those who commit violence. That is wrong. That is wrong, and that sets a terrible precedent. These people are using their first amendment rights, in many instances, to protest something that they object to on moral grounds. We do not need a first amendment to protect politically correct speech. A fundamental principle of our Nation's law is that Government is prohibited from banning and regulating speech or preventing assembly based upon the content of the speech or the ideas expressed. Of course, the right of free speech does not guarantee a receptive audience. Nor does it in any way sanction the use of force or coercion to impose one's views on an unwilling listener.

Likewise, the right to be free from Government interference in obtaining an abortion does not mean that a woman has the right to be insulated from the views of her fellow citizens on the meaning and consequences of that act.

I unequivocally condemn the murder of Dr. Gunn in Florida and the shooting of Dr. Tiller in Wichita, but recognize that this is not the first time in our history that legitimate expressions of ideas have crossed the line into violence by a few extremists.

Political protest has been at the forefront of social change. From the Boston Tea Party to the abolitionist movement, from the antiwar protests and to the activism of the civil rights movement, civil disobedience has been an intimate part of our history. This is perhaps the first time in our Nation's history, however, that those in power have so openly sought to use the authority of Government to broadly suppress the legitimate actions of a movement with which they do not agree. The legislation sweeps with a broad and heavy hand to target peaceful, nonviolent, constitutionally protected activities on the same terms as violent or forceful acts.

I thought our country had outgrown McCarthyism when the Senator from my State was condemned by the other body in 1954. What we are seeing here is modern-day McCarthyism.

Mr. LEWIS of California. Mr. Chairman, will the gentleman yield?

Mr. SENSENBRENNER. I yield to the gentleman from California.

Mr. LEWIS of California. I thank the gentleman for yielding.

Mr. Chairman, I feel very strongly about this issue. As the gentleman knows, from time to time I have taken a close look at questions on the edges of the pro-life pre-choice issue. It is a very tough issue.

The gentleman makes a fundamental point that the right to protest is a constitutional right. I appreciate the gentleman's statement very much.

Mr. SENSENBRENNER. Mr. Chairman, I reserve the balance of my time.

Mr. BROOKS. Mr. Chairman, I yield 3 minutes to the distinguished chairman of the subcommittee, the gentleman from New York [Mr. SCHUMER].

Mr. KREIDLER. Mr. Chairman, will the gentleman yield?

Mr. SCHUMER. I yield to the gentleman from Washington.

(Mr. KREIDLER asked and was given permission to revise and extend his remarks.)

Mr. KREIDLER. Mr. Chairman I rise in support of this measure.

Mr. Chairman, I rise in support of H.R. 796, legislation to protect patients and health professionals from forceful interference with the provision of medical care.

There is no excuse for the violence, destruction, and abuse that have occurred at health clinics around the country. These activities go beyond the free expression of ideas. They violate the first rule of medicine: they do harm. They make it harder for women who simply want to exercise their constitutional right to an abortion. They jeopardize the health of pregnant women trying to get prenatal care. They threaten the health of other women who are not even pregnant, who are just trying to get medical care. Frankly, trying to keep a woman from seeing her doctor, for whatever reason, is one of the most cowardly and despicable acts I can imagine.

There has been concern about whether this legislation restricts freedom of expression, which is protected by the first amendment to our Constitution. I share that concern, because free expression and dissent are the foundations of our democracy. They are also absolutely essential to a healthy doctor-patient relationship.

So I want to be very sure that any legislation we pass here will not have unintended consequences later on. And after careful analysis, I am convinced that this legislation has been crafted to protect protesters, patients, and providers. No one who engages in peaceful, nonviolent protest has anything to fear under this bill. But those would use force or the threat of force should think twice now, because this bill makes such intimidation and harassment a Federal crime. Attorney General Janet Reno has written that such interference "has gone beyond the legitimate expression of opposing views."

Even the American Civil Liberties Union, which works to protect just about every form of free speech there is, has endorsed this bill. It is not free speech that is threatened here—it is women's health and lives. It is nurses, doctors, and other health professionals whose mission is to heal.

Let us be clear about H.R. 796: People can still conduct sit-ins, demonstrate, shout, sing, pray, picket, or proselytize. It would be foolish and unconstitutional to limit any of those activities. But it is dangerous to keep people who need medical care from getting it, and that is why this bill restricts only the most damaging activities: Protesters may not hurt people. They may not threaten people. And they may not physically block women from getting the medical care they need.

This legislation is similar to a law enacted in my State of Washington earlier this year. It works in Washington State, and it will work throughout our country. I urge my colleagues to vote for this bill.

Mr. SCHUMER. I thank the chairman of the committee for yielding this time to me.

Mr. Chairman, I rise in support of H.R. 796.

Our great system of individual rights means nothing if we cannot exercise our rights peacefully. If we allow the hand of violence to choke even one of our basic rights, the rest might as well be written on the wind.

History has taught these lessons over a thousand dark nights. If we let fear strangle one right, violence stalks another. If we let terror intimidate one group, intolerance threatens another.

That is what this bill is about. Because this bill is first and last a civil rights bill. And it shares the common purpose of all great civil rights legislation. It simply ensures that Americans can exercise their rights—free from terror, free from violence, and free from intimidation.

Unfortunately, this is not an academic debate. The record is frighteningly clear about the violence that inspired this bill. In the 6 years between 1977 and 1993, more than 1,000 violent acts against reproductive health providers were reported in the United States.

These were not acts of legitimate protest. These were criminal acts. These were acts of terror—against patients, against doctors, and against nurses. They included bombings, arson, death threats, kidnapings, clinic invasions, assaults, and one senseless murder.

There is no room in our system for this kind of violence. It may disguise itself in the sheep's clothing of protest. But it is not protest. It is the very opposite of protest. It is raw, naked violence.

This violence is not merely a local problem. The evidence is clear that there is a nationwide campaign to prevent women from exercising their right to reproductive health care. In too many cases, local law enforcement authorities cannot or will not act to effectively protect that right. Sometimes they are overwhelmed by sheer numbers. Sometimes they are ideologically motivated to their duty to protect the right to peacefully seek health care.

Mr. Chairman, this is what the bill states, and I will read it again and again and again to combat the misinformation from the other side. This is in subsection (d):

"(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution.

Mr. Chairman, this bill protects the great right of peaceful assembly. It is as carefully crafted as any piece of legislation ever written to protect one right without infringing another. That care and evenhandedness is why so many in the other body who have 100 percent pro-life convictions and who oppose abortion support this bill.

In my own neighborhood, for example, a Catholic bishop recites the rosary every day in front of a clinic to express his opposition to its work. I deeply respect what he is doing. If I thought for one moment that this bill cast even the slightest shadow of a doubt on his right to protest, I would rather not have this bill. But I am certain that it does not.

Those who oppose abortion can still hand out leaflets under this bill. They can still pray. They can still make speeches.

But they cannot use force. They cannot use violence. They cannot use physical obstructions. They cannot choke off the rights of other Americans.

These prohibitions are evenhanded. This bill forbids just as much the use of force and obstruction against reproductive health clinics that do not practice abortion as against those that do.

I urge you to consider the consequences of escalating violence if we do not pass this bill. What has happened already is unthinkable. What is likely to happen is unimaginable. This is a responsible, desperately needed measure. It will prevent violence and ensure civil order.

If we do not end it now, I ask my colleagues, when?

Mr. SENSENBRENNER. Mr. Chairman, I yield 4 minutes to the distinguished gentleman from New Jersey [Mr. SMITH].

(Mr. SMITH of New Jersey asked and was given permission to revise and extend his remarks.)

Mr. SMITH of New Jersey. Mr. Chairman, there is a fundamental difference between those persons who employ violence, or the threat of violence as a means to an end and those who engage in peaceful, nonviolent dissent such as pickets, sit-ins or sidewalk prayer.

The language of H.R. 796, Mr. Chairman, unjustly ends that difference by making nonviolent acts of civil disobedience committed by pro-lifers Federal crimes instead of misdemeanors.

I believe this is an unjust, unjustified, and cruel penalty that totally trashes any notion that punishment should fit the crime.

Under this bill, a woman who simply sits in front of an abortion clinic sidewalk or door and gets in the way of an abortionist or clinic personnel can be thrown in jail for a year on her first offense and be hit with a bruising fine. That is not justice. Just getting in the way, making access unreasonably difficult isn't a felony. Kidnapers, killers, rapists are felons, people who get in the way are not. H.R. 796 as it relates to nonviolent civil disobedience is unconscionably harsh and vindictive.

Let me say emphatically that violence against abortionists or anyone else is contemptible. The pro-life movement categorically condemns all violence including the sanitized violence used against unborn children. Just as shooting people at clinics is wrong, the dismembering the fragile bodies of unborn babies or pumping poison into their systems is wrong.

When it comes to picketing or demonstrating or nonviolent acts of civil disobedience, the motivation of pro-life is to protect, safeguard, emphasize with, and enhance the lives of both the mothers and their babies.

The substitute I will offer today imposes strict penalties on individuals who by force or threat of force, intentionally injure, intimidate, or physically obstruct any person because that person is providing or obtaining reproductive health services. Persons who merely physically obstruct however without using or threatening force would not be subject to Federal penalties.

My substitute clearly addresses the issues the sponsors say they are most concerned about. Violent attacks, such as the one that resulted in the death of Dr. David Gunn, cannot be condoned by anyone. Leaders of all of the major pro-life groups have condemned acts of violence. Dr. Gunn's assailant has been arrested and is subject to the possibility of receiving the death penalty under Florida law. But the key difference that separates my substitute from H.R. 796 is the issue of nonviolent civil disobedience.

Frankly I think members will be shocked to learn that under H.R. 796, a woman or man who engages in a peaceful sit-in or prays silently in a way that hampers access to an abortion mill or gets in the way can be thrown in prison for a year and be fined $100,000. If they do it again, they will be thrown into jail for 3 years and pay up to $250,000.

To the best of my knowledge, not since the Fugitive Slave Act has nonviolent civil disobedience been construed by Congress to be a Federal crime—which is precisely what H.R. 796 would do.

As you well know Mr. Speaker, nonviolent civil disobedience has been used by a myriad of causes and movements, including civil rights, environmentalism, D.C. Statehood, women's rights, antiapartheid, labor rights, antiwar, antinukes, AIDS, and abortion. Under the pending legislation only the pro-life nonviolent activists would be singled out and turned into felons.

H.R. 796 discriminates against pro-life Americans by turning an action based on a viewpoint-specific view on abortion into a felony. To get a taste of how unfair this provision to the bill is consider this:

If picketers nonviolently physically obstruct access to an abortion mill in order to obtain higher wages or benefits, and other clinic personnel or patients find it unreasonably difficult to pass, those picketers could only be charged with a misdemeanor. On the other hand, if pro-life picketers behave in the identical way making ingress or egress to the clinic unreasonably dif-

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 17 of 49

ficult the pro-life picketers can be charged with having committed a felony.

In other words, the same exact action would be punished in radically different ways. Equal justice under the law? Not by a longshot, Mr. Speaker.

Let me also point out that under H.R. 796 more remedies are provided under Federal law to people who sell abortions than are given to persons protected from racial discrimination under Federal civil rights laws.

Under H.R. 796 an array of civil remedies which is unprecedented in traditional Federal civil rights statutes are provided, including statutory damages of $5,000 per violation.

And a pro-life individual does not have to have been convicted of a crime before she can be dragged into court under a civil action brought by the abortion mill. There are numerous instances of clinics filing harassing lawsuits against pro-lifers engaging in legal, first amendment protected activity. H.R. 796 gives theses clinics yet another legal club with which to threaten pro-life persons who participate in legal pickets, prayer vigils, and sidewalk counseling.

H.R. 796 permits a State attorney general to demand an award of attorneys fees from an individual protestor, which is unprecedented in Federal civil rights laws.

In most civil rights cases, plaintiffs are individuals and the defendants are businesses or government entities. To level the playing field, the Supreme Court has interpreted the prevailing party, for the purposes of awarding attorneys fees, to mean the plaintiff if the plaintiff wins any sort of victory, but the defendant only if the action can be shown to have been frivolous. consequently, prevailing party carries with it a meaning that is not appropriate for civil actions that are likely to arise under H.R. 796. In cases arising under H.R. 796, the plaintiffs would probably be businesses—that is abortion clinics—and the defendants would be private citizens.

H.R. 796 provides strong protections under Federal law to abortion providers but utterly fails to give these same protections to individuals exercising their first amendment rights.

H.R. 796 gives pro-abortion escorts and personnel a license to taunt, abuse, obstruct, and provoke pro-lifers—including those engaging in legal pickets. Pro-life women and men have ample reason to fear acts of force or violence from pro-abortion protestors outside of abortion clinics, but these abortion supporters have nothing to fear under this bill. They can taunt, harass, and intimidate pro-life demonstrators, and make every effort to provok them into the slightest violation without fear of being punished by its array of penalties and civil damages.

It is disingenuous for supporters of H.R. 796 to claim that the bill is not viewpoint-biased because it would protect pro-life pregnancy aid centers as well as abortion clinics. There is little controversy over pro-lifers providing free prenatal care for poor women. The controversy centers on abortion—the killing of unborn babies—and H.R. 796 provides no equivalent Federal protection to pro-life persons outside of abortion clinics.

Finally, my substitute makes violence or the threat of violence a Federal crime. It safeguards free speech and treats both sides of this contentious issue with fairness and in a balanced way.

□ 1320

Mr. BROOKS. Mr. Chairman, I yield such time as she may consume to the gentlewoman from Illinois [Mrs. COLLINS].

(Mrs. COLLINS of Illinois asked and was given permission to revise and extend her remarks.)

Mrs. COLLINS of Illinois. Mr. Chairman, I rise today in full support of H.R. 796, the Freedom of Access to Clinic Entrances Act. The need for this legislation could not be any more urgent and I strongly urge my colleagues to join me in supporting it.

Currently, there is a small group of people that are viciously terrorizing women, doctors, health care workers, and their respective families. They use threats, intimidation, and violence in their effort to prevent women and doctors from exercising their legal rights. With each year that passes, more incidents of violence are reported, the harassment grows more fierce and this year a physician in Florida was killed for providing legal, reproductive health services to women.

In my district in Chicago, just this past weekend, the Planned Parenthood/Chicago Area's Midwest Center was bombarded by protesters who chained themselves inside the building. This is only the most recent incident in a long series of attacks on clinics in my district and throughout the country.

The Freedom of Access to Clinic Entrances Act would stop the terror by providing Federal assistance to combat increasingly dangerous and terrifying activities by antichoice fanatics. Federal assistance is needed because of countless incidents in which State and local authorities have been completely overwhelmed and overrun. H.R. 796 would establish criminal and civil penalties for the use of force or physical obstruction aimed at preventing a woman from obtaining an abortion. The bill also enables Federal courts to issue injunctions to regulate demonstrations.

Mr. Chairman, we need to pass this legislation to stop a small minority of Americans from holding the rest of us hostage. To reiterate, law-abiding citizens are being threatened, blocked, and terrified from exercising their legal rights and we in Congress must put an end to it now. I urge my colleagues to join me in voting for H.R. 796 and opposing any weakening amendments or substitutes.

Mr. BROOKS. Mr. Chairman, I yield such time as she may consume to the gentlewoman from California [Ms. HARMAN].

(Ms. HARMAN asked and was given permission to revise and extend her remarks.)

Ms. HARMAN. Mr. Chairman, I rise in strong support of H.R. 796, the Freedom of Access to Clinic Entrances Act.

On November 11, a warm and sunlit Veterans Day, I came with several House Members to attend the dedication of the Vietnam Women's Memorial—to make my peace with the war that scarred my generation and to witness women taking our place as partners and patriots in our Nation's wars.

It was an extraordinary event. Particularly moving was the invocation by former Vietnam veteran, nurse, and current Idaho minister, the Reverend Alice Farquhar-Mayes. Mr. Chairman, I will include the full text of her statement in the RECORD. She said, in part:

> We who waited and worked and worried were forever changed;
>
> We who went willingly into the hell to bring hope, heart, healing, humanity came home forever changed;
>
> We who went into the hell armed with compassion, knowledge, smiles, and tears came home forever changed;
>
> We who went into the hell with a willingness to touch, to hold, to listen, to care came home forever changed.
>
> We were—and are—everywoman.

Women taking our place as partners requires courageous actions to advance justice and equality, particularly here in our own country. Equality for women has been a prominent theme in the 103d Congress, and I am proud of my role:

As a cosponsor of the Family and Medical Leave Act, which became law on February 5, 1993;

As an original cosponsor of the Freedom of Choice Act, H.R. 25;

As an original cosponsor of the Economic Equity Act, H.R. 2790.

As a member of the House Armed Services Committee, I worked to repeal section 6015 of title 10, the last law on the books excluding women from serving in combat roles. In addition, as the first freshman ever to serve on the defense authorization conference committee, I worked to remove provisions from the fiscal year 1994 Defense bill that would have delayed the opening of combat roles to women and imposed excessive reporting requirements on the Defense Department.

I think any woman who is willing to risk death to serve our Nation should be allowed to do so. But I do not believe that women should have to risk injury or death to exercise their legal rights at home, or that others' lives should be put at risk to help them. Today, the House will vote on H.R. 796, the Freedom of Access to Clinic Entrances Act. I support this bill because women and their doctors are facing battle lines at family planning clinics in this country every day.

The tragic murder of Dr. David Gunn, the shooting of Dr. George Tiller, and such other documented acts of clinic violence including 36 bombings, 84 cases of arson, 60 attempted arsons, 35 clinic invasions, 498 acts of vandalism, 86 assaults, 149 death threats, two kidnapings, 29 burglaries and countless cases of stalking against clinic employ-

ees demonstrate the need to curb escalating violence against the freedom of choice. There are those who claim these criminal acts are isolated incidents, but I am persuaded that we must deter potentially violent protests and intervene to assure reasonable access to family planning clinics.

In my congressional district, OB-GYN physicians who perform legal abortions have contacted me for help. These health care providers are concerned that the inclusion of their pictures and home addresses on wanted posters prepared by an antiabortion group could endanger their personal safety and property as well as the safety of their families.

In addition, I must point out that the provisions of this law provide Federal protection not only to abortion clinics, staff and patients, but also to pro-life counseling and pregnancy centers, staff and patients to the extent that they are threatened by force, physical obstruction, and destruction of property.

I am committed to the principle that every citizen has the right to peacefully demonstrate. I am proud to live in a country that gives constitutional protection to free speech. I am equally committed to the principle that all citizens have the right to obtain legal reproductive health services without suffering injury, intimidation, or interference.

For these reasons I am a cosponsor of H.R. 796 and urge all of my colleagues who believe in the Constitution and the right of all citizens to live and work in a safe environment to vote for the Freedom of Access To Family Planning Clinics.

Mr. Chairman, I include the following invocation to which I referred earlier:

DEDICATION OF THE VIETNAM WOMEN'S
MEMORIAL

(By Rev. Alice Farquhar-Mayes)

INVOCATION

Let us begin with a moment of silence; A moment to allow ourselves to be truly present to this place, to this time, to one another, and to God.

O God of light and God of darkness, God of all creation, We dare to claim—and proclaim—Your presence here among us. We dare to claim this as Holy Ground—holy because you are here; holy because we are here.

We seek your blessing on what we do here this day, and on each one of us, however we have come: in body, spirit, prayer; in person and through modern technology.

We give you thanks this day has finally come, for we have waited long, worked hard, prayed often, and sometimes despaired. We give you thanks for all who have supported us and loved us along the way, and for those who have gone before us on the journey Home.

O Timeless God of all our days and years, surround us with your love.

We who waited and worked and worried were forever changed;

We who went willingly into the hell to bring hope, heart, healing, humanity came home forever changed;

We who went into the hell armed with compassion, knowledge, smiles, and tears came home forever changed;

We who went into hell with a willingness to touch, to hold, to listen, to care came home forever changed.

We were—and are—Everywoman.

We now come to you and to this sacred time, to remember and to be remembered;

We come to bear witness and to be heard; to honor and to be honored; to touch and to be touched; to celebrate and to Come Home.

We come to heal and to be healed;

We come that our pain may be assuaged and our joy made full.

We come, perhaps most of all, to pray for PEACE, to declare without equivocation that all war is appalling and abhorrent—to you and to each of us here gathered.

O God who redeems the past and who makes all things new, Come to us and be in us this day and make us ready for what we are about to begin.

Be light to our darkness and peace to our pain. Give us both solace and strength, pardon and renewal. Then we shall find the way of laughter—and the victory will go to Love. Amen.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the gentlewoman from Connecticut [Mrs. KENNELLY].

Mrs. KENNELLY. Mr. Chairman, this country is founded on the first amendment, which guarantees freedom of speech and the right of peaceful assembly. So many of us have worked to protect these rights.

Also, Americans have another fundamental right, and that is the right to live without fear of intimidation or bodily harm. This act safeguards our first amendment rights while keeping safe those who work in a field which has stirred public passions.

If my colleagues doubt that such protections are necessary, let them speak to the men and women who have been the victims of intimidation and violence. Let them speak to the families who have been terrified by death threats. And let them speak to women who have searched their consciences and found some very painful and difficult answers—only to have their path to medical services blocked.

We are talking about death threats, stalkings, chemical attacks, arson, bomb threats and the fatal shooting of Dr. Gunn in Florida and another serious attack in Kansas.

I understand that those who block clinics would say that the greater violence occurs within these facilities. But the people who work in the clinics and the women who use their services are breaking the law.

This bill establishes penalties for violence and acts of intimidation that go far beyond peaceful demonstrations. And it sends a firm message that violence and intimidation will not be tolerated.

Mr. Speaker, this is a reasonable bill, and a necessary bill, and I encourage my colleagues to pass it.

Mr. SENSENBRENNER. Mr. Chairman, I yield 3 minutes to the gentleman from Illinois [Mr. HYDE].

(Mr. HYDE asked and was given permission to revise and extend his remarks.)

Mr. HYDE. Mr. Chairman, I would like to read an excerpt from the Washington Times of November 6:

Activist Dick Gregory and his Dignity Patrol of Citizen Anti-Drug Crusaders say they are prepared for sit-ins and boycotts at local 7-11 Stores and will put their lives on the line by videotaping drug sales. The efforts are a part of a two-prong mission against drug traffic in the District, Mr. Gregory said.

That is just for a little background information.

I certainly would like to vote for this bill. The problem with it is that it is colored with a touch—more than a touch—of unconscious hypocrisy. You would never dream of applying the strictures in this bill to a labor dispute. You would never dream of applying the strictures in this bill to environmental protesters or nuclear demonstrators; no, only abortion.

This is a rifle shot at the anti-abortion movement, and make no mistake about it.

The issue really is not abortion. The underlying issue is the meaning of the first amendment. What are the limits, what are the parameters of free speech?

If these groups that are praying and sidewalk counseling and trying to persuade people not to exterminate their unborn child were in front of another killing place, let us say Auschwitz, you would be honoring them. You would not be making them felons. You would be saying, "You're trying to save people's lives. What a wonderful, noble thing."

But because it is the unborn they seek to protect, we criminalize them. We send them to jail.

I often wonder why the judge-made right to abortion trumps all our other rights. What does it say about us as a country when the abortion license overrides free speech, freedom of assembly, and a 200-year tradition of peaceful protest?

In the constellation of American liberties, the abortion license has become the transcendent liberty.

I do not defend the use of violence. If there is anything counterproductive to the pro-life movement, it is to use violence in protest to violence; but every movement has its extreme radical fringe. You do not condemn the whole movement because of the excesses of its radical fringe.

Political protest has been at the forefront of social change from the Boston Tea Party to Selma, and to pro-lifers these killing places require protests.

This bill subjects nonviolent, possibly perfectly legal behavior, to criminal sanctions. It criminalizes physical obstruction where there is no threat of force or use of force.

Is standing on a sidewalk saying the Rosary and handing somebody a pamphlet or trying to hand them a pamphlet physical obstruction, unreasonable obstruction?

Do you think there are not judges who will find it so?

And what have you done to the first amendment when you do this?

This bill will not tranquilize the atmosphere around the clinics; it will radicalize it.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the distinguished gentleman from New York [Mr. NADLER].

Mr. NADLER. Mr. Speaker, I yield to the gentleman from Rhode Island [Mr. MACHTLEY].

(Mr. MACHTLEY asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. MACHTLEY. Mr. Chairman, I rise in support of this legislation.

This is a perfect example of how Congress can respond to the cry for help coming from each of our States and districts.

Dr. Gunn, the Florida physician who was shot to death last March, brought this issue into the national spotlight.

In my own State of Rhode Island our Planned Parenthood waiting room was invaded; the clinic was blockaded; the Planned Parenthood medical director's driveway was covered with nails. Not only did he get four flat tires, but his wife stepped on a nail, and his two young children had to be kept inside while the nails were cleaned up.

Mr. Chairman, the Freedom of Access to Clinic Entrances does not prohibit demonstrating; it does not infringe on our first amendment right of free speech.

It does, however, make it a Federal crime to obstruct access to an abortion facility; it does make it a Federal crime to damage a clinic; it does make it a Federal crime to use force, threat of force, or physical obstruction to injure, intimidate, or interfere with patients or providers of reproductive health services.

So far this year there have been 329 incidents of violence against abortion providers—over 100-percent increase from 10 years ago. There have been 1,080 incidents of disruption, including hate mail, harassing phone calls, and bomb threats.

It is a Federal crime to use violence and force against every American. Reproductive health service providers are no exception and deserve this same protection.

The fact is that the law of the land allows abortions. Those who have a problem with this should be talking to their Representatives and Senators, not setting bombs, not committing arson or delivering death threats, and certainly not covering a physicians driveway with nails.

This is not about free speech. This is a criminal issue, and I urge my colleagues to vote for this bill.

(Mr. NADLER asked and was given permission to revise and extend his remarks.)

Mr. NADLER. Mr. Chairman, the purpose of this bill is to protect liberty against mob rule. The liberty at issue is fundamental: The right of women to walk into a clinic to exercise their constitutionally guaranteed freedom of choice. Zealots must not be permitted to physically obstruct the exercise of this freedom.

Contrary to some arguments, this bill does not impinge in any way on the first amendment rights of abortion opponents. What it impinges upon is the ability of one group of citizens to impose their beliefs on their fellow citizens by physical obstruction and intimidation.

Antiabortion protestors have an absolute right to say, "Don't do it," or anything else they want to say. They do not have any right to say, by means of physical force or intimidation, "We won't let you do it."

Let us be clear. These concerns are not merely hypothetical. Physical obstruction, intimidation, violence up to and including arson and murder, have become commonplace at abortion clinics and other reproductive health facilities throughout the country.

It is not merely the right, but the obligation of Government to protect citizens whose rights are systematically assaulted as they have been.

The women of America and the health professionals who assist them in controlling their reproductive destinies are looking to us for relief from the outrageous tactics, the violence, the mob rule that has been used by groups whose sense of frustration at their inability to impose their beliefs on everyone else through the political process and the courts has led them to an extremism that justifies in their own minds trampling on the rights of others.

Mr. Chairman, I urge my colleagues to vote "yes" on this bill.

□ 1330

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the distinguished gentleman from Nevada [Mr. BILBRAY].

Ms. VELÁZQUEZ. Mr. Chairman, will the gentleman yield?

Mr. BILBRAY. I yield to the gentlewoman from New York.

(Ms. VELÁZQUEZ asked and was given permission to revise and extend her remarks.)

Ms. VELÁZQUEZ. Mr. Chairman, I rise today in strong support of the Freedom of Access to Clinic Entrances Act.

From 1977 through April 1993, more than 1,000 acts of violence related to clinics, including one murder have been reported in the United States. The pro-life extremists who commit these acts, show a blatant disregard for the lives of those trying to deliver legal abortion services to women all across America—and to those medical professionals who supply these same women with prenatal examinations, mammograms, pap smears, birth control, and other vital women's health services.

Critics of this bill say that it violates their rights under the first amendment. They are grossly misinformed. What the first amendment does not protect—and what H.R. 796 prohibits—is force, threat of force, or physical obstruction which injures, intimidates, or interferes with other persons because they seek to provide or obtain reproductive health services. We must protect the choice and safety of millions of women across this Nation. I urge my colleagues not to be fooled by the allegations of antiabortion extremists, and to vote for this long-overdue bill.

Mr. BILBRAY. Mr. Chairman, when I first heard about this bill, which was over a year ago, and I expressed my disfavor with it, I said it is not needed, that no one should be denied their constitutional rights to picket, and demonstrate, and pray in front of any abortion clinic, or Planned Parenthood clinic, or whatever that facility may be. But over the last year and a half, Mr. Chairman, I have seen the violence increase. I have seen a doctor killed. I have seen another shot. I have seen others injured. Even though I am a prolifer, Mr. Chairman, I recognize that the situation has gotten out of hand.

People say, "Well, if somebody stands in front of a door or accidentally bumps somebody going in while they are praying the rosary, they can be thrown into prison for a year and fined $100,000." Now those that bring up this type of argument know that is not going to happen. The same situation arose recently in my State in a frontier strike. Some picketers assaulted somebody trying to go in. They were convicted. These were union pickets. They were sent to jail and fined because they assaulted people, but they deliberately did it. They knew what they were doing when they did it, and they were repudiated by union leaders as well as others in the community.

Mr. Chairman, nobody is going to go to jail because they accidentally stand on the sidewalk. They are going to be cited if they deliberately interfere with somebody's rights, and I say to my colleagues, "I firmly believe that, even if you're pro-life, you should support this bill and vote for it to keep the violence down and to rid extremists from this situation."

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentlewoman from Nevada [Mrs. VUCANOVICH], the other half of the Nevada delegation.

Mrs. VUCANOVICH. Mr. Chairman, John F. Kennedy once said that—

> This Nation was founded on the principle that all men are created equal and that the rights of every man or woman are diminished when the rights of one man or woman are threatened.

Today in this House, the rights of peaceful, nonviolent pro-life men and women are threatened by this piece of legislation that is aimed solely at them. The pro-life community which believes deeply in the right of life of all people, born and unborn, has repeatedly condemned the violence wrought by a few extremists. H.R. 796 seeks to address this growing problem of violence at abortion clinics throughout the country but in its zeal to protect those who seek or provide abortions, it violates the first amendment rights of those who wish to prayerfully offer an alternative to the violence of abortion.

H.R. 796 makes no distinction between violent and nonviolent protest at abortion clinics. It offers severe penalties for a first offense, up to 1 year in jail and up to $100,000 in fines. Should a grandmother praying the rosary on a public sidewalk be subject to the same harsh penalties as someone who sets fire to a clinic? I think not.

Our country has a history of peaceful protest used by people of conscience who feel that their voice will not be clearly heard in any other way. The first amendment guarantees this right. Let us not pass a bill in this House that would cause us to place an asterisk in the Constitution that reads "freedom of speech is fine unless you oppose abortion."

I urge my colleagues to vote against this bill.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the distinguished gentlewoman from Maryland [Mrs. MORELLA].

(Mrs. MORELLA asked and was given permission to revise and extend her remarks.)

Mrs. MORELLA. Mr. Chairman, today we are considering the Freedom of Access to Clinic Entrances Act (H.R. 796), a bill to determine whether we as a nation will continue to tolerate acts of terror, intimidation, and violence at health care clinics. Some hold that this bill is about stifling protests, about gutting the first amendment, and about promoting abortion.

Nothing could be further from the truth.

This bill is about Kathryn Maxwell of Michigan, who scheduled an appointment for her high-risk pregnancy but was turned away because Operation Rescue blockaded her doctor's office. The local police department of Novi, MI, patrolling outside, said they could do nothing.

The Freedom of Access to Clinic Entrances Act is about the firebombing of a Corpus Christi, TX, clinic that provides a full range of reproductive health care services and also served as an adoption agency. The clinic was burned to the ground.

The bill is about Dr. Pablo Rodriguez, the medical director of a Providence, RI, Planned Parenthood clinic, who wears a bullet-proof vest to work at the suggestion of local police. They told him they could not deal with the protesters at his clinic.

And this bill is about more than 322 clinic invasions; 441 cases of clinic vandalism; 36 bombings; 53 attempted bombings/arsons; 91 death threats; 82 assaults; 30 cases of stalking; 2 kidnappings; 327 clinic invasions; and one murder.

The Freedom of Access to Clinic Entrances Act will give the Federal Government the power to act when State and local authorities cannot or will not act to guarantee access to these clinics where women, especially poor women, go for a variety of medical services that include birth control, prenatal examinations, mammograms, pap smears, as well as abortion services.

In committee hearings in both the 102d and 103d Congresses, we learned of the national scope of the problems women and health care providers face every day not only in well-orchestrated, well-publicized blockades and arson attacks in Whichita and Buffalo but in less publicized, daily threats, vandalism, and intimidation in communities all across the Nation.

We have heard from local officials, like the chief of police of Manassas, VA, whose personnel and budgets have been exhausted in patrolling blockades. And we heard from local officials, like one Texas sheriff, who holds strong antiabortion views, that "he would not enforce local laws against blockaders."

Those who oppose this bill say that it will stifle free speech, gut the first amendment, and punish those who are engaged in acts of protest and civil disobedience, acts that mirror those of the protests and civil disobedience against segregation that thousands of Americans participated in during the 1960's.

Nothing could be further from the truth.

In crafting this bill, Congressman SCHUMER and I, and Judiciary Committee members from both sides of the aisle and from both sides of the abortion debate, have been diligent in ensuring that the principles of free speech and assembly found in the first amendment are protected. This bill unequivocally states that:

> Nothing * * * shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstrations) protected from legal prohibition by the first article of amendment to the Constitution.

This means that protestors can picket, boycott, pray, sing hymns, wave signs, verbally accost patients and personnel, hand out leaflets, photos, and brochures. But, they cannot do all of the above and also chain themselves to the front door, block someone's entry to a clinic, or invade and forcibly occupy a clinic.

The opponents of this bill often compare the activities of antiabortion extremists to the acts of civil disobedience, the protests, and marches of civil rights activists against businesses, local and State governments, and the Jim Crow laws of the South that were attempts to obtain rights for African Americans, rights of citizenship they had long been denied.

The protests and blockades of reproductive health clinics, on the other hand, are nothing less than attempts to deny women their rights, to deny them medical services, in some cases to deny them services that their lives depend on.

The attempt to equate the protests and civil disobedience of the civil rights movement with the blocking of clinic entrances, the burning and bombing of clinics, the stalking of patients, doctors, and nurses, and the shooting death of a doctor in Florida makes a mockery of the principles and the life of Dr. Martin Luther King.

Those who oppose this bill maintain that this bill is about abortion.

Nothing could be further from the truth.

This bill is about providing access to medical services of all kinds without fear, without intimidation, and without coercion. It is about providing services—like prenatal care, pap smears, mammograms—that can literally mean the difference between life and death for many American women. It is about providing freedom of access, without which, women of this country have no freedom of choice.

I urge you to support the Freedom of Access to Clinic Entrances Act not because you are for or against abortion, but because you are against the tactics of terror, coercion, and violence.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the gentleman from Minnesota [Mr. RAMSTAD].

Mr. RAMSTAD. Mr. Chairman, the freedom of Access to Clinic Entrances Act is not a pro-life versus pro-choice issue. It is a necessary response to the escalation of violence at reproductive health centers all across America.

As the hearings demonstrated, there is a need for Federal legislation to protect the constitutional rights of women entering the clinics. In my home State of Minnesota, local law enforcement has simply been unable at times to protect the rights of health care workers and patients.

No one disagrees with the right of peaceful demonstration, but blocking entrances, and thus preventing the exercise of a constitutional right, is not acceptable.

This bill will serve as a deterrent to de-escalate the violence aimed at clinics and health care workers.

Let us be perfectly clear, nothing in this bill prevents the peaceful picketing or other peaceful demonstrations protected under the first amendment of the Constitution.

Mr. Chairman, we need to pass this bill to end the violence.

Mr. SENSENBRENNER. Mr. Chairman, I yield 1½ minutes to the gentleman from New York [Mr. LEVY].

(Mr. LEVY asked and was given permission to revise and extend his remarks.)

Mr. LEVY. Mr. Chairman, it is unavoidable that many people are going to view the battle over this legislation as one between the pro-choice people and those who describe themselves as pro-life. But to me it is not about that at all. Most of us who will vote against this bill today think that the tactics or organizations like Operation Rescue and similar groups are outrageous. We do not think it is right to shoot doctors under any circumstances. It is wrong to set buildings on fire. Murder and arson are illegal in every State. So, why would we seek to federalize these laws?

Mr. Chairman, some people say it is because women have a Federal right to abortion. But people have many Federal rights, and there are no corresponding Federal crimes covering those who interfere with those rights. I, for example, have a right to worship in the synagogue of my choice. It says so right in the Constitution. Any of us can worship wherever we want.

□ 1340

But there is no access to churches and temples bill pending here. If there was, it probably would not be taken seriously.

Quite frankly, I would support the bill which is before us today if it made it a Federal crime to deny any person access to any place where the Federal Government says they have a right to be. In that way this bill, which has been criticized for being overbroad for other reasons, is not broad enough. And I would not exclude abortion clinics. If proponents of the bill were sincere when they say that this vote is not about pro-choice or pro-life, their bill would guarantee access to every place else. Please vote no on H.R. 796.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the distinguished gentleman from Illinois [Mr. SANGMEISTER].

(Mr. SANGMEISTER asked and was given permission to revise and extend his remarks.)

Mr. SANGMEISTER. Mr. Chairman, I am pro-life both personally and politically and, this year, have voted against the Freedom of Choice Act and in favor of the Hyde amendment which bans Federal funding of abortion services. My record is clear. I oppose abortion except in cases of rape, incest or when the life of the mother is threatened by carrying the pregnancy to term. I also support the rights of fellow pro-lifers who choose to peacefully protest outside of abortion clinics. Furthermore, I am a strong supporter of the first amendment which guarantees freedom of speech and the right to peaceably assemble.

However, I am also a former county prosecutor who believes strongly that maintaining a civil society depends on respecting the rights of others and rejecting violence at all times. For this reason I cannot condone, nor even look the other way, when an anti-abortion protestor goes beyond the boundaries of the first amendment and commits acts of violence, harassment or vandalism.

As a member of the House Judiciary Committee, I voted to approve H.R. 796—the freedom of access to clinic entrances bill—on September 14 of this year. At the time, I was very concerned that this bill would infringe upon prolife protesters rights to free speech and assembly. As a result, I offered an amendment in the subcommittee markup to prevent this. My amendment stated that nothing in the bill prohibits any expressive conduct including peaceful picketing protected by the first amendment. With this language included in the final version of the bill, legislative intent—handing out a leaflet is not a violation.

Mr. Chairman, I remain convinced that H.R. 796, in its present form, is necessary and would not have supported this—or any other piece of legislation—if, in my opinion, it unduly infringed upon the legitimate, constitutional right of individuals to peacefully protest. Furthermore, I can not condone the actions of individuals who feel they are above the law and choose violence, harassment or vandalism as a means of voicing their views. Therefore, I will vote yes on FACE. In addition, I want to commend the work of Chairman BROOKS and Chairman SCHUMER in bringing this bill to a vote and urge my colleagues to support this bill.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the distinguished gentlewoman from New York [Mrs. LOWEY].

(Mrs. LOWEY asked and was given permission to revise and extend her remarks.)

Mrs. LOWEY. Mr. Chairman, I rise in strong support of the Freedom of Access to Clinic Entrances Act. Chairman SCHUMER and Representative CONNIE MORELLA are to be commended for their hard work in bringing this critical legislation to the floor.

Mr. Speaker, this bill is long overdue. Indeed, the murder of Dr. David Gunn last spring in Florida was only one tragic indication that the violence has gone too far.

For too long we have allowed the rhetoric of extremists to escalate. Some who could not achieve their goals through the political process have turned to violence and intimidation—they have taken the law into their own hands, and the results have been devastating.

The facts speak for themselves:

In one recent survey, 50 percent of clinics experienced severe antiabortion violence this year. These violent acts include death threats, stalking, chemical attacks, arson, bomb threats, invasions, and blockades.

The National Abortion Federation reports that the number of violent incidents has more than tripled in the last 2 years.

And the longer we wait to pass Federal remedies, extremists are developing new, more insidious ways to attack clinics and to ensure that women do not receive vital services. This year we have seen a frightening use of noxious chemicals to close clinics and harm clinic personnel.

These attacks can cost hundreds of thousands of dollars. This year alone, extreme violence against clinics have caused almost $4 million in damages to clinics.

Mr. Speaker, these violent acts don't happen in a vacuum. They have real effects on real people.

Each blockade, each act of intimidation, each bombing, each arson, each chemical attack means that women and their families do not have access to basic health care.

These clinics do much more than provide abortion services. They provide family planning services, prenatal care, and even adoption services. Earlier this year the Blue Mountain Clinic in Montana was destroyed by arson. It had provided prenatal care and delivery, childhood immunizations, and contraceptives services.

Mr. Speaker, there is a clear nationwide campaign of terror and violence to deprive women of their basic rights, yet State and local law enforcement officials are either unwilling or unable to adequately safeguard the victims.

Women who seek reproductive health services, and physicians who brave almost daily harassment, need our help. We must pass legislation that provides relief both to providers and their patients.

I ask my colleagues to remember that these clinics provide critical health care services to women and their families.

And I ask my colleagues to remember that we are a nation that respects the right to protest, but deplores the use of terror and intimidation.

I urge my colleagues to support H.R. 796.

Mr. SENSENBRENNER. Mr. Chairman, I yield such time as he may consume to the gentleman from Wisconsin [Mr. GUNDERSON].

(Mr. GUNDERSON asked and was given permission to revise and extend his remarks.)

Mr. GUNDERSON. Mr. Chairman, while I hoped I could support this bill, based on the present language I rise in opposition.

Mr. Chairman, I come to this debate as one of the few Members endorsed by neither the pro-life or the pro-choice lobbying organizations. I have always tried to carefully consider each and every issue on the subject of abortion precisely on its merits. The issue before us must be considered in this same way.

To be honest, I came to this debate fully expecting to support the legislation before us. The concept that people can take the law into their own hands is repugnant to me. If we allow individuals to decide for themselves which laws to honor, and which ones to ignore, we will have nothing but anarchy. The operations and tactics of Operation Force and like-minded organizations, I find offensive. Violence to individuals seeking a service, to individuals performing a service, or to buildings housing a service legal under the law simply cannot be tolerated or accepted. Violence is not the solution to resolving this very personal and difficult issue and, for this reason, I had hoped to support the legislation before us.

But a crucial test for every legislator ought to be whether we believe such actions are constitutional. The very oath we take swears us to uphold the Constitution of the United States. We must do that on issues, without regard to the controversy or political consequences of such action. When I defend the constitutional right of every citizen to have equal opportunity in our society, I must do so for everyone. I find that on some issues certain guarantees in our Constitution offend conservatives. On others these guarantees offend or inconvenience liberals. But the same protections must be afforded everyone.

The language in the proposed legislation which concerns me reads as follows:

> Whoever by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person, or attempts to do so, because that person or any other person or any class of person is obtaining or providing reproductive health

services (is subject to criminal and or civil penalties).

It is my conclusion that such language presents three potential problems constitutionally. However, before doing so, I should note that some will suggest this language is modeled after existing Federal language with respect to voting rights and racial discrimination. But there is a difference. Voting rights and civil rights are explicitly guaranteed by the Constitution. Reproductive rights are not. Indeed, Roe versus Wade and other abortion rights decisions are not premised upon any explicitly constitutional guarantee but, rather grounded in the implicit right to privacy which pervades the Constitution.

Obviously, I strongly believe in a constitutional right to privacy. However, the Supreme Court has historically distinguished between legislation based on explicit and implicit constitutional rights. So, just because we have other statutes that employ this language does not necessarily make it appropriate in this legislation.

The 14th amendment provides that no State shall deny any person the equal protection of the laws. While there is no corresponding explicit prohibition against the Federal Government, the Court has held that the fifth amendment's due process clause—life, liberty, or property may not be taken without due process of the law—implicitly guarantees equal protection.

What does that mean for the bill before us? H.R. 796 prohibits physical obstruction which intimidates or interferes with another's obtaining reproductive health services. One could argue that this singles out those individuals who blockade abortion clinics for civil and criminal penalties but leaves other blockaders such as union employees go scot-free when they engage in similar activities and, as such, violates equal protection provisions.

Here, the Court has, and will, distinguish between speech and action. If the bill prohibited picketing at an abortion clinic, the Court would probably find a violation of equal protection since you are punishing one form of speech over another. However, the Court is not so inclined to find a violation of equal protection where its actions, like obstructing entrance to a building, that is regulated and the illegal actions is narrowly defined. Thus, based upon the 14th amendment, I am not ready to conclude an equal protection problem exists.

A second constitutional challenge to the bill will likely be based upon the first amendment's protection of free speech. Again, I believe the proposed legislation meets this test. For the bill states, "nothing in this section shall be construed to prohibit expressive conduct (speech) protected from legal prohibition by the first amendment to the Constitution." This language will direct courts to interpret the bill as aimed only at illegal actions.

So what is the problem constitutionally?

The due process clause of the fifth amendment restricts the Federal Government from taking the life, liberty, or property of any person without the due process of the law. So what does that mean? Oversimplified, it means that every person is entitled to certain legal procedures before the Government can act against them—specifically; notice, a hearing, and an appeal.

Notice means just what it says—that a person has warning that the Government is about to act against them. In this context, a statute that is so vague or all encompassing that it fails to provide adequate notice/warning of prohibited behavior or blurs the line between prohibited behavior and obviously legal behavior will be declared unconstitutional by the courts as overbroad and failing to provide due process to the persons charged thereunder.

Specifically, any person who "by threat of force or physical obstruction * * * intimidates" any other person obtaining reproductive health services violates H.R. 796. Clearly, there are situations under which that could happen. However, the context of the situation is also relevant.

Not every threat of force or physical obstruction intended to intimidate is illegal. In fact, in Wisconsin such actions are not criminal unless a reasonableness standard is met—that is, in the case of threatened force, that a reasonable person under the circumstances would believe that the force was imminent and the person making the threat was capable of delivering the force.

It may be intimidating to have an 80-year-old pro-lifer singlehandedly try to obstruct your entering an abortion clinic by standing in your way and handing you a pamphlet. But is it reasonable to believe this person will actually be able to keep you out? Contrast that to a situation where hundreds of Operation Rescue protestors truly block access to the clinic. Yet, under the bill as drafted, both actions are equally prohibited.

While the amendment by Mr. SCHUMER intends to further clarify the meaning of "intimidate," it is my conclusion the language remains overly broad. I would suggest that to solve this problem one must either further define "intimidate" to mean "imminent threat to bodily harm" or perhaps even better, simply delete the word "intimidate" and properly but narrowly define the word "interfere."

Anyone who has followed my legislative record knows full well of my commitment to tolerance under the law for those people, actions, and even lifestyles that we may not approve of but which must be allowed under the protections of a free society and the Constitution. Yet, it would be wrong for me to vote for legislation simply because I agree with its goal or title.

In an attempt to protect the rights of those who seek the services of a reproductive health clinic, we cannot deny the legitimate rights of those who seek to protest such actions. If our goal is to find that proper balance of protection for both parties, then we have a legislative obligation to define narrowly and properly the terms in a way which will withstand review by the courts.

I have come to the conclusion this legislation is nothing but a lawyer's dream. It will increase litigation and case law by both plaintiffs and defendants. It will result in the courts attempting to do what we should be doing today—properly defining the law.

I am willing to work with any and all to properly solve the legal questions before us. I am willing to work with any and all to guarantee that all Americans have the opportunity afforded them by the Constitution. But I am not willing to vote for legislation that sounds good, but I fear does nothing.

We can and we should do better.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from Oklahoma [Mr. ISTOOK].

Mr. ISTOOK. Mr. Chairman, this bill is about extremism. This bill is an extremist bill being pushed by extremists. Because there are a few, a very few, who use violence to oppose abortion, this bill seeks to retaliate.

This bill is the moral equivalent of launching a nuclear attack against all pro-life protesters, whether they are violent or not. You say you want to punish murder; I agree. But we already have stiff laws against it, including the death penalty. Another law will not help. You say you want to punish arson and fire bombing; I agree. But we already have stiff laws against those crimes. Another law will not help.

This bill is not needed to go after violent protesters. The problem is what it does to nonviolent protesters.

What is it that is new in the bill? It says if you interfere with somebody, if you make a physical obstruction, no matter how slight, that is it; you get a year in prison and a $100,000 fine, a civil lawsuit for at least $5,000, punitive damages, and legal fees. That is extreme.

So what might you do to bring down the full weight of the U.S. Government upon you? If you picket an abortion clinic and you step in front of someone going in, you have physically obstructed them. You have interfered. You get it. If you politely stop somebody and say, "Won't you think this over before you go in?" You have physically obstructed them. You have interfered. You get the full penalty, the incredible and obscene level of penalties.

We already have laws against trespass. Use them. We have laws against destruction of property. Use them. We have laws against violence. Use them.

More than anything else, this bill reminds me of something that happened when I was in college, the tragedy at Kent State, when protesters were shot and killed by Federal troops. That is the kind of extremism that this bill promotes, the attitude of "Kill the protesters."

You cannot put a false face of moderation on this extremist bill. It goes off the deep end. Make the punishment fit the crime, but do not launch the equivalent of a nuclear attack against those who keep protests peaceful.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the distinguished gentlewoman from Pennsylvania [Ms. MARGOLIES-MEZVINSKY].

Ms. MARGOLIES-MEZVINSKY. Mr. Chairman, I am speaking today on behalf of the thousands of women, health care providers, and staff who have become victims of a national war declared upon them by extremist protestors. Protestors who do not wish to express their opinions lawfully and peacefully, but who instead use bombs, guns, and physical violence to get their point across.

Mr. Chairman, I would like to read a quote from a threatening letter delivered to a clinic in Pottstown, which is in my district. Signed by a group

named Avengers for the Unborn, the letter reads:

The religious wimps who protest outside abortion clinics are useless because they are too peaceful. It is time to meet violence against the unborn with violence against the murderers of the unborn.

This kind of harassment can not be tolerated.

These clinics that have been threatened, bombed, or blockaded offer more than just abortion services, they offer crucial, sometimes lifesaving health care services to women. Many women, especially low-income women, are dependent upon these clinics for prenatal care, treatment of sexually transmitted diseases, and cancer screening. Blocking women from obtaining health care is not simply an inconvenience, it is a crime.

Finally, Mr. Chairman, to say that this bill denies first amendment rights is ludicrous. No one in this body wants to deny anyone, regardless of his or her views, the right to speak his or her mind. However, let us make it perfectly clear that the right to free speech does not include the right to threaten, harm, or deny anyone his or her right to enter a clinic.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the distinguished gentlewoman from New York [Mrs. MALONEY].

Mrs. MALONEY. Mr. Chairman, I rise in strong support of the Freedom of Access to Clinics Act.

This act is needed to protect Americans against those who resort to terror and even murder to impose their views through violence and intimidation.

The violence has been directed at people who have attempted to enter medical facilities that offer abortion among a full range of health services.

This violence has been directed at both patients and providers, and has included the murder of a doctor in Florida and the wounding of another doctor in Kansas.

Mr. Chairman, this legislation would simply make it a Federal crime to obstruct access to a clinic, to intimidate, injure, or interfere with anyone seeking or providing reproductive health services.

In other words, you cannot break the law to force your views on someone else. If someone tried to use these tactics to block entry to a supermarket, no community in America would tolerate it. Family planning clinics deserve the same protection.

Last year Congress passed a bill that prevented the violent blockade of animal research clinics. Certainly human health facilities deserve the same protection.

This bill is not about free speech, which is protected under the legislation. It is about conduct that is irresponsible and ought to be illegal.

☐ 1350

Mr. SENSENBRENNER. Mr. Chairman, I yield such time as he may consume to the gentleman from Alabama [Mr. BACHUS].

(Mr. BACHUS of Alabama asked and was given permission to revise and extend his remarks.)

Mr. BACHUS of Alabama. Mr. Chairman, while I deplore the violence that has been mentioned, I reluctantly rise in opposition to H.R. 796 in its present form and in support of the Smith substitute amendment.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from California [Mr. HERGER].

Mr. HERGER. Mr. Chairman, I rise in strong opposition to this legislation, which poses a direct threat to the first amendment free speech rights of every American.

There are dozens of Members of this body who began their political careers in the antiwar or civil rights movements. We regularly hear them tell stories of the struggles they engaged in on behalf of their beliefs.

Nonviolent civil disobedience was a hallmark of both movements. Where would the civil rights movement have been if $250,000 fines had been imposed on those who staged sit-ins at segregated lunch counters? Would we have tolerated laws allowing the bus company to sue Rosa Parks for punitive damages just because she inconvenienced them?

There are currently strong penalties available to punish people who commit violent acts. Yet, this bill treats the pro-life movement as if all demonstrators were potential murderers.

Mr. Chairman, that is equivalent to saying that the Black Panther party was the norm for the civil rights movement, and that the Weathermen bombers were the norm for the antiwar movement. That is just not the case.

Let us not criminalize demonstrations based solely on the viewpoint of the demonstrator. Defeat this unfair and unconstitutional erosion of free speech.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished gentleman from Rhode Island [Mr. REED], a member of the Committee on the Judiciary.

Ms. SCHENK. Mr. Chairman, will the gentleman yield?

Mr. REED. I yield to the gentlewoman from California.

(Ms. SCHENK asked and was given permission to revise and extend her remarks.)

Ms. SCHENK. Mr. Chairman, I rise in strongest support of the Freedom of Access to Abortion Clinic Entrances Act.

Mr. Chairman, passage of this bill is extremely important to me, to the residents of California's 49th Congressional District, and to women across America. At stake is a woman's right to safe access to family planning services.

Last March, five San Diego clinics were sprayed with butyric acid, a dangerous toxin that irritates the eyes and respiratory tract and causes skin burns.

These were not isolated acts. Over 1,100 acts of violence against abortion providers were reported to the California Abortion Rights Action League last year.

Despite the prevalence of such violence, the FBI refused to investigate the attacks in San Diego on grounds that Federal law did not authorize an enforcement response.

Antiabortion violence is a national epidemic. H.R. 796 must be passed so our Government can give American women the protection they deserve.

Mr. REED. Mr. Chairman, I rise in support of H.R. 796, the Freedom of Access to Clinic Entrances Act. We must pass this legislation so that the women of our country are not prevented from exercising their right to reproductive health care by violent protesters.

I want to share with my colleagues the experience of Barbara Baldwin, a good friend of mine who is the executive director of Planned Parenthood of Rhode Island. Her story illustrates the need for Federal action.

The Planned Parenthood clinic waiting room has been repeatedly invaded by protesters. On one occasion, it took over an hour for the Providence Police to clear the reception area. Later, all of their exterior locks were filled with epoxy glue. When the locksmith arrived, one of the picketers told him she had a gun in her purse and would shoot him.

The medical director's face appeared on a wanted poster. His driveway has been mined with nails. He got four flat tires and his wife stepped on a nail when she went jogging. He has two small children and lives in a remote part of the State. In April, someone took out a life insurance policy on his wife, and sent it to the office. He has ordered and plans to wear a bullet proof vest.

The building that houses the clinic was splashed with red Xerox toner and had to be repainted—only to be resplashed with green fluorescent paint later. Clinic patients and staff are regularly harassed by protesters, who frequently video tape everyone going into the clinic. This clinic provides urgently needed preventive health care as well as abortion services.

The clinic executive director has been followed and harassed by a group of men, and eventually had to get a temporary restraining order.

The men who followed here have been arrested in Texas, Ohio, New York, the District of Columbia, Wisconsin, Georgia, and Arizona. They have served time in North Dakota and North Carolina. These are not local protesters: This is a nationwide network.

Since 1977, over 1,000 acts of violence have been reported in the United States, including 36 bombings, 81 arsons, 131 death threats, 84 assaults, 327 clinic invasions, 2 kidnapings, and 1 murder. It is clear that State and local enforcement has been overwhelmed by a nationwide campaign of violence designed to intimidate health care providers and their patients. It is time for

the Federal Government to step in and stop this siege.

The shooting of Dr. David Gunn, anonymous death threats to clinic owners and physicians, arson, bomb threats, and physical attacks on clinic staff and patients are not the acts of peaceful protestors. We cannot allow a organized campaign of intimidation and violence to stop Americans from exercising their right to reproductive health care. This bill is evenhanded, and protects not only abortion clinics but abortion alternative counseling and pregnancy centers to the extent that they are threatened by force, physical obstruction, and destruction of property. H.R. 796 guarantees the right of everyone, those on both sides of the abortion issue, to engage in peaceful protest.

It is incumbent upon us today to protect health care workers like Barbara Baldwin, her staff, and others like her across the country. I urge my colleagues to support this important legislation.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the gentleman from California [Ms. WOOLSEY].

(Ms. WOOLSEY asked and was given permission to revise and extend her remarks.)

Ms. WOOLSEY. Mr. Chairman, I rise today to urge my colleagues to vote for passage of the freedom of access to clinic entrances bill with no weakening amendments. This bill will give our law enforcement officers the tools necessary to prevent blockades of clinics and to punish those who insist on breaking the law time and time again.

I want to point out that this is not an issue of freedom of speech, nor, are many of the protesters in front of abortion clinics nonviolent as they claim.

Instead, they are opposed to allowing women access to the health care of their choice, just as segregationists in the 1950's were opposed to allowing African-Americans access to education and voting.

In the south, in the early 1960's, people opposed to individual freedoms burned crosses, bombed houses, destroyed churches, and killed people who sought to exercise their constitutional rights.

That same legacy of hate and violence was demonstrated at abortion clinics across the country this year, as one doctor was murdered, and another shot.

Mr. Chairman, since 1977, there have been over 1,000 violent acts at family planning clinics including bombing, arson, kidnaping, assault and battery, and murder.

This is America in 1993. It is not the south in the 1950's, and, we must not allow these violent hate crimes to continue.

I urge my colleagues to join me in putting an end to the unlawful activities waged by protesters at clinics. Vote "yes" on the freedom of access to clinic entrances bill.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from California [Mr. CUNNINGHAM].

(Mr. CUNNINGHAM asked and was given permission to revise and extend his remarks.)

Mr. CUNNINGHAM. Mr. Chairman, some who say it is OK to burn the American flag, some who would have pornography funded by the National Endowment for the Arts cite the first amendment. Look at the union picket lines. They say, it is OK for those kinds of things to go on with the unions and their picketing, but try and stop someone that is stopping the loss of life, that is a different thing. That is a double standard.

Mr. Chairman, I rise today in opposition to H.R. 796. Union violence against a workplace, homosexual activists disrupting a Roman Catholic Mass, theft of student newspapers because one group deemed them racist, and, yes, violent trespass and vandalism of abortion clinics all share a common thread. Each one takes an inappropriate action to send a particular message.

While a union may or may not strike, its members may not sabotage a plant without subjecting themselves to the American justice system and sure punishment.

Now we want to make one type of protest subject to Federal punishment and impose a $100,000 penalty and a 1-year prison term. While homosexual organizations may have a dispute with the teaching of a church, disruption of a mass is trespassing at least and a strident violation of our first amendment freedoms.

Theft of a large number of publications is not just theft. It is a theft that does damage to our first amendment freedoms.

It must be pointed out that blocking access to any building is considered trespass under law, State law. Vandalism against private property is punishable by fines, prison terms and/or both.

This bill also goes against States' rights.

All this brings us to the legislation under consideration today, the Access to Clinic Entrances Act. Illegal as all the above activities are, this particular legislation creates a newer, higher level. This bill is unnecessary and I urge my colleagues to oppose it.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished gentleman from Wisconsin [Mr. KLUG].

(Mr. KLUG asked and was given permission to revise and extend his remarks.)

Mr. KLUG. Mr. Chairman, I spent 12 years of my life working as a journalist. No issue is more important to me than the first amendment. And so when this legislation was first introduced, I have to tell my colleagues that as somebody who considers themself pro-choice, I took a look at this legislation with some great trepidation.

I am not a lawyer by training, which frankly may be an advantage in life, but in this particular case, I do not think served me very well.

I asked two professors at the University of Wisconsin, who are experts in constitutional law, to see whether the first amendment specifically applied in this case and whether the rights of the first amendment were indeed protected.

I want to share something with Members that Prof. Larry Church wrote. He said, "This bill prohibits conduct, not expression," which is exactly the argument the gentleman from New York [Mr. SCHUMER] has made. "This is a crucial distinction," Professor Church writes.

He said,

> Last summer, a unanimous Court upheld a Wisconsin statute which enhanced the penalty for a crime if it was committed out of animus against "race, religion or color." Writing for the Court, Justice Rehnquist distinguished the Wisconsin law on the grounds that the St. Paul ordinance which was previously stricken found as unconstitutional was explicitly directed at expression, such as a speech or messages, while the Wisconsin statute was aimed at conduct unprotected by the First Amendment. Similarly, H.R. 796 is explicitly not directed at expression, but rather aims only at unprotected conduct.

□ 1400

So it is clear to me as a defender of the first amendment that the first amendment is protected under this language. The case of the gentleman from New York [Mr. SCHUMER] prevails, and in this case the right that now needs protection is the right of women to seek an abortion if they choose to do so.

I urge my colleagues to vote "yes."

Mr. Chairman, I include the correspondence I referred to earlier:

UNIVERSITY OF WISCONSIN,
*Madison, October 14, 1993.*

Re H.R. 796 and the first amendment.

To: Congressman Scott Klug.
From: Professor Ted Finman.

The Chancellor's office has asked me to examine H.R. 796 and give you my thoughts on how it fits with the First Amendment. I am pleased to do so and hope the following will be useful to you.

My overall conclusion is that H.R. 796 does not violate the protection which the First Amendment provides for speech and other communicative activities. Section (a)(2) deals with damaging or destroying property. It is difficult to see how such conduct could claim First Amendment protection. Thus I take it that the constitutional questions that have been raised are directed to Section (a)(1). As I read this provision, it prohibits the following:

1. intentionally injuring or attempting to injure someone;

2. interfering or attempting to interfere with someone through the use of force or a threat of force;

3. interfering with someone, or attempting to do so, by making entry or exist from an abortion facility unreasonably difficult;

4. using force or threat of force to intimidate or attempt to intimidate someone, or intimidating or attempting to intimidate someone by making entry or exit from an abortion facility unreasonably difficult.

None of these prohibitions restrict speech per se. Speech is prohibited if it constitutes a threat of force and is used to interfere with

someone's effort to obtain or provide reproductive services. That sort of speech, used for that purpose would not be considered protected by the First Amendment. H.R. 796 also speaks about intimidation. Here, however, it is critical to note that H.R. 796 does not prohibit intimidation itself. Rather it prohibits certain means of intimidation: intimidation brought about through the use of force, threats of force or obstruction of facilities. None of these means would be characterized as protected "speech" within the meaning of the First Amendment.

In brief, it is difficult to see how opponents of H.R. 796 could genuinely believe that its prohibitions violate the First Amendment. It may be that they are concerned with how law enforcement officials might apply such a law rather than with what the law says on its face. Section (d)'s exemption of picketing and other expressive conduct provides substantial protection against possible misuses of H.R. 796.

Nothing in a statute, of course, can eliminate all risks of this sort. However, so long as a statute is valid on its face, as H.R. 796 appears to be, the risk of misapplication does not make it constitutionally infirm. Perhaps more importantly, as a practical matter, if such a risk was a good reason for not adopting a law, we would have few laws of any sort. Indeed, if risk of abuse were a telling objective, many valid and useful laws that deal with communicative activity—laws that play a vital social role—would never have been adopted.

For example, many if not most municipalities have ordinances regulating the time and place of parades, marches and similar communicative activities. Experience demonstrates that such laws are subject to abuse. Yet most of us recognize that these ordinances fulfill critical governmental functions, and thus that abuses must be dealt with as they arise, not by foregoing the laws themselves.

It is, of course, difficult to assess the risk of misuse, and I do not purport to possess any expertise on this matter. My personal judgment, however, for whatever it may be worth, is that the risk of misuse of H.R. 796 is small. The watchful eyes of those who oppose abortion and of those who zealously support the First Amendment are likely to deter improper applications of the law. Certainly whatever risk remains will be no greater than the risks associated with many laws that we consider an essential part of our social fabric.

---

OCTOBER 14, 1993.

Re abortion legislation.

From: Larry Church.

This brief memo is in response to your request that I reply to a request from the office of Congressman Scott Klug to review the constitutionality of a bill, H.R. 796, (Amendment Substitute offered by Rep. Schumer) which would make it a federal criminal and civil offense to "block access to reproductive health services." Whether a law is constitutional, of course, depends ultimately on whether the Supreme Court says it is. In my judgment, at least a majority of the Supreme Court, and possibly all of the Justices, would sustain this law. Thus, I think the bill, if enacted, would pass constitutional muster.

The case that might most give pause to my conclusion is probably R.A.V. v. St. Paul, 112 S.Ct. 2538 (1992), in which the Court, per Justice Scalia, struck down a municipal ordinance that criminalized the placing on public or private property of symbols which arouse anger, alarm or resentment on the basis of race, religion or gender. The Court found that the ordinance prohibited expression only with respect to identified "disfavored topics," in violation of First Amendment guarantees of free speech.

H.R. 796 bans only interference with persons seeking or providing reproductive health services. It does not reach any other kind of interference. The bill provides injunctive relief and compensatory and punitive damages (including "statutory damages" of $5000 per violation, in lieu of actual damages) and reasonable attorney and expert witness fees, as well as criminal sanctions that start at one year in prison for a first offense. The bill would have the effect of limiting physical intimidation or coercion, and certainly violence, at abortion clinics—this is presumably precisely its purpose. Because of the severity of its criminal and civil sanctions, and because of the inevitable ambiguity of some of its key terms, (prohibited physical obstruction, for example, is defined in Section (f)(3) to include rendering passage to or from a reproductive health facility "unreasonably difficult") the bill might also induce caution on the part of those who plan only robust, but possibly also intimidating to some, demonstrations. Critics of the bill might thus argue that it does trench upon expression respecting a disfavored topic and so falls within the ambit of the R.A.V. case.

However, I do not think that the H.R. 796, if enacted, would be struck down by the Court. One reason for this is that the bill makes a determined effort to ensure that expression does remain protected. Section (d) explicitly exempts "any expressive conduct" protected by the First Amendment from coverage under the bill; and even though there must always be some ambiguity about operative terms in a statute, Section (a) includes as prohibited actively only that which "by force, threat of force, or physical obstruction, intentionally injuries, intimidates or interferes" with another person. The impact of these provisions is that the bill prohibits conduct, not expression. This is a crucial distinction. Last summer, a unanimous court upheld a Wisconsin statute which enhanced the penalty for a crime if it was committed out of animus against "race, religion, color, disability, sexual orientation, national origin or ancestry." (See Wis. Stat. 939.645(1)(b).) Writing for the Court, Justice Rehnquist distinguished R.A.V. on the grounds that the St. Paul ordinance was explicitly directed at expression, such as speech or messages, while the Wisconsin statute was aimed at conduct unprotected by the First Amendment. Similarly, H.R. 796 is explicitly not directed at expression, but rather aims only at unprotected conduct.

Another case that has a bearing on the issue is *Bray* v. *Alexandria Women's Health Clinic*, 113 S. Ct. 753 (1993), the decision which perhaps precipitated the drive to pass H.R. 796. In Bray, a mojority of the Court concluded that the Civil Rights Act of 1871, now codified at 42 U.S.C. Sec. 1985 (5), did not protect against obstructive demonstrations at abortion clinics. However, the Court held only that the old statute did not apply, not that Congress should not constitutionally pass such a statute. The reason the statute did not apply, the Court said, was because it covered only racial or other class-based discrimination.

Again, there is a critical distinction between a holding that a particular statute does not actually apply to abortion obstructions and one concluding that a different statute that did so apply would be unconstitutional. Justice Scalia's opinion for the Court in Bray goes only to the first point, not the second. Even this much was troubling to two concurring Justices. Justice Kennedy wrote: "Even in the context of political protest, persistent organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens." 113 S. Ct. at 769. Justice Souter concluded that although no finding of an actionable conspiracy had expressly been made, such a finding would have been "supportable on this record." 113 S. Ct. at 778.

For three dissenting Justices, (Blackmun, O'Connor and Stevens) the old 1871 statute did apply; and there was no doubt about the constitutionality of that: "The Court ignores the obvious (and entirely constitutional) congressional intent behind Sec. 1985 (3) to protect this Nation's citizens from what amounts to the theft of their constitutional rights by organized and violent mobs across the country." J. Stevens, dissenting, 113 S. Ct. at 780. (Emphasis added.)

In conclusion, I believe the Court would uphold H.R. 796 against constitutional attack. A woman's constitutional right to obtain an abortion was sanctioned, even created, by the Court itself twenty years ago in *Roe* v. *Wade*. For the Court now to strike down practical congressional support for the implications of that original decision could only severely undermine the decision itself. Given the recent decisions noted above (not to mention the replacement by Justice Ginsburg or Justice White, who was with the majority in Bray and dissented in *Roe* v. *Wade*) this does not seem likely, either in terms of free speech or abortion jurisprudence.

Mr. SENSENBRENNER. Mr. Chairman, I yield myself 1 minutes.

Mr. Chairman, I am a graduate of the University of Wisconsin Law School. One of the things they taught me there is, half the lawyers in the country are wrong, and they are the ones that lose their case. With all due respect to my colleague, the gentleman from Madison, WI, Mr. KLUG, the law professor that he quoted is wrong because the world "intimidation" is stated in the statute.

One can hold up a sign in front of an abortion clinic when standing in front of the entrance that says, "Don't kill your baby." That speech, that is intimidation, and that will result in a jail term and in a $250,000 fine. That is why the first amendment is violated. Remember, we do not need a first amendment to protect politically correct speech.

Mr. Chairman, I yield 2 minutes to the gentleman from California [Mr. DORNAN].

(Mr. DORNAN asked and was given permission to revise and extend his remarks.)

Mr. DORNAN. Mr. Chairman, the gentleman from Wisconsin [Mr. KLUG] and I are both Jesuit-educated. But I laid down in front of a sheriff's office in Mississippi, and I knew I was breaking the law and could be arrested. It was a peaceful demonstration similar to nonviolent protests led by Ghandi who learned this tactic in Ireland. What is wrong with the IRA in Ireland is that they abandoned this tradition and turned to violence. If they had stayed with the peaceful demonstrations that helped win 26 of those 32 counties independence in the beginning of the century, we would not have this tiny island nation still divided.

No, the gentleman from Wisconsin [Mr. KLUG] is wrong. I wish we could have had him here during the flag-

burning debate in which Morton Halperin was leading forces saying that to burn a flag in front of veterans in wheelchairs was not conduct but expression. If burning a flag is expression why isn't other forms of peaceful protest.

Civil disobedience, but peaceful, is protected in this country, and you must pay the piper and go to jail if you violate the law. Aside from the distinguished Black Caucus in this House, I wonder how many people in this House have put their body on the line in peaceful demonstration against laws that they have found were wrong.

Now my friend, and he is my friend, the gentleman from New York [Mr. SCHUMER], is dead wrong. To demonstrate his hypocrisy, I will quote his own words from the debate on the Animal Enterprise Act last year. In this debate, he, Mr. SCHUMER claimed, "violent attacks by extremist groups" is all we are after in this bill, continuing that, "This bill now focuses specifically on these attacks." He went on to say, "Most important, the amendment restricts the scope of the bill to serious offenses. Trivial instances will be left where they should be, to State and local systems."

I include for the RECORD a summary of violent acts by pro-abortion people, not human reproductive freedom people, but pro-abortion people, who insist on killing preborn children with souls ordained by God, at anytime in the womb through all 9 months.

Here are just a handful of instances of violence against peaceful pro-life demonstrators, including a Buffalo abortionist who assaulted pro-lifers with a baseball bat. The liberals are going too far here, Mr. Chairman. This will go to the Supreme Court. And it will lose.

Mr. Chairman, let me say that while I am a strong opponent of abortion on-demand, under no circumstances do I advocate or condone any violence or terrorist attacks against abortion clinics, an abortion practitioner, or other individuals involved in the abortion business. As someone who opposes violence against all human beings, born and pre-born, I find these acts to be reprehensible and horribly counterproductive to the message of the pro-life movement.

Furthermore, the harsh penalties of this legislation would not apply to those who block the doorway of a medical facility in order to protest animal research, promote AIDS funding, demand national health insurance, or whatever. In fact, no Federal offense occurs unless the impeding is done with intent to prevent or discourage any person from obtaining a reproductive health service—defined in the bill to include abortion and abortion counseling.

In fact, FACE seeks to create a Federal thought crime—a criminal offense defined in terms of anti-abortion motivation—which would, in effect, chill the exercise of our constitutionally protected first amendment rights.

If antiwar protesters during the Vietnam war were slapped with high fines and lengthy jail terms for trespassing or engaging in violence, the liberals in this House would have gone berserk. And if civil rights activists in the 1960's were afforded the same Federal penalties for participating in sit-ins and the like, the reaction would have been similar. Then and now, liberals would argue that Americans have the right to free speech.

But because the politically correct majority in the media and in Congress don't like to hear what some Americans have to say about abortion, they have decided to elevate the right to kill pre-born children above the constitutional right to freedom of expression. Make no mistake about it—the intent of this bill is to silence the entire pro-life movement.

The overwhelming majority of pro-lifers are peaceful and nonviolent. And many of the men, women, and children who demonstrate outside clinics are there simply to pray, sing, or provide information to women who are facing a crisis pregnancy.

The pro-life movement should not be condemned because of a handful of individuals who have engaged in actual violence. As a fellow abortion opponent has stated, "To blame the pro-life movement for such isolated events is like discrediting the anti-slavery movement because some zealous abolitionists burned the corps of slave owners." Moreover, I am confident that many in the homosexual, anti-war, animal rights, and the pro-abortion movement are equally appalled by violent individuals in their movements who misconstrue the message they are trying to convey.

But in reality, this bill does not seek to put an end to violence against abortion clinics and abortionists. Indeed, we already have laws on the books that punish violent and unlawful protesters. And I believe these laws should be enforced to the fullest possible extent. Yet this bill seeks to put an end not just to the violence but also to peaceful protesting and civil disobedience of pro-life activities only. No other interest group is subject to Federal criminal penalties.

Yet the FACE bill does not address specific acts of violence like the one that involved the murder of Dr. Gunn. Instead, it targets an entire movement that has the constitutional right to express itself through the free speech clause.

Why are not supporters of this bill concerned about acts of intimidation, violence, and destruction of property by pro-abortion activists?

Consider these examples:

A pro-abortion organization called Church Ladies for Choice demonstrated outside the Calvary Temple in St. Louis MO, in response to the Calvary's assistance in Operation Rescue's summer training program. They banged drums, shouted obscenities, and harassed and mocked churchgoers. When the police arrived, the mob began to turn on them. Six protestors were arrested on charges of assault and obstructing police.

A large group of pro-abortionists blocked the entrance to the Brooklyn Park Evangelical Free Church parking lot while pounding on and denting cars that dared to pass while shouting filthy obscenities at families.

A Right To Life office in Gainesville, FL, was firebombed when a proabortion activists tossed a molotov cocktail at the building.

Dr. Alan Ross, co-owner of a Gaithersburg, MD, medical clinic was found guilty of assaulting two abortion protestors—it was his second conviction in 3 months. He previously jammed a hypodermic syringe into the arm of an antiabortion activist.

A Buffalo abortionist was arrested in 1989 for attacking pro-lifers with a baseball bat.

Joe Scheidler, a pro-life activist, was visited by pro-abortion protesters who stood outside his home and screamed obscenities, then came through the yard and hung black hangers in the trees, on his screen door and on his porch lamp. They proceeded to ring the door and present his wife with a bouquet of hangers for her husband.

There are countless incidences prompted by other protest groups:

The blasphemous show by AIDS activists at St. Patrick's Cathedral in New York City a few years ago. In the name of homosexual rights, these people chained themselves to pews during Mass, then proceeded to spit on and pelt condoms at churchgoers.

On September 19, 2 months ago, the Hamilton Square Baptist Church was stormed by almost 100 homosexual activists who jostled churchgoers, threw rocks, assaulted police officers, and kicked down church doors. They also ripped down the church's Christian flag and replaced it with a homosexual flag, broke a cement bench, and caused over $2,000 in property damage. Later that day, they threatened to throw jars filled with gasoline through the windows of the church.

During the Vietnam war, campuses were bombed killing people, researchers were killed because they performed defense contracts. Speakers who supported U.S. intervention were commonly assaulted.

This bill is patently unconstitutional. It would set a precedent of making criminals out of people based solely on motivation. This contradicts the premise of our criminal justice system which seeks only to punish wrongful action, not wrongful thought.

That my colleagues are thumbing their noses at the impending slippery slope to all political crusades is incredible. If you don't think this legislation has the potential to completely outlaw peaceful protests and civil disobedience, which was effectively used by the late Rev. Martin Luther King, then I suggest you read this bill carefully.

With this said, I ask my colleagues to join me in opposing this outrageous piece of legislation.

Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from Indiana [Mr. SHARP].

(Mr. SHARP asked and was given permission to revise and extend his remarks.)

Mr. SHARP. Mr. Chairman, I rise in support of the bill and against growing violence against individuals who have the right of access to health and reproductive clinics, and also to protect the right of people to peacefully protest.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the gentlewoman from Michigan [Miss COLLINS].

(Miss COLLINS of Michigan asked and was given permission to revise and extend her remarks.)

Miss COLLINS of Michigan. Mr. Chairman, I thank the gentleman for yielding time to me.

Mr. Chairman, I support the Freedom of Access to Clinic Entrances Act and I want to make one thing clear: This bill is about protecting rights, not infringing them. H.R. 796 makes it a crime to use force or threats of force to obstruct access to a reproductive health clinic or to damage such a clinic.

It is important to understand that this bill does not infringe on anyone's rights. In fact, it would explicitly allow peaceful protest. No one is required under this legislation to put down their picket sign or stop distributing literature.

What this bill does require is punishment of those who use violence and intimidation to block people who are trying to get legal health care services. Our Constitution protects free speech. As an African-American and as a woman, no one understands better than I do that nonviolent civil disobedience is an effective means of social protest. The right to peacefully express one's views is a precious constitutional right.

But I believe in the adage that "Your right to swing your arm ends at my face." When anyone interferes with the constitutionally protected right of anyone to consult with his or her health care provider of choice, that conduct should be punished.

Again, this bill is about protecting basic rights. H.R. 796 sends a message that we will not tolerate violence or intimidation that interferes with constitutionally protected rights. It has a double thrust: It protects peaceful demonstration and the right to choose your doctor without fear of violence. that is something we should all support.

The CHAIRMAN. The gentleman from Texas [Mr. BROOKS] has 6 minutes remaining, and the gentleman from Wisconsin [Mr. SENSENBRENNER] has 3 minutes remaining.

Mr. SENSENBRENNER. Mr. Chairman, I yield 2 minutes to the gentleman from Texas [Mr. ARMEY].

Mr. ARMEY. Mr. Chairman, I rise in opposition to this legislation. I am greatly concerned about the impact H.R. 796 will have on freedom of expression. Trespass and other forms of uncivil disobedience are illegal in virtually every State and municipality of our Nation. Thus H.R. 796 is a solution in search of a problem. This bill has a fatal flaw. It discriminates one class of people by making their beliefs—in many instances religiously motivated—a Federal crime. There is no justification for such a new role by the Federal Government.

Mr. Chairman, today's debate is not about civil disobedience. It is about making civil disobedience on behalf of one particular cause a Federal offense.

Look at the evidence. Members of unions who threaten other employees or even destroy property and attack other workers are not covered by this bill. This is true despite the fact that their actions potentially threaten the free association and contract rights of their employers and fellow employees. So called gay rights activists who interrupt worship services across this Nation are not covered by this bill. This is the case even though their actions infringe on a right so fundamental, free exercise of religion, that the Founders of this Nation insisted on placing it first among the Bill of Rights.

Sadly, only those who seek to protect the lives of unborn children are covered by this bill. Regardless of your position on the legality of abortion, I ask my colleagues on both sides of the aisle to consider the consequences of today's act. Let us not start down the path of making Federal crimes out of what are essentially philosophical disputes. The American people deserve better.

Mr. SENSENBRENNER. Mr. Chairman, I yield the balance of my time to the gentleman from South Carolina [Mr. INGLIS], who has a very important point to make.

The CHAIRMAN. The gentleman from South Carolina [Mr. INGLIS] is recognized for 1 minute.

Mr. INGLIS of South Carolina. Mr. Chairman, hidden away in this bill is another reason to be against it, not just the dangerous tide of the federalization of law enforcement, which we seem to be about in the other body and in this body here every day here lately, but leaving that aside, there is another very important reason to oppose this bill. This bill gives a plaintiff a private right of action, a clinic a private right of action to bring a lawsuit against a protester. That protester may be a grandmother on the sidewalk handing out a leaflet, yes, simply extending her arm to give a pamphlet to someone. Viewed from inside that clinic, that will be seen as an aggressive act, one that requires immediate action, and a lawsuit is filed against the grandmother, the grandmother finds herself in court, and we have the litigation explosion and the expansion of it through this bill.

No other civil rights bill gives this private right of action. This one is unique. This one gives a private right of action no other civil rights bill does. Why is that? Is this such a fundamental thing that we have got to give fuel to the fire, the litigation explosion? Stop the litigation explosion. Stop this act.

☐ 1410

Mr. BROOKS. Mr. Chairman, I yield 2½ minutes to the distinguished gentlewoman from Washington [Mrs. UNSOELD].

(Mrs. UNSOELD asked and was given permission to revise and extend her remarks.)

Mrs. UNSOELD. Mr. Chairman, I would ask the gentleman who just spoke to remain in the body, that, in fact, there is other legislation that provides the same right for civil action, and this body passed it without objection last year, which is the access to animal research laboratories.

I will comment that for years radical antiabortion groups have been denying women's rights.

Mr. INGLIS of South Carolina. Mr. Chairman, will the gentlewoman yield?

Mrs. UNSOELD. I yield to the gentleman from South Carolina.

Mr. INGLIS of South Carolina. Is there not a difference though between that statute and this one? Is that not a fact?

Mrs. UNSOELD. It is the same right of access, same right of access.

A vast majority of people that are protected under this bill are women, women going into health clinics for cancer screening, or a Pap smear, or a treatment of a reproductive disorder. They may be seeking help, fertility help, or, yes, possibly an abortion.

But all that these women are asking for is protection of their rights without fear of physical harm, without being pushed and shoved, without having to fight their way into a clinic.

Please, oppose weakening amendments and support passage of the Freedom of Access to Clinic Entrances Act.

For years, radical anti-abortion groups have been denying women's rights and endangering women's health by blockading family planning clinics. In the past year, they have stepped up their attacks. First there was noxious butyric acid, arson and vandalism. Then in March, outside the Pensacola Women's Medical Clinic in Florida, a doctor was shot dead at point blank range. In August, a doctor was shot and wounded in Wichita, KS.

A recent survey found that one in two family clinics has suffered severe violence this year. One in two. These attacks have sparked national outrage and demands that the brutal ideologically based violence be stopped.

The clinic access bill can make the violence stop by imposing tough Federal penalties on those who obstruct and harass people entering clinics. It is carefully crafted to protect the first amendment rights of protesters by explicitly allowing peaceful protest—from picketing and praying to speeches and literature distribution—as long as that protest does not physically block those trying to enter or exit a clinic.

The vast majority of people protected under this bill are women—going to health clinics for a cancer screening or a Pap smear, treatment of a reproductive disorder or yes, possibly an abortion. All that these women are asking from us is protection of their rights without fear of physical harm, without being pushed and shoved, without having to fight their way into clinic. Please oppose weakening amendments and support the final passage of the Freedom of Access to Clinic Entrances Act.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the gentlewoman from Kansas [Mrs. MEYERS].

(Mrs. MEYERS of Kansas asked and was given permission to revise and extend her remarks.)

Mrs. MEYERS of Kansas. Mr. Chairman, I am in support of H.R. 796, the Freedom of Access to Clinic Entrances. There is probably no group of people more outspoken and independent than Kansans, and I would not support this bill if it attempted to impose a certain belief on anyone or if it prevented anyone from speaking their mind.

However, the bill we are discussing seeks to prevent stalking, bombings, arson, and acid attacks to enforce their viewpoint. This bill does not set a precedent. In the past we have addressed national problems with national solutions. Examples are some civil rights laws, and the animal facilities protection act.

We need to protect first amendment rights and we need to ensure that everyone in a community has the right to a full range of legal medical services, without fear of violence or intimidation. I believe this bill does both.

Mr. COX. Mr. Chairman, I rise in opposition to H.R. 796. This legislation would create a new Federal felony for certain kinds of trespass, assault, battery, disorderly conduct, and obstruction of public ways already covered by State law.

I oppose the creation of a Federal criminal code. Criminal law—from murder to trespass—is properly the province of the States. Only when peculiar interstate or international problems of criminal law enforcement render State law inadequate should Congress enlarge the Federal criminal jurisdiction.

Because the conduct complained of by proponents of this legislation is always localized—comprising trespass, disorderly conduct, obstruction of public ways, assault, battery, and like criminal offenses—it does not fall within this narrow exception. If this legislation were to pass, the Federal courts will be required to handle cases as simple as trespass or vandalism.

This new law would also require such offenses to be investigated by the Federal Bureau of Investigation and prosecuted by the U.S. attorneys' offices. Much unnecessary litigation—both criminal and civil because there are new Federal civil causes of action in this bill as well—would be added to the already crushing burden on our Federal court system.

The Smith substitute, while less broad than the underlying bill, likewise federalizes a broad range of State law crimes. For that reason, despite my very high regard for its author, I must vote against it as well.

Instead of seeing to it that justice is served, federalizing basic criminal law enforcement only makes our entire criminal justice system less efficient. That is why I intend to vote "no" on H.R. 796.

Ms. LONG. Mr. Chairman, as a Member of Congress, the issue of abortion is one of the most difficult issues on which I must vote. I have long supported the rights of States to pass restrictions, such as parental consent or notification, that they believe are appropriate. Today the Congress has the opportunity to vote on an amendment that appears to protect the parent-child relationship in such situations.

The Freedom of Access to Clinics Act would make it a Federal offense to use force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with anyone seeking reproductive health services. The DeLay amendment to this bill would exempt parents or legal guardians from penalties or civil remedies when their activities are directed at their minor child. In effect, this provision would allow parents to use force or threat of force against their daughter. I cannot support such a provision that would condone the use of force in such a situation.

Mr. CRANE. Mr. Chairman, I rise to oppose H.R. 796, the Freedom of Access to Clinic Entrances Act.

If the House should pass H.R. 796 as it was reported, we will prohibit the right to peaceful protest which is guaranteed in the first amendment of the Constitution. Moreover, this bill is specifically aimed at only one group of individuals, those who oppose abortion and are attempting to change its current legal status in the United States. Why focus on the pro-life protestors? Where is the concern about protestors during labor disagreements? Why not protect pro-life activists from violent pro-abortion groups? The limited scope of the bill certainly raises questions regarding equal protection under the law. The current language of the bill is so vague that the actions of individuals who peacefully stand before the entrance of a clinic are subject to the same penalties as the violent obstructionist protestors. This ambiguity could certainly lead to a flood of litigation.

While I oppose abortion on demand, I realize that those who perform abortions do have rights themselves. I condemn the actions of the individual who killed the abortionist Dr. David Gunn and those who have bombed clinics where abortions are performed. In fact, those seeking to protect the life of the unborn have condemned the Gunn slaying and the vast majority of organized pro-life demonstrators not only protest in a non-violent manner but have also condemned the violent actions of others.

Mr. Chairman, is it in the purview of the Federal Government to be involved in this issue? Absolutely not. Many States have laws on the books addressing some of the concerns raised during this debate. I believe that we must allow State and local governments to make these laws. If we do not, then we are merely extending the long arm of the Federal Government into every county courthouse and statehouse in America.

In my view, this bill will violate the constitutional rights of Americans to protest peacefully. For all of the above reasons, I urge my colleagues to reject H.R. 796.

Mr. FAZIO. Mr. Chairman, I rise in support of H.R. 796, the Freedom of Access to Clinic Entrances Act.

This is not about abortion, or the right to choose. It is about protecting patients and health care providers from the rapidly escalating violence that we have been witnessing at reproductive health clinics around the country. That is why, in spite of our differing views on the matter of choice, those of us who support this bill have come together on this issue. We believe that something must be done to stop the violence. We believe that individuals do not have the right to attempt to take the law into their own hands because they do not support a woman's right to obtain a safe, legal abortion.

Over the past 10 years we have seen over 1,000 incidents of violence and almost 500 blockades—not peaceful demonstrations—at reproductive health care facilities. One doctor has been killed. Another wounded. Patients and providers have been stalked and threatened. Clinic blockades and invasions, arson, chemical attacks, and bomb threats are all a part of this campaign. Yet, State and local laws have not been enough to address the scope of the problem.

But this bill gives the Federal Government the power to act when—and only when—protestors go beyond the lawful expression of their views and resort to acts of violence against those with whom they do not agree. The Freedom of Access to Clinic Entrances Act makes it a Federal crime to obstruct access to a reproductive health clinic or to damage such a clinic. It further makes it a Federal offense to force, threaten, obstruct, injure, intimidate or interfere with anyone seeking or providing reproductive health services.

The bill explicitly states that it does not apply to peaceful demonstrations, which are a form of expressive conduct that is protected by the first amendment. It does not violate anyone's right to free speech or to demonstrate peacefully. Protestors only break this law when their peaceful demonstrations turn into physical obstructions or, even worse, violence. The bill protects patients and providers and insures patient access, yet it allows those who choose to protest to do so peacefully, within their constitutional rights.

I respect the rights of those who believe that abortion is wrong. However, I also support a woman's right to access the complete range of reproductive health services, and the right of health care providers to render these services—without being assaulted or harassed. For too long, we have watched demonstrators, using physical obstruction and intimidation, prevent women from exercising their constitutional right to obtain an abortion. Enactment of the Freedom of Access to Clinic Entrances Act is long overdue.

Mr. ROSTENKOWSKI. Mr. Chairman, I rise today in support of H.R. 796, the Freedom of Access to Clinic Entrances Act. The increasing rate of vandalism, chemical attack, arson, death threats, and even shooting, is alarming. This legislation provides essential protection to health care providers and their patients.

In the past week, a group of protesters chained themselves to the Midwest Health Center, a clinic owned by Planned Parenthood of the Chicago area. This same clinic was one of three in the Chicago area that were struck by a chemical attack in 1992. Vandals poured a noxious acid through the clinic's mail slot, damaging carpeting, drapery, and furniture. At another health center in the city, vandals drilled a hole in the back door so they could

spray the chemical in. the clinics were forced to be closed for a day, denying access to medical services and birth control information to communities with some of the highest levels of teen pregnancy and infant mortality in the Nation.

Mr. Chairman, this legislation responds to a nationwide campaign to instill fear in doctors and patients. Regardless of our individual views on abortion, we all share an obligation to protect the safety of our constituents. We also share an obligation to protect free speech. I support this legislation because it protects both. This difficult and divisive issue must be fought with reasoned words and ideas, not vandalism and terrorism.

Ms. PELOSI. Mr. Chairman, I rise today in strong support of H.R. 796, the Freedom of Access to Clinic Entrances Act. This bill is a carefully considered, carefully drafted measure which would guarantee the protection of rights for people on both sides of the abortion issue to engage in peaceful protest. It would also extend protection for women seeking access to reproductive health services legally available to them and for providers who offer those reproductive health services.

In 1993, over 50 percent of clinics across the country offering reproductive health services have undergone extreme violence, including death threats, arson, chemical attacks, and bomb threats. In the past 2 months alone, 4 clinics in my home State of California have experienced dangerous and damaging acts, including an arson incident at one clinic in September which caused 1.4 million dollars' worth of damage.

H.R. 796 would provide for the imposition of civil and criminal penalties on individuals who intentionally prevent other individuals from entering or exiting a reproductive health facility. This measure is necessary because abortion issue extremists have too often overstepped their constitutionally protected rights of free speech and assembly and acted illegally, impeding and obstructing the constitutional rights of others.

H.R. 796 would explicitly protect constitutional rights by preserving the freedom to peacefully demonstrate under the first amendment at clinics. This bill would not prohibit or punish lawful activity such as the passing out of leaflets, praying in front of clinics, picketing and other protesting without force, threat of force or physical obstruction. The bill does prohibit the use or threat of force at clinic entrances.

The support the Freedom of Access to Clinic Entrances has—from both sides of the aisle and from both sides of the abortion debate—adds strength and credibility to this bill which would quite simply protect rights already guaranteed in the Constitution by punishing violent offenders.

Mr. Chairman, I urge my colleagues to vote against violence and to vote in favor of H.R. 796, without any debilitating amendments.

Mr. DELAY. Mr. Chairman, this bill has many problems. Later in this debate I will offer an amendment to protect the rights of parents to raise their own children.

Let's be very clear as to what we are doing on the floor of the House today. We are creating special rights for certain people and creating special penalties for certain groups of protesters.

My colleagues have heard several stories of violence committed by persons who oppose abortion. But far more prevalent than violence at abortion clinics is union violence.

I want to inform my colleagues about Eddie York from Dingess, WV. Eddie York is a victim of strike violence. He was 35 years old when he was killed by a single shot in the back of his head this past July.

Eddie worked for an independent contractor cleaning a reclamation pond at a mining operation. He had done this work for years. The mining company was being struck this summer. Eddie York did not even work for the mining company and his was not work performed by the union.

He was shot and killed in Logan County, WV, as he attempted to leave the mine. If my colleagues think it is dangerous to cross picket lines at abortion clinics, they should try to enter or exit most of the mines that are being struck. This mine was no exemption. People have to be escorted on and off the property, and most individuals will only drive in convoys for safety.

Two security vehicles escorted Mr. York and another person off the property. After the vehicles left the property and were driving on a public road, strikers began hurling rocks. Shots were fired from a wooded area; several shots hit other vehicles in the convoy. According to the police, the truck Eddie was driving was hit at least three times. One of those bullets was fatal.

One of the reasons for this violence is that Federal law provides no adequate remedies to deal with the problem of picket line violence. Historically, the National Labor Relations Board has dismissed complaints of violence as nothing more than examples of, in the words of one decision, mere animal exuberance.

While we have a national scheme for regulating union representation elections, collective bargaining negotiations, and picketing activity in connection with union organizing and collective bargaining, the NLRB refuses to address the violence that too often accompanies such activities.

The reason given is that violence is a matter best left to State and local authorities. What happens, unfortunately, is that those authorities are unwilling to get involved in violent strikes because their family members, friends and neighbors are involved. Also, many State and local police forces are represented by union themselves, and too often these police unions end up sympathizing with the strikers.

If we have a national labor policy that regulates collective bargaining, then we should have one that addresses picket line violence. Thousands of Americans have been killed, maimed and seriously injured because of picket line violence arising from labor disputes than have from violence occurring on picket lines at abortion clinics.

Eddie York's tragic death is not unique. Eddie's only crime was that he simply wanted to provide for his family. If Congress is going to take a strong stand against picket line violence, it should do so no matter what the reason for that violence.

Unfortunately, this House refuses to provide or even consider to provide equal protection under the law to hard working Americans subjected every single day to deadly union violence.

People entering abortion clinics will receive special protections under this bill that average Americans attempting to go to work do not receive.

I point out to my colleagues that they should make no mistake about what we are doing with this bill.

Support of this bill will provide more protection to people who want to kill the living than to people who want to make a living.

I urge my colleagues to oppose this bill.

Mr. ANDREWS of Texas. Mr. Chairman, since 1977, there have been over 1,000 recorded violent incidents outside family planning clinics. So far this year there have been hundreds of serious attacks against abortion providers—this includes arson, bombing, and incidents of severe vandalism. This year, in Houston alone, a clinic has been fire-bombed, gas has been poured through roof air vents severely damaging the building and beuyric acid has been used to damage two clinics. During many of these incidents, pregnant women were inside the clinics receiving prenatal examinations. Clearly this interference has gone far beyond the legitimate expression of views.

Attacks on patients continue to increase. Individuals responsible for these heinous acts do not, as they claim, hold peaceful demonstrations, but rather they terrorize patients and clinic personnel. At the very least they set up blockades which prevent staff and patients from entering or leaving clinics.

This bill does not send anyone to jail for exercising their constitutional rights. The truth of the matter is that it protects the rights of anti-choice and pro-choice advocates equally. The only rights that are not protected are those who choose to take the law into their own hands. That is why this legislation is supported by the American Civil Liberties Union, the National Association of Attorneys General and many pro-life organizations, just to name a few.

It is essential that we do more to secure the legal right to choose. We must protect the rights of those who provide legal abortion services from harassment. Too many physicians have had their and their families' lives threatened. We simply cannot allow this to continue.

Recent escalations of violence and blockades at clinics demand that we enact legislation to protect a woman's ability to exercise her constitutional right to an abortion. I urge my colleagues to support the Freedom of Access to Clinic Entrances Act.

Mr. SKAGGS. Mr. chairman, as a cosponsor of the Freedom of Access to Clinic Entrances Act I urge my colleagues to join me in passing this much needed legislation.

Simply stated, this bill would make it a Federal crime to attack or harass people at medical facilities where abortions are performed. We should not, and cannot, continue to condone the activities of a vocal minority who use force and intimidation to interfere with people who lawfully seek to obtain or provide reproductive health services.

As I'm sure everyone is aware, the recent escalation in violence against patients, doctors, and others entering and leaving medical clinics has been both vicious and deadly. Just this year alone, one doctor as shot and wounded by an anti-abortion protester in Kansas, and more tragically, a similar attack in Florida left another doctor dead. There have been all too many other instances of violence, ranging from drive-by shootings and bombings

to vandalism and shovings against people exercising their constitutional right to choose to have an abortion, those who assist them, and even people who happen to be visiting clinics on other business.

This kind of behavior is not acceptable and must not be tolerated. Of course, I respect and support the fundamental right of anti-abortion advocates to voice their opinion. The first amendment protects that right, and I am an unqualified supporter of the first amendment. But actions that interfere with the constitutional right of others to have access to reproductive health services have no more to do with the first amendment than any other criminal assaults.

When peaceful protests become violent confrontations, when a war of words becomes a war with victims, it's time to draw the line. We must ensure that people with a constitutional right to choose an abortion have the necessary freedom from harassment to exercise that right.

Based on tragic recent history, it is clear that existing laws are inadequate to prevent this violence or punish those who commit it. That's why it is urgently necessary that we enact the legislation before us today, and I urge my colleagues to join me in doing precisely that.

Mrs. LLOYD. Mr. Chairman, I rise in support of H.R. 796, the Freedom to Access Clinic Entrances Act [FACE]. I am dismayed by the senseless violence that has occurred in this country against both individuals seeking health services and providers of health care. I realize that many people have deeply held opinions on the subject of abortion. I believe that the right to voice or demonstrate ones' opinion is the essence of our democratic society. However, it is inconceivable to me that the divergence of convictions has led to intentional obstruction of individuals' access and personal freedom to medical services—not just abortion.

I believe that individuals should have the opportunity to access the best health care services available. I am outraged at malicious acts of violence that have occurred toward individuals and health facilities. These traumatic incidents have sent a frightening message across the United States, that individuals seeking or providing health services are now susceptible to threats, injury, or death. Our Founding Fathers did not create the first amendment to justify intrusion on our fellow citizens' civil and constitutional rights.

The FACE bill is a response to the threats and intentional interference that has plagued our health clinics. This bill would impose civil or criminal penalties to persons who intentionally prevent, injure, or intimidate other individuals from entering or exiting a medical facility. The measure would apply to all individuals, regardless of their views. This language does not amend the first amendment, nor does it infringe upon the fabric of the Constitution. H.R. 796 incorporates language from operative Federal statutes, such as the prohibition to use of threaten to use force to willfully injure, intimidate, or interfere with an individual's right to vote. Thus, the argument that this bill is unconstitutional, simply does not hold water.

I wholeheartedly support the first amendment of the Constitution—protecting the freedom of speech or the press, the freedom to establish a religion, the freedom to petition the Government, and the right to peaceably assemble. Everyone is entitled to express their views and I respect that. The first amendment is the backbone of this country and I hold it as a sacred right. However, you can't yell fire in a crowded theater. The first amendment is exploited when individuals inflict harm onto other individuals or violate others' civil and constitutional rights.

Mr. Chairman, H.R. 796 will not prohibit peaceful protesting, assembling, or picketing. This legislation maintains the right to voice one's opinions and assemble for something that is of great concern, as long as it does not present harm to others. I urge my colleagues to support this bill.

Mr. ENGEL. Mr. Chairman, I rise today in support of H.R. 796, the Freedom of Access to Clinic Entrances Act, and in opposition to any weakening amendments.

The need for this legislation is imminent. According to a recent nationwide survey of women's health care clinics which provide reproductive services, antiabortion violence is a serious and life-threatening intimidation tactic. Of the clinics participating in the survey, 50.2 percent have experienced severe antiabortion violence in the first 7 months of 1993. These violent acts included death threats, stalking, chemical attacks, arson, bomb threats, invasions, and blockades.

The violence has been extremely detrimental to the lives of health care workers and to the provision of health care services. Death threats and stalking have caused health care workers and patients to fear for their safety and their lives on a daily basis. The work of many clinics—which often includes low-cost prenatal care, birth control, infertility, and adoption as well as abortion services—has been disrupted regularly by blockades, chemical attacks, and invasions. In extreme cases, innocent lives have been lost, as in the murder of Florida physician, Dr. David Gunn. Clearly, antiabortion violence has created a health care crisis that demands immediate Federal intervention.

In fact, Attorney General Janet Reno testified before the Senate Labor Committee that no adequate remedy now exists to address this crime wave. Anti-abortion crusaders draw blockaders from around the country to overwhelm local law enforcement agencies in an effort to further their cause. As a result, local police departments are either unable, or unwilling, to deal with the scope of this activity, creating a situation analogous to the impetus of Federal civil rights legislation in the 1960's.

H.R. 796 will simply protect access to legal abortion services by prohibiting the use or threat or force that interferes with obtaining or providing reproductive health services. Lawful picketing and protest which is unaccompanied by force, threats of force, or physical obstruction, would not be prohibited and would be explicitly and fully protected by the act.

I urge my colleagues to support this legislation. We cannot continue to condone intimidation tactics and unchecked violence by ignoring the facts Vote in favor of H.R. 796.

Mrs. ROUKEMA. Mr. Chairman, I rise in support of H.R. 796, the Freedom of Access to Clinic Entrances Act and urge my colleagues to pass this legislation. This bill makes it a Federal crime to obstruct access to a reproductive health clinic, or to damage such a clinic. Under H.R. 796, it would become a Federal offense to use force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with anyone seeking or providing reproductive health services.

Local law enforcement is not always capable or willing to respond to abortion providers if violence or any disruption occurs. H.R. 796 remedies this by creating Federal penalties for impeding access to abortion services. H.R. 796 carries criminal penalties of up to $100,000 and up to 1 year in prison for a first violation, and up to $250,000 and 3 years in prison for a second violation.

It is absolutely vital to protect a woman's ability to exercise her constitutional right to an abortion. Eighty-three health facilities were blockaded last year, preventing access to these clinics which provide a range of health services, not just abortion. Women and children depend on such facilities for family planning, prenatal care, and childhood immunizations, as well as abortion. We also need to protect medical facilities from damage or destruction. Sixteen reproductive health clinics were burned and more than 100 incidents of vandalism were reported last year. The violence has escalated to murder and physical harm by use of firearms. We can not allow this to continue.

This is not to say that protesters will not be allowed any freedoms. The Freedom of Access to Clinics Entrances Act protects the rights of everyone to express their opinions. Picketing, prayer, and distributing pamphlets are considered free speech under the first amendment and are protected by H.R. 796. This bill also protects those entering the clinics and the clinics themselves. No one should be subject to violence. By supporting H.R. 796, you will be protecting women from intimidation, terror, and physical threats.

I urge you to support the Freedom of Access to Clinic Entrances Act. This act will allow people the right to oppose abortion, but these same people will not have a right to cause harm to anyone entering or inside an abortion clinic. Clinic violence will no longer be tolerated. Vote for H.R. 796.

Mr. STOKES. Mr. Chairman, I rise today in strong support of H.R. 796, the Freedom of Access to Clinic Entrances Act. I want to commend my colleague from New York, Congressman CHARLES SCHUMER, for crafting this legislation and for working so assiduously for enactment of this critical measure. His leadership in this regard has been especially important as in the last several years, our Nation has witnessed the escalating violence of anti-abortion extremists. Consequently, we have also observed the inadequacy of existing State and Federal laws, and the inability of local law enforcement authorities to curb the rising tide of violence against abortion clinics, doctors, health care workers, and women across the country.

In light of this grave situation, Mr. Chairman, we must recognize that a Federal response to this violence and harassment is absolutely necessary. H.R. 796 embodies that response by providing critically needed Federal civil and criminal penalties against persons engaging in

these heinous acts of harassment, intimidation, and violence. These sanctions will serve as powerful deterrents, curtailing the terror and extremism fueling the rising incidence of clinic violence nationwide.

As we have witnessed, this problem is national in scope and existing Federal law is inadequate to provide a complete remedy. The widespread violence has been extremely detrimental to the lives of health care workers and to the provision of health care services. Death threats and stalking have caused health care workers and patients to fear for their safety and their lives on a daily basis. Statistics show that reported death threats against doctors performing abortions have increased by 600 percent in the last year alone.

Moreover, the work of many clinics, which often provides comprehensive reproductive services including low-cost prenatal care, birth control, infertility, and adoption, as well as abortion services, has been disrupted regularly by blockades, chemical attacks, and invasions. In some cases, antiabortion violence has damaged clinic facilities or driven away clinic staff, forcing these facilities to reduce their patient load and the wide range of services they provide. Other clinics have had to cease operation altogether after their facilities were destroyed by fire or bombings, leaving thousands of women without adequate health care services.

Mr. Chairman, antiabortion violence has created a health care crisis that demands immediate Federal intervention. Antiabortion violence not only has curbed access to abortion, but also has prevented patients, particularly low-income women and their families, from receiving a wide range of health care services—poor women who depend on these clinics for their health care needs have been the primary casualties of antiabortion violence. Failure to pass this critical measure will pose a serious threat to not only a woman's access to reproductive health care, but the health care needs of children and families throughout this country.

Mr. Chairman, the violence and terrorism directed at women and medical personnel at clinics is already epidemic. To fight this epidemic we must enact the Freedom of Access to Clinic Entrances Act. H.R. 796 represents the best medicine to cure this epidemic and I urge all of my colleagues to vote in favor of H.R. 796.

Mr. EVERETT. Mr. Chairman, I rise today in opposition to H.R. 796, the Freedom of Access to Clinic Entrances Act, or FACE. I oppose this legislation not because it seeks to deter violent acts which have been perpetrated against abortion clinic personnel—I feel that such acts should be appropriately punished by law and agree that such violence as the murders of Dr. Gunn and Dr. Tiller cannot be tolerated.

However, to me, this bill is objectionable for two very basic reasons. First, it sets a dangerous precedent constitutionally by essentially criminalizing an individual's particular view point. Mr. Chairman, I am not aware of any penalties for other groups such as animal rights activists, striking workers, and so on, who are known for their vigorous styles of protest. Once again, there are those in this body who want to silence a specific movement and punish speech based on content.

Mr. Chairman, this bill's language is so broad and vague that I feel certain this will encourage more frivolous and time-consuming litigation which will burden our already overtaxed court system. Mr. Chairman, I am also concerned that, under face, there is no clear definition as to what injury is which only opens the door further to lawsuits brought by private individuals based on emotional or mental distress. Moreover, this bill puts peace-abiding nonviolent citizens in the same category as those protestors that employ less peaceful means. As a result, I feel the cumulative effect of this legislation is to ultimately discourage one sector of our society from expressing its constitutionally guaranteed rights of free speech.

In closing, let me say that this bill is a wolf in sheep's clothing. It claims to ensure freedom of access to one group, while denying access to the public arena for those individuals who wish to be heard on the issue of human rights in a peaceful manner. Mr. Chairman, I challenge my colleagues to make this vote a referendum, not on pro-life or pro-choice, but on the need to preserve free speech for all Americans. If we pass H.R. 796, we will have placed a foot in the door that will encourage the further erosion of the constitutional rights for other groups that those in Washington wish to silence.

Mr. Chairman, I urge my colleagues to vote to protect free speech; vote "no" on this legislation.

Mr. KYL. Mr. Chairman, I rise in opposition to the Freedom of Access to Clinic Entrances Act, H.R. 796.

The purported purpose of this bill is to help prevent violence against those who perform abortions. It creates Federal criminal and civil remedies against blockades, assaults, and other violent and threatening tactics by individuals who are motivated by their opposition to abortion.

I am troubled by an increasing trend to duplicate State criminal laws with new Federal laws when, first, State laws and law enforcement are not shown to be inadequate, and second, Federal courts are already overburdened.

Mr. Chairman, the murder of Dr. David Gunn in Florida was deplorable. It cannot be condoned under any circumstance. But, the fact is, it is a crime under Florida law, and the individual responsible for that crime was promptly arrested on a first-degree murder charge. There is nothing to suggest that the State of Florida has in any way been derelict in its duty, or that another law would have prevented the crime.

More than 2,600 pro-life protestors were arrested in Wichita in August 1991 after engaging in incidents of illegal trespass. Not only was a trespass law on the books, but obviously there was no question in the minds of local law enforcement authorities about enforcing it.

And, according to a memorandum dated October 7, 1993, by John Keeney, the Acting Assistant Attorney General, and circulated to U.S. attorneys around the country, a variety of Federal laws are also already available to deal with abortion-related violence. As Mr. Keeney stated in the memorandum, the full copy of which I will ask to be reprinted in the RECORD at the end of my statement,

Federal law enforcement has regularly responded to instances of arson or bombing of medical clinics which provide abortion services. Over the past decade, the Bureau of Alcohol, Tobacco, and Firearms and Federal prosecutors have solved and obtained convictions in many of these cases.

Assistant Attorney Keeney went on to list other statutes that might be invoked: The Hobbs Act, 18 U.S.C. 1951; Interstate Travel in Aid of Racketeering, 18 U.S.C. 1952; RICO, 18 U.S.C. 1962; Bombing or Arson, 18 U.S.C. 844(i); Interstate Communication of a Threat, 18 U.S.C. 875; and Telephone Harassment, 47 U.S.C. 223.

So the problem is not that the activities in question here are legal. They are not. It is not that local law enforcement authorities have failed to enforce those laws. They have.

If there is really a need to enhance the ability of law enforcement to deal with unruly protesters, it is not advanced by passing another law to be enforced. But, I suspect that the goal is not simply to duplicate existing State or Federal laws against criminal offenses, but really to chill even peaceful protests by those motivated by their opposition to abortion.

Mr. Chairman, that gets to another concern which I have: I believe the law ought to apply uniformly no matter what the motivation of the perpetrator. If a group of AIDS activists demonstrate outside an abortion clinic because that clinic's personnel allegedly refuse to care for persons who are HIV positive, they would not be subject to the penalties imposed by this bill. Yet, identical conduct by pro-life protestors at another clinic several miles away would be subject to the very severe penalties of this legislation just because they are motivated by their concern about abortion.

Can we really say that the conduct in the first instance in any less problematic than the second—that those involved in the pro-life protest are deserving of more punishment?

There should not be different penalties depending on the motivation of protestors. Why should animal rights activists, labor groups or AIDS activists be treated differently than pro-life protesters if their conduct is identical?

The effect of this bill is really to establish penalties so daunting, and define offenses so broadly, that few people would consider exercising their constitutional right to protest abortion, even in nonviolent ways.

Many will support this bill because they support access to abortion; but I suggest they should consider what happens when the government looks back on this legislation as a precedent to suppress other conduct and other causes in the future. This bill would put us on a slippery slope. We should be very careful about sanctioning assaults on free speech and expression. To do it in one popular case is to invite it in others that might not be so popular; but, the precedent will have been established.

The constitutional right to free speech and assembly is too precious to be risked on today's popular cause. This is especially so since all of the conduct proscribed by this bill is already adequately covered by other laws against violence and threats of violence.

Mr. Chairman, we don't need to consider a new Federal law every time someone breaks a State or local law—most States and localities already have laws on the books dealing with the offenses that would be covered here. Moreover, many communities are considering so-called bubble laws to provide a zone of protection to people seeking to enter a clinic. So long as such local ordinances apply to all establishments, not just abortion clinics, and

are not impermissibly restrictive on the right to exercise free speech and assembly on public property, such local ordinances would do more to resolve the problems than this legislation.

I urge my colleagues to oppose this bill, and I ask unanimous consent that the Kenney memo be reprinted in the RECORD at this point.

U.S. DEPARTMENT OF JUSTICE,
*Washington, DC, October 7, 1993.*

Memorandum to: All United States Attorneys.

From: John C. Keeney, Acting Assistant Attorney General.

Subject: Threats and Violence Directed Against Abortion Service Providers.

While most anti-abortion activity is comprised of peaceful picketing which is, of course, constitutionally protected under the First Amendment, recently there have been a number of forcible or violent acts or threats against providers of abortion services. This has led the Department to review the federal law enforcement response to such activity. This memorandum is intended to provide guidance to U.S. Attorneys in fashioning an appropriate response to anti-abortion threats and violence which violate federal criminal laws.

Federal law enforcement has regularly responded to instances of arson or bombing of medical clinics which provide abortion services. Over the past decade, the Bureau of Alcohol, Tobacco, and Firearms and federal prosecutors have solved and obtained convictions in many of these cases. However, there has not to date been a comparable effort to exercise jurisdiction under other federal statutes of potential applicability to anti-abortion violence. When there is a jurisdictional basis to respond to forcible or violent acts or threats against abortion service providers, U.S. Attorneys, in conjunction with their local FBI office, should move aggressively to fulfill their enforcement responsibilities. This is particularly critical in those jurisdictions where local law enforcement authorities are not responding effectively.

There are several federal statutes which may, in certain instances, be applicable to such threats and violence. The following is a brief review of some of those statutes.

The Hobbs Act, 18 U.S.C. §1951. This statute may, in certain circumstances, provide a basis for prosecution of persons who attempt to drive abortion clinic providers out of business through the knowing and deliberate use or threatened use of force or violence. Although the statute also requires proof of an adverse effect on commerce, the courts have concluded that only a *minimal* effect is required. Attached is a memorandum which explores in more detail the potential application of the Hobbs Act to forcible or violent protest activity designed to shut down the operation of an abortion clinic.

Interstate Travel in Aid of Racketeering, 18 U.S.C. §1952. This statute has potential applicability to persons who travel in interstate commerce with intent to commit any crime of violence to further an unlawful activity and thereafter engage in or attempt to engage in acts of extortion or arson.

RICO, 18 U.S.C. §1962. This statute makes it a crime to be a part of an enterprise, including a group of individuals associated in fact, engaged in interstate commerce that conducts, or conspires to conduct, its affairs through a pattern of racketeering that could include acts or threats of murder, arson, or extortion in violation of state law.

Bombing or Arson, 18 U.S.C. §844(i). This statute makes it a crime to damage or destroy, or attempt to damage or destroy, by fire or explosive, any building or personal property used in any activity affecting interstate commerce.

Interstate Communication of a Threat, 18 U.S.C. §875. This statute makes it a crime to transmit in interstate commerce any communication containing any threat to injure the person of another. Similarly, it is an offense under that same statute to transmit in interstate commerce, with intent to extort, any threat to injure the property of another.

Telephone Harassment, 47 U.S.C. §223. This statute makes it a crime to use telephone lines to engage in interstate telephone calls designed to harass.

When confronted with abortion clinic threats or violence in your district, you should promptly consider the application of these statutes in determining whether there is an appropriate basis for a federal response. If you initiate any investigations or prosecutions, or have any that are now ongoing, please advise the Terrorism and Violent Crime Section at 202-514-0849, so that we can remain aware of the action being taken in this area. Additionally, attorneys in that Section are available to address any questions you might have concerning the application of the statutes discussed above.

Mrs. MINK. Mr. Chairman, the issue that we debate today is *not* the right to an abortion, and neither is it the right to free access to abortion clinics. We know the answer to both of these questions. The right to choose to have an abortion is a fundamental right, and access to abortion clinics is absolutely necessary to protect that right. Today, that right is being challenged by violent actions of vigilantes, who use fear and terrorism to prevent the free exercise of health care.

Elements of the antiabortion movement have attempted to wrest this issue from reasonable protest to systematically conducting a highly coordinated campaign of terrorism and violence. The unfortunate subject of this violence are those who provide women's reproductive health care services and the women and children who seek their care.

Since 1977, more than 1,000 acts of violence have been committed against abortion clinics, their patrons or staff. These include 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, and 1 murder. These acts of violence do not only block women's access to abortion, but they also threaten the health of the women and children who rely upon these clinics for prenatal care and delivery, childhood immunizations, and contraceptive services. The Freedom of Access to Clinic Entrances Act, H.R. 796, seeks to protect these women and children and those who have been courageous enough to care for them.

H.R. 796 would effectively impede this radical element and protect access by establishing criminal penalties and a civil cause of action against anyone who "by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person because that person or any other person or class of persons is obtaining or providing reproductive health services, or intentionally damages or destroys the property of a facility because that facility provides reproductive health services * * *."

Those who oppose this legislation, or who seek to eviscerate it with weakening amendments, claim that this bill would somehow impinge upon their right to freedom of speech. This is a false argument. Nothing in this act will prohibit picketing, displaying signs, expressions of verbal opposition, praying, or any other lawful attempt to dissuade women from obtaining abortions.

Opponents of this bill also claim that it violates the first amendment in that the terms "physical obstruction", "interfere", and "intimidate" are unconstitutionally vague. Contrary to these assertions, this language is perfectly clear and would easily withstand a constitutional challenge. The Supreme Court has repeatedly stated as much as upholding identical language which has been used in well-established civil rights legislation.

Mr. Chairman, we must not allow the democratic process to be supplanted by a campaign of terrorism and physical harassment. Rather than allowing violence to determine social policy, the threat of punishment will deter overzealous anti-abortion activists to use appropriate protests to achieve their goals. Furthermore, these penalties are not excessive. They are no different from those found in laws which protect persons seeking to exercise their right to vote, or which protect access to public lands or courthouses.

Mr. Chairman, a great travesty is being perpetrated against law abiding citizens. This campaign of terror has been allowed to continue unabated. We must stand up against those who would allow threats, harassment, and violence take the place of debate and reason. Rather than let policy be decided by those who would kill, burn, or terrorize, this Congress must pass the Freedom of Access to Clinic Entrances Act.

Ms. ESHOO. Mr. Chairman, I rise today in support of the Freedom of Access to Clinic Entrances Act.

As an original cosponsor of this legislation, I believe it's vital for us ensure that all people have the right to obtain health care in safety—especially those seeking important reproductive services and the clinic workers who provide them.

Violent extremism in the name of virtue is more than a vice. It's criminal and must be prosecuted. No matter how passionately antichoice activists may feel about their cause, they should not be entitled to physically attack, blockade, or vandalize those with whom they disagree.

All across the nation, Operation Rescue and similar groups have engaged in a systematic conspiracy to use violence to deprive women of their constitutional right to reproductive services. Since 1977, opponents of choice have directed more than 1,000 reported acts of violence at abortion providers, including bombings, arson, death threats, kidnapings, assaults, shootings, and even murder.

Operation Rescue's "No Place To Hide" campaign terrorizes doctors and health care workers from coast to coast. Some doctors and their families are followed to work, school, and shopping, while others are harassed at home.

The most vivid example of this violence occurred last March when Dr. David Gunn, a physician who provided abortion services, was murdered by an antichoice protester in Florida.

Mr. Chairman, enough is enough. American women should not be held hostage to the terrorist tactics of antichoice extremists.

The Freedom of Access Act would remedy this situation by prohibiting the threat of force to interfere with obtaining or providing reproductive health services. At the same time, it would allow lawful picketing and protests that

are unaccompanied by force, threats of force, or physical obstruction.

I believe that this legislation strikes a proper balance between protecting the rights of free access and free speech. Access to reproductive rights must be ensured. And this bill is the right way to do it.

Mr. BROOKS. Mr. Chairman, I yield back the balance of my time.

The CHAIRMAN. All time for general debate has expired. Pursuant to the rule, the committee amendment in the nature of a substitute printed in the bill is considered as an original bill for the purpose of amendment and is considered as having been read.

The text of the committee amendment in the nature of a substitute is as follows:

H.R. 796

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

**SEC. 2. FREEDOM OF ACCESS TO REPRODUCTIVE HEALTH SERVICES.**

Chapter 13 of title 18, United States Code, is amended by adding at the end the following:

**"§ 248. Blocking access to reproductive health services**

"(a) PROHIBITING ACTIVITIES.—Whoever—

"(1) by force, threat of force, or physical obstruction, intentionally injures, intimidates, or interferes with any person, or attempts to do so because that person or any other person or class or persons is obtaining or providing reproductive health services; or

"(2) intentionally damages or destroys the property of a facility, or attempts to do so, because that facility provides reproductive health services;

shall be punished as provided in subsection (b) of this section and also be subject to the civil remedy provided in subsection (c) of this section.

"(b) PENALTIES.—Whoever violates subsection (a) of this section shall—

"(1) in the case of a first offense, be fined under this title or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined under title or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years of for life.

"(c) CIVIL ACTIONS.—

"(1) RIGHT OF ACTION GENERALLY.—Any person who is aggrieved by a violation of subsection (a) of this section may in a civil action obtain relief under this subsection.

"(2) ACTION BY ATTORNEY GENERAL.—If the Attorney General has reasonable cause to believe that any person, or group of persons, is aggrieved by a violation of subsection (a) of this section, the Attorney General may in a civil action obtain relief under this subsection.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—If an attorney general of a State has reasonable cause to believe that any person or group of persons is aggrieved by a violation of subsection (a) of this section, that attorney general may in a civil action obtain relief under this subsection.

"(4) RELIEF.—In any action under this subsection, the court may award any appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory and punitive damages for each person aggrieved by the violation. With respect to compensatory damages, the aggrieved person may elect, at any time before the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation. The court may award to the prevailing party, other than the United States, reasonable fees for attorneys and expert witnesses.

"(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution.

"(e) NON-PREEMPTION.—Congress does not intend this section to provide the exclusive remedies with respect to the conduct prohibited by it, nor to preempt the legislation of the States that may provide such remedies.

"(f) DEFINITIONS.—As used in this section, the following definitions apply:

"(1) REPRODUCTIVE HEALTH SERVICES.—The term 'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system.

"(2) FACILITY.—The term 'facility' includes the building or structure in which the facility is located.

"(3). PHYSICAL OBSTRUCTION.—The term 'physical obstruction' means rendering impassable ingress to or egress from a facility that provides reproductive health services, or rendering passage to or from such facility unreasonably difficult.

"(4) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

**SEC. 3. EFFECTIVE DATE.**

This Act takes effect on the date of the enactment of this Act, and shall apply only with respect to conduct occurring on or after such date.

**SEC. 4. CLERICAL AMENDMENT.**

The table of sections at the beginning of chapter 13 of title 18, United States Code, is amended by adding at the end the following new item:

"248. Blocking access to reproductive health services.".

The CHAIRMAN. No amendment to the substitute is in order except the amendments printed in House Report 103-373. Each amendment may be offered only by a Member designated in the report, shall be considered as read, and is not subject to amendment.

Debate time on each amendment will be equally divided and controlled by the proponent and an opponent of the amendment.

The CHAIRMAN. It is now in order to consider amendment No. 1 printed in House Report 103-373.

AMENDMENT OFFERED BY MR. MC COLLUM

Mr. MCCOLLUM. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Amendment offered by Mr. MCCOLLUM:

Page 5, line 1, strike "Rule" and insert "Rules".

Page 5, line 1 insert "(1)" before "Nothing".

Page 5, after line 5, insert the following:

(2) Nothing in this section shall be construed to interfere with the authority of States to enforce State or local laws regulating the provision of reproductive health services.

The CHAIRMAN. Pursuant to the rule, the gentleman from Florida [Mr. MCCOLLUM] will be recognized for 5 minutes, and a Member opposed will be recognized for 5 minutes.

Mr. BROOKS. Mr. Chairman, I claim the time for the 5 minutes.

The CHAIRMAN. The gentleman from Texas [Mr. BROOKS] will be recognized for 5 minutes in opposition.

The Chair recognizes the gentleman from Florida [Mr. MCCOLLUM].

Mr. MCCOLLUM. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, the amendment that I offer today is the result of a compromise worked out between my colleague, the gentleman from New York [Mr. SCHUMER], and myself that addresses a fairly narrow but nonetheless important issue related to H.R. 796.

Under the bill as currently written, an individual can pursue litigation against an individual who "by force, threat of force, or physical obstruction * * * interferes with any person or any other person or class of persons" who is "obtaining or providing reproductive health services." Unfortunately, the effect of this language could be to unintentionally cripple most or even all constitutional State regulations regarding abortion, including regulations that serve solely to protect the health of women who are seeking to obtain abortions.

For example, an unlicensed late-term abortionist would have a civil cause of action for compensatory damages and punitive damages against State officials who attempt to prevent the abortionist from performing an illegal abortion. Clearly, that was not the intention of the authors of this bill.

Consequently, I offered in the Rules Committee an amendment that would have limited coverage to those offering legal abortions. My colleague, Mr. SCHUMER, also offered a second-tier amendment that would have addressed this problem. The amendment that I am offering today is, as I have noted, a compromise between my amendment and the Schumer amendment.

Under the provisions of this amendment, nothing in H.R. 796 would be construed to interfere with the authority of States to enforce laws regulating reproductive health services.

Mr. Chairman, I have deep reservations about H.R. 796, but the amendment that I am offering addresses a narrow but serious issue that, if uncorrected, could have a profoundly negative impact on the ability of States and localities to protect the health of women who seek abortions.

Mr. Chairman, this compromise amendment is a prudent and sensible approach and I urge that it be adopted.

Mr. SCHUMER. Mr. Chairman, will the gentleman yield?

Mr. McCOLLUM. I am happy to yield to the gentleman from New York.

Mr. SCHUMER. Mr. Chairman, I want to rise in support of this amendment which was jointly introduced by the gentleman from Florida and myself.

It is an important amendment to clarify what we intend to do and what we do not intend to do with the legislation.

As the gentleman from Florida stated, it was never the intent of this legislation that State laws should be preempted, so it makes clear that the FACE bill does not preempt other State and local laws regulating the provision of reproductive services, the kind of laws that would be constitutional restrictions on abortions, medical regulations, laws regarding manner of providing reproductive services, who can perform such circumstances, safety regulations, et cetera. None of that was intended to be overruled by the bill.

It does, of course, maintain the supremacy of Federal law over conduct that violates this act so that States cannot pass contrary laws in an effort to negate FACE, and so by doing this amendment, we are clarifying that, what we want to do with the bill, not overruling existing State laws.

Mr. Chairman, I appreciate the cooperation and support and always gentlemanly intellectual and keen spirit of the gentleman from Florida.

Mr. McCOLLUM. I thank the gentleman. It has been a pleasure working with him.

Mr. Chairman, I reserve the balance of my time.

Mr. BROOKS. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, it is always a pleasure to see Republican and Democratic members of the Committee on the Judiciary working together.

Mr. Chairman, I rise in support of this amendment offered by the gentleman from Florida [Mr. McCOLLUM], a distinguished member of the Judiciary Committee.

Mr. Speaker, the Committee on the Judiciary had absolutely no intent of preempting State or local laws governing the provision of reproductive health services. By adding a rule of construction that there is no such preemption to be found anywhere in the bill, the amendment is merely a clarification of our intent to leave such laws in place.

H.R. 796 also specifically states that Congress does not intend to preempt State laws providing remedies with regard to its prohibited conduct. Of course, should a State or local government pass a law permitting the very blockades or other activities outlawed by this bill, Federal law would prevail, as it must.

I think the amendment offered by the gentleman from Florida is a very useful clarification, and I urge its adoption.

Mr. Chairman, I yield back the balance of my time.

Mr. McCOLLUM. Mr. Chairman, I yield back the balance of my time.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Florida [Mr. McCOLLUM].

The amendment was agreed to.

The CHAIRMAN. It is now in order to consider amendment No. 2 printed in House Report No. 103-373.

AMENDMENT OFFERED BY MR. DELAY

Mr. DELAY. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Amendment offered by Mr. DELAY: Page 3, line 8, strike the period and insert the following: ", except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor."

The CHAIRMAN. Pursuant to the rule, the gentleman from Texas [Mr. DELAY] will be recognized for 15 minutes, and a Member opposed will be recognized for 15 minutes.

The Chair recognizes the gentleman from Texas [Mr. DELAY].

☐ 1420

Mr. DELAY. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I want to thank you for the opportunity to offer ny amendment to H.R. 796, the Freedom of Access to Clinics Act.

As you know, proponents of H.R. 796 claim that the Freedom of Access Act, championed by Senator KENNEDY, protects individuals who enter abortion clinics from harm. The hype surrounding this bill has been intensified by the tragic Pensacola shooting in which Dr. Gunn, an abortion doctor from Pensacola, FL, was violently killed by a criminal who can hardly be characterized as pro-life. The minute he pulled the trigger he proved otherwise.

It is my strong belief that people who commit violent acts should be prosecuted to the full extent of the law. Any person who would intentionally damage, destroy property, or commit acts of violence should be penalized. Opposition to H.R. 796 in no way condones acts of violence. The bill simply extends beyond its stated purpose.

However, the language of H.R. 796 creates a new cause of action whereby parents and legal guardians can incur civil and criminal penalties for activities you and I regard as normal parenting. I know that my colleagues on both sides of the aisle share this concern with me. The loosely defined language on page 5 of the bill defines physical obstruction as "rendering passage to or from such facility unreasonably difficult."

In addition, many Members may not be aware that under the current language of the bill, a parent who interferes with his or her daughter in their own home whether it be refusing to lend them the car or even a verbal reprimand making passage to a facility difficult can be fined and arrested—even in States where parental consent is required.

The amendment I am proposing is the same as that found in the Kennedy bill and simply exempts the parent or legal guardian from penalties resulting from activities directed toward his or her minor child. I would like to point out that this exemption applies only to parents and their minor children and does nothing to exempt adults whose activities are directed at other minor children.

This exemption in no way interferes with, displaces or affects child abuser or related laws; rather, this amendment simply says that this particular act does not create a new cause of action against parents or guardians.

I believe that this exemption should be included to protect parents from being penalized for raising their children.

Mr. Chairman, I reserve the balance of my time.

The CHAIRMAN. Does the gentleman from Texas [Mr. BROOKS] rise in opposition to the amendment?

Mr. BROOKS. Yes, Mr. Chairman, I do.

The CHAIRMAN. The gentleman from Texas [Mr. BROOKS] will be recognized for 15 minutes.

The Chair recognizes the gentleman from Texas [Mr. BROOKS].

Mr. BROOKS. Mr. Chairman, I yield myself such time as I may require.

Mr. Chairman, I rise in opposition to this amendment.

Before we vote on this amendment, let us be very clear about what it is about and what it is not about. It is not about obtaining parental consent before a minor can obtain an abortion. The majority of States already have laws requiring parental consent or notice before a minor can obtain an abortion. H.R. 796 does not change those laws in any way. It also does not apply to peaceful persuasion or to counseling of minors by their parents or their legal guardians against abortion.

What the amendment is about is allowing a person to physically obstruct another person from entering a building, or destroying a building. How, might I ask, are the police to determine that the person making the claim to be a young woman's parent actually is her parent? How are the police even to determine if a young woman is a minor? Ask each young woman for an I.D.? What if she refuses? Should she go straight to jail? Obviously, the amendment does not bother to consider such issues nor does it worry about subjecting police to liability for failing to enforce a basically unenforceable provision of law.

However well-intentioned, this amendment has a great potential for mischief, or worse. I urge my colleagues to reject this amendment.

Mr. Chairman, I reserve the balance of my time.

Mr. DELAY. Mr. Chairman, I yield 2 minutes to the distinguished gen-

tleman from California [Mr. CUNNINGHAM].

Mr. CUNNINGHAM. I thank the gentleman for yielding this time to me.

Mr. Chairman, if you have a child who is underage and is going to approach an abortion clinic without your permission, I would think that you would want to stop them. I would think my colleagues on both sides of the aisle would want the same right to do that without coming under $100,000 fine or a year in jail; because, I tell you, I have an 11-year-old and a 15-year-old daughter and if either one of them tried to go into an abortion clinic, I would stop them. As their father, I am going to do everything I can to protect them.

I think people on both sides of this issue would support that. That is what this amendment is about. It says that a parent who has an underage child who is going to enter an abortion clinic, can stop them. That is not unreasonable. I do not know which side of the issue you are on on this thing, but I look at the entire bill.

This is a parent's responsibility to a child. I would ask my colleagues to support it.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished Member, the gentlewoman from Maryland [Mrs. MORELLA].

Mrs. MORELLA. I thank the gentleman for yielding this time to me.

Mr. Chairman, I urge my colleagues to oppose the DeLay amendment. I recognize how appealing this amendment will be to many Members, but it actually has serious repercussions.

First, please think about what this amendment actually does. It states that parents should not be prevented from using force, the threat of force or physical obstruction if their daughter is seeking to obtain reproductive health services. We are talking about the use of force or threat of force. I don't think that any of us approves of child abuse.

Second, the language challenges the bypass requirement for state parental laws. The Supreme Court has confirmed that such a bypass must be part of these laws. This bypass mechanism is required because there are situations in which a minor does not feel that she can obtain consent, such as the fear of physical violence.

To give an example, a minor could have followed the legal recourse provided to her, and could have obtained a bypass from a judge. She could then go to a clinic to obtain an abortion. However, her parent finds out and forcibly requires her to leave the clinic. This minor has just been denied her rights under the law, and will clearly have to confront the physical violence for which the bypass requirement was established.

This amendment is a dangerous one, and I urge you to defeat it. We cannot condone force against minors by their parents. It is terrible public policy, and I urge a no vote on the DeLay amendment.

☐ 1430

(Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from Florida [Mr. HASTINGS].

(Mr. HASTINGS asked and was given permission to revise and extend his remarks.)

Mr. HASTINGS. Mr. Chairman, I rise in opposition to the amendment and in strong support of the freedom of access bill, a bill which I cosponsored.

This bill will give the Federal Government the power to act when State or local government cannot or will not act to guarantee access to clinics where women go for essential reproductive health services. Many of these services are preventive in nature as such as prenatal care, pap smears, and mammograms. We cannot permit people to physically block access to a place where women, oftentimes poor women, turn for essential medical assistance.

The naysayers say this bill will stifle free speech. They say it will discriminate against protest and civil disobedience by the pro-life movement. I say protest all you want, speak out all you want, but do not physically prohibit any woman from medical treatment. In Florida one doctor already lost his life, we don't need any other lives lost to this senseless violence.

Mr. DELAY. Mr. Chairman, I yield 2 minutes to the gentleman from New Jersey [Mr. SMITH].

Mr. SMITH of New Jersey. Mr. Chairman, I thank my friend for yielding this time to me.

Just let me say to the members of the committee, we are talking about a very simple amendment that seeks to preserve and protect the rights of parents to act in the best interests of their minor daughter. That is all this amendment does. It says that the Federal penalties which could include 1 year in prison, $100,000 in fines for the first offense, 3 years in prison, $250,000 fine for the second offense, if you just say "no" to your daughter to an abortion that she may be contemplating.

This violates parental rights; that is to say if the language of the bill were to prevail and the amendment of the gentleman from Texas [Mr. DELAY] were not to prevail, I think it would set a wedge between children and their parents. That ought not to be what children's rights are all about, trying to divide families.

We ought to be promulgating and promoting policies in this Chamber that provide for healing and provide for opportunities for families to grow and to nurture, not to break them apart.

I can foresee instances, particularly with the physical obstruction provision where a mother or a father perhaps might stand in the doorway of their own home and say to their minor daughter, "Please, don't go out and procure that abortion. Please, you've got a 6-month gestation baby growing and being nurtured inside of you. Please don't go down to that abortion clinic, where chemical poisons will be injected into that baby."

That would be an actionable offense under the provisions of H.R. 796. That, Mr. Chairman, is outrageous.

The DeLay amendment is modest. It is very simple and I think it protects parents' rights in a way they ought to be protected.

If child abuse or something else is committed, there are already laws on the books. Every State of the Union has them. Every municipality has laws where if some kind of coercive action is taken against that minor, that is actionable and ought to be, but to make it a Federal crime to say to your daughter, "Please don't go," and perhaps to stand in the doorway of your own house saying, "Please don't go," that would be actionable and a Federal crime, that is outrageous.

Mr. BROOKS. Mr. Chairman, I yield 3 minutes to the distinguished gentlewoman from Colorado [Mrs. SCHROEDER].

Mrs. SCHROEDER. Mr. Chairman, I thank the gentleman for yielding this time to me.

First of all, let me answer the prior speaker. Of course, the parent can say, "Just say no." The parent can talk, the parent can cajole, the parent can do anything except engage in force or threat of force.

This is a difficult amendment to speak against, because on first blush it looks like where we should be going, and oh, how I wish we could pass this amendment and mandate normal parenting for everyone in America and live happily ever after.

But unfortunately, most of our State legislatures have come to terms with this issue. If we pass this amendment we will be undoing what they did. State legislatures have come to terms with this issue. If we pass this amendment we will be undoing what they did. State legislatures in trying to deal with this very complex issue have said, "Look, we're going to say parental consent, but with a judicial by-pass," because if a young person says, "I'm going to be beaten, I'm going to have all sorts of things done."

If this happens, they have the right to go to a judge or someone and get a judicial bypass around their parents if they are truly under that threat of force.

So most of our State legislatures have had the courage to find an escape valve for young people who are trapped in a family situation that is not normal, where violence is more the course than we would like to admit happens in America's families.

What we will do if we pass this amendment is totally negate that, because what will happen then is even if the young person has obtained the judicial bypass, there will be absolutely no way they could still get the services they needed if the parent proceeded to put forth in front of them, what the bypass is trying to avoid.

Second, it would open up a whole new area, and it is for young people trying to get reproductive services, just nor-

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 36 of 49

mal reproductive service. They may very will be sexually active and not able to communicate that with their parents, and if their parents find out supposedly through threat of force, they could prevent this.

You know, 20 percent of young people are coming down with STD's every year, I do not think any parent wants to deal with that, but some parents deal with it better than others and some are able to have very good discussions with their young people and others are not.

How I wish we could move it so that everybody did; but if we pass this, what we will be doing is legalizing acts of force of a parent against a child. I do not think that is where we want to go.

We will be undoing the very important judicial bypass laws that have been worked out when we have seen young people commit suicides and do other things in these kinds of situations where they could not converse with their parents, and we could also be preventing young people from getting reproductive services when they need them, but feel their parents would not allow.

Mr. Chairman, I urge a no vote.

Mr. DELAY. Mr. Chairman, I yield 3 minutes to the gentleman from California [Mr. DORNAN].

Mr. DORNAN. Mr. Chairman, if I heard the gentlewoman correctly, she said parental rights are awfully difficult to speak against, and boy, should they be.

I knew it would come to this someday. That this father of five and grandfather of nine would be in the position of becoming a criminal when exercising my parental rights over any one of my five children who ever was to contemplate killing one of my grandchildren.

Now, my five are all grown up and in their thirties, and they are five dynamic pro-life young men and women. A couple of them are big in animal rights, too, way beyond any bill I have ever endorsed, but they do have a consistent ethic of respect for life.

I would say to my friend, the gentleman from New York [Mr. SCHUMER], and I do mean my friend, that with some precision the gentleman has tweaked the NRA about their inability ever to make concessions, to be purists right down the line. Yet when it comes to this issue the gentleman himself won't budge.

As for the gentlewoman from Colorado [Mrs. SCHROEDER], she thinks she knows more than most parents.

When it comes to my kids the gentlewoman does not know more than this parent or this grandparent. And when a parent believes that it is a human life in their daughter's womb, then that parent has a right to do whatever they think is required to stop their child from killing their unborn baby. And it is a baby. Did you ever wonder why abortionists who use ultrasound technology to tear the babies apart always divert the screen away from the mother who is allowing the child to be ripped apart in her womb? This remarkable technology is used in killing today. Getting back to the amendment, a vote against the DeLay amendment is a vote against parents.

Mrs. SCHROEDER. Mr. Chairman, will the gentleman yield?

Mr. DORNAN. I am glad to yield to the gentlewoman from Colorado.

I am going to wear my Ranger green sweater tomorrow. It is like a peacock. I can use it to call attention to this side, the father's side, of the parental equation. As Ross Perot said, it takes two to tango.

Go ahead, I yield to the gentlewoman from Colorado.

□ 1440

Mrs. SCHROEDER. Mr. Chairman, is the gentleman asking me to tango?

Mr. DORNAN. Mr. Chairman, how might I interpret that?

Excuse me one second. I ask the gentlewoman, Have you heard Rush Limbaugh's parody of John Lennon's obnoxious song about imagine, in which here is the line "imagine no religion"? Rush has improved it by changing it to, "Imagine there's no liberals." And while I'm at it, did you see the special last night on Denmark? There 10, 11, 12, 13-year-old girls are having sex, carousing, drinking, and smoking. And who do they go to in order to to justify expatriots in Denmark engaged in child pornography? Liberals. American liberals wrecking our culture.

This is all part and parcel of the same culture war that is just heating up. Passing this bill will add to it.

The CHAIRMAN. The time of the gentleman from California [Mr. DORNAN] has expired.

The Chair recognizes the gentleman from Texas [Mr. BROOKS].

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the gentlewoman from Colorado [Mrs. SCHROEDER] so she might pose her questions and make her statement.

Mrs. SCHROEDER. And I will even be happy to loan my green suit to the gentleman from California [Mr. DORNAN] if he likes it so much.

But let me just clarify one more time what I am trying to say because I think it might have been just a bit distorted, and I would like the record to be clear, Mr. Chairman.

I, too, am a parent, and I think I am a very caring parent, and I think all of us who are caring parents try tremendously all the time to have dialog with our young people. Now I think the gentleman from California does that, and I hope I have done a good job of doing that. My children are now older, too, and luckily we got through all those difficult years.

Mr. DORNAN. Probably all good liberals like mine are all good conservatives.

Mrs. SCHROEDER. No, but unfortunately we do not all have perfect families, or we do not all have families with this kind of ability to have dialog, and to talk to their young people and that have built this trust, and what I am talking about here is, No. 1, young people who may want to go to clinics talk to their parents, and their parents threaten them tremendously if they do go to a clinic for reproductive services.

Mr. DORNAN. Does the gentlewoman mean they threaten to cut off their inheritance if they——

The CHAIRMAN. The Chair advises the gentleman from California that he must ask the gentlewoman from Colorado to yield.

The gentlewoman from Colorado [Mrs. SCHROEDER] may proceed.

Mrs. SCHROEDER. Yes, and the gentleman from California [Mr. DORNAN] must call me a gentlewoman even if he does not think I am one.

Mr. DORNAN. I do it all the time.

Mrs. SCHROEDER. Oh, good.

But the gentleman must realize that under the bill you can say anything, you can cut off their inheritance, you can argue, you can do whatever you want in that manner, but violence is what is prevented by this bill, and let us hope that we start lowering the level of violence everywhere, and I doubt very seriously that the gentleman really meant he would stoop to violence against his own children because I think he is so verbally skilled that he would never have to do that. I luckily was verbally skilled enough that I never had to do that, but what we are talking about is incidents——

Mr. DORNAN. Mr. Chairman, would the gentlewoman yield for a short question?

Mrs. SCHROEDER. Let me finish.

The CHAIRMAN. The time of the gentlewoman from Colorado [Mrs. SCHROEDER] has expired.

Mr. DORNAN. All I did was get lectured.

Mr. DELAY. Mr. Chairman, I yield myself the balance of my time which, I believe, is 4 minutes. Is that correct?

The CHAIRMAN. The gentleman is correct.

Mr. DELAY. Mr. Chairman, I think this opposition is really unfortunate. I would like to speak to the bill itself. I think it is a terribly written bill. This bill violates what this country is all about just to protect some abortion clinics and to protect a certain group of people that believe in abortion and want to violate the first amendment rights of American citizens.

But be that as it may, I cannot believe what I have just heard in opposition to this exemption, the smoke that has been blown over this bill in trying to manipulate what my amendment is about. It is just mind-boggling. I guess nothing is scared to the liberals. They want to come into people's houses, tell parents how to act. The argument has nothing to do with force, I might add to the gentlewoman from Maryland and the gentlewoman from Colorado, because, if they read the bill, as I have read the bill, it does just talk about force and threat of force or physical obstruction. But it also talks about in-

timidation and interfering. Interfering can be said about a father telling his daughter that they cannot go to the abortion clinic or, cannot have the keys to the car to drive to the abortion clinic.

Mr. Chairman, this is a loosely written, and probably intentionally so. Look at the vague argument being made. They are trying to cover up what is the intent of my amendment. All the parental exemption states is, if a parent tells his or her child that they cannot go have an abortion or if a parent stands in front of the door and just makes an attempt, to interfere and the the daughter blasts past them and goes to the clinic, the parent becomes a criminal—a Federal felon for trying to be a good parent. This is the most unbelievable attempt to try to kill my amendment by throwing out smoke. And the gentlewoman from Colorado says that the exemption interferes with preemption law—that this preempts State parental notification or judicial bypass. However, there is a nonpreemption section in the bill. My amendment does not preempt State law or parental notification status in State law. And it has nothing to do with the child abuse or sexual abuse laws in the State. All it says is that a parent cannot be made a criminal for being a parent. And it is outrageous in my mind that anyone would speak against this amendment based upon the arguments that have been made.

Mr. Chairman, this bill reaches right into the homes, makes criminals out of parents who in any way interfere with their child having an abortion. This bill is so badly written, it is not even location specific. It does not say, "You have got to be standing out in front of an abortion clinic trying to restrict your child from going in." It does not specify a location in the bill. So, anywhere that a parent tries to interfere with their children having an abortion, a cause of action can be brought against that parent, and that parent can be made a Federal felon if convicted. This is amazing.

Mr. Chairman, policemen cannot tell the age of a child or if a parent is the age of a child. When a parent tells a policeman that this is my daughter, do my colleagues not think the policeman is going to step back, ask the question and ask for some ID, investigate it further? But if the parent is standing out in front of the abortion clinic, talking to his daughter in a very rough way, he will be deemed to have been interfering with his child, with any person attempting to go into that clinic and have an abortion.

This is outrageous, it is outrageous that they would go into the homes of America and make felons out of parents.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the gentlewoman from Florida [Ms. BROWN].

Ms. BROWN of Florida. Mr. Chairman, I rise in support of the freedom of access to clinic entrances bill. This bill will give the Federal Government the power to act when clinic protestors take the law into their own hands to prevent women from obtaining needed medical care and health care workers from providing health services by blockading entrances to clinics, by invading clinics, and by burning these clinics to the ground.

Under this bill, the Federal Government will be able to act when State and local authorities cannot or will not act.

Attorney General Janet Reno has asked Congress to pass this bill because current Federal, State, and local laws are inadequate to protect health care providers, their patients, and clinics.

Today, the opponents of this measure will compare their movement to the civil rights movement and to those protests led by Dr. Martin Luther King. There is a big difference between the two. The protests and marches of the civil rights movement to gain voting rights for African-Americans, is a world apart, from the blocking of clinic entrances, the burning and bombing of clinics, threats directed at patients and health care workers, and the murder of Dr. Gunn in Florida in order to deny women their rights, and to deny them medical services. Shame on you for comparing yourselves to Dr. Martin Luther King.

My colleagues, let us vote for this bill. Without amendments.

□ 1450

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished gentlewoman from Maryland [Mrs. MORELLA].

Mrs. MORELLA. Mr. Chairman, I thank the gentleman for yielding.

Mr. Chairman, all I want to say is the bill was really very carefully crafted. My only response at this point is that what it says is that you have to have one of three actions: force, threat of force, or physical obstruction. Then, in addition to that, intentionally injuring, intimidating, interfering with, or attempting to do so. You have to have both of these things in tandem, and it will not happen in anybody's home.

Mr. DELAY. Mr. Chairman, will the gentlewoman yield?

Mrs. MORELLA. I yield to the gentleman.

Mr. DELAY. Mr. Chairman, the gentlewoman does not think a parent is not going to intentionally stop his child from having an abortion?

Mrs. MORELLA. Mr. Chairman, reclaiming my time, you can use persuasion, of course. But what we are talking about is if you bodily, intentionally stand there in front of a health facility, and you are ready to injure that person, that we should have any waiver, because we consider that to be physical force that should not be used. I want to clarify that this was carefully written.

Mr. DELAY. Mr. Chairman, if the gentlewoman will yield further, I would like to ask a question: Would the gentlewoman show me where it even says health facility or is location specific in the bill?

Mrs. MORELLA. Mr. Chairman, on page 3 of the bill that I have it says that because that person, or any other person, or class of persons, is obtaining or providing reproductive health services or, and then it goes into intentionally damaging. So it says reproductive health services in both instances.

Mr. DELAY. Mr. Chairman, if the gentlewoman will yield further, that does not say anything about a health facility or location of the health facility.

Mrs. MORELLA. Mr. Chairman, the facility is defined at another point within the bill where it lists definitions. It defines reproductive health services, provided in a hospital, clinic, physician's hospital, or other facility, and includes medical-surgical counseling. Then facility includes the building or structure in which the facility is located.

Mr. DELAY. Mr. Chairman, that is not the prohibited activities section.

Mr. BROOKS. Mr. Chairman, I yield the remainder of my time to the distinguished gentleman from Oklahoma [Mr. SYNAR].

The CHAIRMAN. The gentleman from Oklahoma is recognized for 2 minutes.

(Mr. SYNAR asked and was given permission to revise and extend his remarks.)

Mr. SYNAR. Mr. Chairman, my colleague from Texas has, what he considers, a well-intended amendment. Yet I think there are some outstanding questions which really should be posed if we try to practically apply it.

For example, as many of us know, various States have protections today for parental consent notification. States do not interfere on parental discipline. They will, however, stop excessive discipline, as well as child abuse. So the first question with respect to the amendment is how does the gentleman from Texas [Mr. DELAY] intend to deal with that?

Second, as a practical matter, how is a policeman going to determine whether the person causing the interference is indeed the parent, and whether the child is a minor or not? Is the policeman going to ask for an ID, and if the ID is not forthcoming, is the child then put into jail?

Finally, if the police do not enforce the law because they are unable to determine whether it is, indeed, the parent or whether the child is, indeed, a minor, can the police be held liable?

The point is, there are more questions raised by the amendment than are answered. We need to try to avoid the mischief that the amendment would cause.

Therefore, I would ask my colleagues if they would take a very serious look at the practical application of this amendment I think they will come to the conclusion that this is not the type of amendment that we want to attach to this legislation.

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 38 of 49

Mr. DELAY. Mr. Chairman, will the gentleman yield?

Mr. SYNAR. I yield to the gentleman from Texas.

Mr. DELAY. Mr. Chairman, to answer the gentleman when he asked what would we do about child abuse, there is a nonpreemption clause in the bill that does not preempt State law. So if a State law has child abuse provisions and child abuse laws, they hold, as has been recommended by Senator KENNEDY himself when he passed this bill in the Senate.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Texas [Mr. DELAY].

The question was taken; and on a division (demanded by Mr. DELAY) there were—ayes 15, noes 9.

RECORDED VOTE

Mr. BROOKS. Mr. Chairman, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 350, noes 82, not voting 6, as follows:

[Roll No. 579]

AYES—350

Ackerman
Allard
Andrews (TX)
Applegate
Archer
Armey
Bachus (AL)
Baesler
Baker (CA)
Baker (LA)
Ballenger
Barca
Barcia
Barlow
Barrett (NE)
Barrett (WI)
Bartlett
Barton
Bateman
Beilenson
Bentley
Bereuter
Berman
Bevill
Bilbray
Bilirakis
Bishop
Bliley
Blute
Boehner
Bonilla
Bonior
Borski
Boucher
Brewster
Browder
Brown (OH)
Bryant
Bunning
Burton
Buyer
Byrne
Callahan
Calvert
Camp
Canady
Cantwell
Cardin
Carr
Castle
Chapman
Clayton
Clement
Coble
Coleman
Collins (GA)
Combest
Condit
Cooper
Costello
Cox
Cramer
Crane
Crapo
Cunningham
Danner
Darden
de la Garza
Deal
DeFazio
DeLauro
DeLay
Derrick
Diaz-Balart
Dingell
Dixon
Dooley
Doolittle
Dornan
Dreier
Duncan
Dunn
Durbin
Edwards (TX)
Emerson
English (AZ)
English (OK)
Eshoo
Everett
Ewing
Farr
Fawell
Fazio
Fields (LA)
Fields (TX)
Fingerhut
Fish
Flake
Foglietta
Fowler
Franks (CT)
Franks (NJ)
Frost
Furse
Gallegly
Gallo
Gekas
Gephardt
Geren
Gibbons
Gilchrest
Gillmor
Gingrich
Glickman
Goodlatte
Goodling
Gordon
Goss
Grams
Grandy
Green
Greenwood
Gunderson
Gutierrez
Hall (OH)
Hall (TX)
Hamilton
Hancock
Hansen
Harman
Hastert
Hayes
Hefley
Hefner
Herger
Hoagland
Hobson
Hochbrueckner
Hoekstra
Hoke
Holden
Houghton
Hoyer
Huffington
Hughes
Hunter
Hutchinson
Hutto
Hyde
Inglis
Inhofe
Inslee
Istook
Jacobs
Johnson (CT)
Johnson (GA)
Johnson (SD)
Johnson, E. B.
Johnson, Sam
Kanjorski
Kaptur
Kasich
Kennedy
Kennelly
Kildee
Kim
King
Kingston
Kleczka
Klein
Klink
Klug
Knollenberg
Kolbe
Kyl
LaFalce
Lambert
Lancaster
Lantos
LaRocco
Laughlin
Lazio
Leach
Lehman
Levin
Levy
Lewis (CA)
Lewis (FL)
Lightfoot
Linder
Lipinski
Livingston
Lloyd
Lowey
Machtley
Mann
Manton
Manzullo
Markey
Mazzoli
McCandless
McCloskey
McCollum
McCrery
McCurdy
McDade
McHale
McHugh
McInnis
McKeon
McMillan
McNulty
Meek
Menendez
Meyers
Mfume
Mica
Michel
Miller (CA)
Miller (FL)
Minge
Moakley
Molinari
Mollohan
Montgomery
Moorhead
Moran
Murphy
Murtha
Myers
Neal (MA)
Neal (NC)
Nussle
Oberstar
Obey
Ortiz
Orton
Oxley
Packard
Pallone
Parker
Pastor
Paxon
Payne (VA)
Pelosi
Penny
Peterson (FL)
Peterson (MN)
Petri
Pickett
Pickle
Pombo
Pomeroy
Porter
Portman
Poshard
Price (NC)
Pryce (OH)
Quillen
Quinn
Rahall
Ramstad
Ravenel
Reed
Regula
Reynolds
Richardson
Ridge
Roberts
Roemer
Rogers
Rohrabacher
Ros-Lehtinen
Rostenkowski
Roth
Roukema
Rowland
Roybal-Allard
Royce
Sangmeister
Santorum
Sarpalius
Sawyer
Saxton
Schaefer
Schenk
Schiff
Schumer
Sensenbrenner
Serrano
Sharp
Shaw
Shays
Shepherd
Shuster
Sisisky
Skaggs
Skeen
Skelton
Slattery
Slaughter
Smith (IA)
Smith (MI)
Smith (NJ)
Smith (OR)
Smith (TX)
Snowe
Solomon
Spence
Spratt
Stearns
Stenholm
Strickland
Studds
Stump
Stupak
Sundquist
Swift
Talent
Tanner
Tauzin
Taylor (MS)
Taylor (NC)
Tejeda
Thomas (CA)
Thomas (WY)
Thornton
Torkildsen
Traficant
Tucker
Underwood (GU)
Upton
Valentine
Velázquez
Volkmer
Vucanovich
Walker
Walsh
Weldon
Wheat
Whitten
Williams
Wilson
Wise
Wolf
Yates
Young (AK)
Young (FL)
Zeliff
Zimmer

NOES—82

Abercrombie
Andrews (ME)
Bacchus (FL)
Becerra
Blackwell
Boehlert
Brooks
Brown (CA)
Brown (FL)
Clay
Clyburn
Collins (IL)
Collins (MI)
Conyers
Coppersmith
Coyne
de Lugo (VI)
Dellums
Deutsch
Edwards (CA)
Engel
Evans
Filner
Ford (MI)
Ford (TN)
Frank (MA)
Gejdenson
Gilman
Gonzalez
Hamburg
Hastings
Hilliard
Hinchey
Horn
Jefferson
Johnston
Kopetski
Kreidler
Lewis (GA)
Long
Maloney
Margolies-Mezvinsky
Martinez
Matsui
McDermott
McKinney
Meehan
Mineta
Mink
Morella
Nadler
Natcher
Norton (DC)
Olver
Owens
Payne (NJ)
Rangel
Rose
Rush
Sabo
Sanders
Schroeder
Scott
Stark
Stokes
Swett
Synar
Thompson
Thurman
Torres
Torricelli
Towns
Unsoeld
Vento
Visclosky
Washington
Waters
Watt
Waxman
Woolsey
Wyden
Wynn

NOT VOTING—6

Andrews (NJ)
Clinger
Dickey
Dicks
Faleomavaega (AS)
Romero-Barceló (PR)

☐ 1521

Mr. COYNE changed his vote from "aye" to "no."

Ms. CANTWELL, Mr. MILLER of California, Ms. FURSE, Mrs. MEEK, Messrs. PETERSON of Florida, BERMAN, KLEIN, FARR of California, GEKAS, and DEFAZIO, Ms. EDDIE BERNICE JOHNSON of Texas, Messrs. SERRANO, SHAYS, ROSTENKOWSKI, REYNOLDS, FAZIO, SCHUMER, LAMBERT, STUDDS, FIELDS of Louisiana, HOAGLAND, and GIBBONS, Mrs. LOWEY, and Ms. VELÁZQUEZ changed their vote from "no" to "aye."

So the amendment was agreed to.

The result of the vote was announced as above recorded.

The CHAIRMAN. It is now in order to consider amendment No. 3 printed in House Report 103–373.

AMENDMENT OFFERED BY MR. SCHUMER

Mr. SCHUMER. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Amendment offered by Mr. SCHUMER: Page 6, line 4, strike the close quotation mark and the period which follows.

Page 6, after line 4, insert the following:

"(5) INTIMIDATE.—The term 'intimidate' means to place a person in reasonable apprehension of bodily harm to himself or herself or to another.".

The CHAIRMAN. Pursuant to the rule, the gentleman from New York [Mr. SCHUMER] will be recognized for 5 minutes, and a Member opposed will be recognized for 5 minutes.

The Chair recognizes the gentleman from New York [Mr. SCHUMER].

Mr. SCHUMER. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, this is a very simple amendment. It simply takes the definition of intimidate; the bill now prohibits the use of force, threat of force or physical obstruction to injure or intimidate.

A question was raised about the definition of intimidate, and it refines those definitions. I believe it is acceptable to everybody.

Mr. Chairman, I yield back the balance of my time.

The CHAIRMAN. Does any Member wish to speak in opposition to the amendment?

If not, the question is on the amendment offered by the gentleman from New York [Mr. SCHUMER].

The amendment was agreed to.

The CHAIRMAN. It is now in order to consider amendment No. 4 printed in House Report 103–373.

AMENDMENT IN THE NATURE OF A SUBSTITUTE OFFERED BY MR. SMITH OF NEW JERSEY

Mr. SMITH of New Jersey. Mr. Chairman, I offer an amendment in the nature of a substitute.

The Clerk will designate the amendment in the nature of a substitute.

The text of the amendment in the nature of a substitute is as follows:

Amendment in the nature of a substitute offered by Mr. SMITH of New Jersey:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Clinic Violence and Obstruction Prevention Act of 1993".

**SEC. 2. PREVENTION OF VIOLENCE AND OBSTRUCTION AT REPRODUCTIVE HEALTH FACILITIES.**

Chapter 13 of title 18, United States Code, is amended by adding at the end the following:

**"§ 248. Preventing violence and obstruction at reproductive health facilities**

"(a) PROHIBITED ACTIVITIES.—Whoever—

"(1) by force or threat of force, intentionally injures, intimidates, or physically obstructs any person, or attempts to do so, because that person or any other person is lawfully providing or obtaining reproductive health services;

"(2) by force or threat of force, intentionally injures, intimidates, or physically obstructs any person who is lawfully engaging in activity protected by the first article of amendment to the Constitution, or attempts to do so—

"(A) in or on, or within 500 feet of, a facility lawfully providing reproductive health services; or

"(B) in or on, or within 300 feet of, the residence of a person lawfully providing or obtaining reproductive health services; or

"(3) intentionally damages or destroys the property of a facility that is providing reproductive health services, or attempts to do so;

shall be punished as provided in subsection (b) of this section and shall also be subject to the civil remedy provided in subsection (c) of this section, except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

"(b) PENALTIES.—Whoever violates subsection (a) of this section shall be fined under this title or imprisoned not more than 1 year, or both, except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) CIVIL ACTIONS.—

"(1) RIGHT OF ACTION GENERALLY.—Any person who is aggrieved by a violation of subsection (a) of this section may in a civil action obtain relief under this subsection.

"(2) ACTION BY ATTORNEY GENERAL.—If the Attorney General has reasonable cause to believe that any person, or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action and obtain relief under this subsection.

"(3) RELIEF.—(A) In any action under this subsection, the court may award any appropriate relief, including temporary, preliminary, or permanent injunctive relief, subject to subparagraph (B), and compensatory damages for each person aggrieved by the violation.

"(B) No court may issue a temporary, preliminary, or permanent injunction in any case involving or growing out of a demonstration within 500 feet of a facility providing reproductive health services or within 300 feet of the residence of a person lawfully engaging in activity protected under subsection (a)(1), except—

"(i) after hearing the testimony of witnesses in open court in support of the allegations of a complaint made under oath and the testimony offered in opposition thereto, and the granting to opposing parties of the right to cross-examine such witness; and

"(ii) after the court has made and filed with the record in the case findings of fact to the effect that—

"(I) unlawful acts have been threatened and will be committed, or have been committed and will be continued, unless restrained;

"(II) substantial irreparable injury to complainant's person or property will follow;

"(III) as to each item of relief granted, greater injury will be inflicted upon complainant by the denial of relief that will be inflicted upon defendants by the granting of relief; and

"(IV) complainant has no adequate remedy at law.

No such restraining order or injunction maybe issued on account of any threat or unlawful act except against a person making the threat or committing the unlawful act or authorizing or ratifying the same with actual knowledge thereof. Every restraining order or injunction granted in a case involving or growing out of a demonstration within 500 feet of a facility providing reproductive health services or within 300 feet of the residence of a person lawfully engaging in activity protected under subsection (a)(1) shall include only a prohibition of such specific conduct as may be expressly complained of in the complaint filed in such case and as shall be expressly included in the findings of fact.

"(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to prohibit or limit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the first article of amendment to the Constitution.

"(e) NON-PREEMPTION.—Congress does not intend this section to provide the exclusive remedies with respect to the conduct prohibited by it, nor to preempt the legislation of the States that may provide such remedies.

"(f) DEFINITIONS.—As used in this section, the following definitions apply:

"(1) REPRODUCTIVE HEALTH SERVICES.—The term 'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system.

"(2) FACILITY.—The term 'facility' includes the building or structure in which the facility is located.

"(3) PHYSICALLY OBSTRUCTS.—The term 'physically obstructs' means rendering impassable—

"(A) ingress or egress, or rendering passage unreasonably difficult; or

"(B) public ways or traditional public fora or rendering passage through public ways or traditional public fora unreasonably difficult.

"(4) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

**SEC. 3. EFFECTIVE DATE.**

This Act takes effect on the date of the enactment of this Act, and shall apply only with respect to conduct occurring on or after such date.

**SEC. 4. CLERICAL AMENDMENT.**

The table of sections at the beginning of chapter 13 of title 18, United States Code, is amended by adding at the end the following new item:

"248. Preventing violence and obstruction at reproductive health facilities.".

The CHAIRMAN. Pursuant to the rule, the gentleman from New Jersey [Mr. SMITH] will be recognized for 15 minutes, and a Member opposed will be recognized for 15 minutes.

Mr. BROOKS. Mr. Chairman, I rise in opposition to the amendment.

The CHAIRMAN. The gentleman from Texas [Mr. BROOKS] will be recognized for 15 minutes.

The Chair recognizes the gentleman from New Jersey [Mr. SMITH].

Mr. SMITH of New Jersey. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, let me say to members that if you want to tangibly and aggressively crack down on abortion clinic violence without doing irreparable harm to those people engaged in nonviolent civil disobedience, vote for my substitute.

If you want to establish in Federal law that force or threat of force will be punshed, while at the same time not doing irreparable harm to people engaged in nonviolent civil disobedience, vote for my substitute.

If you want to throw violent individuals who kill, firebomb and assault others into prison, which is where they belong, without doing irreparable harm to people engaged in nonviolent civil disobedience, then your vote is "yes" on the Smith substitute, "no" on H.R. 796.

The substitute I offer today imposes strict penalties—including a year in prison and $100,000 in fines—up to 10 years if bodily injury occurs—on individuals who by force or threat of force, intentionally injure, intimidate, or physically obstruct any person because that person is providing or obtaining reproductive health services. The language of my bill tracks our Nation's civil rights law.

If H.R. 796, the Freedom of Access to Clinic Entrances Act, becomes law it will be the first time since the Fugitive Slave Act—which was bitterly resisted by the abolitionists even though prison and fines were heaped upon those against slavery for interfering with that law—that Congress has made nonviolent civil disobedience a felony. H.R. 796 would turn our Nation's longstanding tradition on peaceful civil disobedience on its head. And it would do it—selectively—only to pro-life demonstrators.

H.R. 796 would turn peaceful, nonviolent protestors into felons simply because they rendered passage to or from an abortion clinic unreasonably difficult.

Just getting in the way will make you a felon and draw a long prison term and massive fine.

Just getting in the way, even if you are on your knees praying with hands folded and eyes closed, will make you liable for a year's prison sentence and a $100,000 fine. Do it again and you may go to jail for 3 years and pay a quarter of a million dollars in penalties. And, any aggrieved person may file a suit to recover unlimited punitive damages under the terms of H.R. 796.

H.R. 796 goes to great lengths to protect the financial well-being of abortion mill operators. However, there is virtually no concern demonstrated for peaceful lower and middle-income women and men who would be sub-

jected to draconian jail terms, fines and lawsuits. My substitute addresses this injustice by extending the same protection from assault or interference to pro-life persons engaging in lawful first amendment activity.

Under H.R. 796, pro-abortion counter protestors at abortion mills who physically batter or abuse peaceful pro-lifers will be totally immune to any of the penalties contained in H.R. 796. In fact, passage of this legislation in its current form will encourage proabortion activists to taunt and abuse pro-lifers. If they succeed in eliciting an actionable response, they can then hit the pro-lifer with draconian penalties.

Make no mistake about it. Pro-abortion activists routinely and systematically abuse pro-lifers at abortion clinics. Women who have worked for the abortion industry have told House and Senate committees about numerous instances of abuse by pro-choice activists against pro-lifers.

Katherine Hudson a pro abortion advocate, served for 3 years as a clinic defense activist, primarily in the Washington, DC area. "From many conversations with police not only in D.C., but in Houston, Buffalo, and with Federal marshals, I know that law enforcement is much more concerned with the behavior of the more radical pro-choice liberal activists such as NWROC [National Women's Rights Organizing Coalition], R&R [Refuse and Resist], Act Up and Queer Nation than they are with Operation Rescue," Ms. Hudson told the House Judiciary Subcommittee on Crime and Criminal Justice on April 1, 1993.

The Bay Area Coalition Against Operation Rescue [BACAOR] is very Explicit about their recommended means of dealing with pro-life protectors. In their March, 1990 publication, "Clinic Defense, a Model" they say the following:

> As OR [Operation Rescue] has shifted to picketing more than blockading, we've learned that we can't relax and let them "just" picket * * * Even if the sidewalk is "public," we've had success at putting enough of us out, early enough, to basically bully the ORs into staying across the street.

BACAOR goes on to recommend some specific sexual and religious baiting tactics for dealing with pro-life protestors.

> [I]f baiting an OR about his treatment of women, his sexuality, and how many times he masturbates will keep him from bothering clients and from being able to effectively direct the others, do it.

Mr. Chairman some manuals for training pro-abortion protestors cynically exploits the training pro-life protestors are given in non-violence. Let me read a short excerpt from a training manual put out by the Bay Area Coalition Against Operation Rescue:

> [Pro-life protestors] are coached not to hit people outright. Their passive-aggressive tactics * * * give us plenty of plenty of places to grab hold of their jackets, etc. to pull on. * * * Chivalry is not dead with these people, and that means they have an inordinate sense of modesty and honor about being accused of touching women. There are innumerable instances of female clinic defenders neutralizing male [pro-life protectors] by shouting "get your hands off me, don't you dare touch me" all the while pushing the [male protestors] out of the line.

Mr. Chairman, pro-life protestors are already being hit with frivolous lawsuits from pro-abortion activists. H.R. 796 would provide a new weapon for one-side harassment suits. Consider the testimony of attorney Nikolas J. Nikas of the American Family Association Law Center (Senate Committee on Labor and Human Resource, May 12, 1993):

> One of my clients, a 65 year-old woman suffering from M.S. and confined to a wheelchair, prayed the Rosary outside of an abortion clinic on the public walkway. This obviously dangerous protestor was sued because she allegedly harassed and intimidated abortion clinic staff, volunteer escorts, women and their companions. (p.9)

Based on his extensive experience in defending pro-life protestors who have been faced with such legal dilemmas, Mr. Nikas also made the following statement to the committee:

> [I]n every abortion case that I have ever participated in, or heard about, it is a certainty that the pro-abortion plaintiffs will vigorously attempt to impose sweeping limitations on pro-life expression. (p. 7)

In sum, my substitute is very strong in dealing with violence. However, it also safeguards some of our most cherished freedoms—the rights to free speech and peaceful assembly. Those who believe in fair treatment for both sides in the emotionally changed abortion debate will find a balanced approach in my substitute.

☐ 1530

Mr. Chairman, I reserve the balance of my time.

(Mr. BROOKS asked and was given permission to revise and extend his remarks.)

Mr. BROOKS. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I rise in opposition to the amendment offered by the gentleman from New Jersey [Mr. SMITH].

Mr. Chairman, this substitute proposal is troubling in many ways. It drastically narrows the scope of protection to within a certain number of feet of a facility or residence. Thus, it excludes all those who are on their way to, or from, those places. So, for example, it would put off limits the despicable act of shooting a doctor because he provides reproductive health services because of a loophole that he is traveling miles away from his residence or clinic.

The substitute also narrows the scope of who can seek relief, eliminating the cause of action provided in H.R. 796 for State attorneys general and limiting the right of action of the U.S. Attorney General. At the same time, it imposes burdensome procedures for obtaining a temporary restraining order against prohibited activity, and it narrows the relief that can be sought when a cause of action is brought.

But the real time bomb buried in the substitute amendment is the seemingly innocuous phrase lawful reproductive services. By questioning whether health care services are lawful—which one could do for the treatment of arthritis—the amendment would create a powerful new tool of harassment by allowing opponents of clinic activities to delve into all of a facility's records, its business practices, regulatory compliance, medical licenses. If names and addresses of clients were able to be accessed in the determination of what is, or is not, lawful, the harassment potential would only multiply.

With regard to first amendment activities, I would point out once again that H.R. 796 clearly states that it cannot be used to prohibit any expressive conduct protected from legal prohibition by the first amendment.

For all these reasons, I urge my colleagues to reject this amendment.

Mr. Chairman, I reserve the balance of my time.

Mr. SMITH of New Jersey. Mr. Chairman, I yield myself 30 seconds in order to respond to the chairman.

The chairman is responding to an earlier draft and not the legislation before this body. In this legislation there are no limitations on the effect and the reach where force or the intent to use force is involved. So the comments just made, do not apply to this legislation. If force or the intent to use force are involved here, it applies and the Federal Government would be involved and a crime would have been committed, under my legislation.

So the gentleman has spoken to something that is simply not on the table.

Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from New York [Mr. SCHUMER] the chairman of the subcommittee.

Mr. SCHUMER. I thank the gentleman for yielding this time to me.

Mr. Chairman, I rise in strong opposition to the Smith amendment. Ladies and gentlemen, make no mistake about it, this is a gutting amendment. If this amendment passes, the bill will really be meaningless.

Let me show you why: First, the bill would allow blockades. Right now, one of the reasons that this bill started was the blockading of clinics, not the peaceful protests but tens and hundreds of people sitting by the doorway and not letting women who not only wished services for abortion but services for birth control, services for cervical checks, not allowing them into these clinics. the amendment eliminates blockades.

Second, it would not allow States' attorneys general to enforce the law.

How can States be empowered to protect State laws if the State attorneys general cannot do it?

Third, it encourages frivolous lawsuits unrelated to the provision of re-

productive services. By covering only lawfully provided or obtained services, the Smith amendment encourages lawsuits by Operation Rescue.

Fourth, it makes it virtually impossible to get an injunction against those who commit violence against clinics and providers. One of the clauses of the bill is that if the clinic is besieged, they can go to court and get an injunction.

And finally, it expressly sanctions violence and threats of violence against innocent women and health professionals so long as the violence or threats do not occur near a clinic or a home.

What if a doctor is on the street and what if somebody goes over and jostles him or punches him or harasses him or her? This bill would say, "Sorry, it doesn't cover."

So while there have been amendments, three of which have been added here, that may not be the amendments that reach the broadest expanse, they do not undo the bill. This amendment undoes the bill.

Let me say just one final thing: There is a tradition of civil disobedience. But with civil disobedience goes the fact of accepting punishment. Operation Rescue and all those, who of those who oppose this amendment, not the mainstream of the pro-life movement, have this weird idea that they can blockade clinics but that the law ought not be enforced and that there should be no punishment for that.

That is not the tradition of Martin Luther King, that is not the tradition of Gandhi, that is not the tradition of anyone who knows what civil disobedience is all about.

If somebody feels so strongly that they have to take the law into their own hands, the whole tenet of civil disobedience is that you accept your punishment like an adult man, like an adult woman. And the Smith amendment says, "No, let them blockade, let them not punish," which shows the real purpose of this amendment, not to foster protest, peaceful protest for sure, not to foster anything except to shut down all of the abortion clinics by either legal or illegal means.

Mr. EDWARDS of California. Mr. Chairman, will the gentleman yield?

Mr. SCHUMER. I yield to the gentleman.

Mr. EDWARDS of California. I thank the gentleman for yielding.

Mr. Chairman, I happen to agree with the gentleman that this amendment would gut the bill, and that is why it is offered by the gentleman who is a strong opponent of anything like this. So it is designed that way.

Will the gentleman explain to me why it would gut the bill? Why is it too destructive?

Mr. SCHUMER. Well, it does it in many ways, and I just went through some of them.

Let me repeat: It would allow blockades; it would allow physical violence and harassment as long as it was not near the home or the clinic, such as chasing a doctor. How about harassing the kids of a doctor on their way to school? It would do many of these things. So that is two of the five ways that it guts the bill, and I appreciate the gentleman inquiring.

Mr. BROOKS. Mr. Chairman, I reserve the balance of my time.

Mr. SMITH of New Jersey. I yield myself 15 seconds before I yield to the gentleman from California. Just to answer the gentleman, the gentleman again is reading from the wrong draft. Where violence or the intent to use violence or force is involved, there are no parameters, it covers violence anywhere it is involved. So the gentleman is totally misconstruing this amendment. He is looking at an earlier draft.

Mr. Chairman, I yield 1½ minutes to the gentleman from California [Mr. ROHRABACHER.]

Mr. ROHRABACHER. I thank the gentleman for yielding this time to me.

Mr. Chairman, I am very happy that my colleague, the gentleman from New York [Mr. SCHUMER] has just stated he demands that people who commit civil disobedience be punished. What I would like to know, if they really mean this or whether they are singling out people who believe that babies are being killed.

Now, I can understand there are strong feelings on both sides, because today MAXINE WATERS, a colleague of ours who has strong feelings about statehood, encouraged people to block the doorways of the Cannon Office Building. That is, we have had people encouraging people to commit civil disobedience blocking our own Federal office buildings in order to try to—I will not use the word intimidate, that may be too strong—but to pressure us in order to make a political decision. Should they be persecuted and prosecuted for committing civil disobedience? That is Federal property. There is probably some hypocrisy in this room on issues like that.

Mr. Chairman, I will be supporting, let me note—I am opposing this bill because I do not believe this should be a Federal issue. I do not believe that criminal matters should be a Federal issue. I disagree with my colleagues on both sides who believe that civil disobedience is justified. I think civil disobedience, when you are blocking doorways, is an act that should be prosecuted under the criminal justice system. You are trying to coerce people. I do not care if your belief is about abortion, I do not care if your belief is in statehood, but these are criminal offenses and should be left at the State level.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished gentlewoman from Maryland [Mrs. MORELLA] in opposition to the amendment.

Mrs. MORELLA. I thank the gentleman for yielding. Mr. Chairman, the Smith substitute guts the bill. Physical obstruction is covered only if force or the threat of force is used. Thus, clinic blockades would continue without the Federal relief provided under the bill.

The Smith substitute does not cover force, the threat of force, or physical obstruction beyond a zone around the clinic or the home of the person obtaining or providing reproductive health services. Thus, health care providers or patients would not be protected when they were not at home or at the clinic.

The requirement that would restrict the bill only to any person who is lawfully providing or obtaining reproductive health services would give defendants a means of harassing clinics during lawsuits by delving into all of the clinic's records regarding their business practices, regulatory compliance, medical licenses, and so forth. In effect, if a clinic were found to have failed to comply with any State and local requirement, no matter how insignificant, the bill's remedies would not apply. In addition, such a requirement could provide opportunities for defendants to gain intrusive information about a woman's medical status.

The Smith substitute extends a Federal cause of action to anti-abortion demonstrators. There is no coordinated, national campaign of force, threats of force, physical obstruction, and destruction of property by pro-choice activists against antiabortion demonstrators. There have only been a handful of isolated local incidents, primarily involving fist fights. There has not been a single incident in which local law enforcement authorities have been unable to handle unlawful conduct engaged in by pro-choice activists. The bill is completely evenhanded in providing Federal protection not only to abortion clinics, staff, and patients, but also to pro-life counseling or pregnancy centers, staff, and patients.

A Federal cause of action for demonstrators would turn the bill into another weapon for antiabortion extremists to use against already beleaguered clinics, staff, and patients. These groups have already made clear that they will use any opportunity to file harassing lawsuits against pro-choice activists. The bill would become a clinic harassment bill, not a clinic access bill.

The Smith amendment establishes an extremely restrictive standard for obtaining Federal injunctive relief, making it almost impossible to obtain an injunction. The bill is intended to once again provide Federal injunctive relief, filling the gap in Federal law that resulted from the Supreme Court Bray decision in January.

The Smith amendment would gut the bill. I urge Members to oppose it.

□ 1540

Mr. SMITH of New Jersey. Mr. Chairman, I yield myself 15 seconds to respond to the gentlewoman, to make the point that, the injunctive relief criteria as established in my substitute track what is used in Federal law. We just took it right out of Federal law.

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 42 of 49

So that has been misspoken by my distinguished colleague.

Mr. Chairman, I yield 2 minutes to the gentleman from Florida [Mr. CANADY].

Mr. CANADY. Mr. Chairman, I rise to speak in favor of this amendment, which does not gut the bill, but which, instead, seeks to bring some balance to this bill.

This amendment offered by the gentleman from New Jersey [Mr. SMITH] most importantly would extend the protections of the bill to persons engaged in lawful first amendment activities to protest against abortion.

Without this amendment, the bill inevitably will act to discourage the expression of opinion on one side of the abortion debate.

It will create an atmosphere in which opponents of abortion are fearful of exercising their first amendment rights.

And it will do this notwithstanding the bill language which acknowledges the primacy of the first amendment.

We all, in this House, oppose the settlement of political differences through violence or other illegal means.

There is no place in our country for the lawless acts that have been committed by both opponents and proponents of abortion.

But this bill in its present form presents a totally unbalanced approach to this problem.

Rather than applying equitable, evenhanded protections to those who are the victims of unlawful acts in the conflict over abortion, this bill focuses on only one side of the conflict, singling out that side for a full array of Federal criminal penalties and civil remedies.

This is the fundamental flaw in this bill.

Without the Smith amendment, consider the anomalous situation which this bill will create.

Two people on the sidewalk outside an abortion clinic become engaged in a physical confrontation. One is a pro-life protester. The other is an abortion advocate, and clinic employee.

The pro-lifer will be subject to the full force of the Federal civil remedies and criminal penalties provided in the bill.

The abortion advocate will be immune from such Federal penalties and remedies.

This is fundamentally unfair.

If we allow this by passing the bill without the Smith amendment, it will demonstrate that this Congress is hostile to the lawful expression of pro-life opinion in this country.

It will evidence a disturbing animus toward those peaceful, law abiding, citizens of this country who simply seek to speak up in defense of life.

I urge my colleagues to vote yes on the Smith amendment.

Mr. BROOKS. Mr. Chairman, I yield 2 minutes to the distinguished gentlewoman from Colorado [Mrs. SCHROEDER].

Mrs. SCHROEDER. Mr. Chairman, I thank the gentleman for yielding this time to me.

I really want to urge people to vote against this Smith amendment.

What you are hearing here is people trying to mix the distinction between civil disobedience and violence. There is a bright line between civil disobedience and violence. I think Dr. King would be horrified if he could hear the way his name has been thrown around here.

We are talking about violence. This is the body that approved a bill, and many of you were cosponsors, saying there should not be violence against laboratories that have animals in them.

Would you please tell me why women cannot have health care and have at least extended the same kind of protections against violence?

Now, for those who are saying this is not evenhanded, it is evenhanded. It would allow the same kind of enforcement against any violence by pro-choice people against birth right centers.

So those who are against and those who are for choice, either one of them are in great trouble if they move to block access to the other's clinics and the other's services. That is all this is about.

I find it really unconscionable that we get this so mixed up.

What would this do? This would say a State attorney-general cannot enforce this law. Imagine. How are you going to enforce it if you do not have the State attorneys general doing it?

It would allow blockades. It would also allow the force and the violence now that we are trying to stop.

If any of you have ever visited one of these clinics, you would know that 95 percent of the services in there are dealing with women's basic health care services. This is where they go. Certainly they have the right to get in and get out of there without being subject to violence or without having this restricted.

We know the local law has broken down. That is why we need this bill.

If you did it for bunny rabbits, can we not at least give women equal rights?

Mr. SMITH of New Jersey. Mr. Chairman, I yield such time as he may consume to the gentleman from Maryland [Mr. BARTLETT].

(Mr. BARTLETT of Maryland asked and was given permission to revise and extend his remarks.)

Mr. BARTLETT of Maryland. Mr. Chairman, I rise in strong support of this amendment, which brings a modicum of sanity to an otherwise inane and unconstitutional bill.

I rise in strong support of the Smith substitute amendment and in opposition to the bill. But let me begin my saying that I too, am outraged by the murder of Dr. Gunn of Florida and the shooting of Dr. Tiller in Wichita. I in no way condone the use of violence as a way of demonstrating support for life.

However, this bill goes way beyond addressing the problem of violence at abortion clinics. This bill would set up harsh guidelines for those pro-lifers who practice peaceful civil disobedience. By passing the Freedom of Access to Clinic Entrances Act, the Congress will be setting a precedent—that we can pass laws to restrict the right of free speech based on a person's viewpoint.

Mr. Chairman, I oppose this bill because it applies different rules of conduct to the two sides engaged in this emotionally charged debate. Individuals who attempt to restrict entrance to a clinic for reasons other than the fact that the person is receiving an abortion would not be subject to the same penalties and fines.

This is a bad piece of legislation which is an obvious attempt to selectively apply the first amendment to those people who prescribe to a liberal pro-choice social agenda.

In contrast Mr. Chairman, the Smith substitute is a commonsense, evenhanded alternative that applies penalties for violent acts of protest. At the same time, Mr. Chairman, the Smith substitute protects those individuals who practice first amendment activities in the vicinity of a clinic or residence.

I urge the adoption of the Smith substitute and rejection of the bill on final passage.

Mr. SMITH of New Jersey. Mr. Chairman, I yield 1 minute to the distinguished gentleman from California [Mr. DORNAN].

Mr. DORNAN. Mr. Chairman, where is my friend, the gentleman from New York [Mr. SCHUMER]? Oh good, right there.

I have had very strong passionate pro-life people come to me and say, "Will you rescue with us?"

I have said, "I am a lawmaker. I can't be a lawbreaker, and I hope you expect to feel the penalty of all the law."

It is just like the people who demonstrated from this Chamber in front of the South African Embassy during its evil days when they had flex-cuffs put on. People who demonstrated, including my pal who I saw last night, Rev. Jesse Jackson, realize that breaking the law will result in penalties.

Where did the gentleman get the idea, I say to my dear friend, that these people at their conferences the night before a rescue, and I have gone and witnessed how they set this up, where did the gentleman get the idea that they do not expect to be arrested by local law?

I did march with Martin Luther King. I did not expect to get arrested in my Air Force uniform on August 28, 1963, but I did expect to get arrested in Mississippi and Alabama, and I did.

They do believe they are going to be arrested, I say to my friend, the gentleman from New York [Mr. SCHUMER], honestly.

Mr. Chairman, would the gentleman from Texas [Mr. BROOKS] yield 34 seconds to the gentleman from New York [Mr. SCHUMER] to lecture me?

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the gentleman from New York [Mr. SCHUMER].

Mr. SCHUMER. Mr. Chairman, just to answer the gentleman from California, it is very simple.

This bill is the only hope of enforcing the law in certain sections of the country. When the local sheriff, for ideological reasons, says, "I won't," when there is trespass, when a town like Dobbs Ferry is overwhelmed by Operation Rescue, they have a small number of police officers and a thousand protesters, if the Federal Government does not step in the carefully drawn way of this amendment, there is no punishment.

So by opposing this amendment, those who say they enforceable disobedience and accept the punishment, are saying that in localities that cannot or will not enforce the law, there should be no punishment.

☐ 1550

Mr. DORNAN. But does the gentleman agree they do not expect to be arrested?

The CHAIRMAN. The time of the gentleman from New York [Mr. SCHUMER] has expired.

Mr. SMITH of New Jersey. Mr. Chairman, I yield 2½ minutes to the gentleman from Pennsylvania [Mr. KLINK].

Mr. KLINK. Mr. Chairman, I would like to thank my distinguished colleague, the gentleman from New Jersey, for allowing me to speak in support of his substitute.

This substitute would distinguish between the activities of violent protesters and nonviolent protesters.

This Nation has a history of tolerance—and to some degree even respect—for nonviolent civil disobedience. From the nonviolent abolitionists to the antiwar movements, from Henry David Thoreau to Martin Luther King, Jr., we have always recognized the close association between peaceful and civil disobedience, which violates laws against trespassing and obstruction of public ways, and political speech, which is clearly one of the most highly protected rights within our Constitution.

I am not advocating that civil disobedience should be overlooked, or that laws against trespass or obstruction should not be enforced. People who engage in this type of activity understand very well that there will be consequences to their actions, and because we are a government of laws and not of men, I believe that these laws need to be enforced to maintain order and justice in our society.

My concern is that we are treading a very fine line when we treat some persons engaged in nonviolent civil disobedience differently than other groups of people doing exactly the same thing, especially when the basis for treating them differently hinges on the motivation or political beliefs of those persons.

When we do this, Congress has gone beyond punishing criminal acts; it is putting itself in the business of saying that one cause or political belief is better than another cause or belief. And that gives me great concern.

To punish one group more harshly than another implies discrimination against one particular viewpoint. All groups that engage in peaceful sit-ins and similar activity should be treated in an evenhanded manner, regardless of the motivation of those engaged in this conduct.

Another significant concern that I have with H.R. 796 which this amendment would address is that the bill treats people engaged in nonviolent civil disobedience on a par with those who commit acts of violence. Under H.R. 796, a second offense for physical obstruction—that is, sitting in a doorway—which attempts to interfere with another person would constitute a felony with penalties of up to 3 years in Federal prison and $250,000 in fines.

Finally, Mr. Chairman, I urge my colleagues to support the substitute offered by the gentleman from New Jersey [Mr. SMITH], as I feel the Federal Government does not need to be involved in stamping out this type of peaceful civil disobedience. It should not be involved here.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the gentlewoman from Savannah, GA, [Ms. MCKINNEY].

Ms. MCKINNEY. Mr. Chairman, I rise today as a cosponsor of H.R. 796.

I rise because of the courage displayed by the women, the clinic workers, the doctors, and their families who brave the demonstrators who show up at their homes and offices every day.

These people harass women throughout Georgia and the United States who are going into health clinics—regardless of whether they are at the clinic for an abortion, birth control, or a Pap smear.

Dr. Gay is an abortion provider in the Atlanta area. Day after day, he and his family must drive through anti-abortion protesters picketing his home. And when he gets to his office, Dr. Gay and his staff must again endure mobs stalking the clinic.

Each day, they yell at him and beat their fists on his car. They remind him that two doctors have been shot this year. And sometimes they point their fingers at him like a pistol and say, "You'll be next."

These attacks on Dr. Gay, his staff, his patients, and his family have afforded him a permanent injunction against these terrorists. But with a mayor who will not dispatch the police to enforce the injunction, he has absolutely no one to turn to for protection.

We cannot stand by and allow Americans to endure this terrorism day in and day out.

And further, I cannot stand by and see these people degrade the memory of Dr. Martin Luther King by comparing themselves to him and his philosophy of nonviolence. They act more like those who blocked the schoolhouse doors in Arkansas, Alabama, and Georgia.

I encourage my colleagues to support H.R. 796, and reject the Smith amendment.

Mr. SMITH of New Jersey. Mr. Chairman, I yield 30 seconds to the distinguished gentleman from Maryland [Mr. GILCHREST].

Mr. GILCHREST. Mr. Chairman, before I vote for or against this bill I have a question that I really would like answered by the gentleman from New York [Mr. SCHUMER].

Let me describe a situation. We have 3, 10, 12 people, pro-life, on a sidewalk in front of a clinic. People cannot get by. Police come and lift them up, put them in a paddy wagon, take them away.

Are they subject to a felony and 1 year in jail?

Mr. SCHUMER. Mr. Chairman, will the gentleman yield?

Mr. GILCHREST. I yield to the gentleman from New York.

Mr. SCHUMER. No. The first-time offense they are simply subject to a misdemeanor.

Mr. GILCHREST. Suppose it is the second time.

Mr. SCHUMER. The second time it is a felony, but they need not get jail time. There is no minimum mandatory.

Mr. GILCHREST. I thank the gentleman from New York.

Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from Illinois [Mr. PORTER].

(Mr. PORTER asked and was given permission to revise and extend his remarks.)

Mr. PORTER. Mr. Chairman, I rise in strong opposition to the Smith substitute.

Mr. Chairman, I want to take a moment to address my understanding of the substitute offered by the gentleman from New Jersey and why it should not be adopted.

I think that there is absolutely no disagreement in this body on the primacy of the first amendment. As our debate yesterday reminded us, the right to disagree—and to disagree quite vocally—is precious to our democracy. Abortion is an issue of paramount importance to many, many Americans; it is an intensely controversial issue and one in which we must have a national dialog. The wide spectrum of opinions in this body on the question of abortion is testament to the vitality of that debate.

Free speech is predicated ultimately on the respect this value is accorded by the American people. It is absolutely critical that we do all that we can to protect and promote a fundamental respect for speech—for the right to disagree, the right to advocate and argue, and the right to protest. Every Member of this body is sworn to uphold this right.

But as I understand this substitute amendment, we are attempting to carve out a special treatment not for speech, but rather for conduct. Specifically, the amendment contends that the act of obstructing a clinic should not be illegal.

I think that this contention is mistaken. Obstruction of a clinic is not speech—it is action. It is, moreover, an action that interferes with the rights and privileges of other people. Time and again, our Supreme Court has looked at

the question of abortion. Time and again—notwithstanding substantial changes in the court's makeup at the direction of Presidents' opposed to abortion—that Court has concluded that abortion is a fundamental right. Many in Congress disagree with that conclusion, but none of us are empowered to disregard it, no more than we are empowered to wrest a voting card from the hands of another Member with whom we may disagree. It is a fundamental right, and interference with that right is a crime.

Obstruction is civil disobedience. Many great figures in world history have advocated civil disobedience. But none have contended that they should not be subject to arrest. Civil disobedience contemplates arrest as a consequence—that is how it is differentiated from other crimes, and that is also how it is differentiated from speech. Civil disobedience contemplates peaceful action, but that does not mean that it is not a crime, and that does not mean that it is only speech.

I would also note that civil disobedience is rarely invoked to interfere with the rights of others. Rather, its historical usage has been to protest against that which is viewed as an infringement of one's own rights. This is one reason why the actions of Operation Rescue—even when they are peaceful—are not truly akin to those of Thoreau, Ghandi, and King.

Ultimately, Mr. Chairman, I am concerned that this amendment will inevitably lead to violence. It encourages obstruction and it includes a restrictive standard for obtaining injunctions. Obstruction, in turn, encourages conflict which, in turn, engenders violence. I do not think that this is a role which we should play.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the gentlewoman from Connecticut [Ms. DELAURO].

Ms. DELAURO. Mr. Chairman, I rise in opposition to the Smith substitute. This substitute renders the bill meaningless—it would leave physicians open to continued violence; it would tie up clinics in endless and costly litigation, it would make it virtually impossible to take legal measures against those committing violence, and it would ban State attorney general from enforcing the law. That is not what this law intends.

It is the constitutionally protected right of women in this country to make their own choices about reproductive health. But that right means little if women are barred from exercising it. Barred by violence or the threat of violence. Barred because access to the clinic they use is literally blocked by those who would deny them this right. Or barred because fear for their safety has driven away the people who would provide these health services.

Freedom of speech is also protected by the Constitution. And the bill we consider here today is true to both of these rights. It protects and enforces women's access to reproductive health services—and it carefully protects freedom of speech for those who disagree.

There is no question about the need for action. Vandalism against clinics has doubled. Sixteen clinics have been burned down. Eighty-three clinics have been blockaded. Arson, bombing, and murder have all been unleashed against these clinics and those who run them. Doctors and staff live in fear of providing a constitutionally protected service. We stand today to take that fear away and give them back their safety.

I am saddened, quite frankly, that we are forced to enact this legislation. But we have no choice. The violent challenges to those who would exercise their rights cannot go unmet.

Mr. Chairman. Let us put an end to the killing, the violence, and the fear. Let us show that violence for any cause is an unacceptable course of action. And let us live up to our heritage as a nation governed by laws with a deep and abiding respect for our Constitution. Protect our rights—oppose the Smith substitute and pass the Freedom of Access to Clinic Entrances Act.

Mr. SMITH of New Jersey. Mr. Chairman, I yield 3 minutes to the distinguished gentleman from Illinois [Mr. HYDE].

(Mr. HYDE asked and was given permission to revise and extend his remarks.)

Mr. HYDE. Mr. Chairman, the gentlewoman from Connecticut [Ms. DELAURO] just said we should live up to our heritage. Part of our heritage, as I understand it, is equal protection of the law, and yet we single out prolifers standing in front of an abortion clinic, which they have mistakenly called reproductive rights services, single them out for jail and for fines, but we do not single out the people who are obstructing the way into the Longworth Building or the Cannon Building in support of District of Columbia statehood. We do not single out environmental demonstrators. We do not single out civil rights demonstrators. It is only people who are worried and concerned about the unborn being exterminated in somebody's womb. Mr. Chairman, that is unequal protection of the law.

Now what are we talking about here? I heard the gentlewoman from Colorado [Mrs. SCHROEDER] say "violence." That is precisely right, violence. In the Schumer bill someone can go to jail, be fined, or both, without violence, without threat of violence; simply, Mr. Chairman, physical obstruction. Do my colleagues hear me? Simply physical obstruction.

□ 1600

Then you are subject to these fines. Nobody else in the panoply of demonstrations or civil disobedience is. Just if you dare to try to protect a defenseless unborn child. Then, if you physically obstruct, you are subject to these penalties, these felonies.

Mr. Chairman, every politician that ever ran for office stands and hands people a pamphlet on a corner. Is that physically obstructing? Is that intimidating?

Mr. SCHUMER. Mr. Chairman, will the gentleman yield?

Mr. HYDE. I will be happy to yield to the gentleman.

Mr. SCHUMER. Mr. Chairman, I will say to the gentleman that in all the case law we have looked at under this law, there has never been a case where handing someone a pencil is physically obstructing.

Mr. HYDE. Mr. Chairman, reclaiming my time, I submit to the gentleman that the day is not far away when one of the new judges we are getting is going to find that intimidating, physically obstructing. The gentleman may shake his head, but I do not agree with him.

Mr. Chairman, what you have under the proposal of the gentleman from New York [Mr. SCHUMER] is no violence or force involved, simply physical obstruction. Under Smith, there must be force or threat of force.

Mr. Chairman, is that not what we are against? I heard the word "violence" repeated many times. Let us support Smith, which requires the use of force or the threat of use of force before you felonize somebody for physically obstructing.

Now, I have heard about the doctor that was shot, and, of course, that is tragic. But let me tell Members, if you do not think people get shot and killed in labor disputes, you have not been paying attention.

Mr. Chairman, this article is from last July's Associated Press. "A nonunion subcontractor working at a strike bound arch of West Virginia Mine was shot to death on his first day on the job."

Mr. Chairman, do we have violence on picket lines? Yes. Why do we not federalize and criminalize that violence? Why do we just pick on abortion?

Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from Missouri [Mr. VOLKMER].

(Mr. VOLKMER asked and was given permission to revise and extend his remarks.)

Mr. VOLKMER. Mr. Chairman, I rise in support support of the Smith substitute.

Mr. BROOKS. Mr. Chairman, I yield 1½ minutes to the gentleman from Washington [Mr. INSLEE].

(Mr. INSLEE asked and was given permission to revise and extend his remarks.)

Mr. INSLEE. Mr. Chairman, I rise in opposition to the amendment and in support of the bill. I believe it is altogether fitting and proper that we debate these constitutional issues, because we are the guardians of the constitutional rights of this country.

Mr. Chairman, I think we should take a lesson from the experience of the former Soviet Union. In the Soviet Union, they had a piece of paper that had just about the same Bills of Rights as we did. But there was something they had missing. They had a missing ingredient, a way to provide the enforcement of those rights.

Mr. Chairman, we are taking about the right of privacy here. If we lose in

practice, in practice, the way for a woman to engage in her right of privacy, we will have become the Soviet Union, with a nice Bill of Rights and no way to enforce it.

The Bill of Rights and the right of privacy does not exist only where local sheriffs decide to enforce it. It exists in every county. And because certain sheriffs decide not to enforce that universal right, we are required, vested, and obligated, to take Federal action, just like the Congress did in the civil rights battle when the local sheriffs in Mississippi, and now it is a great State, would not enforce Federal rights.

When Members come and talk in this chamber about the segregation battles and compare that to this situation, the situation of a person who wants to walk into a segregated donut shop and buy a donut, and say it is the same thing if a woman who is pregnant with a high-risk pregnancy, and compare that trauma to someone hungry for a donut, the person has never been pregnant.

Mr. INHOFE. Mr. Chairman, I rise in favor of the Smith substitute.

Mr. Chairman, this legislation does nothing more than create a host of new Federal crimes. It will punish those individuals who choose to participate in nonviolent demonstrations at numerous facilities around the country that provide abortion services. This bill provides very strong protection for abortion providers in this country under Federal law and fails to give the same protection to those persons wishing to exercise their first amendment rights under the Constitution.

This language is so broad and so unclear that pro-life individuals will have to live with the fear that they will be violating Federal law by peacefully protesting. They will be afraid to exercise their first amendment right of free speech. This bill makes nonviolent civil disobedience a Federal crime. Citizens of this country should not have to live in fear of expressing their position on abortion * * * or any issue.

The practice of civil disobedience has a long history in this Nation. This bill singles out pro-life groups specifically. To punish one group for civil disobedience more severely, based on someone's viewpoint on a particular issue, is a clear violation of the first amendment. Mr. Chairman, I thought the first amendment was drafted to protect all Americans from Government infringements on free speech.

Mr. Chairman, the Smith substitute addresses these concerns * * * and I ask my colleagues to vote for the Smith substitute.

Mrs. LOWEY. Mr. Chairman, I rise in strong opposition to the Smith substitute. Amendment has one and only one intent: to gut this critical legislation.

I must admit that I am somewhat heartened by this substitute. Heartened, because it acknowledges the clear recognition of the need for Federal remedies to address the escalating violence at reproductive health clinics. I am pleased that we all agree that the violence has gone too far.

But that is about the only good thing about the amendment.

Do not be fooled—the clear intent of this substitute is to render the bill almost meaningless. The real FACE protects both the rights of protesters and the rights of physicians and their patients. This substitute tips the balance in the favor of extremist protesters.

Indeed, this substitute provides a new cause of action to extremist groups, giving them the right to tie up reproductive health clinics in endless litigation. Just recently, operation rescue formed the legal offense fund, whose purpose is to litigate clinics to death. They intend to exhaust the resources of clinics, providers, doctors and patients through unending litigation. Clearly, they want to put these clinics out of business, and they do not care if, in doing so, they deprive women and their families of access to pre-natal care, immunizations, contraception, and yes, abortion.

A vote for the Smith substitute is a vote to encourage frivolous lawsuits and a vote to weaken the protections H.R. 796 is designed to provide.

I urge my colleagues in the strongest possible terms to oppose the Smith substitute.

The CHAIRMAN. The question is on the amendment in the nature of a substitute offered by the gentleman from New Jersey [Mr. SMITH].

The question was taken; and the Chairman announced that the ayes appeared to have it.

RECORDED VOTE

Mr. SMITH of New Jersey. Mr. Chairman, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 177, noes 255, not voting 6, as follows:

[Roll No. 580]

AYES—177

Allard
Applegate
Archer
Armey
Bachus (AL)
Baker (CA)
Baker (LA)
Ballenger
Barcia
Barrett (NE)
Bartlett
Barton
Bateman
Bentley
Bevill
Bilirakis
Bliley
Blute
Boehner
Borski
Browder
Bunning
Burton
Buyer
Callahan
Calvert
Camp
Canady
Castle
Coble
Collins (GA)
Combest
Costello
Crane
Crapo
Cunningham
de la Garza
Deal
DeLay
Diaz-Balart
Doolittle
Dornan
Dreier
Duncan
Dunn
Emerson
Everett
Ewing
Fields (TX)
Fish
Gallegly
Gekas
Gillmor
Gingrich
Goodlatte
Goodling
Goss
Grams
Hall (OH)
Hall (TX)
Hancock
Hansen
Hastert
Hayes
Hefley
Herger
Hoekstra
Hoke
Holden
Huffington
Hunter
Hutchinson
Hutto
Hyde
Inglis
Inhofe
Istook
Johnson, Sam
Kanjorski
Kasich
Kildee
Kim
King
Kingston
Klink
Knollenberg
Kyl
LaFalce
Levy
Lewis (CA)
Lewis (FL)
Lightfoot
Linder
Lipinski
Livingston
Manton
Manzullo
Mazzoli
McCollum
McCrery
McDade
McHugh
McInnis
McKeon
McMillan
McNulty
Mica
Michel
Miller (FL)
Mollohan
Montgomery
Moorhead
Murphy
Murtha
Myers
Nussle
Oberstar
Ortiz
Orton
Oxley
Packard
Parker
Paxon
Penny
Peterson (MN)
Petri
Pombo
Portman
Poshard
Quillen
Quinn
Rahall
Ravenel
Regula
Roberts
Rogers
Rohrabacher
Ros-Lehtinen
Roth
Rowland
Royce
Santorum
Sarpalius
Saxton
Schaefer
Sensenbrenner
Shaw
Shuster
Skeen
Skelton
Smith (MI)
Smith (NJ)
Smith (OR)
Smith (TX)
Solomon
Spence
Stearns
Stenholm
Stump
Stupak
Sundquist
Talent
Tanner
Tauzin
Taylor (MS)
Taylor (NC)
Tejeda
Thomas (WY)
Tucker
Volkmer
Vucanovich
Walker
Walsh
Weldon
Wolf
Young (AK)
Young (FL)

NOES—255

Abercrombie
Ackerman
Andrews (ME)
Andrews (TX)
Bacchus (FL)
Baesler
Barca
Barlow
Barrett (WI)
Becerra
Beilenson
Bereuter
Berman
Bilbray
Bishop
Blackwell
Boehlert
Bonilla
Bonior
Boucher
Brewster
Brooks
Brown (CA)
Brown (FL)
Brown (OH)
Bryant
Byrne
Cantwell
Cardin
Carr
Chapman
Clay
Clayton
Clement
Clyburn
Coleman
Collins (IL)
Collins (MI)
Condit
Cooper
Coppersmith
Cox
Coyne
Cramer
Danner
Darden
de Lugo (VI)
DeFazio
DeLauro
Dellums
Derrick
Deutsch
Dingell
Dixon
Dooley
Durbin
Edwards (CA)
Edwards (TX)
Engel
English (AZ)
English (OK)
Eshoo
Evans
Faleomavaega (AS)
Farr
Fawell
Fazio
Fields (LA)
Filner
Fingerhut
Flake
Foglietta
Ford (MI)
Ford (TN)
Fowler
Frank (MA)
Franks (CT)
Franks (NJ)
Frost
Furse
Gallo
Gejdenson
Gephardt
Geren
Gibbons
Gilchrest
Gilman
Glickman
Gonzalez
Gordon
Grandy
Green
Greenwood
Gunderson
Gutierrez
Hamburg
Hamilton
Harman
Hastings
Hefner
Hilliard
Hinchey
Hoagland
Hobson
Hochbrueckner
Horn
Houghton
Hoyer
Hughes
Inslee
Jacobs
Jefferson
Johnson (CT)
Johnson (GA)
Johnson (SD)
Johnson, E. B.
Johnston
Kaptur
Kennedy
Kennelly
Kleczka
Klein
Klug
Kolbe
Kopetski
Kreidler
Lambert
Lancaster
Lantos
LaRocco
Laughlin
Lazio
Leach
Lehman
Levin
Lewis (GA)
Lloyd
Long
Lowey
Machtley
Maloney
Mann
Margolies-Mezvinsky
Markey
Martinez
Matsui
McCandless
McCloskey
McCurdy
McDermott
McHale
McKinney
Meehan
Meek
Menendez
Meyers
Mfume
Miller (CA)
Mineta
Minge
Mink
Moakley
Molinari
Moran
Morella
Nadler
Natcher
Neal (MA)
Neal (NC)
Norton (DC)
Obey
Olver
Owens
Pallone
Pastor
Payne (NJ)
Payne (VA)
Pelosi
Peterson (FL)
Pickett
Pickle
Pomeroy
Porter
Price (NC)
Pryce (OH)
Ramstad
Rangel
Reed
Reynolds
Richardson
Ridge
Roemer
Rose
Rostenkowski
Roukema
Roybal-Allard
Rush
Sabo
Sanders
Sangmeister
Sawyer
Schenk
Schiff
Schroeder
Schumer
Scott
Serrano
Sharp
Shays
Shepherd
Sisisky
Skaggs
Slattery
Slaughter
Smith (IA)
Snowe
Spratt
Stark
Stokes
Strickland
Studds
Swett
Swift
Synar
Thomas (CA)
Thompson
Thornton
Thurman
Torkildsen
Torres
Torricelli
Towns
Traficant
Underwood (GU)
Unsoeld
Upton
Valentine
Velazquez
Vento
Visclosky
Washington
Waters
Watt
Waxman
Wheat
Whitten
Williams
Wilson
Wise
Woolsey
Wyden
Wynn
Yates
Zeliff
Zimmer

NOT VOTING—6

- Andrews (NJ)
- Clinger
- Conyers
- Dickey
- Dicks
- Romero-Barcelo (PR)

☐ 1624

Mr. HOCHBRUECKNER, Mr. GUNDERSON, and Ms. DANNER changed their vote from "aye" to "no."

Messrs. PETRI, GILLMOR, and McMILLAN changed their vote from "no" to "aye."

So the amendment in the nature of a substitute was rejected.

The result of the vote was announced as above recorded.

The CHAIRMAN. The question is on the committee amendment in the nature of a substitute, as amended.

The committee amendment in the nature of a substitute, as amended, was agreed to.

The CHAIRMAN. Under the rule, the Committee rises.

Accordingly the Committee rose; and the Speaker pro tempore (Mr. SKELTON) having assumed the chair, Mr. KOPETSKI, Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (H.R. 796) to assure freedom of access to clinic entrances, pursuant to House Resolution 313, he reported the bill back to the House with an amendment adopted by the Committee of the Whole.

The SPEAKER pro tempore. Under the rule, the previous question is ordered.

Is a separate vote demanded on any amendment to the committee amendments in the nature of a substitute adopted by the Committee of the Whole?

Mr. WALKER. Mr. Speaker, I demand a separate vote on the so-called DeLay amendment.

The SPEAKER pro tempore. Is a separate vote demanded on any other amendment?

The Clerk will report the amendment on which a separate vote has been demanded.

The Clerk read as follows:

Amendment: Page 3, line 8, strike the period and insert the following: ", except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor."

Mr. WALKER (during the reading). Mr. Speaker, I ask unanimous consent that the amendment be considered as read and printed in the RECORD.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

The SPEAKER pro tempore. The question is on the amendment.

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

RECORDED VOTE

Mr. WALKER. Mr. Speaker, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 345, noes 80, not voting 8, as follows:

[Roll No. 561]

AYES—345

- Ackerman
- Allard
- Andrews (TX)
- Applegate
- Archer
- Armey
- Bachus (AL)
- Baesler
- Baker (CA)
- Baker (LA)
- Ballenger
- Barca
- Barcia
- Barlow
- Barrett (NE)
- Barrett (WI)
- Bartlett
- Barton
- Bateman
- Beilenson
- Bentley
- Bereuter
- Berman
- Bevill
- Bilbray
- Bilirakis
- Bishop
- Bliley
- Blute
- Boehner
- Bonilla
- Bonior
- Borski
- Boucher
- Brewster
- Browder
- Brown (OH)
- Bryant
- Bunning
- Burton
- Buyer
- Byrne
- Callahan
- Calvert
- Camp
- Canady
- Cantwell
- Cardin
- Carr
- Castle
- Chapman
- Clayton
- Clement
- Coble
- Coleman
- Collins (GA)
- Combest
- Condit
- Cooper
- Costello
- Cox
- Cramer
- Crane
- Crapo
- Cunningham
- Danner
- Darden
- de la Garza
- Deal
- DeFazio
- DeLauro
- DeLay
- Derrick
- Diaz-Balart
- Dingell
- Dixon
- Dooley
- Doolittle
- Dornan
- Dreier
- Duncan
- Dunn
- Durbin
- Edwards (TX)
- Emerson
- English (AZ)
- English (OK)
- Eshoo
- Everett
- Ewing
- Farr
- Fawell
- Fazio
- Fields (LA)
- Fields (TX)
- Fingerhut
- Fish
- Flake
- Foglietta
- Fowler
- Franks (CT)
- Franks (NJ)
- Frost
- Furse
- Gallegly
- Gallo
- Gekas
- Geren
- Gibbons
- Gilchrest
- Gillmor
- Gingrich
- Glickman
- Goodlatte
- Goodling
- Gordon
- Goss
- Grams
- Grandy
- Green
- Greenwood
- Gunderson
- Hall (OH)
- Hall (TX)
- Hamilton
- Hancock
- Hansen
- Harman
- Hastert
- Hayes
- Hefley
- Hefner
- Herger
- Hoagland
- Hobson
- Hochbrueckner
- Hoekstra
- Hoke
- Holden
- Houghton
- Hoyer
- Huffington
- Hughes
- Hunter
- Hutchinson
- Hutto
- Hyde
- Inglis
- Inhofe
- Inslee
- Istook
- Jacobs
- Johnson (CT)
- Johnson (GA)
- Johnson (SD)
- Johnson, E. B.
- Johnson, Sam
- Kanjorski
- Kasich
- Kennedy
- Kennelly
- Kildee
- Kim
- King
- Kingston
- Kleczka
- Klein
- Klink
- Klug
- Knollenberg
- Kolbe
- Kyl
- LaFalce
- Lambert
- Lancaster
- Lantos
- LaRocco
- Laughlin
- Lazio
- Leach
- Lehman
- Levin
- Levy
- Lewis (CA)
- Lewis (FL)
- Lightfoot
- Linder
- Lipinski
- Livingston
- Lloyd
- Lowey
- Machtley
- Mann
- Manton
- Manzullo
- Markey
- Martinez
- Mazzoli
- McCandless
- McCloskey
- McCollum
- McCrery
- McCurdy
- McDade
- McHale
- McHugh
- McInnis
- McKeon
- McMillan
- McNulty
- Menendez
- Meyers
- Mfume
- Mica
- Michel
- Miller (CA)
- Miller (FL)
- Minge
- Moakley
- Molinari
- Mollohan
- Montgomery
- Moorhead
- Moran
- Murphy
- Murtha
- Myers
- Neal (MA)
- Neal (NC)
- Nussle
- Oberstar
- Obey
- Ortiz
- Orton
- Oxley
- Packard
- Pallone
- Parker
- Pastor
- Paxon
- Payne (VA)
- Pelosi
- Penny
- Peterson (FL)
- Peterson (MN)
- Petri
- Pickett
- Pickle
- Pombo
- Pomeroy
- Porter
- Portman
- Poshard
- Price (NC)
- Pryce (OH)
- Quillen
- Quinn
- Rahall
- Ramstad
- Rangel
- Ravenel
- Reed
- Regula
- Reynolds
- Richardson
- Ridge
- Roberts
- Roemer
- Rogers
- Rohrabacher
- Ros-Lehtinen
- Rostenkowski
- Roth
- Roukema
- Rowland
- Roybal-Allard
- Royce
- Sangmeister
- Santorum
- Sarpalius
- Sawyer
- Saxton
- Schaefer
- Schenk
- Schiff
- Schumer
- Sensenbrenner
- Serrano
- Sharp
- Shaw
- Shays
- Shuster
- Sisisky
- Skaggs
- Skeen
- Skelton
- Slattery
- Slaughter
- Smith (IA)
- Smith (MI)
- Smith (NJ)
- Smith (OR)
- Smith (TX)
- Snowe
- Solomon
- Spence
- Spratt
- Stearns
- Stenholm
- Strickland
- Studds
- Stump
- Stupak
- Sundquist
- Swift
- Talent
- Tanner
- Tauzin
- Taylor (MS)
- Taylor (NC)
- Tejeda
- Thomas (CA)
- Thomas (WY)
- Thornton
- Torkildsen
- Torres
- Traficant
- Tucker
- Upton
- Valentine
- Velazquez
- Volkmer
- Vucanovich
- Walker
- Walsh
- Weldon
- Wheat
- Whitten
- Wilson
- Wise
- Wolf
- Young (AK)
- Young (FL)
- Zeliff
- Zimmer

NOES—80

- Abercrombie
- Andrews (ME)
- Bacchus (FL)
- Becerra
- Blackwell
- Boehlert
- Brooks
- Brown (CA)
- Brown (FL)
- Clay
- Clyburn
- Collins (IL)
- Collins (MI)
- Conyers
- Coppersmith
- Coyne
- Dellums
- Deutsch
- Edwards (CA)
- Engel
- Evans
- Filner
- Ford (MI)
- Ford (TN)
- Frank (MA)
- Gejdenson
- Gilman
- Gonzalez
- Hamburg
- Hastings
- Hilliard
- Hinchey
- Horn
- Jefferson
- Johnston
- Kopetski
- Kreidler
- Lewis (GA)
- Long
- Maloney
- Margolies-Mezvinsky
- Matsui
- McDermott
- McKinney
- Meehan
- Meek
- Mineta
- Mink
- Morella
- Nadler
- Natcher
- Olver
- Owens
- Payne (NJ)
- Rose
- Rush
- Sabo
- Sanders
- Schroeder
- Scott
- Stark
- Stokes
- Swett
- Synar
- Thompson
- Thurman
- Torricelli
- Towns
- Unsoeld
- Vento
- Visclosky
- Washington
- Waters
- Watt
- Waxman
- Williams
- Woolsey
- Wyden
- Wynn
- Yates

NOT VOTING—8

- Andrews (NJ)
- Clinger
- Dickey
- Dicks
- Gephardt
- Gutierrez
- Kaptur
- Shepherd

☐ 1646

Mr. LEVIN changed his vote from "no" to "aye."

Mr. BECERRA changed his vote from "aye" to "no."

So the amendment was agreed to.

The result of the vote was announced as above recorded.

The SPEAKER pro tempore (Mr. SKELTON). The question is on the committee amendment in the nature of a substitute, as amended.

The committee amendment in the nature of a substitute, as amended, was agreed to.

The SPEAKER pro tempore. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed and read a third time, and was read the third time.

MOTION TO RECOMMIT OFFERED BY MR. SENSENBRENNER

Mr. SENSENBRENNER. Mr. Speaker, I offer a motion to recommit.

The SPEAKER pro tempore. Is the gentleman opposed to the bill?

Mr. SENSENBRENNER. I am, in its present form, Mr. Speaker.

The SPEAKER pro tempore. The Clerk will report the motion to recommit.

The Clerk read as follows:

Mr. SENSENBRENNER moves to recommit the bill H.R. 796 to the Committee on the Judiciary with instructions to report the same back to the House forthwith with the following amendment:

Page 3, beginning on line 7, strike "and also be subject to the civil remedy provided in subsection (c) of this section".

Page 3, strike line 21 and all that follows through line 24 on page 4.

Mr. SENSENBRENNER (during the reading). Mr. Speaker, I ask unanimous consent that the motion to recommit be considered as read and printed in the RECORD.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

The SPEAKER pro tempore. The gentleman from Wisconsin [Mr. SENSENBRENNER] is recognized for 5 minutes.

Mr. SENSENBRENNER. Mr. Speaker, I yield to the gentleman from Texas [Mr. DELAY].

(Mr. DELAY asked and was given permission to revise and extend his remarks.)

Mr. DELAY. Mr. Speaker, I thank the gentleman for yielding.

I support his motion to recommit.

Mr. SENSENBRENNER. Mr. Speaker, this motion to recommit strikes the civil right of action contained in H.R. 796 both for individuals as well as for the United States and State attorneys general. The attorneys general do not need a civil right of action, because they already have adequate power particularly since the criminal penalties in this bill remain.

However, the civil right of action can be used by those that wish to stop peaceful protests as an intimidating club to prevent people from exercising their first-amendment rights, because anybody who is sued under the civil right of action that is contained in this bill will have to hire their own attorney at their own expense, even if they have not violated the law, because they will have to get themselves exonerated in a Federal court. That is wrong. That can subject anybody that is peacefully praying the rosary in front of an abortion clinic individually each to hire an attorney.

My motion to recommit also strikes the fact that even when the plaintiff can prove no damages there are $5,000 of liquidated damages that are automatically assessed against each defendant. That is wrong, too.

But what is also wrong is that if the defendant prevails, the defendant does not get any attorney's fees whatsoever.

□ 1650

Now, I think that we ought to be fair in this. There is no other civil right of action by an individual against another individual in any of the civil rights laws. The bus company was not given a civil right of action to sue Rosa Parks, the operators of the segregated lunch counters were not given the civil right of action to try to sue those who were sitting in in support of the passage of civil rights laws. There is no reason why a civil right of action should be granted in this bill to allow plaintiffs' attorneys to harass people who are peacefully protesting in front of abortion clinics. And that is what will happen unless my motion to recommit is passed.

I would urge support for the motion to recommit so that this bill does not become another way to enrich plaintiffs' attorneys.

Mr. Speaker, I yield to the gentleman from Missouri [Mr. VOLKMER].

(Mr. VOLKMER asked and was given permission to revise and extend his remarks.)

Mr. VOLKMER. Mr. Speaker, I rise in support of the motion to recommit. The lanuage as contained in the bill presently giving the private cause of action is unprecedented in the history of this country as far as civil rights action is concerned. It is an intimidating factor that really is meant to stifle dissent. I, for one, believe that it should be stricken.

There are other provisions in this bill that go to violence at the clinics; I do not support any violence at the clinics, and I do not think anybody here does. But I do support the right of individuals to dissent, and this language in the bill will actually stifle that because of the threat of the lawsuits and the way that the language in the bill is structured, because you, as a plaintiff, a clinic or a doctor or a nurse, anybody in there, when you sue, you are entitled to liquidated damages if you can prove your case and you also get attorneys' fees. But if you lose, you do not lose anything. You do not lose a thing.

How is that being fair? Why do you not have a provision in here to make it fair that if you lose, if you sue and you lose, you pay $5,000 and you pay attorneys' fees?

Mr. SENSENBRENNER. Mr. Speaker, I yield back the balance of my time.

Mr. BROOKS. Mr. Speaker, I rise in opposition to the motion to recommit, and I yield to the gentleman from Virginia [Mr. MORAN].

(Mr. MORAN asked and was given permission to revise and extend his remarks.)

Mr. MORAN. Mr. Speaker, the need for this legislation arose with the blockade of the Alexandria Women's Health Clinic in my district. I rise in very strong support of this bill as it stands right now.

Mr. Speaker, I rise today in support of H.R. 796, the Freedom of Access to Clinic Entrances Act. I am proud to be a cosponsor of this important legislation. Since the Supreme Court's Bray decision, which overturned a Federal court injunction against Operation Rescue's blockade of the Alexandria Women's Health Clinic, located in my district, clinic violence has escalated nationwide to an unprecedented level. In 1993 alone more than 50 percent of clinics surveyed have experienced some form of violence: arson, chemical attacks, invasions, stalking, blockades, bomb threats, and death threats.

These kinds of radical activities cannot be characterized as peaceful protest. This is outright terrorism, the final aim of which is to shut down clinics and strip the legal right of abortion away from the women of this country. Unless Congress acts to protect clinics, clinicians, and patients, the right to choose will be a right in theory only, available only to those brave few willing to risk their personal safety to exercise their constitutional rights.

In my own State of Virginia, without Federal assistance, localities have no effective means of ending blockades which have effectively shut down clinics throughout northern Virginia. The strain that antiabortion violence places on local law enforcement is simply too much. Our local officials need help from the Federal Government. That's what this legislation will provide.

Opponents of this bill have tried to paint this legislation as an extreme piece of legislation that will prevent peaceful protestors from exercising their first amendment rights under the Constitution. This is absolutely untrue. This bill will criminalize the use of force, threat of force, or physical obstruction which interferes with anyone seeking or providing reproductive health services. It won't stop protestors from demonstrating outside of clinics, holding posters, or shouting at people entering clinics. It won't stop people from sitting and praying in front of a reproductive health care facility. It will stop the campaign of violence and terrorism gripping our country that led to the tragic shooting death of Dr. David Gunn in Florida.

This debate is not about abortion, it is about the liberty of individuals to exercise their legal rights in this country. It is our role to protect those rights when they are endangered, as Congress did when it prohibited unlawful interference with an individual's attempt to exercise the right to vote.

I urge my colleagues, regardless of your position on abortion, to take a stand against terrorism, take a stand against violence, and reaffirm our Constitution. I urge my colleagues to vote for H.R. 796.

Mr. BROOKS. Mr. Speaker, I yield to the gentlewoman from Arizona [Ms. ENGLISH].

(Ms. ENGLISH of Arizona asked and was given permission to revise and extend her remarks.)

Ms. ENGLISH of Arizona. Mr. Speaker, I rise today in support of H.R. 796, the Freedom of Access to Clinic Entrances Act.

Mr. Speaker, I rise today in support of the Freedom of Access to Clinic Entrances Act.

This legislation is urgently needed to protect reproductive health care providers and their patients from the violence that has been plaguing these people and facilities. In recent years, various acts of violence, including arson, bombings, death threats, and murder have been reported and were determined to be related to efforts blocking access to clinics. Yet, State and local law enforcement agencies have been unable to prevent these crimes from occurring.

According to Tuesday's Washington Post, crime was recognized as the biggest issue facing the country today. I see the Freedom of Access to Clinic Entrances Act as another necessary facet to the overall crime package put before Congress, and we cannot debate the package without addressing this most serious of issues. State and local law enforcement

Case 1:22-cr-00096-CKK Document 197-4 Filed 03/17/23 Page 48 of 49

agencies have been unable to protect the victims of the illegal and dangerous attempts to block access because there is no specific prohibition on interference with clinic access.

The act of interference cannot be prosecuted; but rather only the specific act which serves to interfere. It is only through specific Federal and civil penalties designed to protect access to clinics that physicians and patients can be fully protected. It is quite evident that the situation is getting worse and something must be done. The Freedom of Access to Clinic Entrances Act can wait no longer.

The Freedom of Access to Clinic Entrances Act has bipartisan support, as well as pro-choice and pro-life support. It is an antiviolence bill, penalizing violence only, while permitting peaceful protest.

In this era of violent crime, let us ensure that the women, men, and children who need the services these facilities provide are able to receive these services in a peaceful, antiviolent environment. Their health and their lives depend on this.

Mr. BROOKS. Mr. Speaker, I yield to the gentleman from Kansas [Mr. SLATTERY].

(Mr. SLATTERY asked and was given permission to revise and extend his remarks.)

Mr. SLATTERY. Mr. Speaker, I rise today in support of H.R. 796. This legislation would preserve the first amendment freedoms guaranteed by our constitution. Protesters at reproductive health clinics would not be penalized for exercising free speech. Protesters would only be penalized for violent and threatening conduct, which is not and should not be protected by the first amendment.

Equally important, a woman's right to choose as defined by the U.S. Supreme Court would be preserved by this legislation. This legislation would protect a woman from individuals engaging in violent, forceful or intimidating acts in order to restrict her access to reproductive health care. This legislation would also protect the rights of health care providers to provide legal health care services to women.

It is high time that individuals engaging in violent acts outside of reproductive health clinics get the message that their behavior and disregard for the rights of others will no longer be tolerated. It is not appropriate to continue to treat women as second-class citizens, and I believe that this legislation carefully protects womens' rights without infringing on the right of peaceful protest.

I strongly defend the right of antiabortion protesters to picket, pray, or otherwise oppose the performance of abortions. These protesters have strongly held views, and they have the constitutional right and moral obligation to express them. But others who disagree with those views, have an equal right to ignore their protests.

Some suggest that this issue should be handled by State and local officials, rather than the Federal Government. But the national campaigns by antiabortion groups are calculated precisely to overwhelm the resources of local law enforcement agencies. Wichita, KS has certainly confronted this problem.

I support this measure today because I believe it is a fair and practical protection against undue violence. It protects those who seek access to clinics. But it also protects those who do not believe in the use of abortion services and who wish to demonstrate that belief consistent with their constitutional right to peaceably assemble.

Americans of conscience must not be denied the right to oppose abortion. They must be permitted to protest and lobby and pray and carry signs. Even if what they say offends people. Congress must protect their right to speak and assemble peacefully while they struggle to change the law.

What they cannot do is threaten people, harass people, intimidate people. Certainly, they cannot hurt people. But the committee report accompanying this bill tells of arsons, bombings, shootings, death threats, assaults, kidnapings, even a murder—acts of violence aimed at Americans who seek to exercise a hotly debated but constitutionally protected right.

The report tells of the inability and unwillingness of some local authorities to enforce State laws. In such circumstances, it is appropriate for the Federal Government to act.

I believe that H.R. 796 will not hinder legal protests. It simply limits the debate to lawful civil discourse, where it belongs.

I urge my colleagues to support this bill.

Mr. BROOKS. Mr. Speaker, I am, of course, dead set against this motion to recommit. It would limit the remedies for victims of violence, sabotage, et cetera, at these clinics to the people and to the properties. It would limit all the civil damages. This means the doctors could not sue, the nurses could not sue, the victims could not sue, and it is a detriment to the effectiveness of this legislation.

I would ask for its unanimous defeat.

Mr. Speaker, I yield to the gentlewoman from the District of Columbia [Ms. NORTON].

Ms. NORTON. Mr. Speaker, I rise to oppose the motion to recommit and to urge passage of the Freedom of Access to Clinic Entrances Act. I speak as a Member who has spent much of her professional career as a civil rights and constitutional lawyer.

The gentleman has objected to the provision of the bill providing for a private civil cause of action, stating that civil rights bills do not contain such private causes of action against other individuals.

Mr. Speaker, this is a bill which is unlike the typical civil rights legislation in that it is not directed against Government institutions or employers, but against individuals who are intimidating other individuals. In our law, this is akin to a tort, where indeed a private right of action would always be possible.

Mr. Speaker, I want to congratulate the chairman and the sponsors of this bill because they have accomplished a very difficult task. They have written a constitutional statute even though it touches upon the first amendment area. I could not vote for this bill if they had not crafted it as skillfully as they have.

The opposition cannot accuse me of being for this bill because I am pro-choice, although, of course I am pro-choice. However, Mr. Speaker, as a first amendment specialist in practice, I had occasions to argue first amendment cases in the Supreme Court of the United States and in other courts and often in cases where those whom I represented were individuals whose views I abhorred, including people who would be proud to call themselves racists. What I was trying to indicate—as an ACLU lawyer—by representing such individuals was that once the first amendment is weakened against them, it is weakened against all of us. The amendment tilts toward no point of view, but only in favor of free expression. Thus only through principled support of the first amendment can you guarantee that your own views will not be subject to an exception you may desire for others.

The greatest abuse in this debate, however, has been to invoke the name of Martin Luther King, Jr. The bill reaches protest action Dr. King would reject. Let me describe what kind of action this bill would reach.

Last January, Operation Rescue blockaded several clinics in the District of Columbia. At the Hillcrest Center in southeast Washington, every entrance was obstructed by anti-choice demonstrators. The driveway was blocked with a dumpster, the front door was blocked by anti-choice protestors who had locked their arms through hollow steel pipes welded to railroad ties wedged against the door, and both the rear and side doors were blocked by cars with flattened tires. Inside each car, several demonstrators chained and handcuffed themselves to the same type of steel pipe and tie contraption.

Hours later, when the police finally removed all the obstructions, the doors themselves could not be opened because the locks had been filed with glue.

The actions I have just described, Mr. Speaker, have nothing in common with the nonviolent protests led by Dr. Martin Luther King, Jr. I was in some of those protests. We knelt and prayed, as well, but we were quickly arrested. We did not physically intimidate any member of the public. Instead, we were physically intimidated by the police. And yet we did not fight back, and we did not keep others from enjoying their constitutional right.

The outrageous violence and intimidation that has become the trademark of Operation Rescue and its imitators have given nonviolent direct action a bad name. It is time that we reclaimed the good name of militant but peaceful protest in the tradition of Martin Luther King, Jr., by passing the Freedom of Access to Clinic Entrances Act.

The SPEAKER pro tempore (Mr. SKELTON). All time has expired.

Without objection, the previous question is ordered on the motion to recommit.

There was no objection.

The SPEAKER pro tempore. The question is on the motion to recommit.

The question was taken, and the Speaker pro tempore announced that the noes appeared to have it.

Mr. SENSENBRENNER. Mr. Speaker, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 182, noes 246, not voting 5, as follows:

[Roll No. 582]

AYES—182

Allard
Applegate
Archer
Armey
Bachus (AL)
Baker (CA)
Baker (LA)
Ballenger
Barcia
Barlow
Barrett (NE)
Bartlett
Barton
Bateman
Bentley
Bereuter
Bevill
Bilirakis
Bliley
Blute
Boehner
Bonilla
Borski
Browder
Bunning
Burton
Buyer
Callahan
Calvert
Camp
Canady
Coble
Collins (GA)
Combest
Costello
Cox
Crane
Crapo
Cunningham
de la Garza
Deal
DeLay
Diaz-Balart
Doolittle
Dornan
Dreier
Duncan
Emerson
Everett
Ewing
Fields (TX)
Fish
Gallegly
Gekas
Gilchrest
Gillmor
Gingrich
Goodlatte
Goodling
Goss
Grams
Grandy
Hall (OH)
Hall (TX)
Hamilton
Hancock
Hansen
Hastert
Hayes
Hefley
Herger
Hoekstra
Hoke
Holden
Huffington
Hunter
Hutchinson
Hutto
Hyde
Inglis
Inhofe
Istook
Johnson, Sam
Kanjorski
Kasich
Kildee
Kim
King
Kingston
Klink
Knollenberg
Kolbe
Kyl
LaFalce
Levy
Lewis (CA)
Lewis (FL)
Lightfoot
Linder
Lipinski
Livingston
Manton
Manzullo
Mazzoli
McCandless
McCollum
McCrery
McDade
McHugh
McKeon
McMillan
McNulty
Mica
Michel
Miller (FL)
Mollohan
Montgomery
Moorhead
Murphy
Murtha
Myers
Nussle
Ortiz
Orton
Oxley
Packard
Parker
Paxon
Penny
Peterson (MN)
Petri
Pombo
Portman
Poshard
Quillen
Quinn
Rahall
Ravenel
Roberts
Rogers
Rohrabacher
Ros-Lehtinen
Roth
Royce
Santorum
Sarpalius
Saxton
Schaefer
Schiff
Sensenbrenner
Shaw
Shuster
Skeen
Skelton
Smith (MI)
Smith (NJ)
Smith (OR)
Smith (TX)
Solomon
Spence
Stearns
Stenholm
Stump
Stupak
Sundquist
Talent
Tanner
Tauzin
Taylor (MS)
Taylor (NC)
Tejeda
Thomas (CA)
Thomas (WY)
Valentine
Volkmer
Vucanovich
Walker
Walsh
Weldon
Wolf
Young (AK)
Young (FL)

NOES—246

Abercrombie
Ackerman
Andrews (ME)
Andrews (TX)
Bacchus (FL)
Baesler
Barca
Barrett (WI)
Becerra
Beilenson
Berman
Bilbray
Bishop
Blackwell
Boehlert
Bonior
Boucher
Brewster
Brooks
Brown (CA)
Brown (FL)
Brown (OH)
Bryant
Byrne
Cantwell
Cardin
Carr
Castle
Chapman
Clay
Clayton
Clement
Clyburn
Coleman
Collins (IL)
Collins (MI)
Condit
Conyers
Cooper
Coppersmith
Coyne
Cramer
Danner
Darden
DeFazio
DeLauro
Dellums
Derrick
Deutsch
Dingell
Dixon
Dooley
Dunn
Durbin
Edwards (CA)
Edwards (TX)
Engel
English (AZ)
English (OK)
Eshoo
Evans
Farr
Fawell
Fazio
Fields (LA)
Filner
Fingerhut
Flake
Foglietta
Ford (MI)
Ford (TN)
Fowler
Frank (MA)
Franks (CT)
Franks (NJ)
Frost
Furse
Gallo
Gejdenson
Gephardt
Geren
Gibbons
Gilman
Glickman
Gonzalez
Gordon
Green
Greenwood
Gunderson
Gutierrez
Hamburg
Harman
Hastings
Hefner
Hilliard
Hinchey
Hoagland
Hobson
Hochbrueckner
Horn
Houghton
Hoyer
Hughes
Inslee
Jacobs
Jefferson
Johnson (GA)
Johnson (SD)
Johnson, E. B.
Johnston
Kaptur
Kennedy
Kennelly
Kleczka
Klein
Klug
Kopetski
Kreidler
Lambert
Lancaster
Lantos
LaRocco
Laughlin
Lazio
Leach
Lehman
Levin
Lewis (GA)
Lloyd
Long
Lowey
Machtley
Maloney
Mann
Margolies-Mezvinsky
Markey
Martinez
Matsui
McCloskey
McCurdy
McDermott
McHale
McInnis
McKinney
Meehan
Meek
Menendez
Meyers
Mfume
Miller (CA)
Mineta
Minge
Mink
Moakley
Molinari
Moran
Morella
Nadler
Natcher
Neal (MA)
Neal (NC)
Oberstar
Obey
Olver
Owens
Pallone
Pastor
Payne (NJ)
Payne (VA)
Pelosi
Peterson (FL)
Pickett
Pickle
Pomeroy
Porter
Price (NC)
Pryce (OH)
Ramstad
Rangel
Reed
Regula
Reynolds
Richardson
Ridge
Roemer
Rose
Rostenkowski
Roukema
Rowland
Roybal-Allard
Rush
Sabo
Sanders
Sangmeister
Sawyer
Schenk
Schroeder
Schumer
Scott
Serrano
Sharp
Shays
Shepherd
Sisisky
Skaggs
Slattery
Slaughter
Smith (IA)
Snowe
Spratt
Stark
Stokes
Strickland
Studds
Swett
Swift
Synar
Thompson
Thornton
Thurman
Torkildsen
Torres
Torricelli
Towns
Traficant
Tucker
Unsoeld
Upton
Velazquez
Vento
Visclosky
Washington
Waters
Watt
Waxman
Wheat
Whitten
Williams
Wilson
Wise
Woolsey
Wyden
Wynn
Yates
Zeliff
Zimmer

NOT VOTING—5

Andrews (NJ)
Clinger
Dickey
Dicks
Johnson (CT)

☐ 1719

Messrs. HOBSON, UPTON, and REGULA changed their vote from "aye" to "no."

So the motion to recommit was rejected.

The result of the vote was announced as above recorded.

PERSONAL EXPLANATION

Mrs. JOHNSON of Connecticut. Mr. Speaker, I was unavoidably detained during the preceding vote. Had I been here, I would have voted "no."

☐ 1720

The SPEAKER pro tempore (Mr. SKELTON). The question is on the passage of the bill.

The bill was passed.

The title of the bill was amended so as to read: "A bill to amend title 18, United States Code, to assure freedom of access to reproductive services."

A motion to reconsider was laid on the table.