# EXHIBIT E

# CONGRESSIONAL RECORD

## 103RD CONGRESS

**SENATE**

| Bill | Date | Page(s) |
|------|------|---------|
| S. 636 | Nov. 16, 1993 | S15655-88, S15702-28 |

**Action:**

**Measures Passed:**

***Freedom of Access to Medical Clinic Entrances:***
By 69 yeas to 30 nays (Vote No. 373), Senate passed S. 636, to amend the Public Health Service Act to permit individuals to have freedom of access to certain medical clinics and facilities, after agreeing to a modified committee amendment in the nature of a substitute, and taking action on amendments proposed thereto, as follows:

**Pages S15655-88, S15702-28**

Adopted:

(1) Smith Amendment No. 1191, to differentiate between violent and non-violent activities.

**Pages S15664-67, S15676**

(2) By 56 yeas to 40 nays (Vote No. 369), Kennedy Modified Amendment No. 1192 (to Amendment No. 1191), to lower the maximum penalties applicable for offenses not involving force or threat of force.

**Pages S15668-73, S15675-76**

(3) Hatch Amendment No. 1190, to protect the First Amendment rights to exercise religion.

**Pages S15660-62, S15676**

(5) Coats Amendment No. 1194, to add a cause of action relating to infringement on exercise of lawful speech or assembly.

**Pages S15685-88, S15702-07, S15712**

(6) Kennedy/Boxer Amendment No. 1195 (to Amendment N. 1194, in the nature of a substitute. (By 36 yeas to 63 nays (Vote No. 370), Senate earlier failed to table the amendment.)

**Pages S15707-12**

(7) Hatch Modified Amendment No. 1196, to define pregnancy or abortion-related services as lawful.

**Pages S15712-16, S15720**

(8) Kennedy/Boxer Amendment No. 1197 (to Amendment No. 1196), in the nature of a substitute. (By 35 yeas to 64 nays (Vote No. 371), Senate earlier failed to table the amendment.)

**Pages S15716-20**

Rejected:

By 38 yeas to 61 nays (Vote No. 372), Hatch Amendment No. 1198, in the nature of a substitute.

**Pages S15720-23**

During consideration of this measure today, Senate also took the following action:

Smith Amendment No. 1193 (to Amendment No. 1191), in the nature of a substitute, was ruled out of order.

**Pages S15673-75**

## FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will now proceed to the consideration of S. 636, which the clerk will report.

The legislative clerk read as follows:

A bill (S. 636) to amend the Public Health Service Act to permit individuals to have freedom of access to certain medical clinics and facilities, and for other purposes.

The Senate proceeded to consider the bill which had been reported from the Committee on Labor and Human Resources with an amendment to strike out all after the enacting clause and inserting in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

**SEC. 2. CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds that—

(1) medical clinics and other facilities throughout the Nation offering abortion-related services have been targeted in recent years by an interstate campaign of violence and obstruction aimed at closing the facilities or physically blocking ingress to them, and intimidating those seeking to obtain or provide abortion-related services;

(2) as a result of such conduct, women are being denied access to, and health care providers are being prevented from delivering, vital reproductive health services;

(3) such conduct subjects women to increased medical risks and thereby jeopardizes the public health and safety;

(4) the methods used to deny women access to these services include blockades of facility entrances; invasions and occupations of the premises; vandalism and destruction of property in and around the facility; bombings, arson, and murder; and other acts of force and threats of force;

(5) those engaging in such tactics frequently trample police lines and barricades and overwhelm State and local law enforcement authorities and courts and their ability to restrain and enjoin unlawful conduct and prosecute those who have violated the law;

(6) this problem is national in scope, and because of its magnitude and interstate nature exceeds the ability of any single State or local jurisdiction to solve it;

(7) such conduct operates to infringe upon women's ability to exercise full enjoyment of rights secured to them by Federal and State law, both statutory and constitutional, and burdens interstate commerce, including by interfering with business activities of medical clinics involved in interstate commerce and by forcing women to travel from States where their access to reproductive health services is obstructed to other States;

(8) the entities that provide abortion-related services engage in commerce by purchasing and leasing facilities and equipment, selling goods and services, employing people, and generating income;

(9) such entities purchase medicine, medical supplies, surgical instruments, and other supplies produced in other States;

(10) violence, threats of violence, obstruction, and property damage directed at abortion providers and medical facilities have had the effect of restricting the interstate movement of goods and people;

(11) prior to the Supreme Court's decision in Bray v. Alexandria Women's Health Clinic (113 S. Ct. 753 (1993)), such conduct was frequently restrained and enjoined by Federal courts in actions brought under section 1980(3) of the Revised Statutes (42 U.S.C. 1985(3));

(12) in the Bray decision, the Court denied a remedy under such section to persons injured by the obstruction of access to abortion-related services;

(13) legislation is necessary to prohibit the obstruction of access by women to abortion-related services and to ensure that persons

injured by such conduct, as well as the Attorney General of the United States and State Attorneys General, can seek redress in the Federal courts;

(14) the obstruction of access to abortion-related services can be prohibited, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment of the Constitution or other law; and

(15) Congress has the affirmative power under section 8 of article I of the Constitution as well as under section 5 of the Fourteenth Amendment to the Constitution to enact such legislation.

(b) PURPOSE.—It is the purpose of this Act to protest and promote the public health and safety and activities affecting interstate commerce by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with a person seeking to obtain or provide abortion-related services, and the destruction of property of facilities providing abortion-related services, and by establishing the right of private parties injured by such conduct, as well as the Attorney General of the United States and State Attorneys General in appropriate cases, to bring actions for appropriate relief.

**SEC. 3. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

Title XXVII of the Public Health Service Act (42 U.S.C. 300aaa et seq.) is amended by adding at the end thereof the following new section:

**"SEC. 2715. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

"(a) PROHIBITED ACTIVITIES.—Whoever—

"(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing abortion-related services; or

"(2) intentionally damages or destroys the property of a medical facility or in which a medical facility is located, or attempts to do so, because such facility provides abortion-related services,

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense, be fined in accordance with title 18 or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18 or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B).

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may

elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $15,000, for a first violation; and

"(ii) in an amount not exceeding $25,000, for any subsequent violation.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory and civil penalties as described in paragraph (2)(B).

"(d) RULES OF CONSTRUCTION.—Nothing in this section shall be construed or interpreted to—

"(1) prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;

"(2) deprive State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State or local law;

"(3) provide exclusive authority to prosecute, or exclusive penalties for, acts that may be violations of this section and that are violations of other Federal laws;

"(4) limit or otherwise affect the right of a person aggrieved by acts that may be violations of this section to seek other available civil remedies; or

"(5) prohibit expression protected by the First Amendment to the Constitution.

"(e) DEFINITIONS.—As used in this section:

"(1) ABORTION-RELATED SERVICES.—The term 'abortion-related services' includes medical, surgical, counselling or referral services, provided in a medical facility, relating to pregnancy or the termination of a pregnancy.

"(2) INTERFERE WITH.—The term 'interfere with' means to restrict a person's freedom of movement.

"(3) INTIMIDATE.—The term 'intimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.

"(4) MEDICAL FACILITY.—The term 'medical facility' includes a hospital, clinic, physician's office, or other facility that provides health or surgical services or counselling or referral related to health or surgical services.

"(5) PHYSICAL OBSTRUCTION.—The term 'physical obstruction' means rendering impassable ingress to or egress from a medical facility that provides abortion-related services, or rendering passage to or from such a facility unreasonably difficult or hazardous.

"(6) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

**SEC. 4. EFFECTIVE DATE.**

This Act shall take effect with respect to conduct occurring on or after the date of enactment of this Act.

The ACTING PRESIDENT pro tempore. Under the previous order, the Senator from Utah [Mr. HATCH] or his designee is recognized to offer an amendment on which there shall be 90 minutes debate.

Mr. HATCH addressed the Chair.

The ACTING PRESIDENT pro tempore. The Senator from Utah [Mr. HATCH].

Mr. HATCH. At this time I would like to say there will be no amendment on assaults during labor disputes; we have decided not to go with that amendment, which would ordinarily take 1¼ hours.

At this time, I would like to request that the following two amendments be stricken from the list of remaining amendments: The amendment to strike State attorneys general's authority to sue, and the amendment to protect other constitutional rights.

I ask unanimous consent that they be taken from the list.

The ACTING PRESIDENT pro tempore. Without objection, it is so order.

The Senator from Massachusetts [Mr. KENNEDY] is recognized.

MODIFICATION OF COMMITTEE SUBSTITUTE

Mr. KENNEDY. Mr. President, I have sent to the desk a modification of the committee substitute amendment to S. 636.

The ACTING PRESIDENT pro tempore. The Senator has that right. The amendment is modified.

Mr. KENNEDY. I would ask for its immediate consideration.

The ACTING PRESIDENT pro tempore. The amendment is modified.

The committee substitute, as modified, is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

**SEC. 2. CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds that—

(1) medical clinics and other facilities throughout the Nation offering abortion-related services have been targeted in recent years by an interstate campaign of violence and obstruction aimed at closing the facilities or physically blocking ingress to them, and intimidating those seeking to obtain or provide abortion-related services;

(2) as a result of such conduct, women are being denied access to, and health care providers are being prevented from delivering, vital reproductive health services;

(3) such conduct subjects women to increased medical risks and thereby jeopardizes the public health and safety;

(4) the methods used to deny women access to these services include blockades of facil-

ity entrances; invasions and occupations of the premises; vandalism and destruction of property in and around the facility; bombings, arson, and murder; and other acts of force and threats of force;

(5) those engaging in such tactics frequently trample police lines and barricades and overwhelm State and local law enforcement authorities and courts and their ability to restrain and enjoin unlawful conduct and prosecute those who have violated the law;

(6) this problem is national in scope, and because of its magnitude and interstate nature exceeds the ability of any single State or local jurisdiction to solve it;

(7) such conduct operates to infringe upon women's ability to exercise full enjoyment of rights secured to them by Federal and State law, both statutory and constitutional, and burdens interstate commerce, including by interfering with business activities of medical clinics involved in interstate commerce and by forcing women to travel from States where their access to reproductive health services is obstructed to other States;

(8) the entities that provide pregnancy or abortion-related services engage in commerce by purchasing and leasing facilities and equipment, selling goods and services, employing people, and generating income;

(9) such entities purchase medicine, medical supplies, surgical instruments, and other supplies produced in other States;

(10) violence, threats of violence, obstruction, and property damage directed at abortion providers and medical facilities have had the effect of restricting the interstate movement of goods and people;

(11) prior to the Supreme Court's decision in Bray v. Alexandria Women's Health Clinic (113 S. Ct. 753 (1993)), such conduct was frequently restrained and enjoined by Federal courts in actions brought under section 1980(3) of the Revised Statutes (42 U.S.C. 1985(3));

(12) in the Bray decision, the Court denied a remedy under such section to persons injured by the obstruction of access to abortion-related services;

(13) legislation is necessary to prohibit the obstruction of access by women to abortion-related services and to ensure that persons injured by such conduct, as well as the Attorney General of the United States and State Attorneys General, can seek redress in the Federal courts;

(14) the obstruction of access to pregnancy or abortion-related services can be prohibited, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or other law; and

(15) Congress has the affirmative power under section 8 of article I of the Constitution as well as under section 5 of the Fourteenth Amendment to the Constitution to enact such legislation.

(b) PURPOSE.—It is the purpose of this Act to protect and promote the public health and safety and activities affecting interstate commerce by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with a person seeking to obtain or provide abortion-related services, and the destruction of property of facilities providing abortion-related services, and by establishing the right of private parties injured by such conduct, as well as the Attorney General of the United States and State Attorneys General in appropriate cases, to bring actions for appropriate relief.

**SEC. 3. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

Title XXVII of the Public Health Service Act (42 U.S.C. 300aaa et seq.) is amended by adding at the end thereof the following new section:

**"SEC. 2715. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

"(a) PROHIBITED ACTIVITIES.—Whoever—

"(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing abortion-related services; or

"(2) intentionally damages or destroys the property of a medical facility or in which a medical facility is located, or attempts to do so, because such facility provides pregnancy or abortion-related services,

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense, be fined in accordance with title 18 United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $15,000, for a first violation; and

"(ii) in an amount not exceeding $25,000, for any subsequent violation.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).

"(d) RULES OF CONSTRUCTION.—Nothing in this section shall be construed or interpreted to—

"(1) prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;

"(2) deprive State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State and local law;

"(3) provide exclusive authority to prosecute, or exclusive penalties for, acts that may be violations of this section and that are violations of other Federal laws;

"(4) limit or otherwise affect the right of a person aggrieved by acts that may be violations of this section to seek other available civil remedies;

"(5) prohibit expression protected by the First Amendment to the Constitution; or

"(6) create new remedies for interference with expressive activities protected by the First Amendment to the Constitution, occurring outside a medical facility, regardless of the point of view expressed.

"(e) DEFINITIONS.—As used in this section:

"(1) INTERFERE WITH.—The term 'interfere with' means to restrict a person's freedom of movement.

"(2) INTIMIDATE.—The term 'intimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.

"(3) MEDICAL FACILITY.—The term 'medical facility' includes a hospital, clinic, physician's office, or other facility that provides health or surgical services or counselling or referral related to health or surgical services.

"(4) PHYSICAL OBSTRUCTION.—The term 'physical obstruction' means rendering impassable ingress to or egress from a medical facility that provides pregnancy or abortion-related services, or rendering passage to or from such a facility unreasonably difficult or hazardous.

"(5) PREGNANCY OR ABORTION-RELATED SERVICES.—The term 'pregnancy or abortion-related services' includes medical, surgical, counselling or referral services, provided in a medical facility, relating to pregnancy or the termination of a pregnancy.

"(6) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

**SEC. 4. EFFECTIVE DATE.**

This Act shall take effect with respect to conduct occurring on or after the date of enactment of this Act.

**CONGRESSIONAL RECORD — SENATE** *November 16, 1993*

Mr. KENNEDY. Mr. President, I yield myself 15 minutes of the time.

Could I ask, Mr. President, how much time there is on the bill?

The ACTING PRESIDENT pro tempore. There is 1 hour for general debate on the bill.

Mr. KENNEDY. And that is equally divided?

The ACTING PRESIDENT pro tempore. That is correct.

Mr. KENNEDY. Mr. President, I yield myself 15 minutes.

Mr. President, this legislation will protect women, doctors and other health care providers from the tactics of violence and intimidation that are often used by antiabortion activists.

In the past 15 years, more than 1,000 acts of violence against abortion providers have been documented in the United States. Over 100 clinics have been bombed or burned to the ground. Hundreds more have been vandalized.

A recent survey by the Feminist Majority Foundation of clinics around the country showed that during the first 7 months of this year, fully half of the participating clinics had been the target of arson, bomb threats, chemical attacks, invasions and blockades, and other abuses.

It is not only the clinics that are being attacked. Doctors, nurses, and patients have all become targets. At least two doctors have been shot by antiabortion extremists.

Dr. David Gunn was murdered last March when he was shot at point-blank range outside a clinic in Pensacola, FL. At a Wichita clinic in August, Dr. George Tiller was shot and wounded in both arms.

In December 1991, a man in a ski mask opened fire with a sawed-off shotgun at an abortion clinic in Springfield, MO, and two clinic workers were seriously wounded.

And the worst is by no means over.

The Pensacola News Journal reported last week that Operation Rescue has announced plans to shut down two Pensacola clinics this month, using unspecified field activities that will undoubtedly include these tactics.

Attacks on clinics are not isolated incidents. Health care providers are living in fear for their lives. Many have received explicit threats against themselves and their families. One doctor in Texas received a letter in his mailbox at home that said, "Now you will die by my gun in your head * * *. Get ready [you're] dead."

A doctor in Rhode Island, who testified before the Labor Committee, was notified that a catastrophic health and dismemberment insurance policy was taken out for his wife.

Many physicians have found their faces, names, and addresses on "Wanted" posters. They take these threats seriously—especially after Dr. Gunn's murder, because he, too, had been targeted on wanted posters.

In addition to the violence and threats of violence, clinic blockades and invasions are disrupting the delivery of health care services throughout the country. Since 1977, over 30,000 arrests have been made in connection with clinic blockades and related disruptions.

Typically, in these incidents, dozens of persons—and sometimes hundreds, or even thousands—join together to barricade clinic entrances and exits. Often, they push their way into the clinics, then chain themselves to the furniture and equipment.

A widely used recent tactic is to inject toxic chemicals into the facility in the middle of the night. Acid to make staff and patients ill is sprayed into the clinic, where it seeps into carpets and furniture. The clinic is forced to shut down for days or weeks while it undergoes an expensive cleanup.

These are not peaceful protests. These attacks are more akin to assaults. The city manager of Falls Church, VA called them military assaults in testimony before the Labor Committee describing attacks on a clinic in his jurisdiction. Patients and staff were held hostage for hours while the police tried to restore order, and a police officer was injured in the melee.

The consequences of this kind of conduct are unacceptable. The constitution guarantees the right of a woman to end a pregnancy, but the violence and blockades are designed to make it impossible for women to exercise that right.

Already, 83 percent of the counties in this country have no abortion provider. As clinics are burned down and the doctors are intimidated, it becomes harder and harder for women to obtain a safe and legal abortion.

The violence and blockades hurt others too. Many of the targeted clinics offer a wide range of health services. When these clinics are bombed, burned, blockaded or invaded, all of their patients suffer.

The Blue Mountain Clinic in Missoula, MT, was totally destroyed by arson last March. The clinic offered abortions, but it also provided prenatal care and delivery, childhood immunizations, diagnosis and treatment of sexually transmitted diseases, and contraceptive services. Many patients traveled over a hundred miles to obtain health care from the clinic. Now, that community has lost access to these needed services.

The perpetrators of this conduct believe that abortion is wrong, and they are entitled to their view. But no matter how strongly they feel, assaulting doctors and blockading and bombing clinics should not be tolerated.

This legislation is designed to prevent this reprehensible conduct and to ensure that it will be punished when it occurs.

It establishes a new Federal criminal offense prohibiting force, threat of force, physical obstruction, or destruction of property intended to interfere with access to pregnancy or abortion-related services. It also establishes the right to bring Federal civil suits to enjoin such conduct and to obtain damages to compensate the victims.

The language of the bill is drawn in part from Federal civil rights laws that prohibit force or threat of force to interfere with the exercise of other fundamental Federal rights—such as the right to vote, or to obtain Federal benefits, or to obtain housing without regard to race. Examples are found at 18 U.S.C. 245(b), and 42 U.S.C. 3631. Both of these laws were enacted as part of the Civil Rights Act of 1968.

The penalties in this bill are consistent with the penalties set forth in those laws: up to 1 year of imprisonment for the first offense; up to 3 years for subsequent offenses; up to 10 years if bodily injury results; and up to life in prison if death results.

The U.S. Criminal Code also provides for a range of maximum fines for Federal crimes, depending on the applicable maximum prison term, and such fines will be available here as well.

This measure prohibits four specific categories of conduct:

(1) It prohibits the use of force, including shooting or assaulting providers or patients.

(2) It prohibits the threat of force.

This provision applies in the case of serious, credible threats of bodily harm, such as the explicit death threats that many doctors have received.

(3) It prohibits physical obstruction of the facilities.

This is carefully defined in the legislation to mean making the entrance or exit impassable, or making passage unreasonably difficult or hazardous.

(4) It prohibits the damage or destruction of property. This includes arson, firebombing, chemical attacks, and other serious vandalism.

The legislation does not restrict activities protected by the first amendment. Those who are picketing peacefully outside clinics, praying or singing, or engaging in sidewalk counseling and similar activities that do not block the entrances have nothing to fear from this law. Those activities are protected by the Constitution, and this legislation does not restrict them.

The violent conduct that this legislation does prohibit is not even arguably protected by the first amendment, even if it is intended to express a point of view. As the Supreme Court said last June in its unanimous opinion in the hate crimes case Wisconsin versus Mitchell:

[A] physical assault is not by any stretch of the imagination expressive conduct protected by the first amendment * * *. Violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact * * * are entitled to no constitutional protection. [Wisconsin v. Mitchell, 113 S. Ct. 2194 (June 11, 1993).]

The same is true of physical obstruction of access to a public or private building—it is entitled to no constitutional protection. [Cox v. Louisiana, 379 U.S. 536, 555 (1965).]

In short, this legislation will not penalize a point of view. It will not penalize conduct expressing that point of view in nonviolent, nonobstructive ways.

The only conduct it prohibits is violent or obstructive conduct that is far outside any constitutional protection. That is why the measure has been unequivocally endorsed by the American Civil Liberties Union and many others who have reviewed its constitutional implications.

Some may wonder why we need a Federal law, since such activities are normally a matter for State and local authorities. State and local laws against trespass, vandalism, assault and homicide, cover a large part of the conduct this legislation would address.

But in a number of incidents around the country, local officials, apparently opponents of abortion rights themselves, have been unwilling to enforce the laws. A sheriff in Texas has stated unequivocally that he will not enforce the law against those seeking to stop abortions. A police chief in Minnesota was arrested for participating in a clinic invasion himself.

A Federal law is also needed because we are confronted with a nationwide pattern of conduct by persons and organizations who operate across State lines in a manner that often makes it difficult or impossible for local authorities to respond effectively. Antiabortion activities of the most extreme kind have been reported in every part of the United States. When the organizers and their recruits move from one clinic to another in different jurisdictions, Federal investigative and law enforcement resources are essential.

Local authorities are often overwhelmed by the sheer numbers of clinic attackers. The Falls Church, VA, official who testified to the Labor Committee told us that his town had only 30 uniformed officers to arrest over 200 clinic attackers. It took hours for the police to clear the clinic. The lone city prosecutor handling the charges was swamped, and ultimately the trial had to be held in the community gym, because it was the only place large enough.

Clearly, these cases should be Federal cases.

Prior to the Supreme Court's decision in Bray versus Alexandria Health Clinic last January, in circumstances like this the clinic operators, staff or patients could apply to Federal court for an injunction, which could then be enforced by U.S. marshals.

For example, in the campaign against several clinics in Wichita in the summer of 1991, it was the Federal marshals who were able to restore order. But in Bray, the Court held that the civil rights law under which such injunctions had been issued does not apply to antiabortion blockades. That decision created an unfortunate gap in the Federal laws that this legislation will close.

Attorney General Reno, with her background in local law enforcement and her special sensitivity to the appropriate roles of Federal and local authorities, wholeheartedly concurs in the need for Federal help here. In fact, she testified that enactment of this legislation is one of the Justice Department's top priorities.

Some have asked why the bill singles out abortion-related violence and blockades. The answer is that this legislation singles out for new Federal penalties and remedies exactly the conduct that calls for a Federal response—no more, no less. Antiabortion violence and blockades have been occurring across the Nation as part of a coordinated, systematic campaign to intimidate abortion providers and patients, and State and local authorities have been unable to control it.

Nothing remotely comparable is happening that would justify a Federal law against violent demonstrations in other contexts. There is no record of any organized, nationwide pattern of violence or blockades by labor unions or any other group, let alone a pattern of conduct that local authorities have been unable to handle.

When a need for Federal legislation is shown, Congress should act. Last year we passed by voice vote a law prohibiting violence against animal research facilities. No one objected on the ground that it singled out animal research opponents unfairly.

Finally, S. 636 evenhandedly addresses the possibility of abuses by both sides of the abortion controversy. It provides exactly the same protection for pro-life counseling centers, staff, and clients that it provides for abortion clinics and their staff or clients. It does so by applying its prohibitions to conduct aimed at interfering with pregnancy or abortion-related services, and defining that term to include services relating to pregnancy or the termination of a pregnancy.

If abortion rights activists were to vandalize a pro-life counseling center, or use force against a counselor who works there, they would be subject to the same criminal and civil liability as pro-life activists who attack abortion clinics or use force against a doctor who works there.

This provision was added to S. 636 in the Labor Committee to respond to the desire for equal treatment of both sides. The even-handedness principle is further refined in the modified substitute I offer today. At the request of Senator WOFFORD, we have changed the name of the services covered from "abortion-related" to "pregnancy or abortion-related," to make it even clearer that pro-life pregnancy counseling is included in its protections.

In addition, as a further modification after discussions with Senators DURENBERGER and KASSEBAUM, the bill ensures that demonstrators—whichever side of the abortion debate they are on—do not obtain any right under this law to bring a civil suit. Only patients and clinic personnel will have that right.

As reported by the Labor Committee, S. 636 permitted any person aggrieved by the prohibited conduct to sue for damages or injunctive relief. That could have been read to permit suits against clinic attackers to be brought not only by a patient or doctor or clinic owner, but also by a pro-choice demonstrator or clinic defender. Pro-life demonstrators outside the same clinic would not have had a similar right to such relief.

As modified, the bill restores the evenhandedness principle. It permits suits only by persons involved in providing or obtaining services in the facility. If demonstrators outside a clinic engage in pushing, shoving, or other forceful conduct against each other, neither side can sue under this law.

This measure, in short, provides fair, evenhanded treatment for all concerned. It is urgently needed. It is not enough for Congress to condemn the violence.

We must act before more doctors are killed, or more clinics are blockaded or burned to the ground.

Law enforcement officials at all levels of government agree, including Attorney General Reno, who testified in strong support of this legislation. The consensus includes the State attorneys general, who adopted a unanimous resolution urging Congress to pass this law. It includes local officials throughout the country who need this Federal help.

All of the leading women's rights groups and groups concerned with women's reproductive health regard this measure as a top priority.

Health care providers, too, have joined in calling for passage of this legislation. The American Medical Association has endorsed it, and so has the American College of Obstetricians and Gynecologists. Their view is clear—no doctor should be forced to go to work in a bulletproof vest.

In addition, the respected British medical journal, the Lancet, in an editorial in its October 16, 1993 issue, addressed this issue in American medicine and stated, "Congress should act soon to end this terrorism."

The Senate should act, and act now. This measure has bipartisan support from Senators who are pro-choice and Senators who are pro-choice and Senators who are pro-life. We may not agree on the issue of abortion, but we do agree that the use of violence by either side to advance its views is wrong.

I urge the Senate to pass this legislation.

PRIVILEGE OF THE FLOOR

Mr. KENNEDY. Mr. President, I ask unanimous consent that Lucy Koh, a fellow in my office, be afforded floor privileges.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

AMENDMENT NO. 1150

(Purpose: To protect the first amendment
right to exercise religion)

Mr. HATCH. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The ACTING PRESIDENT pro tempore. The clerk will report.

The legislative clerk read as follows:

The Senator from Utah [Mr. HATCH] proposes an amendment numbered 1150.

Mr. HATCH. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

On page 6, between lines 2 and 3 insert the following as new section 2715(a)(2): "by force or threat of force or by physical obstruction, intentionally injuries, intimidates or interfere with or attempt to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of worship; or"

Renumber current section 2715(a)(2) as 2715(a)(3), and add the following at the end of line 7 on page 6: "or intentionally damages or destroys the property of a place of religious worship,"

On page 11, line 15, add "or to or from a place of religious worship" after "services" and before the comma, and add "or place of religious worship" after "facility" on line 16 of page 11.

Mr. HATCH. Mr. President, before I talk about that amendment, we have an order of amendment here. Following my amendment, Senator SMITH will bring up his amendment. Then I am to offer one on limit protection to illegal abortions. I want to go to the White House for the bill signing of the Religious Freedom Restoration Act.

I will soon ask unanimous consent to take that out of order so that I can go.

Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. HATCH. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro termpore. Without objection, it is so ordered.

Mr. HATCH. Mr. President, the religious liberty amendment that I am offering is very straightforward. It would ensure that the first amendment right of religious liberty receives the same protection from interference that S. 636 would give abortion. Simply put, anyone who votes against this amendment or who attempts to dilute it values religious freedom far less than abortion.

Religious liberty is the first liberty guaranteed in the Bill of Rights. As the lead cosponsor, along with Senator KENNEDY, of the Religious Freedom Restoration Act, I have worked to guarantee that religious liberty is protected against Government intrusion. Through this amendment, religious liberty would also be protected against

private intrusion—in exactly the same way that S. 636 would protect abortion.

Make no mistake about it: The right of Americans of various religions to attend their places of worship in peace is under attack throughout the country. Various groups, acting on behalf of various causes, have undertaken an interstate campaign of harassment, physical assaults, and vandalism. Consider, for example, some recent episodes:

Just over a week ago, protesters disrupted Scripture reading at the Village Seven Presbyterian Church in Colorado Springs, CO, and pelted the congregation with condoms. Similar protests have occurred throughout the country, and organizers of the Colorado Springs protest said that they planned further disruptions in the future. [Gazette Telegraph, 11/8/93; Gazette Telegraph, 11/10/93].

In February of this year, the St. Jude's United Holiness Church in St. Petersburg, FL, was burned to the ground by an arsonist. Another arsonist set fire to at least 17 other churches throughout Florida and to churches in Tennessee and Colorado. [St. Petersburg Times, 2/2/93, 1/9/93].

Catholic services have been disrupted and Catholic churches have been vandalized in New York and other cities. In New York, activists exposed churchgoers at St. Patrick's Cathedral to a pornographically altered portrait of Jesus, invaded the cathedral, screamed, waved their fists, and tossed condoms in the air. [New Dimensions, July 1990]. Those responsible for these acts have planned similar disruptions throughout the country. [Doe letter]. In May of this year, protesters poured glue into the locks of five churches [Boston Globe, 5/21/93]. Other recent attacks against Catholic leaders have occurred in Washington, DC, Boston, Springfield, MA, Los Angeles, and New York.

In mid-September, in San Francisco, activists blocked access to the Hamilton Square Baptist Church, pushed and shoved churchgoers, threw rocks and eggs at them, and destroyed church property. The police failed to respond to calls for more assistance and made no arrests. [Statement by Dr. David C. Innest]

Synagogues have been victimized by defacement and vandalism on countless occasions.

Our Nation was founded on the principle of religious liberty. If any right deserves protection from private interference, it is religious liberty. The amendment that I am offering would do no more than give religious liberty the same protection that S. 636 would give abortion.

The choice for my colleagues is simple: Do they value religious liberty at least as much as abortion? If so, they should vote for my amendment.

Mr. President, I ask for the yeas and nays on this amendment.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. HATCH. Is it possible for me to get that slight modification in the order so I can go to the White House?

Mr. KENNEDY. Mr. President, I would be glad to yield. I see my colleague, the Senator from Ohio, and the Senator from California, and I would like to yield to him. How much time remains on the bill itself?

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts has 14 minutes on the bill itself and 19 minutes on the amendment.

Mr. KENNEDY. I know the Senator from Utah wants to go to the White House for the signing of the Religious Freedom Restoration Act. If I could, I would like to ask a few questions and I will yield.

Mr. METZENBAUM. I would like to go, too.

Mr. KENNEDY. I would, too, but I am going to stay here. I will ask just a few questions, and then I would be glad to yield to the Senator from Ohio.

So I yield 7 minutes on the amendment.

As I understand the Senator's amendment, it would simply extend the bill's prohibitions to include the actual or temporary use of force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with anyone lawfully exercising or seeking to exercise the first amendment, the right of religious freedom at a place of religious worship and to intentionally damage or destroy property of a place of religious worship.

Am I correct that the amendment would cover only conduct actually occurring or, in the case of an attempt, intending to occur in place of religious worship, such as a church, synagogue or the immediate vicinity of a church?

Mr. HATCH. The Senator is absolutely right.

Mr. KENNEDY. So, to be clear on this, the amendment would cover only conduct actually occurring at an established place of religious worship, a church or synagogue, rather than any place where a person might pray, such as a sidewalk?

Mr. HATCH. That is correct.

Mr. KENNEDY. Mr. President, we can accept the amendment. With this understanding, we are prepared to accept the amendment.

Mr. HATCH. I asked for the yeas and nays on the amendment because I think we will have to have a vote on it. But I would like to have the yeas and nays stacked until after Senator METZENBAUM and I return from the White House.

Mr. KENNEDY. It will not be possible for me to agree to that until I consult with the leaders.

Mr. HATCH. I have no doubt the leaders will accommodate us because we are going to the White House at the President's request.

Mr. KENNEDY. The Senator would be surprised at what the leaders agree to or do not agree to.

I will be glad to try and recommend that.

Mr. HATCH. I am sure the Senator would.

Mr. KENNEDY. I am keenly aware of the leader on our side in terms of his interests.

Mr. HATCH. Let me just comment on that. I have no doubt that the leaders will accommodate us because we have given up a 1½-hour amendment here this morning.

What I would like to do and have our majority floor manager ask the leader when he arrives is to stack votes beginning at 10 o'clock so we have enough time to get back from the White House.

We have already disposed of three amendments and this one will be voted on, and I appreciate the Senator being willing to accept it. But I would like to have a vote on it because I think it is that important.

I yield the floor.

Mr. KENNEDY. Mr. President, on the amendment I will be glad to yield 10 minutes to the Senator from Ohio.

Mr. HATCH. Could I then still ask my request to allow my amendment—it would come right in the middle of the White House proceeding—to go after the Coats amendment? Right now it is stacked in front of the Coats amendment. I will ask unanimous consent to accommodate us in going to the White House and that I be permitted to offer the amendment on limit of protection on legal abortions after the Coats amendment.

The ACTING PRESIDENT pro tempore. Is there objection?

Mr. KENNEDY. Mr. President, I have every intention of accommodating my friend from Utah. I have not seen the technical amendment, and I am not in a position to agree to any consent request.

Mr. HATCH. What is the Senator talking about?

Mr. KENNEDY. I thought he said this amendment.

Mr. HATCH. No. It is the amendment. We have these amendments stacked in order.

Mr. KENNEDY. All right. Do I understand that the measure that is before us now is the Hatch amendment?

Mr. HATCH. No. The next amendment will be the Smith amendment, punishing violent offenses more severely than nonviolent offenses, and then the amendment after that would be my amendment to limit protection of legal abortions, of which the Senator has a copy, and I would like that amendment to be stacked until later.

Mr. KENNEDY. I understand. But we now have before the Senate the religious freedom amendment. Labor disputes has been put aside. Now we have interfering with religious exercise. That is the measure before us. That has 40 minutes evenly divided. Am I correct on that?

The ACTING PRESIDENT pro tempore. The Senator is correct.

Mr. KENNEDY. How much time do I have on that amendment?

The ACTING PRESIDENT pro tempore. The Senator has 16 minutes and 30 seconds.

Mr. KENNEDY. On that I yield 10 minutes to the Senator from Ohio, and I will consult with the majority leader about the request of the Senator.

The ACTING PRESIDENT pro tempore. The Chair recognizes the Senator from Ohio [Mr. METZENBAUM] for 10 minutes.

Mr. METZENBAUM. Mr. President, I rise in support of the Freedom of Access to Clinic Entrances Act. Whether they are pro-choice or pro-life, law-abiding people absolutely deplore the increasing number of attacks against women who seek to exercise their constitutional right to have a legal abortion, and the health professionals that help them exercise this right. As members of a civilized society we must strongly denounce any interjection of violence into this debate. Any suggestion that the use of violence is an acceptable way to settle our differences is repugnant and does a real disservice to all those involved in the abortion debate.

The murder of Dr. David Gunn of Florida and the shooting of Dr. George Tiller of Kansas because they performed legal abortions was simply barbaric. These shameful acts are the result of a national campaign against medical clinics, their employees and patients. This campaign includes bombings, acts of arson, clinic invasions, blockades, acts of vandalism, assaults, and death threats. Just last month, a family planning clinic in Bakersfield, CA, was destroyed by arson, causing $1.4 million in damages.

In the past, doctors and patients threatened by intimidating activity aimed at clinics were able to obtain Federal injunctions to protect themselves under a Federal civil rights statute. But in January 1993, the Supreme Court ruled that this Federal law could no longer be used to protect medical employees and patients from clinic blockades.

At Senate hearings, Attorney General Reno testified that no adequate State or Federal remedy now exists to address this national crime wave. Local law enforcement is either unable or unwilling to deal with the massive protests that are designed to overwhelm the police, courts and jails in targeted cities. The Attorney General made it clear that Federal legislation is urgently needed to better address this situation.

The bill offered today would give Attorney General Reno the crime fighting tool she requested. Modeled on the Voting Rights Act, this bill prohibits the use or threat of force to interfere with obtaining or providing reproductive health services. It protects access to clinics that perform abortion services as well as access to clinics that counsel against the procedure. Lawful picketing and protests without force, threats of force or physical obstruction are not prohibited.

The Freedom of Access to Clinics Entrances Bill reaffirms that we are a Nation of laws and not vigilante justice. I urge my colleagues to support it.

Mr. President, I yield the floor, and I thank the Senator from Massachusetts for yielding the time.

The ACTING PRESIDENT pro tempore. Who yields time?

Mr. KENNEDY. Mr. President, I suggest the absence of a quorum and ask unanimous consent that the time be charged equally.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. KENNEDY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KENNEDY. Mr. President, I ask unanimous consent that no second-degree amendment be in order to the pending Hatch religious freedom amendment.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KENNEDY. Mr. President, how much time remains on the amendment?

The ACTING PRESIDENT pro tempore. The Senator has 11½ minutes.

Mr. KENNEDY. I yield 10 minutes to the Senator from California.

Mrs. BOXER addressed the Chair.

The ACTING PRESIDENT pro tempore. The Chair recognizes the Senator from California, Senator BOXER.

Mrs. BOXER. Mr. President, I rise in strong support of the bill authored by my colleague, the distinguished chairman of the Labor and Human Resources Committee, Senator KENNEDY. I thank him for his leadership on this issue. It is a very key issue today. Violence in America is a very key issue today and this bill addresses one part of that terrible problem.

Mr. President, America is proud of its democracy, and there is no question that our right to dissent is a precious and constitutional right. People have died for that right. I would not vote for anything that interfered with that right.

But violent dissent is not a right. Violent dissent is vicious, it is dangerous, and it is lethal. And what this bill is about is addressing violent dissent, Mr. President, we see day after day in America.

In March, Dr. David Gunn was killed by an antiabortion protestor. In August, Dr. George Tiller was the victim of a similar attempt on his life. These tragedies sent shock waves through our communities and the Halls of Congress. But they are only the most recent developments in a crusade that goes well beyond the peaceful expression of opposite points of view.

Mr. President, every day, physicians and health care professionals face in-

timidation, harassment, and now—more than ever—violence.

When they come to work they face angry protestors blockading their front doors. They receive hate mail, death threats, and harassing phone calls. Many are stalked, forced to wear bullet proof vests and work behind steel shutters. Their faces appear on "wanted" posters. Their clinics are bombed, vandalized, and set on fire.

Since 1977, radical opponents of choice have directed nearly 3,000 acts of violence at abortion providers.

Mr. President, I abhor violence wherever it comes from.

This bill is evenhanded. And that is important. This bill does not say you can promote violence if you are one way on choice and you cannot if you are another. This bill says that violence will not be tolerated at a clinic whatever the source.

In a recent survey of reproductive health care clinics released by the Fund for the Feminist Majority, 21 percent received death threats to clinic staff during the first 7 months of this year; 18.1 percent of clinics reported bomb threats; 16 percent of clinics were blockaded; 14.9 percent of clinics reported that their staff had been stalked—and anyone who has been stalked can tell you what an intimidating, frightening experience it is; 10.3 percent of clinics reported chemical attacks; and 2 percent reported arson.

Mr. President, in my home State of California, we have too many examples of this to report. On March 9, just 1 day before the brutal murder of Dr. Gunn, six medical clinics in San Diego and two in Riverside were sprayed with butyric acid—a foul smelling chemical that irritates the eyes and respiratory tract and often causes burns and nausea. Four health care workers were hospitalized after inhaling the fumes. I happened to be visiting the clinic that very day and I can report to this body, Mr. President, that people were shaken, good people, hardworking people, principled people. Mr. President, this is wrong.

Two months ago in Bakersfield, Family Planning Associates was set on fire, sustaining extensive damage and disrupting the delivery of important health care services to women.

And I need to stress, Mr. President, that these clinics that are being bombed, that are being sprayed, that we have doctors being stalked and nurses being intimidated, these clinics provide a potpourri of services to women. They provide many services, health services. For many of them it is the only health care they get. And they may not be going there about an abortion. They may be there to get help in becoming pregnant or to get their breast cancer exam. And yet, they are subjected, increasingly, to violence.

So, Mr. President, the doctors do get hurt. But so do American women who have seen these offices that they go to

for help transformed from safety zones to war zones.

The fact is that the vast majority of the medical facilities which have been targeted, as I said, provide a range of vital health care services to women. And the very people who are protesting are sometimes interfering with prenatal care, so important to the baby that will come into this world.

We know that it is going to harm a baby if a mother inhales butyric acid at a health care clinic. So the very people who claim to stand up for the future children are injuring them by spraying these clinics with acid, by frightening these mothers, who need to take care of themselves at that very important time.

Ashley Phillips, executive director of the Womencare Clinic of San Diego, wrote the following in the Los Angeles Times after her facility was sprayed with acid.

Like many other women's clinics in this country, the one I direct is not an abortion clinic. We are a nonprofit community clinic in San Diego offering a broad range of health care services. * * * Hundreds, if not thousands, of people were exposed to the lingering fumes [as a result of the acid attack]. Pregnant women, the very people the "pro-life" community says they want to protect, were endangered.

Attorney General Janet Reno has acknowledged that existing Federal law is inadequate to arrest and prosecute those who cross the line from peaceful protest to physical obstruction, vandalism, harassment, or worse, with the clear purpose of preventing women from exercising their right to choose.

That is why the bill before us is so critical. It will ensure that women are able to exercise their right to choose by having access to necessary health care services. And it will ensure that the health care professionals who serve them are protected from violence and harassment. At the same time, it in no way interferes with or penalizes the legitimate first amendment rights of antiabortion protestors.

And again I say, I value my right to protest, just as I value my right. But we are talking here about violence. We are not talking here about nonviolence.

We must act today to end this horrifying cycle of fear and violence in our nations. Whatever one's feelings on reproductive choice—and I have friends in this Chamber on both sides of this difficult issue—I know that we can all agree that the fear and the violence must be stopped.

Again, I want to thank Senator KENNEDY for his extraordinary leadership on this issue. And I want to thank my friends in this Chamber who do not happen to agree with my position on choice or Senator KENNEDY's position on choice but have joined with us today to stand together as Americans against violence.

I appreciate having this time.

I yield the floor at this time.

The ACTING PRESIDENT pro tempore. The Senator from California yields the floor. Who yields time?

The Senator from Massachusetts is recognized.

Mr. KENNEDY. Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. KENNEDY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KENNEDY. Just so we understand where we are, I ask consent that the Hatch amendment be temporarily set aside.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KENNEDY. Mr. President, I suggest the absence of a quorum and ask consent the time charged be evenly divided.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. REID. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. REID. Mr. President, it is my understanding that the Hatch amendment has been withdrawn and we are now——

Mr. KENNEDY. It has been temporarily set aside.

Mr. REID. And that we are now debating S. 636?

The ACTING PRESIDENT pro tempore. The Senator is correct.

Mr. KENNEDY. Mr. President, we are under a time limitation. How much time do I have?

The ACTING PRESIDENT pro tempore. The Senator has 12 minutes on the bill.

Mr. REID. Will the Senator from Massachusetts yield me about 3½ minutes?

Mr. KENNEDY. I yield 4 minutes to the Senator from Nevada.

The ACTING PRESIDENT pro tempore. The Senator is recognized for 4 minutes.

Mr. REID. Mr. President, last March I was the first Member of this body to stand on this floor and address a serious problem which was later to become my motivation for supporting this bill that is before us today.

When I spoke last March I was referring to the senseless killing of a man named Dr. David Gunn. Dr. Gunn was shot down in cold blood as he left his job at a health clinic in Pensacola, FL. Dr. Gunn was senselessly murdered. He was shot three times in the back with a .38 caliber revolver.

There is no question about my position on the issue of abortion. I am prolife. But despite the feelings of anyone on this emotional issue, there is no justification for the kind of senseless brutality that our Nation witnessed outside this clinic in Pensacola, FL, in

March. We cannot as a society allow acts of violence to promote any cause—I repeat any cause—no matter how just the people promoting the cause believe their cause to be.

So I rise today in support of the measure before us as a fair and practical protection against undue violence. It protects those who seek access to clinics. But it also protects those who do not believe in the use of abortion services and who wish to demonstrate that belief as provided by the constitutional protections of peaceable assembly.

The key term is peaceable. No one whose aim is to demonstrate peaceably that they oppose abortion should fear this bill. The bill specifically affirms expressions protected by the first amendment to the Constitution of this country. Its aim is not to restrict the rights of people to demonstrate but to protect the rights of people to be free from the fear of violence against them. I happen to believe that the majority of people who choose to demonstrate outside abortion clinics because of their conscientious beliefs are not violent people. They are not people who wish to do harm to others. They are trying to do good according to their beliefs. Those who seek access to clinics have nothing to fear from the vast majority of these citizens.

But, as in all things, a few bad apples in a barrel spoil the whole barrel. And, because of this as we know the whole barrel is lost. So a few bad apples demonstrating can ruin the whole ability to assemble peaceably, thus the need for the legislation that we are considering today—that becomes paramount.

Senator KENNEDY in conversations that I had with him earlier this year graciously agreed to remove earlier provisions of this legislation that I felt were unnecessary, provisions that would have, in the minds of some, constituted prejudicial treatment of anti-abortion demonstrators. The bill before us is what it should be: A protection for the rights of both sides of this controversial issue.

As I said on March 11, we are not singling out a particular group because of a few bad apples. I am a supporter of working men and women. Yet we have chosen in the history of this country, and presently, today, for good reason, to place some protections for businesses on the legitimate rights of workers to set up picket lines. We limit the number of pickets to so many pickets per block. There are all kinds of restrictions.

The ACTING PRESIDENT pro tempore. The time of the Senator from Nevada has expired.

Mr. KENNEDY. I will yield 3 more minutes to the Senator.

Mr. REID. I thank my colleague.

We limit the number of pickets to so many pickets per block. There are restrictions set on the ability of workers to demonstrate against the businesses that they feel they have a grievance against. This provision allows workers to demonstrate while protecting businesses from the potential for violence in sometimes a very emotional situation. The same principle applies to the issue before this body today.

In what has become an increasingly violent society, we must act as best we can to discourage this violence. To do otherwise is to encourage violence.

I commend the members of the Judiciary Committee and especially the chairman of the Judiciary Committee for trying to develop a fair approach to curbing one potential for violence in our society today. We must protect the constitutional right to demonstrate. We must also prevent the kind of senseless act that could take the life of another Dr. Gunn somewhere in our country.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts is recognized.

Mr. KENNEDY. Mr. President, I yield myself 2 minutes.

I, first of all, commend the Senator from Nevada. He has, in his very brief but important statement, set out exactly what we are intending to do and that is to be evenhanded on this issue. That has been the point we have emphasized and stressed during this period of time. He has, through his urging, and the urging of Senator WOFFORD, Senator DURENBERGER, and others, indicated to us their strong view about violence in our society. He has absolutely captured the essence of this legislation and that is to deal with violence and to be evenhanded.

It was only on that condition that the Senator from Nevada indicated his willingness to support us. That is our purpose; that is our intention; that is what this legislation is all about. I know this is an issue that can be distorted and misrepresented, but he has captured, as I mentioned earlier, the essence of it in talking about violence. That is what this legislation addresses. We are very, very appreciative of both his statement and his support.

Mr. REID. Will the Senator yield for a brief comment?

Mr. KENNEDY. I do.

Mr. REID. I also want the record to reflect I enthusiastically support this legislation. To me, this was not a close call. We in this body and the other body must do everything we can do to prevent violence.

Our society is far too violent, and there is no cost that justifies violence.

So I repeat to the chairman of the committee, who I also congratulate for moving this bill to the floor, I enthusiastically support this legislation. It was not a close call for me.

Mr. KENNEDY. I thank the Senator.

The PRESIDING OFFICER (Mrs. MURRAY). Who yields time?

Mr. KENNEDY. Madam President, I yield myself 1 more minute.

We are making very good progress. We are attempting to accommodate the different Members. If the member-

ship will accommodate us, we are moving forward with the legislation. We want to protect everyone's rights, which we will. We also want to try to accommodate the different Members and their schedules in terms of permitting them to express what opinions they want about the legislation.

Our friend from New Hampshire is here and is prepared to offer an amendment. If he will permit a brief intervention at this point, because we are attempting to work that out, I think we could accommodate two Senators and then we could move on.

How much time does the Senator wish?

Mr. WELLSTONE. Madam President, I think 5 minutes at the most.

The PRESIDING OFFICER. Five minutes for the Senator from Minnesota. The Senator from South Carolina needs how much time?

Mr. THURMOND. I need 7 minutes.

Mr. KENNEDY. Madam President, I ask unanimous consent that we have 5 minutes for the Senator from Minnesota and 7 minutes for the Senator from South Carolina.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WELLSTONE. Madam President, I will be pleased to defer to the Senator from South Carolina if he would like to speak first on this.

The PRESIDING OFFICER. The Senator from South Carolina.

Mr. THURMOND. Madam President, I rise today to oppose the so-called Freedom of Access to Clinic Entrances Act.

We have heard during today's debate discussion on the tragic killing of Dr. David Gunn in Pensacola, FL, in March of this year. This type of violence should be condemned, and clearly violence is not the answer when protesting at abortion clinics.

It is my concern that this narrowly drafted legislation, if enacted, will suppress nonviolent political demonstrations because of the subject matter of the conduct. The impact of this legislation will fall almost entirely on persons who are engaged in nonviolent civil protest and exercising forms of free speech that is lawful, but which supporters of this amendment find distasteful.

Many other organizations or groups engage in blockades and civil disobedience. Union workers block access to work sites during strikes and labor disputes. Homosexuals have engaged in sit-ins or disruptions of church services. The Mayor of Washington, DC, Mrs. Sharon Pratt Kelly, was recently arrested for participating in a prostatehood street blockade. All of these activities interfered with the progress of people engaged in a number of legal activities. For this reason, I do not agree with the use of blockades as a form of protest. However, none of these participants were subject to the harsh and disproportionate penalties called for in this measure.

Madam President, this bill calls for both criminal and civil penalties. For a

first offense, a person may be fined $100,000 and imprisoned for 1 year. For any subsequent offenses, a person may be fined an additional $250,000 and imprisoned for an additional 3 years.

This person would also be exposed to a number of civil penalties. First, anyone who feels they have been aggrieved under this measure may bring a suit to receive appropriate injunctive relief, punitive damages, and compensatory damages. With respect to compensatory damages, this measure will set a minimum award of $5,000 if a plaintiff chooses this award prior to final judgment. Second, the Attorney General of the United States may commence a civil action against the same person and seek injunctive relief and compensatory damages. The court may also assess a civil penalty up to $15,000 for a first violation, and $25,000 for any subsequent violation. Finally, the State attorneys general may also commence a civil action and seek the same relief as the Attorney General of the United States.

The penalty here simply does not fit the crime. This measure will not only make those prosecuted under this measure criminal felons, but it will also subject them to enormous monetary exposure.

This does not draw on the peaceful civil disobedience that follow the traditions of Mahatma Gandhi or Dr. Martin Luther King, Jr. Civil disobedience is unlawful, and should be punished. However, acts of peaceful civil disobedience should be punished in the same manner as similar conduct engaged in by anyone else. The imposition of substantially more severe penalty presents the threat of viewpoint discrimination. Therefore, I believe this measure *is* likely to have a chilling effect on legitimate first amendment speech.

Unfortunately, this legislation would elevate the right to abortion above the first amendment. This is demonstrated by the testimony given by Attorney General Janet Reno on May 12, 1993 before the Senate Committee on Labor and Human Resources. Ms. Reno states that this bill "is an effort to protect individuals in the exercise of their right to choose an abortion and to eliminate the harmful effect on interstate commerce resulting from interference with the exercise of that right. That justification is surely sufficient to override any incidental effect that the bill may have on expression."

I do not believe that the criminal and civil penalties contained in this legislation will have an incidental effect on pro-life expression. I believe that it will virtually eliminate such expression.

The supporters of S. 636 contend this is an answer to the violence surrounding the issue of abortion. S. 636 is not the answer. In fact, this act will create a new Federal criminal offense for conduct that the States are currently able to address.

Therefore, the so-called Freedom of Access to Clinic Entrances Act will

raise the right of abortion above the constitutionally enumerated right of free speech. It will serve as a suppression of speech of those with heartfelt beliefs concerning issues surrounding abortion. It will expose those who peacefully protest to unreasonable penalties. It will also create another Federal offense, when States are currently able to address the issue of violence surrounding abortion.

I believe this legislation improperly addresses the issue, and I urge my colleagues to reject this measure.

I yield the floor.

Mr. WELLSTONE addressed the Chair.

The PRESIDING OFFICER. The Senator from Minnesota.

Mr. WELLSTONE. Madam President, first of all, let me thank Senator KENNEDY, chairman of the Human and Labor Resources Committee, for his leadership on this issue. I think he has made every effort to reach out to other Senators and, for that reason, I believe this Freedom of Access to Clinic Entrances legislation will have tremendous support.

I am going to build on the remarks of my colleague from Nevada. I think it is quite possible for Senators to have very different positions in relation to pro-choice/pro-life, if we want to use those labels. I think people in good faith can have different positions on these issues. But many, many pro-life—and I call people what they call themselves out of respect—many pro-life people in Minnesota, my State, are absolutely horrified by the violent and destructive behavior that has taken place blocking access to clinics.

I want to be very clear about what this bill prohibits. It prohibits: "the use or threat of force or physical obstruction to intentionally injure, intimidate or interfere with any person because that person is or has been providing pregnancy or abortion-related services."

I could go on. But, Madam President, I just want to make three points in the brief period of time I have.

Point No. 1: Last winter, I spoke at the memorial service of Dr. David Gunn. I will never forget that service here in Washington, DC. I said to myself at that service that if there was any way as a U.S. Senator I could be part of passing legislation to end this violation, that is what I would do. I think that is precisely what this piece of legislation is about.

Point No. 2: In my State of Minnesota, there is a woman, Gerry Rasmussen, who is the director of the Midwest Health Center for Women. It is sad that she has to train her staff in antiterrorist activities because of all of the threats of violence and threats of use of force against women who are coming in to really exercise their constitutional right. It is sad that she has to live with the threatening phone calls, the bricks thrown through her window, the stalking, and all of the rest. I think there is a kind of climate

of terror in the country. Frankly, I think very good people, in very good faith, even disagreeing in relation to pro-life and pro-choice, want to see this ended. I really do think this is very comparable, very analogous to the exercise of civil rights legislation and giving the Attorney General and the Federal Government some machinery to work with to make sure that women are able to exercise this right.

A final point, and I could go on and on. I believe that if anyone was to examine my record—I certainly hope this would be the case—they would see strong support for first amendment rights. This piece of legislation in no way, shape, or form undercuts the right of any citizen to be involved in peaceful protest, undercuts the right of any citizen to speak out against what they oppose, undercuts the right of any citizen to speak out for what they favor. That is not what this legislation is about. This legislation prohibits the use or threat of force.

Madam President, for that reason alone, as we now think about the ways we in the United States of America can confront the violence that exists in our society, it seems to me it is more than appropriate the Senate pass this piece of legislation. For all too long we have turned our backs on this violence that has taken place all across the land. For all too long we have turned our gaze away from it. And finally, today, I think we are going to pass a piece of legislation that the vast majority of legislators and people in this country can and will support.

I thank the Chair.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. Madam President, I suggest the absence of a quorum, the time not be charged to either side.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. SMITH. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Who yields time?

AMENDMENT NO. 1191

(Purpose: To differentiate between violent and nonviolent activities)

Mr. SMITH. Madam President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from New Hampshire [Mr. SMITH] proposes an amendment numbered 1191.

Mr. SMITH. Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

Strike page 6, line 14 through the end of page 9 and insert the following:

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense involving force or the threat of force, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense involving force or the threat of force after a prior conviction for an offense involving force or the threat of force under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life. In the case of offenses not involving force or the threat of force, whoever violates this section shall be imprisoned not more than 30 days for the first offense and 60 days for the second and subsequent offenses.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of conduct prohibited by subsection (a) and involving force or the threat of force may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services. Any person aggrieved by reason of conduct prohibited by subsection (a) and not involving force or the threat of force may commence a civil action for temporary, preliminary, or permanent injunctive relief not to exceed 60 days against the individual or individuals who engage in the prohibited conduct. Such injunctive relief shall apply only to the site where the prohibited conduct occurred.

"(B) RELIEF.—In any action under subparagraph (A) involving force or the threat of force, the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgement, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to belief that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against such respondent—

"(i) in an amount not exceeding $15,000, for a first violation involving force or the threat of force; and

"(ii) in an amount not exceeding $25,000, for any subsequent violation involving force or the threat of force.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).".

Mr. SMITH. Madam President, one of the fundamental problems with the underlying legislation, S. 636, is that it fails to differentiate between violent and nonviolent activities. I do not think there is any one of us who would take the position that violent activities under any circumstances should be condoned. But instead of making that vital distinction, S. 636 imposes the same severe penalties on both kinds of actions, violent and nonviolent.

Let me offer a hypothetical example to illustrate this problem. Let us suppose that a pro-life protester is sitting peacefully with others on a sidewalk outside an abortion clinic. Say it is a woman and she is quietly praying and perhaps singing a religious song. Let us suppose that this peaceful activity is interfering with the ability of the clinic personnel and the patients to enter the clinic. Let us make that assumption.

Under S. 636 that nonviolent protester would be in violation of the law because she is using "physical obstruction" to interfere with abortion services.

Let us suppose further that another antiabortion protester at another abortion facility is hurling large rocks at the windows of the clinic. No bodily injury results. Under S. 636, that violent protester would likewise be in violation of the law because he is using violence in order to interfere with and intimidate persons who are engaged in providing abortion services and damage to the property of the clinic.

Madam President, I hope that my colleagues will agree with me that those two hypothetical situations involve acts of a fundamentally different character. But the bill does not say that. The bill does not say that. The nonviolent pro-life protester that I have described is engaged in a peaceful sit-in reminiscent of Ghandi and the civil rights movement of Dr. Martin Luther King. She is completely nonviolent. The violent protester, on the other hand, is engaged in the use of lawless force that should not be tolerated or condoned in a society based on the rule of law.

But there is a distinct difference here. Under S. 636, what I believe to be a misguided approach, the peaceful pro-life protester that I have described is subject to exactly the same—very stiff, I might add—penalties as the rock-throwing violent political extremist.

Thus, under S. 636 the nonviolent protester, just like her violent counterpart, would face criminal penalties of 1 year in jail, and/or a substantial fine for a first violation, and 3 years and even more of a substantial fine for subsequent violations.

I ask my colleagues. Is that fair? Is that what you are trying to get at with this legislation? Is that really what you want to do? I ask you to think back to the days of the civil rights and the labor movements in which many of my colleagues who are supporting this legislation were some of the strongest proponents. And I ask you if that is fair? Is that really what you want to do?

For the peaceful protester the civil damages would be $5,000 per violation, $15,000 in civil penalties for a first violation, and $25,000 in civil penalties for any subsequent violation. Using my hypothetical, that person on the third offense who was sitting and singing a religious song in front of an abortion clinic on the third offense would be fined $25,000. Is that really what you want to do?

Madam President, the indiscriminate manner in which S. 636 penalizes both violent and nonviolent activities is contrary to the very spirit of American history and the essence of the Constitution of the United States of America, and, in essence, frankly, of the freedom to protest, to speak out about things that you believe very deeply in.

Our American tradition recognizes the fundamental distinction between lawlessness and violent acts, and acts of peaceful civil disobedience. We have seen that throughout our history.

Let me provide another illustration. If some of our States during the 1950's and 1960's had been able to impose the same kind of severe penalties on peaceful civil disobedience that S. 636 proposes, then the civil rights movement might very well have been stymied.

I say to my colleagues, some of my colleagues who are on the floor, Senator WELLSTONE and others, who were strong advocates of that movement, is that what you would like to have done to that movement in the fifties and sixties? That is what you are doing here to those people who legitimately believe that abortion is wrong, who simply want to protest that fact.

I urge my colleagues to think very carefully about that fact this morning as we consider my amendment, which I believe is much more reasonable.

Let me read some excerpts from the Encyclopedia of the American Constitution regarding civil disobedience and the civil rights movement. I ask you all to reflect upon this.

Civil disobedience is a public, nonviolent, political act contrary to law usually done with the aim of bringing about a change in the law or policies of the government. The idea of civil disobedience is deeply rooted in our civilization, with examples evident in the life of Socrates, the early Christian society, the writings of Thomas Aquinas and Henry David Thoreau, the Indian nationalist movement led by Gandhi, and the Civil Rights activities of Dr. Martin Luther King, Jr.

Further reading from the excerpts of the Encyclopedia of the American Constitution:

The fundamental justification for civil disobedience is that some persons feel bound by philosophy, religion, morality, or some other principles to disobey a law that they feel is unjust. As Martin Luther King, Jr. wrote in his "Letter from Birmingham": "I submit that an individual who breaks a law that his conscience tells him is unjust, and willingly accepts the penalty by staying in jail to arouse the conscience of the community over its injustice, is in reality expressing the very highest respect for law."

Dr. King and his followers felt compelled to disobey laws that continued the practice of segregation; they opposed the laws on moral, ethical, and constitutional grounds. Although the movement initially attempted to change the system through conventional legal and political channels, it eventually turned to the tactics of civil disobedience in order to bring national attention to its cause.

And, finally, from the same encyclopedia of the American Constitution:

The civil rights movement's tactics included sit-ins, designed to protest the laws and the practice of segregated lunch counters and restaurants. Protests would enter restaurants, demand to be served, and when service was refused, they would refuse to leave. As a result, many were arrested on grounds of criminal trespass.

The sit-ins, freedom rides, and continued demonstrating eventually swayed public opinion and contributed to the passage of the Civil Rights Act of 1964.

Madam President, we are not talking about the violent people who commit the violent acts, who do the shootings and the violent property damage against the abortion clinics; we are talking about the peaceful protesters who peacefully would like to exercise their constitutional rights to show their opposition to what they believe to be—and I believe to be—an act of violence in and of itself inside the abortion clinic.

This is not "John Browns." These people are not John Brown. These people are the "Rosa Parks" and the "Martin Luther Kings" we are talking about here. Let us make sure we understand that. I hope my colleagues will understand it and consider this amendment to reduce the penalties for those nonviolent people under this act.

This Senator recognizes that acts of civil disobedience are unlawful by definition, but I firmly believe—and we did not change that—that acts of politically motivated, peaceful civil disobedience should only be punished in generally the same manner as with the same underlying unlawful conduct when engaged in by anybody else. All we are asking for is reason.

If, for example, pro-life protesters commit an unlawful trespass, then they should be subjected to the same kind of penalties as other trespassers who have no other political motivation. To impose a more severe penalty on a politically motivated trespasser than on the ordinary trespass for the same conduct is viewpoint discrimination; pure and simple, that is what it is. Moreover, it is, I submit, viewpoint discrimination that is fundamentally inconsistent with the first amendment to the Constitution of the United States.

Madam President, the committee report contends that S. 636 is modeled on Federal civil rights laws. That is what their report says—that it is modeled on Federal civil rights laws. But I note that the Federal civil rights laws cited by the committee report do not include the term "physical obstruction," because that is the key in the language of the bill on page 5 under section 2715, "Prohibited Activities": "Whoever by force or threat of force"—no problem, I agree with you—"or by physical obstruction intentionally injures, intimidates," et cetera.

What is physical obstruction? Is it the young woman I talked about who was sitting on the ground in front of the clinic singing and praying? Is that physical obstruction? If she does that three times, should she spend up to a year or two in jail and pay a $25,000 fine? Is that really what you want? Would you have supported doing that to Rosa Parks and Martin Luther King and so many others during the civil rights movement?

My amendment addresses this flaw—and it is a flaw, a very serious flaw—in a straightforward manner. We have all debated the issue of abortion on this floor before. It is a contentious issue, and I think we all have respect for each other's views. I am trying to appeal here to reason, to let you understand how far we are with this legislation—though well intentioned—and I think all of us on this side agree with the violent portion.

But my amendment addresses this in a straightforward manner by drawing a clear and a very distinct line between violent and nonviolent protest activities. First, my amendment preserves the bill's tough penalties on the violent activities. We do not touch it. Second, it does so by making absolutely clear that the stiff fines and prison terms specified under the bill apply to the offenses involving force or the threat of force or any violent activity. No problem with that.

My amendment recognizes that nonviolent civil disobedience is unlawful by providing jail terms of not more than 30 days—that happened during the civil rights movement, and it can continue to happen here—for the first offense, and 60 days for the second and subsequent offenses, if it continues. Our amendment deals with that. We change the legislation to make it 30 and 60 for those who violate the act in a manner that does not involve force or the threat of force but, rather, peaceful protest.

Madam President, acts of violent lawlessness will be punished with appropriately severe penalties. We do not change the underlying legislation. But acts of civil disobedience like the mass sit-ins that draw on the rich traditions of Gandhi and King are not, under my amendment, subject to harsh penalties. They are under this bill. Read it. But, at the same time, those acts of civil disobedience are punished under my amendment, because they are unlawful, with reasonable punishment.

It is critical and fair, Madam President, that we make a fundamental distinction between these two: violent and nonviolent demonstrations. And for that reason, I believe that this bill is aimed at preventing pro-life protesters from obstructing the entrances to abortion clinics, because this bill is abortion specific. There is no such law aimed at preventing strikers in labor unions from protesting a factory or a business. It does not apply to them. It does not apply to the civil rights people, and I am not advocating that it should.

But why does it specifically mention abortion clinics? Why are we discriminating against one group of people who feel deeply about an issue? If they commit a violent act, put them in jail and give them the penalties they deserve. If they are peacefully protesting, as others have done, then treat them with the respect they deserve and the rights they have under the Constitution of the United States. That is all I am asking.

I want to say that I appreciate the work of and the discussions the Senator from Massachusetts and I had in trying to work toward some compromise on the language regarding the peaceful protesting. I have made some changes in my amendment as a result of those conversations. I think we still may be a little bit apart on the injunctive aspect of this legislation and also on the penalties. But I have moved some to try to accommodate him, and I hope that perhaps we will be able to reach a compromise on this. If we cannot, then I will be prepared at the appropriate time to seek the yeas and nays on my amendment. I will withhold that for the moment, but I would like to reserve that right.

At this time, Madam President, I yield the floor.

Mr. KENNEDY. Madam President, I yield myself 5 minutes on the amendment.

Madam President, first of all, I want to thank the Senator from New Hampshire for his willingness to enter into a dialog and discussion. I talked to him last evening about his amendment, I think he stated very well that he is most concerned about the nonviolent aspects of this legislation and has, in a good-faith effort, tried to address those

with his amendment. I appreciated the opportunity to talk with him about it.

As the amendment has been put before the Senate, it would not be acceptable in terms of the objectives that we are attempting to achieve.

Basically, we are trying to go back to the prior Bray decision which did not limit, for example, injunctive relief. There are certain circumstances where injunctive relief has some terms, but prior to Bray there was no overall limitation and many areas were covered by injunctive relief in order to ensure the protection of constitutional rights. The amendment of the Senator from New Hampshire would put a limitation on that.

Therefore, for that reason, and others that I will mention briefly, it would be unacceptable.

Madam President, Dr. King did not seek to block entry into places where he engaged in protest. Those who sat at the lunch counters did not seek to block access to the counters. They merely wanted to be served.

Here the protesters are seeking to block exercises of constitutional rights. That is not what Dr. King was really all about.

He was not interested in closing the door. He was interested in opening the door. That is the very fundamental and significant distinction.

Finally, Madam President, what we are talking about is a constitutional right. With all respect to my friend from New Hampshire, we do not want to trivialize the penalties in terms of individuals being able to achieve those constitutional rights.

I am very much concerned that with the amendment of the Senator from New Hampshire has offered, we would be in danger of trivializing those kinds of protections.

I will talk further about the amendment. But I see my friend from Minnesota seeks recognition.

How much time does the Senator wish?

Mr. WELLSTONE. I think 2 or 3 minutes.

Mr. KENNEDY. I yield 4 minutes to the Senator from Minnesota.

The PRESIDING OFFICER. The Senator from Minnesota.

Mr. WELLSTONE. Madam President, I just wanted to respond to my good friend from New Hampshire, and he is a good friend. We differ on views, but he is someone I really respect. Sometimes we agree on issues.

I do think that one major difference was the one that the Senator from Massachusetts pointed out. Having been in North Carolina and having been a small part of that civil rights movement, we were involved in trying to make sure that, in fact, each and every citizen had a constitutional right. We were trying to overturn the system of apartheid which we had in the South which meant we were trying not to block people being able to eat at restaurants regardless of color or use a restroom but to make sure each citizen could do so.

I think the civil rights analogy is precisely the opposite. It is the law of the land that women have a right to go to the clinic and have a right to choose to have an abortion.

What is happening is that constitutional right is being blocked much like the right to be able to eat at a lunch counter regardless of the color of one's skin was really being denied a group of citizens. Thus, there is a need for a Federal role.

I would say to my friend from New Hampshire that, as we speak here today on the floor of the Senate, it has been brought to my attention that at the Milwaukee clinic Dr. Paul Simers right now as we debate this amendment on the floor of the Senate is being blocked from being able to enter his clinic by 20 blockaders. Police are not able or are not enforcing the restraining order. As a result, there is a patient with an incomplete miscarriage. She needs treatment. She is inside the clinic. My understanding is that there is one staff person with her but not a nurse.

This you could argue is nonviolent. You could argue that within the framework of the amendment of the Senator from New Hampshire you have 20 blockaders. I assume that they are not being violent. I would certainly hope so. But as a matter of fact, the result of what they are doing is that you have a woman who is in dire need of care inside the clinic and you have a doctor who is being blocked by 20 blockaders who are nonviolent, but it is certainly the use of force in the sense they are blocking the doctor from being able to go in and provide this woman with care.

So, I think as we think about what is at stake here there is a compelling reason for this legislation. Therefore, in the absence of further changes in language, I would certainly oppose the amendment proposed by the Senator from New Hampshire.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. SMITH. Madam President, how much time do I have?

The PRESIDING OFFICER. The Senator from New Hampshire controls 3 minutes 32 seconds.

Mr. SMITH. Madam President, I wish to respond to a couple of points made by my colleague.

I repeat again that in the legislation there is no distinction between force or threat of force or physical obstruction. There is no distinction between those terms in terms of penalties. That is my objection.

I would certainly say that as to anyone who is a perhaps a young woman, with three children, who opposes abortion, who happens to sit down and sing and pray in front of an abortion clinic, who gets 30 days in jail away from her family as a result of doing this, I hardly think that is a trivial penalty. That is a very serious penalty, and it is a disruptive penalty to that young woman and her family who believes very deeply about what she cares for and cares about.

I strongly disagree with my colleague from Massachusetts that this is a trivial penalty. As a matter of fact, if it is done a second time, it is 60 days. So they are serious penalties.

Again, in relation to the comparison of the civil rights movement with this situation, they wanted equal treatment. Martin Luther King, Rosa Parks, and all of those, wanted equal treatment.

The issue is the same. Pro-lifers want equal treatment. They want equal protection of the lives of unborn children under the Constitution of the United States. They are doing it peacefully. They have a right as peaceful people to not be treated like criminals for the same reason that those people who protested in those restaurants, on those buses, and in the streets of Atlanta and Selma for that same reason, that they should not have been treated like criminals. There is no difference.

Let us not cloud this by saying it is one issue of wanting to get into a restaurant or to be seated at a restaurant. Let us not be so specific that we lose sight of the real issue here.

The real issue here is: Do you respect the right of civil disobedience, peaceful protesting? Do you make a distinction between peaceful professing and criminal activity? That is the issue before us on this legislation, and that is the difference in my amendment that I am adding to this legislation. If you support a peaceful protest being a criminal activity, then you would be opposed to my amendment because that is the distinction here.

Madam President, I ask for the yeas and nays on my amendment and yield back the remainder of my time.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. KENNEDY. Madam President, I think I have time on the amendment. Am I correct?

The PRESIDING OFFICER. The Senator from Massachusetts has 14 minutes. The Senator from New Hampshire has 28 seconds.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. Madam President, it is my intention, when the Senator from New Hampshire concludes, to offer a second-degree amendment.

How much time remains on both sides?

The PRESIDING OFFICER. The Senator from Massachusetts has 7 minutes 18 seconds. The Senator from New Hampshire has 28 seconds.

Mr. SMITH. I yield back the remainder of my time.

Mr. KENNEDY. I yield back the remainder of my time.

The PRESIDING OFFICER. All time is yielded back.

CONGRESSIONAL RECORD — SENATE *November 16, 1993*

AMENDMENT NO. 1192 TO AMENDMENT NO. 1191

(Purpose: To lower the maximum penalties applicable for offenses not involving force or threat of force)

Mr. KENNEDY. Madam President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

The Senator from Massachusetts [Mr. KENNEDY] proposes an amendment numbered 1192 to the Smith amendment numbered 1191.

Mr. KENNEDY. Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection it is so ordered.

The amendment is as follows:

On page 1 of the amendment, line 1, strike out "page 8" and all that follows through the end thereof and insert in lieu thereof the following: "page 7, line 6, insert after 'that,' the following: 'for an offense involving exclusively a nonviolent physical obstruction, the length of imprisonment shall be not more than 6 months for the first offense and not more than 18 months for a subsequent offense,'".

Mr. KENNEDY. Madam President, the Senator from New Hampshire has made, I think, a useful and valid point, and that is drawing a distinction between the civil and criminal penalties with regard to nonviolent demonstrations. We have moved in his direction to recognize that distinction but not to the extent that it is acceptable to the Senator from New Hampshire.

I believe, under his amendment, it would severely restrict both the criminal and civil remedies in a way that was not there prior to the Bray decision. It is our intention to go back prior to the Bray decision, and that is why I offer this second-degree amendment.

Madam President, the pending Smith amendment would severely limit the availability of civil remedies for nonviolent blockades of abortion clinics and would effectively gut the authority in the Federal courts that the Federal courts had prior to the Bray decision to enjoin blockades.

Injunctions would be limited in duration to 60 days in length. That was not there prior to the Bray decision. And, also, under the amendment of the Senator from New Hampshire, it is targeted just to the particular clinic. Prior to the Bray decision it could be more expansive.

What we are trying to do is to ensure that in a particular area, should the injunction be granted, it would be applicable to the area and to the region. Under the law prior to the Bray decision, those injunctions could be altered; they could be adjusted to accommodate the conditions at that particular time. The amendment of the Senator from New Hampshire is a good deal more restrictive.

The second-degree amendment I have sent to the desk will preserve the important civil remedy while reducing the criminal penalties for nonviolent offenders. It would provide for a maximum criminal penalty for nonviolent first offenders of 6 months. Those are maximum criminal penalties. Under the sentencing guidelines, of course, nonviolent first offenders would often get lower sentences.

A comment has been made that that 30 days and 60 days are a long period of time. What we are talking about is the maximum 30 days in the legislation and very, very few—I inquired of staff about how many instances actually required that amount of time. It is very difficult to imagine, quite frankly, that that amount of time was applicable to any of the offenders.

But the pending Smith amendment would cap the criminal penalty to 60 days no matter how many times the offender acted to violate the criminal law—which is what we are really driving at. You could say the first time was an experience. But what is happening in many different communities is the fact that you have individuals that go out time in and time out, time in and time out, and involve themselves in these kinds of activities.

Clearly, we are not breaching the legitimate first amendment rights or the rights of protest and demonstration in this. What we are talking about is the violence. That happens to be the thrust of this legislation.

The pending Smith amendment would, as I mentioned, cap criminal penalties at 60 days no matter how many times the offender acted to violate the criminal law.

Our second-degree amendment strikes a fair balance. It reduces the criminal penalty for nonviolent offenders to a maximum of 6 months. It falls within the sentencing guidelines to take into consideration any aggravating or mitigating circumstances, clearly, and 18 months for subsequent offenses.

I think it would be a clear indication that if an individual does violate this law for the first time, it is not a felony, but if they are going to be involved in repetitive violations, it is going to be a felony.

What we are talking about, as was stated very clearly by the Senator from Nevada, is basically violence, and what we are talking about are constitutional rights. And we are intending that there be a distinction between the violent and the nonviolent, as the Senator has pointed out. But we also want to make sure when we are talking about constitutional rights we are talking about ensuring that those rights are going to be protected. And violating someone else's constitutional rights is a fundamental and serious matter.

Madam President, I hope our amendment will be accepted.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. I reserve the remainder of my time.

Mr. SMITH. Madam President, I rise in opposition to the second-degree amendment offered by the Senator from Massachusetts.

First of all, let me say I appreciate that he moved somewhat from the very extreme position that he had in the original legislation. But he has not moved far enough in order to be fair.

Under the underlying bill, if you peacefully protested and did not commit any violent act or in any way attempt to create or threaten to commit any violent act, under the underlying bill the penalty was 1 year. Senator KENNEDY has moved that to 6 months. On the second offense he moves from 3 years to 18 months.

But the bottom line is you are still a felon. You are a convicted felon under the Kennedy bill.

Our amendment, our first-degree amendment, says 30 days, and 60 days; 30 days for the first offense, even in a peaceful protest—we accept that as the penalty—and 60 days for the second offense. But, again, let me remind my colleagues of what we are doing here. I will use another example.

A young woman, housewife perhaps, who has three children, who has never had any type of criminal activity in her life, she simply believes morally that abortion is wrong, comes to an abortion clinic, peacefully protests—perhaps with a sign, perhaps by sitting in the street singing or praying, whatever the case may be. That is her crime.

The second time she does that under the Kennedy amendment she could be sentenced to a maximum of 18 months in jail, become a felon, be away from her family for 18 months for exercising her constitutional right of civil disobedience. That is the penalty here. That is what we are doing.

I cannot for the life of me understand why anyone would want to do that to an individual in the example that I gave. Again, the debate has been focused on the violent portion, on the murder of Dr. Gunn, on the other violent acts that have taken place. I do not condone those acts. Neither does anyone else. Those acts were senseless acts of violence that were wrong just like the act of abortion is a senseless act of violence inside the clinic. That is another issue.

The point is, we do not condone those violent acts and my amendment does not discuss those violent acts. We do not change the penalties for those violent acts in the underlying bill with my amendment. They stay the same. We are looking at this portion of this bill which says, "by force or threat of force or by physical obstruction." No one in this debate, in spite of my challenge, has come forth and said what physical obstruction is.

A young woman with children, responsibilities at home, sits down in the street in front of a clinic and says, "I really wish that we could stop the abortions that are going on in that clinic because those are my religious principles"—she is going to be sentenced to a maximum of 6 months in jail for the first time she does it.

Some of the people who are standing up here today have been the strongest proponents of the rights of women in the United States of America—they say they are. They would put a woman in jail for 18 months for simply saying and protesting peacefully that she does not think a life should be taken in the act of abortion. Something strange is happening here. This debate has taken on a twist that is just beyond this Senator, I guess, because I simply do not understand it.

I yield the floor.

The PRESIDING OFFICER (Ms. MOSELEY-BRAUN). The Senator from Massachusetts.

Mr. KENNEDY. Madam President, I yield myself 3 minutes.

The PRESIDING OFFICER. The Senator from Massachusetts.

### AMENDMENT NO. 1192 AS MODIFIED

Mr. KENNEDY. Madam President, I send a modification to the desk.

The PRESIDING OFFICER. The Senator has a right to modify his amendment and the amendment is so modified.

The amendment (No. 1192), as modified, is as follows:

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that, for an offense involving exclusively a nonviolent physical obstruction, the length of imprisonment shall be not more than six months for the first offense and not more than 18 months for a subsequent offense, and except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(i) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $15,000, for a first violation; and

"(ii) in an amount not exceeding $25,000, for any subsequent violation.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).

Mr. KENNEDY. Madam President, I indicate to the membership it is basically a conforming amendment and a technical one.

This bill does not cover constitutionally protected protest. Peaceful expression of a person through picketing, leafleting, or praying outside a clinic, counseling center, et cetera—it does not cover that, No. 1. Only when a view is expressed through force or threat of force or physical obstruction or destruction of property would there be a violation of law. It is important that we understand what this legislation is about and what it is not about.

It is clear that clinic blockades involving the physical obstruction of access to the facilities are not constitutionally protected conduct. As the Supreme Court said in the Cox versus Louisiana, a group of demonstrators could not insist upon the right to cordon off a street or entrance to a public or private building and allow no one to pass who did not agree to listen to their exhortations. That is what we are talking about.

Even where the blockades and invasions do remain peaceful, they still obstruct access to the facility depriving women of the ability to exercise their constitutional right to choose or to obtain other health care offered by the facility. There is no first amendment protection for obstruction of public or private facilities and no reason to exempt it from punishment.

It is critical that this legislation prohibit and penalize such obstructions.

Equating these clinic blockades and invasions with the tradition of civil disobedience practiced by Mahatma Gandhi and Martin Luther King is an insult to both of these great leaders. These clinic assaults, and that is what we are talking about, assaults, are intended to block—not enhance, not to achieve—but to block the exercise of a constitutional right. Dr. King and the civil rights activists of the fifties and sixties, by contrast, used peaceful civil disobedience in their effort to guarantee the constitutional right to equal protection of the laws; not to interfere with anyone else's constitutional right. That is a basic and fundamental distinction.

I hope at the appropriate time the Senate will accept my amendment.

I reserve the remainder of my time.

Mr. SMITH. Madam President, how much time do I have remaining?

The PRESIDING OFFICER. There are 15 minutes 4 seconds remaining.

Mr. SMITH. I yield Senator HATCH whatever time he wishes to consume.

Mr. HATCH. I thank my dear colleague.

Madam President, the Smith amendment meaningfully distinguishes between violent and nonviolent conduct. The Kennedy second-degree amendment would effectively wipe out this distinction. I believe the American tradition of dealing with peaceful civil disobedience requires support for the Smith amendment. I am kind of alarmed by what is going on here on this particular issue.

A major defect in S. 636 is that, notwithstanding all the rhetoric you will hear about violence, S. 636, this bill, entirely fails to differentiate between violent and nonviolent activity. Under S. 636, a person who commits an entirely peaceful violation, a grandmother, for example, quietly sitting with a group of others on a sidewalk outside an abortion clinic, is subject to the same stiff penalties as a person who brandishes a gun. That is ridiculous. I respectfully submit this failure to differentiate between violent and nonviolent activity betrays all the core principles we all cherish. Our American tradition recognizes the fundamental distinction between acts of violent lawlessness and acts of peaceful civil disobedience.

Acts of violent lawlessness appropriately invite severe penalties. But acts of peaceful civil disobedience, mass sit-ins, for example, that draw on the tradition of Gandhi and Martin Luther King, Jr., should not be subjected to such steep penalties. Such acts are, of course, not privileged. Civil disobedience is, by definition, unlawful. Acts of peaceful civil disobedience should, however, be punished roughly in the same manner and to the same extent as like conduct engaged in by anyone else.

For example, if protesters commit unlawful trespass, they should be subject to roughly the same penalties that other trespassers face. To impose a substantially more severe penalty pre-

sents the threat of viewpoint discrimination, no matter how cleverly disguised.

Had States during the fifties and sixties been able to impose and uphold such severe penalties on peaceful civil disobedience, the civil rights movement might well have been snuffed out in its infancy.

A broad range of peaceful anti-abortion activity may be disruptive and interfere with lawful rights of others. The same, it must be noted, was true of civil rights protests: They were, and they were intended to be, disruptive and they interfered with the then lawful rights of others. But they were right.

It is not my point to debate the relative moral standing of the anti-abortion and civil rights movements. Nor do I suggest that peaceful civil disobedience should not be punished. I would simply like to emphasize the grave danger of viewpoint discrimination inherent in imposing the same severe penalties on civil peaceful disobedience as on violent lawlessness.

It has been, and undoubtedly will be, contended that S. 636 is modeled on Federal civil rights laws. I must point out, however, that, among other things, the Federal civil rights laws that have been cited do not contain the term "physical obstruction," and they have been construed to apply only to acts of violence or threats of violence. In extending its severe penalties to peaceful civil disobedience, S. 636 departs radically from the models on which it purports to rely.

To sum up my first major objection, violent activity is fundamentally different from peaceful civil disobedience. S. 636 utterly fails to recognize that particular difference and, therefore, I think should be defeated.

Senator KENNEDY, the distinguished chairman of the committee and manager of the majority on this bill, has said that S. 636 is necessary to restore the situation to what it was before the Bray case. But as the ninth circuit ruling last week shows, the very statute that was at issue in Bray is still being used to block pro-life protests. So it is simply not true to say that the severe penalties under S. 636 are needed to restore the status quo before Bray. That Ninth Circuit Court of Appeals case makes that clear.

Madam President, I yield back the remainder of my time to my colleague from New Hampshire.

Mr. SMITH addressed the Chair.

The PRESIDING OFFICER: The Senator from New Hampshire.

Mr. KENNEDY. If the Senator will just yield, obviously the Senator is entitled to how much time he wishes to use. I note that the Senator from California wants to make a brief comment. It is related to both this amendment and the general bill. So whenever it is suitable, I will yield to her at that time.

The PRESIDING OFFICER. The Senator from New Hampshire has the floor.

Mr. SMITH. How much time remains?

The PRESIDING OFFICER. Nine minutes forty seconds.

Mr. SMITH. Madam President, again, let me repeat what we are talking about in terms of the difference between the second-degree amendment and the first-degree amendment, which I have offered. The second-degree amendment by the Senator from Massachusetts does pull back from the original bill, and I have already complimented him on that in terms of the criminal penalties for those who may be peacefully protesting in front of an abortion clinic. But it still makes them a felon: Second offense, maximum of 18 months in jail; first offense, 6 months in jail.

If we want to talk about physical obstruction, we certainly would have to agree that the sit-ins and protests of the civil rights movement resulted in physical obstruction, but they were also civil disobedience. Those people in the 1960's who conducted those sit-ins were heroes to many of my colleagues who today are on the floor favoring this underlying legislation. And today, by those same colleagues, those same proponents of the civil rights legislation, they are felons. Heroes yesterday; felons today.

What is the difference? The difference is what you are protesting against. That is the only difference; that is the only difference. The civil rights movement protested against discrimination and segregation, and rightfully so. The protesters we are talking about today are protesting against abortion. Heroes yesterday; criminals today.

The Senator from Massachusetts said it was an insult to the memory of King and Gandhi to use that comparison. I would be willing to challenge the Senator from Massachusetts or anyone else, if Dr. King were here today and could speak out, Dr. King would be pro-life. Dr. King would be for the protection of innocent human life, and he would also be standing up for those people who want to physically sit down and protest in front of an abortion clinic.

Mrs. BOXER. Will the Senator yield for a question?

Mr. SMITH. In one moment I will. That is really the issue. It is hard to say because Dr. King is not here to speak, but Dr. King, in my opinion, would speak in behalf of the unborn and Dr. King would speak for the right of those people to peacefully protest.

We are hearing a lot of discussion here which is off the subject, which is what happens around here too much. The subject of this legislation that deals with the violent protesters and the violent people we do not differ with. My amendment does not touch that. My amendment is talking about the physical obstruction clause in this bill which is linked with force or threat of force. A sit-in was physical obstruction. I really do not understand the logic of making one person a felon today who would have been a hero yesterday, and you are doing it on the basis of what the protest is about. Examine your conscience and think about that. It is really the issue.

I will be happy to yield to the Senator.

Mrs. BOXER. Madam President, I thank the Senator very much. I would just say to the Senator, I think we really do a disservice to Dr. King, his memory, and his beliefs to assume what he would be saying in this debate. I find it, frankly, insulting.

I could think, because Dr. King was one of my heroes, that Dr. King, if he was here, would stand up and say people have a right to their constitutional protections, but I do not know that he would say that. But I will say to the Senator that if—I ask the Senator, does he have any direct knowledge that Dr. Martin Luther King would come out on this side of the issue? Because, again, I certainly do not think that anything was ever written by Dr. King about this, and my own view is he would be standing on the side of freedom and the constitutional rights that we have.

Mr. SMITH. If I can reclaim my time and respond briefly to a rather facetious remark made by the Senator from California, I am not a psychic and I am not communicating with Dr. Martin Luther King, lest somebody think I may be. Maybe someone else is, but I am not.

I also will say, Dr. King—it is a matter of record—believed in nonviolence. Can anybody stand here on the floor and tell me that abortion is not a violent act against the unborn child?

Mrs. BOXER. Is that a question to this Senator?

Mr. SMITH. I will ask the Senator from California to answer that question specifically. Is it a violent act against an unborn child?

Mrs. BOXER. I think that a woman's right to choose is—

Mr. SMITH. Answer my question. Is abortion a violent act against an unborn child?

Mrs. BOXER. I think the question is a loaded question, and that a woman's right to choose is about her constitutional rights. I think that if the Senator thinks I was being facetious, let me tell the Senator, I was not. I was hurt by the Senator's comments because Dr. Martin Luther King is a hero of mine. He is one of the reasons I am in politics. And to suggest that the Senator from New Hampshire knows what he would be saying I think is an insult to his memory.

Mr. SMITH. If I can reclaim my time, Madam President, I did not say I knew what Dr. Martin Luther King would say. I said I believe if Dr. Martin Luther King were here today, he would be defending the rights of the unborn. He would also be defending the rights of

those people who want to peacefully protest in front of an abortion clinic just like he defended the rights of those who wanted to sit in and peacefully demonstrate for the end of segregation and discrimination. I believe that is a fair comparison.

The comment was made by the Senator from Massachusetts that it was an insult to the memory of Dr. King. I simply responded to that comment. That is really the extent of it.

I believe that Gandhi and King would be very much in favor of supporting unborn children. I think we also have to realize that unborn women are also part of this. We are now getting back into the content of the issue of abortion when in fact the issue here is whether or not the Senator and I, all of us on the Senate floor, wish to make a criminal out of a woman or a man, but let us talk about a woman for a moment since that seems to be the focus here—a woman having the right to simply sit down peacefully in front of a clinic and say through prayer perhaps or through a placard, whatever she chooses, that abortion is wrong.

Now, it is interesting that in the New York Times this morning we had an editorial which basically pointed out, "By holding to the basic bill, Congress can rise to its duty of safeguarding the constitutional rights of women who choose to have abortions and the safety of those who provide them."

But it also should have added another line which would say that in doing so, we will trample the rights of those who oppose abortion and the rights of unborn women in the process. That is what should have been added to the New York Times editorial.

This issue is really quite simple. Let us not cloud it with a lot of emotional debate. The issue is do you want to make a criminal out of a person, including young women, many of whom are going to be arrested, prosecuted, convicted, and placed in jail for up to 6 to 18 months, for simply saying in a peaceful way that abortion is wrong? If that is what you want to do, then you should vote for the Kennedy substitute and vote for the underlying amendment.

I yield the floor.

The PRESIDING OFFICER. Who yields time? The Senator from Massachusetts.

Mr. KENNEDY. I yield 10 minutes to the Senator from California.

The PRESIDING OFFICER. The Senator from California.

Mrs. FEINSTEIN. Madam President and the Senator from Massachusetts, I thank you.

I have been listening to this dialog on the question of what degree of penalties. I would submit quite respectfully to the Senator from New Hampshire, I think it is appropriate to debate the question. I would submit the Constitution has set forward certain basic rights and an individual has a right to carry out these basic rights. If someone is standing in front of a door

of a clinic hands joined, albeit standing there peacefully, blocking the entrance, with people standing all around, some chanting, some praying, some shouting epithets, the police need to be called, there is a very charged, highly emotional, difficult situation and very humiliating for someone to try and negotiate, I submit to you that that is the heart of the issue.

I stand for Senator KENNEDY's second-degree amendment. I stand for this basic act. I have been to these Operation Rescue situations. I have seen the dynamics that take place. Seeing it on television, reading about it in the newspaper cannot really translate all that is involved in a clinic blockade, a clinic protest.

Let me take the national overview for a moment. In the last few years, and especially this year, there is a disturbing trend of increasing violence at family planning clinics—not lessening violence. Threatening letters are sent to doctors. Patients are blocked from safe access to clinics. Clinics are invaded. They are sprayed with toxic chemicals. They are burned to the ground. One doctor shot and killed; others, murder attempted. And the organizers of these protests often go from State to State to participate in the organization, the strategizing and the carrying out of these blockades. They are more than just peaceful protests. They are very often actual blockades, strategized and put together in a way to prevent access, to discourage access by threat, by intimidation or by whatever.

So these are not necessarily peaceful protests. Sometimes they are real examples of vigilante extremism, and they mirror very often the spread of hate crimes and random violence across our society.

I would like to get to that in these remarks. But this year alone there have been more than 1,400 acts of violence against abortion providers and patients, and cases of arson and vandalism directed at clinics have more than tripled over the past 3 years.

A report found that, in 1993, more than 50 percent of clinics surveyed have experienced some form of violence: Death threats, stalking, arson, bomb threats, blockades. The economic impact of clinic violence is also large. Just through September of this year, in the first 9 months, it was $3.7 million of damage to clinics throughout our country.

Let me talk about my State, California. There has been a tremendous amount of violence. Let me cite the following: Five clinics in San Diego sprayed with butyric acid, a chemical that causes painful irritation to the skin and eyes; facilities in and around Riverside doused with the same chemical causing $100,000 in damage; throughout the summer, clinics in San Jose targeted for blockades and invasions—not peaceful protests, blockades and invasions, costing public agencies

over $1 million in overtime, costs for prosecution and other expenses.

At a blockade, antiabortion activists storm and surround a clinic. They often use military-style tactics to prevent women from entering.

So it is not the peaceful civil rights sit-in. Women who seek abortions in blockaded clinics must attempt to run the gauntlet of pushing, verbal abuse, and physical obstruction. State and local law enforcement agencies have often attempted to prevent clinic blockades, but their efforts have been undercut by minimum penalties and limited resources available to them.

Let me give you one incident. On September 20 of this year, in Bakersfield, CA, someone poured gasoline around the perimeter of the only clinic in town that provided a full range of reproductive and medical services. That clinic was burned to the ground. The $1.4 million fire at Family Planning Associates also demolished eight other businesses including one that provides home health care to the terminally ill.

Before the arson, doctors in the communities had been sent threatening questionnaires.

And let me read from the Los Angeles Times to tell you exactly how this works.

In April, the letters and questionnaires started to arrive at certain obstetricians' offices inquiring whether the doctor performs abortions or refers patients to clinics that perform them.

Dr. Tracy Flanagan, 36, an ob/gyn physician then in private practice, received such a letter and was outraged at the implied intimidation and threat. She refused to answer, and received a second letter, which gave her a deadline and warned: "If we do not receive a response from you, we will consider this to be an indication that you perform abortions."

So, in other words, you either answer the questionnaire or these groups target you. They assume you perform the abortion.

The article goes on to say:

It also said she would be "outed"—a tactic that involves publishing names of doctors who allegedly perform abortions and picketing at those doctors' homes and offices. In a small city like this, with about 50 ob/gyns for a population of 200,000, such publicity could ruin a practice.

In fact, Dr. Flanagan left Bakersfield out of fear. She now practices in San Francisco at the University of California Medical Center.

She said, and I quote:

"Some colleagues said I shouldn't answer. Others said I should take a public stand [to protest the letter-writers' methods]. But Dr. [David] Gunn had already been shot in Florida, and it was unclear to me just how far these people would go. So I sent a letter saying I did not perform abortions, which was correct at the time.

This is the kind of threat and intimidation that is going on in California at the present time. Doctors are sent letters and then they are expected to reply. If they do not, they are threatened. If they do not respond a second time, they are "outed."

In other words, if they do not respond, it is assumed by groups that they take the action to practice, and in the course of their practice perform an abortion, and then they are targeted.

So that is the reason it is important on a human level to have substantial penalties, to say we are not going to tolerate these kinds of things.

Ms. MIKULSKI. Madam President, will the Senator yield for a question?

Mrs. FEINSTEIN. I certainly will.

Ms. MIKULSKI. I thought that the Senator's statements were well taken, and I know the Senator's devotion to the cause of nonviolence. I too am troubled by the fact that we would never want to stop a nonviolent protest. A group of nuns saying a rosary across the street from a clinic I believe—is it the Senator's understanding that would be acceptable under this framework that we are passing; that it will continue to allow the nonviolent protest?

Mrs. FEINSTEIN. That is correct.

Ms. MIKULSKI. Is it also the Senator's belief that this is so narrowly drawn and therefore would allow both first amendment, literally first amendment rights, but also the figurative first amendment rights which is the nonviolent protest; that does not harass, intimidate, or exacerbate? Violence would be prohibited?

Mrs. FEINSTEIN. That is correct.

Ms. MIKULSKI. I thank the Senator for clarifying that. I believe we want to continue to allow that nonviolent protest but at the same time stop the violence and the harassment.

Mrs. FEINSTEIN. I thank the Senator very much. I thank her for her very good work.

The PRESIDING OFFICER. The Senator's time has expired. The Senator from Massachusetts has 1 minute remaining.

Mrs. FEINSTEIN. If I might just conclude.

Mr. KENNEDY. I yield the remaining minute to the Senator.

The PRESIDING OFFICER. The Senator is recognized.

Mrs. FEINSTEIN. If I may quickly conclude, I think, Madam President, the point here is that there is nonviolence and then there is nonviolence. The act of nonviolence has to assume a certain passivity. The acts that I have talked about do not assume that passivity. They assume an active pattern and practice which is aimed at stopping the right for an individual to go into a medical building, regardless of cost, and the threat and intimidation that goes along with that.

So I am proud to support the second-degree amendment and to support this legislation. I believe it is legislation that is necessary and overdue.

I yield the floor.

Ms. MIKULSKI. Mr. President, I rise today to support the Kennedy amendment to the crime bill. I believe that the Freedom of Access to Clinic Entrance Act, which Senator KENNEDY is

offering as an amendment, is a perfect compliment to the crime bill. In fact, passing this amendment is essential—if we are going to curb the escalating pattern of terrorism, harassment, vandalism, and violence that is being committed against health clinics across this Nation and protect health care providers from violent attacks.

Nine months ago almost to the day—Dr. Gunn was killed in front of a Pensacola clinic that provided abortion services. His death was shocking. And it sent an urgent message to Congress that it was time for action. Within weeks we had a bill. That legislation is now before this body for immediate consideration.

The problem we are seeking to address is clear: State and local law enforcement are being overwhelmed. Radical pro-lifers have elevated the war against the freedom to choose to a new level of domestic terrorism. And our local officials do not have the capacity to fight this coordinated national campaign.

From 1977 through April 1993 more than 1,000 acts of violence—including: 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnapings, 327 clinic invasions, and 1 death have been reported. Doctors in my State have been forced to wear bulletproof vests to work. And women live in fear that they may not be able to gain access to the medical services they need.

It is a fundamental tenet of this country that we all have the right to lawful demonstration—whatever our beliefs. All of us here support that. But opponents of abortion have substituted vigilantism for lawful demonstrations. They have interfered with a woman's constitutionally protected right to obtain an abortion. They have destroyed clinic facilities—leaving women without access to health care facilities. And they have threatened the safety of individuals providing health care services.

This terrorism must be stopped. These violent and lawless actions have made a mockery of the Constitution.

We must be able to protect health care providers like Dr. Gunn. We must assure them that they do not have to risk their life—or the sanctity of their homes—and the safety of their families—because of the health care services they provide. The Government has a historic role to play in protecting the health and safety of its citizens.

But according to our new Attorney General—the highest law enforcement official in this country—current Federal law is inadequate—

We need new Federal authority to help local law enforcement put a stop to the large-scale, national, systematic campaign of terrorism and violence going on today.

This amendment is especially urgent because of recent Supreme Court action earlier this year in Bray versus Alexandria that severely curtailed the effectiveness of an existing statute to remedy abortion clinic blockades. The

Supreme Court left Congress with the responsibility of ensuring that women are able to exercise their right to get an abortion free from intimidation or violence.

This bill would do that. It would authorize civil and criminal penalties for interference with access to abortion service—regardless if that interference occurred at the site of a clinic—as part of a large scale action—whether it involved sabotage in the middle of the night—or if it involved an attack on an abortion provider in his or her home or car. And it meets the Reno test—

It is narrowly drawn and contains strong, but necessary medicine to address the specific problem of interference with access to abortion services;

It protects the expression of free speech and does not violate the first amendment; and

It establishes sufficient civil and criminal penalties to give law enforcement officials sufficient tools for curbing the violence.

The Attorney General has urged us to pass this bill. So has the American Medical Association and countless women's groups from across the country. I call on my colleagues to do the same.

This bill says no to violence. No to harassment. And no to terrorism. It says yes to free speech. Yes to legitimate demonstrations. And yes to the protection of women seeking access to health care services and the dedicated men and women who provide those services at clinics across this country.

I yield the floor.

Mr. KENNEDY. Madam President, how much time remains?

The PRESIDING OFFICER. There is no time remaining on the side of the proponents of the amendment, and there are 17 seconds remaining on the side of the opponents.

Mr. KENNEDY. In the general debate I understand I have 4 minutes left. Is that correct?

The PRESIDING OFFICER. That is correct.

Mr. KENNEDY. I yield that time to the Senator from Rhode Island.

The PRESIDING OFFICER. The Senator from Rhode Island is recognized.

Mr. PELL. I thank my friend for yielding.

THE FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT

Mr. PELL. Madam President, I rise today as an original cosponsor of S. 636, the Freedom of Access to Clinic Entrances Act, to express my strong support for immediate action on this important legislation. In many places across this Nation, including communities in my own State of Rhode Island, physicians, medical clinic workers and patients have been subjected to violence—or the threat of violence—because they perform abortions, or work at clinics that perform abortions, or are seeking an abortion.

While I recognize and strongly support the right to protest peacefully, I

do not believe that this right allows any individual to inflict fear, violence, or pain on others, or to destroy property. And I firmly believe that crime cannot masquerade as free speech or free expression, subjecting individuals who are involved in a constitutionally protected activity—abortion services—to murder, arson, stalking, and other heinous crimes.

During Labor Committee consideration of this measure, concerns were raised about the measure's constitutionality and breadth. The committee made several modifications which were intended to ensure that the legislation is fair—by including medical clinics that provide pregnancy-related services as well as abortion-related services—and protective of the constitutional right to free speech. I firmly believe that the bill before us draws a fair, reasonable and constitutional line between the right of protesters to protest, and the right of women to obtain reproductive services, including abortion services, and of medical personnel to provide these services.

Madam President, it is important for Senators to realize that this is not some abstract debate on a point of law that may or may not affect real people. This is of great importance to many Americans and many Rhode Islanders. On November 3, 1993, Ms. Barbara Baldwin, executive director of Planned Parenthood of Rhode Island, described in a speech some of what she and other Rhode Islanders, including Rhode Island Planned Parenthood's courageous medical director, Dr. Pablo Rodriguez, have had to face in recent months.

I would like to quote for a moment from the remarks of Barbara Baldwin, executive director of Planned Parenthood—and a good friend, well known to this Senator—from Rhode Island.

In December our waiting room was invaded twice. * * *

In January our Medical Director's face appeared on a wanted poster, and they sent the poster to his home, his office and our clinic.

In March our clinic was blockaded twice by minute men blockades, small but effective. [Also], our Medical Director's driveway was mined with nails. He got 4 flat tires, and his wife stepped on a nail when she went jogging. He has two small children and lives in a remote area of the state.

In April I walked from work to a neighborhood restaurant for lunch, was followed unknowingly, and after being seated two men began yelling, calling me a murderer [sic], and then telling everyone in the restaurant I had blood on my hands and murdered babies for a living. [Also] * * *, our building was splashed with red xerox toner and we were forced to repaint the entire building. Later it was painted with green fluorescent paint.

[Also] [I]n April I was followed in my car on two different occasions as I was going home. I diverted my route and hid once at the airport and once at McDonald's.

In May we were picketed* * *, and our staff were identified by name, and often told their homes would be picketed. * * *

This kind of treatment is simply not right, and should not be permitted, and is not legal.

Madam President, no one engaged in a constitutionally protected activity should have to endure the fear, harassment, and prospect of violence that the Rhode Island Planned Parenthood staff and patients have had to endure. Thank goodness, no one has been seriously hurt in our State as a result of these tactics. But people in other States have been hurt, and, as we all know, Dr. David Gunn died in Florida after being shot by a protester.

I firmly believe that the legislation before us today is necessary to prevent this kind of orchestrated violence and harassment, to protect medical clinic personnel and patients, and to ensure that women continue to be able to exercise their constitutional right to reproductive freedom.

I hope that the Senate will approve this legislation today and send a message that we will no longer tolerate this attack on the rights of American women.

I congratulate the Senator from Massachusetts for his leadership in this battle.

Mr. HATCH. Madam President, I yield 2 minutes off the bill in addition to my 17 seconds to the distinguished Senator from New Hampshire.

Mr. SMITH. Madam President, I would like to respond briefly to the Senator from Maryland, who I see is still on the floor, because I know she is concerned about this as well. I want to read from the report language.

The act is carefully drafted so as to not prohibit expressive activities that are constitutionally protected, such as peacefully carrying picket signs, making speeches, handing out literature, or praying in front of a clinic, so long as these activities do not cause a physical obstruction.

Using your analogy of the nuns, if 10 nuns obstruct access to that clinic, praying with the rosary, they can be sentenced to 6 months in jail. So the bottom line is that this bill, as written, can result in nuns going to jail for peacefully protesting if they obstruct access. How do we define obstructing access? Is it sitting in front of the clinic or sitting in the street? What is obstruction? It is not clearly spelled out. I want to make it clear that if you want it to result in the possibility of putting nuns in jail, maybe we ought to vote for the underlying amendment.

Madam President, I am concerned about the time. Has the time expired on the other side on the Kennedy amendment?

The PRESIDING OFFICER. It has expired.

Mr. SMITH. How much time do I have?

The PRESIDING OFFICER. All time on the amendment has expired on both sides. Four minutes were yielded by the Senator from Massachusetts from the bill. Four minutes were yielded by the Senator from Utah on the bill. There are now 39 seconds remaining on that 4 minutes for the Senator from New Hampshire. There are no seconds remaining for the Senator from Massachusetts.

Mr. KENNEDY. Parliamentary inquiry. What is the current matter before the Senate?

The PRESIDING OFFICER. The pending question is the Kennedy amendment No. 1192, as modified.

AMENDMENT NO. 1193 TO AMENDMENT NO. 1191

(Purpose: To differentiate between violent and nonviolent activities)

Mr. SMITH. Madam President, I send a second-degree amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from New Hampshire [Mr. SMITH] proposes an amendment numbered 1193 to amendment No. 1191.

Mr. SMITH. Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

Strike all after "PENALTIES" and insert in lieu thereof the following :

".—Whoever violates this section shall—

"(1) in the case of a first offense involving force or the threat of force, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense involving force or the threat of force after a prior conviction for an offense involving force or the threat of force under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury), miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life. In the case of offenses not involving force or the threat of force, whoever violates this section shall be imprisoned not more than 30 days.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of conduct prohibited by subsection (a) and involving force or the threat of force may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damage, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to belief that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $15,000, for a first violation involving force or the threat of force; and

"(ii) in an amount not exceeding $25,000, for any subsequent violation involving force or the threat of force.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general importance, such Attorney General may commence a civil action in the name of such State as parens patriae on behalf of natural persons residing in such State, in appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).".

The provisions of this amendment shall take effect one day following the enactment of this Act.

Mr. SMITH. Madam President, this second-degree amendment is substantively identical to the first-degree amendment, which I have already offered. It is the same amendment.

My purpose in offering it is simply so that I have the opportunity to have a vote on my amendment. In the event that the Kennedy amendment should be agreed to, I would not have a vote on my first-degree amendment. That is the purpose for offering the second-degree amendment to the Kennedy amendment.

I ask for the yeas and nays on that amendment.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Ms. MIKULSKI. Will the Senator yield while I try to clarify the parliamentary situation?

Mr. SMITH. If I have any time left.

Ms. MIKULSKI. I ask unanimous consent that the time of the Senator be extended by 2 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. MIKULSKI. The Senator from New Hampshire and I are absolutely committed to the concept of nonviolent protesting. I would like to bring to the Senator's attention that when I used my point about the nuns walking and saying their prayers or singing a hymn, the Senator mentioned that they could be placed in jail.

I want to bring to the Senator's attention that it is my understanding from the bill that prohibited activities would be "by force or threat of force," or by physical obstruction that intentionally injures, intimidates, or interferes; or attempts to injure, intimidate, or interfere with the person. And then it goes on.

Even if nuns were in front of the door, I cannot believe that they would be threatening by force or threatening to intentionally injure. Therefore, their type of protest would be in the spirit that has been common practice in nonviolent demonstration activity. It is the intentional injuries or the threat of force that I believe are the operational concepts. Is that the Senator's understanding, or do we have two different understandings of the bill?

Mr. SMITH. I will respond with whatever time is left. I agree that I think the motive of the Senator is the same. I do not question that. I think that the language does not handle that. I think that physical obstruction is physical obstruction. If 10 nuns are sitting in front of an abortion clinic and people cannot get in, I assume that under the underlying bill, without my amendment being agreed to, those nuns could be arrested, could be sentenced to 6 months in prison. And were it to be the second offense, they could be sentenced to 8 months in prison and could be felons. That is my understanding, and it is also the understanding of counsel regarding this matter. So I say we ought to be very careful here.

I think my amendment is very reasonable. I think we ought to take a good, hard look at what we are doing here on the Senate floor today.

Mr. KENNEDY. Madam President, as I understand it, we are back to 20 minutes a side on the Senator's amendment.

The PRESIDING OFFICER. That is correct.

Mr. KENNEDY. Madam President, we want to point out, for the benefit of the Members, what effectively we are doing in this amendment. As I understand it, what was in the initial amendment of the Senator from New Hampshire—and that is what is before the Senate—is unacceptable, because that effectively undermines what we were attempting to do to return to the Bray decision, which would permit, for example, in the areas of injunction, no time limitation. He provides a time limitation on it. That did not exist prior to Bray. We are trying to go back to the situation prior to that Bray decision at which time effectively there was no violence. There was no violence, or limited violence.

The Senator from New Hampshire can talk all he wants about the ability of people to demonstrate and protect their first amendment rights. They are protected. It is clear. It is specific in the language of the bill as well as in the report.

All of us have been around here long enough to understand what often happens in the U.S. Senate, sometimes intentionally, sometimes not. But in a number of instances, people do not describe accurately what is in the bill and then differ with it.

I must say, Madam President, what we are attempting to do is to go back to the situation where we have permitted the injunctions that were available and utilized when there was the real possibility of danger and physical violence, and to ensure that constitutional rights are going to be protected. I know that the Senator differs with that and will describe a different situation, but that is what we are doing, what we intend to do, and that is what this bill is effectively about.

We had attempted, in good faith, to draw a distinction between the civil and criminal penalties. That was not acceptable to the Senator from New Hampshire. But we believe if you are going to violate a constitutional right, you do not trivialize it by talking about 30 or 60 days a misdemeanor; you make it a felony on the second offense. We either consider this a fundamental or basic right, or we do not. If we do, you have to put in the teeth. I was around here when we passed the 1968 Housing Act. It was wonderful. You could read that legislation, and it effectively, on the face of it, eliminated discrimination in housing. But it did not do it because it had no real teeth. If we are talking about doing something in this area, we ought to do it.

We waited until the mid-1960's to try to pass a housing bill that did something against discrimination.

It is not acceptable. The Senator's amendment is not acceptable if we are serious about protecting fundamental rights.

I reserve the remainder of my time.

The PRESIDING OFFICER. Who yields time?

Senator SMITH addressed the Chair.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. SMITH. Madam President, I ask for the yeas and nays on the underlying Kennedy amendment No. 1192, as well.

The PRESIDING OFFICER. The request is not in order at this time.

Mr. KENNEDY. Madam President, I ask unanimous consent that it be in order at this time to accommodate the Senator.

The PRESIDING OFFICER. Without objection, it is so ordered.

Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The yeas and nays have been ordered on the underlying Kennedy amendment No. 1192, as modified.

Mr. KENNEDY. Madam President, I suggest the absence of a quorum, and I ask unanimous consent that the time be equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. PACKWOOD. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

PRIVILEGE OF THE FLOOR

Mr. PACKWOOD. Madam President, I ask unanimous consent that Steve Grimand, a participant in the legislative fellowship program working in my office, be granted floor privileges on the freedom of access bill and on the crime bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. PACKWOOD. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. KENNEDY. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. KENNEDY. Madam President, as I understand, all the other time has been yielded.

The PRESIDING OFFICER. The time on this amendment has expired.

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER. The Senator from Massachusetts is advised that the amendment of the Senator from New Hampshire numbered 1193 is technically not in order at this time. The yeas and nays, however, have been ordered on amendment No. 1192.

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER. The Senator from Massachusetts.

AMENDMENT NO. 1192, AS FURTHER MODIFIED

Mr. KENNEDY. I send a modification of the amendment to the desk and ask unanimous consent that it be in order.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is so modified.

The amendment (No. 1192), as further modified, is as follows:

In lieu of the language proposed to be inserted, insert:

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that, for an offense involving exclusively a nonviolent physical obstruction, the fine shall be not more than $10,000 and the length of imprisonment shall not be more than six months, or both, for the first offense; and the fine shall be not more than $25,000 and the length of imprisonment shall not be more than 18 months, or both, for a subsequent offense; and except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results it shall be for any term of years or for life.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and

"(ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000, for any other subsequent violation.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).

Mr. KENNEDY. I ask unanimous consent to have 2 minutes, 1 minute for the Senator from New Hampshire, if he has a question, and for explanation.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. KENNEDY. Madam President, what we have basically done is adjust the penalty in this legislation with regard to the amendment itself. That, I think, makes it more consistent with what the Senator originally was desirous of. In the legislation it was $100,000, and $250,900 for the second offense. We are down to $10,000 and $25,000 maximum.

There was one other provision talking about maximums and minimums, and they have been adjusted in a similar way. We did it with civil penalties.

That is the extent of the modification. So I just wanted the Senator to understand that.

Mr. SMITH. Madam President, I say to the Senator, I appreciate the modification. I think the modification certainly does move a long way, from $100,000 and $250,000 penalties down to $10,000 and $25,000. However, the point is that these are still criminal offenses and very stiff fines. But I appreciate the fact that the Senator has made those modifications, which he did not have to do. We appreciate that.

The PRESIDING OFFICER. All time has expired on the amendment. The yeas and nays have been ordered. The clerk will call the roll on amendment No. 1192, as modified.

Mr. SMITH. May I ask for one clarification of the Senator from Massachusetts? Are those just for the peaceful, nonviolent? Are the criminal penalties the same criminal penalties?

Mr. KENNEDY. The Senator is correct. It is only for the peaceful, nonviolent.

Mr. SMITH. I thank the Senator for that clarification.

The PRESIDING OFFICER. The question is on agreeing to the amendment No. 1192, as further modified, to amendment No. 1191. On this question, the yeas and nays have been ordered, and the clerk will call the roll.

The bill clerk called the roll.

Mr. FORD. I announce that the Senator from Oklahoma [Mr. BOREN], the Senator from North Dakota [Mr. DORGAN], and the Senator from Tennessee [Mr. MATHEWS] are necessarily absent.

Mr. SIMPSON. I announce that the Senator from Kansas [Mrs. KASSEBAUM] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber who desire to vote?

The result was announced—yeas 56, nays 40, as follows:

[Rollcall Vote No. 380 Leg.]

YEAS—56

| | | |
|---|---|---|
| Akaka | Glenn | Murray |
| Baucus | Graham | Nunn |
| Biden | Harkin | Packwood |
| Bingaman | Hollings | Pell |
| Boxer | Inouye | Pryor |
| Bradley | Jeffords | Reid |
| Bryan | Kennedy | Riegle |
| Bumpers | Kerrey | Robb |
| Byrd | Kerry | Rockefeller |
| Campbell | Kohl | Sarbanes |
| Chafee | Lautenberg | Sasser |
| Cohen | Leahy | Shelby |
| Daschle | Levin | Simon |
| DeConcini | Lieberman | Simpson |
| Dodd | Metzenbaum | Specter |
| Dole | Mikulski | Stevens |
| Durenberger | Mitchell | Wellstone |
| Feingold | Moseley-Braun | Wofford |
| Feinstein | Moynihan | |

NAYS—40

| | | |
|---|---|---|
| Bennett | Faircloth | Lugar |
| Bond | Ford | Mack |
| Breaux | Gorton | McCain |
| Brown | Gramm | McConnell |
| Burns | Grassley | Murkowski |
| Coats | Gregg | Nickles |
| Cochran | Hatch | Pressler |
| Conrad | Hatfield | Roth |
| Coverdell | Heflin | Smith |
| Craig | Helms | Thurmond |
| D'Amato | Hutchison | Wallop |
| Danforth | Johnston | Warner |
| Domenici | Kempthorne | |
| Exon | Lott | |

NOT VOTING—4

| | |
|---|---|
| Boren | Kassebaum |
| Dorgan | Mathews |

So the amendment (No. 1192), as modified further, was agreed to.

Mr. KENNEDY. Madam President, I move to reconsider the vote by which the amendment was agreed to.

Mr. DODD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. DOLE. Madam President, I would like to say a few words explaining why I voted for the Kennedy amendment to the pending bill.

As this amendment was originally drafted, the maximum criminal penalties for those who engage in nonviolent activities obstructing access to abortion clinics would remain at $100,000 for first-time violations and $250,000 for each subsequent violation. I thought these penalties were too high, particularly for nonviolent protestors, and sought to reduce them substantially. For purposes of establishing criminal penalties, it is important that we distinguish between violent activities and peaceful, nonviolent protests.

After discussions with my colleague from Massachusetts, he agreed to modify his amendment so that the maximum criminal penalties would be reduced by 90 percent—to $10,000 for first-time violations and $25,000 for each subsequent violation. Keep in mind, they were $100,000 to $250,000.

In addition, the original Kennedy amendment made no distinction between violent protests and nonviolent protests for purposes of the civil actions available to the U.S. Attorney General and the attorneys general of each of the States. Senator KENNEDY agreed to modify his amendment so that the maximum civil penalties that may be awarded are reduced to $10,000 for first-time violations and $15,000 for each subsequent violation. Under the original Kennedy amendment, the maximum fines were $15,000 for first-time violations and $25,000 for each subsequent violation.

I still think they are too high, do not misunderstand me. But I think we made a big, big change for the better. In my view, it is a step in the right direction.

Madam President, I am not totally satisfied that these modifications go far enough. But, in my view, they are a step in the right direction. Since the amendment, as modified, substantially reduces the maximum criminal pen-

alties that can be imposed on nonviolent protestors, I voted for its adoption.

AMENDMENT NO. 1191, AS AMENDED

Mr. KENNEDY. Madam President, I have conferred with the Senator from New Hampshire. He has agreed that a vote on the underlying amendment now is not necessary. And so I ask unanimous consent to vitiate the vote that was previously ordered.

The PRESIDING OFFICER. Without objection, it is so ordered.

The question is on agreeing to amendment No. 1191, as amended.

The amendment (No. 1191), as amended, was agreed to.

Mr. KENNEDY. Madam President, I move to reconsider the vote by which the amendment was agreed to.

Mr. HATCH. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KENNEDY. Madam President, may we have order, please?

The PRESIDING OFFICER. There will be ordered.

AMENDMENT NO. 1190

Mr. HATCH. Madam President, in order to expedite this, it is my understanding that both sides can agree on the Hatch amendment. So I ask unanimous consent that the yeas and nays be vitiated.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH. I ask that the amendment be agreed to.

The PRESIDING OFFICER. The question is on agreeing to amendment numbered 1190.

The amendment (No. 1190) was agreed to.

Mr. HATCH. Madam President, I move to reconsider the vote by which the amendment was agreed to.

Mr. KENNEDY. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. CHAFEE. Madam President, I wish to express my strong support for the Freedom of Access to Clinic Entrances Act, which has been reported by the Committee on Labor and Human Resources.

It is interesting to note that this came out of that committee on a bipartisan vote. In other words, while there were four Republicans who voted against it, there were three Republicans who voted for it in the committee.

In my view, this bipartisan compromise does a careful job of balancing the right to peaceful protest with a woman's right to reproductive health services.

The House, as I understand it, is also taking up the legislation this week. So the chances are good that we can put a bill on the President's desk in rather short order.

The amendment by the Senator from New Hampshire, as I understand it, would reduce the penalties. It seems to me that the second offense penalty sug-

gested by the Senator from New Hampshire appears to be very mild. It goes to a maximum of 60 days as opposed to the length of time that is provided within the legislation.

S. 636 would make it a Federal offense to impede access to abortion-related services, including pregnancy counseling services.

It would also make the damage or destruction of property of such facilities a Federal crime.

Moreover, S. 636 would enable victims of clinic violence to seek injunctive relief in civil damages. These are very, very important steps. To confront the escalating tide of violence around the country, the bill also gives the Attorney General and the State attorneys general critical enforcement roles through our Federal and State courts.

Madam President, this issue is not about a women's right to choose or about free speech. Indeed, some of the bill's very supporters count themselves among the pro-life movement. This issue is about violence; it is about destruction of property; it is about intimidation; and it is about terrorism. And, indeed, it is even about murder.

Should we wait for more innocent victims to join Dr. Gunn, the Florida physician who was shot to death this past March? Or are we prepared to say, "Enough is enough"?

Now, I would like to bring to the attention of the Senate those tactics that have been used in my home State of Rhode Island against Planned Parenthood and its staff just over the past 12 months.

In December, the medical director began receiving subscriptions to magazines and other unwanted publications.

In January, the medical director's face appeared on a wanted poster that was sent to his office and home. "Wanted for murder" and the medical director's face appeared on it.

In March, the clinic was blockaded twice by activists, and the director's driveway was mined with nails which blew out four tires and caused his wife an injury.

In April, a clinic employee was intimidated at a restaurant by two men who began yelling that she was a murderer, and had blood on her hands for murdering babies. That same woman was also followed in her car by another car on two occasions.

In April, the clinic was splashed with red xerox toner and had to be repainted—only to face another assault with green fluorescent paint.

In May, the clinic was picketed every day, and staff were identified by name by the picketers and told their homes would also be picketed.

The clinic ultimately went to court, and a restraining order was granted to one of its employees to stop two individuals from talking to, following, or approaching her. The order was later violated by one of those individuals. Here is the interesting fact and why I think we need Federal legislation. Both

of the men covered under the restraining order have been arrested in Texas, Ohio, New York, the District of Columbia, Wisconsin, Georgia, and Arizona.

In other words, this is a calculated conspiracy. Both of the men covered under the restraining order that was granted in Rhode Island had been arrested in Texas, Ohio, New York, the District of Columbia, Wisconsin, Georgia, and Arizona, and they had also served time in North Dakota and North Carolina.

From 1977 to April of this year, more than 1,000 acts of violence have been committed against reproductive health services personnel in the United States. These acts include some 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnappings, 327 clinic invasions and 1 murder, and people say we do not need to take some action? Another 6,000 blockades and other disruptions were reported over that same period.

Madam President, these are not the tactics of passive resistance; they are the acts of emboldened extremists who believe society will continue to tolerate their illegal behavior under an ambiguous mantle of free speech. I say, "enough is enough." It is time for us to draw the line, and restore needed balance by passing S. 636, and by rejecting the amendments that will be offered to this bill.

Ms. MOSELEY-BRAUN. Madam President, I support this legislation because it will protect reproductive health care providers and their patients from the deliberate campaign of terror and violence that has been targeted toward them.

As is all too obvious from any cursory review of our Nation's newspapers, there is a history of violence perpetrated against health care clinics that provide comprehensive reproductive services. In the last 16 years, more than 1,000 acts of violence have been reported. These acts of violence include at least 36 bombings, 19 arsons, 84 assaults, 131 death threats, 2 kidnappings, 327 clinic invasions, and 1 murder.

I am sad to say that these acts of violence are not on the wane, Madam President, but continue to grow in number and in intensity. Six weeks ago, a clinic in Peoria, IL, which has been providing women's health care services for 19 years, was firebombed. property damage was estimated at $10,000. Thank goodness, no one was hurt.

Despite the best intentions, State and local law enforcement officers have been unable to adequately safeguard medical providers, patients, and clinics against this dangerous activity. State and local laws against trespassing, vandalism, assault, and homicide are not adequate. A national response is necessary because this is an interstate problem. Offenders routinely plan their activities in one jurisdiction and then cross State lines to carry them out. In many localities, offenders grossly outnumber the police and local facilities,

including jail cells and courthouses. This legislation is therefore critically necessary to fully shield law-abiding physicians and women from continued interference with their constitutional rights.

This is a narrow piece of legislation; it has been carefully crafted. It fully protects the rights of peaceful protesters to demonstrate. It is modeled after Federal civil rights laws that prohibit unlawful interference with an individual's attempt to exercise the right to vote. It does not cover peaceful picketing, praying, singing, leafleting, or sidewalk counseling. Moreover, this legislation is even handed. It protects centers that counsel against abortion, staff, and patients, as well as clinics that offer abortion services, their staff, and their patients.

This legislation targets any act of force, threat of force, or physical obstruction involving reproductive health centers only if there is intentional injury, intimidation, or interference with a person trying to obtain or provide pregnancy or abortion-related services.

It does not punish anyone for their views. It punishes only when a person acts to obstruct a clinic entrance, harm a doctor, or intimidate a woman trying to access health care services.

Law enforcement officials support this legislation as an important and necessary tool to discourage this violence. That is why this amendment has been endorsed by Attorney General Reno, as well as the National Association of Attorneys General.

To conclude, Madam President, I would like to affirm that abortion is legal in this country. Some people do not believe in abortion, and they have the right to protest, and to educate the public of their viewpoint. But this debate is not about abortion. It is about violence. Those who do not believe in abortion do not have the right to murder, commit arson, or harass medical providers or women who seek medical care from clinics that provide full reproductive services. I thank the Senator from Massachusetts for offering this legislation, and urge its passage so that we can send a clear message that this kind of violence and terror will not be tolerated.

Mr. WOFFORD. Madam President, I wish to engage in a short dialogue with my distinguished colleague from Massachusetts, Mr. KENNEDY, about the Freedom of Access to Clinic Entrances Act.

When I first became aware that Senator KENNEDY was introducing this legislation I was pleased because. Like so many others, I was appalled by the events in Wichita, KS in 1991 in which those opposed to abortion blockaded the entrance of health clinics that offered the procedure.

Since that time we have witnessed a number of painful incidents across the country in which violence has been perpetrated against abortion providers and facilities. Most recently in my home State of Pennsylvania, in the

town of Lancaster, a Planned Parenthood clinic was firebombed. These incidents and the potential for others like them illustrates that there is a need for S. 636.

During the Labor Committee markup of the bill, I expressed my general support for S. 636 but also raised my serious concerns regarding the use of the term "abortion-related" to describe the type of services protected by the legislation.

Madam President, I would like to clarify this issue regarding the bill. It is my understanding that when this bill is brought to the Senate floor the term "abortion-related" services will be changed in S. 636 to "pregnancy or abortion-related" services. Am I correct in my understanding?

Mr. KENNEDY. The Senator is correct. The term "abortion-related" services has been changed to "pregnancy or abortion-related" services. I believe this change refines the language of the legislation to make clear that it protects access to services relating to pregnancy without diminishing its protection of a woman's access to health clinics that perform abortions.

Mr. WOFFORD. As I stated during the markup, it is my belief that this legislation should serve as a rule of reason to persuade people on all sides of this deep controversy not to move beyond peaceful protest and truly civil disobedience, over the threshold into physical obstruction, intimidation and violence. It is my further belief that this change addresses the concerns I raised in committee, and with it, I offer my name as a cosponsor of S. 636. I look forward to working for its passage.

Mr. KENNEDY. I would like to thank my distinguished colleague from Pennsylvania for his support. I too look forward to working with him for immediate passage.

Mr. WOFFORD. Let me close by thanking my distinguished colleague from Massachusetts for his clarification and his willingness to work with me in crafting a piece of legislation that I can fully support. I yield the floor.

Mr. BAUCUS. Madam President, I rise today to express my support for, S. 636, the Freedom of Access to Clinic Entrances Act. This legislation would make obstructing access to clinics a Federal crime and would establish criminal and civil penalties for acts of violence and threats of force that seek to intimidate women from obtaining abortion services or doctors and nurses from providing abortion services.

An example from my State of Montana illustrates the desperate need for this legislation. One of my constituents is Dr. Susan Wicklund. Dr. Wicklund, a practicing physician in Bozeman, received many threatening and graphically violent letters over a period of a few months. Fearing that the situation could turn violent, I contacted the Attorney General's office and asked them to investigate.

Imagine my shock and outrage when the Attorney General's office responded that there was nothing they could do; there was "no cause of action prosecutable under current Federal law." This is wrong. A woman's right to choose is a constitutional right in this country. The Federal Government must be allowed to protect health care providers whose lives are threatened merely because they help women exercise their constitutional right. Dr. Wicklund should not have to live in fear simply because she is doing her job and abiding by the law. This legislation would offer Dr. Wicklund, and many doctors like her around the country, protection and relief from the constant harassment they face just because they are doing their job.

Madam President, this legislation would also address the difficulties faced by State and local police when confronted by clinic blockades. For example, in Missoula, MT, most of the protesters arrested last year after blockading the Blue Mountain Woman's Clinic were not from the community. Since local authorities often have trouble sharing information with other jurisdictions, it is important for Federal agencies to step in and coordinate the response if necessary.

Sadly, that same Missoula clinic was recently burned to the ground at the hands of an arsonist, becoming the second Montana clinic closed due to arson in the last 2 years. Under S. 636, arson, if committed because a clinic provides abortion services, would be classified as a Federal criminal offense, with strict penalties for the individuals responsible. Strong penalties would help deter future criminal acts. The Blue Mountain Woman's Clinic might still be intact today if stiff federal penalties had been in place. This bill deserves broad support from all who are opposed to this kind of senseless violence.

As we all know, the spread of violence surrounding the choice issue is on the rise in this country. We need to address it head on. We cannot stand by any longer and watch as more doctors are murdered like Dr. Gunn in Florida.

The first amendment to the Constitution guarantees all Americans the right to peaceful assembly. This bill is carefully crafted to ensure that this right is not violated. Peaceful expression of anti-abortion views will not be penalized by this legislation. However, as should be the case, violent and intimidating behavior will be punished in a strict, but fair manner.

I ask my colleagues to help deter violence in this country by voting for this important legislation.

Mr. LAUTENBERG. Madam President, I rise in support of the Freedom of Access to Clinic Entrances Act. As an original cosponsor of this legislation, I have long supported efforts to stop violence and harassment at our Nation's reproductive health clinics.

Madam President, the Supreme Court has upheld a woman's constitutional right to choose in numerous court cases beginning with Roe versus Wade. Despite these legal assurances, the right to choose has been greatly eroded recently.

States have enacted waiting periods, so-called informed consent laws, and other impediments to reproductive health services that do not apply to people seeking other health services. On top of all of this, clinic violence, harassment, and obstruction have increased dramatically. This was dramatized by the cold-blooded murder of Dr. David Gunn earlier this year outside of a Pensacola, FL, health clinic. His murder took place after years of harassment and posting of "wanted signs" with his picture on it. But this was no isolated incident.

Since 1977, opponents of choice are responsible for more than 1,000 acts of violence against abortion providers, including bombing, arson, death threats, kidnapings, assaults, shootings, and clinic invasions.

Also during this time period, antichoice protesters have committed over 5,000 acts of disruption, including clinic blockades, bomb threats, hate mail, harassing phone calls, and demonstrations.

Madam President, this legislation will make it a Federal crime to prohibit someone from obtaining abortion services or assisting someone who desires these services by force, threat of force or physical obstruction.

This legislation does not make it illegal for people to protest civilly. It does not restrict freedom of speech. It simply prevents violence, obstruction and harassment of women and health care professionals.

Madam President, the women of this country must have a real right to choose, not an abstract one. If we allow violence, vandalism, and harassment to continue at reproductive health clinics, women will not be able to exercise this constitutional right.

I urge my colleagues to support this legislation.

Mr. HARKIN. Madam President, I rise in support of the Freedom of Access to Clinic Entrances Act. This important legislation, which I have cosponsored, provides for Federal action to address the wave of violence and harassment of health care facilities that provide abortion services. It is time for a Federal response to the blockades of clinics, and the violence, and harassment directed at clinic employees, health professionals, and patients.

The statistics tell the story. There have been hundreds of cases of clinic invasions, vandalism, death threats, arson, and bombings. Most distressing is the tragic case of Dr. David Gunn, who was brutally shot in the back by an antiabortion extremist. In 1992 alone, some 194 violent incidents were documented, with 16 cases of arson, 116 cases of vandalism, 9 assaults, 8 death threats, and 26 invasions. This is a problem of national scope, requiring a national response.

Attorney General Janet Reno has testified that current Federal law is inadequate to address this problem. After the assassination of Dr. Gunn, 16 of my Senate colleagues joined me in calling for an investigation of these activities by the Federal Bureau of Investigation on March 18, 1993. On April 9, Director William Sessions responded to our letter.

Director Sessions stated that, "The Department of Justice concluded that current Federal criminal laws are not adequate to address the issues of denial of access and related violence at abortion facilities." Therefore, the FBI is precluded from undertaking the kind of comprehensive investigation demanded by this pattern of abuse and violence.

But beside the violence directed at clinics, clinic blockades are being used to prevent patients from entering these clinics, or to harass them if they attempt to enter. The Federal Government must respond to these incidents as well as incidents involving the use of force.

Some argue that clinic blockades are an exercise of the constitutional right to free speech. I believe that a person's right to swing his fist ends where my nose begins. The same is the case in this instance. I strongly defend the right of antiabortion protesters to picket, pray, or otherwise oppose the performance of abortions. These protesters have strongly held views, and they have the constitutional right to express them.

However, as with the fist, their rights ends where another person's rights begin. These protesters have the right to express their views. But others who disagree with those views, or who choose not to listen to them, have an equal right to ignore their protests.

Some suggest that this issue should be handled by State and local officials, rather than the Federal Government. But the national campaigns of Operation Rescue and other antiabortion extremist groups are calculated precisely to overwhelm the resources of local law enforcement agencies. In 83 incidents in 1992, some 2,580 arrests were made in clinic blockades. Protesters converge on protest sites from across the Nation, and some people travel from protest to protest. The flood of protesters gathering from around the country often overwhelms the local capacity to jail blockaders. Often, blockaders who are released immediately return to the blockade. Adequate detention facilities are needed to address these tactics.

Blockades are not analogous to the nonviolent protests of the civil rights movement. There is a fundamental difference between people protesting to vindicate their rights to be treated as equal citizens, and people whose protest is intended to prevent others from exercising their lawful rights. Unlike the protests at lunch counters in the 1960's, which were intended to ensure equal access for all, and to force a change in law, these protests are in-

tended to force the blockaders' views on those who disagree, regardless of the others' legal rights.

But let me also state what this bill is not about. It is not about preventing people from praying in public. It is not about silencing protests. It does not prohibit sit-ins, except if those sit-ins physically obstruct access to a clinic. And it is not about whether abortion is right or wrong.

The right to choose is protected under the Constitution, as a part of the fundamental right to privacy, and this measure is intended to ensure that women may exercise that right. This legislation is a law enforcement measure, not an abortion rights measure. I strongly support this bill, and I urge its adoption.

Mr. SIMPSON. Madam President, I am and always have been pro-choice, and I also firmly support the right of a woman to have free and unrestricted access to all necessary health care facilities.

I am in whole-hearted support of the principle which the sponsors of this legislation are addressing. I also join with them in condemning in the strongest manner possible the violent acts that have occurred—murder, bombing, physical threats, and violence have absolutely no place in our society. In particular, such acts have no place associated with political debate on issues as important and as contentious as the choice or antiabortion issue. In my view, such criminal behavior should be punished very severely, indeed.

This is a very thorny issue: In its pure sense, this legislation addresses certain forms of physical obstruction—in the form of political protest—and imposes sanctions on that behavior.

As I stated, Madam President, I am strongly pro-choice. I am also strongly pro-free speech. And I have been listening most attentively to the debate on this legislation. I have been weighing the various concerns raised by our colleagues, and I want to commend them on a most thoughtful and thought-provoking debate.

However, Madam President, one thing has become clear to me. This really is not an issue of pro-choice or pro-life. What we are faced with is legislation responding to the actions of extremists.

Extremists have abused their constitutional rights in a manner which has prevented other, innocent citizens, from availing themselves of their own rights.

The fact is that all of the rights we speak of here are based in the first amendment. And that has made the debate much more contentious.

In any area of our life, if one group uses their rights to abuse or to limit the rights of others, the Government has been called upon to act. That is our duty and that is why we are here posed to act.

The level of interference with the rights of others—women in this in-

stance—has reached such extremes that we in Congress must act. It is my view that this legislation is appropriate. The fact that it is needed, however, is most regrettable.

Mrs. MURRAY. Madam President, throughout the debate on the crime bill last week, we heard over and over again about the horrible consequences of violence in our society today. Like many people across this Nation, I believe that it is time for us to demonstrate to our children that we do not condone these acts of violence, and that we will not tolerate them.

The bill before us today is necessary because of the campaign of terror being perpetrated against abortion clinics, doctors, and patients across the Nation.

Madam President, I fully support our first amendment rights under the U.S. Constitution. However, it is time for us to acknowledge that violence is not a mode of free speech. It is not a way to express an opinion about a woman's constitutional right to choose.

Since 1977, more than 1,000 acts of violence have been directed at abortion providers. Women's health care providers across the Nation have faced bombings, arson, death threats, kidnapings, assaults, and shootings.

Just 2 months ago, the Family Planning Associates clinic in Bakersfield, CA, was destroyed by arson, causing $1.4 million in damage. Also in September, a Planned Parenthood office in Lancaster, PA, was severely damaged by a firebomb. In August of this year, Dr. George Tiller of Kansas was shot. In March, Dr. David Gunn was murdered in Florida.

Madam President, I have heard from physicians in my home State of Washington. They are alarmed at the increasing violence against women's health care providers. One doctor wrote:

Every time I walked toward the building, I thought to myself that some anti-choice terrorist could have set a bomb and that my life could be on the line. Fortunately, so far I have been able to work unimpeded, but with every assault on a clinic around the country I have worried about the safety of my staff as well as that of my patients. The next time a gun is fired, it could well hit a patient or staff member. The psychological toll all this takes on clinic staff is enormous, as you can well imagine.

Attorney General Janet Reno says that Federal legislation is necessary. According to the Attorney General, "The problem is national in scope, local law enforcement has been unable to deal effectively with it, and existing Federal law is inadequate to provide a complete response."

Madam President, the Freedom of Access to Clinic Entrances Act is a response to violence. This legislation is necessary, and long overdue. It outlaws clinic violence while protecting legitimate free speech activities.

This bill contains a message that we as responsible adults must send today. No more violence. I urge my colleagues to vote for this bill, and I thank Sen-

ator KENNEDY for his leadership in bringing it before us.

Mr. PACKWOOD. Madam President, I rise today to voice my strongest support for the Freedom of Access to Clinic Entrances Act. I am proud that I have been a cosponsor of this legislation for three consecutive Congresses.

This act would provide a critical safeguard to the right of all women not only to choose to have an abortion but in many cases to seek basic health services. At the same time, this legislation works evenhandedly to protect providers of pregnancy counseling and adoption services from unlawful protest activities.

I commend Senators KENNEDY and KASSEBAUM and the Senate Labor Committee for their diligent work and diplomacy in drafting a bill that I hope will be agreeable to most Senators, whether they identify themselves as being pro-choice or pro-life.

For at least the last 15 years, a contract campaign of violence has been waged against providers of abortion, a legal medical procedure. Antiabortion activists have used blockades, bombings, intimidation, and even murder as tools to close clinics.

My home State, Oregon, has been disproportionately affected. In 1 year alone, three torchings of clinics caused more than a half a million dollars in damages. In Forest Grove, OR, fliers were distributed offering a $1,000 reward for any information leading to the arrest of a doctor who performs abortions, and a death threat was sent to a clinic. During the blockage of a Portland clinic, patients were struck in the face and knocked against a car. These are just a few examples from a long unfortunate string of incidents.

The time has come to put an end to this madness. Violence is reprehensible for any reason. In our democratic system, the protesters clearly have the right to disagree with Roe versus Wade and pursue legal means to reverse this decision. This bill protects the rights of those on all sides of this controversial issue to peacefully exercise their rights under the first amendment. But those who use extreme and often criminal tactics to express their views must be stopped.

Madam President, I hope this legislation will be enacted in the near future. Its enforcement will help put behind us a tragic chapter in our history where disagreements between citizens have led to bloodshed. I thank the Chair.

Mr. LEVIN. Madam President, I am pleased to be a cosponsor of the Freedom of Access to Clinic Entrances Act of 1993, and welcome the opportunity to support this bill today on the Senate floor.

On January 13, 1993, the Supreme Court handed down its decision on Bray versus Alexandria Women's Health Clinic. In this decision, the Court struck down a lower court ruling which had held that a Federal civil rights law could be used to stop abortion protesters from blockading repro-

Case 1:22-cr-00096-CKK   Document 203-1   Filed 03/21/23   Page 28 of 62

ductive health clinics. In overruling the lower court decision, the Supreme Court held that the Ku Klux Klan Act does not provide a Federal cause of action against persons obstructing access to abortion clinics.

Prior to the Supreme Court's ruling, several Federal courts had issued injunctions against clinic blockages based on the Ku Klux Klan Act. These injunctions proved highly effective in curbing large blockades. In ruling that this Federal law does not apply to clinics, the Supreme Court removed the possibility that those affected by clinic violence could invoke this law to obtain Federal court injunctions.

The incidence of clinic violence is on the rise. Recently, the Feminist Majority Foundation concluded a nationwide survey of clinic violence that occurred during the first 7 months of 1993. Of clinics participating in the survey, 50.2 percent experienced violent acts including death threats, stalking, chemical attacks, arson, bomb threats, invasions, and blockades.

Clinics located in Michigan were among those that faced the most acute violence. Of 13 Michigan clinics who responded to the survey, four reported receiving death threats, three received bomb threats, four experienced chemical attacks, and clinic staff were stalked at three clinics. One Michigan clinic was the victim of attempted arson, and an organized blockade was conducted at another clinic.

With the intensification of clinic violence and the lack of effective alternatives to address this violence, the need for the Freedom of Access to Clinic Entrances Act is clear. This bill would prohibit the obstruction of access by women to pregnancy or abortion-related services. More specifically, it would prohibit the use of force, threat of force, or physical obstruction to injure, intimidate, or interfere with a person seeking private abortion or pregnancy-related services. It would also prohibit the destruction of clinic property and ensure that persons injured by clinic obstruction, as well as State attorneys general, could seek redress in the Federal courts.

Concerns have been raised that this legislation, if passed, would restrict the first amendment rights of antiabortion protesters to peacefully demonstrate. This is not true. The bill would prohibit only acts or threats of force, physical obstruction, and destruction of property. Picketing, distributing pamphlets and other materials, and peacefully expressing views would not be affected by this legislation whose activities are protected. The Clinic Access Act addresses conduct—not speech—and draws a strict delineation between the two.

This bill is even-handed in that it would extend identical protection to both clinics that offer abortion-related services, their staff, and patients and pro-life counseling centers and their staff and patients. Intentional care has been taken in the bill language to clarify this point.

The fact remains that the right to terminate a pregnancy remains a constitutional right under the right to privacy as ruled by the Supreme Court. Individuals should not be threatened, harmed, or prevented from exercising this right. Similarly, individuals performing legal abortion services should also be protected from harm.

For these reasons and others, I will support passage of this legislation.

Mr. DANFORTH. I am a pro-life Senator. I have always been pro-life and I remain strongly pro-life. I believe that abortion on demand is the wrongful destruction of life and that Roe versus Wade was decided incorrectly. If I could change the decision in that case, I would do it without hesitation. Abortion on demand cheapens life and the skyrocketing incidence of abortion in America is a national tragedy.

Those are my personal, deeply held opinions. I recognize that many Americans disagree vehemently with me. Abortion is a complex issue. They are entitled to their opinion as I am to mine. Unfortunately, tragically, the law now sides with them.

As the Senate considers the Freedom of Access to Clinic Entrances Act, the debate will revolve around many issues. For me, the issue is not abortion. It is how we conduct the debate about abortion and whether we can continue to allow violence and intimidation to be used as weapons in that debate. I do not see that as a complex issue at all.

So I will vote for passage of S. 636. Because when I vote, I do so as a Senator, sworn to uphold the Constitution. And as long as the Government of this country protects the right to an abortion it is my obligation to protect from violence Americans who seek to exercise their rights—even if I am personally dismayed that such a right is held to exist.

I have fought to change the law's permissive view of abortion and will continue to do so. As Missouri's State attorney general, I even argued before the Supreme Court to uphold the right of my State to impose restrictions on abortion. But my fight will always remain within the bounds of the law. We are a nation of laws. Those who break the law—those who use violence—no matter how they try to justify it, must be stopped. That is the essence of the rule of law.

I believe Americans of conscience must not be denied the right to decry abortion. They must be permitted to protest and lobby and pray and carry signs. Even if what they say offends people. Congress must protect their right to speak and assemble peacefully while they struggle to change the law.

What they cannot do is threaten people, harass people, intimidate people. Certainly they cannot hurt people. But the committee report which accompanies S. 636 tells of arsons, bombings, shootings, death threats, assaults, kidnapings, even a murder—acts of violence aimed at Americans who seek to exercise a hotly debated but constitutionally protected right. The report tells of the inability and unwillingness of some local authorities to enforce State laws and the coordination of such activities across State lines.

In such circumstances, it is appropriate for the Federal Government to act. I believe that S. 636 will not hinder legal protests. It will limit the genuine debate to lawful civil discourse, where it belongs.

Mr. McCAIN. Madam President, I oppose the Freedom of Access to Clinic Entrances Act, S. 636. As strongly as I believe in the sanctity of life, I am as strongly opposed to violence as a means by which to prevent or intimidate a woman from obtaining an abortion or a practitioner from performing an abortion. As objectionable as abortion is to me personally, violence can never be the answer. I completely and unequivocally condemn the March 1993 killing of Dr. David Gunn and all other acts of violence against abortion clinics and providers of abortion services.

However, S. 636 is not the appropriate vehicle to address these outrageous and indefensible acts. As drafted, it is overbroad and infringes upon the constitutionally protected free speech of our citizens. It imposes harsh Federal penalties on those who engage in protests, even if entirely nonviolent, on the basis of a specific disfavored viewpoint—opposition to abortion. While the bill's sponsors have made efforts to create the pretense that it is even-handed, protecting both abortion and antiabortion activities, in fact it is specifically devised to stifle the expression of those opposed to abortion. Mr. President, this measure will have a profoundly chilling effect on free speech. I am also deeply concerned that it singles out a class of citizens—those who seek or perform abortions—and gives them protections beyond those available to other Americans.

Because I believe that this bill is fundamentally flawed, I supported amendments to improve it by penalizing only violent behavior, and creating a legal cause of action against individuals who react violently against those who are peacefully protesting. I also supported an amendment by Senator HATCH to penalize violent behavior against religious institutions such as churches and synagogues. We should use our limited Federal law enforcement resources to protect our citizens against violence, not against free speech.

Mr. GORTON. Madam President, the issue before us today is one of how we can prevent violence which surrounds some demonstrations at health clinics which provide pregnancy or abortion-related services. Persons on both sides of the abortion issue agree that the violence must stop.

Few will deny that the gross acts of violence against abortion clinics, pro-life counselling centers, and places of religious worship are unconscionable. Each of these types of facilities have

experienced arson, bombings, and other types of destructive attacks. The persons who seek and the persons who provide the services of these facilities have been physically harassed and, at times, have had even had their lives threatened or endangered.

I support the Freedom of Access to Clinic Entrances Act, in order to ensure safe access of legal services provided at medical facilities and at places of religious worship.

Equally important, however, is that we treat all sides equally and do not trample on fundamental constitutional rights such as the freedom of speech. This bill has come a long way toward reaching that fair equilibrium.

This bill achieves a balance between two diametrically opposed points of view. It is of vital importance that we send a clear message that the violence which has occurred at some demonstrations will not be tolerated, and must end. It is also of great importance that we not infringe upon the constitutionally protected freedoms of speech, assembly and protest.

Mr. DANFORTH. I would like to ask the chairman a few questions about the Freedom of Access to Clinic Entrances Act. Many of my constituents from Missouri Right to Life whom I have supported for a long time have communicated certain concerns about the underlying legislation. They are concerned that this legislation will "suppress pro-life picketing, leafleting and sidewalk counseling outside abortion clinics by use of * * * lawsuits and injunctions" made possible by this act. Is it the intent of the drafters of this legislation to allow lawsuits to be filed against peaceful picketers who are not attempting to prevent ingress or egress from an abortion clinic and are conducting their protests in a peaceful and orderly manner?

Mr. KENNEDY. Although we cannot control the filing of lawsuits, it would not be our intention that a lawsuit of this type be successful as long as the picketers were not threatening or obstructing or attempting to injure, intimidate, or interfere with a person or a provider's access to the abortion clinic in question.

Mr. DANFORTH. By the chairman's response, I assume that the same would be true with peaceful leafleting and noncoercive counseling outside of an abortion clinic.

Mr. KENNEDY. Subject to the same conditions, I would agree with the Senator from Missouri.

Mr. DANFORTH. If I might ask the chairman one additional series of questions about the legislation. My pro-life constituents have also voiced another related concern. Many of them participate in nonviolent "sit-ins" at abortion clinics to demonstrate their heartfelt, intense opposition to the wrongful taking of human life occurring there. These "sit-ins" may make it more difficult for an individual to gain entrance to the clinic, just as civil rights marchers in the 1960's made it more

difficult to gain entrance to certain stores, which had discriminatory policies. For example, sit-ins were held at Woolworths in which participants took every available seat at the lunch counter. Now, I am sure that this action made it difficult to gain entrance to the lunch counter to purchase food. But, is it the chairman's intention to make nonviolent sit-ins, in which a person still has access to a building, albeit access is made more difficult, a violation of Federal law?

Mr. KENNEDY. I would answer the Senator that it is not the intention of the sponsors of this bill to make nonviolent sit-ins a violation of Federal law, unless the sit-in is arranged in such a way as to constitute a physical obstruction, defined in the legislation. As long as a person has access to and egress from an abortion clinic and as long as the protest is not arranged so as to make it unreasonably difficult or hazardous to gain that ingress and egress, then I do not believe that the situation in question would violate this legislation.

Mr. DANFORTH. The chairman's response raises the central concern of this Senator about the legislation in question—the meaning of the term "unreasonably difficult or hazardous." I understand that if this legislation becomes law, this term will be defined on a case-by-case basis in the courts. But, I am wondering if the chairman would indulge me in a few hypotheticals to give the courts some guidance. If a group of pro-life Missourians with placards in their hands and prayers on their lips, created a line across the front of an abortion-clinic and left room for one individual to pass, without physically restricting that individual's freedom of movement, does the chairman believe that these demonstrators would have made ingress or egress from the abortion clinic unreasonably difficult or hazardous?

Mr. KENNEDY. As the Senator from Missouri properly pointed out, the ultimate definition of this term will be left to the courts. But, I do not mind explaining my understanding of the term "unreasonably difficult or hazardous." In the hypothetical which you have presented, I do not believe that the protestors would have made access to the clinic unreasonably difficult or hazardous as long as they left a reasonable amount of room for a person to enter and leave the building.

Mr. DANFORTH. Would the chairman's analysis change if the same group of protesters were heatedly and forcefully telling the person wanting access to the clinic about the facts that her action would be the wrongful taking of human life, and that in their eyes, it would amount to murder? If the protesters still allowed the person access, albeit more limited access than would be available without any protestors, would the chairman agree with me that this scenario should not be considered as making access to the

clinic unreasonably difficult and hazardous?

Mr. KENNEDY. As long as the protestors left a reasonable amount of room for a person to enter and leave the building I do not believe that their voicing of their opinions regarding abortion would change my analysis. Of course, this law would make it a violation of Federal law for those protestors to threaten a person with violence or to place them in reasonable apprehension of bodily harm because of their desire to gain entrance or egress from an abortion clinic.

Mr. DANFORTH. I thank the chairman for taking the time to discuss this matter with me.

Mr. BRYAN. Madam President, earlier this year, this Nation experienced a most unfortunate escalation of people's differences on the issue of abortion. The murder of Dr. David Gunn outside the medical clinic where he worked and had provided legal abortion services, sickened Americans on both sides of the issue.

We have all seen on television women seeking legal medical services being physically prevented from gaining access to the facilities where those services are provided. We have all heard about health care providers throughout this country who literally put their lives on the line to provide that legal health care to those women.

We have all heard of the bombing and destruction of family planning clinics. We have heard the experiences of health care providers who work in those facilities whose houses have been picketed, whose children have been harassed at school, and whose phones have become the vehicle for threats of all kinds.

This violence and intimidation cannot be tolerated. Women who are simply trying to exercise their legal right to choose abortion-related services without interference, without fear, and without intimidation must be protected. Today we can ensure their access to those services are protected.

Let me make it clear that this bill will not interfere with anyone's right to peacefully express themselves in protest—regardless of which side they are on in the abortion debate. I would not support this legislation if it did. This bill will, however, ensure women seeking legal medical services can get those services without fear for their physical safety.

The abortion issue will continue to be debated and protested. But that debate and those protests must be conducted without the violence and the intimidation that have characterized the issue recently.

Today we must take action to protect women seeking legal abortion-related services, and health care workers who provide those legal services. As a cosponsor of the Freedom of Access to Clinic Entrances Act of 1993, I urge my colleagues to support this legislation, and take the step necessary to guaran-

tee the right to choose can be exercised.

Mr. DURENBERGER. Before we vote on this bill, I have some questions about the operative language, contained in section 2715(a).

My purpose in offering these questions to the chief sponsor of this legislation is to clarify what activities will be allowed and which will be prohibited if this legislation becomes law.

My understanding is that facilities covered by this legislation include both those facilities providing abortion-related services or other pregnancy-related medical services to women and pro-life counseling centers or so-called pro-life crisis centers. Is that correct?

Mr. KENNEDY. Yes, that is correct. The bill is even-handed in that it protects both those facilities providing abortions or abortion counseling and those that counsel women not to terminate their pregnancy. I should also point out that a significant number of patients at clinics providing abortions are seeking medical attention—such as pap smears, birth control, and so forth—that are entirely unrelated to the termination of a pregnancy. These patients are protected too.

Mr. DURENBERGER. I thank my colleague for that response.

My understanding is that, under this bill, a person or group of people could not physically block access to a facility that provides abortion-related services or pro-life counseling services. Is that correct?

Mr. KENNEDY. That is correct. The bill prohibits physical obstruction, which is defined to mean rendering ingress to or egress from the facility impassable, or unreasonably difficult or hazardous. Blockades and invasions of facilities that block access obviously are prohibited by this language. Human gauntlets that impede access are also prohibited. Other examples include pouring glue into locks, chaining people and cars to entrances, strewing nails on areas leading to doors, and blocking entrances with immobilized cars.

Mr. DURENBERGER. I also understand this bill would not interfere with constitutionally protected rights of free speech and lawful assembly.

Mr. KENNEDY. That is correct. The conduct that this bill prohbits—acts and threats of force, physical obstruction, and damage or destruction of property—is not constitutionally protected. Activities that are protected by the first amendment—peaceful expression of views' in nonthreatening, nonobstructive ways—are not restricted by this legislation.

Mr. DURENBERGER. As I understand it, under this bill, pro-life protestors gathering outside a medical facility could picket, pray, chant, wail, yell, sing, hold signs, wave banners, hand out pamphlets, sidewalk counsel and carry on similar activities protected by the first amendment. That would all be perfectly legal. They could

not be sued or be subject to criminal penalties for that activity.

Mr. KENNEDY. That is right. As long as those activities did not threaten force or physically block access to the facility.

Mr. DURENBERGER. Would it be allowable under this bill for a group of pro-life protesters to sit down in the path of people trying to get into a facility?

Mr. KENNEDY. They could, as long as they were not physically obstructing the entrance. If a patient is forced to walk over strewn bodies, for example, ingress could well become unreasonably difficult or even hazardous, in which case there would be a prohibited physical obstruction. On the other hand, ingress and egress would not be considered "unreasonably difficult or hazardous" if people trying to enter or leave a facility could easily get past protesters who may be sitting in the sidewalk approaching a clinic entrance.

Mr. DURENBERGER. Under this bill, you define "intimidate" to mean placing a person "in reasonable apprehension of bodily harm." Is that definition meant to encompass emotional damages?

Mr. KENNEDY. "Bodily harm" as used in the definition of intimidate is intended to have the same meaning that is given in other Federal laws, such as 18 U.S.C. 1365: "a cut, abrasion, bruise, burn, or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ or mental faculty; or any other injury to the body, no matter how temporary." These are not the only kinds of injuries that are compensable under the law, however. If a use or threat of force or a physical obstruction intended to injure, intimidate, or interfere with a patient or provider causes purely emotional injury, for example, that injury would be compensable. For example, if someone fires a weapon at a doctor but misses, the doctor could recover if he could prove that he had suffered an emotional injury. On the other hand, conduct that is not prohibited by this legislation, but that nonetheless upsets someone—for example, nonobstructive sidewalk counseling, taunts of "baby killer," holding up disturbing photographs—could not result in criminal or civil liability.

Mr. DURENBERGER. So, in the latter example, the individual who was upset by a taunt or a photograph or some other legitimate exercise of First Amendment expression could not obtain damages for emotional distress?

Mr. KENNEDY. That is correct.

Mr. DURENBERGER. I also have two questions about the new language contained section 2715(c) of the bill. I understand that that language limits those that may bring lawsuits under this bill to persons involved in obtaining or providing or seeking to obtain or provide pregnancy or abortion-related services.

Mr. KENNEDY. That is right. Before this modification was made, there was no limitation on who might have a private cause of action under S. 636. In fact, that language was broad enough to cover protesters. Now, only those involved in obtaining or providing services have a private right of action under subsection (a)(1).

Mr. DURENBERGER. By defining "aggrieved person" in this way, was it your intention to exclude clinic escorts or so-called clinic defenders?

Mr. KENNEDY. That is correct. Demonstrators, clinic defenders, escorts, and other persons not involved in obtaining or providing services in the facility may not bring such a cause of action.

Mr. DURENBERGER. I thank my colleague for his responses.

Mr. FEINGOLD. Madam President, I rise to speak in support of S. 636 which would ensure freedom of access to clinics while protecting the right to peacefully demonstrate.

Although some of my colleagues might want to characterize this issue as solely about abortion, it most certainly is not. It is primarily a response to a nationwide pattern of violence that ranges from murder and woundings to bombings, arson, chemical attacks, and other vandalism. Local authorities have either been unable, or in some cases, unwilling to curb this spread of violence, and it is the responsibility of the Federal Government to step in now to help ensure that women seeking to exercise their constitutional right to an abortion are not denied access to clinics which provide these services.

The violent crimes I speak of are systematically directed as denying women their constitutionally protected right to choose, and are not unlike the pattern of violence we witnessed during the civil rights unrest of the 1960's.

In fact, Attorney General Janet Reno recently said the following in providing testimony on this legislation:

The reluctance of local authorities to protect the rights of individuals provides a powerful justification for the enactment of federal protections that has been invoked previously by congress in passing laws to protect civil rights.

Just as our current circumstances closely parallel those of the 1960's the legislation we are now considering is patterned after civil rights legislation from that time—the voting rights act of 1965.

Madam President, I would like to take a moment to talk about the kinds of violence I have seen take place in my home State.

At least two recent Milwaukee Journal articles outlined the incidents which have occurred at Wisconsin clinics or to Wisconsin abortion providers in 1993: According to these articles:

Bullets were fired into one clinic on four separate occasions;

A Wisconsin doctor received a letter saying the anonymous writer would

"hunt you down like any other wild beast and kill you";

Butyric acid was poured at the entrance of another clinic forcing the clinic to close for 4 days and costing an estimated $48,000 for clean-up by a hazardous materials unit;

Protesters bound themselves together inside of a van that was then used to ram a clinic entrance; and

Three protesters jumped on top of a patient's car as she drove through the parking lot.

This is by no means an inclusive list, nor are these incidents as violent as what has occurred in some other States, but they do illustrate the need for swift action.

Are all of the protesters from Wisconsin? Many are not. The offensive letter sent to the Wisconsin doctor I just mentioned had a California postmark. The woman who was charged with the attempted murder in the shooting and wounding of Kansas doctor, George Tiller, was also wanted in Wisconsin in connection with a blockade at a Milwaukee clinic, and unpaid citations are on file in Milwaukee for residents of Florida, Kansas, Washington State, New York, and several of Wisconsin's bordering States.

I do not mean to say that every clinic incident or demonstration is violent or illegal. Quite the contrary. Wisconsin planned parenthood reported to me they have been the object of picketing 301 times thus far in 1993. They characterize these incidents as "mostly lawful," and the lawful, peaceful expressions of free speech will continue to be protected.

Madam President, I am a cosponsor of the Freedom of Access to Clinic Entrances Act, because I believe we have a serious problem with escalating violence during what should be peaceful demonstrations at abortion clinics. Though I disagree with them, I respect deeply the beliefs and convictions of those who oppose abortion. I also respect deeply the rights of women to seek this legal medical procedure. This amendment does not curtail the rights of abortion opponents to protest peacefully at abortion clinics. It does reduce the chance for violent confrontation and it does restrict appropriately the blocking of clinic entrances. It has been carefully crafted to avoid interferences with peaceful protests or expressive conduct which is protected by the first amendment. For these reasons, I support and urge passage of this legislation.

Mr. RIEGLE. Mr. President, I rise in support of Freedom of Access to Clinic Entrances Act. Congress needs to enact this legislation to ensure that all individuals have free and unhindered access to reproductive health facilities.

America has a long history of protecting the rights of individuals to peacefully protest and assemble in public. Recently however, some forms of protest have crossed the line between organized protests and infringement on the rights of others. These instances have become increasingly more frequent in protests involving abortion facilities.

Some protesters have blockaded abortion facilities, physically preventing women from entering the facility. These obstruction tactics effectively deny women access to medically legal services. Additionally, some protesters have embarked on organized campaigns of harassment and intimidation of health care providers who work in abortion clinics. Patients and staff at abortion clinics deserve Federal protection from physical obstruction, intimidation, and harassment.

The Freedom of Access to Clinic Entrances Act prohibits blockades or protests intended to injure, intimidate or interfere with individuals seeking entrance to a facility that provides reproductive services. The act protects those who legally provide abortion services from similar forms of protest. Violation of this act would be punishable by Federal law. The act is modeled after existing law which prohibit behaviors that prevent others from exercising their right to vote or enjoying the benefits of Federal programs.

The act is limited in scope. The Freedom of Access to Clinic Entrances Act will not deny any individual their first amendment right of freedom of speech. Peaceful activity such as picketing and distributing information will not be affected. Public protests at reproductive health facilities will continue to be legal so long as such protests do not injure or obstruct individuals entering abortion facilities.

Mr. President, the Freedom of Access to Clinic Entrances Act continues to preserve the first amendment right of all individuals to engage in peaceful protest while ensuring that women have access to reproductive health centers without fear of physical harassment or intimidation. I support the Freedom of Access to Clinic Entrances Act and encourage my colleagues to support this important legislation.

Mr. DOLE. Mr. President, I would like to say a few words about the access to abortion clinic bill, which passed the Senate earlier today.

In 1991, the city of Wichita was the site of one of the largest abortion clinic protests ever. The protest literally tore the city apart, disrupting lives, interfering with businesses, and transforming much of Wichita into a media circus of protestors, police, and camera crews, and needless to say, the protest experience served only to deepen the already deep divisions separating the pro-life and pro-choice citizens of the Wichita community.

Even today, the memory of the protest experience still lingers. These memories will not fade away, as the citizens of Wichita remain hopeful they will not have to endure a repeat of the disruptive events that took place in 1991.

Now, Mr. President, my record is clear: I have consistently voted in support of the pro-life position.

But like the overwhelming majority of Americans, I do not condone violence either, whether the violence is directed at an abortion clinic or at a counseling center that promotes alternatives to abortion like adoption. And for this reason, Mr. President, I voted for the bill.

In my view, violence serves only to promote more violence, more mutual distrust, more anger, and less understanding.

Obviously, abortion is one of the great moral and political dilemmas of our time. But if, at some point in our Nation's history, we are to solve this dilemma and put the abortion debate behind us, the key to our success will not be violence and hate, but a reconciliation borne out of mutual understanding and respect.

Mr. President, earlier today, I endorsed the Hatch substitute amendment, which I believe strikes a fair balance between the competing interests at stake here. Unfortunately, this amendment was not adopted by the Senate.

I also supported two other amendments that the Senate failed to adopt—a second amendment, offered by my distinguished colleague from Utah, limiting the protections of the bill only to clinics that perform legal abortions, and an amendment offered by my distinguished colleague from Indiana, Senator COATS, that extends the bill's prohibitions to those who engage in violence against pro-life activists.

Finally, throughout this debate, I thought it was important that the abortion clinic access bill distinguish between violent activities and peaceful, nonviolent protests. Our country has a rich tradition of nonviolent civil disobedience and this is one tradition that should be preserved.

As a result, I was able to prevail upon my colleague from Massachusetts, Senator KENNEDY, to reduce by 90 percent the maximum criminal penalties for nonviolent protestors blocking access to abortion clinics—from $100,000 for first-time violations and $250,000 for each subsequent violation, to $10,000 for first-time violations and $25,000 for each subsequent violation.

Although these new, lower penalties are still too punitive, I do believe they represent a step in the right direction.

If and when the bill is brought to conference, it is my hope that these monetary penalties, as well as the maximum terms of imprisonment proposed in the bill, will be reduced even further. The penalties for engaging in nonviolent civil disobedience should not be as severe as those that have been proposed. The punishment should fit the crime, not exceed it.

In the coming weeks, I will be working with my colleagues to inject more balance into the bill by attempting to reduce the severity of these penalties.

Mr. President, violence will never, ever unite the Gordian knot of abortion. Our only hope for ultimately resolving the abortion issue lies in the

CONGRESSIONAL RECORD — SENATE *November 16, 1993*

power of persuasion—peaceful, non-violent, persuasion. It is my hope that this debate will serve to remind us of this truth.

Mr. FORD. Madam President, may we have order, please.

The PRESIDING OFFICER. The Senate will be in order.

Mr. KENNEDY. Just for the benefit of the membership, I would like to inquire of the Senator from Utah as to the status of the additional amendments. I think we have made good progress this morning and I am grateful to all of our Members for their cooperation. I wonder if the Senator might be able to indicate what amendments are outstanding and what the intention of the Senator is so that we all would be advised.

Mr. HATCH. Madam President, it is my understanding that we are going to go to the Coats amendment now, with 40 minutes equally divided, subject to a second-degree amendment. And then a Hatch amendment, which I hope we will not use all the time on, and then another Hatch amendment, which will be a substitute that I hope we do not use all the time on.

Mr. KENNEDY. Just so we do understand, then, we will go to the Coats amendment rather than the Hatch amendment which had been ordered, and we will ask consent to be able to do that, then we will come back to the Hatch amendment, and then another Hatch amendment; is that the Senator's understanding?

Mr. HATCH. Yes.

Mr. KENNEDY. And then to final passage.

And we obviously reserve our right for a second-degree amendment.

Mr. COATS addressed the Chair.

The PRESIDING OFFICER (Mr. BREAUX). The Senator from Indiana.

Mr. COATS. Mr. President, may we have order?

The PRESIDING OFFICER. The Senate will be in order. The Senate will be in order. The Senate will be in order before business will proceed.

The Senator from Indiana is recognized.

Mr. FORD. Mr. President, I believe unanimous consent is necessary to go to the amendment of the Senator from Indiana. Therefore, I ask unanimous consent that his amendment be taken out of order.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator is recognized.

Mr. COATS. Mr. President, the issue that we are debating today is a part of a broader issue—the issue of abortion. It is an issue that has divided our Nation, divides neighbors and families and friends and has led to incidents of violence, which we all regret. We have discussed that this morning.

Mr. KENNEDY. Mr. President, could we have order?

The PRESIDING OFFICER. The Senator will suspend. Those Members desiring to engage in conversation will please retire to the cloakrooms. Discussions will please cease so that the Senate can be in order.

The Senator from Indiana.

Mr. COATS. Mr. President, I think if there is something that we can all agree on here in the Senate this afternoon, it is that we want to stop the violence that occurs around this particular issue. We want to stop the violence in whatever form and for whatever reason that occurs as a result of the passions that are raised as people engage in this issue.

In fact, our whole discussion last week on the Senate floor was over the matter of how we can reduce the level of crime and reduce the level of violence in this country. We talked about increasing penalties. We talked about guns. We have spoken of the success of boot camps. We talked about providing new prison space and putting policemen on corners in streets across this country. And we passed a number of amendments in that regard.

Today, however, we are debating a bill that will potentially seek to fill some of those newly created prison spaces with ordinary, law-abiding citizens who happen to care very deeply and passionately about an issue of conscience and who dare to express their views.

On initial glance, S. 636 leaves the impression that violence that occurs in terms of access to health facilities or abortion-related facilities is all one-sided; that the only force or threat of force or intimidation or coercion that exists exists on the side of those who are preventing access.

And while that has happened, and while we lament that that has happened and regret that that has happened, and while we are taking appropriate steps to try prevent that from happening, it is important to understand that there is violence that occurs on the other side of the equation, on the other side of the protest line.

Let me quote from one of the witnesses who appeared before our committee in discussing this issue. Donald McKinney, an attorney from Wichita, testified to us about the numerous acts of violence he has seen perpetrated by the so-called clinic support individuals. I quote from him:

I witnessed a woman assaulted by a male clinic supporter who blindsided her with a body block. That same abortion supporter lit a cigarette and held it near the hair of women pro-lifers as they sang worship songs. They blew smoke in their faces and berated them with obscene language. One prolife sidewalk counselor was shot in the back with a pellet gun. A window on my vehicle was shot out. Many pro-lifers have been physically assaulted or have had property damaged.

This individual, Donald McKinney, continued:

There is a need for Federal legislation to protect constitutional rights at abortion clinics, but the need is for legislation to protect first amendment freedom of speech and religious expression. This need exists also.

The incident that was related to our committee unfortunately is not an isolated incident. We have heard a number of descriptions of incidents that have occurred that I regret and that I believe we should do everything we can to prevent from occurring in the future. But we also need to understand that these incidents occur to individuals on both sides of this issue and both sides of this protest.

In late January 1992, a New Jersey abortion clinic agreed to pay two prolife demonstrators $15,000 in settlement of their assault and battery——

The PRESIDING OFFICER. The Senator will suspend. The Senate is not in order. Those Senators wishing to engage in conversation should retire to the cloakroom. The Senator deserves to be heard by his colleagues. The Senate is not in order. The Senator from Indiana.

Mr. COATS. Mr. President, I thank you for the order. I am flattered so many Senators are on the floor. I cannot take too much pleasure in that, however, because none of them are listening to what I am saying, but at least they are on the floor.

Let me go back to my description of some of these incidents that have taken place and the violence that has occurred that has affected those who are seeking to demonstrate their convictions on the pro-life side of the question.

In January 1992, a New Jersey abortion clinic agreed to pay two pro-life demonstrators $15,000 in settlement of their assault and battery claims arising from an incident in which the clinic personnel tried to rip away signs the two were carrying and swung at one of them.

In January 1993, an abortionist in Clive, IA, was arrested for punching a pro-life organizer and for damaging his car.

In December 1992, a judge gave probation to two male proabortion activists who assaulted a female prolife demonstrator. Pro-life activists have been pushing and shoving pro-life protesters, including clergymen, outside clinics.

On March 11, 1993, the day after Dr Gunn was murdered, a death threat was left on the answering machine of Tennessee Right to Life. The threat stated that a person with a gun would shoot people at the next pro-life gathering.

In June 1990, five pro-life advocates in the Knoxville area found fake pipe bombs in their driveways in an apparent attempt to intimidate them from protesting.

This goes on and on and I could point out a number of other instances. I do not point them out because I condone them. I do not. I do not condone any form of violence related to this issue. In fact, threatening life or taking life in the name of defending life is hypocritical at best and certainly something that we cannot condone. But I point these out merely to demonstrate that this disarming and trampling of free speech rights on one side of the debate will not solve the problem.

*November 16, 1993*                **CONGRESSIONAL RECORD — SENATE**                **S 15685**

The question that we as a Senate body need to ask is: Should Congress be in the business of protecting people from messages that disturb their conscience? In light of the first amendment, I think that answer has to be no. Should we make sure that the penalties that are applied for force or threat of force or intimidation be equally applied to the rights of individuals regardless of which side of the political issue that they happen to come down on?

In testimony presented to our Labor Committee, Attorney General Janet Reno stated, and I quote:

The right of individuals in that minority—

Referring to pro-lifers—

to express their views must be respected. The freedom that our society affords individuals to express even the most unpopular opinions is the bedrock upon which our democracy rests and makes us virtually unique. Peaceful antiabortion protesters—

Attorney General Reno went on to say—

fit within this tradition.

Mr. President, this bill, if not amended by the Coats amendment, will put a real chill on the exercise of free speech by pro-life activists.

The authors of the Kennedy amendment attempt to alleviate what I consider a serious overbreadth and vagueness problem in the bill by a "rule of construction," which says:

Nothing in this section shall be construed or interpreted to prohibit expression protected by the first amendment of the Constitution.

According to constitutional experts who have looked at this question, the conclusion is, and I quote:

One cannot simply write a bill that encroaches on free speech rights and then add a disclaimer in this fashion. In the area of abortion rights, for example, a State could not save a criminal prohibition of abortion by disclaimer that "nothing in this section that shall be construed to prohibit conduct protected under the law." This kind of absurd approach to drafting—

He goes on to say—

includes constitutionally protected conduct within its sweep but then leads citizens to read and interpret Supreme Court opinions and determine which applications of the statute are actually in effect.

Mr. President, someone would say, "Well, the bill may indeed be unconstitutional; we'll have to let the Supreme Court make that final determination." But how many people will have to go to jail or be prosecuted under the terms of this legislation before this constitutionality is decided on?

The committee report to S. 636 fails to shed any light on the problem of the bill's application as well. Because on page 28, the report states:

The act is carefully drafted so as not to prohibit expressive activities that are constitutionally protected, such as peacefully carrying picket signs, making speeches, handing out literature, or praying in front of a clinic (so long as these activities do not cause a "physical obstruction" making ingress to or egress from the facility impassible or rendering passage to it difficult or hazardous).

Mr. President, that is precisely the point. Activities that are otherwise legal and protected by the first amendment will, under the bill before us, be subject to an additional requirement that they not physically obstruct. The addition of the phrase "physical obstruction" is troublesome as it does not appear in any of the existing laws that S. 636 is said to be modeled after. This is a new term, and while the bill now includes a definition for its application, it is unclear.

Mr. President, the amendment I will shortly be sending to the desk is intended to recognize that there is a delicate balance which exists that protects both first amendment interests and a woman's right to privacy. The amendment I am sending to the desk creates a cause of action for protesters who are injured, intimidated or interfered with when they are attempting to exercise legally protected free speech rights near a medical facility, that facility being defined in the bill before us.

My amendment simply says that those penalties that are applied to individuals who violate the act in the name of protecting and expressing pro-life sentiments will be applied to those who seek to express pro-choice sentiments if they, by force or threat of force or intimidation, interfere with the lawful protests of those seeking to express their opinion on the pro-life side of the question.

In brief, the amendment reads: Whoever by force or threat of force intentionally injures, intimidates, or interferes with, or attempts to do the same with any person who is participating lawfully in speech or peaceful assembly concerning reproductive health services shall be subject to the penalties provided in the act.

The amendment also strikes a rule of construction in the Kennedy amendment which prohibits any additional causes of action for protesters.

Mr. President, the amendment that I am offering here is narrow in scope—in fact, narrower than I would like. However, I believe it is a critical addition to this bill before us because under its provisions individuals who interfere with persons engaged in lawful and peaceful protest will be subject to the penalties of the act.

The inclusion of protections for protesters is vital if we are serious about alleviating the violence that takes place in these protests.

Mr. President, I wish to make sure that Members understand I am not equating the incidents of violence or force or threat of force that have occurred against pro-life demonstrators with those that have occurred against those seeking to ensure access to this facility. I do not know if there is a balance. I do not know if there is an equation. Certainly on the basis of media reports and things that I have heard, there is more violence that occurs on the access side of the question than on the protest side of the question. But that does not mean there is not violence that occurs on the other side of this equation.

If we are truly sincere in eliminating, or reducing to the extent that we can, violence that occurs at these clinics, we need to understand and apply sanctions to violence wherever it occurs by whomever it occurs. We have to reduce hostility on both sides of the issue. Failure to address this in a meaningful yet fair way amounts to a form of content discrimination that I do not think we should support.

Passing the Kennedy amendment in its present form would set a precedent. If its logic were broadly applied, who knows what methods of peaceful protest are denied to a movement of conscience in the future. It is simply not our job to pick and choose who should be denied tools of expression still available to others. My amendment intends to equalize the penalties that apply under this legislation to those who by force or threat of force intimidate or attempt to intimidate those seeking to express their opinions on this most volatile and divisive issue that faces us.

I see no reason why the Coats amendment cannot be supported by Members of this body who are on either side of this issue—pro-life, pro-choice, pro-access, antiaccess. I see no basis for objecting to this amendment regardless of where you come down on this question from a philosophical or political basis. Therefore, I hope we can have solid support for the amendment that I am offering.

AMENDMENT NO. 1194

(Purpose: To add a cause of action relating to infringement on exercise of lawful speech or assembly)

Mr. COATS. With that, Mr. President, I send this amendment to the desk and ask for the yeas and nays.

The PRESIDING OFFICER. The clerk will report the amendment of the Senator from Indiana.

The legislative clerk read as follows:

The Senator from Indiana [Mr. COATS] proposes an amendment numbered 1194.

Mr. COATS. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

Notwithstanding any other provision in this Act add the following:

The language on page 6, between lines 7 and 8 is deemed to have inserted the following:

"(3) by force or threat of force intentionally injures, intimidates, or interferes with, or attempts to injure, intimidate, or interfere with any person who is participating, or who has been seeking to participate, lawfully in speech or peaceful assembly regarding lawful reproductive health services at or near a medical facility (as defined in this section)."

Mr. COATS. I again repeat my call for the yeas and nays.

The PRESIDING OFFICER. The yeas and nays are requested. Is there a sufficient second?

There is a sufficient second.

The yeas and nays are ordered.

The PRESIDING OFFICER. The Senator from Indiana is recognized.

The Senator yields the floor.

The Senator from Minnesota seeks recognition?

Mr. DURENBERGER. Mr. President, I rise to offer my support for the bill offered by my colleague from Massachusetts, and if I may to respond to the statement made by my dear friend and colleague from Indiana right near the end of his comments before he introduced his amendment, and that is why would anyone on either side oppose this particular amendment.

Mr. KENNEDY. Mr. President, I yield 10 minutes of my time to the Senator from Minnesota.

The PRESIDING OFFICER. The Senator is recognized for 10 minutes.

Mr. DURENBERGER. I thank my colleague.

Mr. President, some are characterizing the legislation before us as an abortion bill. I can sort of tell from some of the lobbyists lined up out in the corridors as we are coming to and from these votes that is a characteristic. A lot of them are trying to line this up between prochoicers and prolifers, as we characterize them in political terms.

But having been through this now for a year, I must say I do not share that view. In its earlier versions, the case could be made that this bill took sides in that controversy, but the bill that we are voting on today does not. I view this bill as an attempt by the Congress and the Nation to endorse an old-fashioned notion, one might call it, of civility in our national debates. Call it what you will, civility or nonviolence or respect for human dignity, it is something that is too often lacking in our society.

Ask anyone who has been in Washington as long as I have or ask the good people who engage in peaceful protest, and they will tell you that in Washington or in our political campaigns or in demonstrations across this country, we are witnessing the deterioration of legitimate debate into mean-spirited attacks and sometimes physical confrontation.

In the abortion controversy, a minority of activists on both sides have engaged in an increasingly violent, and I would say increasingly dangerous, form of protest. The fundamental right of a people to express themselves in peaceful protest is constitutional. We must protect the rights of every citizen to live in this country and to go about their business without fear for their personal safety.

While the bill does not address the deep moral and constitutional conflict in this country about abortion, it does declare it is our policy that this conflict will be addressed by peaceful, civil, and nonviolent means.

I supported the passage of S. 636 in the form it was voted out of the committee, but I voted for it at the time in the hope and, as the chairman knows, with the expectation that it would be improved subsequently. The chairman has, indeed, made every effort since that time to make this a bill which needs and deserves all of our support and without amendment.

Let me outline some of the ways in which Senator KENNEDY has improved the bill. We were concerned that the bill might be constitutionally "overbroad" under the first amendment, that it might be held void for vagueness, as they say, by the courts. To address this concern, they have added in relatively strict definitions for some of the key terms in the bill.

The words "physical obstruction" are now defined as making access to or from a medical facility impassable, unreasonably difficult, or hazardous. The word "intimidate" means to place a person in reasonable apprehension of bodily harm, and the words "interfere with" mean to restrict a person's freedom of movement.

These definitions mean that the bill makes specific acts illegal. It is not an assault on anyone's speech or self-expression on the issue of abortion. In fact, the legislation now states expressly, it shall not be construed or interpreted to "prohibit expression protected by the first amendment of the Constitution."

My colleague from Massachusetts has also added a section that provides legal protection for parents and legal guardians. Under this amendment, parents and guardians cannot face legal penalties for counseling their children not to have an abortion.

Some were concerned that the initial legislation was not even-handed. It looked like a pro-choice bill, pure and simple, and I was one of these people.

To respond to this concern, Senator KENNEDY has broadened the definition of "abortion-related services" to include "pregnancy and abortion-related services." Now the bill not only protects facilities that perform abortions but also those that provide a broad range of health and pregnancy-related services, including counseling about adoption and other alternatives to abortion.

The Senator also deleted a section that would have given the Secretary of HHS broad investigative power to determine whether the provisions of S. 636 had been violated and, where appropriate, to refer the matter to the Attorney General for civil action.

And now to the point. Most significantly, this bill now allows only clinic patients and personnel to obtain legal relief. Only clinic patients and personnel are entitled to obtain legal relief. This change makes it clear that people outside a facility who are there for ideological reasons, for or against the abortion, as we saw all summer long during the exercise of Operation Rescue in Minneapolis and St. Paul, do not

have a private right of action under the law.

This is the issue raised by the amendment of my dear colleague from Indiana. During the committee markup, I voted for an amendment just like it because, as drafted then, protesters who were at the clinic because they felt strongly against abortion and wanted to express that could be arrested potentially for their protest. But somebody who showed up on the other side, on the other side of the street, to protest the protesters and to express their views could not be. And I supported the amendment by my colleague from Indiana because it evened out the treatment. It made it more balanced.

At that time the bill, as drafted, would allow pro-choice protesters, those protecting the right of entrants, or the demonstrating, if you will, against the other demonstrators, a private right of action under private law.

What the bill now does, because of the modifications that were worked out after the bill left the committee, is to take away that private right or course of action under Federal law. Now there is no need to extend that same right to pro-life protesters or demonstrators. The bill, as currently drafted before us, allows legal relief only to clinic patients and personnel. And this is the critical, if you will—not the only, but the critical—change that has been agreed to by the proponents of this legislation and by the Senator from Massachusetts.

We have recognized that Federal law should be extended narrowly to protect only those who were actually attempting to obtain or provide medical or counseling services. It does not protect the escorts. It does not protect the antidemonstrators, if you will.

I am convinced now, Mr. President, that this legislation strikes the right balance between protecting clinic patients and protecting the legitimate rights of clinic protesters. No one will be jailed for gathering in front of a clinic picketing, praying, chanting, shouting, holding signs, waving banners, or sidewalk counseling. That would all be perfectly legal under this bill.

The legislation has been greatly improved. It is a serious solution to a real problem of clinic violence which many of us have experienced in our communities. The Supreme Court has consistently held for over two decades now that the right to terminate a pregnancy is protected by the U.S. Constitution. I have voted many, many times to change that constitutional interpretation. But it remains the law of the land.

I cannot stand here and condone the harassment, violence, and blockades against women and doctors who are exercising, or attempting to exercise their constitutional right, even though I may disagree with them.

I firmly believe that violence in the name of a cause accomplishes little more than to damage that cause. We

are all on the side of life. We are on the side of peace. That is why we all ought to join the effort to eliminate the violence and the fear of violence that is poisoning our attempt to foster a true prolife ethic in this country.

There is just no escaping this conclusion. Some say the bill is a Federal solution to a State problem, that we, in Congress, have no business meddling in what is essentially a local government responsibility.

But I must say to my colleagues the record is by now very clear, whether it is Wichita, Minneapolis, or wherever you want to go. There are many times when the problem is too big for local authorities to deal with. State and local law enforcement agencies have been outmanned and overwhelmed by national scale, nationally orchestrated attempts to close abortion facilities by physically blocking access to them and promoting violence against patients.

Local police departments in the Minneapolis-St. Paul area are being forced—in our case, this summer—to make substantial dollar investments in the policing of clinic protesters. I cannot tell you how many hundreds of thousands of dollars have been invested in our community in anticipation of something that we all know has occurred in other instances.

The PRESIDING OFFICER. The Chair informs the Senator that his 10 minutes allocated have expired.

Mr. KENNEDY. Mr. President, I have talked with the majority leader. He has indicated that he would want us to proceed for a reasonable period of time. So I would be glad to yield another 3 minutes to the Senator from Minnesota.

The PRESIDING OFFICER. Without objection, the hour will be extended. The Senator is recognized for an additional 3 minutes.

Mr. DURENBERGER. Mr. President, I appreciate the chairman yielding.

I will be brief.

One clinic administrator in our community had to spend $12,000 in legal fees to get restraining orders against activists who threatened and stalked her.

I would love to put in the RECORD, except it is too personal, the fear expressed by a lot of these people who have been stalked, have garbage dumped on their lawn, who month after month, week after week, year after year are waiting for somebody to appear in the middle of the night and blow them away.

This is happening on both sides. I think the most egregious this summer in Minneapolis-St. Paul were by the other side, not the pro-life side. I mean recognizable folks in our community showed up to do the same thing to the other people. That is my only point for getting involved as I have in all of this.

We have had two efforts to blow up an abortion clinic in Robinsdale, MN. I do not think it is right. I do not think it is reasonable. I do not think it is pro-life.

So, Mr. President, I think the reality is that the Senator from Indiana and I both have the same end and the same objective in mind. I believe that over time his amendment in the committee, Senator HATCH's effort in the committee, and so forth, have persuaded the chairman to change this bill in ways that I would argue that all of us should oppose the amendment, and that we should all support the passage of this bill.

I believe it is time for people of good will on both sides of the issue to make every possible effort to put their common interest first. And our common interest I think is to reach a peaceful, democratic, and constitutional solution to this problem. With our votes today let us honor the principle that violence is no solution to the issues that divide us. That is what the vote is all about. I hope we look beyond the abortion issue and support the kind of compromise that this is, which will help us in our efforts to combat violence.

Local police departments in the Twin Cities are being forced to make substantial dollar investments in the policing of clinic protests. One clinic administrator had to spend $12,000 in legal fees to get restraining orders against activists who have threatened and stalked her. One of whom has actually signed a statement endorsing violence as an appropriate antiabortion tactic.

The restraining order against that providence activist expires next month.

There have already been two attempts in the last year alone to blow up an abortion clinic in Robbinsdale, MN. The people who work there have been harassed, both at work and at their homes.

Let me note, in fairness, that there have been abuses by those on both sides of the abortion debate. This past summer, during operation rescue's 12-week training session in the Twin Cities, Minnesotans received a forceful reminder that harassment, vandalism, and lack of respect for the rights of individuals are not the exclusive province of either extreme in this debate.

But it is clear that we need to look for a solution. We need to put an end to this climate of fear that is poisoning the debate on abortion.

I believe that this bill will help us find the answer. The actions of too many individuals on both sides have not been about rational discourse and changing people's minds. They have been about hate and fear and physical violence.

I believe that it is time for individuals of good will on both sides of this issue to make every possible effort to put their common interest first—and our common interest is to reach a peaceful, democratic, and constitutional solution.

Senator KENNEDY, Senator KASSEBAUM, and I have been able to put aside our differences on the underlying issue of abortion, and reach agreement on a bill that we believe will help curb abuses by both sides. Again, my vote is an antiviolence vote—it is not a vote to support one side or the other.

Let me stress once again that this legislation is not perfect. It is a compromise that does not satisfy either side.

But it is fair. And, it will help create an environment in which we can work toward a peaceful, democratic, and constitutional solution to the abortion controversy.

With our votes today, let us honor the principle that violence is no solution to the issues that divide us. That is what this vote is about. I hope you will look beyond the abortion issue and support a compromise which will help us in our efforts to combat violence.

The PRESIDING OFFICER. Who yields time?

Mr. COATS. Mr. President, how much time is on this side?

The PRESIDING OFFICER. The Senator controls 20 minutes. The Senator spoke for 15, and retains 20 minutes.

Mr. COATS. Mr. President, I yield myself two minutes to respond to the Senator from Minnesota.

The Senator from Minnesota is correct when he says that the bill does now limit the right to bring civil actions against protesters. And from that standpoint, the bill has been improved. But what the Senator did not say was that peaceful protesters will still be subject to criminal penalties and fines if they fall under the physical obstruction definition.

In the report which was submitted with the bill, it states that, on page 28, the act is carefully drafted so as now to prohibit expressive activities that are constitutionally protected such as the peaceful carrying of picket signs, making speeches, handing out literature or praying in front of a clinic.

What the Senator from Minnesota said, left out when he quoted this, is the parentheses which follow which says, "so long as these activities do not cause a "physical obstruction" making ingress to or egress from the facility impassable or rendering passage to it difficult or hazardous."

That is what the crux of the argument has been this morning: Should the application of criminal penalties be applied to those who are engaged in what is defined as lawful peaceful protest?

As events have proven, those protesters' constitutional rights are interfered with on both sides of the issue. They are spat upon, beat, pushed, shoved. There is violence that occurs, and yet no criminal punishment is available against the perpetrators of the action.

So it is not evenhanded, as the Senator has suggested. What we are simply trying to do is make sure that it is an evenhanded application of both civil and criminal rights of action under this legislation.

Mr. DURENBERGER. Will the chairman yield me 2 minutes?

Mr. KENNEDY. I yield 2 minutes to the Senator.

Mr. DURENBERGER. I probably did not include all of the language, but I was not trying to read the report. It is not to be interpreted as trying to give half a definition. The reality is that the penalties are for physically obstructing, intimidating, or interfering with access to health clinics.

Therefore, anyone on either side of the protest who is guilty of physical obstruction, intimidation, and interfering with access to the clinic is going to potentially be guilty of a crime and can be arrested. The assumption I make is that somebody who is there to sort of protect, by protest or by demonstration, access to the clinic is not going to commit a crime against those who are physically obstructing, intimidating, or interfering with access.

Mr. COATS. Mr. President, if I may respond to that, I just read off a list of threats of force and intimidation and of crimes that have been committed against those who are peacefully protesting. I think the fallacy in the Senator's argument is that he assumes that that does not happen. It happens, regrettably, on both sides of this question. There is a long list of incidents of violence that have occurred against those who were there protesting peacefully and lawfully.

I am not in any way condoning unlawful protest. I do support the language in Senator KENNEDY's bill that provides the penalties, both civil and criminal, against those who are unlawfully denying access to the clinic and taking away the rights of those women seeking entrance into the clinic or those performing the legal services of the clinic.

What I am simply saying here is that our goal ought to be to reduce violence wherever it occurs and however it occurs and by whomever it occurs relative to these reproductive health service clinics or these medical clinics. And since violence occurs both ways, let us have the bill apply an evenhanded application of penalties both ways, with the goal, again, of reducing or hopefully eliminating whatever violence might occur at these facilities.

Mr. DURENBERGER. Maybe 30 seconds to reply, Mr. President, if I might. What the bill does now—the extension of Federal jurisdiction here is only to the act of physically obstructing access to the clinic. So if somebody on either side of the issue physically obstructs access to the clinic, they are guilty of a crime. That is the narrow definition of this bill—obstructing access to the clinic.

Mr. COATS. Our whole debate has been over the definition of physical obstruction and what that means. We just went through that debate with Senator SMITH. It appears that if a group of nuns are on a public sidewalk in front of a clinic, lawfully so, protesting, and are sitting there saying prayers or singing songs, they are going to be subject to the penalties of this legislation,

and subject to not only fines but imprisonment for their activities.

I am simply trying to say that we ought to protect those who are lawfully protesting what they in deep conscience believe to be their right to do, and that is the purpose of this amendment.

Mr. KENNEDY. Mr. President, I yield myself 2 minutes.

Mr. President, I want to thank the Senator from Minnesota for both his comments and for the very constructive suggestions he has made and for his responses to these last inquiries.

The Supreme Court indicated in a unanimous opinion last June in the case of Wisconsin versus Mitchell, upholding a hate crimes law, that physical assault is not by any stretch of the imagination expressive conduct protected by the first amendment. Violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact are entitled to no constitutional protection.

In the famous case of Cox versus Louisiana, it was pointed out that a group of demonstrators could not insist upon the right to cordon off a street or entrance to a public or private building and allow no one to pass who did not agree to listen to their exhortations.

What we are talking about in these cases are violence, threats of violence, or obstruction to prohibit entrance into these facilities. I think any fair reading of the various cases decided by the Supreme Court of the United States would substantiate the position that those of us who support the legislation are expressing here today.

Mr. President, I understand now the leaders are on the floor and wish to address the Senate. So we will defer action on this measure. There is a short time left on the amendment of the Senator from Indiana. There will be a short debate on the amendment of the Senator from Utah and a short debate on the substitute and, hopefully, we will get to final action in the early afternoon.

I see my friend from California and also the Senator from Illinois on the floor. At the request of the majority leader, I will withhold our time and address this issue shortly after the caucuses.

---

## FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

The Senate continued with the consideration of the bill.

The PRESIDING OFFICER. Regular order is amendment No. 1194.

Who yields time?

---

## FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

The Senate continued with the consideration of the bill.

Mr. COATS. Mr. President, under the time remaining on my amendment, which I believe is 15 minutes, I yield 10 minutes to the Senator from North Carolina.

Mr. HELMS. Mr. President, naturally, I support the Coats amendment, but I want to talk in general terms about the underlying bill.

Talk about double standards. What this Senate is about to do is so flagrant, so devoid of logic and fairness, that it defies comprehension. Is this the world's greatest deliberative body that so many talk about so often? Or is it merely a politically correct outfit that is more interested in the next election than in the next generation?

Think about it, Mr. President. The Senate is rushing to declare that nonviolent protests by one group of American citizens are criminal acts—but this same Senate is silent in seven languages about the advocates of every liberal cause that comes down the pike which is equally disruptive.

You name it, Mr. President, and in every case the political liberals are left untouched—the animal rights activists, the antinuclear power crowd, the antiwar zealots.

And then there are those motley people who constantly march in the streets for what they call "homosexual rights." By the way, Mr. President, I have never once heard one of the sponsors of the pending legislation voice a critical syllable about the vulgar people who parade up and down America's streets demanding that sodomy be regarded as "just another lifestyle." No, sir, they focus on the prolife people, the people who are objecting to the deliberate destruction of innocent human life.

Then there are the noisy advocates of women's rights, D.C. statehood, so-called civil rights—and, of course, the advocates of the deliberate destruction of the most innocent, most helpless humanity imaginable—unborn babies. These advocates chant that they are pro-choice and the Senate never gives a thought to the question about the choice to do what.

So while the rhetoric of supporters of this bill, S. 636, focuses heavily on the issue of violence, the bill's language is in fact aimed at all pro-life protesters, not just the handful who are violent—and, incidentally, whose activities I oppose. There are and always have been laws to punish violent and unlawful protests at abortion clinics or anywhere else, and these laws must be enforced.

But the sweeping language of this bill stipulates that even persons engaged in nonviolent sit-ins at abortion clinics, or who picket or distribute pro-life literature outside of abortion clinics shall be subjected to harsh criminal and civil penalties. You cannot find a mention of any other group.

This bill goes far beyond discouraging and punishing the reprehensible acts of a few violent extremists in the pro-life movement. This legislation seeks to silence the entire pro-life movement by forbidding, in effect, the willingness of individual pro-lifers to speak out, even peacefully, for fear of being selectively and aggressively prosecuted and/or sued in court by the U.S. Attorney General no less, and the State attorneys general, no less, or by any and all self-proclaimed "aggrieved" pro-abortion claimants.

Even if one assumes that the same penalties for nonviolent as well as violent political activities are necessary, the double standard of applying them only to pro-life protests is not. This double standard should lead the United States Supreme Court to find this bill unconstitutional on its face, because restricting and criminalizing an individual's motivation for his acts in this way, as opposed to outlawing the acts themselves, is a clear violation, I believe, of the Constitution's protection for freedom of expression under the First Amendment.

But, Mr. President, where is the Senate's indignation about other protest groups that, like the pro-life protesters, have a few extremists in their ranks? Why is the Senate silent in the face of actions such as the December 10, 1989, protest by 4,500 ACT-UP members who interrupted mass inside St. Patrick's Cathedral in New York;

where 111 protesters were arrested for trespassing, disorderly conduct, and resisting arrest for acts such as chaining themselves to pews, spitting on and throwing condoms at church members, and desecrating the cathedral and the holy communion.

How about the firebombing of the Right to Life office in Gainesville, FL, this past February?

This past March 15, an abortion rights protester, while protesting outside a pro-life meeting at Holy Family Catholic Church, in South Bend, IN, was arrested for spitting on a Catholic priest.

On March 13 of this year, in Fremont, CA, pro-abortion rights protesters "taunted, yelled, kicked at, scratched, and chased a small group of men from the parking lot of Bethel Baptist Church where a statewide meeting of Operation Rescue had been planned. They also blocked entry to and exit from the church." I am quoting from the San Francisco Examiner of March 14 of this year.

On September 19 of this year 75 to 100 homosexual protestors descended on Hamilton Square Baptist Church in San Francisco, banging on the church doors, destroying church property and jostling members of the church to protest the church's public opposition to homosexuality. No charges were brought against the protestors by the police.

Mr. President, not one of these types of protesters is covered by the enhanced penalties this bill sets up for both violent and nonviolent pro-life protesters.

I could go on and on and on and on, Mr. President. But where do we get off practicing double standards as being politically correct and important? I pray that this bill, when it is passed, will quickly end up in the U.S. Supreme Court, because I am eager to see how the justices will rule.

Mr. President, this is how the underlying bill works. The penalties established in the legislation apply only if the prohibited actions are committed because—because—a facility, or the services rendered or sought by an individual, are abortion-related. For example, the committee report, on page 24, states that the bill's penalties and prohibitions are not invoked if the protest activity is motivated by concerns about the environment, or for other reasons—making it clear that a protester's opposition to abortion, not the nature of his or her actions, is what will trigger their punishment under this legislation.

For instance, as the bill was originally reported out of committee and before the vote on the previous amendment, all pro-lifers violating this law would have been subject to a criminal fine of up to $100,000, or imprisonment up to 1 year, or both, for a first offense. And for a second offense there is a fine up to $250,000 or up to 3 years in prison or both.

These criminal penalties are draconian enough, but this legislation also allows anyone providing or seeking an abortion—or the U.S. Attorney General, or the States attorneys general—to sue pro-life protesters in Federal court for civil damages including compensatory and punitive damages, attorneys fees, and costs. And even if compensatory or punitive damages cannot be proved, this law gives proabortion plaintiffs the right to seek $5,000 in statutory damages in lieu of actual damages. However, a pro-life defendant who successfully prevails in such a lawsuit is not entitled to collect attorney's fees, costs, or damages from the proabortion plaintiff under the bill, even if the pro-life protection proves the case was frivolous to begin with.

Mr. President, another egregious aspect of this bill is the fact that it does not distinguish between, on the one hand, nonviolent sit-ins and picketing by pro-lifers and on, the other hand, actual violence—which the majority of the pro-life movement abhors as being inconsistent with the core of pro-life beliefs.

Under this bill, even nonviolent pro-life picketers will be forced to defend themselves in court. Pro-lifers will be hauled into court on the mere assertion of an aggrieved party that they were interfered with in obtaining or providing an abortion since—in their subjective judgment—even nonviolent picketing makes passage to or from an abortion clinic unreasonably difficult.

Even if a court later exonerates a pro-life protester on the basis that passage was not made unreasonably difficult in the court's judgment, the enormous cost in time and money to prove their innocence will discourage any participation in future protests even though they may be legal.

I say again, Mr. President, that under this bill, even nonviolent pro-life picketers will be forced to defend themselves in court. How much will that cost them in time and money?

Does this bill do that to labor union protesters or any of the other protesters who clog our streets from time to time?

Oh, of course, that is all right. Boys and girls will be boys and girls. Do not pay any attention to them. But, get those pro-lifers. And that is the real intent of this legislation.

I noticed in a letter from Janet Reno, Attorney General of the United States, to Senator KENNEDY, that was passed out just this morning, that Ms. Reno says: "I understand that S. 636, the Freedom of Access to Clinic Entrances Act, will be considered by the Senate," so forth so on. "I wish to restate my strong support for S. 636 and urge its enactment."

She goes on to say that she opposes "amendment of the bill to expand its coverage to other situations." Of course, what she means is she opposes expanding the bill to include any type of protester other than pro-life protesters.

So you see, Mr. President, she is going after the pro-lifers and no one else.

Now let us look at the issue from a different perspective—which brings us to the letter from the Secretary of Labor, Robert Reich, that was also passed out this morning. He says:

DEAR SENATOR KENNEDY: I am writing to express my opposition to an amendment proposed by Senator Orrin Hatch that would make it a Federal offense to physically intimidate or interfere with a person in connection with a labor dispute. The amendment would impose criminal and civil penalties and subject individuals to damages, including statutory damages of $5,000.

Of course, Senator HATCH never offered this amendment, but look at what Secretary Reich goes on to say about applying the penalties for pro-lifers in this bill to labor protesters and strikers as well as the Hatch amendment would have done. He says:

The [Hatch] amendment is also unfair. It would permit the imposition of heavy federal fines and damages for one kind of wrong in a labor dispute while leaving others under the current rules, which make such conduct subject to injunctive relief, but not to civil money penalties, damages or criminal prosecution. * * *

[I]f the aggrieved employees respond by picketing and blocked a truck making deliveries to the employer's property, they would each be liable under the Hatch amendment for $5,000 in statutory damages, plus costs, fees, compensatory damages, and punitive damages. In addition, they could be subject to one year's imprisonment and fines.

Mr. President, Secretary Reich makes the very point that we are trying to make on the floor today. Applying such draconian criminal and civil penalties to just one side of a political dispute, or one kind of protestors and not all protestors, is blatantly unfair. And that is precisely the point Senator HATCH intended to drive home with his amendment, if he had offered it, to include labor protesters under this bill's penalties.

Mr. President, I ask unanimous consent that the entire text of Secretary Reich's letter; as well as a detailed analysis of the bill from the Republican Policy Committee both be printed in the RECORD at the conclusion of my remarks.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

DEPARTMENT OF LABOR,
SECRETARY OF LABOR,
*Washington, DC, November 15, 1993.*
Hon. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, DC.*

DEAR SENATOR KENNEDY: I am writing to express my opposition to an amendment proposed by Senator Orrin Hatch that would make it a federal offense to physically intimidate or interfere with a person in connection with a labor dispute. The amendment would impose criminal and civil penalties and subject individuals to damages, including statutory damages of $5,000.

The amendment is unnecessary. There has been no showing of a nationally organized, interstate campaign of violence directed at a class of people in the context of labor relations as there has been in the context of abortion rights. Strike violence and picketline misconduct are generally handled by the National Labor Relations Board and

local police authorities without the need for state intervention, let alone the intervention of the Justice Department. The vast majority of collective bargaining contracts are settled without strikes, and only a small number of strikes and lockouts involve violence of any kind.

The amendment is also unfair. It would permit the imposition of heavy federal fines and damages for one kind of wrong in a labor dispute while leaving others under the current rules, which make such conduct subject to injunctive relief, but not to civil money penalties, damages or criminal prosecution.

For example, under the terms of the amendment, an employer who threatened to fire his 100 employees if they voted for a union would not be subject to damages or criminal and civil penalties—only to a cease and desist order. If the employer carried out his threat and did fire them, he would be liable only for back pay. But if the aggrieved employees responded by picketing and blocked a truck making deliveries to the employer's property, they would each be liable under the Hatch amendment for $5,000 in statutory damages, plus costs, fees, compensatory damages, and punitive damages. In addition, they could be subject to one year's imprisonment and fines.

I urge the Senate to reject the Hatch amendment to the Freedom of Access to Clinic Entrances Act of 1993.

Sincerely,

ROBERT B. REICH.

U.S. SENATE,
REPUBLICAN POLICY COMMITTEE,
*Washington, DC, November 15, 1993.*
DEAR SENATOR HELMS: This is in response to your request for an assessment on the constitutionality of S. 636, the so-called Freedom of Access to (Abortion) Clinic Entrances Act. S. 636 imposes steep federal penalties (up to $100,000 and/or one year in jail for a first offense, up to $250,000 and/or 3 years for repeaters) on persons impeding access to medical facilities providing abortion or abortion referral, even in cases where there is no violence or threat of violence. In addition, expansive private civil remedies are provided for those "aggrieved by reason" of such conduct.

PUNISHMENT OF PRO-LIFE THOUGHT

The criminal standard of S. 636 is only met if the offender is acting because the facility provides abortion services. Thus, the opinion or viewpoint or thoughts of the offender directly constitute an element of the crime. This is clearly pointed out in the Committee Report (p. 24), which states that the operative section of the bill—

". . . prohibits the intentional damage or destruction of property of a medical facility *only* if the offender has acted "because" the facility provides abortion-related services. Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would *not* violate this Act (though their conduct might violate some other law, such as local trespass law). In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not its policy and practices on abortion-related services." [Emphasis added.]

[Note: The Committee's hypothetical example of a protest over emissions policy does not address the applicability of the Act if emissions were the product of an incineration facility to dispose of aborted infants.]

A footnote to the above excerpt goes on to explain that the offender's motive constitutes "an element of the offense." In

other words, the subjective intention of the offender to stop abortions is a necessary element of the crime, without which the Act does not apply. In short, the motivating thought is punished.

The constitutional infirmity of this aspect of S. 636 is pointed out by two noted scholars (Michael Stokes Paulsen of the University of Minnesota Law School and Michael W. McConnell of the University of Chicago Law School) in their written testimony for the Committee on May 20, 1993 (pp. 16–19):

"The most fundamental premise of First Amendment law is that government may not penalize speech or conduct on the basis of its content or viewpoint [according to a 1992 U.S. Supreme Court decision, *R.A.V.* v. *City of St. Paul;* cited below as *R.A.V.*]. . . . [T]his principle applies even to government regulation of the *unprotected* aspects of expression: government may not regulate even unprotected speech or conduct out of hostility to the views being expressed by such conduct. . . . As the [Supreme] Court explained in *R.A.V.,* 'nonverbal expressive activity can be banned because of the action in entails, but not because of the ideas it expresses.' " [original emphasis]

S. 636 WILL NOT PROTECT PRO-LIFE DEMONSTRATORS

The Committee Report (pp. 24–25) states (rather unconvincingly) that even pro-life counselling centers would be protected by S. 636. To address that issue, Senator Kennedy will substitute a Committee amendment for the original text when the bill is considered on November 16, in which "pregnancy" services are also covered. However, nothing in the bill's origin suggests that there is any other goal but protecting abortion clinics and that inclusion of other services in purely pro forma.

This is illustrated by the fact that S. 636 affords pro-life demonstrators have absolutely no protection from attack by pro-abortion activists. As Profs. Paulsen and McConnell point out:

"These hearings have shown (and far more evidence could be supplied) that lawful pro-life demonstrators often are assaulted by pro-choice activists and mistreated by local law enforcement authorities—in violation of *their* civil rights. If the drafters of this legislation were concerned about constitutional violations in the abortion context, they would provide redress against *these* unlawful acts, no less than against the unlawful acts of anti-abortion protesters. The one-sidedness of the proposed bill strongly suggests that it is an instrument of partisanship—of strong preference for one side in this rancorous public debate." [original emphasis]

Indeed, when it was recently proposed to add language to S. 636's companion bill in the House (H.R. 796) that would have extended civil remedies to pro-lifers assaulted by pro-abortion activists, the ACLU weighed in with a letter (July 29) stating the following:

"[W]e believe that clinic providers rightly fear that this amendment could be used to harass them. The expense of time and energy needed to defend these types of lawsuits would be enormous, and an onslaught of new federal nuisance suits would be extraordinarily burdensome to clinics who [sic] already find themselves under siege." [cited in October 25 letter to Senators by Doug Johnson of the National Right to Life Committee; his notation of grammatical error]

Not only does this illustrate the one-sidedness of S. 636—that its intent is to hit only pro-life, not pro-abortion, protesters—but it reveals what may be the more important intent of the bill: to have a "chilling effect" on perfectly legal picketing and leafletting activities at abortuaries. The same kind of nui-

sance suits from which the ACLU seeks to protect clinics would be greatly facilitated by S. 636 if brought against pro-lifers. If protesters who had no intention of committing trespass or otherwise engaging in lawful conduct were subject to such suits—even if they ultimately were vindicated—the legal costs and jeopardy of homes and property would be sufficient for many to decide to not take that risk. Many critics of S. 636 allege that this, even more than the unlawful trespass activities, is the more potent intention of the bill.

This is further highlighted by the fact that under S. 636 only the plaintiff (i.e., the abortuary) can be reimbursed for attorney and expert witness fees. The pro-life defendant cannot receive reimbursement, even he is vindicated in court. This is an open invitation to punitive, even spurious, lawsuits.

"RIGHT" TO ABORTION ONLY RIGHT PROTECTED

To return to the selectivity of the bill: not only is it squarely aimed at pro-life, versus pro-abortion, activities, it does not at all address non-abortion-related activities that also interfere with the exercise of legally protected rights. These include, in Paulsen and McConnell's summary: animal rights raids on research labs, anti-nuclear and anti-war sit-ins at nuclear power plants and blockades at campus recruitment offices, and "gay rights" interference with church services. They observe:

"If the drafters of this legislation were genuinely concerned about the effects of unlawful political protest tactics in general, they would broaden the statute to encompass all such instances of unlawful protest that interferes with the rights of others, irrespective of the object of the protest." [original emphasis]

The Committee Report attempts to defend the "thought crime" aspect of S. 636 by pointing out (p. 29) that the Supreme Court, in upholding a Wisconsin "hate crime" statute, stated that it is permissible to punish—

". . . conduct motivated by a discriminatory point of view more severely than the same conduct engaged in for some other reason or for no reason." [Wisconsin v. Mitchell; cited below as Mitchell]

Mitchell involved a Wisconsin statute upheld by the Court, whereas R.A.V., cited earlier, involved a similar city ordinance in the same state which the Court had struck down. The difference, according to law professor David M. Smolin of the Cumberland Law School (Alabama), is that the Mitchell statute—

". . . involve[d] the enhancement of the penalty for a separate and preexisting crime against the person, aggravated battery, such enhancement being based on the intentional selection of the battery victim because of his race. The ordinance invalidated in R.A.V., by contrast, specifically targeted the expressive nature of certain symbols, such as a Nazi swastika, because of the hateful message sent by such symbols." [written testimony submitted to the Committee on May 18]

Finally, though this is not directly suggested by any of the authorities, I think it is permissible to distinguish the Mitchell statute from S. 636 in the following way. In Mitchell, the Court was dealing with what was already a crime of violence, where the hate thought component, as it related to selection of a victim, was treated by the statute as an aggravating factor. Indeed, the hate thought is intimately connected with the violence committed. In S. 636, on the other hand, we are dealing (in the case of physical obstruction) with a non-violent act, which would not constitute a Federal offense at all except for the thought motivating the behavior. The thought in question, moreover, has no natural connection to commis-

sion of violent acts, and indeed sees itself as preventing violence. In this respect, the case of Bray v. Alexandria Women's Health Clinic, 1993, is significant in its holding that 19th century anti-Ku Klux Klan statutes could not be applied to blockades of abortion clinic, because the effort was not to deprive women of their civil rights but to save infants. (Indeed, it was the finding of the Bray Court that the anti-Klan statutes were not applicable to abortion protests that gave birth to S. 636.)

OVERBREADTH AND VAGUENESS

Thus, it appears that the validity of S. 636 on this point would largely hinge on whether it appeared more directed at extending harsher punishment to already criminal activity, because of an aggravating circumstance (i.e., targeting), or whether it was really directed at the expressive content. The answer to this question, according to Smolin, may be related to the issues of "overbreadth and vagueness":

"Thus, for example, if S. 636 only covered acts of violence or actual violence, it would be more like the penalty enhancement statute . . . upheld in . . . Mitchell. By contrast, if S. 636 extends to political protests, or focuses on the message, then it is more like flag burning at a political protest, or like the ordinance invalidated in R.A.V."

Clearly, there are reasons to see S. 636 as quite broad. For example, the Committee Report claims that S. 636 is "modeled" on Federal civil rights laws, such as 18 U.S.C. Sec. 245 "which prohibits force or threat of force to willfully injure, intimidate, or interfere with any person" regarding voting. The Report neglects to mention, however, that S. 636 prohibits "physical obstruction" (as well as force and threat of force), a standard not found in the cited statute. As Prof. Smolin points out, this leads to a vagueness question:

"A sidewalk counselor stepping in front of a pregnant woman to offer her literature cannot know, as the Act is currently written, whether a momentary 'physical obstruction' violates the Act. As Judge Learned Hand once noted, '[o]ne may obstruct without preventing, and the mere obstruction is an injury * * * for its throwns impediments in its way.'"

Prof. Smolin notes the invalidation by the courts of statutes seeking to prohibit animals rights activists from getting in the way of hunters:

"'[T]he Second Circuit [has] held that a Connecticut statute making it criminal to 'interfere with the lawful taking of wildlife by another person' was unconstitutionally vague on its face. The Second Circuit stated that the term 'interfere' 'can mean anything' and 'is so imprecise and indefinite that it is subject to any number of interpretations.'" [Dorman v. Satti, 1988]

I hope the foregoing is of use to you.

Sincerely,

JAMES GEORGE JATRAS,
*Policy Analyst.*

The PRESIDING OFFICER. The 10 minutes yielded to the Senator from North Carolina has expired.

Who yields time?

Mr. KENNEDY. Mr. President, I understand that I have 4 minutes remaining.

The PRESIDING OFFICER. The Senator is correct.

Mr. KENNEDY. I yield myself that time.

Mr. President, the amendment of the Senator from Indiana is really unnecessary. Our bill does not address peaceful protest by either side. A protester who

is assaulted has remedies under State law.

There is no nationwide pattern of violence against the protesters. That has really not been the case. There may be anecdotal stories and information, some of which have been referred to. But there is no nationwide pattern of violence against protesters, and that has not been established.

Our bill is evenhanded. It does not give demonstrators on either side the right to sue. It does not give either the prochoice or the prolife demonstrators the right to sue.

As reported by the Labor Committee, S. 636 permits any person aggrieved by the prohibited conduct to sue for damages or injunctive relief.

That could have been read to permit suits against abortion clinic attackers brought by a patient or doctor or also a clinic defender or prochoice demonstrator.

Some felt this unfair because prolife demonstrators who have assembled outside the same clinic would not have the same right to sue for interference with their rights.

As modified, the bill will permit suits only by the persons involved in or obtaining or providing, or seeking to obtain or provide services in the facility.

Thus, the measure now makes clear that it creates no new remedies for activists on either side who claim that demonstrators on the other side have been interfering with their rights.

The pending Coats amendment would give prolife demonstrators a chance to bring harassment suits against providers, clinics, and doctors—those we are trying to protect. Any time there is any jostling between the demonstrator on either side of the abortion debate there will be a suit. There is a real basis for this fear.

Randall Terry recently set up a new Legal Offense Fund dedicated to filing multiple lawsuits against anyone alleged to have abused prolife demonstrators. His fundraising letter says:

Your gift today will help the American Anti-Persecution League establish a $100,000 Legal Offense Fund. Notice I didn't write legal defense fund.

Instead, AAPL will fund attorneys to go on the offensive against anyone who abuses prolife demonstrators. They are going to play legal hardball. They are going to win.

Our weapon will be multiple civil lawsuits.

So a cause of action for prolife demonstrator will transform the bill from a clinic access bill to a clinic harassment bill, further clogging the Federal courts in the process. Since the bill now provides no private right of action by demonstrators on either side of the abortion debate, it would be particularly unfair to expand it to provide prolife demonstrators with a cause of action for alleged interference with their rights.

I will include the letter from Janet Reno, a copy of which is at each Senator's desk. She says there is no record demonstrating the need to expand the bill to cover this situation Senator

COATS has talked about, and she knows this expansion of the bill would be inconsistent with the proper distribution of law enforcement responsibilities between local and Federal authorities.

I ask unanimous consent that the letter from Attorney General Reno be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

OFFICE OF THE ATTORNEY GENERAL,
*Washington, DC, November 15, 1993.*
Hon. EDWARD M. KENNEDY,
*Chairman, Committee on Labor and Human Resources, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: I understand that S. 636, the Freedom of Access to Clinic Entrances Act, will be considered by the Senate on Tuesday, November 16. I wish to restate my strong support for S. 636 and urge its enactment.

As I stated in my testimony before the Committee on Labor and Human Resources, this legislation is essential to curb an escalating pattern of interference with the access of women to abortion services. This interference has gone beyond the legitimate expression of opposing views as opponents of abortion have resorted to force, threats of force, physical obstruction and destruction of property. These activities have occurred in all parts of the country and have overwhelmed the ability of local law enforcement to respond.

The Department of Justice is fully committed to using all of the tools now at its disposal to address this problem. The limits to our existing authority, however, make enactment of S. 636 essential.

S. 636 is narrowly drawn to address this problem. It contains strong, but necessary medicine to address the specific problem of interference with access to abortion services. The creation of a new federal crime and civil cause of action is justified by the nationwide scope of this problem, its severity, the inadequacy of local law enforcement to address it, and the important constitutional right that is being protected. A strong legislative record has been created that justifies this expansion of federal authority.

The narrow focus of this bill on activities that interfere with access to services related to pregnancy or abortion is important to the justification for its enactment. I oppose amendment of the bill to expand its coverage to other situations. No record exists demonstrating that expansion is necessary to address equally serious interference on a nationwide scale with another constitutional right, which local authorities are not equipped to protect adequately. Without such a record, expansion of the bill's coverage would be inconsistent with the proper distribution of law enforcement responsibilities between local and federal authority. Such expansion would weaken the bill. The Department of Justice, therefore, supports enactment of S. 636 in its current form.

In conclusion, I urge the Senate to pass this important legislation.

Sincerely,

JANET RENO.

Mr. KENNEDY. I hope the amendment is not accepted.

I reserve the remainder of my time.

The PRESIDING OFFICER. Who yields time?

The Senator from Indiana.

Mr. COATS. Mr. President, it is my understanding the Senator from Massachusetts will be offering a second-degree amendment to my amendment

*November 16, 1993*   **CONGRESSIONAL RECORD — SENATE**   **S15707**

shortly. I think we should move to that fairly expeditiously.

I will just say, in the time that I have remaining, that what we are attempting to do here is to balance two rights.

One is the legal right of access to an abortion clinic for women seeking services from that clinic.

The second is the right of those who have convictions to the contrary to protest same through legal means.

A cause of action exists against those who block that access if they violate the standards as set forth in Senator KENNEDY's bill. But no cause of action exists for those who are legally protesting that action if the same actions occur against them as occur against those seeking access.

So we are attempting to balance those two rights. We think those rights are guaranteed under the Constitution and that we ought to try to find some semblance of balance.

We do not believe that Senator KENNEDY's rule of construction as outlined in the legislation has the effect of law in balancing that right, and it certainly does not do anything toward providing the cause of action which we hope by providing cause of actions on both sides will eliminate the violence that has occurred at these clinics that everyone on this floor wants to try to reduce or eliminate.

That is the argument I will be making against the Senator's second-degree amendment and in favor of my amendment.

If the Senator from Massachusetts wants to yield back his time under the underlying Coats amendment, I will yield back the remainder of my time, and we can go to the second-degree amendment.

Before I do that, I will be happy to yield to the Senator from Utah.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. HATCH. Mr. President, I thank my colleague because I appreciate the battle that is waged here. This is never an easy issue. I really appreciate the effort that he has made.

I was concerned about part of the earlier debate when one of our very dear Senators came on the floor, who I do not think understands the bill very well, because the bill does not address at all the problem of pro-abortion violence at abortion clinics. Remember what I said. It does not address at all pro-abortion violence. That is pretty important because this is hardly a neutral bill under constitutional law.

In the context of protests at abortion facilities, the bill's criminal and civil penalties will only apply against pro-life people. We all know there is violence on both sides from time to time. I do not countenance violations from wherever it comes. I think it is a denigration of the pro-life cause for anybody who claims to be pro-life to be violent or to create violence. But there is some pro-choice violence at these

clinics too, and there is nothing done in this bill to take care of that.

The bill, as I view it, will, therefore, give pro-abortion activists a virtual license to harass pro-life people without any consideration at all to the other side of this question.

I think the Coats amendment is needed to achieve peace on both sides. I commend the distinguished Senator for being willing to come here and make this point.

In their understandable eagerness to protect abortion clinics from violence, the drafters of this bill have, I am afraid, been insufficiently attentive to first amendment values and rights. I believe that it is possible both to protect against violence at abortion clinics and to safeguard first amendment rights.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. HATCH. I yield myself 2 additional minutes from the bill.

The PRESIDING OFFICER. The Senator has that right. The Senator is recognized.

Mr. HATCH. As I said, I believe that it is possible both to protect against violence at abortion clinics and to safeguard first amendment rights. The Coats amendment would do just that, and I urge my colleagues to support it.

Let us begin with the fact that violence and abuse at abortion clinics comes from both sides of the line. I am not going to argue over which side is nastier. On different occasions, one side or the other may be. The important point is to put an end to the violence and abuse on both sides. This bill is one-sided and that is the problem and that is what the distinguished Senator is pointing out. Imagine for a moment that S. 636, in its current form, were to become law. Suddenly, those on the clinic side of the battle would have a virtual license to harass and provoke peaceful pro-life protesters, since they would know that the slightest bit of retaliation would subject to pro-lifers to the severe penalties of the bill. Contrary to what has been said by some, recent revisions to S. 636 do not remedy this imbalance. History teaches us clearly that you do not achieve peace by disarming only one of the combatants. The way to achieve peace is to treat both sides equally, and to make clear that conduct that is unacceptable by one side will be unacceptable by the other.

This common sense is reinforced by the first amendment. Just as persons seeking abortion are exercising a protected right, so are persons speaking out on abortion. The Coats amendment would simply ensure that first amendment rights are protected as much as the right to abortion.

In short, anyone who values first amendment rights at least as much as abortion should support the Coats amendment.

I reserve the remainder of my time.

Mr. KENNEDY. Mr. President, I am prepared at this time to send an

amendment to the desk. The Senator from Indiana has yielded back his time, as I understand it, and I would be prepared to do so also.

The PRESIDING OFFICER (Mr. WELLSTONE). The time of the Senator has expired.

Mr. KENNEDY. Mr. President, I believe my time has expired as well, and, if not, I yield back the remainder of my time.

AMENDMENT NO. 1195 TO AMENDMENT NO. 1194

(Purpose: To protect rights guaranteed under the first amendment)

Mr. KENNEDY. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Massachusetts [Mr. KENNEDY], for himself and Mrs. BOXER, proposes an amendment numbered 1195 to amendment No. 1194.

In lieu of the matter proposed to be inserted, insert the following:

SEC. . RULE OF CONSTRUCTION.

Notwithstanding any other provision of this Act, nothing in this Act shall be construed to interfere with the rights guaranteed to an individual under the First Amendment to the Constitution, or limit any existing legal remedies against forceful interference with any person's lawful participation in speech or peaceful assembly.

Mr. KENNEDY. Mr. President, if there are concerns that have been expressed about interfering with first amendment rights, what we are saying very clearly here is we are not trying to add, we are not trying to detract. Whatever is out there now with respect to first amendment rights, we have included in the legislation, and we are glad to restate it again here this afternoon.

Mr. President, I yield myself 5 minutes.

Mr. President, I am somewhat amazed at the statements of my friend from Utah about the one-sidedness of this legislation, because nothing could be farther from the truth, or any reference to the legislation itself.

It talks about pregnancy or abortion-related services—pregnancy services on the one hand and abortion-related services on the other. And then in the definitions of pregnancy or abortion-related services, the term "pregnancy or abortion-related services" includes medical, surgical, counseling, or referral services provided in a medical facility relating to pregnancy or the termination of a pregnancy.

That was very well crafted to include pro-life centers and counseling centers, referral centers, as well as those that are going to provide abortion services to women.

So, quite frankly, we have tried to demonstrate—not tried to demonstrate; we have made sure that this legislation would be balanced in that particular way, even though we were hard-pressed to find any evidence other than anecdotal evidence about the threats to pro-life facilities.

So I think that is very important to just mention at this time.

Mr. President, the amendment that I have just sent to the desk is to eliminate any doubt that this bill will not interfere with any person's right under the first amendment or limit any existing legal remedies against forceful interference with anyone's lawful participation in speech or peaceful assembly. There are remedies now in the law for people who are protesting and exercising their first amendment rights who may be injured in the process by counterdemonstrators. They can sue for damages under State tort laws.

My amendment makes clear that nothing in this bill limits those remedies. And the amendment on behalf of myself and the Senator from California further makes clear that no new Federal suits can be brought by either side, demonstrators or counterdemonstrators. And I believe that certainly addresses any misunderstanding or misapprehension that Members may have on that issue.

It is not a new issue. It is one that we have faced during the course of the development of the legislation in the committee and as we were debating and discussing it or with our colleagues. Senator DURENBERGER and Senator KASSEBAUM have a very clear understanding as to exactly what we are doing in terms of the balance of this legislation and in relation to these first amendment rights.

So I am hopeful, Mr. President, that we will have acceptance of this amendment, which has been offered by the Senator from California and myself.

I yield 7 minutes to the Senator from California.

Mrs. BOXER. I thank the chairman for yielding to me. I am very pleased to be working with him on this amendment.

The Kennedy-Boxer second-degree amendment is a unifying amendment. It is bringing us together as Americans. It is saying quite clearly that every single person in this country has a right to have their first amendment rights protected and that, in fact, notwithstanding anything in this law, anyone can sue if their first amendment rights have been interfered with.

It does not talk about who is antichoice or pro-choice, Mr. President. It just says all of us as Americans, whatever our view on any subject, have a right to free speech and to have that right protected

So I really do believe that we should vote for this second-degree amendment.

Now, the Senator from Utah says that the legislation without the Coats amendment is one-sided. I refer my friend, the Senator from Utah, to page 5 and 6 of the bill where it is clearly stated in section 2715 that anyone who commits violence, either at an abortion clinic or at a pregnancy counseling center—which, by the way, includes both sides of this equation—shall be subjected to penalties. So the bill applies quite equally, as you can see on page 6, both to abortion-related services or pregnancy-related services.

I am very pleased to be a cosponsor of this particular amendment. I am proud to be a part of it because I think where the Senator from Indiana is taking us is on a very divisive path. He is singling out one group, when, in fact, the bill itself, Mr. President, is quite even-handed. It warns all of our citizens, whatever side you are on on this subject, pro-choice or anti-choice, that you better respect people's first amendment rights, and that you better respect people's right to live in peace without violence.

So I hope that we will adopt this amendment. I want to read it again:

Notwithstanding any other provision of this act, nothing in this act shall be construed to interfere with the rights guaranteed to an individual under the first amendment to the Constitution or limit any existing legal remedies against forceful interference with any person's lawful participation in speech or peaceful assembly.

I call this, in my opinion, the unifying amendment, and I hope that it will be adopted. I hope we can then move on with this very important bill. I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. HATCH. Will the distinguished Senator yield some time?

Mr. COATS. I will be happy to yield some time to the Senator from Utah. We are operating on a 40-minutes-equally-divided timeframe. How much time does the Senator wish?

Mr. HATCH. If I can have 5 minutes.

Mr. COATS. I yield 5 minutes to the Senator from Utah.

Mr. HATCH. Mr. President, as I read this amendment:

Notwithstanding any other provision of this act, nothing in this act shall be construed to interfere with the rights guaranteed to an individual under the first amendment to the Constitution or limit any existing legal remedies against forceful interference with any person's lawful participation in speech or peaceful assembly.

If that read that we intend to give the same rights to pro-life protesters as we do to pro-abortion protesters, then I could see there was fairness here. But apparently there is no desire to give exactly the same protections to those who are pro-life people as they want to give to pro-abortion people. That is the difference here.

I guess the authors of the amendment are hoping that the courts will not see this subtle difference. Why not give the same first amendment protection to the pro-life people as you are giving to the pro-abortion people in this bill? The only answer is that some people appear to value abortion more than they do the first amendment.

Mrs. BOXER. Will the Senator yield for a moment?

Mr. HATCH. If I can just make these points and then I will be happy to.

Mrs. BOXER. Sure.

Mr. HATCH. The second-degree amendment does not address the problem of pro-abortion violence at abortion clinics. It protects the abortion facilities and this bill probably protects pro-life facilities. What it does not do is protect pro-life protesters the same as it protects pro-abortion protesters at abortion clinics.

What Senator KENNEDY has said is beside the point when he talks about other respects in which the bill is arguably neutral. It is not neutral in that respect, and that is the defect in this bill; it is a constitutional defect in this bill. The second-degree amendment of the distinguished Senators from Massachusetts and California does not give those whose first amendment rights are interfered with any right to enforce those rights. That is the constitutional point that I am making.

If you read on page 5, it says:

Prohibited Activities. Whoever

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from obtaining or providing pregnancy or abortion-related services.

It is limited to protect those who are pro-abortion at or near these facilities, but it does not protect the pro-life people from vicious attacks or violence by pro-abortion people at abortion clinics. That is the point that I am making. It is an important point. It is one you just cannot cast aside because you write an amendment that looks like you are protecting everybody's first amendment rights and freedom. The fact is that amendment does not do that. It does not resolve that particular problem.

The inequality in this bill is at the abortion clinics. That is where the inequality is.

I yield back the remainder of my time to the distinguished Senator from Indiana.

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. KENNEDY. Mr. President, the Senator is just incorrect. If he would look at page 7 of the legislation, it talks about rights of action: Any person aggrieved by reason of the conduct, who is a person "involved in providing or seeking to provide or obtaining or seeking to obtain services in a medical facility that provides pregnancy or abortion-related services."

So it limits the rights of action. Then the legislation in the rules of construction talks about "Nothing in this section will be construed or interpreted to prohibit expression protected by the first amendment or create new remedies for interference with expressive acts protected by the first amendment occurring outside of a medical facility regardless"—regardless—"of the point of view expressed."

The Senator can keep saying that it only does it for one and does not do it for the other and can take up all the time. We are certainly satisfied, and

not only are we satisfied, but we have the support of Senator DURENBERGER and Senator KASSEBAUM, who originally took that position, who were careful in terms of making sure that it was going to be balanced and fair, evenhanded. That is what their letter is all about. How much time do I have?

The PRESIDING OFFICER. The Senator has 11 minutes 26 seconds.

Mr. KENNEDY. I yield 4 minutes to the Senator from California.

Mrs. BOXER. Mr. President, I thank the chairman for yielding. Again, it is strange to have legislation in front of you which is clearly evenhanded which has the support of people who feel the same way as the Senator from Indiana and the Senator from Utah on the issue of abortion and believe that the Coats amendment is wrong and the Kennedy-Boxer approach is correct. It is like we are debating two different things.

Again, I urge my colleagues and friends to simply read the underlying bill. Page 5, page 6, page 7 repeats the appropriate language over and over again. What it basically says is this: If you commit violent acts or you intimidate, harass or hurt people, no matter what your views are, you are going to be in trouble for it. That is what this bill ought to do. It should stop violence no matter what your philosophical point of view is on the issue of abortion. And that is what the bill does.

The second-degree amendment should put the Senators' minds to rest. If they are not happy with the legislation, my goodness, it is clear enough, as Senator KENNEDY has explained over and over and over again. He now offers this amendment which clearly states that every single person in the United States of America is entitled to first amendment rights, and notwithstanding this legislation or any other, they have the right to bring action if their rights are interfered with.

So, Mr. President, I do not mind debating it on the facts. It is fair to disagree with one another on the facts, but I have to second the Senator from Massachusetts, the chairman of the committee, on his point, which simply says that this bill is evenhanded. To stand up here and say that it is not goes against the very words in this bill which clearly show that it relates to pregnancy or abortion-related services. So we are covering both aspects here. I cannot imagine how a Senator, like Senator DURENBERGER would be with us on this bill, and others, who happen to share the view of the two Senators from Utah and Indiana; that they would not be with us if they felt we were not being evenhanded. I yield the floor.

Mr. HATCH. Will the Senator yield to me?

Mr. COATS. I will be happy to yield the Senator from Utah additional time to respond.

Mr. HATCH. I would like to ask the question. Can either the Senator from Massachusetts or the Senator from California answer this question? Can pro-abortion protesters be punished for violence at abortion clinics? And the answer, I might as well give to you, is no, under this bill. Abortion protesters may be protected at pro-life clinics or pro-life facilities, but pro-abortion protesters cannot be punished under this bill for violence at abortion clinics the way it is written. And the answer to that is no, even if they are violent against the pro-life people.

No matter what they do at abortion clinics, they are not punished under this bill. That is as clear cut as I can make it, and that is what your bill says and that is why the COATS amendment is so needed.

I yield back the remainder of my time.

Mr. KENNEDY. I yield myself 1 minute. That is the most cockamamie reasoning I have heard in the Senate.

Mr. HATCH. Show me in the bill.

Mr. KENNEDY. What we are talking about is the ability to gain entrance. We are staying away from the protesters outside, pro-life or other protesters outside of a clinic. We are staying away from that. The Senator might like to get into that, but we are staying away. We have a very targeted, limited guarantee to individuals who want to be able to go into that facility. That is what we are talking about. Now you can debate all afternoon if you want to and say this is dealing with protesters here and protesters there. If that protester is threatening with violence and committing violence or obstructing the entrance there, then they are covered in here.

What happens out across the street we are not saying; we are not getting involved in that. We are saying whatever the law is on the first amendment now is the law when we pass that bill. So if the Senator wants to say, "Well, what happens if there are pro-choice demonstrators, where in the bill are you handling pro-choice demonstrators; show it to me." If they commit violence at a facility, they are included. If they do not, and fall outside the definitions, they are not. That is true whether it is a pro-life facility or a facility that offers abortion. That is the answer.

Mr. HATCH. Then the answer is "no," that it is not true that pro-abortionists can be punished for violence at abortion clinics. What we are asking here is can you punish pro-abortion protesters or pro-choice protesters, whatever you want to call them, if they attack pro-life protesters at an abortion clinic, and the answer is "no" under this bill.

Mr. KENNEDY. Excuse me. Yes, they are, under this bill.

Mr. HATCH. Show me the language, because it is not in here.

Mrs. BOXER. If I could just say——

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. I yield 3 more minutes.

Mrs. BOXER. I thank the Senator.

I would just add my voice to the incredulous response of the Senator from Massachusetts to some of these statements.

Whether or not this bill passes, there are laws in each and every State against violence, against abuse, against attack. What we are looking at in this bill is the clinics themselves, regardless of whether they are providing abortion services or whether they are providing pregnancy counseling and alternatives to abortion.

But for the Senator to stand up and say that people who commit violent acts are not going to be arrested or detained—in other words, what I am saying to the Senator is that we have laws in this land that deal with this. The Senator from Massachusetts says we are talking about clinics, we are talking about people having the right to move forward, to gain entrance to a pregnancy counseling center, as you may call it, or to a health facility where abortion is provided. This is evenhanded.

Mr. HATCH. Will the Senator yield?

Mrs. BOXER. People who break the law will pay the consequences.

Mr. HATCH. Will the Senator yield?

Mrs. BOXER. Yes.

Mr. HATCH. Many States have laws that would provide some action against it. We are talking about a piece of legislation here you are trying to pass that is unconstitutional in this respect because it is not neutral. The point I am making is the bill does not provide any remedies for pro-abortion violence at abortion clinics. Pro-choicers will not be subject to the same penalties as pro-lifers engaged in identical conduct at the same site.

Now, that is the problem with this bill. That is the problem that the distinguished Senator from Indiana is trying to correct. If he does not correct it, this bill will not be neutral, this bill will not be constitutional, and all the efforts that you are putting forth at this point will be in vain.

What is the problem with clarifying the language and saying that if pro-abortion or pro-choice protesters attack pro-life protesters at an abortion clinic, they can be subject to the same penalties as pro-life protesters who attack pro-abortion protesters? I do not think the pro-life protesters should do that. I do not think that they should be able to get away with that. But neither do I think that pro-choice protesters ought to be able to get away with that. That is a fundamental weakness of this bill. To his credit, the distinguished Senator from Indiana is pointing that out very clearly. That is what his amendment is about. Frankly, I do not see any argument. To just say everybody has the first amendment rights does not cure the defect.

Mr. COATS. Mr. President, may I inquire how much time remains?

The PRESIDING OFFICER. The Senator from Indiana has 14 minutes and 51 seconds remaining.

Mr. COATS. And the Senator from Massachusetts?

The PRESIDING OFFICER. The Senator from Massachusetts has 4 minutes remaining.

Mr. COATS. Mr. President, let me make a couple of points. No. 1, what Senator KENNEDY has attempted to do is utilize a rule of construction to address the concern that has been raised by myself and the Senator from Utah and others, and particularly in regards to that rule of construction I would like to raise the question as to whether or not that validly addresses the issue the authors think it does.

We received in committee written testimony from two distinguished professors, Professor Paulson from the University of Minnesota Law School, as well as a recognized constitutional scholar, Prof. Michael McConnell from the University of Chicago Law School, and I quote from them. They say:

Such a savings provision——

That is, this rule of construction—does nothing to save the statute from vagueness or overbreadth problems. It does not define more precisely the terms being used, nor does it narrow the scope of constitutional applications of the statute. Indeed, Senate bill 636 omits language contained in the House version of the bill which, while insufficient, at least makes clear that certain expressive activity is not sought to be regulated. The House bill, as marked up in committee, provides that this section does not prohibit any expressive conduct including peaceful pickets or peaceful protests protected by the first amendment.

So point No. 1 is we question whether or not a rule of construction can be the savings provision that the authors intend it to be to deal with this problem of providing the first amendment rights to individuals protesting the actions taking place at the abortion clinics. And some distinguished constitutional law professors have said it does not serve that purpose.

Second, we are in trouble here today because the Kennedy amendment adds a new standard by which individuals can be held accountable and subject to civil and criminal penalties. It adds the standard of physical obstruction. Much of our debate today has centered around this new standard, but people have not realized that this was added to the standards outlined in the original Civil Rights Act.

Now, physical obstruction gets us into trouble here in defining just how we apply these penalties, because we get into the situation talked about this morning of a nun or group of nuns or religious protesters or any protesters occupying a public place, say, a sidewalk, in front of an abortion clinic in a peaceful protest, say, sitting on the sidewalk singing hymns or praying, and constituting physical obstruction because those who are seeking access to the health clinic have to step around or step over or step through those individuals.

That now is a cause of action against those individuals who are lawfully protesting and subjects them to both civil and criminal penalties and may find themselves in jail paying a very substantial fine.

"Physical obstruction" is the term that is new to civil rights law. The bill presented here by the Senator from Massachusetts is modeled on the 1964 civil rights law, but that law did not contain the phrase "physical obstruction," and therefore we are dealing with a new standard.

I would like to get back to the point everyone was talking about this morning in terms of the goal of this bill. The goal of this bill, as proponents of the bill talked about this morning, was to end the violence; we have to find a way to stop the violence that is occurring at these abortion facilities.

We all abhor that violence, and we all are seeking to find a remedy for that violence, to at least reduce it, and hopefully eliminate it.

The Senator from Massachusetts has proposed that we apply portions of the 1964 Civil Rights Act with very tough penalties. He said we have to have something with teeth in it in order to stop this violence. So we have these very tough civil and criminal penalties that are applied.

But as the Senator from Utah have repeated, and I have said over and over, they are not applied in an equitable manner. So violence that might occur at an abortion facility—force, intimidation, interference—which is conducted by pro-life individuals protesting the action taking place at that clinic against pro-abortion activists, that violence raises causes of action with very severe civil-criminal penalties against persons perpetrating that violence. But if the tables are turned and the pro-abortion individuals do exactly the same thing to the pro-life individuals at that clinic, no new cause of action arises.

That is the inequity which exists in the substitute amendment offered by the Senator from Massachusetts, which we are trying to remedy with these amendments. Senator SMITH offered an amendment earlier, which, unfortunately, was rejected, trying to separate the penalties for violent and nonviolent. It was amended by Senator KENNEDY and they are reduced thankfully, but the penalties still exist.

What I am trying to do is simply say that those individuals who are exercising lawful protest, who are guaranteed them under their first amendment rights, if those individuals are subject to the same kind of threat of force, attempt of force, intimidation by proabortion activists, if they are subject to that same action, they ought to also have a cause of action that provides equity on both sides. It is only when we have that equity on both sides that we will reduce the violence or hopefully eliminate the violence that is currently taking place which we all do not condone and we all abhor.

That is the reason, in order to get to that question, in order to get to a vote on the Coats amendment, that we have to defeat the second-degree amendment offered by Senator KENNEDY which I contend—the Senator from Utah and many others contend—will not address the question.

So, Mr. President, at the appropriate time, when the debate is finished, I will move to table that, and we will have a vote on it.

At this point I yield, reserving the remainder of my time.

Mr. KENNEDY. Mr. President, I yield myself 1 minute.

Mr. President, I know that the Senator from Indiana is troubled by the words "physical obstruction." The Senator used that very term in his own bill at the time of the markup, justifiably so.

I will include in the RECORD the justification for that, the United States Code and the Supreme Court cases which define that as a definable term.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

**KEY TERMS IN BILL ARE NOT UNCONSTITUTIONALLY VAGUE OR OVERBROAD**

1. PHYSICAL OBSTRUCTION

In *Cameron* v. *Johnson*, 390 U.S. 611 (1968), the Supreme Court held that a statute prohibiting picketing in such a manner as to "obstruct or unreasonably interfere with free ingress or egress" to and from courthouses was not vague or overbroad under the First Amendment. The Court held that the statute "clearly and precisely delineates its reach in words of common understanding. It is a precise and narrowly drawn regulatory statute." Id at 616. The term used in our bill—"physically obstruct"—is narrower than "obstruct or unreasonably interfere," and therefore clearly valid under Cameron.

Many other statutes prohibit "obstructions" of various kinds. For example.

43 U.S.C. 1063, prohibiting obstruction of transit over public lands by the use of "force, threats, intimidation . . . or other unlawful means" has been on the books since 1885, and was upheld by the Supreme Court in 1922.

See also 18 U.S.C. 1507, prohibiting "interfering with, obstructing, or impeding the administration of justice";

18 U.S.C. 112, prohibiting "obstruction" of a foreign official in the performance of his duties;

18 U.S.C. 1752, prohibiting "obstructing or impeding ingress or egress" to or from designated federal grounds.

Mr. KENNEDY. Second, Mr. President, a prochoice activist who blockades or bombs a prolife counseling center is subject to the exact same criminal and civil liability as a prolife activist who blockades or bombs an abortion clinic, period.

Finally, Mr. President, I will include in the RECORD the resolution of the State attorney generals, the National Association of Attorney Generals, a resolution that was passed without opposition that endorses this legislation.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NATIONAL ASSOCIATION OF ATTORNEYS GENERAL RESOLUTION TO SUPPORT LEGISLATION TO PROTECT PATIENTS AND HEALTH CARE PERSONNEL AT FAMILY PLANNING CLINICS

Whereas, as chief legal officers for our respective states, we take pride in our diverse communities, their historic respect for life and property, and the American tradition of open and peaceful discussion of issues of public policy; and

Whereas, we strongly support every citizen's constitutional freedom of speech, which includes peaceful, legal public witness, assembly and picketing; and

Whereas, we recognize that many citizens of the country hold deep convictions regarding the abortion issue; and

Whereas, bombing, arson, murder and any other acts of criminal violence are clearly not appropriate means of addressing issues of public policy in the United States; and

Whereas, the recent murder of Dr. Gunn outside his clinic in Florida is the latest example of violence against family planning clinics; and

Whereas, since 1980 in the United States, over 400 bombings, arsons and acts of vandalism have been directed against family planning clinics; and

Whereas, the recent United States Supreme Court ruling in *Bray* vs. *Alexandria*, holding that federal courts have no jurisdiction under existing civil rights laws to act to protect patients and employees of family planning facilities, made clear the need for Congress to act; and

Whereas, the Congress is considering legislation such as H.R. 796, The Freedom of Access to Clinic Entrances Act of 1993, which would, among other things;

1. Make assaults and attacks on medical personnel and property at family planning facilities a federal criminal offense and make clear that federal law enforcements' power to act.

2. Establishes a private right of action for parties injured by such criminal conduct.

3. Authorizes the United States Attorney General to bring civil suits to obtain injunctions against offensive conduct, seek damages for the victims, and impose stiff fines on the perpetrators; and

Whereas, many individuals including United States Attorney General Janet Reno have already spoken out forcefully in support of this sensible legislation;

Now, Therefore, Be It Resolved That the National Association of Attorneys General:

1. While not taking a public position on the abortion issue, condemns any and all acts of criminal violence directed against family planning clinics; and

2. Urges Congress to adopt legislation designed to protect women, physicians and other health personnel from violence aimed at family planning clinics across the country where abortions are performed, without unduly infringing on the right to peaceful protest; and

3. Commends those who pursue peaceful, legal discussion of the abortion issue and appeals to all citizens concerned about the abortion issue to conduct all public discussions in a peaceful and legal manner; and

4. Urges Congress to expressly authorize state Attorneys General to enforce in the federal courts in their states the provisions of any federal law aimed at violence at family planning facilities; and

5. Authorizes its Executive Director and General Counsel to transmit these views to appropriate members of the Administration, Congress, and other interested individuals and associations.

Mr. KENNEDY. Mr. President, I think that we have responded to these questions both in the legislation and with the second-degree amendment.

I yield my remaining time to the Senator from Illinois.

The PRESIDING OFFICER. The Senator from Illinois.

Ms. MOSELEY-BRAUN. Thank you very much, Mr. President. I appreciate the Senator yielding.

Mr. President, this amendment is no remedy at all. In fact, this amendment is what might be called sometimes a killer amendment. It seeks to change the legislation by expanding it to unenforceability. It expands the language of the legislation to cover demonstrators and their activities in regards to the whole clinic access issue.

What about the principles, Mr. President? What about the people who are actually using the clinic, seeking to use the clinic, the people who work there? The principles of women, the clinic owners, the doctors—those are the individuals to whom the bill is addressed. And the whole idea behind this legislation and the specific language of the legislation protects access to the clinics, protects the woman in the exercise of her constitutional rights.

Neither side with regard to third parties, the demonstrators, is addressed or protected in this bill. This does not say you can be a pro-life demonstrator or a pro-choice demonstrator, and you are going to have a private right created under this legislation. It only creates a right of action with regard to the specific individuals who are directly affected, to the principals in this whole debate, not to third parties.

This amendment would expand it to third parties, and would thereby give rise to the unenforceability of the law. But probably as insidiously or even more insidiously, it will expand and change this from a clinic access bill to a clinic harassment bill by further clogging the Federal courts in the process.

I point out, Mr. President, that there is evidence and we have seen letters from fundraisers on the pro-life side of this issue, the larger controversy involved here, that says quite simply, that lawsuits will be used to continue the harassment and the violence as a way to continue to promote that particular cause.

Quite frankly, the organization which sent out a fundraising letter said:

Your gift today will help the American Anti-Persecution League establish a legal offense fund. Notice I did not write legal defense fund. Instead AAPL will fund attorneys to go on the offensive against anyone who abuses pro-life demonstrators. They are going to play legal hardball and they are going to win. Our weapons will be multiple civil lawsuits.

This amendment gives them the right to file those multiple civil rights lawsuits.

I will just say, Mr. President, this is a killer amendment. This is a hostile amendment.

I encourage the Members of the Senate to vote against it.

Thank you.

The PRESIDING OFFICER. The Senator from Indiana.

Mr. COATS. Mr. President, I just simply state that once again we are talking about two rights here, a woman's right to an abortion, and first amendment right guaranteed to every American to freedom of speech, freedom of assembly, and the right to protest actions that they in good conscience do not believe in.

What we are trying to do with this bill is to find a balance between both of those rights. No one is seeking to deny women their constitutionally court-ordered guaranteed right to abortion. I do not agree with that. But it is a legal right available to them, and nothing that we are doing seeks to take that away.

By the same token, we do not want to jeopardize the first amendment rights which, after all, are first amendment rights that we hold very dear and very precious. Therefore, the Coats amendment seeks to address that question I think in the only valid way.

I urge our colleagues to give us an opportunity to have a straight up-or-down vote on that question; whether or not we are going to balance those rights or whether they are going to be one-sided.

We cannot have a vote on that unless we table the Kennedy second-degree amendment. Again, at the appropriate time, I will offer a motion to do so.

In response to the argument of the Senator from Illinois about clogging up the courts, I think back to the time of the march for racial equality and the civil rights protests of the sixties. I do not think anybody worried too much about clogging up the courts. In fact, instead of clogging up the courts, we ended up providing the very guarantees of rights to minorities in this country that were long overdue.

So I do not think we should use the argument of clogging up the courts as a way of saying the rights are not available to Americans who are protesting issues that they feel very passionately and very deeply about and are doing so in a legal manner.

Therefore, I hope that we can get to the underlying question, and solve this so that we can move forward and do what we all really want to do, collectively, and that is to end this violence that is occurring at these abortion clinics around the country and related to the whole issue of cause of abortions.

This is a debate that deeply divides us. We need to have this debate. It is important that individuals from both sides of the debate have the opportunity to express their deeply-held views. It is also important that we do not do anything to deny their right to express those views.

Hopefully we can conduct that debate on a national basis and on a civil basis and not in a way that incites or pro-

motes any kind of violence. That is what we are really all about here. There really should be no disagreement on this issue.

Mr. President, I yield reserving whatever remaining time I might have.

The PRESIDING OFFICER. All the time of the Senator from Massachusetts has expired on the amendment.

Mr. COATS. Mr. President, I yield back all my time.

I move to table the Kennedy amendment and ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk called the roll.

Mr. FORD. I announce that the Senator from North Dakota [Mr. DORGAN] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 36, nays 63, as follows:

[Rollcall Vote No. 370 Leg.]

YEAS—36

| | | |
|---|---|---|
| Bennett | Exon | Lott |
| Bond | Faircloth | Lugar |
| Brown | Ford | Mack |
| Burns | Gramm | McCain |
| Coats | Grassley | McConnell |
| Cochran | Gregg | Murkowski |
| Coverdell | Hatch | Nickles |
| Craig | Hatfield | Pressler |
| D'Amato | Heflin | Roth |
| Danforth | Helms | Smith |
| DeConcini | Johnston | Thurmond |
| Dole | Kempthorne | Wallop |

NAYS—63

| | | |
|---|---|---|
| Akaka | Glenn | Moseley-Braun |
| Baucus | Gorton | Moynihan |
| Biden | Graham | Murray |
| Bingaman | Harkin | Nunn |
| Boren | Hollings | Packwood |
| Boxer | Hutchison | Pell |
| Bradley | Inouye | Pryor |
| Breaux | Jeffords | Reid |
| Bryan | Kassebaum | Riegle |
| Bumpers | Kennedy | Robb |
| Byrd | Kerrey | Rockefeller |
| Campbell | Kerry | Sarbanes |
| Chafee | Kohl | Sasser |
| Cohen | Lautenberg | Shelby |
| Conrad | Leahy | Simon |
| Daschle | Levin | Simpson |
| Dodd | Lieberman | Specter |
| Domenici | Mathews | Stevens |
| Durenberger | Metzenbaum | Warner |
| Feingold | Mikulski | Wellstone |
| Feinstein | Mitchell | Wofford |

NOT VOTING—1

Dorgan

So the motion to lay on the table the amendment (No. 1195) was rejected.

(Later the following occurred:)

Mr. BREAUX. Mr. President, on rollcall No. 370, I was present and voted "no." The official record has me listed as absent. Therefore, I ask unanimous consent that the official record be corrected to accurately reflect my vote. This will in no way change the outcome of the vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The foregoing tally has been changed to reflect the above order.)

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER. The Senator from Massachusetts is recognized.

Mr. KENNEDY. Mr. President, I think yeas and nays had been ordered earlier. I would be glad to proceed with voice votes on these two amendments, if it is agreeable. I have talked to the Senator from Indiana, and it is acceptable to him. If there is no other objection by the membership, I ask unanimous consent that the votes that were ordered earlier be vitiated.

The PRESIDING OFFICER. Without objection, it is so ordered.

The question is on agreeing to the second-degree amendment.

The amendment (No. 1195) was agreed to.

The PRESIDING OFFICER. The question is on agreeing to the first-degree amendment, as amended.

The amendment (No. 1194), as amended, was agreed to.

Mr. KENNEDY. Mr. President, I move to reconsider the vote by which the amendment was agreed to.

Mr. COATS. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KENNEDY. Mr. President, I understand my friend from Utah has an amendment that will be offered by him and then a substitute; am I correct?

Mr. HATCH. That is correct. And I do not think we need to take all the time on this amendment. We will try to be as short as we can.

Mr. KENNEDY. We will try to expedite this. We may have a second-degree amendment, but we will try to expedite this and get an early resolution of these matters.

I thank the membership.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Senator from Utah.

AMENDMENT NO. 1196

(Purpose: To prevent S. 636 from being used as a vehicle to protect illegal abortions)

Mr. HATCH. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Utah [Mr. HATCH] proposes an amendment numbered 1196.

Mr. HATCH. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection it is so ordered.

The amendment is as follows:

On page 6, lines 1 and 6, amend proposed sections 2715(a) (1) and (2) to add the word "lawful" between "providing" and "pregnancy or abortion-related services".

On page 10, line 8, change "and" to "or".

On page 11, line 7, add the following new subsection 2715(e)(3):

"(3) LAWFUL.—The term 'lawful' means in compliance with applicable laws and regulations relating to pregnancy or abortion-related services."

Renumber the remaining provisions of subsection 2715(e).

The PRESIDING OFFICER. There will be order in the Chamber. The Senator from Utah has the floor. There will be order in the Chamber. All conversation will desist.

The Senator may proceed.

Mr. HATCH. Mr. President, I offer an amendment that would remove the protections that the current version of S. 636 would accord illegal abortions. The current version of S. 636, unlike the original version, would provide blanket protection to illegal abortions. Indeed, S. 636 might well effectively cripple most or all State regulation of abortion, including regulation that serves solely to protect the health of women. For example, an unlicensed late-term abortionist would have a civil cause of action for at least $5,000 in compensatory damages and for punitive damages against State officials who attempted to prevent him from performing illegal abortions.

The stated rationale for S. 636 is that those exercising a legally protected right should be protected in exercising that right. That rationale plainly does not extend to unlawful conduct such as illegal abortions.

My amendment would remedy this defect in S. 636 by ensuring that it does not cover illegal abortions.

The supporters of S. 636 may claim that it would not create any liability for enforcement by State or local law enforcement authorities of State or local laws. This claim, however, is not supported by the unambiguous text of the bill. Nothing in the provision defining prohibited activities exempts enforcement activities by State officials. Likewise, the relevant rule of construction set forth in S. 636 provides merely that the amendment shall not be construed to "prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section" and I want to emphasize that it does not provide that S. 636 shall not be construed to subject State officials to liability for enforcement activities.

In short, S. 636 would nominally permit enforcement of State laws regulating abortion, but it would give those subject to enforcement a separate, and extremely potent, civil cause of action against State officials. Moreover, S. 636 would also give illegal abortionists the same extremely potent civil cause of action against any Good Samaritan citizen who responsibly attempted to deter an imminent and dangerous illegal abortion.

It has been suggested by the supporters of S. 636 that protection of illegal abortions is necessary to prevent the possibility of abusive litigation discovery.

But the danger of abusive discovery exists in every piece of litigation. Our system has developed a workable method of preventing such abuses.

The trial judge will control what discovery is and is not permissible. It is disturbing, to say the least, that the amendment would protect illegal abor-

tions in order to eliminate routine aspects of litigation that all other litigants in this country face.

So I urge my colleagues to support this amendment. Basically, all that it does is prevent blanket protection for illegal abortions. I think that is a worthy objective. That is why I offer it. I reserve the remainder of my time.

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER (Mr. ROBB). The Senator from Massachusetts.

Mr. KENNEDY. I yield myself 5 minutes.

Mr. President, I oppose inserting the word "lawful" to make the bill apply only when force or obstruction is used against lawful abortion services. The amendment may sound uncontroversial, even appealing on its face. In reality, however, it is unnecessary and would seriously undermine the bill.

First, this is unnecessary to ensure that State law enforcement officials cannot be sued for enforcing State abortion laws. This bill does not authorize such suits. It applies only to private, not official, conduct.

In the legislation on page 10, it points out:

Nothing in this section shall be construed or interpreted to deprive State and local law enforcement of responsibility for prosecuting the acts that may be violations of this section that are violations of State or local law.

So if there is illegal activity, the States still have the requirement and the responsibility for that kind of enforcement and they are the ones who ought to consider it. If there are parties that know of illegal activities, they ought to be in a position of reporting them to the State authorities to enforce those laws. That is the way, basically, our Federal system works.

The committee report states the act creates no civil or criminal liability for the enforcement by State or local law enforcement authorities of State or local laws, including those regulating the performance of abortion or availability of abortion-related services.

This could not be much clearer as to what is expected and not expected in terms of State authority.

There is, Mr. President, no evidence, in any event, that the providers that are being targeted with blockades, arson and assault are providing illegal abortions. You would think you would want to be able to make the case that this is a problem if we are going to try and address it. But we do not believe that case has been made; neither does the Attorney General believe that that case has been made. That is not really the problem, as we understand it.

As the Senator pointed out, the problem with inserting the word "lawful" in the legislation, as this amendment would do, is that it would give every defendant in both criminal and civil cases a chance to argue that his or her conduct did not violate this law because the provider that was targeted was not acting lawfully. Defendants would routinely argue that the clinics they were blockading or bombing or doctors they assaulted were not complying with the State regulations on such matters as parental notice, informed consent or waiting periods. And to assert this defense, the defendant then would ask for discovery of all the provider's records on these matters.

The Justice Department believes that this would be a litigation nightmare, and I agree. Every prosecution of someone who blockaded a clinic or assaulted a doctor would be converted effectively into a fishing expedition and into the practices of the victim, the clinic or the doctor. It is not enough to argue the rules limiting discovery might help to prevent abuses when there is no reason to enact the law in the form that is subject to such abuse.

So, Mr. President, there is no reason that private parties charged with violating this law should not be able to defend themselves by claiming that they were merely trying to enforce State laws and prevent unlawful abortions. The States can do that job themselves. No matter how some might feel about abortion, they should not be permitted to take the law into their own hands.

What we do not want to encourage are vigilante movements in various communities. We have that now with Operation Rescue. Just to give them another opportunity to go ahead with their harassment that they are involved in and threatening the lives and the well-being and the health of our fellow citizens is not something that this bill is about or that we in this Senate should be about.

I reserve the remainder of my time.

The PRESIDING OFFICER. Who yields time?

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Senator from Utah.

Mr. HATCH. Mr. President, my amendment simply remedies a major defect in this bill by ensuring that it does not cover illegal abortions. Why not limit protections of this bill to lawful abortions? I cannot imagine any rationale that could be used to rebut the import of that question.

This whole debate shows how extreme this bill is on the proabortion side. I think it would have a lot more support if it was not so extreme, if it did not rush to support illegal abortions and illegal abortionists, to avoid the mere risk of abusive discovery, which is about the only argument they can make. That is a risk every litigant faces. I have been in all kinds of litigation in my lifetime as an attorney. Every case involves the potential abuse of discovery. But to use that as an excuse to not knock out illegal abortions in this bill shows how extreme this bill is.

S. 636 very simply protects illegal abortion. It is that simple. Why is it so difficult to want to knock it out? Why is it the Holy Grail of all abortion legislation, that you cannot knock out illegal abortions? I do not know, but that is all that is involved in this amendment. We are making the bill apply only to lawful abortions. That seems to be fair. It seems to be right. It seems to be legal. It seems to make sense. It certainly is a good argument to make.

There is not much more I care to say about it. I am prepared to go to a vote. I am prepared to yield back the remainder of my time.

Mr. NICKLES. Will the Senator yield?

Mr. HATCH. I will be happy to yield whatever time the Senator needs.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized for up to 13 minutes 54 seconds.

Mr. NICKLES. Mr. President, one, I wish to congratulate and compliment Senator HATCH. I, frankly, am shocked and surprised that the manager of the bill will not accept this amendment. It is a heck of a thing to say that we want to have this additional Federal protection, including criminal penalties and civil remedies, even for illegal abortion.

When I heard Senator HATCH had this amendment, I thought this was an amendment that would not really be debated; that it would be accepted. I hope that the Senator from Massachusetts will accept this amendment. Even from his perspective, I do not see that this amendment would be detrimental to his case or his cause because I know—or I think I know—that the Senator from Massachusetts does not advocate in any way, shape or form illegal abortion.

So I hope that the Senator will agree with the Senator from Utah and accept this amendment. Maybe that is not a possibility. Maybe the Senator has the votes to kill any amendment that is offered on this side. But I hope that some of our colleagues will listen to some of the debate that has been raised by my friends and colleagues from New Hampshire and Indiana.

I will just touch on a couple of the comments that were made and a couple of the amendments that were offered. My friend and colleague from New Hampshire offered an amendment that said, "Well, wait a minute, let's look at these penalties. The penalties do not apply to any civil rights disturbances; they apply only to ones related to abortion services and only to those people who might be involved in obstruction of access to an abortion clinic."

What about the so-called proabortion rights people who are harassing people who are on the pro-life side? The Senator from Indiana raised this question. I know I heard my friends and colleagues who were debating the other side of the issue say this was an evenhanded bill. It is not. The criminal penalties and civil remedies protect only those persons on the proabortion rights side.

I think most of our colleagues are aware of the fact that many times, when these debates and demonstrations take place outside of a clinic, you have

groups on both sides of the issue. Unfortunately, this bill only has remedies and protections for those on the proabortion rights side and it increases penalties—criminal penalties—felonies applicable to those who are engaged in demonstrations, peaceful demonstrations, lawful demonstrations on the prolife side of the question. That is not equitable. That is not fair. This bill is not balanced.

My colleague from New Hampshire said that the penalties were extreme, and they are. To have 6 months' and then have 18 months' penalties for individuals who are lawfully, peacefully demonstrating their objection to abortion is extreme. I cannot help but think that there are some inequities. I can see a case where at a hospital, if they were picketing or demonstrating against a hospital because they performed abortion services, they could have the full weight of this new Federal law thrown against them, fines of $10,000 for the first offense and $25,000 for the second offense and 18 months in jail. And there might be a couple of nuns who are there praying together trying to change the policy of this hospital. They could be put into jail for 18 months and fined $25,000, and my guess is for most nuns that is a very significant fine. My guess is that the $25,000 fine for most people who would engage in this type of demonstration is a very significant fine.

But I believe it is also legal if the nurses' union wanted to demonstrate and picket outside that hospital for higher wages. That would be legal, no restrictions whatsoever. I just find this to be very one-sided, very unbalanced, and certainly not fair. No question about it, it is definitely a suppression of freedom of speech and freedom of assembly. I do not have any doubt it is going to be declared unconstitutional. But I am bothered by a lot of the debate, and I am bothered by this amendment because this amendment seemed so acceptable. I have a hard time seeing why we want to have a new Federal statute to improve access for illegal abortion.

Again, I encourage the proponents of this bill to accept this amendment, and I compliment my friend and colleague from Utah for offering it. I hope it would be accepted and included as a small improvement on a bill that I think needs a lot of improvement.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. I yield 5 minutes to the Senator from California.

The PRESIDING OFFICER. The Senator from California [Mrs. BOXER] is recognized for up to 5 minutes.

Mrs. BOXER. I thank the Chair very much.

I call the amendment that has been offered the vigilante amendment, Mr. President. If people want to put an end to violence at clinics, you have to vote against this amendment, or for the substitute, if one is offered. Let me tell you why.

Any protester who might be violent—and as you know, we support the right of peaceful protest, but any protester that might be violent at a clinic, who wanted to attack a doctor or a nurse, could simply say in defense: I shot that doctor because I thought there was an unlawful abortion going on.

Let me repeat that. Any violent protester who is determined to commit violence, Mr. President, under this amendment could commit this act of terror and violence and say as an excuse that I thought there was an illegal abortion going on.

I would like to point out how ironic this particular amendment is because those who offer it always talk about States rights and how important States rights are, and about how the Federal Government should not trample on States rights.

The fact is we have State laws that regulate these clinics. We have State laws that tell us what a legal abortion is. To take away that right and put it in the hands of the people who have shown they support violence undermines this bill that has been worked on so long and so hard by the Senator from Massachusetts and his committee, and which has bipartisan support in the Senate—and I might add support from those who call themselves prochoice and antichoice. This is a killer amendment, and we have to defeat it.

What we need to do is to make sure our States enforce the law, not give the law over to people who could under this amendment kill and then use it as an excuse by saying that they thought there was something illegal going on. That is vigilantism. Anyone who is for law and order and for the States being able to enforce the law will vote this down.

I yield the floor, Mr. President.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY addressed the Chair.

The PRESIDING OFFICER. The Senator from Massachusetts [Mr. KENNEDY].

Mr. KENNEDY. How much time do I have?

The PRESIDING OFFICER. The Senator controls 12 minutes 22 seconds.

Mr. KENNEDY. I yield myself 5 minutes.

Mr. President, the Senator from California has stated this very well. No. 1, different States have different laws governing these kinds of procedures. In Massachusetts, they are different from California, and they are different from New York. So the question is who is going to enforce them. Are we going to let the States enforce them or are we going to have private parties enforce them? And beyond that, there was no representation during the course of the hearings, there has been no representation by any of the law enforcement officials, there has been no pleading by the States attorneys general that they cannot control their situations with regard to illegal abortions. They are not

asking the Congress of the United States for this kind of authority and power.

We have made it very explicit in the legislation that they have the responsibility to enforce their State laws, and that is what is important.

In listening to the argument here, to say how in the world can you possibly support a bill if there is going to be illegality going on in the State, we just had the crime bill. Why do we not say we are not going to provide funding to the State of Oklahoma until they stop all crime?

Let us deal with the issues, Mr. President. The issues are targeted; they are focused. They deal with facilities that are going to provide counseling for prolife, and we are also going to have protections for individuals who want to exercise their constitutional rights on abortion. It is targeted and balanced. That is why we have the unanimous support of the State attorneys general and why we have been able to gain the strong bipartisan support on this particular measure.

So, Mr. President, I reserve the remainder of my time.

The PRESIDING OFFICER. Who yields time?

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Senator from Utah [Mr. HATCH].

Mr. HATCH. I have to say that I am always impressed whenever the distinguished Senator from Massachusetts stands up and argues for the rights of the States; it is always an elevating and very good thing to hear, but the fact is that all I am trying to prevent is benefits to the illegal abortionists from this bill.

Why is it so difficult for the sponsors of this bill to outlaw illegal abortion and to not allow the benefits of this bill to go to illegal abortionists? To me it makes sense. I think it would make sense to any fair person. Why should we be worrying about protecting the rights of illegal abortionists and how can we let the sponsors get away with their own excuse that the amendment might lead to abusive discovery in litigation or it might lead to more litigation? It will not, anyway. This amendment does not override States rights in any degree. On the contrary, it simply makes sure that Federal law does not give any benefits for what is unlawful under State law.

You cannot listen to this debate without worrying about this bill and how radical it is. The fact is it is a very radical bill. And when they stand here and fight against getting benefits to illegal abortionists or for illegal abortion out of the bill, you know something is wrong.

I think this bill could have a lot more support if they would fine tune some of these things. I have to say the amendments we have been bringing up are very good ones. But I cannot imagine a better amendment than one that says that illegal abortions should not benefit from this bill, and illegal abor-

tionists should not benefit from this bill.

There are no State laws being overridden here. The fact of the matter is that the very arguments being made by the proponents of this bill are so radical that you have to question an awful lot of other things in this bill as well. But right now, I am limiting my questioning to just one thing. Let us get rid of illegal abortion, and let us not give rights to illegal abortionists. Let us not protect illegal abortion. Let us not worry about whether it is going to cause abusive discovery because judges are very capable of taking care of that as they do in every litigation case.

I just do not understand the arguments from the other side. All we are simply saying is that the Federal law should not give benefits for what is unlawful under State law. This bill allows it. This bill permits those benefits.

I have to say I am appalled at the way our colleagues do not seem to understand that. All we are going to do is just try to make whatever benefits come from this bill come from lawful things rather than illegal things.

I yield the remainder of the time to the distinguished Senator from Oklahoma.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized for up to 5 minutes 18 seconds.

Mr. NICKLES. Mr. President, I wish to make a couple of comments. I thank my friend and colleague from Utah. I know I heard Senator KENNEDY state that this bill is balanced. I ask the Senator to correct me if I am wrong, but this bill is not balanced, at least in my opinion, because it allows people who are engaged in a peaceful sit-in to be sued, to be subjected to criminal penalties. And the counter of that, if you had people on the proabortion side who would harass or intimidate or get engaged in pushing or shoving or some types of violence, the prolifers do not have civil remedies available. There are no criminal penalties against anyone who would be on the proabortion side of an argument that might turn violent.

So there are civil and criminal penalties against people engaged in demonstrating outside of abortion clinics but not the other way around. That is not balanced. That is one-sided. That is not fair.

I ask my friend and colleague from Massachusetts if I am incorrect, and I would also ask him—this bill protects persons who are providing or obtaining pregnancy or abortion-related services. I ask my colleague. Does that also include demonstrators on the proabortion rights side? Again there are many cases. Demonstrations have people on the prolife side. Does the bill protect escorts? Does it protect people who would be demonstrating in favor of abortion rights? Could they be designated as escorts for the day? And would they have protections, enhanced protection under this bill?

Mr. KENNEDY. The response is that we were debating that about 4 or 5 hours ago. We are glad to come back and revisit it, if that is the desire of the Senator from Oklahoma.

It provides the protections for the individuals and for the doctors and medical team at the particular facility, whether it is a facility that is counseling and conferring on the pro-life on pregnancy matters or whether on the abortion services as well. Those are protected in terms of the prolife counseling and those that are involved in the clinical services.

Mr. NICKLES. If the Senator will yield further, would that mean—again, in big demonstrations, could the clinic use escorts, 40 or 50 escorts? Can they put on a shirt that says they are working at the clinic? Would this give them protection for that day or that purpose?

Mr. KENNEDY. No, it would not.

Mr. NICKLES. I appreciate my colleague's answer.

In my opening comment I said in response to the Senator's question as far as the bill being balanced, suppose you have a large group of pro-life demonstrators and a large group of pro-abortion rights demonstrators, and they are engaged in singing, or they are engaged in shouting. Now, correct me if I am wrong, but under the Senator's bill the people on the pro-abortion rights side would be able to file civil actions against the pro-life demonstrators, but the pro-life demonstrators could not file civil or criminal actions against the pro-abortion rights demonstrators.

Mr. KENNEDY. That is not an accurate characterization. We have just debated those allegations for the last 2 hours. Pro-choice activists who blockade or bomb a pro-life counseling center are subject to the exact same criminal and civil liability as a pro-life activist who blockades or bombs an abortion clinic. That is parity.

Mr. NICKLES. If the Senator will yield, he did not answer my question. That was assuming a different scenario. I said if you had a pro-life activist group engaged in heated discussion with a pro-abortion rights group outside the same abortion clinic, and they are both engaged in a significant, heated discussion—and some people would say that would qualify under this bill—correct me if I am wrong, but the pro-abortion rights demonstrators have legal rights against the pro-life group and the pro-life group does not have legal rights under this bill against the pro-abortion rights group.

Mr. KENNEDY. No, that is not correct.

Mr. NICKLES. So the pro-life group would have legal action against—

Mr. KENNEDY. This bill does not apply in terms of the demonstrators. I do not know how many more times we have to say it. It does not apply in terms of the demonstrators. That is what the last vote was on. We are saying whatever is going to be the appropriate kinds of first amendment rights—

The PRESIDING OFFICER. All time controlled by the Senator from Utah and yielded to the Senator from Oklahoma has expired. The Senator from Massachusetts controls 10 minutes and 11 seconds.

Mr. KENNEDY. I yield myself 3 minutes.

The fact of the matter is this does not create those kinds of rights in terms of those that are going to be out there picketing on the pro-life side and those that are pro-choice. Whatever applies in terms of first amendment rights, in Oklahoma or Massachusetts, they will be protected. Whatever the tort law is in Massachusetts or Oklahoma, they will be protected. This bill is about access. It is not about demonstrators.

I know that there are those who say, no matter how many times we say it and no matter how many times we refer to the legislation, no matter how many times we go to the report, no matter how many times we refer to the good work that has been done by Senators DURENBERGER and KASSEBAUM, no matter how many times we refer to the State attorneys general, there are just some people that say that is not the case. It is the case.

If the Senator has another question, I would be glad to yield him my time.

Mr. NICKLES. Mr. President, I appreciate my colleague's response, but I do not concur with his answer, much to his surprise. There has been significant debate on this point.

Mr. President, the Senator from Massachusetts just mentioned that this bill is about access. And the points are, I believe, that the civil remedies or the criminal penalties will only apply to those persons who are under this bill perceived to be denied access.

My point is that there are some real inequities because you have many people who might be determined to deny access, who want to demonstrate on statehood on behalf of D.C. They are not going to be penalized under this bill. You have people that might be demonstrating for equal rights for gay rights activities. Well, they are not subject to these penalties. This singles out only those persons who are demonstrating, even in a peaceful way, against or around an abortion clinic. It does not even say it has to be in the vicinity of the abortion clinic. This is a very far-reaching bill, Mr. President.

I compliment my colleague from Utah for his amendment. I hope my colleagues will support his amendment. I yield the floor. I thank my friend from Massachusetts for yielding the time.

AMENDMENT NO. 1196, AS MODIFIED

Mr. HATCH. Mr. President, I send a modification to my amendment to the desk.

The PRESIDING OFFICER. Without objection, it is so modified.

The amendment (No. 1196), as modified, is as follows:

On page 6, line 1, amend proposed sections 2715(a)(1) to add the word "lawful" between "providing" and "pregnancy or abortion-related services".

Mr. KENNEDY. Mr. President, I will yield the remainder of my time.

The PRESIDING OFFICER. Is there further debate on the amendment?

AMENDMENT NO. 1197 TO AMENDMENT NO. 1196

(Purpose: To clarify that nothing in this Act affects State regulation of abortion.)

Mr. KENNEDY. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Massachusetts [Mr. KENNEDY], for himself and Mrs. BOXER, proposes an amendment numbered 1197 to amendment No. 1196.

Mr. KENNEDY. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

In lieu of the matter to be inserted insert the following: "pregnancy or abortion-related services: Provided, however, That nothing in this section shall be construed as expanding or limiting the authority of States to regulate the performance of abortions or the availability of".

Mr. KENNEDY. Mr. President, I offer this amendment on behalf of myself and Senator BOXER from California. I yield myself 3 minutes.

Mr. President, the second-degree amendment makes it crystal clear that this law will not expand or contract the authority of States to regulate abortion. It will not affect State abortion laws at all or the ability of the State or local authorities to enforce those laws. The second-degree amendment I sent to the desk says this expressly, so there can be no misunderstanding about that.

States have the responsibilities, and the States have not requested any additional kind of authority. There has been no representation, in terms of the development of this legislation, that that kind of an additional authority is necessary, and this puts the responsibilities where the responsibilities should be, which is with the State authorities and with the local communities. I hope that this amendment will be accepted.

I yield 3 minutes to the Senator from California.

Mrs. BOXER. Mr. President, again, I just want to say that the chairman of the committee, Senator KENNEDY, has reached to the heart of the issue in question. If this is really a legitimate amendment, then I think it ought to be supported. If the makers of the initial amendment are serious about making sure that there are standards at these clinics and that only legal abortions are performed, I think they should embrace this amendment. Because what this amendment essentially says in plain English is that nothing in the bill

can be construed as expanding or limiting the authority of the States to regulate the performance of abortion, or the availability of pregnancy or abortion-related services.

Again, my friends who put forward the initial amendment are always arguing for the States to have this opportunity, and here the Senator from Massachusetts says that nothing in this bill changes that. The States can enforce the laws and determine what is legal and act on what is illegal.

Mr. President, the proper way to deal with the performance of illegal abortions is to call the police, not blockade the clinic, not to take the law into your own hands and say: I think something is happening inside there and it gives me a license to put someone's face on a wanted poster and use violence to get what I cannot get legally.

So I think that this substitute is very important, because we are in essence saying very clearly: Let the message go out from this U.S. Senate, that the States have the right to pass the laws that affect these facilities and to enforce those laws. What this bill is doing, and why it is so important, is it is saying to both sides of the abortion debate: You cannot be violent. You cannot hurt people who are exercising their constitutional rights.

Anything that would undermine this premise of the bill, which has been so carefully crafted by the chairman—and which has so much bipartisan support—we should defeat. I think that Senator KENNEDY, by putting forward this second-degree amendment, is doing what needs to be done. He is saying it loud and clear. If there are any illegal activities going on in these clinics, the States should enforce the law. But we are not going to give over law enforcement to vigilantes on either side of this debate. So let us support the Senator from Massachusetts. I yield back to the Senator.

Mr. KENNEDY. If the Senator will yield for a question. Does the Senator not agree that what we are attempting to deal with is the incidents of violence and even death or murder, firebombing, the throwing of acid? There have been 30,000 arrests in incidents which have taken place in recent years. We are trying to deal with the blockades and violence.

Does the Senator agree with me that unless we take this amendment that we now have, the second degree, if an individual believed there was some kind of noncompliance with State laws in terms of parental consent or other regulations—just believed that to be true—he could go out and throw the acid, could attack the individuals, and there would be no protections under this legislation for the innocent people who need the protection; is that the understanding of the Senator?

Mrs. BOXER. Absolutely. The Senator has presented it for all to hear that if we do not accept this second-degree amendment and the underlying amendment is adopted, we are essen-

tially saying—I have heard the word radical used here in this debate by those on the other side. Let me tell you what is radical. What is radical is putting acid through a clinic door and injuring innocent people. What is radical is forcing doctors to wear bulletproof vests. What is radical is killing people who do not agree with you. That is what is radical.

What this underlying legislation is saying is no more to both sides; no more violence. The Senator is exactly right. If we do not pass this substitute, I fear the message that will come out of this Senate will be an invitation to those who want to take the law into their own hands, to continue the violence, and as an excuse to say: I thought something illegal was going on.

That is my long answer to the Senator's short question.

Mr. KENNEDY. I think the Senator made an excellent answer.

Mr. NICKLES. Will the Senator from Massachusetts yield?

Mr. HATCH. Mr. President, let me make a couple of comments, and then I will yield some time to ask any questions.

This second-degree amendment will do absolutely nothing to change the fact that this bill would give Federal protection to acts that are illegal under State law. How can you justify that? I would like to vote for something that prevents violence against abortion clinics and against the prolife facilities. But this bill is very flawed. One of the biggest flaws is that it protects acts that are illegal under State law. I might add that this second-degree amendment is another false cosmetic change.

My amendment has nothing to do with vigilantes. I do not know how anybody can use that language with regard to the amendment. This is not a question of subjective belief, whether somebody thinks that an illegal act is being performed. It is actual illegality that matters. This bill protects actual illegality; it gives protection to it. How can we justify it? How can anybody justify that? It is a defective bill.

Frankly, why are we in the business of protecting illegality and using it as an excuse that it might involve abusive discovery. That is no argument. The fact of the matter is that there is no reason why we should be allowing illegality in any way. It has nothing to do with vigilantism. This amendment of mine, which they are now trying to amend with this cosmetic change, simply makes sure Federal law does not give benefits for what is unlawful under State law. It is simple. It would benefit this bill and would help to correct it. I do not know how anybody can argue against it.

I yield whatever time the Senator from Oklahoma might need.

Mr. NICKLES. Mr. President, I will ask my friend and colleague from Massachusetts. I am trying to decide what

this second-degree amendment is. It says:

In lieu of the matter to be inserted—

So he strikes the Hatch language or the Hatch amendment. And then he says:

Insert the following:

Nothing in this section shall be construed as expanding or limiting the authority of States to regulate the performance of abortions or the availability of * * *.

Does this mean the Senator from Massachusetts is now in favor of allowing the States to have parental notification laws or a 24-hour waiting period? Is he affirming the State's right to have regulation of the performance of abortions?

Mr. KENNEDY. This does not attempt to dictate to the States any procedures on those particular matters.

As the Senator by his question points out, there is enormous variety in all of the States in terms of the limitations. Obviously, the Roe versus Wade and Webster decisions are controlling in certain aspects, but there are different provisions in State laws, and this does not expand or contract those.

Mr. NICKLES. Would my friend from Massachusetts agree with me that we shall allow those States that wish to have regulations, such as a parental notification or a 24-hour waiting period, to have the ability to pass these regulations?

Mr. KENNEDY. The Senator knows very well what the Roe versus Wade decision has provided and what is permissible and what is not permissible under that decision.

That decision in a very clear way demonstrated the particular rights of privacy and liberty under this Supreme Court holding, and the States, within those guidelines, have made decisions that are consistent, by and large, with the decision of the Supreme Court. This does not affect that in one way or the other.

Mr. NICKLES. If the Senator will yield for one additional question, then I was hoping when I read this language that maybe my friend and colleague from Massachusetts—and maybe my friend and colleague from California—would be opposing the so-called Freedom of Choice Act, because the Freedom of Choice Act would expressly prohibit the waiting period and parental notification legislation and other legislation that States have enacted. It would preempt those. I was hoping maybe by reading this language my friend and colleague would now be opposing that legislation and be in support of the State's right in making some now legal restrictions on abortion. I am not sure that my colleague went that far, but I was hopeful that maybe he might.

Mr. KENNEDY. I appreciate the good will the Senator expressed toward us, but I do not intend to take the time of the Senate to further express my strong commitment on the issue of choice. That is not what this is about.

What this is really about is about violence and whether the amendment that was being offered by the Senator from Utah is going to fundamentally lessen the issue of violence or enhance it, as I think appropriately stated by the Senator from California, with vigilante actions.

We have tried to address this in a way which I believe is consistent with the underlying thrust of the legislation.

I yield the remainder of my time.

Mr. NICKLES. I think I still have the floor.

Mr. President, I ask the Senator from Massachusetts one additional question. I tried to hone this down. I heard my friend and colleague say that this is not about protesters. I am afraid that this language is about protesters. I know he said it is about access.

Again I heard my colleague say that he thinks this legislation is balanced. I stated—and my colleagues on this side have stated—that we feel it is not balanced.

Let me ask him a very defined question. At an abortion clinic—correct me if I am wrong—pro-life protesters are subject to criminal penalties and pro-abortion rights protesters are not. Am I correct?

Mr. KENNEDY. Anyone who obstructs the entrance for the reasons defined in this legislation—because of the pregnancy services or abortion services provided inside—will be in violation.

Mr. NICKLES. The Senator did not answer my question.

Mr. KENNEDY. I heard the question, because we have been hearing the same question all afternoon, and we have been answering. It might not be the answer that the Senator wants to hear but, nonetheless, it is what the legislation is about.

Mr. NICKLES addressed the Chair.

The PRESIDING OFFICER. The Senator retains the floor.

Mr. NICKLES. Mr. President, I shall make a couple comments. My colleague says "anyone who obstructs." My comment is that many times and at many places where you have a confrontation between pro-lifers and people who are pro-abortion rights people, you have a conflict. The facts are that the people who are on the pro-life side of the equation are subject to criminal penalties but not the other way around. Those who are on the pro-abortion rights side are not subject to criminal penalties. So this is not fair or balanced legislation.

Mr. President, concerning this second-degree amendment, this amendment says nothing. This amendment is like most of the other second-degree amendments that we have had on almost every single amendment. It is nothing but cover. It is nothing but a fig leaf. It basically says:

Nothing in this section shall be construed as expanding or limiting the authority of States to regulate the performance of abortions or the availability of * * *.

In other words, it does not do anything. It is one or two sentences that say nothing. It is cover. It maybe will help people vote with my friend and colleague from Massachusetts.

I compliment him and his staff for coming up with such great legal ambiguities that maybe will confuse people and give people cover for voting against this amendment and against the amendment of our friends and colleagues from New Hampshire and Indiana. It is a fig leaf. It does nothing. This language very clearly does nothing. It says:

Nothing in this section shall be construed as expanding or limiting the authority of States * * *.

It does nothing.

The amendment of my friend and colleague from Utah says: Make sure we do not give an expanded Federal right for civil and criminal penalties for illegal abortions. There are some clinics that specialize in late-term abortions. They make more money that way. There are some clinics that are mills that specialize in the destruction of unborn human beings in the seventh, eighth, and ninth month, well after viability and in most cases quite illegal. My friend and colleague from Utah is saying: Wait a minute. Let us not give them this special protection.

Unfortunately, the proponents of this legislation will not agree.

This is a very common sense amendment, and I am bothered by the fact that it is being opposed.

Mrs. BOXER. Mr. President, will the Senator yield for a question?

Mr. NICKLES. I will yield in a minute.

Mrs. BOXER. I thank the Senator.

Mr. NICKLES. I am bothered by the fact that this is opposed, because I would like to share with my friend and colleague a story that I read by a person who worked in a clinic in Wichita that specializes in late-term abortions—specializes in them. They do lots of them, and they make a lot more than the $250 or $300 that is made for abortions that are performed quite commonly in the first trimester. They make a lot more money. I am bothered by the fact of what is happening in a lot of States.

As a matter of fact, looking at State laws, 30 States have laws regulating and prohibiting post-viability abortions; 25 States have some form of parental notification or consent laws; and about 20 States have some form of informed consent or waiting period.

I am bothered by the fact that you would have some States that do have laws that say we do not want abortions after viability, and my friend and colleague says let us not give special Federal protection to violation of those laws.

I heard my friend and colleague from California make some comment: Wait a minute. If we pass the amendment of the Senator from Utah this is going to be vigilante time.

I just make mention that the case in point where Dr. Gunn, who was murdered—and I denounce that criminal activity. That happened in the State of Florida. The State of Florida has laws against murder. The individual who committed that crime could receive penalties all the way up to, and including, death.

There are State penalties. There is State enforcement. There are State laws against arson. There are State laws against using acid on and destroying private property.

So to insinuate that if we do not pass this bill there will be no protection—and that some type of vigilante activity will be OK—is absurd.

As a matter of fact, the individual who committed that crime is now in prison and is awaiting trial. Again, that penalty could go all the way up to the death penalty.

I make comment that we are creating a very special class and saying that it is illegal under Federal criminal penalties, with fines of $10,000 for the first offense, and a felony and a fine of $25,000 for a second offense, for someone to engage in demonstrating outside an abortion clinic. That may be holding a sign and saying "abortion kills," or "it is a child not a choice," and they may be holding hands, praying. And we are going to subject them to that kind of penalty. I find that to be very, very unfair; very unequal.

I would just urge my colleagues to support the amendment by my friend from Utah and to defeat the underlying bill, as well.

I am happy to yield for a question.

Mrs. BOXER. I thank the Senator very much for yielding.

Mr. NICKLES. Mr. President, how much time do I have remaining?

The PRESIDING OFFICER. The Senator controls 6 minutes and 18 seconds.

Mr. NICKLES. I reserve the remainder of my time. I would be happy to respond to a question on the time of the Senator from California.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. Mr. President, how much time do I have?

The PRESIDING OFFICER. The Senator from Massachusetts controls 13 minutes and 14 seconds.

Mr. KENNEDY. I yield 7 minutes to the Senator from California.

The PRESIDING OFFICER. The Senator from California is recognized for up to 7 minutes.

Mrs. BOXER. Thank you very much. And I thank the Senator for being willing to engage in a respectful dialog with me.

The Senator has stated that he is aware that there are clinics that are routinely providing abortions that are illegal. I wonder if the Senator from Oklahoma would tell me if he has reported those clinics to the police, the proper authorities in those States?

Mr. NICKLES. I would respond to the Senator, I personally have not. But I will also respond to the Senator that

those statements have been made to the police and there have been attempts to prosecute, or there have been attempts to try to get the States to prosecute individuals for their illegal abortions.

Mrs. BOXER. I would say to the Senator that the appropriate way to deal with this is to call the police, not to have an amendment here that essentially sends a message to people that they should take the law into their own hands. And that is really the essence of the debate on this particular amendment.

And I think, if I might say, that the Senator from Massachusetts has in the underlying bill been very careful to be evenhanded. Philosophical preferences do not come into play here. If you are violent and you are pro-choice, or if you are violent and you are anti-choice, the fact is you are covered under this bill.

Mr. NICKLES. Will the Senator yield?

Mrs. BOXER. Let me just finish my point.

If there are clinics that are breaking the law, an appropriate call should be made to the police.

I am shocked to hear the Senator say that this amendment is a fig leaf. I cannot believe that the Senator from Oklahoma thinks his State's laws are fig leaves. I know he does not. I certainly do not believe California's State laws are fig leaves. It is serious law.

What we are saying here very clearly is that we support the language in this bill. We point out that nothing in this bill should be construed as expanding or limiting the authority of States to regulate the performance of abortion or the availability of pregnancy or abortion-related services.

We could not be clearer here. And the Senator tried to say, "Well, does that go for other issues, as well?" This bill deals only with violence at clinics. Whether the clinic is a pro-life clinic or a clinic that provides abortions, the law applies.

Mr. NICKLES. Will the Senator yield?

Mrs. BOXER. I am happy to yield, but I would like to yield on the Senator's time.

The PRESIDING OFFICER. Who yields time?

Mr. NICKLES. Mr. President, on our time——

The PRESIDING OFFICER. Without objection, the Senator from Oklahoma is recognized on time chargeable to the Senator from Utah. The Senator has 6 minutes and 5 seconds remaining.

Mr. NICKLES. Mr. President, I will just mention that I think my colleague from California is wrong.

My colleague from California said, "Hey, this bill outlaws violent activity," and she said it applies to pro-choice people or pro-abortion rights people as well as to pro-life people.

I will ask my friend and colleague from California, if you are outside of an abortion clinic and if you have a

pro-life demonstration—if I could have my colleague's attention——

Mrs. BOXER. Yes. I know what you are going to ask me, because you asked it several times.

Mr. NICKLES. If you are outside of an abortion clinic and you have a confrontation, these criminal penalties apply only to pro-life demonstrators. They do not apply to the so-called pro-abortion rights demonstrators.

Mrs. BOXER. Let me just repeat: A pro-choice activist who blockades or bombs a pro-life counseling center is subject to the exact same criminal and civil liabilities as a pro-life activist who blockades or bombs an abortion clinic.

This bill deals with access to clinics, I say to my friend. It does not deal with an omnibus crime bill.

Mr. NICKLES addressed the Chair.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. NICKLES. My colleague from California read the same scripted answer that my colleague from Massachussetts read, and it does not answer the question. The question is very simple. If you have a confrontation outside of an abortion clinic, pro-life demonstrators are subjected to criminal penalties and pro-abortion rights demonstrators are not. That is not equal. That is not fair.

Mr. KENNEDY. And that is not the bill.

Mr. NICKLES. Madam President, I have the floor.

The PRESIDING OFFICER (Ms. MIKULSKI). As I understand it, the Senator from California has the floor.

Mr. NICKLES. Madam President, I have the floor.

Mrs. BOXER. I would say, I reserved the remainder of my time and the Senator wanted to ask me a question, so he has the time at this point.

The PRESIDING OFFICER. The Senator from Oklahoma is using his time yielded by the Senator from Utah, but the Senator from California has the floor.

Is that correct?

Mr. NICKLES addressed the Chair.

Mrs. BOXER. Madam President, if I have the floor, I would like to respond.

The PRESIDING OFFICER. The Chair wishes to clarify that the Senator from California has the floor. If the Senator from California wishes to yield to the Senator from Oklahoma, it should be for the purposes of a question. If the Senator from Oklahoma wishes to speak when the Senator from California concludes her statement, then the Chair will look for recognition for the Senator.

Mrs. BOXER. Madam President, how much time is left for the Senator from Massachusetts?

The PRESIDING OFFICER. The Senator has 6 minutes remaining.

Mrs. BOXER. Madam President, I would like to respond to the Senator, because we are getting to the point where we are having some interrup-

tions, and we are equally guilty of that.

The Senator from Oklahoma is posing the question again. It is about, I think, the seventh or eighth or ninth time that this Senator has heard it. He is posing the question about whether or not a pro-life person is treated in the same manner as a pro-choice person.

I think we have stated over and over that the answer is yes, because we are dealing in this bill, Madam President, with safeguarding the right of every individual in America to have access to a clinic, whether they are going for pregnancy counseling in a pro-life center or whether they are going for abortion counseling in a family planning clinic. And in the exercise of that right, we say in this bill, anyone who interferes with it in a violent fashion, seeks to intimidate or harm or hurt, will be prosecuted.

Now we are not talking about an argument that is going on three blocks away. This is not an omnibus crime bill. There are laws of this land that prohibit violent activity. But in this bill, we are targeting these clinics.

I think the amendments that have come before this body from the people who do not like this bill—and they are very clear that they do not like this bill—these amendments are undermining the underlying legislation. I understand that. They are trying to gut this legislation. They are trying to make it worthless.

So it is important to stand up and defeat these amendments and pass the substitute amendments.

The Kennedy amendment is very clear. Again, it says nothing in this section shall be construed as expanding or limiting the authority of States to regulate the performance of abortions or the availability of pregnancy or abortion-related services.

Madam President, we are not reaching to other questions and other issues that the Senator from Oklahoma would like us to. Those debates we will have in the future.

Mr. NICKLES. Will the Senator yield?

Mrs. BOXER. I will be happy to yield to the Senator on his own time.

Mr. NICKLES. Madam President, how much time do I have remaining?

The PRESIDING OFFICER. The Senator has 4 minutes and 54 seconds.

Mr. NICKLES. How much time remains on the other side?

The PRESIDING OFFICER. There remains 6 minutes and 42 seconds.

Mr. NICKLES. Madam President, I would like to ask my friend and colleague from California a question and I would like to see if I cannot clarify this issue.

Am I correct that if, at an abortion clinic, pro-lifers block entrance to the clinic, they are penalized under this bill? Is that correct?

Mrs. BOXER. If my colleague reads the section, it is anyone who intimidates or tries to use violence, be they pro-choice or anti-choice. So we do not

say one side or the other. I am trying to answer the Senator. I am not trying to use up his time, I am just trying to answer the Senator.

Mr. NICKLES. The answer is yes?

Mrs. BOXER. That is not what I said. I said anyone who intimidates, interferes, or uses violence, whether they are pro-choice or pro-life.

Mr. NICKLES. Let me ask my colleague another question. If pro-abortion demonstrators attack the pro-lifers who are blocking the clinic entrance, are they penalized under this bill?

Mrs. BOXER. I am giving the Senator the same answer that he keeps rejecting and he says is scripted, which is that a pro-choice activist who blocks the gates——

Mr. NICKLES. But your——

Mrs. BOXER. When the Senator asks me a question and then interrupts me as I answer, it is hard for me to answer.

Mr. NICKLES. But your scripted answer applies to a different issue. That applies to a pro-life clinic, if pro-choicers are demonstrating against that. I did not ask that question.

I said if you have pro-lifers demonstrating outside an abortion clinic and they are attacked by pro-choicers, would the pro-choicers be subjected to the penalties under this bill?

Mrs. BOXER. Attacks from demonstrators on either side are not the subject of this bill. I repeat to my good friend from Oklahoma, this bill deals with access to clinics.

Mr. NICKLES addressed the Chair.

The PRESIDING OFFICER. The Senator from Oklahoma continues to hold the floor.

Mr. NICKLES. Madam President, I appreciate my friend and colleague's statement, because she is right. People who block access to a clinic, either type of clinic—they are subject to the penalties of this bill. If those people are attacked, the attackers are not subjected to the penalties of this bill.

I make mention of that because they are not. So I have heard people say we are against violence outside of clinics. But, frankly, it is only those people who could be characterized as pro-lifers, or anybody blocking access to a clinic—and, frankly, that is only going to be pro-lifers blocking access to an abortion clinic—but if they are attacked by people who support abortion rights, and sometimes these things unfortunately do become confrontational, there is no action or cause of action under this bill. So it is inequitable.

I make that point. I would say the inequity is so stark, and so unreal, and so unfair, and so unbalanced that, really, we ought to be ashamed. I do have some confidence, though, that the Supreme Court is going to throw this entire bill out as being unconstitutional and a gross infringement on first amendment rights.

Unfortunately, it looks like the Senate is going to pass it. I hope that is not the case. But I think we have made our point, and the point is very clear

that this bill, unfortunately, would allow people to attack some people who are demonstrating—maybe even demonstrating peacefully, maybe holding hands praying, and saying, "Let us not destroy innocent, unborn human beings"—and unfortunately this bill only attacks them and their civil liberties. I think that is a gross injustice.

Madam President, I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. KENNEDY. Madam President, I am prepared to yield back the remainder of my time.

Mr. HATCH. Madam President I am prepared to yield back the remainder of my time. I ask for the yeas and nays on the amendment.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. NICKLES. Madam President, I move to table the KENNEDY amendment. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

[illegible partial column text]

FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1993

The Senate continued with the consideration of the bill.

Mr. KENNEDY. Madam President, I yield back the remainder of my time.

Mr. HATCH. I yield back the remainder of time.

The PRESIDING OFFICER. The question now occurs on the motion to lay on the table the amendment of the Senator from Massachusetts. The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. FORD. I announce that the Senator from North Dakota [Mr. DORGAN] is necessarily absent.

The result was announced—yeas 35, nays 64, as follows:

[Rollcall Vote No. 371 Leg.]

YEAS—35

| | | |
|---|---|---|
| Bennett | Danforth | Hatfield |
| Bond | Dole | Helms |
| Breaux | Domenici | Johnston |
| Burns | Exon | Kempthorne |
| Coats | Faircloth | Lott |
| Cochran | Gramm | Lugar |
| Coverdell | Grassley | Mack |
| Craig | Gregg | McCain |
| D'Amato | Hatch | McConnell |

| | | |
|---|---|---|
| Murkowski | Reid | Thurmond |
| Nickles | Roth | Wallop |
| Pressler | Smith | |

### NAYS—64

| | | |
|---|---|---|
| Akaka | Glenn | Moseley-Braun |
| Barcus | Gorton | Moynihan |
| Biden | Graham | Murray |
| Bingaman | Harkin | Nunn |
| Boren | Hoflin | Packwood |
| Boxer | Hollings | Pell |
| Bradley | Hutchison | Pryor |
| Brown | Inouye | Riegle |
| Bryan | Jeffords | Robb |
| Bumpers | Kassebaum | Rockefeller |
| Byrd | Kennedy | Sarbanes |
| Campbell | Kerrey | Sasser |
| Chafee | Kerry | Shelby |
| Cohen | Kohl | Simon |
| Conrad | Lautenberg | Simpson |
| Daschle | Leahy | Specter |
| DeConcini | Levin | Stevens |
| Dodd | Lieberman | Warner |
| Durenberger | Mathews | Wellstone |
| Feingold | Metzenbaum | Wofford |
| Feinstein | Mikulski | |
| Ford | Mitchell | |

### NOT VOTING—1

Dorgan

So the motion to lay on the table the amendment (No. 1197) was rejected.

Mr. KENNEDY. Madam President, I move to reconsider.

Mrs. BOXER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KENNEDY. Madam President, I have talked to the Senator from Oklahoma. I understand he is agreeable to vitiate the yeas and nays on the two amendments. Therefore, I would ask unanimous consent that the order for the two rollcall votes be vitiated.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

The question is now on agreeing to amendment 1197.

The amendment (No. 1197) was agreed to.

The PRESIDING OFFICER. The question is now on agreeing to amendment No. 1196, as amended.

The amendment (No. 1196), as amended, was agreed to.

Mr. KENNEDY. Madam President, I move to reconsider the vote.

Mrs. BOXER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KENNEDY. Madam President, if we could have the attention of the Members, I think I state correctly that the Senator from Utah will offer a complete substitute, and I do not expect to speak on that for 2 minutes literally.

Mr. HATCH. I only intend to speak roughly 2 minutes. But I have the distinguished Senator from Oregon who would like to take 5 minutes. I think we can keep our side below 7 minutes.

Mr. KENNEDY. Just for the information of the Members, we do not anticipate a second-degree amendment. We will not offer that, which ought to be news for the Members. We hope others do not, as well. Then we expect to go right to final passage. There has been a request for a rollcall, just so we have

some understanding for the Members about what the timing would be.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Senator from Utah.

Mr. HATCH. I agree with the Senator from Massachusetts. I do not want a second-degree amendment on this. This is a substitute amendment.

AMENDMENT NO. 1198

(Purpose: To provide for a substitute amendment)

Mr. HATCH. Madam President, I send a substitute amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

The Senator from Utah [Mr. HATCH] proposes an amendment numbered 1198.

Mr. HATCH. Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

On page 1 of the amendment, strike out line 1 and all that follows through the end thereof and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

**SEC. 2. PURPOSE.**

It is the purpose of this Act to protect and promote the public health and safety and activities affecting interstate commerce by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with a person seeking to obtain or provide reproductive health services (including protecting the rights of those engaged in speech or peaceful assembly that is protected by the First Amendment to the Constitution), and the destruction of property of facilities providing reproductive health services, and to establish the right of private parties injured by such conduct, as well as the Attorney General of the United States, to bring actions for appropriate relief.

**SEC. 3. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

Title XXVII of the Public Health Service Act (42 U.S.C. 300aaa et seq.) is amended by adding at the end thereof the following new section:

**"SEC. 2715. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

"(a) PROHIBITED ACTIVITIES.—Whoever—

"(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person who is or has been seeking to obtain or provide lawful reproductive health services;

"(2) intentionally damages or destroys the property of a medical facility or in which a medical facility is located, or attempts to do so, because such facility provides lawful reproductive health services; or

"(3) by force or threat of force intentionally injures, intimidates or interferes with any person who is participating, or who has been seeking to participate, lawfully in speech or peaceful assembly regarding reproductive health services,

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c). Nothing in this subsection shall be construed to subject a parent or legal guardian of a minor to any penalties or civil remedies under this section for

activities of the type described in this subsection that are directed at that minor.

"(b) PENALTIES.—Whoever violates this section shall—

"(1)(A) in the case of a first offense involving force or the threat of force, be fined in accordance with title 18 or imprisoned not more than 1 year, or both; and

"(B) in the case of a second or subsequent offense involving force or threat of force after a prior conviction for an offense involving force or threat of force under this section, be fined in accordance with title 18 or imprisoned not more than 3 years, or both;

except that, if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life; or

"(2) in the case of an offense not involving force or the threat of force, be imprisoned not more than 90 days.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) involving force or threat of force may commence a civil action for the relief set forth in subparagraph (B).

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $15,000, for a first violation involving force or the threat of force; and

"(ii) in an amount not exceeding $25,000 for any subsequent violation involving force of the threat of force.

"(d) RULES OF CONSTRUCTION.—Nothing in this section shall be construed or interpreted to—

"(1) prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;

"(2) deprive State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section or that are violations of State or local law;

"(3) provides exclusive authority to prosecute, or exclusive penalties for, acts that may be violations of this section and that are violations of other Federal law;

"(4) limit or otherwise affect the right of a person aggrieved by acts that may be violations of this section to seek other available civil remedies;

"(5) prohibit expression protected by the First Amendment to the Constitution; or

"(6) unreasonably interfere with the right to participate lawfully in speech or peaceful assembly.

"(e) DEFINITIONS.—As used in this section:

"(1) INTERFERE WITH.—The term 'interfere with' means to intentionally and physically prevent a person from accessing reproductive health service or exercising lawful speech or peaceful assembly.

"(2) INTIMIDATE.—The term 'intimidate' means intentionally placing a person in reasonable apprehension of immediate bodily harm to him- or herself or to a family member.

"(3) MEDICAL FACILITY.—The term 'medical facility' includes a hospital, clinic, physician's office, or other facility that provides health or surgical services.

"(4) PHYSICAL OBSTRUCTION.—The term 'physical obstruction' means rendering impassable ingress to or egress from a facility that provides reproductive health services, or rendering passage to or from such a facility unreasonably difficult or hazardous.

"(5) REPRODUCTIVE HEALTH SERVICES.—The term 'reproductive health services' includes medical, surgical, counselling or referral services relating to pregnancy.

"(6) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

SEC. 4. EFFECTIVE DATE.

This Act shall take effect with respect to conduct occurring on or after the date of enactment of this Act.

Mr. HATCH. Madam President, I do not intend to take a lot of time.

Mr. BUMPERS. Parliamentary inquiry, Madam President. What is the time agreement on this? Is there a time agreement?

The PRESIDING OFFICER. Forty minutes equally divided.

Mr. KENNEDY. It is the intention of the two managers to take 2 minutes each.

Mr. HATCH. The Senator from Oregon wants 5 minutes. Madam President, I intend to be brief. There is no reason to have a lengthy debate here. We all understand what has been going on. This substitute amendment contains the same tough penalties as the original bill for any violent activity in or near an abortion clinic. It makes a differentiation between violent activity and peaceful civil demonstrations and peaceful civil disobedience. So it clarifies that.

It protects first amendment rights on both sides, and it removes the protection for illegal abortion. It is basically the same bill with the corrections that I think will make it constitutional, that I think would get 100 percent of the Senators to vote for it and, frankly, would show that everybody in this body is against the violence that has been occurring. If it is not accepted, we will be split, and naturally we will not have the unanimity and the support for the bill that all of us would like to see.

That is all I have to say about it. I do not intend to say anything else.

I yield 6 minutes to the distinguished Senator from Oregon.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. HATFIELD. Madam President, several years ago, I supported a resolution in the Senate which condemned

the violent attacks that were being carried out against health care facilities, especially those that provided abortions. At that time I said "the use of violence is never permissible and those who engaged in such acts must accept the full penalty of the law for their actions." I still believe that today. I have always felt that one should work within the law to bring about change—whether it's to stop a war one does not believe in, or to stop the taking of a life through abortion.

As one who opposes abortion, I have worked to change our Nation's law with regard to abortion. I have tried to refocus the debate away from abortion toward the circumstances that lead women to have abortions. As a society, we must address the important causes—the root causes—that force women to choose abortion. We have the tools to make abortion a moot issue, if only we can move beyond the issue of whether abortion is right or wrong, to the real life situations that force women to make that choice. We have made progress, but we still have a long road ahead of us.

. Madam President, it is after much thought and consideration that I rise today to oppose the legislation before us. I do so not because I support or condone in any way the violent attacks that are being carried out—I do not—it is because I oppose creating Federal penalties that focus primarily on those individuals who oppose abortion by singling out abortion-related facilities for special treatment. Those who support this legislation do not dispute this fact, although changes have been made in the bill so that these penalties extend to pro-life counseling centers as well. They argue that the attacks and violence are directly attributable to those individuals in the pro-life movement. To me, by creating this special category we are perpetuating the divisions between pro-life and pro-choice supporters and making it more difficult to focus on the root causes of abortion.

Although there is precedent in the law for the creation of Federal criminal penalties to protect a specific industry, this legislation was only passed last year. It is important to note that although Federal law regulates labor disputes that interfere with the flow of commerce, State penalties apply to acts of violence that result from labor disputes. With this limited history, I am not convinced that creating a new Federal cause of action targeted to a specific enterprise with both criminal and civil penalties is the appropriate response.

In fact, at this time I am inclined to support new Federal penalties only in the broadest of perspectives; that is, to protect public access to all commercial enterprises. Drawing upon the idea put forth by our distinguished colleague from Kansas, Senator KASSEBAUM, why should we tolerate any acts of violence whether they be against health care facilities, medical research facilities,

churches, or small businesses? If we are going to create a Federal cause of action, let us send the message that we, as a society, will not accept violent attacks which prevent people from exercising their constitutional rights in any setting.

Supporters of this legislation have argued vigorously against broadening the scope of the bill beyond abortion services. They state that problems with violence have not been sufficiently documented to warrant such an expansion, and where problems exist State and local laws have provided adequate deterrents. For me it is an issue of fairness. How can one differentiate between violence that results from a clinic blockade versus the violence that results from a labor dispute? What about violent attacks by environmentalists, or antiwar protesters. Is tree spiking any worse than spraying noxious fumes into a clinic? I do not think so. They are both acts of violence that disturb the flow of commerce. And if we are going to create a Federal cause of action to address these acts, we should not treat them differently.

Madam President, I understand the ramifications of the violence to which many health care facilities have been subjected. In my own State of Oregon during 1992 three clinics were attacked by arsonists who caused substantial damage. That is why the Oregon Legislature recently revised the State's criminal mischief statute to provide stronger criminal penalties for acts of violence that damage, disrupt, or interfere with access to essential public services, including medical facilities obtained at doctors offices and places where licensed medical practitioners provide health care services.

I might also say that I believe that the State and Federal authorities should work together to prosecute those who are responsible for violent acts that prevent individuals from accessing those services.

Such disruptions now constitute a class C felony under Oregon law. This law gives State prosecutors a stronger means to punish those who interfere with a woman's right to seek a legal abortion. I fully support Oregon's legislation to protect access to essential public services because it applies broadly to all public services. And, I believe State and Federal authorities should work together to prosecute those who are responsible for violent acts that prevent individuals from accessing these services. This violence cannot be tolerated.

As I stated earlier, this type of legislation should be broader in scope, aimed at preventing violence in all places of commerce.

I hope that before supporting this legislation, my colleagues will carefully weigh the issue of fairness and evenhandedness in crafting Federal penalties as a deterrent to acts of violence. Instead of singling out abortion-related facilities for special treatment,

let us work together to address the causes of abortion in order to remove the need for protests and blockades and to make abortion a moot issue.

Madam President, let me also say until we begin to talk about contraception and the perfectability of contraception and medical research, until we begin to talk about sex education in our schools and elsewhere, we are still dealing with only the results that force women into actions of abortion.

Mr. HATCH. Madam President, I have been informed that I need to yield 5 minutes to the distinguished Senator from New Hampshire. I believe he will be the last to speak on our side.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. SMITH. Madam President, the debate today, unfortunately, has gotten off the focus. All of us who have spoken out on this bill are supportive of what Senator KENNEDY has in his legislation regarding violence. But we are not talking about violence in some of the examples we have seen here. We are talking about nonviolence.

You would think that all of the people who have been out there in the prolife movement and have protested against abortion clinics were murderers and violent criminals, to hear the debate. Unfortunately, though, there has not been a lot of focus on some of the comments that have been made by those on the other side.

I have here with me a copy of a booklet called "Clinic Defense, A Model, First Edition," March 1990, which was published by the Bay Area Coalition Against Operation Rescue. It might be interesting to hear some of their comments.

Here is their basic philosophy:

Our philosophy is that our first line of defense for protection of reproductive rights is self defense. We cannot rely on courts, police or legislators to protect our fundamental rights to control our bodies and reproductive options.

We have heard that many organizations tell people not to "touch" Operation Rescue, but this, of course, is not really clinic defense.

We are prepared to pick 'em up and move 'em out. This can be done in a concerted way, using several or all of us at a time, to maximize effectiveness, and to minimize danger to individual defenders from police.* * *

Work with defenders around you to focus on a person or persons who need to be removed; identify them, and push the Operation Rescue out from one defender to the next until they are put out of the defense line.

Listen to this:

Rescuers have an inordinate sense of modesty and "honor" about being accused of touching women. There are innumerable instances of clinic defenders neutralizing male OR's by shouting, "get your hands off me, don't you dare touch me," all the while they are tugging or pushing Operation Rescue out of the line.

These are the tactics coming from the other side—and that is not everybody, and I do not imply that it is everybody. It even gets worse. I quote

again from the booklet, which reads as follows:

Clinic Escorting. As Operation Rescue has shifted to picketing and blockading, we've learned that we can't relax and just let them "just" picket.

Mr. President, I ask unanimous consent that this document be printed in the RECORD, because it speaks for itself.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[Bay Area Coalition Against Operation Rescue (BACAOR)

CLINIC DEFENSE: A MODEL

BACAOR STRATEGY

Our philosophy is that our first line of defense for protection of reproductive rights is self defense. We cannot rely on courts, police or legislators to protect our fundamental rights to control our bodies and reproductive options.

CLINIC DEFENSE TACTICS

We have heard that many organizations tell people not to "touch" OR [Operation Rescue], but this of course is not really clinic defense.

We are prepared to pick em up and move em out. This can be done in a concerted way, using several or all of us at a time, to maximize effectiveness, and to minimize danger to individual defenders from police, OR, or OR cameras.

Work with defenders around you to focus on a person or persons who need to be removed, identify them, and push the OR out from one defender to the next until they are put out of the defense line.

[Rescuers] have an inordinate sense of modesty and "honor" about being accused of touching women. There are innumerable instances of clinic defenders neutralizing male OR's by shouting "get your hands off me, don't you dare touch me" all the while they are tugging or pushing OR out of the line.

THE POLICE

We do not call police ourselves during a hit. Our best work is done before police arrive, or when there are not enough police there to prevent us from doing what we have to do. Get in place before cops can mess with it; establish balance of power early, do key acts requiring physical contact with OR as much as possible before cops have enough people to intervene.

Try to keep them out of it. If they are cruising by, wave them on. Be a voice of authority and reason; let them know we have it all under control and everything is just fine, thank you, officer. (Another good argument for official vests or shirts is that it gives us a tremendous amount of authority.)

CLINIC ESCORTING

As OR has shifted to picketing more than blockading, we've learned that we can't relax and let them "just" picket. It's critical to keep pushing, to not lend any legitimacy to their harassment of women on any level. As much as we can, we are drawing lines, saying, no, you cannot picket on the sidewalk in front of the clinic; this is our territory. Go across the street, go away, go wherever—but as far away from the clients as is possible to .assert. Even if the sidewalk is "public," we've had success at putting enough of us out, early enough, to basically bully the ORs into staying across the street.

OR DOGGERS

We assign one or two escorts to be with [sidewalk counselors] at all times—one on one if we can. These "doggers" are there to focus on and engage the OR, and to place

ourselves physically between them and the client. We may use handheld cardboard signs * * * to put up a visual block between the OR and a client.

There are also the marchers * * * who walk around in small groups, pray and harass women from the periphery * * * We assign several escorts per group of these ORs—the object is to round them up and neutralize them.

TACTICS WITH THE ORS

The way people cope with the ORs when there is not a client present runs the gamut from having long philosophical conversations to doing sexual and religious baiting. * * * Having explicitly sexual conversations can really make an anti uncomfortable without directly engaging him. Singing "Goddess" songs while they do their Hail Marys is a lovely way to affirm an alternative view of appropriate religious activities.

Isolate and Humiliate. It is critical to separate in some way the resident OR leader or troublemakers. We assign them a particular escort and do our best to isolate them from the others by getting them to lose their cool, look foolish, argue with us, etc. Although in general sexual jokes or extreme harassment are not useful with the OR picketers (they tend to settle right into martyrdom) if baiting an OR about his treatment of women, his sexuality, and how many times he masturbates will keep him from bothering clients and from being able to effectively direct the others, do it.

Remember, we are under no obligation to be polite to these people. They are here to harass women and torment them, and no matter how nice they are to you, that agenda doesn't change. They have already broken Miss Manners code by being at the clinic at all—don't let them think they can make up for it by being "polite."

TEMPORARY RESTRAINING ORDERS

A Temporary Restraining Order (TRO) is a legal device currently in use by several clinics across the country. * * * One example of a TRO's application to certain situations is to prevent a picketer from walking or standing in a given area. This is useful when the sidewalk area fronts the clinic closely, and a "legal" moving sidewalk picket by OR in that area would legally allow OR to get very close to incoming clients. Some clinics have been successful in getting the court to authorize a "free zone," such as a 5-foot wide space from a clinic entrance to the street where picketers are prohibited from stepping. One clinic obtained a TRO to keep picketers out of a private parking lot. Restraining picketers from approaching the client's cars has also been granted.

We believe the clinics are not a legitimate forum for anti-abortion harassment, and it is not a "free speech" issue. Of course in some instances, a TRO may act as a deterrent to picketers and reduce their presence or effect at the clinic, but in cases where determined groups of OR have made it clear they will be there every single week, the struggle to abide by the arbitrary "rules" set forth by a TRO can be prohibitive of other tactics escorts may need to effectively keep OR at bay.

Mr. SMITH. I will conclude my portion of the debate, since I have been here engaging in it since 8 o'clock this morning.

To sum up, Mr. President, there are five reasons why S. 636 should be defeated. First, it is extreme. Second, it sets a terrible precedent. Third, it is vague. Fourth, it is hypocritical. And fifth, it is unconstitutional.

Let me be specific. There is no distinction in the bill between the violent and the peaceful protesters. You can conduct a sit-in peacefully, as a nun might do, praying with her rosary, and be put in jail for as long as 18 months, and can be fined $25,000 for simply sitting and saying the rosary if you block the entrance.

Read the legislation if you do not think that is true.

Second, it is a terrible precedent. It is going to come back and bite some of the very people who have been such strong proponents of this legislation today. That is because some day, somewhere along the line in the future, there is going to be another social or political protest movement that you are going to want to support. And those who oppose that movement will be back out here opposing these kinds of harsh penalties on that movement. When that happens, you are not going to see this Senator out here saying you cannot do that. I am not going to be that hypocritical.

S. 636 does not define "physical obstruction"; it is very vague. There is no distinction. It is hypocritical for the very reason I gave. We did not see this same protest against the civil rights movement—and rightfully so—or for labor's right to protest in front of a business. We do not see it with the environmentalists, who are perhaps protesting against logging or some other matter.

S. 636 is unconstitutional, very simply, because freedom of speech and assembly is protected in the first amendment and it is being denied under this legislation. This is a very radical bill, and it is very unfortunate, frankly, that the amendment offered—the substitute by Senator HATCH—is not going to pass and that many of the amendments that Senators NICKLES, COATS, myself and Senator HATCH have offered all day have been defeated. It is unfortunate. I think we are going to see a serious constitutional challenge to this bill, and rightfully so. I hope that challenge is successful.

I yield the floor.

Mr. KENNEDY. Madam President, first of all, I want to express, on behalf of Senator BOXER and others, our appreciation for the cooperation that we have received here. We hope that the Senate will reject the amendment of the Senator, the substitute amendment. Effectively, what it represents is an assembling of all of the other amendments we have rejected during the course of the day. That is the bottom line. It is another vote on everything that we have rejected earlier today.

A final point. I will put into the RECORD a list of all of the organizations that have embraced and support our current underlying legislation, which represent the State attorneys general; various religious organizations, business and professional; various women's organizations; medical and health organizations.

I ask unanimous consent that that list be printed in the RECORD.

There being no objection, the list was ordered to be printed in the RECORD, as follows:

### ENDORSERS OF S. 636
#### WOMEN'S ORGANIZATIONS
American Association of University Women
  Black Women's Agenda, Inc.
  B'nai B'rith Women
  Center for Women Policy Studies
  Clearinghosue on Women's Issues
  Coalition of Labor Union Women
  Fund for the Feminist Majority
  General Federation of Women's Clubs
  Mexican American Women's National Association
National Association of Commissions for Women
  National Council of Jewish Women
  National Displaced Homemakers Network
  National Organization for Women
  NOW Legal Defense and Education Fund
  National Women's Conference Center
  National Women's Conference Committee
  National Women's Law Center
  National Women's Party
  National Women's Political Caucus
  Older Women's League
  Women for Meaningful Summits
  Women of All Colors
  Women's Action for New Directions
  Women's Activist Fund
  Women's International League for Peace and Freedom
  Women's Legal Defense Fund
  YWCA of the USA

#### REPRODUCTIVE RIGHTS ORGANIZATIONS
National Abortion Federation
National Abortion Rights Action League
Planned Parenthood Federation of America

#### MEDICAL AND HEALTH ORGANIZATIONS
American College of Obstetricians and Gynecologists
  American Medical Association
  American Medical Women's Association
  American Nurses Association
  American Psychological Association
  National Black Women's Health Project
  Society for the Advancement of Women's Health Research
  Women's International Public Health Network

#### CIVIL LIBERTIES ORGANIZATIONS
American Civil Liberties Union
People for the American Way
Women's Institute for Freedom of the Press

#### BUSINESS AND PROFESSIONAL ORGANIZATIONS
National Federation of Business and Professional Women
National Association of Negro Business and Professional Women's Clubs, Inc.
National Association of Social Workers

#### RELIGIOUS ORGANIZATIONS
American Ethical Union
American Humanist Association
American Jewish Committee
American Jewish Congress
Americans For Religious Liberty
Catholics for a Free Choice
Methodist Federation For Social Action
National Service Conference of the American Ethical Union
Presbyterian Church (USA), Washington, D.C. Office
Presbyterians Affirming Reproductive Options
Religious Coalition for Abortion Rights
Union of American Hebrew Congregations
United Church of Christ, Board for Homeland Ministries

United Church of Christ, Coordinating Center for Women
United Church of Christ, Office for Church and Society
United Methodist Church, General Board of Church & Society, Ministry of God's Human Community
United Synagogue of Conservative Judaism
Women of Reform Judaism: National Federation of Temple Sisterhoods

#### STATE ATTORNEYS GENERAL
National Association of Attorneys General

#### PUBLIC POLICY ORGANIZATIONS
Center for the Advancement of Public Policy

Mr. KENNEDY. It is my hope that we reject the substitute and move to final passage. I am prepared to yield my time.

Mr. HATCH. I am prepared to yield my time, but I will make one last comment. Yes, this contains corrections, but it is exactly the same bill as Senator KENNEDY's with the corrections made. I hope that we can accept this amendment.

I yield the remainder of my time, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The question now occurs on amendment No. 1198 offered by the Senator from Utah.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. FORD. I announce that the Senator from North Dakota [Mr. DORGAN] is necessarily absent.

The PRESIDING OFFICER (Mr. CAMPBELL). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 38, nays 61, as follows:

[Rollcall Vote No. 372 Leg.]

#### YEAS—38

| | | |
|---|---|---|
| Bennett | Faircloth | Lugar |
| Bond | Ford | Mack |
| Breaux | Gramm | McCain |
| Burns | Grassley | McConnell |
| Coats | Gregg | Murkowski |
| Cochran | Hatch | Nickles |
| Conrad | Hatfield | Pressler |
| Coverdell | Heflin | Roth |
| Craig | Helms | Smith |
| D'Amato | Hutchison | Thurmond |
| Danforth | Johnston | Wallop |
| Dole | Kempthorne | Warner |
| Exon | Lott | |

#### NAYS—61

| | | |
|---|---|---|
| Akaka | Glenn | Moynihan |
| Baucus | Gorton | Murray |
| Biden | Graham | Nunn |
| Bingaman | Harkin | Packwood |
| Boren | Hollings | Pell |
| Boxer | Inouye | Pryor |
| Bradley | Jeffords | Reid |
| Brown | Kassebaum | Riegle |
| Bryan | Kennedy | Robb |
| Bumpers | Kerrey | Rockefeller |
| Byrd | Kerry | Sarbanes |
| Campbell | Kohl | Sasser |
| Chafee | Lautenberg | Shelby |
| Cohen | Leahy | Simon |
| Daschle | Levin | Simpson |
| DeConcini | Lieberman | Specter |
| Dodd | Mathews | Stevens |
| Domenici | Metzenbaum | Wellstone |
| Durenberger | Mikulski | Wofford |
| Feingold | Mitchell | |
| Feinstein | Moseley-Braun | |

#### NOT VOTING—1

Dorgan

S 15724        CONGRESSIONAL RECORD — SENATE        *November 16, 1993*

So the amendment (No. 1198) was rejected.

Mr. KENNEDY. Mr. President, I ask for the yeas and nays on final passage.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second.

The yeas and nays were ordered.

Mr. HATCH. Mr. President, like millions and millions of other Americans opposed to abortion, I categorically and unequivocally condemn acts of violence against abortion clinics and their personnel. Such desperate acts of violence are no answer to the violence of abortion itself.

S. 636 is not, however, a well-honed or appropriate Federal response to the problem of violence outside abortion clinics. I will identify some of the major defects in S. 636, but before I do, let me offer a couple observations prompted by our ongoing consideration of the crime bill.

We have heard much over recent days from both the majority leader and Senator BIDEN about the need to recognize the primary role of States in criminal law enforcement. I agree very much with this, and have worked hard to make sure that State and local law enforcement will have the resources that they need to combat the growing problem of violent crime on our streets.

The need to recognize the primary role of State and local law enforcement is especially compelling on such matters as trespass. Unfortunately, S. 636 betrays this principle. Lending Federal enforcement assistance where needed is one thing; federalizing local trespass law is quite another. S. 636 would do the latter, and it thereby contravenes the sound counsel that the majority leader and the Senator from Delaware have been offering.

We have also heard much in recent days about the shortage of prison space in this country and the need to make sure that violent offenders serve their full sentences. Here again, S. 636 violates this counsel, as it would subject large numbers of people who have engaged in entirely nonviolent activity to Federal prison terms.

Let me now highlight the core provisions of S. 636, and then identify the major defects that I see in that bill. S. 636 would make activity that is already illegal under State law also a crime under Federal law, and would subject such activity to extremely harsh penalties. Under the bill, anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been * * * obtaining or providing pregnancy or abortion-related services" would face a criminal penalty of 1 year in jail and a large fine for a first violation, and 3 years in jail and a larger fine for any subsequent violation. In addition, S. 636 would also authorize private parties, the Attorney General and State attorneys general to seek large civil penalties against such

person. For example, private parties could obtain $5,000 per violation plus unlimited private punitive damages, and both the U.S. Attorney General and State attorneys general could obtain civil penalties of thousands of dollars per violation.

These extremely harsh penalties might well be warranted if S. 636 addressed only violent activity. Here again, however, it must be emphasized that States already have and impose even more severe penalties for violent activity, and a slew of Federal statutes is also available to address violent conduct.

A major defect in S. 636 is that, notwithstanding all the rhetoric you will hear about violence, S. 636 entirely fails to differentiate between violent and nonviolent activity. Under S. 636, a person who commits an entirely peaceful violation—a grandmother, for example, sitting silently with a group of others on a sidewalk outside an abortion clinic—is subject to the same stiff penalties as a person who brandishes a gun.

I respectfully submit that this failure to differentiate between violent and nonviolent activity betrays core principles that we all should cherish. Our American tradition recognizes the fundamental distinction between acts of violent lawlessness and acts of peaceful civil disobedience. Acts of violent lawlessness appropriately invite severe penalties. But acts of peaceful civil disobedience—mass sit-ins, for example, that draw on the tradition of Gandhi and Martin Luther King, Jr.—should not be subjected to such steep penalties.

Such acts are, of course, not privileged. Civil disobedience is, by definition, unlawful. Acts of peaceful civil disobedience should, however, be punished roughly in the same manner and to the same extent as like conduct engaged in by anyone else. For example, if protesters commit unlawful trespass, they should be subjected to roughly the same penalties that other trespassers face. To impose a substantially more severe penalty presents the threat of viewpoint discrimination, no matter how cleverly disguised.

Had States during the 1950's and 1960's been able to impose and uphold such severe penalties on peaceful civil disobedience, the civil rights movement might well have been snuffed out in its infancy. A broad range of peaceful antiabortion activity may well be disruptive and may interfere with the lawful rights of others. The same, it must be noted, was true of civil rights protests: they were, and were intended to be, disruptive, and they interfered with the then-lawful rights of others.

It is not my point here to debate the relative moral standing of the antiabortion and civil rights movements. Nor do I suggest that peaceful civil disobedience should not be punished. I would simply like to emphasize the grave danger of viewpoint discrimination inherent in imposing the same se-

vere penalties on peaceful civil disobedience as on violent lawlessness.

It has been and undoubtedly will be contended that S. 636 is modeled on Federal civil rights laws. I must point out, however, that, among other things, the Federal civil rights laws that have been cited do not contain the term "physical obstruction," and they have been construed to apply only to acts of violence or threats of violence. In extending its severe penalties to peaceful civil disobedience, S. 636 departs radically from the models on which it purports to rely.

To sum up my first major objection: Violent activity is fundamentally different from peaceful civil disobedience. S. 636 utterly fails to recognize this difference.

The second major problem with S. 636 is that it elevates the right to abortion above even first amendment rights. Let me explain carefully, for this point is critical. I am not here arguing that S. 636 itself violates the first amendment; I will discuss that point shortly, and ultimately the courts would have to decide it. What is beyond dispute is that in the clash between abortion and free speech, S. 636 would provide special protection to abortion that it would not provide to the constitutional guarantee of free speech.

As the testimony at a Labor Committee hearing this spring amply demonstrated, violence and abuse at abortion clinics come from both sides. If this problem is to be dealt with, it must be dealt with evenhandedly.

If S. 636 in its current form were to become law, those persons confronting peaceful, lawful pro-life demonstrators would suddenly have a virtual license to harass and provoke them, since they would know that the slightest bit of retaliation would subject the pro-life demonstrators to the severe penalties under the bill. The clear lesson of history is that peace is not achieved by disarming only one of the contestants. The way to achieve peace is to treat both sides equally and to make clear that conduct that is unacceptable by one side will be unacceptable by the other.

Consistent with these principles, it is imperative that those exercising their lawful first amendment rights to speak out against abortion have the same protections from violence and abuse as those seeking abortion. Unless the right to abortion is to be elevated above even the first amendment, the penalties under the bill should be extended to those who, by force or threat of force, injure, intimidate, or interfere with persons lawfully exercising their first amendment rights at abortion-related facilities.

The third major problem with S. 636 is that it would surely chill the exercise of first amendment rights. In practice, of course, those who would have to take account of the prospect of the draconian penalties under S. 636 would be not simply those who would actually engage in the activities prohibited

by it, but also those who might even possibly be alleged—rightly or wrongly—to have engaged in those activities. Because S. 636 delegates an astonishing amount of what is in essence prosecutorial authority to State attorneys general and to private parties—including abortion clinics—and because it offers them the bonanza of substantial monetary penalties, it is a virtual certainty that innocent persons who have done nothing more than engage in the lawful exercise of their first amendment rights will be targeted and pursued. The chilling effect on legitimate first amendment speech is therefore likely to be intense.

Another glaring defect of S. 636 is that it would protect illegal abortions. As a result, it could effectively cripple most or all State regulation of abortion, including regulation that serves solely to protect the health of those obtaining abortions. For example, an unlicensed late-term abortionist would, under the plain language of the bill, have a civil cause of action for at least $5,000 in compensatory damages and for punitive damages against State officials who attempted to prevent him from performing illegal abortions.

The supporters of S. 636 may claim that it would not create any liability for enforcement by State or local law enforcement authorities of State or local laws. This claim, however, is not supported by the text of S. 636. Nothing in the provision defining prohibited activities exempts enforcement activities by State officials. Likewise, the relevant rule of construction provides merely that S. 636 shall not be construed to "prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section"; it does not provide that S. 636 shall not be construed to subject State officials to liability for enforcement activities.

In short, S. 636 would nominally permit enforcement of State laws regulating abortion, but it might well give those subject to enforcement a separate, and extremely potent, civil cause of action against State officials. Moreover, S. 636 would clearly give illegal abortionists the same extremely potent civil cause of action against any good samaritan citizen who responsibly attempted to deter an imminent and dangerous illegal abortion.

The stated rationale for S. 636 is that those exercising a legally protected right should be protected in exercising that right. That rationale plainly does not extend to protection of unlawful conduct, such as illegal abortion.

It has been suggested by the supporters of the bill that protection of illegal abortions is necessary to prevent the possibility of abusive litigation discovery. But the danger of abusive discovery exists in every piece of litigation, and our system has developed a workable method of preventing such abuses: the trial judge will control what discovery is and is not permissible. It is disturbing, to say the least, that S. 636

would protect illegal abortions in order to eliminate routine aspects of litigation that all other litigants in this country face.

My final major objection to S. 636 is that it discriminates against the pro-life viewpoint. Granted, this discrimination is cleverly disguised. But, as the Supreme Court recently reemphasized in Church of Lukumi versus Hialeah [(U.S. June 11, 1993)], "[f]acial neutrality is not determinative" of a statute's compliance with the first amendment. Id., at 12. While the Church of Lukumi case concerned the free exercise clause of the first amendment, there is every reason to believe that its analysis applies equally to the first amendment's free speech clause. Among the lessons of the Church of Lukumi case are that the first amendment "protects against government hostility which is masked, as well as overt," slip op., at 12, and that "the effect of a law in its real operation is strong evidence of its object," id. at 13.

S. 636 clearly masks a hostility to the pro-life viewpoint. While facially neutral as between abortion facilities and pro-life facilities, it fails to provide pro-life speakers the same needed protection from violence and abuse as those seeking and providing abortion. It also singles out abortion-related activity for harsh penalties that do not apply to many other causes engaged in similar conduct. The clearly intended effect of S. 636 in its real operation would be to disadvantage pro-life speech significantly.

I have many more substantive objections to the bill. For example, the delegation of so much enforcement authority to private and State entities undermines a stated rationale for the bill: the asserted need for careful, coordinated Federal action.

Finally, Mr. President, one of my concerns with this bill is that it would treat violence differently depending on the cause engaged in the violence. In other words, any action, from the mundane to the deadly, would be covered by the bill if the targets of this action provide abortion services.

The same is not true for those who do not provide abortion services. If a striking union member kills another employee, if a group of strikers goes on a rampage and burns and destroys property, if they blockade traffic, harass local citizens, and threaten spouses and children—the bill is silent. According to the proponents, the only violence worth addressing in Congress is violence committed against those who provide abortion services. All other victims are somewhat less important.

What makes this proposition even more incredible is that the record of union violence in recent decades is so pronounced. Even this year, we have seen an incredible degree of violence in connection with an ongoing strike by the United Mine Workers of America.

Mr. President, I ask unanimous consent that a list of examples of the kind of violent acts that have marred Unit-

ed Mine Worker strikes be included in the RECORD at the conclusion of my remarks. This union is not alone, however. There are many other examples of union violence over the past decades.

The point is, Mr. President, that I believe labor violence in recent years equals if not surpasses the degree and amount of violence against abortion clinics.

There should be not politically acceptable violence. Killings, shootings, beatings, countless threats and millions of dollars in property damage should not be ignored simply because they are committed in connection with a labor dispute. There is no logical reason while the millions of Americans who have been victimized by labor violence should not enjoy the same protections that my colleagues are so ready to provide to those who run abortion clinics.

Mr. President, I was prepared to offer an amendment to correct this failure in the legislation but I have been told that one of my colleagues will offer the striker replacement bill as a second degree amendment to mine. My only recourse under the existing unanimous-consent agreement would be to offer second degree amendment after second degree amendment, which would violate the spirit of the agreement.

Consequently, I will not offer my amendment. Instead, my colleagues will be asked to vote today to endorse the notion that those who provide abortion services are more important than any other Americans. We will be asked to endorse the inexplicable position that violent acts against abortion clinics deserve congressional attention but killings, beatings, and rampages during labor strikes do not. That is simply not acceptable.

### EXAMPLES OF VIOLENCE

In September 1979 during a United Mine Workers strike in Wayne County, KY, a coal company's security guard was shot only 2 hours after an injunction was ordered prohibiting violence at the facility.

In June 1980 a United Mine Worker official was arrested for shooting a mine security guard in the back with a high-caliber hunting rifle.

In April 1981 striking mine workers and coal truck drivers engaged in a gun battle that wounded four men.

In May 1981 striking coal miners went on a destructive rampage in West Virginia, burning trucks, smashing office windows, and setting fire to the office of a coal company.

Also in May 1981 a nonunion mine was assaulted by heavy gun fire coming from striking United Mine Workers.

In February 1982 the home of the chief negotiator for a coal company was hit by dynamite bombs 2 days in a row.

In May 1985 a 35-year-old man was killed by snipers as he drove a truck that had been hauling nonunion coal. The man left behind two children and a pregnant wife.

Also in May 1985 another coal truck driver was shot and injured by sniper fire as he was transporting coal during a strike.

In August 1985 an owner of a strike-bound coal company was hit by sniper fire at his facility.

A State court in Virginia issued a restraining order against the United Mine Workers following union violence during the Pittston strike. Fines stemming from that order have exceeded $50 million. The union has appealed the order to the Supreme Court. The Clinton administration has filed an amicus brief in support of the right of the State court to impose the order and the fines.

In 1987, the Fourth Circuit Court of Appeals issued an order against the United Mine Workers as a result of the union's violence against subsidiaries of the A.T. Massey Coal Co. Under the order, which was intended to curb future violence, the union is required, among other things, to train its members about appropriate conduct during a strike, to teach them that firearms are not allowed on the picket line, and that blockades, attacks on motor vehicles, and similar conduct was not permissible.

During February 1993 it is reported that at several mines, windows were broken in trucks and cars; rocks were thrown at supervisors and guards; steel balls and bolts were fired from slingshots at guards and supervisors; a supervisor was shot with a pellet gun; a truck was burned by a Molotov cocktail; and gunshots were fired into the side of a mine office.

On May 18, 1993, a train, which had left a mine in Perry County, IL, was derailed outside of Coulterville. Several strikers had placed flares on the track, forcing the engineer to stop the train. While some of the strikers were asking the engineer to return the train to the mine, someone tampered with the emergency braking system. When the engineer focused on fixing the braking system, the bottoms of several of the cars were opened, dumping more than 500 tons of coal on the tracks. When the train began to move again, five cars were derailed. It took the railroad over 12 hours to clean up the coal, reset the cars on the track, and reopen the rail line. The railroad will have to pay for these damages. Several days later, supervisors discovered that several spikes holding rails in place had been removed or loosened minutes before another train passed over a track on company property.

On the night of June 1, 1993, a pipe bomb exploded outside a mine supervisor's home in Perry County, IL. Metal fragments from the bomb struck the side of the house, blew a hole in the yard and damaged a fence. The supervisor, his wife, and children were at home at the time of the explosion. The Bureau of Alcohol, Tobacco, and Firearms is investigating the bombing.

On June 3, 1993, after dropping off wire rope at a mine in Perry County,

IL, a truck driver was followed by a pickup truck with Illinois license plate, "UMWA 12." The driver of the pickup repeatedly attempted to pass the truck, while his passenger threw jackrocks at the truck's tires. The truck was followed into Missouri, where the truck driver was able to call the police. The police arrested the driver and owner of the pickup, who was also the president of the United Mine Workers local at the mine. When they searched the pickup, the police found an M-1 carbine, a .38 automatic pistol and clip, a .22 caliber pistol, firecrackers, a slingshot, ball bearings, jackrocks, a radio scanner, a two-way radio, electronic eavesdropping equipment, an ice-pick, a variety of camouflage clothing, and a ski mask.

On June 8, 1993, a convoy of supply trucks attempted to enter the premises of another mining operation. The lead trucks came under attack. The windshield of a petroleum products truck was broken and six of its tires were flattened. Fearing additional damage, the convoy was forced to turn around and not enter the mine.

On June 9, 1993, a striker at another mine attacked a vendor's truck with a baseball bat, while another striker destroyed the truck's radiator. A third striker pointed a pistol at the driver.

On June 13, 1993, an electrical transformer at a mine came under gunfire. The repairmen who arrived to fix the damage caused by the bullets were bombarded with rocks. The local union president and vice president were identified. Later that day, some 21 picketers threw rocks at security guards.

On Sunday, June 13, 1993, at approximately 8 p.m., near a West Virginia mine, a caravan of supervisors in both personal cars and a bus were driving on a public road on their way back to the mine from a weekend break. At a point where the road was being repaired and only one lane was open, more than 20 people dressed in camouflage, hoods, and masks attacked the cars, breaking windshields and damaging the vehicles. The cars driven by women were damaged the most. One person was seriously injured when an individual ran directly up to one car and threw a large rock through the passenger window, striking the passenger on the shoulder and arm.

On June 14, 1993, a fire broke out at a coal company's preparation plant in West Virginia. The fire began when someone opened a valve on a diesel storage tank and set it afire. The fire also destroyed a bulldozer. Jackrocks were placed around five trucks. The damage cost almost $300,000.

On June 18, 1993, a mining supervisor was driving on a public road when he noticed he was being followed. The car sped in front of him and pulled over to the side of the road. The supervisor stopped his car and got out in order to film the other car with his camcorder. When he turned the camcorder on, he was attacked by two employees, whom he recognized. He was knocked to the

ground and kicked, and his camcorder was stolen.

Late at night on June 19, 1993, some 200 picketers massed at a wooden bridge near the entrance of a West Virginia mine. The security guards became worried and called for reinforcements. The strikers dumped tires and other debris on the bridge and set them on fire in an attempt to burn down the bridge. The local fire department was called but refused to cross a picket line. The guards fired tear gas into the mob to disperse it and shots were fired. The 12 guards were able to put out the fire, but 1, who has responded to the call for reinforcements, was struck in the head by a rock. An ambulance was called but the ambulance was unable to cross the bridge. The emergency personnel were allowed to walk to the injured guard, and he was taken to the hospital, where he received 13 stitches to his face and head. Some 2 hours after being called, the local police arrived at the mine and promptly searched the guards. No weapons were found, since the guards are not armed. The strikers were not searched and finally dispersed at daylight.

On June 23, 1993, rifle fire at a West Virginia coal mine damaged the mine's large, electrical transformer, which provides most of the power for the facility. The cost of the damage was more than $300,000.

On June 30, 1993, at a mine in West Virginia, rifle fire damaged the main electrical transformer, creating more than $500,000 worth of damage.

On July 14, 1993, a 70-ton electrical transformer, which provided power to a mine in Pike County, IN, was vandalized, and the substation was disabled. Electrical service to the mine was lost, but nearly 2,000 other utility customers also lost their power, including 8 people who are on life support systems. The utility was able to make arrangements with the local Red Cross and the sheriff's department to provide temporary shelter and relief for these individuals. It will take a week to replace the transformer, at a cost of more than $500,000 to the utility.

On July 19, 1993, at a mine in West Virginia, strikers threw rocks, damaging several buildings and vehicles and an electrical transformer was ruined by rifle fire. When a tow truck arrived on the scene to remove the damaged vehicles, a striker attempted to throw jackrocks under the truck and was arrested by the police.

On July 21, 1993, at a mine in West Virginia, the electrical transformer was shot several times and disabled, cutting off power to the mine. This mine has been known as a gaseous mine, making electrical ventilation to avoid methane gas buildup especially critical. Several individuals who were underground at the time were forced to evacuate the mine on foot.

On July 22, 1993, Ed York, an employee of an independent contractor, was shot and killed as he tried to leave Arch of West Virginia Ruffner mine.

Mr. York had been cleaning out a pond, a job he had performed for years, to make sure that mine was in compliance with various environmental rules and regulations. This was not work performed by the union. Mr. York was killed when a four car convoy he was in came under attack by camouflage strikers wearing masks. The strikers hurled rocks at the lead vehicle, slowing it down. Several shots were fired and Mr. York was hit in the back of the head and killed.

On October 1, 1993, a foreman at a coal mine in Illinois had his home vandalized. His truck tires were slashed, paint was thrown on the vehicle, and a container of antifreeze was put in the backyard, so that it could be reached by the foreman's prize show dog. The show dog was the mother of 23 championship puppies. Antifreeze is deadly and painful poison for a dog, because it has a sweet aroma and taste that dogs love, but it can cause total kidney disfunction. Despite the efforts of local veterinarians, the dog finally died after several extremely painful days. Four other company supervisors had their homes vandalized the same night.

This month, up to 75 United Mine Workers blocked salaried employees from entering a Blacksville, WV, mine for 2½ hours. The homes of two foremen were vandalized, causing more than 5,000 dollars' worth of damage at one home. Bricks were thrown through one window, landing on a bed where a 12-year-old child was sleeping.

Recently, a Federal grand jury in West Virginia indicted eight people for various criminal acts stemming from the murder of Edward York. The indictment contains the following assertions:

On or about July 22, 1993, defendant Jerry Dale Lowe discharged the Colt Trooper Mark III .357 caliber magnum revolver, serial No. 30259U, striking and killing John Edward York, also known as Eddie York, the driver of a Deskins vehicle.

The PRESIDING OFFICER. If all time is yielded back, the question is on agreeing to the committee substitute amendment, as amended.

The committee substitute amendment, as amended, was agreed to.

The PRESIDING OFFICER. If there be no further amendment to be proposed, the question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed for a third reading and was read the third time.

The PRESIDING OFFICER. The bill having been read the third time, the question is, Shall the bill pass? The yeas and nays have been ordered, and the clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. FORD. I announce that the Senator from North Dakota [Mr. DORGAN] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber who desire to vote?

The result was announced—yeas 69, nays 30, as follows:

[Rollcall Vote No. 373 Leg.]

YEAS—69

| | | |
|---|---|---|
| Akaka | Feingold | Mikulski |
| Baucus | Feinstein | Mitchell |
| Biden | Ford | Moseley-Braun |
| Bingaman | Glenn | Moynihan |
| Bond | Gorton | Murray |
| Boren | Graham | Nunn |
| Boxer | Harkin | Packwood |
| Bradley | Hollings | Pell |
| Brown | Hutchison | Pryor |
| Bryan | Inouye | Reid |
| Bumpers | Jeffords | Riegle |
| Byrd | Kassebaum | Robb |
| Campbell | Kennedy | Rockefeller |
| Chafee | Kerrey | Roth |
| Cohen | Kerry | Sarbanes |
| Conrad | Kohl | Sasser |
| Danforth | Lautenberg | Shelby |
| Daschle | Leahy | Simon |
| DeConcini | Levin | Simpson |
| Dodd | Lieberman | Specter |
| Dole | Mathews | Stevens |
| Domenici | McConnell | Wellstone |
| Durenberger | Metzenbaum | Wofford |

NAYS—30

| | | |
|---|---|---|
| Bennett | Gramm | Lugar |
| Breaux | Grassley | Mack |
| Burns | Gregg | McCain |
| Coats | Hatch | Murkowski |
| Cochran | Hatfield | Nickles |
| Coverdell | Heflin | Pressler |
| Craig | Helms | Smith |
| D'Amato | Johnston | Thurmond |
| Exon | Kempthorne | Wallop |
| Faircloth | Lott | Warner |

NOT VOTING—1

Dorgan

So the bill (S. 636), as amended, was passed, as follows:

S. 636

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Freedom of Access to Clinic Entrances Act of 1993".

**SEC. 2. CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds that—

(1) medical clinics and other facilities throughout the Nation offering abortion-related services have been targeted in recent years by an interstate campaign of violence and obstruction aimed at closing the facilities or physically blocking ingress to them, and intimidating those seeking to obtain or provide abortion-related services;

(2) as a result of such conduct, women are being denied access to, and health care providers are being prevented from delivering, vital reproductive health services;

(3) such conduct subjects women to increased medical risks and thereby jeopardizes the public health and safety;

(4) the methods used to deny women access to these services include blockades of facility entrances; invasions and occupations of the premises; vandalism and destruction of property in and around the facility; bombings, arson, and murder; and other acts of force and threats of force;

(5) those engaging in such tactics frequently trample police lines and barricades and overwhelm State and local law enforcement authorities and courts and their ability to restrain and enjoin unlawful conduct and prosecute those who have violated the law;

(6) this problem is national in scope, and because of its magnitude and interstate nature exceeds the ability of any single State or local jurisdiction to solve it;

(7) such conduct operates to infringe upon women's ability to exercise full enjoyment of rights secured to them by Federal and State law, both statutory and constitutional, and

burdens interstate commerce, including by interfering with business activities of medical clinics involved in interstate commerce and by forcing women to travel from States where their access to reproductive health services is obstructed to other States;

(8) the entities that provide pregnancy or abortion-related services engage in commerce by purchasing and leasing facilities and equipment, selling goods and services, employing people, and generating income;

(9) such entities purchase medicine, medical supplies, surgical instruments, and other supplies produced in other States;

(10) violence, threats of violence, obstruction, and property damage directed at abortion providers and medical facilities have had the effect of restricting the interstate movement of goods and people;

(11) prior to the Supreme Court's decision in Bray v. Alexandria Women's Health Clinic (113 S. Ct. 753 (1993)), such conduct was frequently restrained and enjoined by Federal courts in actions brought under section 1980(3) of the Revised Statutes (42 U.S.C. 1985(3));

(12) in the Bray decision, the Court denied a remedy under such section to persons injured by the obstruction of access to abortion-related services;

(13) legislation is necessary to prohibit the obstruction of access by women to pregnancy or abortion-related services and to ensure that persons injured by such conduct, as well as the Attorney General of the United States and State Attorneys General, can seek redress in the Federal courts;

(14) the obstruction of access to pregnancy or abortion-related services can be prohibited, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or other law; and

(15) Congress has the affirmative power under section 8 of article I of the Constitution as well as under section 5 of the Fourteenth Amendment to the Constitution to enact such legislation.

(b) PURPOSE.—It is the purpose of this Act to protect and promote the public health and safety and activities affecting interstate commerce by prohibiting the use of force, threat of force or physical obstruction to injure, intimidate or interfere with a person seeking to obtain or provide pregnancy or abortion-related services, and the destruction of property of facilities providing pregnancy or abortion-related services, and by establishing the right of private parties injured by such conduct, as well as the Attorney General of the United States and State Attorneys General in appropriate cases, to bring actions for appropriate relief.

**SEC. 3. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

Title XXVII of the Public Health Service Act (42 U.S.C. 300aaa et seq.) is amended by adding at the end thereof the following new section:

"**SEC. 2715. FREEDOM OF ACCESS TO CLINIC ENTRANCES.**

"(a) PROHIBITED ACTIVITIES.—Whoever—

"(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing pregnancy or abortion-related services: *Provided, however,* That nothing in this section shall be construed as expanding or limiting the authority of States to regulate the performance of abortions or the availability of pregnancy or abortion-related services;

"(2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of worship; or

"(3) intentionally damages or destroys the property of a medical facility or in which a medical facility is located, or attempts to do so, because such facility provides pregnancy or abortion-related services, or intentionally damages or destroys the property of a place of religious worship,

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

"(b) PENALTIES.—Whoever violates this section shall—

"(1) in the case of a first offense, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 1 year, or both; and

"(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 3 years, or both;

except that for an offense involving exclusively a nonviolent physical obstruction, the fine shall be not more than $10,000 and the length of imprisonment shall be not more than six months, or both, for the first offense; and the fine shall be not more than $25,000 and the length of imprisonment shall be not more than 18 months, or both, for a subsequent offense; and except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

"(c) CIVIL REMEDIES.—

"(1) RIGHT OF ACTION.—

"(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a medical facility that provides pregnancy or abortion-related services.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

"(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

"(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

"(i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and

"(ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000, for any other subsequent violation.

"(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, and such conduct raises an issue of general public importance, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

"(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).

"(d) RULES OF CONSTRUCTION.—Nothing in this section shall be construed or interpreted to—

"(1) prevent any State from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section;

"(2) deprive State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State or local law;

"(3) provide exclusive authority to prosecute, or exclusive penalties for, acts that may be violations of this section and that are violations of other Federal laws;

"(4) limit or otherwise affect the right of a person aggrieved by acts that may be violations of this section to seek other available civil remedies;

"(5) prohibit expression protected by the First Amendment to the Constitution; or

"(6) create new remedies for interference with expressive activities protected by the First Amendment to the Constitution, occurring outside a medical facility, regardless of the point of view expressed.

"(e) DEFINITIONS.—As used in this section:

"(1) INTERFERE WITH.—The term 'interfere with' means to restrict a person's freedom of movement.

"(2) INTIMIDATE.—The term 'intimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.

"(3) MEDICAL FACILITY.—The term 'medical facility' includes a hospital, clinic, physician's office, or other facility that provides health or surgical services or counselling or referral related to health or surgical services.

"(4) PHYSICAL OBSTRUCTION.—The term 'physical obstruction' means rendering impassable ingress to or egress from a medical facility that provides pregnancy or abortion-related services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous.

"(5) PREGNANCY OR ABORTION-RELATED SERVICES.—The term 'pregnancy or abortion-related services' includes medical, surgical, counselling or referral services, provided in a medical facility, relating to pregnancy or the termination of a pregnancy.

"(6) STATE.—The term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.".

SEC. 4. RULE OF CONSTRUCTION.

Notwithstanding any other provision of this Act, nothing in this Act shall be construed to interfere with the rights guaranteed to an individual under the First Amendment to the Constitution, or limit any existing legal remedies against forceful interference with any person's lawful participation in speech or peaceful assembly.

SEC. 5. EFFECTIVE DATE.

This Act shall take effect with respect to conduct occurring on or after the date of enactment of this Act.

Mr. KENNEDY. Mr. President, I move to reconsider the vote by which the bill was passed.

Mrs. BOXER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KENNEDY. I want to extend my appreciation to the staff who did such an excellent job on developing and facilitating passage of this legislation, particularly Judy Appelbaum of my staff who did outstanding work on her first major piece of legislation. I offer my thanks to the following staff for all their efforts: Senator KENNEDY: Judy Appelbaum, Jeff Blahner, Ron Weich, Lucy Koh; Senator BOXER: Rebecca Rozen; Senator HATCH: Ed Whalen, Sharen Prost; Senator MIKULSKI: Robyn Lipner; Senator FEINSTEIN: Alexander Russo; Senator MURRAY: Helen Howell; Senator MOSELEY-BRAUN: Dana Bender; Senator KASSEBAUM: Kimberly Barnes-O'Connor; Senator DURENBERGER: Dean Rosen.