## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | |
| LAUREN HANDY, ET AL, | : | NO. 1:22-cr-00096(1)CKK |

### DEFENDANT HANDY'S RESPONSE TO GOVERNMENT'S MOTION IN LIMINE

### ARGUMENT

#### I. The Government's Motion Generally

The proper purpose of a motion in limine is to address complex and troublesome evidence, or head off improper evidence, in advance of trial so that it doesn't have to be dealt with while a jury sits and waits. But the propriety of most evidence cannot be reliably determined until its relevance has been established by related evidence or questioning that has actually appeared at trial. Blanket rulings, in advance, on whole subjects of imagined evidence, are premature:

> "Courts should 'exclude evidence on a motion in limine **only** when that evidence is determined to be **clearly** inadmissible on **all** potential grounds.'"
>
> *United States v. Georges*, No. 2:20-CR-157 (2), 2021 WL 4191223, at *2 (S.D. Ohio Sept. 15, 2021) (quoting *Delay v. Rosenthal Collins Grp., LLC*, No. 2:07-CV-568, 2012 WL 5878873, at *2 (S.D. Ohio Nov. 21, 2012)) (emphasis added).

In the Government's Omnibus Motion In Limine ("Omnibus Motion"), the Government seeks vague and extraordinarily broad *in limine* rulings, which it attempts to justify in the interest of an "efficient trial". (Dkt 248, p. 2). But, what the Government deems "efficiency" cannot be allowed to trump fairness.  The Government seeks to improperly circumscribe in indefinite terms, Defendant's ability to fairly defend herself against the conduct charged.  The government seeks to

expansively exclude what may be relevant evidence and counsel's ability to advocate on Defendant's behalf at trial.  This Court should reject those efforts.

With limited exceptions as set forth herein, the motion should be denied.  "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise."  *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975).  The Court should deny the Omnibus Motion and require the Government to object to whatever it deems improper at the time of trial so that the Court is able to rule on those objections in context rather than barring entire categories of vaguely defined evidence and argument without reference to what the Court is actually being asked to rule upon.

If there is any chance the evidence (or argument) may be admissible on some basis, the motion should be denied, and the matter addressed in the specific context of the facts of the case as they evolve at trial.

## II. Specific Subjects of the Government's Motion

### 1.  Jury Nullification

The Government asks this Court for an order barring defendants from "arguing or commenting in a manner that encourages jury nullification." (Dkt. 248, pp. 2-8).  The Government identifies three specific categories of "jury nullification" argument that it seeks to exclude.  However, other than those categories, the Government fails to specifically identify what would be encompassed in its request that Handy be foreclosed from any argument or comment "that encourages jury nullification."  Handy addresses the specific categories identified by the Government below, but the Court should deny the motion (with limited specific exceptions discussed *infra*) because the

Government fails to identify what would be prohibited under such a blanket prohibition, the requested prohibition encompasses appropriate comment and argument, and any such blanket prohibition can only unfairly hinder Handy's defense for fear of running afoul of the expansive and amorphous proscriptions proposed by the Government.

For example, a statement to the jury that it should return a verdict that truth dictates, and justice demands could be encompassed by the prohibition sought by the Government.  Indeed, any statement to the jury that references justice or fairness could be encompassed by the prohibition requested by the Government (*e.g.,* the jury decides what is just, the jury is charged with returning a just and fair verdict, the jury delivers justice, the jury must decide the case in a just and fair manner).  The extraordinary scope of the Government's motion, and its wholly amorphous contours (which make it impossible to comply with), are demonstrated by its acknowledgement that it seeks to bar any mention of matters that may "implicitly encourage" jury nullification or which may "attempt to entice" jury nullification.  (See Dkt 248, p. 8, arguing that the Court should bar any mention of statements relating to the Superior Court prosecution, its dismissal or suggesting governmental overreach in charging federal offenses). In the same vein, the Government argues that evidence relating to the dismissal of the D.C. code violation charges against Defendant, and argument that the Government has turned an unlawful entry into a federal case, might "implicitly encourage jury nullification by suggesting that the jury should not care about the offense…." (Dkt 248, p. 8).  In other words, the Government not only seeks to bar any statement intended to encourage jury nullification but also any statement which the jury could potentially interpret as "implicitly encouraging" jury nullification. See *U.S. v. Georges*, No. 2:20-CR-157, 2021 WL 4191223, *5 (S.D. Ohio 9/15/2021) (granting motion in limine to exclude

argument  "explicitly encouraging jurors to disregard applicable law" but denying a "a blanket exclusion concerning all arguments that could conceivably be construed as *encouraging* the jury to disregard its duty" and indicating it would rule at trial on "attempts to advance such indirect arguments."  [Emphasis in original.]. As in *U.S. v. Georges*, this Court should deny the motion in limine to the extent that it seeks to bar all arguments that could conceivably be construed as encouraging the jury to disregard its duty and rule on any objections the Government may assert at the time of trial.

A.      **"Statements regarding punishment or collateral consequences of conviction."**

The Government argues, "Defendants should be prohibited from referencing potential punishment or any collateral consequences of conviction at any stage of the trial in this matter."  (Dkt 248, p. 4). Handy acknowledges that the courts have held that when a jury will play no role in sentencing it should not be advised of the potential punishment that may be imposed upon a conviction.  For that reason, Handy does not object to that aspect of the Government's motion.

However, the Government does not explain what it means by "collateral consequences of conviction", and it fails to cite any precedent defining "collateral consequences of conviction" or holding that exclusion of "collateral consequences of conviction" is appropriate.  Accordingly, that aspect of the Government's motion should be denied. If the Government deems some matter at trial improper because it references what it considers to be the "collateral consequences of conviction", it should be required to object and the Court should address the propriety of any such matter at that time and in the context in which it is raised.  See *U.S. v. Ramirez*, No. 6:09-CR-45-ORL-35KRS,  2009 WL 10675380, *2 (M.D. Fla. 11/5/2009) ("As to collateral consequences,

Defendant Ramirez's response is well-taken. The Government has not presented any legal authority that precludes reference to potential collateral consequences if convicted. Additionally, and more importantly, the Court cannot make a determination as to the admissibility of such references in the abstract. At trial, the Government may make objection to any such references as they arise and as necessary, and the Court will make a ruling on the objection(s) at that time.")

**B.     "Statements regarding Governmental vindictiveness or abuses by the Department of Justice."**

The Government seeks an order prohibiting "any reference to, or arguments concerning, alleged political motivations underpinning the United States' prosecutorial decisions."  (Dkt 248, p. 5). The Government asserts that such references and arguments would be improper because the Government has discretion in determining whether to charge and would encourage jury nullification. The Government asserts that if Defendants' motions to dismiss the indictment are denied, "it would be improper for the Defendants to make any such arguments to the jury." (Dkt 248, p. 6).  The Government's motion in limine should be denied.

 Despite the government's charging discretion, Defendant has a right to cross-examine witnesses on matters relating to their bias, prejudice or credibility.  The Court's decision in *United States v. Safavian*, No. 05-0370, 2008 WL 5255534, at *1 (D.D.C. Dec. 12, 2008), a decision relied upon by the Government (Dkt 248, p. 6), recognizes that questions that touch upon selective or vindictive prosecution may go to the bias, prejudice or credibility of a witness.  Because such matters may constitute appropriate cross-examination of Government witnesses, the Court should deny this aspect of the Government's motion in limine and rule on any objections the Government may assert at the time of trial and in the context in which they arise.

**C.     "Evidence of the Superior Court prosecution or statements regarding Governmental overreach in charging federal offenses."**

5

This Court should likewise reject the Government's attempt to foreclose any reference or argument relating to governmental overreach or abuse in charging federal offenses.

The Government wrongly asks this Court to exclude "any evidence or reference to the dismissal of the D.C. Code violations, prosecutorial decisions, or argument that the Defendants['] conduct was at most a D.C. Code unlawful violation are irrelevant and must be excluded." (Dkt 248, p. 7).

Like questioning relating to selective or vindictive prosecution, questioning relating to governmental overreach, overcharging, or other abuse similarly may go to the bias, prejudice or credibility of a particular witness. Accordingly, the Court should deny this aspect of the Government's motion in limine and rule on any objections the Government may assert at the time of trial and in the context in which they arise. As the District Court recognized in *U.S. v. Magee*, No. 2:21-CR-00171, 2022 WL 17585041, *1 (D. Nev. 12/11/22), "To exclude evidence on a motion in limine, the evidence must be inadmissible 'on all potential grounds.' Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." [Citations omitted throughout.]

In addition to its relevance objection, the Government argues:

> such evidence may improperly and implicitly encourage jury nullification by suggesting that the jury should not care about the offense because the Defendants' conduct was effectively an unlawful entry and the Government abandoned that prosecution in an effort to up the ante and punish the Defendants for doing something that the Defendants' believe they are morally obligated to do. (Dkt 248, p. 8).

The Government seeks to prohibit the admission of evidence and foreclose argument not based on what the evidence shows or what is actually stated, but on speculation as to what might

"encourage" a jury to extrapolate from what the evidence or argument might "suggest".  The Government cites no authority that supports such a tenuous and speculative standard and fails to demonstrate that any such evidence or argument would satisfy the definition of jury nullification. Additionally, the Government's motion would seemly foreclose the wholly legitimate argument that Defendant's conduct might be a violation of *some* law—perhaps a misdemeanor local ordinance violation—but not a violation of the charged offense and the offense on whose elements the jury will be instructed.  If that argument is foreclosed, the jury could be misled into erroneously thinking that, if it believes the Defendant did *something* criminal, it must convict on the charged offense. Thus, to prevent the Government from being able to convict based on a misapprehension of the facts and the law, the motion *in limine* should be denied.

Most of the cases cited by the Government address a specific request for a jury instruction on the issue, as distinct from the mere right of defense counsel to make reference to it. Defendant is not asking for a jury instruction, so the Government's motion appears to seek more than the case law supports.

At least some of the evidence the government seeks to exclude as supposedly "encouraging jury nullification" could be offered for other, legitimate purposes. The court can address admissibility of evidence at the time it's offered.

The government's motion includes broad attempt to prohibit argument that tends toward jury nullification. They treat it as a disregard of the law, where it may be the opposite.

While the jurors may feel like cattle in a chute, being told when and where they can go, told not to discuss things, deprived of their cell phones, et cetera, they actually have a dominant role in the courtroom, just as they do in our system of self-government. Every branch of government appears in the courtroom on a criminal case, but each branch gets its authority from, and is accountable to, the people, also represented in the courtroom by the jury. When they are done voting for their representatives, they are <u>not</u> done exercising their authority, because they also see to the application of laws made in their name. They go from the voting booth to the jury box, and nothing happens to the defendant unless they feel it is just. These ideas have been thoughtfully addressed in at least two relatively recent cases. In U.S. vs. Dougherty, et al, 473 F.2d 1113 (1972), the court addressed them at length:

> Our reference to the "intensity" factor underlying the *pro se* right should not be understood as embracing the principle of "nullification" proffered by appellants. They say that the jury has a well-recognized prerogative to disregard the instructions of the court even as to matters of law, and that they accordingly have the legal right that the jury be informed of its power. We turn to this matter in order to define the nature of the new trial permitted by our mandate.

> There has evolved in the Anglo-American system an undoubted jury prerogative-in-fact, derived from its power to bring in a general verdict of not guilty in a criminal case, that is not reversible by the court. The power of the courts to punish jurors for corrupt or incorrect verdicts, which persisted after the medieval system of attaint by another jury became obsolete, was repudiated in 1670 when Bushell's Case, 124 Eng.Rep. 1006 (C.P. 1670) discharged the jurors who had acquitted William Penn of unlawful assembly. Juries in civil cases became subject to the control of ordering a new trial; no comparable control evolved for acquittals in criminal cases.

> The pages of history shine on instances of the jury's exercise of its prerogative to disregard uncontradicted evidence and instructions of the judge. Most often commended are the 18th century acquittal of Peter Zenger of seditious libel, on the plea of Andrew Hamilton, and the 19th century acquittals in prosecutions under the fugitive slave law. The values involved drop a notch when the liberty vindicated by the verdict relates to the defendant's shooting of his wife's paramour, or purchase during Prohibition of alcoholic beverages.[31]

> Even the notable Dean Pound commented in 1910 on positive aspects of "such jury lawlessness."[32] These observations of history and philosophy are underscored and illuminated, in terms of the current place of the jury in the American system of justice, by

the empirical information and critical insights and analyses blended so felicitously in H. Kalven and H. Zeisel, The American Jury.[33]

Reflective opinions upholding the necessity for the jury as a protection against arbitrary action, such as prosecutorial abuse of power, stress fundamental features like the jury "common sense judgment" and assurance of "community participation in the determination of guilt or innocence."[34] Human frailty 1132*1132 being what it is, a prosecutor disposed by unworthy motives could likely establish some basis in fact for bringing charges against anyone he wants to book, but the jury system operates in fact, (see note 33) so that the jury will not convict when they empathize with the defendant, as when the offense is one they see themselves as likely to commit, or consider generally acceptable or condonable under the mores of the community.

The existence of an unreviewable and unreversible power in the jury, to acquit in disregard of the instructions on the law given by the trial judge, has for many years co-existed with legal practice and precedent upholding instructions to the jury that they are required to follow the instructions of the court on all matters of law. There were different soundings in colonial days and the early days of our Republic. We are aware of the number and variety of expressions at that time from respected sources — John Adams; Alexander Hamilton; prominent judges — that jurors had a duty to find a verdict according to their own conscience, though in opposition to the direction of the court; that their power signified a right; that they were judges both of law and of fact in a criminal case, and not bound by the opinion of the court.[35]

The rulings did not run all one way, but rather precipitated "a number of classic exchanges on the freedom and obligations of the criminal jury."[36] This was, indeed, one of the points of clash between the contending forces staking out the direction of the government of the newly established Republic, a direction resolved in political terms by reforming but sustaining the status of the courts, without radical change.[37] As the distrust of judges appointed and removable by the king receded, there came increasing acceptance that under a republic the protection of citizens lay not in recognizing the right of each jury to make its own law, but in following democratic processes for changing the law.

The crucial legal ruling came in United States v. Battiste, 2 Sum. 240, Fed.Cas. No. 14,545 (C.C.D.Mass. 1835). Justice Story's strong opinion supported the conception that the jury's function lay in accepting the law given to it by the court and applying that law to the facts. This considered ruling of an influential jurist won increasing acceptance in the nation. The youthful passion for independence accommodated itself to the reality that the former rebels were now in control of their own destiny, that the practical needs of stability and sound growth outweighed the abstraction of centrifugal philosophy, and that the judges in the courts, were not the colonial appointees projecting royalist patronage and influence but were themselves part and parcel of the nation's intellectual mainstream, subject to the checks of the common law tradition and professional opinion, and capable, in Roscoe Pound's words, of providing "true judicial justice" standing in contrast with the colonial experience.[38]

1133*1133 The tide was turned by *Battiste,* but there were cross-currents. At mid-century the country was still influenced by the precepts of Jacksonian democracy, which spurred demands for direct selection of judges by the people through elections, and distrust of the judge-made common law which enhanced the movement for codification reform. But by the end of the century, even the most prominent state landmarks had been toppled;[39] and the Supreme Court settled the matter for the Federal courts in Sparf v. United States, 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895) after exhaustive review in both majority and dissenting opinions. The jury's role was respected as significant and wholesome, but it was not to be given instructions that articulated a right to do whatever it willed. The old rule survives today only as a singular relic.[40]

The breadth of the continuing prerogative of the jury, however, perseveres, as appears from the rulings permitting inconsistent verdicts. These reflect, in the words of Justice Holmes, an acknowledgment that "the jury has the power to bring in a verdict in the teeth of both law and facts,"[41] or as Judge Learned Hand said: "We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."[42]

Since the jury's prerogative of lenity, again in Learned Hand's words (*supra,* note 34) introduces a "slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions," it is only just, say appellants, that the jurors be so told. It is unjust to withhold information on the jury power of "nullification," since conscientious jurors may come, ironically, to abide by their oath as jurors to render verdicts offensive to their individual conscience, to defer to an assumption of necessity that is contrary to reality.

This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy. This is the concern voiced by Judge Sobeloff in United States v. Moy-lan, 417 F.2d 1002, 1009 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970):

To encourage individuals to make their own determinations as to which laws they will obey and which they 1134*1134 will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic.

The statement that avowal of the jury's prerogative runs the risk of anarchy, represents, in all likelihood, the habit of thought of philosophy and logic, rather than the prediction of the social scientist. But if the statement contains an element of hyperbole, the existence of risk and danger, of significant magnitude, cannot be gainsaid. In contrast, the advocates of jury "nullification" apparently assume that the articulation of the jury's power will not extend its use or extent, or will not do so significantly or obnoxiously. Can this assumption fairly be made? We know that a posted limit of 60 m.p.h. produces factual speeds 10 or even 15 miles greater, with an understanding all around that some "tolerance" is acceptable to the

authorities, assuming conditions warrant. But can it be supposed that the speeds would stay substantially the same if the speed limit were put: Drive as fast as you think appropriate, without the posted limit as an anchor, a point of departure?

Our jury system is a resultant of many vectors, some explicit, and some rooted in tradition, continuity and general understanding without express formulation. A constitution may be meaningful though it is unwritten, as the British have proved for 900 years.

The jury system has worked out reasonably well overall, providing "play in the joints" that imparts flexibility and avoid undue rigidity. An equilibrium has evolved — an often marvelous balance — with the jury acting as a "safety valve" for exceptional cases, without being a wildcat or runaway institution. There is reason to believe that the simultaneous achievement of modest jury equity and avoidance of intolerable caprice depends on formal instructions that do not expressly delineate a jury charter to carve out its own rules of law.[43] We have taken due and wry note that those whose writings[44] acclaim and invoke Roscoe Pound's 1910 recognition of the value of the jury as safety valve, omit mention of the fact that in the same article he referred to "the extreme decentralization that allows a local jury or even a local prosecutor to hold up instead of uphold the law of the state" as one of the conditions that "too often result in a legal paralysis of legal administration,"[45] that his writings of that period are expressly concerned with the evils of the "extravagant powers" of juries,[46] and that in 1931 he joined the other distinguished 1135*1135 members of the Wickersham Commission in this comment:[47]

In a number of jurisdictions juries are made judges of the law in criminal cases, thus inviting them to dispense with the rules of law instead of finding the facts. The juror is made judge of the law not to ascertain what it is, but to judge of its conformity to his personal ideals and ascertain its validity on that basis. . . . It is significant that there is most satisfaction with criminal juries in those jurisdictions which have interfered least with the conception of a trial of the facts unburdened with further responsibility and instructed as to the law and advised as to the facts by the judge.

The way the jury operates may be radically altered if there is alteration in the way it is told to operate. The jury knows well enough that its prerogative is not limited to the choices articulated in the formal instructions of the court.[48] The jury gets its understanding as to the arrangements in the legal system from more than one voice. There is the formal communication from the judge. There is the informal communication from the total culture — literature (novel, drama, film, and television); current comment (newspapers, magazines and television); conversation; and, of course, history and tradition. The totality of input generally convey adequately enough the idea of prerogative, of freedom in an occasional case to depart from what the judge says. Even indicators that would on their face seem too weak to notice — like the fact that the judge tells the jury it must acquit (in case of reasonable doubt) but never tells the jury in so many words that it must convict — are a meaningful part of the jury's total input. Law is a system, and it is also a language, with secondary meanings that may be unrecorded yet are part of its life.

When the legal system relegates the information of the jury's prerogative to an essentially informal input, it is not being duplicitous, chargeable with chicane and intent to deceive. The limitation to informal input is, rather a governor to avoid excess: the prerogative is reserved for the exceptional case, and the judge's instruction is retained as a generally effective constraint. We "recognize a constraint as obligatory upon us when we require not merely reason to defend our rule departures, but damn good reason."[49] The practicalities of men, machinery and rules point up the danger of articulating discretion to depart from a rule, that the breach will be more often and casually invoked. We cannot gainsay that occasionally jurors uninstructed as to the prerogative may feel themselves compelled to the point of rigidity.[50] The danger of the excess rigidity that may now occasionally exist is not as great as the danger of removing the boundaries of constraint provided by the announced rules.

We should also not the inter-relation of the unanimity requirement for petit juries, which was applicable to this trial, and is still the general rule though no longer constitutionally required for state courts.[51] This is an additional reason — a material consideration, though neither a necessary nor sufficient condition — to brake the wheels of those who would tell the petit jurors they are to determine the rules of law, either directly or 1136*1136 by telling them they are free to disregard the judge's statement of the rules. The democratic principle would not be furthered, as proponents of jury nullification claim, it would be disserved by investing in a jury that must be unanimous the function not merely of determining facts, hard enough for like-minded resolution, but of determining the rules of law.

Rules of law or justice involve choice of values and ordering of objectives for which unanimity is unlikely in any society, or group representing the society, especially a society as diverse in cultures and interests as ours. To seek unity out of diversity, under the national motto, there must be a procedure for decision by vote of a majority or prescribed plurality — in accordance with democratic philosophy. To assign the role of mini-legislature to the various petit juries, who must hang if not unanimous, exposes criminal law and administration to paralysis, and to a deadlock that betrays rather than furthers the assumptions of viable democracy.

Moreover, to compel a juror involuntarily assigned to jury duty to assume the burdens of mini-legislator or judge, as is implicit in the doctrine of nullification, is to put untoward strains on the jury system. It is one thing for a juror to know that the law condemns, but he has a factual power of lenity. To tell him expressly of a nullification prerogative, however, is to inform him, in effect, that it is he who fashions the rule that condemns. That is an overwhelming responsibility, an extreme burden for the jurors' psyche. And it is not inappropriate to add that a juror called upon for an involuntary public service is entitled to the protection, when he takes action that he knows is right, but also knows is unpopular, either in the community at large or in his own particular grouping, that he can fairly put it to friends and neighbors that he was merely following the instructions of the court.

In the last analysis, our rejection of the request for jury nullification doctrine is a recognition that here are times when logic is not the only or even best guide to sound conduct of government. For machines, one can indulge the person who likes to tinker in pursuit of fine tuning. When men and judicial machinery are involved, one must attend to the many and

complex mechanisms and reasons that lead men to change their conduct — when they know they are being studied; when they are told of the consequences of their conduct; and when conduct exercised with restraint as an unwritten exception is expressly presented as a legitimate option.

What makes for health as an occasional medicine would be disastrous as a daily diet. The fact that there is widespread existence of the jury's prerogative, and approval of its existence as a "necessary counter to case-hardened judges and arbitrary prosecutors,"[52] does not establish as an imperative that the jury must be informed by the judge of that power. On the contrary, it is pragmatically useful to structure instructions in such wise that the jury must feel strongly about the values involved in the case, so strongly that it must itself identify the case as establishing a call of high conscience,[53] and 1137*1137 must independently initiate and undertake an act in contravention of the established instructions. This requirement of independent jury conception confines the happening of the lawless jury to the occasional instance that does not violate, and viewed as an exception may even enhance, the over-all normative effect of the rule of law. An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny.

Finally, we are aware that the denial of defendants' request for a nullification instruction will be considered by them to negative some, or perhaps most, of the value of the right of *pro se* representation which we have recognized. This point could be answered in terms of logic: The right of self-representation is given for reasons recognized by the law, and cannot be a springboard to establish the validity of other advantages or conditions that lie in its tactical wake. Thus, a defendant's ability to present his demeanor and often even a kind of testimony, without exposure to impeachment or cross-examination, may be a tactical consequence of *pro se* representation, and even a moving cause of its invocation, but this is not to say it is an objective of the law. But defendants' position merits a more spacious answer, that lies outside the domain of formal logic. It is this. The jury system provides flexibility for the consideration of interests of justice outside the formal rules of law. This embraces whatever extra the defendant conveys by personal representation, whether through demeanor or sincerity of justification. But it is subject to the overriding consideration that what is tolerable or even desirable as an informal, self-initiated exception, harbors grave dangers to the system if it is opened to expansion and intensification through incorporation in the judge's instruction.

*U.S. vs. Dougherty, et al, 473 F.2d 1113 (1972)*

More recently, the matter was addressed again in U.S. vs. Polizzi, 549 F.Supp.2d 308 (2008):

The American petit jury is not a mere factfinder. From the time the right to trial by jury was embedded in the Constitution as a guarantee to criminal defendants through the Sixth Amendment in 1791, it has been expected to bring to court much of the wisdom and consensus of the local community. *See* Part IV, *infra.* It has, when jurors deemed it necessary, stood as a guardian of the individual against the sometime cruel overreaching of government and its menials. Much of our modern procedural "reforms" have been designed

to limit the jury's reach and power, increasingly shifting control to judges; these efforts have attempted unconstitutionally to transform the jury into a simple factfinder from its grander historical position under the Constitution as representative of the people in the courts.

Recent Supreme Court developments stress "originalism" — that is to say, the meaning at the time the relevant constitutional language was adopted. The approach has been applied to sentencing in a series of Supreme Court cases reviving the original meaning of the Sixth Amendment guarantee of trial by jury in criminal cases and the right of a defendant to be confronted with opposing witnesses. *See* Part IV.D, *infra.* The development is based upon what is believed to be colonial practice immediately preceding adoption of the Sixth Amendment, and the reception of then current British practice. *See* Part IV.A, *infra.*

Extrapolation of the recently emphasized constitutional principle requiring a jury finding of the facts needed to enhance a sentence requires courts to recognize that colonial and British juries in the late eighteenth century had power to control the finding of guilt in order to affect the sentence. In exercising its extensive discretion, the jury was expected to be aware of and understand the sentence that would follow from its decision. That jury power to know and act may not be eviscerated, as was done in this case by this court's error in failing to advise the jury of the five-year mandatory minimum sentence required on conviction of receipt of child pornography.

Although much of modern civil and criminal procedural rule-making has been devoted to controlling juries, *see* Part IV.C, *infra,* the emphasis on originalism by the Supreme Court in sentencing and confrontation requires enforcement of a basic element of the Sixth Amendment as originally understood: the jury of the vicinage, being aware of the sentencing implications of a finding of guilt, had the frequently exercised power to refuse to follow the law as construed by the court, and could acquit or downgrade the crime in order to avoid a sentence it deemed excessive.

The complexity of modern United States criminal law and the general public's lack of detailed knowledge of federal statutory provisions require that, in the few cases where necessary, the jury be informed of such matters as the required minimum term of incarceration that will follow from its verdict so that it can exercise its constitutionally mandated historic role. Cases which have rejected this view, on the ground that it permits a form of impermissible "nullification," have not followed the Sixth Amendment as it must be interpreted after recent Supreme Court originalist holdings. *See* Part IV.E, *infra.*

Consideration of jury power contemporaneous with the Sixth Amendment's adoption leads to the conclusion that this court committed constitutional error when it denied defendant's request to inform the jury of the statutory mandatory five-year minimum applicable to the receiving counts. A new trial on those counts, granted pursuant to defendant's Rule 33 motion, will be required to correct that prejudicial error. 323*323 *See* Part V, *infra.* The requested instruction might well have led to a hung jury or a verdict of not guilty or not guilty by reason of insanity.

This ruling on what the jury is entitled to know about sentencing is limited to that small group of cases where the jury would not be expected to know of the applicable harsh mandatory minimum. It would not, for example, appear to be applicable to robbery, terrorism or personal assaults with weapons where juries expect long prison terms to be imposed. It would also not apply where the defendant asked that the jury not be informed because of potential prejudice.

An acquittal on the receiving counts would not mean the defendant would go unwhipped of justice. Because they do not require a minimum sentence, the possession counts stand; they provide ample ground for serious non-mandatory penalties, including a substantial prison term, a heavy fine and a long period of supervised release. *See* Parts V.C, VI, *infra*. The instant trial and the attendant evidence and publicity have revealed a man who entertains himself by buying, downloading and viewing the most vile child pornography; the cost of his defense was considerable; and the loss of self-respect and the esteem of community and family constituted a devastating punishment. The criminal process and the trial are the modern equivalents of eighteenth-century branding, being put in stocks, or being carted about the community in shame. Defendant, whatever the ultimate outcome of the prosecution, is now publicly marked as morally culpable.

*U.S. vs. Polizzi, 549 F.Supp.2d 308 (2008)*

If a jury doesn't wish to convict, nobody can make them. <u>That is a true statement of the law.</u> In fact, the law that so-called "jury nullification" supposedly ignores, gives them that prerogative! The U.S. Constitution places no limitation on the jury's power and provides some guiding principles that support their exercise of ultimate authority. The jury's power to acquit is unqualified. But the case law the government cites addresses mostly the propriety of attorneys encouraging them to exercise it. Courts are protective of their own role and wouldn't naturally share it with the great unwashed and supposedly uneducated! But the jury power is unqualified <u>for a reason.</u> The people really do complete the circle, demonstrating our self-governance by writing the constitution, by retaining the sole authority to amend it (which they have frequently exercised), by voting for the legislative representatives and the executive, and indirectly the judiciary (in some places electing judges directly) and finally by coming into the courtroom and having the final say on how it's all applied. That is not lawless. It is contemplated by the foundational laws by which we govern ourselves.

Fear of anarchy is overwrought. Juries like law and order, and a verdict must be unanimous. Jury nullification will always be a rare event.

The U.S. Supreme Court has ruled in Dobbs that there never was a federal right to abortion. Federal prosecution under a federal statute that has lost its constitutional basis may strike a reasonable jury as improper, especially where legally firm state charges are available. Likewise, where the Constitution (the supreme law) provides in the Fifth and Fourteenth Amendments that "no person…shall be deprived of life…without due process" or denied "equal protection of the law," a jury could reasonably perceive a conflict between that and the lesser FACE act whose constitutional underpinnings do not exist and whose denial of these rights is patent. Resolving the problem in favor of acquittal respects applicable law.

The executive's power to pardon presupposes guilt but is unqualified anyway. The jury's power to acquit is similar, and proper acknowledgment of it should be allowed.

As part of its argument on so-called nullification, the government objects to a "mini-trial" over the circumstances surrounding the dismissal of the state charges. This conflicts with its willingness to engage in many mini-trials over other acts by the defendants, proffered in the government's 404 motion, most of which are denied, and each of which would have to be established via "mini-trial" before admissibility could even be addressed!

### 2. Use of Defendant's Statements to Prove Offense Charged

Defendant's statements may be admissible against her under the right circumstances, and subject to limitations imposed by the court when the statements are offered. The risk here is conviction of

a person for what she has said, as opposed to what she has done. The court can best prevent this by rulings made at the time of trial.

But the Government seeks an order "allowing the admission of the Defendants' statements, which are evidence of an element of the charged offenses (*e.g.,* conspiracy) or to establish the Defendants motive or intent."  (Dkt 248, pp. 8-10).  The only clues as to the statements to which the Government refers are its assertions that the statements were conveyed by various media and that, "[t]he Government intends to introduce several statements made by the Defendants before, during, and after the charged offenses, which will aid the jury's determination as to whether the Government has proved the elements of charged civil rights conspiracy and/or to establish the Defendants' motive and intent in committing the charged FACE Act offense." (Dkt 248, p. 9, citing Fed.R.Evid. 801(d)(2)(A) & (E), and 803(3)).

The Government fails to cite any authority that it is appropriate for the Court to just take its word as to the admissibility of the Government's evidence. At a minimum, Defendant is entitled to a specific identification of the evidence as to which the Government prematurely seeks an admissibility ruling so that Defendant can meaningfully address the request. Moreover, this Court cannot possibly analyze the propriety of evidence in the absence of any actual proffer of that evidence.  The Motion must be denied on those bases.

Any ruling about the admissibility of any of Defendants' statements should be made at trial, after the Government specifically identifies the evidence it seeks to have admitted, the Government has asserted a basis for admission of that evidence (rather than a laundry list of potential reasons that the statements might be admissible), and the Court has been provided

copies of the proffered statements for its review and consideration. The Court should rule on admissibility based on evidence actually tendered, rather than Government assertions about what the evidence is and self-serving statements about why it might be admissible.


### 3. Preclusion of Argument that Defendant's Speech or Conduct was Protected Under the First Amendment.

The Government's motion as to First Amendment arguments is a naked attempt to keep the Defendants from defending themselves against the charged offenses. The Government apparently does this to lighten its burden of proof on key elements of a FACE offense, namely the Government's requirement to prove motive and intent. *See, e.g., Lotierzo v. A Woman's World Med. Ctr.*, 278 F.3d 1180, 1182 (11th Cir. 2002); *United States v. Retta*, 840 F. Supp. 2d 262, 268 (D.D.C. 2012) (citing 18 U.S.C. § 248(a); *United States v. Mahoney*, 247 F.3d 279, 282-84 (D.C. Cir. 2001); *Terry v. Reno*, 101 F.3d 1412, 1420 (D.C. Cir. 1996)); *see also Allentown Women's Ctr., Inc. v. Sulpizio*, 403 F. Supp. 3d 461, 464-65, 468 (E.D. Pa. 2019).


The question of Defendant's motive and intent is a key issue for the jury. It is therefore flatly wrong for the Government to contend that First Amendment activity is irrelevant under FRE 401, and far from being inadmissible under FRE 403 Defendant's intent to engage in First Amendment activity points directly to an issue in controversy to be decided by the jury.


The cases cited by the Government miss the point. *United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009), which is not a FACE case, stands for the uncontroversial principle that

protected speech may cross the line into unlawful advocacy.    *See* 594 F.3d at 154

(discussing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)).   That hardly makes, as the

Government seems to think, the First Amendment irrelevant to such a case, let alone the

instant one.   The other decision cited by the Government, *United States v. Amawi*, 695 F.3d

457 (6th Cir. 2012), (also not a FACE case) is even less relevant since the defendants there

requested an instruction that would have directed the jury away from focus on the elements

of the offense.   *See* 695 F.3d at 482.   By contrast, Defendant here seeks use of First

Amendment evidence and arguments precisely because they are relevant to the motive and

intent elements of a FACE offense.


As such, the Government's attempt to preclude argument and evidence relating to the First

Amendment should be rejected.


### 4.   Preclusion of Defendant's Out of Court Statements.

The government seeks to exclude <u>exculpatory</u> out of court statements by the defendant

even as it offers <u>inculpatory</u> out of court statements that may be closely related or made at

the same time. The basis for this conundrum is the singular rule under FRE 801(d)(2)(A)

that a party's own statement offered against him is not hearsay.


A party's own statement offered <u>by</u> him could be hearsay under some circumstances and

not others. FRE 801 starts off by excluding from the definition of hearsay a prior statement

made by a person <u>who testifies at trial</u> and is subject to cross-examination, which is

consistent with his testimony and is offered to rebut a suggestion of recent fabrication. This

would clearly exclude most of a testifying defendant's prior exculpatory statements from the effect of the hearsay rule. The government's own motion, on this point, seems to presuppose that the defendant would be offering the statement in lieu of testimony.

A defendant's prior statements may also directly undermine the government's evidence or argument without being offered to prove the truth of the matter asserted. These things can best be addressed only at trial.

But the Government seeks to preclude any use by Defendants of any out-of-court statements. (Dkt 248, pp. 12-14).  But the Government fails to identify the out-of-court statements to which it refers and improperly seeks a ruling on the admissibility of evidence without actually identifying that evidence or the purpose for which it is or might be proffered.  Any out-of-court statements would only conceivably by hearsay if offered for the truth of the matter asserted and, even then, there are numerous exceptions to the hearsay rule which might apply to any particular out-of-court statement. See Fed. R. Evid. 803. Accordingly, any ruling about the admissibility of any out-of-court statement should be made at trial, so that the Court may make a reasoned decision after consideration of the purpose for which the out-of-court-statement is tendered and/or a determination of the applicability of any hearsay exception(s).

5. **Preclusion of Defendant's "character" evidence.**

The Government seeks to exclude "any evidence of the Defendants' good character or specific acts of good conduct" and a ruling that "Defendants should be limited to

introducing only general reputation or opinion evidence concerning a pertinent character trait." (Dkt 248, p. 16).  The motion should be denied.

The Government's request sweeps too broadly.  For example, it asks the Court to exclude evidence of Handy's "charitable work, affiliations with religious or social organizations, admirable family life, [and] general good standing in the community."  (Dkt 248, p. 15).  Such a prohibition would prohibit Defendant from introducing any basic evidence regarding herself  - indeed, she would be prohibited from testifying to such basic information as to whether she was married or has any children.

Further, although Handy does not intend at this time to introduce evidence simply to prove her general good character or to introduce "specific acts of good conduct", she is entitled to introduce evidence of her character for being law abiding and peaceful, which the Government concedes is admissible.  (See Dkt. 248, pp. 15-16 ("Although a Defendant's character for law-abidingness is always 'pertinent' … and although a Defendant's character for peacefulness may be pertinent in this case, other character evidence is not pertinent …."  [Citations omitted throughout.] Moreover, the Government acknowledges that specific instances of good conduct that are related to a character trait that is an element of the charge may be appropriate  (Dkt 248, p. 16), and Defendant is entitled to introduce such evidence.

The Court should deny the Government's motion and address any objections the Government may assert to any evidence it deems improper character evidence at the time of trial.

6. **Limitation of cross examination of Government Witnesses pertaining to their personal health care.**

The Government seeks to limit cross-examination of Government witness, Patient A, as to her "status as a clinic patient" "to whether she sought or obtained 'reproductive health services' only." (Dkt 248, p. 18).  The Government seeks to restrict cross-examination "to matters elicited during direct examination about Patient A's health care, which will be limited to the simple fact that she 'was obtaining … reproductive health services.'" (Dkt 228, p. 19).

The motion should be denied. As the Government acknowledges, an element of the charged crime requires the jury to determine whether Defendants "intentionally engag[ed] in prohibited conduct 'because Patient A was obtaining … reproductive health services.'"   (Dkt 248, p. 18). "Reproductive health services" is a defined term under the FACE Act.  18 U.S.C. §248(e)(5) ("The term "reproductive health services" means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy."). Cross-examination regarding the nature of the services sought by Patient A relates directly to the question of whether the Government can prove an element of the crime charged. The Government concedes this when it (perplexingly) asserts, "[t]he Government is not required to prove the precise reproductive health service Patient A sought, *but rather only prove that she sought a service as defined by the FACE Act*.'"  [Emphasis added.] The Government fails to explain how it can prove that Patient A "sought a service as defined by the FACE Act" without identifying that service.  Moreover, the Government cites *no* authority for the proposition that a criminal defendant is required to take the Government's word for its claim that the service sought falls within the FACE Act definition and may be properly foreclosed from cross-examining a witness regarding an element of the crime.  Nor does the Government cite any authority in

support of its claim that Patient A's privacy rights trump Handy's right to a fair trial and her liberty interests.

## 6. CONCLUSION

WHEREFORE the Government's motion should be denied.

**Respectfully submitted,**

**s/MARTIN A. CANNON**
**MARTIN A. CANNON**


**/S/ DENNIS BOYLE**
**DENNIS BOYLE**

## <u>CERTIFICATE OF SERVICE</u>

DENNIS BOYLE, hereby certifies that a true and correct copy of the foregoing document has been

electronically filed.

<u>/S/ DENNIS BOYLE</u>
**DENNIS BOYLE**

**DATED: 6-23-23**