# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| LAUREN HANDY, | : | |
| JONATHAN DARNEL, | : | |
| PAULA "PAULETTE" HARLOW, | : | |
| JEAN MARSHALL, | : | |
| JOHN HINSHAW, | : | |
| HEATHER IDONI, | : | |
| WILLIAM GOODMAN, | : | |
| JOAN BELL, and | : | |
| HERB GERAGHTY, | : | |
| | : | |
| Defendants. | : | |

## UNITED STATES' TRIAL BRIEF

On October 22, 2020, the Defendants invaded a reproductive health clinic, and in doing so, injured one of its nurses and inflicted significant trauma on patients seeking health care. For this conduct the two-count superseding indictment charges each defendant with one count of 18 U.S.C. § 241 (conspiracy against rights) and one count of 18 U.S.C. § 248(a)(1) (clinic access obstruction). Trial against Defendants Handy, Hinshaw, Idoni, Goodman, and Geraghty is set to begin August 9, 2023. Trial against Defendants Darnel, Harlow, Marshall, and Bell is set to begin September 6, 2023. These charges stem from the Defendants' participation in a scheme to obstruct access to a women's reproductive health clinic (the "Clinic") located in the District of Columbia on October 22, 2020, and their blockade of that facility.

The government submits this trial brief (1) to provide the Court with relevant factual background and (2) to identify and address certain evidentiary issues that are likely to arise at trial.

1

## I.      Overview of the Scheme

On October 22, 2020, the Washington Surgi-clinic – a reproductive health care provider that offers gynecological and pregnancy termination services – was prepared to open with several scheduled morning appointments.   Among those appointments, one was for a woman named "Hazel Jenkins," which was later discovered to have been made by Handy using a false name. The main entrance to the clinic suite is located on the fourth floor of a high-rise building.   The clinic has a separate entrance for staff several feet from the main entrance that leads directly into the surgical area, while the main entrance leads into the clinic's waiting room.   Shortly before the first scheduled 9:00 a.m. appointments, the Defendants and numerous co-conspirators had gathered at the clinic to execute a planned blockade.   When the clinic's main entrance door was opened, the Defendants forced entry into the clinic and blockaded the facility.   The Defendants pushed and shoved against the clinic staff, who attempted to physically resist the Defendants. During the melee in the clinic's waiting room, a clinic nurse was injured after one of the Defendants pushed her away from the entrance door. The Defendants used their bodies, ropes, chains, and locks to physically obstruct the clinic's patients from obtaining, and staff from providing, reproductive health services.

The conspiracy to blockade the clinic began several weeks earlier, when co-conspirators began to communicate using social media, text messaging, and meeting both virtually and in person.   Handy and Darnel led the meetings and planning, and throughout the communications leading up to and throughout the invasion the conspirators' purpose was clear: to prevent patients from receiving reproductive health service, and specifically abortion services.

### A. *Social media messages planning the blockade*

Several Defendants communicated extensively in the weeks leading up to the October 22, 2020, clinic blockade.   In addition to telephone calls, they used social media messaging applications (Facebook.com) and mobile phone text messages to plan the blockade.   The Defendants used the word "rescue" when referring to the criminal blockade they planned.   For example, on September 13, 2020, Darnell sent Handy a Facebook.com message about scheduling Zoom.com meetings to plan the blockade, which stated:

> If you have figured out how to incorporate telephone calls to the Zoom, make sure to mention that on the invite.   Also I would use the word "rescue" in the title somewhere and "civil disobedience" in the description.   Not too many people understand what is meant by "direct action" but the idea of deliberately breaking the law is sexy.   In fact you should probably add a brief definition of red rose rescue and traditional rescue in the description.

USA Ex. No. 5083 at 15.

On October 1, 2020, for example, Darnel sent Handy the following Facebook.com message: "Got a couple of YES answers for logistical help outside the abortion mill on the 22nd . . . ."   *Id.* at 19.   Handy sent the following messages to Darnel on October 16, 2020: "Will, Matt and Patty want to risk arrest . . . Also Joan [co-defendant Bell] has two people who *might* risk arrest . . . I'm calling Heather [co-defendant Idoni] and seeing if there's any updates from her because I think she's been trying to get people to block."   *Id.* at 23.

Finally, in the days before the blockade, Handy and Darnel discussed a final meeting the co-conspirators would have to finalize the details for the planned blockade.   First, on October 20, 2020, Darnel forwarded a Facebook.com message to Handy from a woman named "Cyndie" who was hosting the "rescuers" at her home, which stated: "Dear Lauren, We are very excited about having you and the rescuers over tomorrow.   It is my privilege to open the home for this group . .

3

. ."   *Id.* at p. 26.   Then the following day, on October 21 – the day before the blockade – Handy

sent Darnel the following message: "The plan is 5-5:40[,] people [] say hellos, eat[,] [a]nd then

zoom/meeting start[s]."   *Id.* at p. 27.

Darnel further sought to publicize the blockade, which he planned to livestream on

Facebook.com.   On October 19, 2020, he posted a comment on a group page that he owned called

"DC Area Anti-Abortion Advocacy," which was where he livestreamed the blockade.   In that

post, Darnel wrote: "I'm sure most of you are already aware of the important event happening this

Thursday morning.   Many of you will be present on site.   Those of you who cannot attend: would

you be willing to commit to sharing the livestream videos of the event . . . ?   We are trying to

inspire other anti-abortion laborers . . . ."   USA Ex. No. 5066 at 9-10.   And, on October 21,

Darnel sent messages to media outlets soliciting news coverage of the blockade that would take

place the next day.   In those messages, he wrote: "If you are interested in covering a story about

civil disobedience on behalf of unborn babies, you can find plenty of footage on posts at the DC

Area Anti-Abortion Advocacy [Facebook] page . . . ." and "I have a tip about an act of civil

disobedience (15 arrests) by pro-lifers tomorrow in Washington, DC.   Respond if you want

details."   USA Ex. No. 5072.

Handy was also in regular contact with Geraghty about the planned blockade, where they

similarly discussed logistics including soliciting participants who would risk arrest, travel and

lodging for out-of-state blockaders, and drafting a press release following the anticipated arrests.

Below is an example of the text message exchange between them:

4

| DATE | SENDER | MESSAGE |
|---|---|---|
| 10/7/21 | Geraghty | "Cool I won't get into town until around 6 probably so when I know what's up I'll reach out" |
| | Handy | "No prob – I'll try to go to the debate thing.   Is Michael New gonna be there?" |
| 10/9/21 | Geraghty | "Hey sorry I'm needy but can we have a video call in the next few weeks to talk a little more about the upcoming plans?" |
| | Handy | "Morning! Not needy at all – I remember when I first did a Rescue so it's all understandable.   The 12th-14th would be the best days for me – if you can pick a time and day I'll be able to work my plans around that." |
| | Geraghty | "How about the 12th at 1PM?" |
| | Handy | "That's good with me – want to do it via Zoom or just phone?" |
| | Geraghty | "Either is fine with me!" |
| | Handy | "I'll set up a zoom and send u an invite" |
| 10/12/20 | Handy | "Hey!   Can we move our zoom up to 12noon?" |
| | Geraghty | "Yep" |
| 10/13/20 | Handy | "Address to the air BnB[:] 133 Quincy Pl NE[,] Washington, DC 20002" |
| | Geraghty | "We have it the 21st & 22nd?" |
| | Handy | "Oh….no… don't worry I'll fix it" |
| | | "Does this look correct?" |
| | Geraghty | "Looks good to me!" |
| 10/16/20 | Handy | "I keep getting phone calls and more and more people are joining us" |
| | Geraghty | "Any non-Christians? Lol" |
| | Handy | "Not yet – I've been trying to manifest some more lol" |
| | | "I really think this Rescue is going to be huge – something that we've haven't seen for 25 years" |

| | | |
|---|---|---|
| | | "Jonathan is working hard on getting non-Christian press and I'm gonna use my connections as well" |
| 10/19/20 | Handy | "So far we have 11 people risking arrest"<br><br>"This is just getting bigger and bigger!!" |
| | Geraghty | "Great!" |
| | Handy | "Also I'm writing the first draft of the press release.   Do you want to be mentioned or quoted?" |
| | Geraghty | "Sure no pressure tho.   If you want to make it look more woke you can say something along the lines of 'Activists from many political and religious backgrounds will be joining the action. Pro-life atheist Herb Geraghty said, "It is important that we utilize all nonviolent means available to us to prevent this egregious violence against the unborn.   We are putting our bodies on the line to save these babies and provide support and resources to their parents.""'"<br><br>"Acutally maybe make it say 'rescuers are putting…' so if I chicken out I don't look like a liar." |
| | Handy | "I keep getting more calls! I number is climbing up to 14 people!" |
| 10/20/20 | Geraghty | "Is there still room for terrisa at the airbnb?   She's considering coming"<br><br>"Do you know who else is staying there?   Or just us?" |
| | Handy | "Just us – I found housing for the Michigan, New York and Boston people" |
| | Geraghty | "What time are we planning to do the rescue" |
| | Handy | "We are all meeting up at 8:30" |
| | Geraghty | "Any estimate of how many are participating on Thursday" |
| | Handy | "So far 14 people are risking arrest and 5 people are leaving when the cops come" |
| | Geraghty | "Wow" |
| | Handy | "Honestly it's so mine blowing and we have more people leaning |

| | | |
|---|---|---|
| | | towards blocking.   Joan is taking my place to block because she wanted me on the outside to organize.   I agreed because I respect her judgement.   I'm still completely non comp – it's gonna be pretty interesting seeing what the cops will do with 5-6 Jane/John Does." |
| 10/21/20 (day before incident) | Handy | "Also this is what the host sent me:   Lock box password is 1853[.]   Your room is upstairs number 2[.]   Wifi name Fios-Guest[.]   Password washington1790[.]   Note: Please take the shoes off when you get in[.]   Address: 133 Quincy Pl NE, Washington, DC 20002[.]" |
| 10/23/20 (day after incident) | Geraghty | "Hey!   Thanks so much for welcoming me and everything else these past few days.   Especially making sure I had somewhere safe to stay 😊" |
| | Handy | "Overall this was a major success imo and I'm very proud of everything you accomplished" |

USA Ex No. 4001.   Evidence introduced at trial will establish that the "Michigan, New York, and

Boston people" Handy referenced above included: Idoni (who is from Michigan); Smith, Hinshaw,

and Goodman (who are from New York); and Harlow and Marshall (who are from Boston).   Other

individuals whom Handy referenced above by first name include "Jonathan" Darnel and "Joan"

Bell.   *Id*.

> B.   *"133 Quincy Pl. NE, Washington, D.C."*

As the Defendants planned the logistical details of the blockade, Handy solicited monetary

donations to fund housing for herself and Geraghty, who traveled from Pennsylvania to D.C. to

participate in the clinic blockade.   Social media evidence introduced at trial will show that Handy

communicated with an unindicted co-conspirator ("UCC-1"), where she asked for a donation to

fund lodging for Geraghty.   *See* USA Ex No. 5091.   On October 13, 2020, Handy sent UCC-1

the following message: "Hey, The Rescue is on October 22nd and I am getting an Air BnB for

Herb for two nights.   I was wondering if you or someone you know could help me supplement

the cost?"  *Id.* at 4.  UCC-1 agreed to help, and responded by asking if he could "send [the donation] through the Mercy Missions page[]."  *Id.*  Handy responded "yes," and shared a link to a Donorbox.org account for the Mercy Missions organization.  *Id.*; *see also* USA Ex. No. 5022.

Records obtained from the Mercy Missions' Donorbox.org account show a donation for $100 from UCC-1, made on October 13, 2020.  *See* USA Ex. Nos. 1700, 1701.  And, records obtained from AirBnB show a lodging reservation made that same day by Handy for a home located at 133 Quincy Pl. NE, Washington, D.C.; and the registered guests were herself and Geraghty.  USA Ex Nos. 5001, 5002.

### C.  The fake clinic appointment

Handy called the clinic the week prior to the blockade and made a fake appointment.  The appointment was made under the pseudonym "Hazel Jenkins," and was scheduled for 9:00 a.m. on the date of the blockade.  In making the fake appointment, Handy further claimed that she was nine weeks pregnant, and that it was her first pregnancy.  The clinic created an appointment card detailing this appointment.  USA Ex. No. 5053.  Then, on the morning of the blockade, shortly before the clinic was scheduled to open, Handy encountered a clinic employee outside of the clinic's entrance and claimed to be "Hazel Jenkins" with a 9:00 a.m. appointment, to ensure the locked clinic door was opened for her and her co-conspirators.

### D.  Video Evidence

Video footage obtained from the following sources captured the blockade, and the coordinated actions of the Defendants and their co-conspirators executing the planned blockade: clinic security cameras, body-worn camera (BWC) footage from responding Metropolitan Police Department (MPD) Officers, and Darnel's Facebook.com livestream.

8

As discussed below, BWC and livestream footage recorded various statements made during the clinic blockade, which, as discussed below, are co-conspirator statements. The video footage shows the Defendants and other co-conspirators force entry into the clinic. Once within the waiting room, the Defendants move furniture to block clinic doors. Some Defendants use locks and chains to bind themselves together and to furniture, while others stand in the clinics' several doorways and harangue patients and staff. Video footage shows the Defendants and their co-conspirators blockading a total of four clinic doors, interfering with the clinic patients' and staff's access to the facility. Specifically, Handy physically obstructs the clinic's main entrance; Bell, Harlow, Smith, and Hinshaw – bound together with locks and chains – blockade two doors within the clinic's waiting room; and Idoni and Goodman use their bodies to block the clinic's staff entrance. Geraghty, who participated in the forced entry into the clinic, at times blocks the clinic's main entrance with Handy, and at times blocks the staff entrance with Idoni and Goodman. And, throughout the entire blockade, Darnel livestreams the event.

Video footage of the blockade further shows the Defendants physically obstructing Patient A after she arrives for her scheduled reproductive health care appointment. Marshall and an unindicted co-conspirator are seen confronting Patient A in the clinic's waiting room, preventing her from accessing the clinic's surgical exam area. When Patient A attempts to access the clinic through the staff entrance, she is physically obstructed by Idoni, Goodman, and yet another unindicted co-conspirator. Patient A's only access point into the clinic was the receptionist window located in the clinic's waiting room. In an act of desperation, Patient A climbs up onto a chair, through the sliding glass window, and into an administrative office located in the examination-surgical area of the clinic.

9

The Defendants' blockade lasted over two hours.   Eventually, MPD Officers arrested the Defendants.   MPD Officers were required to used power tools to remove the locks and chains from some Defendants, after the Defendants refused to provide them with the keys to remove those locks. With the exception of Darnel and Geraghty – who left the clinic moments before arrests were made – the Defendants were physically carried out of the building and into transport vehicles.

## II.      The Government's Evidentiary Presentation

At trial, the governments intends to call law enforcement agents who will present the substantial documentary evidence detailing the Defendants' scheme; MPD officers who responded to the Clinic and captured the Defendants' clinic obstruction on body worn camera; video taken from cameras in the Clinic; Clinic employees who will describe the Defendants' actions on October 22, 2020, and how those actions obstructed the function of the Clinic; and patients of the Clinic who had appointments at the clinic on October 22, 2020, who will describe their interactions with the Defendants that day and how the Defendants' actions impacted their access to the Clinic. To prevent in-trial delay from objections that can be resolved before trial begins, below we address the admissibility of the government's evidence and how we intend to present that evidence.

### a.   Documentary and Video Evidence

As indicated above, we intend to introduce documents demonstrating the Defendants' scheme—telephone records, Facebook messages and posts, text messages, and records from the Clinic.   We also intend to introduce photo and video evidence obtained from MPD BWC and clinic surveillance cameras of the Defendants carrying out the scheme by barricading themselves in the Clinic and obstructing access to and the functioning of the clinic.

The admissibility of evidence like this involves three questions: first, whether the evidence

is relevant; second, whether the evidence is authentic—*i.e.*, whether it is what it purports to be; and third, whether the evidence contains any inadmissible hearsay. The relevance of this evidence, broadly speaking, is explained in the description of the Defendants' scheme and blockade of the Clinic in Part I above. Below, we explain how we intend to authenticate evidence and why the government's evidence is admissible non-hearsay.[1]

### i. Authentication

To authenticate evidence, such as an email, text message, photo, video, or other record, the proponent "must produce evidence sufficient to support a finding [by the jury] that the item is what the proponent claims it is." Fed. R. 901(a). The threshold for authenticity is "not high" and the proponent's burden is "slight"; the proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Hassanshahi*, 195 F. Supp.3d 35, 48 (D.D.C. 2016) (citations and quotation marks omitted); *see also United States v. Safavian*, 435 F. Supp.2d 36, 39 (D.D.C. 2006) ("[T]he Court need not find that the emails are necessarily what the proponent claims, only that there is evidence sufficient for the jury to make such a finding.") (citation omitted).

Authenticity can be established through testimony from a witness with knowledge that "an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), by examining the item's "appearance, contents, substance, internal patterns, or other distinctive characteristics [ ], taken together with all the circumstances," Fed. R. Evid. 901(b)(4), and other methods. Absent evidence of alternations

---

[1] On July 27, 2023, the government sent counsel for the Defendants a draft stipulation for the authenticity of the evidence discussed here. Regardless of whether the government and the Defendants can come to an agreement on the authenticity of the evidence in advance of trial, the government maintains this evidence is both authentic and admissible.

or specific indicia that a document is not what it purports to be, arguments about its reliability or trustworthiness are "more appropriately directed to the weight the jury should give the evidence," not to whether it should be admitted. *Id.* at 40; *see also Hassanshahi*, 195 F. Supp. 3d at 48 ("The ultimate resolution of the evidence's authenticity is reserved for the jury.").

The majority of the evidence the government intends to offer at trial was obtained through search warrants, grand jury subpoenas, and voluntary disclosure. Such evidence is readily authenticable through testimony by a law enforcement agent with knowledge of the collection process. *See Braswell v. United States*, 487 U.S. 99, 119 (1988) (explaining that the government may authenticate records through testimony "establishing that the corporation produced the records subpoenaed" and the "jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena"). Although such testimony is itself sufficient to authenticate records, the authenticity of communications such as emails, text messages, and correspondence will be further confirmed by their content, including the Defendants' mutual identification of each other, their email addresses, the subject of their communications, and other contextual information—such as call-detail and video and photo records corroborating the communications' content. *See Safavian*, 435 F. Supp.2d at 39 (authenticating emails based on the email addresses connecting names to accounts, signature blocks identifying the sender, the communications' content, and comparison to other admitted records).

Furthermore, although the video and photograph evidence the government intends to offer at trial could also be authenticated by a law enforcement agent with knowledge of how this

evidence was obtained, the government further intends to authenticate its video and photograph evidence through the testimony of those familiar with the actions captured in the video and depicted in the photographs. *See United States v. Rembert*, 863 F.2d 1023, 1026-27 (finding photographs can be authenticated through witness testimony and through the contents of the photograph itself); *see also United States v. Strothers*, 77 F.3d 1389, 1393 (D.C. Cir. 1996) ("Tapes may be authenticated 'by testimony describing the process or system that created the tape' or 'by testimony from parties to the conversation affirming that the tapes contained an accurate record of what was said.'") (*citing United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993).

In addition, virtually all the records the government will introduce at trial were produced to the government, and thus to the defense, with an accompanying certification under Federal Rule of Evidence 902(2), (4), or (11), which render the records self-authenticating.

## ii. **Admissibility**

### 1. **Business Records**

The government will introduce a variety of business records, such as call-detail records and records obtained from Facebook, the Clinic, and AirBnB. Federal Rule of Evidence 803(6) excepts from hearsay "[r]ecords of a [r]egularly [c]onducted activity," such as "[a] record of an act[ or] event," if the record: "(A) was made at or near the time by—or from information transmitted by—someone with knowledge; (B) . . . was kept in the course of a regularly conducted activity of a business . . .; [and] (C) making the record was a regular practice of that activity . . . ." A business record is admissible without testimony from a custodian upon "a certification that complies with Rule 902(11)," Fed. R. Evid. 803(6)(D), and if "the record and certification [are made] available for inspection—so that the [opponent] has a fair opportunity to challenge them."

13

Fed. R. Evid. 902(11); *see Melendez-Diaz v. Mass.*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."). The categories of records listed above fall squarely within Rule 803(6)'s confines.

## 2.  Facebook and Text Messages

The government intends to introduce the Facebook and text messages that the Defendants exchanged, in particular Facebook and text messages Handy and Darnel exchanged with each other and exchanged with others. These communications offer the jury a front-row seat to what the Defendants understood and thought at the time they acted. These emails and text messages are admissible as co-conspirator statements under Rule 801(d)(2)(E).

A co-conspirator statement is defined as follows: "The statement is offered against an opposing party and: was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  The government must establish that the statement meets these criteria by a preponderance of the evidence and may rely – at least in part – on the statements themselves to prove the existence of the conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

The co-conspirator statement need not have been made in furtherance of the charged conspiracy; it is admissible as long as it was made in furtherance of any conspiracy which the defendant had joined.  *See, e.g.*, *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988) ("The statements of joint venturers may fall within the scope of the Rule [F.R.E. 801(d)(2)(E)], and there is no requirement that a conspiracy be formally charged in the indictment."); *see also*

*United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022) (when determining the admissibility of a co-conspirator statement, "we have repeatedly stressed that the alleged conspiracy need not be the same as the one charged."); *United States v. Weadick*, 15 F.4th 1, 9 (1st Cir. 2021) ("But the hearsay exception under Rule 801(d)(2)(E) can apply 'regardless of whether the conspiracy furthered [by the alleged hearsay] is charged or uncharged and regardless of whether [the conspiracy] is identical to or different from the crime that the statements are offered to prove.'"); *United States v. Rutland*, 705 F.3d 1238, 1248 n.4 (10th Cir. 2013) ("The conspiracy supporting the introduction of the out-of-court statement need not be the same as the conspiracy charged in the indictment, so long as the statement was in furtherance of the uncharged conspiracy.").

The requirement that the statement have been made in furtherance of the conspiracy is broadly interpreted.  *See, e.g., United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011); *United States v. Sims*, 999 F.3d 547, 552–553 (5th Cir. 2021).   The D.C. Circuit has explained the "in furtherance" requirement this way:

The "in furtherance of" requirement is a limitation on what statements by co-conspirators may be admitted; mere narratives of past successes and failures, for example, are not admissible. Nor are a "conspirator's casual comments to people outside or inside the conspiracy" admissible under this rule.  If the statement, however, can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted.  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988) (emphasis added) (citations omitted).   "A wide array of statements can fit this [in furtherance] requirement, including those made 'to induce enlistment or further participation in the group's activities; . . . to

prompt further action on the part of conspirators; . . . to reassure members of a conspiracy's continued existence; . . . to allay a co-conspirator's fears; and . . . to keep co-conspirators abreast of an ongoing conspiracy's activities.'" *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017).   The following other types of statements have also been deemed to be "in furtherance of the conspiracy":   (1) those regarding the group's organizational structure, logistics, and activities, *United States v. Ibraheem Izzy Musaibli*, 42 F.4th 603, 606, 614–619 (6th Cir. 2022); (2) those that "identified other co-conspirators and their roles"; *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *13 (6th Cir. July 5, 2022) (unpublished opinion); (3) those made to enlist assistance with the conspiracy, *United States v. Bowman*, 215 F.3d 951, 961 (9th Cir. 2000); and (4) those made to law enforcement to stall enforcement actions.   *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996).

### iii.  Method of Presentation

Most of the government's documentary evidence will be presented through the testimony of a case agent. The government's body worn camera evidence will be presented through the testimony of an MPD officer or officers. The video obtained from the Clinic surveillance cameras will be presented through the testimony of Clinic employees.

The government will also use summary exhibit(s) to demonstrate the communications between the Defendants leading up the blockade of the Clinic on October 22, 2020.   Summary charts are admissible under Federal Rule of Evidence 1006, which allows their use "to prove the content of voluminous writings [or] recordings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006; *see also United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008) ("The point of Rule 1006 is to avoid introducing all the documents. As long as a party has laid a

foundation for the underlying documents, a chart summarizing them can itself be evidence under

Rule 1006."). Courts routinely permit the use of such summary charts where, as here, their use will

assist the jury's understanding of the evidence and expedite trial. *E.g., United States v. Fahnbulleh*,

752 F.3d 470, 479 (D.C. Cir. 2014).

### b. Post-Arrest Statements

The government does not intend to introduce at trial any of the Defendants' post-arrest

statements. The government anticipates the Defendants will use post-arrest statements that are not

inculpatory and for the truth of the matter asserted. For reasons previously briefed, the Defendants

should be precluded from introducing these statements as they are hearsay. ECF No. 248 at 12-14.

Furthermore, although the government does not intend to introduce the post-arrest statements, even

if the government did so, Federal Rule of Evidence 106, the "Rule of Completeness," does not

change the fact that these statements are inadmissible. *Id.* at 13-14.

### III.   Anticipated Defenses

The facts are not in dispute. The Defendants planned to barricade themselves inside the

Clinic on October 22, 2020. The Defendants arrived in Washington, D.C. on October 21, 2020,

bringing with them chains, ropes, and locks, and discussed their plans for the next day. On October

22, 2020, they carried out their plan and barricaded themselves in the Clinic using chains, ropes,

and locks, obstructing access to and the functioning of the Clinic. The government will prove

beyond a reasonable doubt that the Defendants conspired together to obstruct access to the Clinic

and did, in fact, obstruct access to and the functioning of the Clinic. The *why* the Defendants did

so is irrelevant and any attempt by the Defendants to introduce such evidence should be excluded.

*See* ECF No. 248 at 2-8 (government motion *in limine* to preclude Defendants from making

arguments intended to invite jury nullification), 11-12 (government motion *in limine* to preclude Defendants from arguing that their conduct was protected by the First Amendment), 12-14 (government motion *in limine* to preclude Defendants from introducing improper character evidence), 14-16 (government motion *in limine* to preclude Defendants from introducing improper character evidence, 16-18 (government motion *in limine* to preclude Defendants from improperly cross-examining witnesses); ECF No. 301 (government's objection to defendant's request to assert affirmative defenses); ECF No. 316 (government motion *in limine* to preclude certain defense exhibits). Furthermore, as discussed above, the government's evidence clearly demonstrates that the Defendants intended to impede women from receiving reproductive health services at the Clinic. *See supra* at 2-10.

## IV.   Other Issues

### a.  Witness Pseudonyms

To avoid potential safety and security problems for its civilian witnesses, including the Clinic patients and employees, the government proposes to have its civilian witnesses testify under a pseudonym and will file under seal for the Court and for the Defendants a key that identifies its civilian witnesses and the name with which they intend to use while testifying, thus avoiding any Confrontation Clause problems. The Defendants will be given, and have already been provided through discovery and the government's witness list, ECF No. 287 (filed under seal), sufficient information to place the witnesses in their proper setting, without having to disclose their true name at trial in open court.  *See, e.g., United States v. Mohamed*, 727 F.3d 832, 838 (8th Cir. 2013) (the witness's "use of a pseudonym did not deny Mohamed the opportunity to effectively conduct cross-examination. The district court disclosed [the witness's] real name to defense

counsel, so defense counsel had the ability to investigate [the witness's] background.").

In determining whether it is appropriate to permit a witness to testify under a pseudonym, courts apply a balancing test—weighing a defendant's ability to cross-examine effectively with a witness's safety concerns. *See e.g.*, *United States v. Celis*, 608 F.3d 818, 830-35. (D.C. Cir. 2010), *United States v. Ramos–Cruz*, 667 F.3d 487, 500 (4th Cir. 2012), *United States v. El–Mezain*, 664 F.3d 467 (5th Cir. 2011), *Siegfriedt v. Fair*, 982 F.2d 14, 17 (1st Cir. 1992), *United States v. Rangel*, 534 F.2d 147, 148 (9th Cir. 1976); *see also United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) ( "[W]here there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute. . . . Under almost all circumstances, [however,] the true name of the witness must be disclosed."). Courts have routinely found that where the government has disclosed a witness's true name to defense counsel, allowing that witness to testify under an alias provides defense counsel with an opportunity for effective cross-examination. *See e.g.*, *Celis*, 608 F.3d at 834-835, *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1142 ("The Government may provide an opportunity for effective cross-examination by disclosing a witness's real name to defense counsel while the court still allows the witness to testify under an alias, but this is not the only means to do so."); *see also United States v. Machado–Erazo*, 951 F.Supp.2d 148, 157 (D.D.C. 2013) (applying a balancing test and determining that expert witness could testify without disclosing true name or other personal identifying information due to continuing threat of safety).

Here, the government's witnesses have legitimate safety concerns. As alleged in the indictment, the Defendants used force and Nurse K was injured as the Defendants carried out their scheme. Furthermore, protestors continue to enter the Clinic building, wait in the hallway, and

harass patients and Clinic staff. The government anticipates there will be associates of the Defendants in the courtroom and outside the courthouse during trial. If the government's witnesses testify with their true names, this would open them up to additional harassment by a wide network of people who are clearly willing to take extreme measures to forcefully obstruct a women's right to reproductive health care. Furthermore, at least one Defendant has already expressed to this Court that she will not abide by this Court's orders, indicating the government's witnesses may be at greater risk of harm. 7/24/23 Hrg. Tr. at 24-25. On the other hand, where defense counsel has the true names of all government witnesses, the use of an alias while testifying does little harm to the rights guaranteed by the Confrontation Clause.   The Defendants will still have the opportunity to confront physically the witnesses against them.   They will have opportunity for cross-examination, and the trier of fact would have the opportunity to assess the demeanor and credibility of the witnesses.   In addition, the witnesses will give their testimony under oath, subject to the penalty of perjury.   If defense counsel objects to the use of pseudonyms, the government intends to ask the Court to make the appropriate findings and permit the government's witnesses to use a pseudonym at trial.

## V.    Conclusion

The conspirators' purposeful choice to invade the clinic and inflict trauma, physical and emotional, on its patients and staff is one for which they must be held accountable. The government's evidence will prove their guilt beyond a reasonable doubt.

//

//

//

20

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ John Crabb Jr.*
JOHN CRABB JR.
NY Bar No. 2367670
REBECCA G. ROSS
NY Bar No. 5590666
Assistant United States Attorneys for the
District of Columbia
john.d.crabb@usdoj.gov
Rebcca.Ross2@usdoj.gov


KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Sanjay.Patel@usdoj.gov

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Trial Brief has been filed and served upon all parties listed on the Electronic Case Filing (ECF) System and is available for viewing and downloading from the ECF system.

DATE: August 1, 2023.

*/s/ Rebecca G. Ross*
REBECCA G. ROSS
Assistant United States Attorney

22