IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| LAUREN HANDY | : | NO. 1:22-cr-00096CKK |

## DEFENDANT LAUREN HANDY'S SUPPLEMENTAL MEMORANDUM TO GOVERNMENT'S MOTION IN LIMINE

The court has in abeyance the government's motion in limine regarding the video of Dr. Cesare Santangelo and a related pamphlet. The court has indicated it will rule on the motion after hearing Ms. Handy's testimony regarding the video, but has not indicated whether Ms. Handy will be allowed to testify specifically as to the <u>contents</u> of the video in laying the foundation for it.

It is Ms. Handy's position that since the video dramatically motivated her decision to address born-alive abortion concerns and Dr. Santangelo's clinic specifically, she is entitled to introduce it to corroborate her good faith belief with respect to the intent element of the offense.

Ms. Handy will testify as to the following:

1. Specific statements made by Dr. Santangelo, and

2. Inferences she drew from them. Those inferences were informed by knowledge she acquired in the aftermath of seeing this life-changing video. That knowledge is based upon guidelines she studied, published by the pro-abortion Society of Family Planning, which contain the following:

> Transient fetal survival is very unlikely after intra-amniotic installation of saline or urea, which are directly feticidal. **Transient survival with misoprostol for labor induction abortion at greater than 18 weeks ranges from 0% to 50%** [51] and has been observed in up to 13% of

> abortions performed with high-dose oxytocin. [52]. **Factors associated with a higher likelihood of transient fetal survival with labor induction abortion include increasing gestational age**, decreasing abortion interval **and the use of non-feticidal inductive agents** such as the PGE analogues [113].
>
> *Clinical Guidelines, Labor induction abortion in the second trimester*, Society of Family Planning (February 2011), (p. 13)
>
> (emphasis supplied).

Ms. Handy need not be an expert to acquire available information and draw her own conclusions. In fact, if she were to put on an expert to testify as to the reasonable inferences that can be drawn from Dr. Santangelo's statements, the government could properly object. This trial is not over the truth of those statements or supportive inferences drawn by an expert Ms. Handy didn't consult. Such inferences cannot be properly imputed to her.

On the other hand, the trial is very much about her beliefs at the time and her reasons for acting. The jury must address her credibility when she testifies that she had those beliefs, and the related question of whether they were reasonable. Reasonableness of the beliefs is not a specific element of the charge. But the more reasonable a belief is, the more credible a jury may find a person who claims to have possessed it.

Ms. Handy is entitled to support her beliefs with as much detail as was in her mind at the time of the events charged. Though newer information is available, Ms. Handy will make no reference to, or attempt to incorporate, anything of which she was not aware, or by which she was unaffected, when she went into Dr. Santangelo's clinic.

In accord with this, she will testify as to the following beliefs, and the support for them in the video:

1. As she learned from the Society of Family Planning guidelines, live birth abortions ("transient fetal survival") occur from 0% to 50% of the time in typical labor induction abortions at 18 weeks gestation or more, and the likelihood increases with greater gestational age and the non-use of feticides to kill the child in advance of the procedure.

2. At the time of the events, Dr. Santangelo was well known to perform very late term labor induction abortions (as opposed to dismemberment abortions), well beyond 18 weeks, and without the use of feticides. The video supports this:

**Late Term**

In the video, Dr. Santangelo indicates the pregnancy, which he is clearly willing to terminate, is at 24-25 weeks:

> 43:23  **Woman**: How big is the baby?
>
> **Dr**.**Santangelo**: Your pregnancy at this point is about 24-25 weeks, so it's about the size of your hand. Let's put it that way.

**Labor Induction as opposed to Dismemberment:**

In the video, Dr. Santangelo describes an effort to bring the child out without dismemberment, and implies that the effort often works:

> 43:07  **Dr**. **Santangelo**: Hopefully we'll get the pregnancy out intact, but it doesn't always happen that way.
>
> [ ]
>
> 44:07  **Woman**: You say you take it out intact?
>
> **Dr**. **Santangelo**: We try. That's the whole reason we do the dilation today and tomorrow.

**No Use of Feticide:**

In the video, Dr. Santangelo describes his preferred method of killing the child, and it doesn't involve the use of feticide:

> 43:13  **Dr**. **Santangelo**: I cut the umbilical cord first, wait for the baby to expire, and then we do it that way.

3

> 43:20  **Dr**. **Santangelo**: So hopefully the pertinent, the fetus will expire first, and then we do the pregnancy termination.
>
> [ ]
>
> 44:15  **Woman**: Does it ever, like, move or anything when it comes out?
>
> 44:19  **Dr**. **Santangelo**: That's why I try and sever the umbilical cord first and we wait for that to stop pulsing, and that's why the fetus is expired first, so it doesn't.

3. Consistent with what the Society of Family Planning Guidelines indicate could happen, Dr. Santangelo acknowledges that "hopefully" the child will expire first, but that severing the umbilical cord is what causes the death of the baby**,** and that he will "try" to accomplish that, but that live birth can happen:

> 43:20  **Dr**. **Santangelo**: So hopefully the pertinent, the fetus will expire first, and then we do the pregnancy termination. (emphasis supplied).
>
> [ ]
>
> 44:19  **Dr**. **Santangelo**: That's why I try and sever the umbilical cord first and we wait for that to stop pulsing, and that's why the fetus is expired first, so it doesn't.

<u>In what logically follows from these uncertainties, Dr. Santangelo acknowledges live birth in terms that suggest not hypotheticals, but actual experience:</u>

> 44:32  **Woman**: Has it ever survived? After it comes out?
>
> **Dr**. **Santangelo**: Not here, no.
>
> 44:40  **Dr**. **Santangelo**: It could, I mean, you know, if some people go into labor, you know, prior to us, you know, when you do this. What we do is, we, we try and help the cervix dilate. <u>And some people will go into labor before we, we do the procedure. And that can happen, you know, it's unusual.</u>
>
> 44:59  **Woman**: And what <u>do</u> you…?
>
> **Dr**. **Santangelo**: <u>Usually</u> at this point
>
> **Woman**:  What <u>do</u> you do?
>
> **Dr**. **Santangelo**: The … is to early to survive, <u>usually</u>, it will expire shortly after birth.

4

The first part of the exchange set forth above is worth re-reading:

> 44:32 **Woman**: Has it ever survived? After it comes out?
>
> **Dr**. **Santangelo**: Not here, no.

**This is not a statement that no child has ever come out alive. It is a statement that, having done so, no child has survived at Dr. Santangelo's clinic.**

4. Having acknowledged the possibility, Dr. Santangelo then acknowledges what he would do in the event of a live birth:

> **Woman**: But if it did, what would happen? Would I have to take it home and be responsible for it?
>
> 45:18 **Dr**. **Santangelo**: I mean, you know, technically, you know, legally, we would be obligated to help it, you know, to survive, but, you know, it probably wouldn't. It's all in how vigorously you do things to help a fetus survive at this point. When you have a pregnancy that's 23, 24 weeks, if you're, you're, extra, if you, if you, do everything possible, to help it survive, you know, there's a maybe a 20-30% chance it would survive.
>
> 45:48 **Dr**. **Santangelo**: If you don't do anything, then, you know, the chances are much, much less.
>
> **Woman**: I'm just scared of like…
>
> **Dr**. **Santangelo**: Sure…
>
> 45:55 - 45:58  (Both talking, indiscernible.)
>
> 45:58 **Woman**: So would you make sure that it, like…
>
> **Dr**. **Santangelo**: Yeah…
>
> **Woman**: …doesn't survive?
>
> **Dr**. **Santangelo**: Of course, we do. (Nodding head yes) Obviously, you're here for a certain procedure and if your pregnancy were, let's say you went

5

into labor, your membranes rupture, and you delivered before we got to the termination part of the procedure here, you know, then we would do things, we would, we would, we would not help it.

**Woman**: OK

**Dr**. **Santangelo**: Let's say, we would not intubate.

**Woman**: OK

**Woman**: So you'd make sure it wouldn't survive…

**Dr**. **Santangelo**: We wouldn't do any extra, it's like…

**Woman**: …to help it?

**Dr**. **Santangelo**: Yeah. It would be, you know, a person that would be a terminal person in the hospital, let's say, they had cancer. You wouldn't do any extra procedures to help that person survive. Like Do Not Resuscitate orders. We would do the same thing here. Whereas if you were in a hospital in Virginia, let's say, and you went into labor and you went to the hospital and they saw you alive they would do everything possible to help that fetus survive.

**Woman**: But you won't.

**Dr**. **Santangelo**: We wouldn't.

## CONCLUSION

While people may differ in their response to Dr. Santangelo's statements, there is little question that some people could hear in them what Ms. Handy heard in them. The credibility of Ms. Handy's claim to have been affected by the video is ultimately a jury question. The jury cannot determine that issue without seeing the video.

Further, in order to lay the foundation for the video, establishing its relevance and probative value, Ms. Handy must be allowed to speak in detail about it prior to its admission.

**Respectfully submitted,**

**s/MARTIN A. CANNON**
**MARTIN A. CANNON**

6

                            **/S/ DENNIS BOYLE**

                            **DENNIS BOYLE**

**CERTIFICATE OF SERVICE**

DENNIS BOYLE, hereby certifies that a true and correct copy of the foregoing document has been electronically filed.

                            **/S/ DENNIS BOYLE**

                            **DENNIS BOYLE**

**DATED: 8-20-23**