UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAUREN HANDY,<br>    Defendants. | Criminal Action No. 22-096 (CKK) |

**MEMORANDUM OPINION**
(September 22, 2023)

On October 22, 2020, a group of pro-life activists forced entry into a reproductive health clinic in the District of Columbia in order to halt, for as long as possible, abortions scheduled for that day.  For their actions, the Government charged ten of these activists with, among other things, conspiracy against civil rights, in violation 18 U.S.C. § 241.[1]  Over the course of two trials, two juries of impartial Washingtonians have since convicted eight of the charged defendants on this offense.  During deliberations, the jury in the first trial asked the Court to further define the conduct barred by section 241: conspiring with another "to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to" that person, in relevant part, by "the laws of the United States."  Consistent with Supreme Court precedent, the Court instructed the jury that these terms ("intimidate" and "oppress" in particular) "are not used in any technical sense, but cover a variety of conduct intended to harm, frighten, punish, prevent, or obstruct a person's exercise or enjoyment of a [legal] right."  *See United States v. Waddell*, 112 U.S. 76, 80 (1884).  This memorandum opinion further explains the reasoning behind this instruction and why the Court rejected the parties' alternative proposed instructions.

---

[1] Defendants are:  Lauren Handy, Jonathan Darnel, Jay Smith, Paula "Paulette" Harlow, John Hinshaw, Heather Idoni, William Goodman, Joan Bell, and Herb Geraghty.

1

I. **BACKGROUND**

According to the allegations in the operative indictment, all ten Defendants successfully schemed to disrupt access to a reproductive health clinic in the District of Columbia on October 22, 2020. ECF No. 113 at 5. Defendant Handy orchestrated this conspiracy, directing her co-Defendants to undertake various preparations to blockade the clinic. *Id.* For example, Defendants Smith, Marshall, Hinshaw, Bell, and allegedly Harlow used chain and rope to block the clinic's doors. *Id.* at 6. For her part, Defendant Handy made an appointment at the clinic under a false name in order to ensure her entry and her co-conspirators' entry shortly thereafter. *See id.* at 4. Defendant Smith's entry was particularly violent, causing a nurse to stumble backwards and injure her ankle. *Id.* at 5. Defendant Handy then purportedly directed others to blockade the clinic's doors, keeping potential patients out. *See id.* at 5-6. Meanwhile, Defendant Darnel live-streamed the incursion, telling listeners that he and co-conspirators had "intervene[d] physically with their bodies to prevent women from entering the clinic[.]" *Id.* at 6. Based on the foregoing, the Government charged each defendant with: (1) conspiracy against rights, in violation 18 U.S.C. § 241, and (2) obstructing, with violence or force, access to a reproductive health clinic, in violation of 18 U.S.C. §§ 248(a)(1), (b)(1).

The Court severed the case into three trials: (1) an August 9, 2023 trial featuring Defendants Handy, Hinshaw, Idoni, Goodman, and Geraghty; (2) a September 6, 2023 trial featuring Defendants Darnel, Marshall, and Bell; and (3) an October 23, 2023 trial featuring Defendant Harlow. The tenth Defendant, Jay Smith, entered a plea of "guilty" on a superseding information on March 1, 2023. A jury returned a verdict as to the first group on August 29, 2023, finding each Defendant in that group guilty of each charge in the operative indictment, including a special finding that they used force against persons or property to achieve their unlawful ends.

On September 15, 2023, another jury returned the same verdict as to the second group.

In advance of the first trial, the parties proposed dueling instructions for the offense at issue here. Each recited, in relevant part, the conduct criminalized by 18 U.S.C. § 201: conspiring "to injure, oppress, threaten, or intimidate" patients and employees of the clinic in this case in their exercise of a right to receive and provide reproductive health services. *Compare* Government's Proposed Jury Instructions, ECF No. 270 at 24 (July 7, 2023) *with, e.g.*, Defendant Handy's Proposed Jury Instructions, ECF No. 277 at 19 (July 7, 2023). And each proposed the exact same definition for "injured, oppress, threaten, or intimidate": the terms are "not used in any technical sense, but cover a variety of conduct intended to harm, frighten, punish[,] or prevent the free action of other persons. *Compare* ECF No. 270 at 24 *with* Proposed Jury Instructions, ECF No. 277 at 19. In an effort to condense and streamline the instructions, the Court omitted a definition for the terms from the jury instructions that went to the first jury.

As it turned out, the jury required one. During its deliberations, the jury sent the following note: "What's the meaning under the law of "oppress" and "intimidate" in Instruction No. 24 as it relates to Count One [conspiracy against rights, in violation of 18 U.S.C. § 241]?" The Government requested that the Court provide the definition it proposed in advance of trial. Defendants, however, changed course, and proposed a variety of alterations predicated upon, among other things, statutory definitions in 18 U.S.C. § 248 and the mens rea required for conspiracy in violation of 18 U.S.C. § 371, a distinct offense not charged in this case. After reviewing relevant authority and considering the parties' oral arguments, the Court provided a definition almost identical to that which the parties each proposed before trial:

> The words "oppress" and "intimidate" are not used in any technical sense, but cover a variety of conduct intended to harm, frighten, punish, prevent, or obstruct a person's exercise or enjoyment of a right guaranteed by the laws of the United States.

3

The Court repeated this instruction in the second trial. Although the Court placed a great deal of its reasoning on the record orally, this memorandum opinion further explains and expands on that reasoning.

## II. DISCUSSION

### A. History and Construction of 18 U.S.C. § 241

To the extent that the Court and the parties were confronted by a question of statutory interpretation, the Court begins with the relatively laconic text of 18 U.S.C. § 241:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercise the same . . . .

Were the meaning of the terms defining the statute's proscribed conduct a question of first impression, the Court would, of course, apply familiar textual canons of construction. *See United States v. Wells*, 519 U.S. 482, 489-93 (1997). Yet section 241 is not *terra incognita*. It is one of this country's oldest civil rights statutes and, necessarily, one of its older criminal statutes as well. *See United States v. Price*, 383 U.S. 787, 801-02 (1966); *see also generally* Nancy S. Abramowitz, *Legislating Civil Rights: The Role of Sections 241 and 242 in the Revised Criminal Code*, 63 Geo. L.J. 203 (1974).

Congress first enacted section 241 in 1870 to ensure, among other things, the swift and peaceful implementation of the Reconstruction Amendments and the Civil Rights Act of 1866. *See United States v. Mosley*, 238 U.S. 383, 386 (1915) (Holmes, C.J.); Edward F. Malone, *Legacy of the Reconstruction: The Vagueness of the Criminal Civil Rights Statutes*, 38 UCLA L. Rev. 163, 171-75 (1990). Section 241's first iteration differed only in syntax, not in substance. It criminalized conspiracies "to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder" the exercise of a "right or privilege granted or secured to him by the Constitution

or laws of the United States." Enforcement Act of 1870 ch. 114 § 6, 16 Stat. 140, 141 (1870). It also required the same mental state: entering the conspiracy "because of [the targeted victim's] having exercised" a particular right or privilege. *Id.*

Although violence perpetrated by the Ku Klux Klan was "obviously in the mind of Congress" in passing section 241, Congress went further to "protect[] *all* [f]ederal rights from conspiracies against them" not just "conspiracies contemplating violence." *Mosley*, 238 U.S. at 387-88 (emphasis added). The majority in *Mosley* further rejected the dissent's insistence that conspiracy against rights should be "strictly construed" because the statute is "highly penal." *Id.* at 389 (Lamar, J., dissenting). Rather, section 241 "sweep[s]" broadly by using, as is relevant here, "general words" at the beginning of the statutory text. *Id.* at 388.

In this regard, *Mosley* reaffirms even older Supreme Court precedent explicating the sorts of conspiracies that section 241 criminalizes. "Whenever," the Supreme Court explained in *Waddell* in 1884, the charged conduct is "of a character to prevent[] or throw obstruction in the way of exercising [a federal] right, and for the purpose and with the intent to prevent it, or to injure or oppress a person because he has exercised it[,]" that conduct "come[s] within the purview of the statute." 112 U.S. at 80. From this longstanding precedent, decidedly binding upon this Court, it is not difficult to determine that the statute's *actus reus* is defined precisely as Defendants initially requested: "injure" and "oppress" are "not used in any technical sense, but cover[] a variety of conduct intended to harm, frighten, punish[,] or prevent the free action of other persons." *See United States v. McDermott*, 29 F.3 404, 408 (8th Cir. 1994). Here, this Court went further only to incorporate a conspiracy to "obstruct" the enjoyment of a federal right, as the Supreme Court held in *Waddell*. *See* 112 U.S. at 80.

At the same time, this Court also applied a narrower definition: it is not enough that a

5

defendant conspire to oppress a person's "free action;" rather, a defendant must conspire to oppress a person's exercise of a legal right. Here, the Court has previously explained why 18 U.S.C. § 248 provides a predicate right arising under the laws of the United States. *United States v. Handy*, Crim. A. No. 22-096 (CKK), 2023 WL 4744057, at *3 (D.D.C. July 25, 2023). Insofar as the right forms a part of the conduct proscribed by section 241, this Court will briefly revisit the issue for the sake of completeness.

A predicate right must be "'secured by the Constitution or laws of the United States.'" *United States v. Guest*, 383 U.S. 745, 753 (1966) (quoting 18 U.S.C. § 241). Although the law previously recognized a limited right to access abortion services arising under the Fourteenth Amendment, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992), as of a little more than a year ago, no longer, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2265 (2022). Shifts in constitutional law is of no moment in this case, however, because the Government has proceeded exclusively upon the theory that 18 U.S.C. § 248 (the Freedom of Access to Clinic Entrances Act, or "FACE Act") provides a right or privilege arising under the laws of the United States. *See* Superseding Indictment, ECF No. 113 at ¶ 8.

A right or privilege for the purposes of section 241 must be "specific[ally]" identified by the "express terms" of the federal law that creates the right or privilege. *See United States v. Kozminski*, 487 U.S. 931, 941. The FACE Act does so by clearly proscribing any private individual from obstructing a patient from receiving or a clinic employee from providing, among other things, abortion services. 18 U.S.C. §§ 248(a)(1), (e)(5). The FACE Act even provides a private cause of action. *Id.* (c)(1)(A). That a right does not sound in a law passed pursuant to section five of the Fourteenth Amendment, and instead pursuant to another of Congress' enumerated powers, is also immaterial.

6

For example, take *United States v. Johnson*, 390 U.S. 563 (1968). There, the Supreme Court sustained the application of section 241 to a conspiracy to force, through intimidation, three Black restaurant patrons to leave the establishment. *Id.* at 565-66. The right at issue was the Civil Rights Act of 1964's guarantee of equal access to all places of "public accommodations." *Id.* at 563 (quoting 42 U.S.C. § 2000a(a)). The constitutionality of this legal right, of course, arises from the Commerce Clause, not section five of the Fourteenth Amendment. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252 (1964).[2]

### B. Counter Arguments

Defendants orally levied a slew of counterarguments. None of them convinces, predominantly because none of them provides an end run around binding Supreme Court precedent. First, Defendants Handy and Idoni pressed textualist arguments in favor of a narrow reading than that applied in *Waddell* and its progeny. Defendant Handy requested that the Court apply three statutory canons of construction: the specific controls the general, and the recent controls the older, and the rule of lenity. Trial Trans. at 77:19-22, 79:8 (Aug. 25, 2023) (hereinafter "Trial Trans."). After joining these arguments, Defendant Idoni also renewed her request that the Court apply a dictionary definition of "oppress." Trial Trans. at 74:24-75:2; Def.'s Proposed Jury Instruction, ECF No. 314 (July 26, 2023) (citing, *inter alia*, Wikipedia). Lastly, and

---

[2] The Civil Rights Act of 1964 is not the only statute enacted pursuant to Congress' power to regulate interstate commerce that creates a right or privilege under federal law. For instance, a federal law permitting a retired law enforcement officer to carry a concealed firearm "that has been shipped or transported in interstate or foreign commerce" is a "law of the United States" that creates an enforceable privilege. *See DuBerry v. District of Columbia*, 824 F.3d 1046, 1049 (D.C. Cir. 2016) (quoting 18 U.S.C. § 926C(a)) (applying similar language in 42 U.S.C. § 1983). Similarly, a federal law's requirement that a nursing home must protect a resident's health and safety creates a privilege that a nursing-home resident may enforce. *See Health and Hosp. Corp. of Marion Cty. v. Talevski*, 143 S.Ct. 1444, 1450 (2023) (also applying similar language in 42 U.S.C. § 1983).

7

nonresponsively, Defendant Geraghty appeared to contest the mental state required to convict on section 241.

Each textualist argument seems to be based mainly upon Defendants' threshold argument that *Waddell* interpreted a version of conspiracy against rights codified at a separate section of the United States Code. *See* Trial Trans. at 73:6-10. Even assuming that no appellate authority existed post-*Waddell* and that *Waddell* interpreted a distinct, earlier version of section 241, textual analysis would still render its holding operative here. The prior-construction canon requires the Court to presume that "[i]n adopting the language used in [an] earlier [version of an] act," Congress adopted the Supreme Court's prior construction of that language "and made it a part of the enactment." *Shapiro v. United States*, 335 U.S. 1, 16 (1948). This stabilizing canon broadly defeats Defendants' other linguistic canons. *See* Scalia & Garner, *Reading Law* 323 (2012).[3]

Nor, on their own, do the general/specific and recent/older canons apply here. The former usually applies where a narrow statute speaks to a narrow set of conduct and another, broader statute speaks to a broader set of conduct inclusive of the former. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976). In such a circumstance, the narrower statute is not "controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974). Here, Defendant appears to argue that the later FACE Act should constructively amend the older section 241. Yet by invoking the general/specific canon, Defendants have it backwards—the Court is construing the broader statute, not the narrower

---

[3] This also assumes a statute passed in near identical form in 1870 can be properly understood through an exclusively textualist approach. Section 241 undoubtedly predates the textualist revolution and the Supreme Court's exclusive reliance upon certain linguistic and textual canons. *See* Jonathan T. Molot, *The Rise and Fall of Textualism*, 106 Colum. L. Rev. 1, 23-24 (2006). Insofar as section 241 was first enacted and subsequently amended in minor part "when a different view of statutory interpretation held sway," the persuasive value of Defendants' approach is entirely unclear even were the Court beginning from a blank slate. *See United States v. Wells*, 519 U.S. 482, 509 (1997) (Stevens, J., dissenting).

statute.

Similarly, that the FACE Act was passed after section 241 is of no consequence. In advancing this argument, Defendants appear to maintain that the FACE Act amends in some way section 241. To do so, however, the FACT Act would: (1) have to contain a provision "in irreconcilable conflict" with section 241, (2) need to "cover[] the whole subject of" section 241's ambit, and (3) be "clearly intended as a substitute" to section 241. *See Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). Such circumstances are exceedingly rare. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001). And they clearly are not present here. The Court perceives absolutely no conflict between the two statutes; if anything, they are complementary. Conspiracy against rights governs a broad array of conspiracies against any federal right, whereas the FACE Act is limited to interference with health clinics and places of worship. *Compare* 18 U.S.C. § 241 *with* 18 U.S.C. § 248(a). Nor is there any indication that Congress intended to repeal section 241 through the FACE Act's enactment.

Defendants' reliance on the rule of lenity is similarly misplaced. The rule of lenity constitutes "the familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 411 (2010) (internal quotation marks omitted). The rule, obviously, requires ambiguity—whether, after resorting to other tools of statutory construction, there is still "a reasonable doubt" as to a term's meaning. *See Moskal v. United States*, 498 U.S. 103, 108 (1990). There is, of course, no ambiguity, much less any ambiguity that would require this Court to employ the rule of lenity. *Supra* at 5; *cf. also United States v. Ehrlichman*, 546 F.2d 910, 922-23 (D.C. Cir. 1976) (mental state required by section 241 evidently not ambiguous. To be sure, section 241 includes a broad array of conspiracies within its ambit, but the rule of "[l]enity offers no proper refuge from [a] straightforward (even though

9

capacious) construction." *See Yates v. United States*, 574 U.S. 528, 566 (2015) (Kagan, J., dissenting); *see also United States v. Grider*, 585 F. Supp. 3d 21, 33 (D.D.C. 2022).

Lastly, Defendant Geraghty presented some argument regarding the mental state required by section 241. Briefly, it suffices to note that any argument regarding the mental state it issue is a non sequitur, for the jury asked the Court to clarify what *conduct* is prescribed, not with what *intent* a defendant must act to be found guilty of conspiring against a federal right.

\*   \*   \*

In sum, the Court again concludes that it appropriately instructed the jury as to the conduct proscribed by 18 U.S.C. § 241.

Dated: September 22, 2023

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge