```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
        UNITED STATES OF AMERICA,        )  Criminal Action
3                                        )  No. 1:22-CR-096
                            Plaintiff,   )
4                                        )  JURY TRIAL
        vs.                              )
5                                        )  Washington, D.C.
        LAUREN HANDY, JOHN HINSHAW,      )
6       HEATHER IDONI, WILLIAM           )  August 16, 2023
        GOODMAN, HERB GERAGHTY,          )  Time:  9:10 A.M.
7                                        )  MORNING SESSION-REDACTED
                            Defendants.  )
8
            TRANSCRIPT OF JURY TRIAL - MORNING SESSION - REDACTED
9              BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                     UNITED STATES DISTRICT JUDGE
10
                          A P P E A R A N C E S
11

12      For Plaintiff:      JOHN CRABB, JR.
                            U.S. Attorney's Office
13                          601 D Street NW
                            Washington, DC 20530
14
                            SANJAY HARIVADAN PATEL
15                          DOJ-CRT
                            Civil Rights Division, Criminal Section
16                          950 Pennsylvania Avenue NW
                            Washington, DC 20004
17
        For Defendant       MARTIN A. CANNON
18      LAUREN HANDY:       Thomas More Society
                            16983 370th Street
19                          Carson, IA 51525

20                          STEPHEN M. CRAMPTON
                            Thomas More Society
21                          P.O. Box 4506
                            Tupelo, MS 38803
22
                            DENNIS E. BOYLE
23                          BLERINA JASARI
                            Boyle & Jasari, LLP
24                          1050 Connecticut Avenue
                            Suite 500
25                          Washington, DC 20036
```

```
 1                    A P P E A R A N C E S - (Cont.)

 2

 3    For Defendant      ALFRED GUILLAUME, III
      JOHN HINSHAW:      Law Offices of Alfred Guillaume, III, LLC
                         1350 Connecticut Avenue NW
 4                       Suite 308
                         Washington, DC 20036
 5

 6    For Defendant      ROBERT J. DUNN
      HEATHER IDONI:     Robert J. Dunn, PC
                         1413 Center Avenue
 7                       Bay City, MI 48708

 8    For Defendant      HOWARD J. WALSH, III
      WILLIAM GOODMAN:   3712 Cardiff Court
 9                       Chevy Chase, MD 20815

10    For Defendant      JOHN C. KIYONAGA
      HERB GERAGHTY:     600 Cameron Street
11                       Alexandria, VA 22314

12

13

14

15

16

17

18

19

20    Stenographic Court Reporter:

21                       Tamara M. Sefranek, RMR, CRR, CRC
                         Official Court Reporter
22                       United States Courthouse, Room 6714
                         333 Constitution Avenue, NW
23                       Washington, DC  20001
                         202-354-3246
24

25
```

```
 1                          I N D E X

 2    WITNESS                                          PAGE

 3    ASHLEY JONES

 4         Direct Examination by Mr. Crabb              57

 5
      SARA COMPTON
 6
           Direct Examination by Mr. Crabb              88
 7

 8    SASHA PROCTOR

 9         Direct Examination by Mr. Patel             107

10

11    EXHIBITS ADMITTED                                PAGE

12    Government's Exhibit 1008                          70
      Government's Exhibit 1016                          70
13    Government's Exhibit 5053                          93
      Government's Exhibit 2007                         102
14    Government's Exhibit 2010                         102
      Government's Exhibit 2016                         102
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were had out of the
 3    presence and hearing of the jury:)
 4              THE COURTROOM DEPUTY:  Criminal Case 22-096, United
 5    States v. Lauren Handy, John Hinshaw, Heather Idoni, William
 6    Goodman, and Herb Geraghty.
 7              Counsel, would you please identify yourself for the
 8    record, starting with the government.
 9              MR. CRABB:  Good morning, Your Honor.  John Crabb and
10    Sanjay Patel for the United States.
11              THE COURT:  Good morning.  All right.  For Ms. Handy,
12    who is here?
13              MR. CANNON:  Martin Cannon, Steve Crampton, Dennis
14    Boyle, Blerina Jasari appearing for Lauren Handy, who is
15    present.
16              THE COURT:  All right.  And for John Hinshaw?
17              MR. GUILLAUME:  Good morning, Your Honor.  Alfred
18    Guillaume on behalf of Mr. John Hinshaw.  Mr. Hinshaw is
19    present.
20              THE COURT:  All right.  Good morning.  For Ms. Idoni?
21              MR. DUNN:  Did you say Ms. Idoni?
22              THE COURT:  I'm sorry?
23              MR. DUNN:  Did you say Ms. Idoni?  I didn't hear you.
24              THE COURT:  Yes, Ms. Idoni.
25              MR. DUNN:  Robert Dunn appearing on behalf of Heather
```

1     Idoni, who is present.

2                    THE COURT:  All right.  Good morning.  William

3     Goodman?

4                    MR. WALSH:  Good morning.  Howard Walsh on behalf of

5     Mr. Goodman, who is seated next to me.

6                    THE COURT:  And Herb Geraghty?

7                    MR. KIYONAGA:  Good morning, Your Honor.  John

8     Kiyonaga for Mr. Geraghty, who is present.

9                    THE COURT:  All right.  So all of the jurors are

10    here.  They actually started coming at 8:00 -- so they're going

11    to be a very prompt group -- in the jury room.

12                    Just for your own information, they are provided some

13    food in the morning.  I wasn't sure whether they had started

14    that practice again or not, but they have.

15                    I do have the exhibit list from the government that

16    is set out in the format that Ms. Patterson has asked for.  I

17    don't believe I received a list of the witnesses that the

18    government plans on calling each week.  If you could give us

19    that, that would be helpful as well.

20                    I have a list of all of the witnesses, but it would

21    be -- you don't have to do it right now, but it would be

22    helpful to have that so if we anticipate some issues or

23    instructions we know we're going to have to give, it would be

24    helpful.

25                    In terms of the pseudonyms, I'm assuming you don't

1     want me to say anything to the jury one way or the other.  They

2     will just be introduced as this is their name.  I don't think

3     the jurors have to know what their real names are.  I would be

4     inclined not to.  I don't want to make them more paranoid than

5     the jury is already about security.

6          MR. CRABB:  We agree, Your Honor, and ask that the

7     Court follow that course.

8          THE COURT:  Okay.  So we'll just use the names.  We

9     can always change it if there's another -- you know, something

10    else.  Okay.  I think that's it.

11         I would just simply say for those that are in the

12    audience, obviously, the courtroom is open.  We do have an

13    overflow courtroom as well if people want to be there.  You can

14    probably talk in there, but in here you can't.

15         What I would ask is that you not do something that's

16    distracting or disrupting.  I'm assuming that you're not going

17    to be saying anything or commenting on the evidence or

18    witnesses or the Court's rulings or anything else.  I would --

19    in that light, I would ask that -- I understand from the

20    Marshals Service that there was an interest in -- I don't

21    know -- sprinkling holy water or oil.  Please don't do that.

22    Some people have allergies; plus, it, frankly, in terms of the

23    furniture and stuff, it's not a good idea.  It's a courtroom;

24    not a church.

25         In terms of the rosaries, you're allowed to have a

1    rosary.  Just don't ostensibly hold it up.  That's distracting.

2    Take a look at what you're doing.  Bibles, you can hold.

3    Again, if you don't ostentatiously -- and that goes for the

4    defendants -- hold it up so you're trying to get their

5    attention -- it's disruptive -- that's not allowed.  Otherwise,

6    I don't have any feelings one way or the other if you want to

7    have a bible in front of you to take a look at.

8            The big thing is not to disrupt, not to try and

9    influence the jury in any way.  And jurors, frankly, are smart,

10   so they're going to figure out that that's what you're trying

11   to do.  But, most importantly, just don't do it.  It's going to

12   prolong the case, make it a much longer case and more

13   complicated and may impact whether the visitors at least get to

14   sit in here.

15           So my suggestion is you come, you listen.  That's

16   what you've come for.

17           Happily, I got no missives last night.  So I'm

18   assuming we're ready to go forward with the opening statements

19   from the government, and then, hopefully, you-all have figured

20   out what order in which you wish to do this.

21           I'm hopeful that you-all, knowing who the witnesses

22   will be, will confer in advance to figure out who is going to

23   ask what or whatever so that we don't have a whole series of

24   little conferences every time we have a witness, which adds

25   additional time.  I'll, obviously, allow a little bit of that,

1      but we need to move this case.  We've taken extra time with the

2      jury selection.

3              I would ask, if there are things that you need to

4      work out with the government, before you bring it to me -- as

5      I've said in my order -- have a discussion with the government

6      and see if you can resolve it.  If you can't, then bring it up

7      with me.  If you haven't talked to them to start with about

8      redactions or some other things in the exhibits, then there's

9      no point in bringing it up with me.  Talk to them.  They may be

10     willing to do it, in which case I don't need to intervene.

11             Are we ready to go?  Mr. Dunn?

12             MR. DUNN:  One housekeeping matter.  Yesterday while

13     you were giving your instructions at the end of the day, my

14     client, Ms. Idoni, who has a back condition, had such pain that

15     she had to get up and walk over behind the table over there and

16     leaned up against the wall.  I don't know if you noticed that

17     or not.

18             The only reason I bring it up -- first of all, is it

19     okay if she does that?

20             THE COURT:  Yes.

21             MR. DUNN:  Secondly, I'm wondering if the jury might

22     think that's disrespectful of the Court.  I'm wondering if you

23     could just tell the jury, perhaps, that based on a medical

24     condition, you know, maybe somebody has to get up --

25             THE COURT:  I'd prefer not to indicate medical

```
 1    conditions.  That's personal information on her.  What I can do

 2    is to say that we have a large group of both defendants and

 3    counsel, and there may be times when people will move around.

 4    They should not be distracted by it.  I think I'll put it that

 5    way.  But if she needs to, she does it quietly and doesn't make

 6    a fanfare out of it, it shouldn't be a problem.

 7                MR. DUNN:  Okay.

 8                THE COURT:  All right.  If we're ready to go -- we

 9    have the -- I don't know whether you have lapel mics.  We have

10    the podium.  Is everybody set?

11                MR. PATEL:  Your Honor, I'll be delivering the

12    government's opening, and I'm using the lapel mic.

13                THE COURT:  Okay.  Terrific.  We have two of them.

14    You can have one, and we can move things over.

15                I take it every defense counsel is going to say

16    something?

17                MR. KIYONAGA:  I believe so, ma'am.

18                THE COURT:  Okay.  That's fine.  I'll leave it to you

19    to do it in whatever order you wish.  We'll simply do it

20    seriatim.

21                (The following proceedings were had in the presence

22    and hearing of the jury:)

23                THE COURT:  Good morning, members of the jury.  Thank

24    you for being so timely.  We're starting off on the right foot.

25    I appreciate it.
```

1           It is a little nippy in here.  They leave it sort of

2     on the high side since we have so many people.  By the end of

3     the day, it gets hot in here.  So you should just know that if

4     you need to have a wrap.

5           All right.  We're at this point ready to proceed.

6     We'll be doing opening statements.  The government will start,

7     and then each of the defendants has a right, if they choose, to

8     make an opening statement as well.  I would just remind you

9     that this is to help you with what the evidence is that they

10    plan on presenting, or their defense.  And these are not

11    evidence, but they're to assist you.

12          Go ahead.  Government?





























































41



42



43



44















51



THE COURT:  All right.  I believe that this is the --
all of the opening statements.  In terms of -- I don't know --
we're going to be moving to the next witnesses.  I want to be
sure, if you need a break -- we don't want to break up the
testimony if we can.

If you need a break, I don't have a problem doing the

1    morning break at this point, and then we'll come back and start

2    with the witness.  If you don't need a break -- but don't be

3    shy if you need one.  Put your hand up if you want one.  If

4    not, we'll proceed.

5         Okay.  Let me take the morning break, and then we'll

6    come back, and we'll go until 1:00.  Don't speculate or

7    discuss.  Keep in mind, their statements, whether it's the

8    government or the defense, they're not evidence in the case.

9         We'll do a 15-minute break, which is the full morning

10   break.  So five of 11:00 we'll be back.

11        (The following proceedings were had out of the

12   presence and hearing of the jury:)

13        THE COURT:  Government, who is the first witness?

14        MR. CRABB:  Ashley Jones, Your Honor.

15        THE COURT:  All right.  I am going to give some

16   thought as to whether a jury instruction needs to be given to

17   the jury as to what is and what is not in the case.  But I'll

18   run it by you.  I'm not going to say anything without talking

19   to you about it first.  We'll do it after the break.

20        MR. CRABB:  Thank you, Your Honor.

21        MR. KIYONAGA:  Your Honor, can I very briefly be

22   heard?  I'd like to object -- this is John Kiyonaga, counsel

23   for Herb Geraghty.  I would like to object to the government's

24   practice of objecting to every other word that defense counsel

25   say.  It's disruptive, and I believe at this juncture it's

1    abusive.

2              We understand that we have a set of guide rails that

3    the Court has established.  I apologize if I ran afoul of them.

4    It was not my intent.  But the net effect is going to be that

5    we're -- nobody wants to draw a rebuke from the Court in front

6    of the jury.

7              THE COURT:  Well, I understand that.  There are some

8    things you can wait until the end to object and other things

9    you want to stop the argument.

10             Frankly, his objections, I don't think, have been

11   inappropriate so far.  So I would agree that it helps -- that's

12   why I gave you this list to, hopefully -- and told you to read

13   my rules so that there would not be any interruptions in your

14   arguments.

15             If you stick to them, if you read all of my things,

16   all of the things that came up are in my rules somewhere.

17   Okay?  There would have been no objections if you-all just

18   simply followed them.  So I agree that it's helpful not to, but

19   if you're trying to stop people from proceeding, you don't wait

20   until the end.

21             So the answer, frankly, is pay attention to my

22   rulings.  All of these are on the record.  You have objections.

23   They're there.  You've preserved them.  So it's not as if --

24   just follow them.

25             MR. KIYONAGA:  Very well, ma'am.

1                THE COURT:  We'll be back at five of.

2                (Recess taken.)

3                (The following proceedings were had out of the

4       presence and hearing of the jury:)

5                THE COURT:  I gave some thought to whether I would do

6       an instruction.  I've decided not to.  I think it's premature.

7       Let me just simply say that, having seen the video that's at

8       issue, there is nothing in the video that supports as a fact

9       that they had any live births.  They can come to their own

10      belief from looking at it, but it doesn't show that they had

11      live births.  Okay?

12               So in summary form -- and Mr. Cannon threaded the

13      needle quite nicely.  It's a very nuanced difference, but I'm

14      going to put out another order that describes it a little more

15      carefully.

16               But the argument -- in summary form, they see the

17      video, they develop the belief.  The belief by itself goes

18      nowhere.  It's a belief that then informs their intent in terms

19      of the intent -- their intentions when they went into the

20      clinic.

21               So the belief is what precipitates their -- or is the

22      what -- the belief has to be connected to their intent.  In

23      other words, based on their belief, they develop this intent,

24      and that's what Mr. Cannon argued.  That is correct.

25               I'm going to put something else out again that is a

 1    little more specific to make sure the distinctions are there.

 2    So it goes to the specific intent that they would have had in

 3    going into the clinic.  But by itself, if you don't link it to

 4    the intent, it doesn't really have any particular probative

 5    value, which is why I interrupted people.

 6             I'm not going to discuss it further.  I'm going to

 7    put another order out that will describe it even more fully,

 8    but I want to make sure that that's my ruling.  Mr. Cannon was

 9    the only one who actually described it correctly for his

10    client, which is why I interrupted the others

11             MR. KIYONAGA:  Ma'am, I don't mean to argue.  I just

12    want to point one thing out.  I highlighted your abbreviated

13    order.  And it's possible in the hurly-burly of my delivery

14    that I didn't say what I intended to say.

15             What I think I said was, after seeing the video, it

16    was Mr. Geraghty's reasonable good faith belief --

17             THE COURT:  Right.  But the belief by itself -- it

18    has to be linked.  I'm trying to make a point.  We don't need

19    it now for what the witness is, and we're holding them up.

20    They're waiting in line out here.

21             I want to make it clear, the belief on its own, the

22    probative value is only if that belief is based on that belief

23    they develop the specific intent that they claim they had in

24    going into the clinic.  If you don't link the two, their belief

25    by itself doesn't do anything as a defense.

 1          Okay.  That's the point I was trying to make, which

 2     Mr. Cannon did describe accurately, but the rest of you did

 3     not, which is why I interrupted you.  I'll put something else

 4     out that defines this more carefully.

 5          Obviously, when we get to that, which won't be until

 6     the -- presumably, the defendants decide to testify, we can

 7     discuss what instructions should be given to them so they

 8     understand it.  All right?

 9          MR. KIYONAGA:  Very well, Your Honor.

10          THE COURT:  Let's get the jury in.

11          (The following proceedings were had in the presence

12     and hearing of the jury:)

13          THE COURT:  All right.  Good morning again.  We're

14     ready to proceed with the government's case.  So if the

15     government would call its first witness.

16          MR. CRABB:  Thank you, Your Honor.  The government

17     calls Ashley Jones.  May I get her, please?

18          THE COURT:  Yes.  If you would step over here,

19     please.  You need to remain standing so we can swear you in.

20          THE COURTROOM DEPUTY:  Would you raise your right

21     hand, please.

22          (Witness sworn.)

23          THE COURTROOM DEPUTY:  Please be seated.

24          THE COURT:  All right.  You can go ahead and sit

25     down.  The chair moves back and forth, so make yourself

```
 1    comfortable.  You do need to speak into the microphone so we

 2    make sure that we have a record.  So think of speaking to

 3    somebody at the back door.

 4                 THE WITNESS:  Okay.  Yes.

 5                 THE COURT:  All right.  I want to make sure that you

 6    allow counsel to finish their question before you start to

 7    answer even if you know what they're going to ask you.  They

 8    should wait until you finish your answer before they move on to

 9    the next question.

10                 If you hear the word "objection" and you see any of

11    the people at the tables stand -- they're going to object.  So

12    what I'd ask is, if you haven't started to answer, don't.  If

13    you're in the middle of the answer, please stop.  Let me hear

14    the objection, and then I can tell you whether to answer or

15    not.  All right?

16                 THE WITNESS:  Uh-huh.

17                 THE COURT:  Go ahead.

18                 MR. CRABB:  Thank you, Your Honor.  May I begin?

19                 THE COURT:  Yes.

20                         DIRECT EXAMINATION OF

21                            ASHLEY JONES

22    BY MR. CRABB:

23    Q.  Good morning, Ms. Jones.

24    A.  Good morning.

25    Q.  You've got the seat pulled up and make sure the microphone
```

1    is close?

2    A.  Yes.

3    Q.  Are you comfortable?

4    A.  Yes.

5    Q.  Can you hear me okay?

6    A.  Yes.

7    Q.  Well, let's start.  Would you please introduce yourself to

8    the ladies and gentlemen of the jury.

9    A.  Hi.  I'm Ashley Jones.

10   Q.  Ms. Jones, how old are you?

11   A.  27.

12   Q.  How far did you go in school?

13   A.  I went through four years of college.

14   Q.  What did you study?

15   A.  Occupational therapy.

16   Q.  Are you doing occupational therapy now?

17   A.  Not at the moment.  I was in a five-year program, and I

18   never finished the fifth year.

19   Q.  Are you currently working?

20   A.  Not at the moment.

21   Q.  In general, where do you live?

22   A.  In Pennsylvania.

23   Q.  Ms. Jones, I'd like to ask you some questions about things

24   that happened a couple years ago.  I'd like to ask you some

25   questions about 2020.

```
 1    A.  Okay.

 2    Q.  In 2020, did you become pregnant?

 3    A.  Yes.

 4    Q.  At some point did you decide to terminate that pregnancy?

 5    A.  Yes, I did.

 6    Q.  Where did you go to get that procedure done?

 7    A.  Here in Washington, D.C., at the Surgi- -- surgi-tech

 8    women's clinic.

 9    Q.  Were you living in Washington, D.C., at the time?

10    A.  No.

11    Q.  How did you get a referral to that particular clinic?

12    A.  It was through an agency, I believe.  It was found online.

13    They did all the, like, appointment reservations and everything

14    for me.

15    Q.  Did you, ultimately, come to Washington, D.C., for the

16    procedure?

17    A.  Yes.

18    Q.  Do you remember about when that was?

19    A.  I remember -- I believe it was in October 2020.

20    Q.  Did you come to D.C. by yourself or with anyone else?

21    A.  My boyfriend came with me.

22    Q.  When you came to D.C., did you stay overnight?

23    A.  Yes.

24    Q.  How long had you planned to be in D.C. when you came?

25    A.  Three days.
```

1   Q.  Why was that?

2   A.  There was a three-day process for the abortion.

3   Q.  Did you actually come to Washington to get the abortion?

4   A.  Yes.

5   Q.  Did you go to the surgery center for day one?

6   A.  Yes, I did.

7   Q.  Did you get the procedure that day?

8   A.  No.  The first and second days were just prep sessions

9   for -- the third day was the actual procedure.

10  Q.  Let me ask you.  So the first day, did you go to the clinic

11  for the first day?

12  A.  Yes, I did.

13  Q.  Were you able to go to the clinic and do what you needed to

14  do that day?

15  A.  Yes.  Sorry.  I was going to say it was a normal

16  appointment; walk in and leave.

17  Q.  Okay.  Sorry.  I interrupted.  So you were able to get in

18  and out that day?

19  A.  Yes.

20  Q.  Did you have to come back the next day?

21  A.  Yes, I did.

22  Q.  Were you able to do what you needed to do at the clinic the

23  second day?

24  A.  Yes.

25  Q.  Were you able to get in and out of the clinic that day?

1    A.  Yes, I was.

2    Q.  Did you go back a third day?

3    A.  Yes, I did.

4    Q.  Were the conditions at the clinic different on the third

5    day?

6    A.  Yes.  Going the third day, everything was completely

7    different.

8    Q.  Starting at the beginning, please tell the jury how it was

9    different the third day when you got there.

10   A.  So the third day when we pulled up -- my boyfriend pulled

11   up to the side, and right away we saw a bunch of protestors

12   and -- like, near the entrance of the building.

13              MR. CANNON:  Say again.

14              THE WITNESS:  We saw protestors near the entrance of

15   the building, a big crowd of them.  So he was letting me out to

16   go in while he was finding parking.

17              And there was a smaller group who left the bigger

18   group and right away came to the car before he even pulled off,

19   and they just were chanting.  I could hear the chanting, the

20   yelling.  The smaller group that came to me right away started

21   just bombarding me with comments and my boyfriend as well.

22   BY MR. CRABB:

23   Q.  Do you remember in general what kind of things these people

24   were saying to you?

25   A.  They were asking what I was doing, how could you do this,

1   we can help you, you're killing babies, you're going to hell if

2   you do this.  Just that type of comments.

3   Q.  Did you get out of the car?

4   A.  Yes, I did.

5   Q.  What happened then?

6   A.  So I was trying to make my way to the front entrance where

7   I, the previous day, walked in.  And, like I said, there was a

8   bigger crowd.

9          So as I separated from my boyfriend, the smaller

10   crowd, maybe with two ladies or three, were walking with me

11   trying to just keep talking to me or reprimanding me about

12   their thoughts.  And I then made it to the entrance.  I saw the

13   bigger crowd, and it was just almost impossible to get in

14   without being stopped.

15   Q.  Why do you say it was almost impossible to get in without

16   being stopped?

17   A.  Well, it took a while for me to even get to the front

18   because of the smaller group stopping me, talking to me,

19   pulling at me, trying to deter me from the front.  And then

20   when I did make it to the front, there was just so much

21   commotion with the other larger group; there was cameras, there

22   was videos, there were more chanting from the larger group,

23   just a lot of distractions and people.

24   Q.  Did you say that someone was pulling at you?

25   A.  This one girl.  I was still near the car, so, yes, there

1    was a shorter lady who was following me the most.  She was

2    pulling on my arm trying to get me to walk with her.

3    Q.  At that point before you had actually gotten into the

4    building, did anyone do anything to block your way?

5    A.  Just -- not necessarily block me from the building, but

6    they were walking side by side with me, kind of in front of me

7    as I walked.  So they were walking with me.

8             And then the bigger crowd was blocking the entrance

9    where I normally was walking the walkway.  So I had to go kind

10   of walk where I was used to on the walkway, but there was steps

11   that I couldn't really get down, so I had to, like, skip over

12   maybe the platform a little bit to get down to the entrance

13   where the door was.

14   Q.  Help me -- tell me what you mean when you say you had to

15   skip over the platform.

16   A.  It was kind of laid out like a campus, like it had some,

17   like, landscaping and some gardening and then there's like

18   steps, there's a walkway, like an entrance that you walk to get

19   to the doors.  But the -- a gardening area where I kind of had

20   to walk down because of all the commotion near the steps.

21   Q.  Were you, ultimately, able to get inside the building?

22   A.  I was.

23   Q.  What did you do when you got inside of the building?

24   A.  When I got inside of the building, I tried to go to the

25   elevator alone, but the people, the smaller crowd followed me

1     in.  There were at least, I believe, two ladies who followed me

2     to an elevator.  The whole walk to the elevator, they were with

3     me; they had their pamphlets.  They were still trying to talk

4     to me; not really letting me speak.  They were just speaking at

5     me.

6     Q.  Ms. Jones, you had mentioned a moment ago a woman who

7     pulled at you when you were outside?

8     A.  Yeah.

9     Q.  Was that woman inside the building also?

10    A.  Yes.  Yes.  When I was able to enter, she entered with me.

11    Q.  What did you do once you got inside the building, inside

12    the lobby?

13    A.  In the lobby, I went to the elevator.

14              MR. CRABB:  Your Honor, Government's Exhibit 1008 is

15    a security video from this clinic on October 22, 2020.  The

16    defense has stipulated to the authenticity of that video.  We

17    seek the admission right now of Government's Exhibit 1008.

18              THE COURT:  You're indicating that there's a

19    stipulation as to authenticity?

20              MR. CRABB:  Yes, Your Honor.

21              THE COURT:  All right.  If there's -- at this point

22    you're asking to have it admitted or use a portion of it?

23              MR. CRABB:  Both.  We're asking it be admitted, and

24    in the next few minutes we'll seek to use a portion of it.

25              THE COURT:  All right.  If authenticity is being

1    stipulated to, then I see no reason not to proceed.

2              She'll have to identify something with it before it's

3    shown to the jury, but it should be admitted.

4              MR. CRABB:  Yes, Your Honor.  Similarly, Your Honor,

5    Government's Exhibit 1016 is a video taken from a Metropolitan

6    Police Department officer's body-worn camera.  The defense has

7    stipulated to authenticity of that video.  We also seek its

8    admission at this time.

9              THE COURT:  All right.  Assuming that that's accurate

10   as well, then it can be admitted.

11             MR. CRABB:  Thank you, Your Honor.

12             MR. KIYONAGA:  Excuse me.  Your Honor, we've

13   stipulated to the authenticity, not to admissibility.

14             THE COURT:  Presumably, there would be some

15   identification of what it is that she would know that's on the

16   video.

17             Is that what you're planning on doing?

18             MR. CRABB:  No, Your Honor.  Our understanding is the

19   defense has stipulated it's authentic.

20             THE COURT:  Is there any other issue -- excuse me.

21   Other than authenticity that it is an MPD and that the other

22   is -- what is it? -- the clinic surveillance video, you have a

23   particular issue with this?

24             MR. KIYONAGA:  Your Honor, as to admissibility --

25             THE COURT:  Okay.  Let's pick up the phones.  Put the

1   husher on.

2              (The following proceedings were had out of the hearing

3   of the jury:)

4              THE COURT:  Can you hear me?

5              MR. KIYONAGA:  Yes.  This is John Kiyonaga.  Can you

6   hear me, Your Honor?

7              THE COURT:  Yes.  The point is, is there any issue or

8   objection in terms of admitting it?  Do you have to -- what's

9   the objection to it?

10             MR. KIYONAGA:  Well, Your Honor, we haven't seen it

11  yet.  We don't know if they plan to run the entire thing, but

12  we would object to completeness if they're parsing separate

13  parts that they want to show the jury.

14             THE COURT:  They may want to show -- I don't know

15  what -- this is something that should have been discussed in

16  advance and not be doing it now.  If you've seen the whole

17  thing, if he's trying to show there's something that relates to

18  her, certainly they can do that.

19             Mr. Crabb, are you showing all of it or just a

20  portion that relates to her?

21             MR. CRABB:  The latter, Your Honor.  Just the

22  portions that relate to this witness.

23             MR. KIYONAGA:  Your Honor, this is John Kiyonaga.

24  The defense -- and I was speaking for them -- offered to

25  stipulate to the authenticity of every one of the government's

1    exhibits.  We did this in the spirit of collegiality.  We ask

2    that they stipulate to the authenticity of our exhibits, almost

3    all of which come directly from government discovery.

4              THE COURT:  I'm not going to get into that discussion

5    in terms of -- I know what -- in terms of they were unwilling

6    or you did not reach that agreement.

7              My understanding is that you have a stipulation to

8    authenticity for these two documents.  Is that correct or not,

9    these two videos?

10             MR. KIYONAGA:  As to authenticity; not as to

11   admissibility.  And we may object on --

12             THE COURT:  Okay.  What is the objection to

13   admissibility?  They're going to show her, presumably, the

14   portions that relate to her.  What is your objection?

15             MR. KIYONAGA:  Your Honor, we're not prepared to say

16   at this point.  We would probably object to the lack of

17   completeness if they're not going to show the whole thing.

18             THE COURT:  At some point they will be showing all of

19   it.  There's no point in showing the whole thing that shows

20   things that don't relate to her.

21             MR. KIYONAGA:  Your Honor, I don't know what they're

22   going to show.

23             THE COURT:  Mr. Kiyonaga, he has just indicated to

24   you that they are going to show portions of the video that show

25   her, presumably, coming in.  Anything else?

1          MR. CRABB:  I'm sorry, Your Honor.  Yes, coming in

2    and also interacting with both staff and defendants.

3          THE COURT:  Okay.  So they're going to show what

4    she -- the two videos that relate to her.  They're not showing

5    something else.

6          If you want, on cross-examination, if you think

7    there's something else that needs to be shown, you can.  But

8    there's no point in having it all shown if it relates to other

9    people that are not testifying or have not testified so far.

10         So at this point you have stipulated to authenticity,

11   the admissibility, frankly, of the whole thing, or you can do

12   this piecemeal, which doesn't make any sense unless you have

13   some objection to some piece of it that there's some problem

14   with it.  They're going to show at this point the portion of it

15   that relates to her.  Okay?  I don't see any problem with doing

16   that.

17         MR. CANNON:  Your Honor, it's Martin Cannon.  Can I

18   be heard briefly?

19         THE COURT:  Go ahead.

20         MR. CANNON:  I'm not so concerned about whether the

21   video relates to the witness as I am about whether the video

22   relates to the defendants.  The testimony has been that there's

23   a crowd of people out there.

24         Unless the outside video has one or more of our

25   clients in it, I don't know that it's relevant.  There are many

1    people out there that aren't in this case.

2              THE COURT:  Doesn't matter.  It's still relevant in

3    terms of her putting it into context and her arriving there.

4    The video doesn't have to show each one of your clients.  That

5    may show that your clients weren't involved in particular

6    actions.

7              So there's no reason for her -- she's testified.

8    There's video to support her getting into the clinic.  I don't

9    see any reason why that can't be shown.  If there's something

10   that shows up that's a problem, then say so.

11             You all need to resolve this beforehand.  I will not

12   have this case dragged out indefinitely because the two sides

13   can't seem to talk, or you're making objections that don't make

14   any sense.

15             She's making an argument; she's going to discuss.

16   She's discussed what's happened to her.  Presumably, they're

17   going to show what happened in the clinic, and she'll testify

18   to it.  So it will show, presumably, some of your clients.  If

19   they don't, then it's going to be pointed out that your client

20   was not involved in something.

21             But, certainly, her arrival and how she gets into the

22   clinic and who is there is certainly probative.

23             (The following proceedings were had in the presence

24   and hearing of the jury:)

25             THE COURT:  So as I understand it, I'll admit it and

```
 1    what's going to be shown, as I understand it, is what relates
 2    to this witness.  Is that correct, Mr. Crabb?
 3                MR. CRABB:  Yes, Your Honor.  Thank you.
 4                THE COURT:  All right.  So these are -- again, it
 5    is which exhibits?
 6                MR. CRABB:  The first exhibit, Your Honor, is
 7    Government's Exhibit 1008.  The second exhibit is Government's
 8    Exhibit 1016.
 9                THE COURT:  Okay.
10                MR. CRABB:  We ask they both be admitted at this
11    time.
12                THE COURT:  All right.  Go ahead.
13                (Government's Exhibits 1008 and 1016 were admitted.)
14                MR. CRABB:  Thank you, Your Honor.
15                THE COURT:  Presumably, you're going to be showing
16    for the jury at this point what relates to Ms. Jones; is that
17    correct?
18                MR. CRABB:  I apologize, Your Honor?
19                THE COURT:  What relates to Ms. Jones is what's going
20    to be shown to the jury at this point; is that correct?
21                MR. CRABB:  Yes, Your Honor.  We intend to show
22    portions of both of the videos that have been admitted that do
23    depict Ms. Jones and what she encountered that day;
24    October 22nd of 2020.
25                THE COURT:  Okay.  That's fine.
```

```
 1                  MR. CRABB:  Thank you, Your Honor.

 2                  THE COURT:  Let us know if you can't see anything on

 3      the screens.

 4      BY MR. CRABB:

 5      Q.  Good morning again, Ms. Jones.

 6      A.  Hello.

 7      Q.  I believe when we left off, you were explaining to the jury

 8      what happened once you had gotten into the lobby of the

 9      building?

10      A.  Yes.

11      Q.  Tell us, please, what happened at that point.

12      A.  So I made it into the elevator, and the two ladies followed

13      me in.  I tried not to have them with, but they were persistent

14      and got in with me.  There was somebody else also in the

15      elevator, I believe, that was doing something else that day.

16      Had nothing to do with this.

17                  So we're in the elevator.  We got to the fourth

18      floor.  During the elevator ride, they were just very

19      persistent with their comments and what they were saying.  The

20      same just of -- just negative things to me.  And we got to the

21      fourth floor.  They were -- they followed me out.

22                  Right when the doors opened, I saw another line of

23      people, protestors who I hadn't seen the previous days.  It was

24      empty the other days I came.  But the third day, when the doors

25      opened, I saw more protestors along the wall.
```

1          And you make a left to go to the door that I had

2     normally gone in the previous days.  There was a police

3     officer, I had the ladies with me still following me.  I went

4     to the door of the -- the center and noticed right away that it

5     was just same kind of chaos that was outside; just with

6     different people.

7          This time there was chairs moved that weren't

8     positioned like -- how they were previous days.  The protestors

9     moved their chairs to block all the doors to the actual

10    entrance.  So instead of just, like, the waiting/reception

11    area, they were blocking all the doors to go into the office.

12    So I couldn't get in.

13    Q.  Thank you.  Let me interrupt you for a moment, please.

14    A.  Uh-huh.

15          MR. CRABB:  Your Honor, at this point we ask to show

16    the jury Government's Exhibit 1004, which is a portion of

17    what's previously been admitted as Government's 1008.

18          THE COURT:  Okay.  So this is the portion that would

19    relate to what you've just described as relating to Ms. Jones;

20    is that correct?

21          MR. CRABB:  Yes, Your Honor.

22          THE COURT:  All right.  And this is what, presumably,

23    the defendants do not have a problem with since it's specific

24    to the -- this particular witness.

25          It's admitted.  Go ahead.

1          MR. CRABB:  May we show it to the jury and the

2     witness, please?

3               THE COURT:  Yes.

4               MR. CRABB:  Ms. Tart, is that doable?

5     BY MR. CRABB:

6     Q.  Ms. Jones, let us know if you can see it on your screen.

7     A.  Yes, I can.

8               MR. CRABB:  Your Honor, may we confirm that the jury

9     can see it?

10              (All jurors say:  "Yes.")

11              THE COURT:  All right.  I just want to make sure the

12    screens can be seen.

13    BY MR. CRABB:

14    Q.  Before we actually start the video playing -- you said you

15    could see this, Ms. Jones?

16    A.  Yes.

17    Q.  Could you tell the jury, in general, what room this depicts

18    on the screen right now.

19    A.  This is the reception area to the women's clinic in the

20    building that I was talking about earlier.

21    Q.  Do you see a -- on the left of the screen, do you see

22    another door?

23    A.  Yes.

24    Q.  From your prior visits to the clinic, do you know where

25    that door led to?

1    A.  Yes.  That's the door where I had previously gone into when

2    they called my name.

3    Q.  On your -- prior to your visits to the clinic the two

4    preceding days, had the chairs been configured in this fashion

5    when you went there?

6    A.  No.

7    Q.  Were there police officers in the reception area when you

8    went before?

9    A.  No.

10           MR. CRABB:  Ms. Tart, would you please play the

11   video.

12           (Video played.)

13           MR. CRABB:  Would you please pause, Ms. Tart.

14   BY MR. CRABB:

15   Q.  Ms. Jones, are you still able to see the video?

16   A.  Yes.

17   Q.  Did you see a woman come through the front doors wearing a

18   gray top on the right of the screen now?

19   A.  Yes.  I see myself.

20   Q.  Is that you in the gray top with a strap over your right

21   shoulder?

22   A.  Yes.

23           THE COURT:  You can -- if you touch your finger, it

24   should show up on the screen, I think.

25           THE WITNESS:  So where I just touched with the yellow

1    dot is myself entering the room.

2            THE COURT:  Why don't you touch it a little harder so

3    people can actually see it.

4            THE WITNESS:  (Witness complies.)

5    BY MR. CRABB:

6    Q.  Thank you, Ms. Jones.

7            Ms. Jones, before we start the video back, do you see

8    a woman in a blue shirt standing directly in front of you?

9    A.  Yes, I do.

10   Q.  Prior to this moment, had you encountered that woman?

11   A.  Yes.

12   Q.  Is she one of the women you previously described to the

13   jury?

14   A.  Yes.

15   Q.  Which one is she?

16   A.  She was outside with me and, I believe, on the elevator

17   coming up with me as well.  I remember her the most.  Outside

18   when we first arrived as well to the car -- or at the car with

19   me.

20   Q.  Thank you.

21           MR. CRABB:  Would you please restart the video.

22           (Video played.)

23           MR. CRABB:  Would you pause, please.

24   BY MR. CRABB:

25   Q.  Ms. Jones, are you putting your hands to your ears at this

1   point?

2   A.   Yes.

3   Q.   How come?

4   A.   I had already heard a lot -- they were just repeating the

5   same things.  I tried to be, like, nice with them in the

6   elevator and -- but they weren't being nice; they weren't

7   stopping.  I had asked plenty of times.

8           They were repeating everything they were saying to

9   me.  They were just getting louder and more, like, aggressive,

10  it seemed, mean.  Everything they were saying wasn't helpful.

11  They weren't going away.

12          And that's just the only thing I could really do.  I

13  was trying to go to my appointment so everything else was just

14  very distracting.

15  Q.   Thank you.

16          MR. CRABB:  Would you please start the video back.

17          (Video played.)

18          MR. CRABB:  Would you pause it here, please.

19  BY MR. CRABB:

20  Q.   Ms. Jones, did you just walk out of the waiting room?

21  A.   I did.

22  Q.   Why did you do that?

23  A.   I believe I was trying to see if I could go a different

24  way.  So I went to the hallway.  Also, to get away from the

25  commotion inside of the reception area.

1    Q.  Were you able to find another way into the clinic?

2    A.  So I was -- wasn't able to.  But just seconds before

3    this -- before we paused it, we saw the ladies in the reception

4    window kind of point out to the hallway.  So I think, if I can

5    recall, they were telling me to go into the other entrance,

6    which seemed to be like an employee-only entrance in the

7    hallway.  There was, like, a door that seemed flushed to, like,

8    the wall.

9          So I made a left out of the elevator, but the other

10   door that was employees only was towards the right.  So I

11   hadn't seen it previously.  But I think that's where I was

12   trying to see if I could enter since everything was blocked

13   here.

14   Q.  Let me ask you a couple of follow-ups.  First of all, would

15   you touch on the screen -- you mentioned a window and a

16   receptionist.

17         Would you touch on the screen what you're referring

18   to.

19   A.  (Witness complies.)

20   Q.  Was that someone from the clinic staff who was giving you

21   the directions?

22   A.  Yes.  That's where I checked in every other day -- I mean,

23   the previous two days, as you normally would for an

24   appointment.

25         MR. CRABB:  Your Honor, I apologize for my

1    technological shortcomings.  How do we erase the screen?  It's

2    clearly my fault.

3                THE COURT:  Ms. Patterson can do it.

4                MR. CRABB:  Thank you.

5    BY MR. CRABB:

6    Q.  Ms. Jones, when you went into the hallway, were you able to

7    go through that other entrance?

8    A.  No.

9    Q.  Why not?

10   A.  There were more protestors, more people, just the same

11   chaos and comments and just more commotion.  Everything was

12   still blocked with people.

13               MR. CRABB:  Ms. Tart, would you start the video back,

14   please.

15               (Video played.)

16               MR. CRABB:  Would you pause it there, please.

17   BY MR. CRABB:

18   Q.  Did you come back into the reception area?

19   A.  I did.

20               (Video played.)

21               MR. CRABB:  Would you pause it again, please,

22   Ms. Tart.

23   BY MR. CRABB:

24   Q.  Ms. Jones, did you see yourself come back into the

25   reception area?

1    A.   Yes, I did.

2    Q.   Please explain to the jury what they just saw you do.

3    A.   So I came back in because there was no way of getting into

4    the offices through the hallway entrance.  So I came back in,

5    and nothing changed with being able to enter through the other

6    doors.

7         So I just pulled up -- or I got up on the chair and

8    went through the reception window to get inside where I saw the

9    two work- -- where I saw a worker who I felt comfortable and

10   familiar with from the previous days.

11   Q.   On the previous days, had you entered the treatment area in

12   the same way?

13   A.   No.

14   Q.   Once you crawled through the receptionist's area and got to

15   the treatment area, were you eventually able to get the

16   treatment that you had scheduled for that day?

17   A.   I was.  It was just different.  Obviously, going through

18   the window was different.  And when I got through, they had

19   everybody -- the patients kind of spread out.  We weren't able

20   to wait in the waiting room because of everything going on.

21        So it was kind of just a whole different chaotic

22   situation; still chaos in there, but just more comfortable with

23   the doctors, like, on the other side.  And I was able to then

24   get the treatment.

25              MR. CRABB:  Your Honor, at this point we ask to show

1    a different clip of a video to Ms. Jones.

2              THE COURT:  All right.

3              MR. CRABB:  This is marked as Government's

4    Exhibit 1011, and it is part of what's previously been admitted

5    as 1016.

6              THE COURT:  So this is another excerpt; is that

7    correct?

8              MR. CRABB:  Yes, Your Honor.

9              THE COURT:  All right.  I'll admit [sic] it.

10             MR. CRABB:  Thank you, Ms. Tart.

11   BY MR. CRABB:

12   Q.  Ms. Jones, can you see this on your screen now?

13   A.  Yes, I can.

14   Q.  This is a different video that has audio on it.  Can you

15   recognize, generally, what's depicted on the screen at this

16   point?

17   A.  Yes.  This was the protestors that were inside the

18   reception area that I had previously seen blocking the doors

19   and chanting and singing.  They have, like, a chain, I believe,

20   that you can see blocking or chained -- so they were all

21   chained together to the doors so you couldn't remove it or move

22   them.

23   Q.  Do you see part of a door on the right of the screen and a

24   door to the left of that?

25   A.  Yes.

1    Q.  On your previous visits to the clinic, had you used those

2    doors?

3    A.  Yes.  So the chairs that are lined up right now with

4    protestors in them were lined up along the other wall where

5    there were no doors.  So this was normally on the previous two

6    days completely opened, and I was able to go into my

7    appointment through the entrance of the normal door, and then I

8    was able to come out through the exit door.  And I would come

9    out and be in the reception area again, and I would leave.

10   Q.  Thank you.

11          MR. CRABB:  Would you start the video, please.

12          (Video played.)

13   BY MR. CRABB:

14   Q.  Ms. Jones, did you hear a female voice just then?

15   A.  Yes, I did.

16   Q.  Whose voice was that?

17   A.  My own voice.

18   Q.  What were you saying?

19   A.  At that point I said, "You all need to stop.  I'm here for

20   an appointment," I think.

21   Q.  When you said you all need to stop, who were you talking

22   to?

23   A.  The protestors, the -- what they were saying, I was

24   speaking to and the two ladies who were a part of that.

25   Q.  And is the volume fine; can you hear this okay?

```
1    A.   Uh-huh.
2              THE COURT:  You have to answer yes or no.
3              THE WITNESS:  I'm sorry, what?
4              THE COURT:  You have to answer yes or no.  I didn't
5    hear you.
6              THE WITNESS:  I'm sorry.  Yes.
7              MR. CRABB:  Thank you.
8              (Video played.)
9    BY MR. CRABB:
10   Q.   Did you hear yourself again?
11   A.   Yes, I did.
12   Q.   What were you saying?
13   A.   I said, "I need to go.  What are they doing to me?  Can I
14   please go through?"
15   Q.   Did you see, right before we paused, an elbow on the right
16   of the screen?
17   A.   Yes.
18   Q.   Do you know whose elbow that was?
19   A.   That was me.
20   Q.   Is that where you're standing in relation to these two
21   women who are on the screen now?
22   A.   Yes.  I was all the way towards the right.
23             MR. CANNON:  I'm sorry.  I couldn't hear that.
24             THE WITNESS:  I was all the way towards the right of
25   the screen at this point.
```

```
 1              MR. CRABB:  Would you start back, please.

 2              (Video played.)

 3      BY MR. CRABB:

 4      Q.  Ms. Jones, did you see a woman's face come through the

 5      screen?

 6      A.  Yes, I did.

 7      Q.  Who was that?

 8      A.  That was my face.

 9      Q.  What were you saying?

10      A.  I said, "How is this allowed?  How is this allowed?"  I

11      couldn't hear the end, what I had just said after that, if you

12      want to replay or -- I don't know what I said.

13      Q.  Thank you.  When you said, "How is this allowed," please

14      tell the ladies and gentlemen of the jury what you meant.

15      A.  How was it allowed.  I was trying to speak to the police

16      officer.  I thought he would be able to help me, but the whole

17      time up until this point nothing was being done.

18              He wasn't really doing anything, or maybe he couldn't

19      do anything.  But I was asking him how is this allowed for them

20      to keep on harassing me, yelling at me, pulling at me, nudging,

21      blocking the doors.

22              At this point I was supposed to be inside my

23      appointment or at least checked in and be able to sit down and

24      get ready mentally even for everything.  Instead, I had all of

25      this going on.
```

```
1              So that's what I was referring to when I said, "How

2      is this allowed?"

3      Q.  Ms. Jones, at this point, how did you feel?

4      A.  I felt very overwhelmed, not okay at all.  I felt a little

5      bit, like, sick to my stomach, of course, and just not good.

6              MR. CRABB:  Would you start the video, please.

7              (Video played.)

8      BY MR. CRABB:

9      Q.  Ms. Jones, did you hear someone say, "I'm not listening to

10     you.  Let me go"?

11     A.  Yes.  That was my voice.

12             (Video played.)

13     BY MR. CRABB:

14     Q.  Ms. Jones, do you see this woman in the blue top in the

15     reception window?

16     A.  Yes, I do.

17     Q.  Do you recognize that person?

18     A.  Yes, I do.

19     Q.  Is that one of the staff members you mentioned before that

20     you were talking to?

21     A.  Yes.  She was there the previous days -- I recognized

22     her -- helping me when I was there, and this day she was also

23     behind the window the whole time, but she was there trying to

24     help.

25     Q.  Thank you.
```

```
 1              MR. CRABB:  Would you please proceed.

 2              (Video played.)

 3    BY MR. CRABB:

 4    Q.  Ms. Jones, do you see a door depicted here?

 5    A.  Yes, I do.

 6    Q.  Is that the door you mentioned you tried to get in down the

 7    hall?

 8    A.  Yes.

 9    Q.  Were you able to go into that door?

10    A.  No.

11    Q.  Why not?

12    A.  These other protestors, these two ladies here, were

13    blocking it, and they wouldn't move.  When the police officer

14    even tried to move them and tell them, they were still -- I

15    wasn't able to get in.

16    Q.  Thank you.

17              MR. CRABB:  Would you please start the video back.

18              (Video played.)

19              MR. CRABB:  Thank you.

20    BY MR. CRABB:

21    Q.  Ms. Jones, let me ask you, I believe before we started this

22    video, from the other video that showed you go through the

23    receptionist's window, you said you went back and eventually

24    got the treatment you had scheduled that day?

25    A.  Yes, I did.
```

1   Q.  Did you eventually leave the clinic that day?

2   A.  Yes, I did.

3   Q.  Do you remember about when?

4   A.  It was -- if I had to say, I think it was after 3:00.  I

5   don't know.  I don't recall exact time, but I believe it was

6   after 3:00.

7   Q.  Did you go back home to Pennsylvania that night?

8   A.  No, I did not.

9   Q.  Had you planned to go back home that night?

10  A.  Yes.

11  Q.  Why didn't you go back home that night?

12  A.  With everything going on, it just extended our stay.  It

13  was just too much to handle to leave that day.

14          MR. CRABB:  May I have a moment, Your Honor?

15          THE COURT:  Yes.

16          MR. CRABB:  Thank you.  Thank you, Your Honor.  No

17  further questions.

18          THE COURT:  All right.  Cross-examination.  Is

19  somebody going to cross-examine her?

20          MR. CANNON:  We're considering that briefly, Judge.

21          THE COURT:  All right.

22          MR. CANNON:  No questions for Ms. Jones.

23          THE COURT:  All right.

24          MR. WALSH:  No questions of Ms. Jones, Your Honor.

25          THE COURT:  Is there anybody who does wish to

1     question her?

2                MR. KIYONAGA:  One moment, please, Your Honor.

3                THE COURT:  All right.

4                MR. KIYONAGA:  Nothing here, ma'am.

5                THE COURT:  All right.  Mr. Guillaume, anything from

6     you?

7                MR. GUILLAUME:  No, Your Honor.

8                THE COURT:  Mr. Walsh?  Mr. Dunn, anything from you?

9                MR. DUNN:  No.

10               THE COURT:  Mr. Kiyonaga?

11               MR. KIYONAGA:  Nothing here, ma'am.

12               THE COURT:  All right.  So then I assume we can ask

13    this witness to step down.

14               MR. CRABB:  Thank you, Your Honor.

15               THE WITNESS:  Thank you.

16               (Witness excused.)

17               THE COURT:  All right.  Your next witness?

18               MR. CRABB:  Your Honor, our next witness is Sara

19    Compton, who will be here.  She's coming in from the hallway.

20               THE COURT:  Okay.  If you'd come down the center and

21    come over here to my left.  If you would step up, and we need

22    to swear you in, so if you could remain standing.

23               THE COURTROOM DEPUTY:  Could you raise your right

24    hand.

25               (Witness sworn.)

```
 1                THE COURTROOM DEPUTY:  Please be seated.

 2                THE COURT:  All right.  You can take your mask off

 3     while you're speaking.  You can move your chair up so you're

 4     comfortable, and move the microphone down so we can hear you.

 5     Okay?  Talk as if you're talking to somebody at the back door.

 6                THE WITNESS:  Okay.

 7                THE COURT:  If -- I would ask that you allow counsel

 8     to finish their question before you answer even if you know

 9     what they're going to ask you.  We need to have the question

10     and the answer.  They should also wait for you to finish your

11     answer as well before going on.

12                If you see anybody at the tables start to stand or

13     hear the word objection, they're objecting; I'd ask if you

14     haven't started to answer, don't.  If you're in the middle of

15     your answer, please stop.  Let me hear the objection, and then

16     I'll tell you whether you can answer.  All right?

17                THE WITNESS:  Okay.

18                THE COURT:  Go ahead.

19                MR. CRABB:  Thank you, Your Honor.

20                         DIRECT EXAMINATION OF

21                            SARA COMPTON

22     BY MR. CRABB:

23     Q.  Good morning, Ms. Compton.

24     A.  Good morning.

25     Q.  Can you hear me okay?
```

1    A.   Yes.

2    Q.   Okay.   Are you comfortable there?

3    A.   Yes.

4    Q.   Would you please start by introducing yourself to the

5    ladies and gentlemen of the jury.

6    A.   My name is Sara Compton.   At the time of the incident, I

7    was the recovery room nurse and procedure counselor at the

8    Washington Surgi-Clinic.

9    Q.   Thank you.   You said at the time of the incident.   Are you

10   talking about October 22nd of 2020?

11   A.   Yes.

12   Q.   Before we get to that, let me ask you a couple other

13   questions.

14           Do you have any medical training?

15   A.   I am a registered nurse.

16   Q.   Please tell the ladies and gentlemen of the jury just in

17   general what you did as a registered nurse.

18   A.   I -- I would counsel the patients as to what exactly was

19   going to go on in the procedure.   I would ensure that they were

20   comfortable.   I would ensure they didn't have any questions.

21           And then once the procedures were finished, I would

22   monitor their vital signs, I would monitor their bleeding.   I

23   would ensure that they were 100 percent safe to leave the

24   clinic.

25   Q.   Ms. Compton, among other things, did you say one of your

1    duties was to counsel the patients?

2    A.  Yes, that is correct.

3    Q.  Tell us what you mean by that, please.

4    A.  I would explain the procedures to them, I would explain

5    every sort of side effect, anything that might possibly happen

6    outside of the norm.  I would ensure that they were 100 percent

7    comfortable with the procedure.  And I would make sure that

8    they were 100 percent certain that this was the procedure that

9    they would like to do.

10   Q.  What do you mean you'd make sure they were 100 percent

11   certain this is what they wanted to do?

12   A.  I would confirm with them multiple times that they

13   understood the procedure they were going to have, that they

14   were comfortable with the procedure, that they understood that

15   there were other options outside of the procedure, and that

16   they were not being coerced into this procedure.

17   Q.  Ms. Compton, so I understand, when you're talking about

18   being a registered nurse and these different duties, were these

19   things you did when you worked at the Washington Surgi-Center

20   [sic]?

21   A.  That is correct.

22   Q.  Where is that located, specifically?

23   A.  Specifically, that is 2112 F Street in northwest

24   Washington, D.C.

25   Q.  Are you currently working there?

1    A.   No, I am not.

2    Q.   From when to when did you work there?

3    A.   I worked there from March of 2016 until February of 2022.

4    Q.   What kind of services were provided to patients at the

5    Washington Surgi-Center [sic] during the time you worked there?

6    A.   Well, we terminated pregnancies, we did procedures that

7    were local anesthesia where they were awake, but they had

8    numbing and pain management.  We did procedures where they were

9    under general anesthesia, which is when they were asleep for

10   the procedure but their vital signs were monitored while they

11   were asleep.  We also did the chemical abortion, which is the

12   medication administered.

13          We did sonograms to confirm pregnancy and length of

14   pregnancy.  We did sexually transmitted infection testing, and

15   we also would do checkups, like gynecology checkups, Pap

16   smears, that type of thing.

17   Q.   You mentioned several other procedures that you did to

18   terminate a pregnancy?

19   A.   Yes.

20   Q.   Did any of those procedures go over the course of more than

21   one day?

22   A.   Yes.  We did -- for a length of -- if they were a little

23   further along in the pregnancy, we would need two or three days

24   to ensure the procedure was done safely.

25   Q.   Ms. Compton, while you were working at the surgi-center,

1    did you -- were you ever involved in taking appointments for

2    patients?

3    A.  Yes.  That was one of my duties.  I would answer the

4    telephone and schedule appointments.

5    Q.  Could you describe just generally for the jury how that

6    process went.

7    A.  Well, I would answer the phone, and normally the person

8    that was on the other end would explain the exact reason they

9    were calling.  And I would ask the length of pregnancy, I would

10   ask how many pregnancies they had in the past.  I would ask

11   them if they had any health issues that we should be aware of,

12   any bleeding issues, any respiratory issues.

13          I would ask them their age.  I would talk to them

14   about which date they would like to come in.  And, yeah, that

15   was pretty much the appointment process.  Give them a price.

16   Q.  I'm sorry?

17   A.  I said I would also let them know the price of the

18   procedure that they were having based on their preference.

19   Q.  Did the clinic require appointments for patients to be

20   seen?

21   A.  Yes.  Yes, we did.

22          MR. CRABB:  Your Honor, at this time we ask that

23   Government's Exhibit 5053, which is an appointment card from

24   the surgi-center be admitted.

25          THE COURT:  Which one?  I'm sorry.

1          MR. CRABB:  I apologize, Your Honor.  Government's

2     Exhibit 5053.

3          THE COURT:  Okay.  Are there any objections to this?

4          MR. CANNON:  No.

5          MR. KIYONAGA:  No, ma'am.

6          THE COURT:  All right.  I don't hear any objections,

7     so I'll admit it.  That's 5053.

8          (Government's Exhibit 5053 was admitted.)

9          MR. CRABB:  May we show it both to the witness and

10    the jury, please, Your Honor?

11         THE COURT:  Yes, publish.

12    BY MR. CRABB:

13    Q.  Ms. Compton, can you see what's been admitted as

14    Government's 5053?

15    A.  Yes.

16    Q.  First of all, is that an appointment card similar to what

17    you just described for the jury?

18    A.  Yes, it is.

19    Q.  My second question is, do you see handwriting on it?

20    A.  Yes, I do.

21    Q.  Do you recognize that handwriting?

22    A.  Yes, I do.

23    Q.  Whose is that?

24    A.  That is my handwriting.

25    Q.  Did you take this appointment?

1   A.  Yes, I did.

2   Q.  Do you see on the upper left corner where it says name?

3   A.  Yes.

4   Q.  Please tell the ladies and gentlemen of the jury what it

5   says there.

6   A.  It says:  Jenkins, Hazel.

7   Q.  Does that indicate that's the person who the appointment

8   was for?

9   A.  Yes.

10  Q.  Do you see below that where it says:  Appointment date?

11  A.  Yes.

12  Q.  Did you write something there?

13  A.  Yes, I did.

14  Q.  What did you indicate?

15  A.  I indicated October 22nd, which was the date of the

16  appointment.

17  Q.  Does that mean this person who identified themselves as

18  Hazel Jenkins made an appointment through you with the

19  Washington Surgi-Center [sic] for October 22nd?

20  A.  Yes, that's correct.

21  Q.  Would you just briefly explain to the jury what the other

22  entries mean, the other information you took down.

23  A.  So below the appointment date is the date of Ms. Jenkins'

24  last menstrual period, and we had determined she was nine weeks

25  old [sic] from the date of her last period.  If you go to the

1    right side at the top, the fee is how much she would be paying

2    for the procedure.

3          Below that is the time that she was to arrive at the

4    clinic for the procedure.  Below that where it says age would

5    be how old Ms. Jenkins was.

6          Then if you go to the -- back to the left where it

7    says referred by, it says:  Online.  That means that she went

8    to Google or an online -- she did online research and found us

9    via our website.  Below that it says state, which is the state

10   she lived in, which is Virginia.  And beside that -- to the

11   right of that is her phone number.

12         Below that where it says previous pregnancies and

13   outcomes, it has P zero, which stands for she had not been

14   pregnant before.  Below that, general health would be any

15   health issues that we should be aware of to -- for a safe

16   procedure.  In this case, she stated she has asthma.

17         Below that is any medications that she would be on or

18   she'd be taking, which would be an inhaler.  Below that is any

19   allergies that she may have, and she stated she was allergic to

20   dogs and grass.  And below that is if she had ever been a

21   patient of the clinic before, and zero means that she had not

22   been a patient of the clinic before.

23   Q.  Thank you.  I apologize if I missed it.

24         You earlier indicated that the appointment date was

25   October 22nd?

1    A.   That's correct.

2    Q.   Straight across from that, is there a time noted for the

3    appointment?

4    A.   Yes.   Where it says appointment time, it says 9:00 a.m.

5    That was the -- her appointment time, was to be there at

6    9:00 a.m.

7    Q.   Ms. Compton, with the exception of the price, this

8    information about the person who purported to be Hazel Jenkins,

9    who would have provided that to you?

10   A.   It would have been Ms. Jenkins herself over the telephone.

11   Q.   Now, Ms. Compton, let me ask you a couple questions about

12   October 22nd of 2020.   Did you go to work that day?

13   A.   Yes, I did.

14   Q.   When you got to work at the surgi-center that day, did you

15   notice anything unusual or different from other days?

16   A.   When I was getting ready to ride the elevator, my husband

17   had given me a phone call and said there was a large group of

18   people that had followed me in, and he found them suspicious so

19   to be careful.   And when I was on the elevator, I did ride the

20   elevator with one other person who asked me about a restroom.

21        And then I got to the clinic, and I believe there

22   were people starting to gather outside of the clinic.   And that

23   was when I went into the clinic.

24   Q.   What did you do when you got inside the clinic?

25   A.   I went to our clinic manager, and I told her about what --

1     the phone call that my husband had made and told her that he

2     felt that we should be careful, and I told her to keep an eye

3     out because it --

4     Q.   Thank you.

5          MR. CRABB:   Your Honor, at this time we ask that

6     Government's Exhibit 1001 be admitted, which is a clip from

7     what's previously been admitted as Government's 1008.

8          THE COURT:   All right.   I'll allow it.   You want to

9     publish?

10         MR. CRABB:   Yes, Your Honor.   May we please show it

11    both to the jury and to the witness.

12              (Video played.)

13         MR. CRABB:   Would you pause, please.

14    BY MR. CRABB:

15    Q.   Ms. Compton, can you see that on your screen?

16    A.   Yes, I do.

17    Q.   Would you tell the jury, please, what's depicted on the

18    screen right now.

19    A.   That is the waiting room of the Washington Surgi-Clinic.

20    Q.   Do you see the brown door kind of in the center of the

21    screen to the right?

22    A.   Yes, I do.

23    Q.   What's that door lead to?

24    A.   That door leads to the -- well, it leads to the hallway,

25    which leads to the office, the waiting room.

1    Q.  I'm sorry.  I think I asked a confusing question.  What's

2    on the other side of that door?

3    A.  The other side of that door is the hallway to the building.

4    Q.  Okay.  Outside the clinic?

5    A.  Yes.

6    Q.  And do you see a window in the middle of the screen?

7    A.  Yes, I do.

8    Q.  What's on the other side of that?  What does that open up

9    to?

10   A.  That opens up to the front office where we -- the patients

11   check in when they arrive at the clinic.

12   Q.  And, Ms. Compton, do you see some green chairs along the

13   right side of the screen?

14   A.  Yes, I do.

15   Q.  And then some other chairs along the left side of the

16   screen?

17   A.  Yes, I do

18   Q.  Is that the normal configuration of the waiting room at the

19   Washington Surgi-Center [sic]?

20   A.  Yes.  Yes, it is.

21   Q.  And do you see a door on the left of the screen that's

22   partially opened?

23   A.  Yes, I do.

24   Q.  What does that door open to?

25   A.  That door opens to the main part of the clinic where,

 1    specifically, the phlebotomy station, the station where blood

 2    is drawn, and the procedure rooms.

 3    Q.  In order to get treatment at the Washington Surgi-Center

 4    [sic], would a patient need to go through that door?

 5    A.  Yes, they would.

 6               (Video played.)

 7               MR. CRABB:  Would you pause, please.

 8    BY MR. CRABB:

 9    Q.  Did you see someone enter the video?

10    A.  Yes, I did.

11    Q.  Is that one of your co-workers from the Washington

12    Surgi-Center [sic]?

13    A.  It is.  It's my co-worker.

14               MR. CRABB:  Please continue.

15               (Video played.)

16               MR. CRABB:  Would you pause, please.

17    BY MR. CRABB:

18    Q.  Ms. Compton, did you see someone come through the door and

19    go across the screen?

20    A.  Yes, I did.

21    Q.  Did you recognize that person?

22    A.  Yes

23    Q.  Please tell us who that is.

24    A.  That is me.

25    Q.  Why did you come across the floor of the reception area and

```
1    go toward the door?

2    A.  Because I had heard that my co-worker was struggling, so I

3    went to help her.

4              MR. CRABB:  Would you continue the video, please.

5              (Video played.)

6              MR. CRABB:  Would you pause, please.

7    BY MR. CRABB:

8    Q.  Did you see another person come across the floor in blue

9    with a broomstick?

10   A.  Yes.

11   Q.  Is that another one of your co-workers from the Washington

12   Surgi-Center [sic]?

13   A.  Yes, it is.

14             MR. CRABB:  Would you continue the video, please.

15             (Video played.)

16             MR. CRABB:  Would you pause, please.

17   BY MR. CRABB:

18   Q.  Ms. Compton, is this you down on the center of the screen

19   toward the left?

20   A.  Yes, it is.

21   Q.  What are you trying to do there?

22   A.  I am -- well, first, I was trying to block the door with my

23   body so that he couldn't get through, and I was also telling

24   him he is not welcome here.  He needs to leave.  "Sir, you need

25   to leave now.  You're not welcome here.  You need to leave."
```

1    Q.  Thank you.

2              MR. CRABB:  Would you continue the video.

3              THE COURT:  Can you move the microphone over a little

4    bit so you're talking a little more directly into it.  There

5    you go.

6              MR. CRABB:  You can move the base to --

7              THE WITNESS:  Okay.  Is this better?

8              THE COURT:  A little better, yes.

9              (Video played.)

10             MR. CRABB:  Would you pause the video, please.

11   BY MR. CRABB:

12   Q.  Ms. Compton, did you go back to the door?

13   A.  Yes, I did.

14   Q.  Was there someone who went with you?

15   A.  Yes, there was.

16   Q.  Was that a patient?

17   A.  It was.  It was a patient.

18   Q.  Ms. Compton, during the entry, the people came through the

19   door and what you've just described for the jury, were you

20   injured during that period?

21   A.  Yes, I was.

22   Q.  What type of an injury did you receive?

23   A.  It was a sprain on my left ankle.

24   Q.  I know you're a registered nurse.  Did you actually have

25   the ankle examined by a doctor?

1    A.  Yes, I did.

2    Q.  What was your injury?

3    A.  It was a severe sprain of the left ankle.

4    Q.  Did you receive any treatment for that injury?

5    A.  Yes, I did.

6    Q.  Please tell the ladies and gentlemen of the jury what

7    treatment you received.

8    A.  I -- well, I went to the emergency room and was given an

9    air cast and anti-inflammatory medication and crutches and was

10   instructed to stay off of it.

11              MR. CRABB:  Your Honor, at this point we ask that

12   Government's Exhibits 2007, 2010, and 2016, which are

13   photographs, be admitted.

14              MR. CANNON:  No objection.

15              THE COURT:  2010?

16              MR. CRABB:  Yes, Your Honor.

17              THE COURT:  What's the rest?

18              MR. CRABB:  Also 2007.

19              THE COURT:  Okay.

20              MR. CRABB:  And also 2016.

21              THE COURT:  All right.  Any objections to these?

22              MR. KIYONAGA:  No, ma'am.

23              THE COURT:  If I don't hear anything, I'm assuming

24   there aren't.  Then I'll admit 2007, 2010, and 2016.

25              (Government's Exhibits 2007, 2010, and 2016 were

1    admitted.)

2          MR. CRABB:  Thank you, Your Honor.  May we start with

3    2007.  Can we please show that both to the jury and to the

4    witness.

5    BY MR. CRABB:

6    Q.  Can you see that, Ms. Compton?

7    A.  Yes, sir.

8    Q.  Whose ankle is that?

9    A.  That is my ankle.

10   Q.  What does it show?

11   A.  It shows the swelling that occurred after the ankle was

12   sprained.

13         MR. CRABB:  Could we now, please, go to what's been

14   admitted as Government's Exhibit 2010.

15   BY MR. CRABB:

16   Q.  Ms. Compton, is that another photograph of your ankle?

17   A.  Yes, it is.

18   Q.  Does that show the swelling around your ankle?

19   A.  Yes, it does.

20         MR. CRABB:  Last, could we go to the series of photos

21   that have been admitted as Government's Exhibit 2016.

22   BY MR. CRABB:

23   Q.  Let's start with the first.  Is that another photograph of

24   your ankle after you were injured?

25   A.  Yes, it is.

1    Q.  Does it show any bruising in addition to swelling?

2    A.  Yes, it does.

3           MR. CRABB:  Could we go to the next page of that

4    exhibit, please.

5    BY MR. CRABB:

6    Q.  Is that your foot?

7    A.  Yes, it is.

8    Q.  Are those your toes on the injured foot?

9    A.  Yes, it is.

10          MR. CRABB:  Go to the next page, please.

11   BY MR. CRABB:

12   Q.  Is that your foot also?

13   A.  Yes, it is.

14   Q.  One more.  What's that show, Ms. Compton?

15   A.  That, I believe, is a bag with an ice pack.

16   Q.  Was that part of the treatment you did for your ankle?

17   A.  Yes, it is.

18          MR. CRABB:  Can we see the next one, please.

19   BY MR. CRABB:

20   Q.  Is that part of your ankle or leg?

21   A.  Yes.

22   Q.  Skip that one.  Closeup of your leg?

23   A.  Yes, it is.

24   Q.  Thank you.

25          Ms. Compton, going back for a moment to October 22nd

1    of 2020, how long were the Surgi-Clinic's operations interfered

2    with that day based on the people who forced their way into the

3    front?

4    A.  I -- well, I left to go to the hospital around noon.  And

5    to my knowledge, right after I left, they began with treatments

6    again once everybody had been removed.

7    Q.  But prior to approximately noon, had treatments been

8    suspended?

9    A.  Yes.  Yes, they had.

10   Q.  And why were treatments suspended prior to noon?

11   A.  We did not feel it was safe to continue with procedures

12   with the intruders in the waiting room.

13              MR. CRABB:  Thank you, Your Honor.  May I have just a

14   moment?

15              THE COURT:  Yes.

16              MR. CRABB:  Thank you, Your Honor.  No further

17   questions.

18              THE COURT:  All right.  Any questions from Mr. Cannon

19   or any of the others?

20              MR. CANNON:  No, Your Honor.

21              THE COURT:  Mr. Guillaume?

22              MR. GUILLAUME:  No, Your Honor.

23              THE COURT:  Mr. Dunn?

24              MR. DUNN:  May I just have a moment?

25              THE COURT:  Yes.  I'll move on to Mr. Walsh.

```
 1                    MR. WALSH:  Just one minute.

 2                    MR. DUNN:  No questions.

 3                    THE COURT:  All right.  Mr. Walsh?

 4                    MR. WALSH:  Just one moment.

 5                    MR. KIYONAGA:  Nothing.

 6                    THE COURT:  Mr. Kiyonaga, anything from you?

 7                    MR. KIYONAGA:  Nothing here, Your Honor.

 8                    THE COURT:  All right.  You can step down.  You're

 9      excused at this time.

10                    THE WITNESS:  Okay.  Thank you.

11                    (Witness excused.)

12                    THE COURT:  All right.  Your next witness?

13                    MR. PATEL:  Your Honor, the government calls Sasha

14      Proctor.

15                    THE COURT:  All right.

16                    MR. PATEL:  I'll see if she's here.

17                    THE COURT:  All right.  If you would come through the

18      wooden gates.  Come forward.  Come down the center, and if

19      you'd come over to my left, please.  If you would just step up

20      and raise your right hand, we're going to swear you in.

21                    (Witness sworn.)

22                    THE COURTROOM DEPUTY:  Please be seated.

23                    THE COURT:  All right.  You can go ahead and sit

24      down.  You can move the chair up to make yourself comfortable.

25      You can take the mask off so we can actually hear what you're
```

```
 1    saying.
 2              Okay.  And then you need to speak -- go ahead and --
 3    is it comfortable leaving it that way?  You need to speak into
 4    the microphone in a nice loud, clear voice.  Talk to somebody
 5    at the back door.  All right?
 6              THE WITNESS:  Okay.
 7              THE COURT:  Allow counsel to finish their questions
 8    before you start to answer, and they should wait for you to
 9    finish your answer before they move on.
10              If you see anybody at the tables out there stand,
11    they're objecting, or you hear the word objection, if you
12    haven't started to answer, don't.  If you're in the middle of
13    your answer, please stop.  Let me hear the objection, and then
14    I'll tell you whether you can proceed.  All right?
15              THE WITNESS:  Okay.
16              THE COURT:  You do need to keep your voice up,
17    though.
18              THE WITNESS:  Okay.
19              MR. PATEL:  May I begin, Your Honor?
20              THE COURT:  Yes.
21              MR. PATEL:  Thank you.
22                          DIRECT EXAMINATION OF
23                            SASHA PROCTOR
24    BY MR. PATEL:
25    Q.  Could you please introduce yourself to the jury.
```

1   A.  My name is ███████.

2   Q.  I'm sorry, ma'am.

3               MR. PATEL:  May I have one moment, Your Honor?

4               THE COURT:  Okay.  Perhaps an explanation should be

5   given --

6               MR. PATEL:  Yes, Your Honor.

7               THE COURT:  -- to the jury?  Do you all agree?

8          For some of the witnesses we have used other names,

9   not their actual names, so -- for both privacy and safety

10  concerns.  So let's proceed.

11              MR. PATEL:  May I proceed?  All right.

12  BY MR. PATEL:

13  Q.  Ms. Proctor, can you please introduce yourself to the jury.

14  A.  My name is Sasha Proctor.  I'm a medical assistant, and I'm

15  also a small business owner, and I have an esthetician shop.

16  Currently, I work as a medical assistant part-time and run my

17  business full-time.

18  Q.  Ms. Proctor, do you work at the Washington Surgi-Clinic?

19  A.  Yes.

20  Q.  Where is the clinic located?

21  A.  2112 F Street Northwest, Washington, D.C.

22  Q.  And how long have you worked at the clinic?

23  A.  I worked there since 2017, and then I stopped and came back

24  a year ago.

25  Q.  During the time you worked at the clinic and now, what is

1    your job or what is your role there?

2    A.  I'm sorry.  Can you repeat the question.

3    Q.  What is your job or what is the position that you hold at

4    the clinic?

5    A.  I'm a medical assistant.  So I do phlebotomy, I do the

6    triaging, check patients in, make appointments, prep the rooms,

7    assist the doctor.

8    Q.  What sort of services does the clinic offer?

9    A.  They offer services for women, reproductive services,

10   abortion services, regular gynecology services as well.

11   Q.  Can you describe the type of patients the clinic sees?

12   A.  We have a diverse amount of patients that come in.  So from

13   all different backgrounds, all walks of life.  So we have women

14   with pregnancies that they may be struggling with.  We come

15   across children that are rape victims, people who come from

16   other countries who have been sex trafficked.

17            So we deal with a lot of different women with

18   different circumstances.

19   Q.  You indicated that one of the duties that you had was to

20   take appointments?

21   A.  Yes.

22   Q.  How would appointments usually be taken by the clinic?

23   A.  We take appointments by phone, and then we document them by

24   writing appointments on a card.  So we write all of the

25   appointments out by hand.

1    Q.  And how soon before an appointment is scheduled must the

2    appointment be made?

3    A.  We do same-week appointments.  So if a client or a patient

4    calls on a Tuesday, depending on the length of pregnancy, if we

5    can see them, we'll take them that next day.

6    Q.  Is the clinic located in a multistory building?

7    A.  Yes.

8    Q.  What floor is the clinic located on?

9    A.  The fourth floor.

10   Q.  You were working at the clinic back in October of 2020?

11   A.  Yes.

12   Q.  Can you describe what the clinic's layout was in terms of

13   the waiting room.

14   A.  So the waiting room, when you walk in, you're going to see

15   chairs on your left side and your right side.  There is a

16   check-in window on the right side as well, and then there's a

17   door that leads to the treatment area.  That door remains

18   locked.

19            Additional to that door is another door at the end of

20   the office, and it leads to the treatment area, but that

21   room -- that door stays unlocked so that the patients there

22   have access to the bathroom.

23   Q.  Does the main entrance into the clinic from the hallway of

24   the building lead directly into the waiting room?

25   A.  I'm sorry.  Say that again.

```
 1   Q.  Does the main entrance of the clinic from the hallway lead

 2   directly into the clinic's waiting room?

 3   A.  Yes.

 4   Q.  Is there another entrance in the hallway that leads into

 5   the clinic?

 6   A.  Yes.  That's an employee door.

 7   Q.  And is that door usually locked?

 8   A.  Yes.

 9   Q.  Is it fair to say that the employee door is only used by

10   the clinic staff?

11   A.  Yes.

12   Q.  Who are some of the people that worked at the clinic with

13   you back in October of 2020, not by name, but just by position?

14   A.  We had a -- we have two registered nurses and myself and

15   the doctor.

16   Q.  And was one of those nurses a clinic manager as well or the

17   clinic administrator?

18   A.  Yes.

19   Q.  Are you familiar with the clinic's security cameras or the

20   security system?

21   A.  Yes.

22   Q.  How many cameras are located in the hallway outside of the

23   clinic?

24   A.  There's one.

25   Q.  And is there a camera inside of the clinic's waiting room?
```

1    A.  Yes.

2    Q.  So directing your attention to October 22nd of 2020, do you

3    remember working that day?

4    A.  Yes.

5    Q.  Do you remember what time the clinic was scheduled to open

6    that day?

7    A.  Yes.

8    Q.  What time was that?

9    A.  9:00 a.m.

10   Q.  And what time was your shift?

11   A.  9:00 a.m.  Starts at 9:00.  I get there usually about 8:50.

12   Q.  So is it fair to say that you arrived at the clinic on this

13   day before the clinic was scheduled to open?

14   A.  Yes.

15   Q.  Did anything unusual happen when you got out of the

16   elevator and before you entered into the clinic?

17   A.  Yes.

18   Q.  Can you tell the jury what happened.

19   A.  So the day that I arrived to work that day, when I got off

20   the elevator, we normally do have people waiting in the hallway

21   to be seen because it's a first-come first-serve basis.

22          What I noticed is when I got off the elevator that

23   the hallway door was wedged open, which is like the emergency

24   escape door.  That was wedged open.  And when I went inside, I

25   let the nurse know what I seen.  But previously before me

1    entering, one of the patients walked up to me and said, hello,

2    my name is Angel -- Hazel Jenkins.  I have an appointment

3    today.  And I said, okay.  We open up exactly at 9:00.

4            And then when I went into the office, I let the

5    office manager know what I seen in the hallway with the door

6    being open.  After that, she went out, and she seen that there

7    were multiple people standing in the stairwell.  And those --

8    Q.  Let me interrupt you, Ms. Proctor.

9            So when you came out of the elevator before you

10   entered into the clinic, you indicated that you saw the

11   stairwell door ajar; is that what you said.

12   A.  Yes.

13   Q.  Were you able to see whether or not there was anybody in

14   the stairwell?

15   A.  No.  I was not able to see anyone.  I was just seeing that

16   the door was open.

17   Q.  Was that unusual?

18   A.  Yes.

19   Q.  Why?

20   A.  Because it's never open.  That door is never open.  It's an

21   emergency stairwell.  We usually use it only when, like, the

22   elevators are down or it's crowded.  It's never open.

23   Q.  Is that something that you had reported to the manager when

24   you went into the clinic?

25   A.  Yes.

1    Q.  Now, you said before you entered into the clinic, you

2    encountered somebody outside of the clinic's entrance?

3    A.  Yes.

4    Q.  Was there a group of people outside of the entrance, or was

5    it just one person?

6    A.  There were a group of people.

7    Q.  The person who you described that approached you, could you

8    describe her?

9    A.  Heavy-set, glasses, she was covered in black.  She had a

10   hair cover on and then like a drape over her body, was all

11   black, and she had a face mask on.

12   Q.  What did she say her name was?

13   A.  Hazel Jenkins.

14   Q.  Did she indicate to you that she had an appointment at the

15   clinic that morning?

16   A.  Yes.

17   Q.  I want you to take your time, take a look around this

18   courtroom and see whether or not you recognize the person who

19   you saw identifying herself as Hazel Jenkins that morning.

20            THE COURT:  I think people need to take their masks

21   off because nobody is going to be able to tell otherwise.

22            MR. PATEL:  With your permission, Your Honor, we'd

23   ask everyone to take their mask off.

24            THE COURT:  Everybody can take it off if you have it

25   on.

 1                    THE WITNESS:  Yes, I see her.

 2     BY MR. PATEL:

 3     Q.  Can you point at her and describe something she's wearing

 4     or let us know where she's seated in the courtroom.

 5     A.  Right here with the red hair, glasses, and she have all

 6     black on.

 7                    MR. PATEL:  Your Honor, will the record reflect an

 8     in-court identification of Defendant Handy?

 9                    THE COURT:  Any objection?

10                    MR. CANNON:  I don't think so.

11                    THE COURT:  All right.  I'll let the record reflect

12     that the witness has identified Ms. Handy.

13     BY MR. PATEL:

14     Q.  So after this lady, Ms. Handy, identified herself as Hazel

15     Jenkins, did you go into the clinic and report that to your

16     clinic manager as well?

17     A.  Yes.

18     Q.  You indicated that the clinic manager then went outside of

19     the clinic to investigate whatever it was that you reported to

20     her?

21     A.  Yes.

22     Q.  What did you do while the manager was outside of the

23     clinic?

24     A.  I stood at the door to hold it cracked open for her so she

25     don't have to use her key to get back in.  Because I wasn't

1   sure what was out there, so I wanted her to have easy access

2   back in.

3   Q.   Which door was that?

4   A.   The employee door.

5   Q.   Is it fair to say that the employee doors are located

6   across from the elevators?

7   A.   Yes.

8   Q.   October 22nd, 2020, was during the height of the COVID

9   pandemic; is that accurate?

10  A.   Yes.

11  Q.   Were there some protocols in place at the clinic in terms

12  of the number of people who could be present inside of the

13  clinic and what the rules were?

14  A.   Yes.

15  Q.   What were those?

16  A.   So we had a limit.  We was only taking patients up to the

17  amount of seats that we had available.  We were not allowing

18  more than one companion per patient due to the restrictions for

19  COVID.

20       Everyone had to wear masks, and we pretty much took

21  extra precautions when it came to patients' bodily fluids.

22  Q.   Okay.  So after you went into the clinic, the clinic

23  manager went out.  Did she at some point come back and return

24  in through that staff door?

25  A.   Yes, she did.

1    Q.  While you were inside but before the clinic was open for

2    the first scheduled appointments, did you happen to see an

3    appointment card for Hazel Jenkins?

4    A.  Yes, I did.

5           MR. PATEL:  Your Honor, I'd like to show this witness

6    and publish to the jury Government's Exhibit 5053, which has

7    already been admitted.

8           THE COURT:  All right.  Go ahead.

9    BY MR. PATEL:

10   Q.  Ms. Proctor, looking at Government's Exhibit 5053, is this

11   the Hazel -- card that you saw for an appointment for Hazel

12   Jenkins that morning on October 22nd?

13   A.  Yes.

14   Q.  And it shows that she had an appointment at 9:00 in the

15   morning?

16   A.  Yes.

17   Q.  Thank you.  So after you confirmed that there was an

18   appointment for an individual named Hazel Jenkins, did you

19   eventually open the clinic's front door?

20   A.  Yes.  We did open up.

21   Q.  Was there anything unusual that you were expecting prior to

22   opening that door?

23   A.  I was expecting something unusual only because when the

24   office manager went to check the stairwell, she seen the

25   protestors out there.  So that's why, when I opened the door, I

```
 1   knew in my head there's something, but I didn't know that it
 2   would, you know, go that way.
 3   Q.  Before you opened the clinic door, were you in the office
 4   area behind the receptionist's window that you described
 5   earlier?
 6   A.  Yes.
 7   Q.  Are there security monitors in that office area that show
 8   what the cameras are recording?
 9   A.  Yes.
10   Q.  Were you able to see anything on those monitors before you
11   opened the front door?
12   A.  We just seen normal behavior of patients waiting to be
13   seen, you know, waiting for our doors to open.
14   Q.  So at 9:00 did you approach the front door to open it from
15   the inside?
16   A.  Yes.
17   Q.  Was it locked at that time?
18   A.  Yes.
19   Q.  Did you unlock it?
20   A.  Yes.
21   Q.  Generally, what happened when you unlocked the door?
22   A.  When I unlocked the door, I was met with a mixture of
23   patients that we already had prior to that day.  So we had,
24   like, three-day patients.  So we always met with those, new
25   patients, and Hazel.
```

1    Q.  Okay.  If you can speak into the microphone so everybody

2    can hear you.

3    A.  Okay.

4    Q.  Were you aware whether or not there were a mixture of

5    patients and perhaps other people standing outside of the door

6    before you opened it?

7    A.  Yes.

8           MR. PATEL:  Your Honor, if I may publish Government's

9    Exhibit 1001, which has been admitted into evidence.

10          THE COURT:  Yes.  Go ahead.

11   BY MR. PATEL:

12   Q.  Ms. Proctor, have you seen this video before?

13   A.  Yes.

14   Q.  And you're familiar with the security camera --

15          MR. PATEL:  Your Honor, a juror is raising her hand.

16          THE COURT:  Can everybody see it?  Yes.

17   BY MR. PATEL:

18   Q.  Ms. Proctor, you indicated that the clinic's waiting room

19   has a security camera; is that right?

20   A.  Yes.

21   Q.  Is this video that you're seeing, or at least the paused

22   screen, a depiction of the footage from one of those cameras in

23   the waiting room?

24   A.  Yes.

25   Q.  And is the camera pointed at the front door of the clinic

 1    that leads into the hallway?

 2    A.  Yes.

 3              THE COURT:  You have to keep your voice up a little

 4    bit.

 5              THE WITNESS:  Okay.

 6              MR. PATEL:  Pull the microphone a little closer to

 7    you and just aim it right -- there you go.  Thank you.

 8              (Video played.)

 9              MR. PATEL:  Pause it right there.

10    BY MR. PATEL:

11    Q.  Ms. Proctor, you recognize the person in the video?

12    A.  Yes.

13    Q.  Who is that?

14    A.  Me.

15    Q.  And what were -- what are you about to do in this video?

16    A.  Unlock the door.

17              (Video played.)

18              MR. PATEL:  Pause it right there.

19    BY MR. PATEL:

20    Q.  Can you describe for the jury what's happening when you

21    initially opened that front door.

22    A.  So I noticed additional people in the hallway at that time.

23    I was unsure whether to open the door, and then I seen a

24    familiar face, which is one of the patients that we were

25    already working with prior to that day.  So I decided to let

1    her in.  But after that, everyone else came in with her.

2    Q.  Okay.

3              (Video played.)

4    BY MR. PATEL:

5    Q.  Was there another nurse who came in through one of those

6    interior doors in the waiting room?

7    A.  Yes.

8    Q.  Is that -- is she one of the nurses working with you that

9    morning at the clinic?

10   A.  Yes.

11   Q.  Can you describe what happened the moment she came out from

12   within the clinic's -- behind that clinic door and into the

13   waiting room.

14   A.  So when she came out, she pretty much came to just help

15   reinforce the door and keep the door closed to, you know, just

16   give me an extra hand on trying to get them out or keep them

17   from coming in.

18   Q.  So who was trying to come in?

19   A.  The protestors.

20   Q.  And why were you trying to close the door?

21   A.  I was closing the door because it was -- I didn't feel like

22   they should be there with a lot of the women there going

23   through a lot of the mental struggles that they were going

24   through at that time.  A lot of people didn't want to be there.

25              And for them to have to endure judgment, people

1   yelling in their face, I didn't feel like that's something that

2   everyone -- you know, that someone would want to deal with

3   going through something they don't want to deal with.  Like I

4   said previously, a lot of people have their own issues coming

5   in here, and the last thing that they need is someone judging

6   them or screaming in their face.

7          So we was trying to keep a safe environment for them.

8   That's why I didn't want to let them in.

9   Q.  Are they allowed to be in the clinic if they don't have an

10  appointment?

11  A.  I'm sorry?

12  Q.  Are they allowed to be inside of the clinic if they don't

13  have an appointment?

14  A.  No.  Because it's appointment only.

15  Q.  Were they trying to get into the clinic?

16  A.  Yes.

17  Q.  Were there a mixture of men and women among these group

18  trying to get in through this --

19          MR. KIYONAGA:  Objection, Your Honor.  Sorry.

20  Eliciting facts not in evidence.  The witness said it was

21  first-come first-serve.

22          THE COURT:  You've asked before if anything has

23  happened.  I'll overrule your objection.

24          Go ahead.

25  BY MR. PATEL:

1    Q.  When patients -- let me go back.

2         When patients have a scheduled appointment, do you

3    schedule groups of them for approximately the same time block?

4    A.  Yes.

5    Q.  Explain what you meant when you said first-come

6    first-serve.

7    A.  Okay.  So we scheduled them for the same time so they all

8    show up at the same time.  So whoever comes first, we see them

9    in that order.  So they all have appointments.  It's just we

10   see them in the order that they come in.

11   Q.  Is it fair to say that you would not see a walk-in?

12   A.  Yes, it's fair.

13        MR. CANNON:  What was the question?

14        THE COURT:  It's fair to say you would not see a

15   walk-in; she answered yes.

16   BY MR. PATEL:

17   Q.  Going back to the people who were trying to get in through

18   the front door and you were trying to keep out, was there a

19   mixture of men and women?

20   A.  Yes.

21   Q.  Can you describe what they were doing to get in through the

22   front door as you were trying to close it?

23   A.  They were pushing, shoving, trying to wedge the door open,

24   shoving themselves through me, through the other employee.

25   Q.  Okay.

```
 1                      MR. PATEL:  Can we play the video.

 2                 (Video played.)

 3                      MR. PATEL:  Pause it right there.

 4    BY MR. PATEL:

 5    Q.  There was another employee who came out from one of the

 6    open doors within the clinic's waiting room.  Was that the

 7    clinic manager?

 8    A.  Yes.

 9    Q.  What did -- what were the three of you doing once she came

10    out of the interior door to the clinic?

11    A.  You said what were the three of us doing?

12    Q.  Yes.

13    A.  We were all trying to pretty much make sure that they don't

14    get in.  We were trying to put our force together to try to get

15    them all out or not have as many in there as possible.  We were

16    all just using our force to get them out, trying to push them

17    out, you know, so that they don't come in.

18                      MR. PATEL:  Can you play the video.

19                 (Video played.)

20                      MR. PATEL:  Pause it right there.

21    BY MR. PATEL:

22    Q.  Can you describe the type of force that you and the other

23    clinic staff were being met with as you were trying to keep

24    these people out of the clinic's waiting room.

25    A.  It was a lot of aggression, stubbornness, entitlement to be
```

1    there.  So it was very hard to remove them out.  So it was just

2    a lot of aggression that we were met with at that time.

3    Q.  How about the type of physical force that you were met with

4    in terms of these people trying to push their way in?

5    A.  The type of physical force, it was -- I mean, it was to the

6    point that an employee got injured.  So they -- they were just

7    very -- they were very forceful, very aggressive.

8              MR. PATEL:  Can we continue to play the video,

9    please.

10             (Video played.)

11             MR. PATEL:  Can you pause it right there.

12   BY MR. PATEL:

13   Q.  Do you see the clinic manager at the bottom of the screen

14   having a conversation with one of the individuals or the men

15   that had come into the clinic?

16   A.  Yes.

17   Q.  Were you able to hear the conversation that she was having

18   with that individual --

19             THE COURT:  You're dropping your voice.

20             MR. PATEL:  I apologize, Your Honor.

21   BY MR. PATEL:

22   Q.  Were you able to hear the conversation that the clinic

23   manager was having with the young man at the bottom of the

24   screen in that video?

25   A.  I heard a bit of the conversation, yes.

1    Q.   What was that conversation?

2    A.   The conversation -- I'm sorry.

3              MR. CANNON:  Objection, relevance.

4              THE COURT:  No.  I'll allow it.  Go ahead.

5              THE WITNESS:  Okay.

6              THE COURT:  I'm assuming there's some relevance here.

7              THE WITNESS:  The conversation was pretty much in

8    reference to religion.  She's pulling out her rosary to let him

9    know that she serves the same God that he do.  And she knows

10   that we have a nonjudgment to God, and he has no right to be

11   here judging these women.  You know, she goes to mass just the

12   same way that he does, and she understands the word of God.  So

13   that was their --

14   BY MR. PATEL:

15   Q.   Did you and the clinic manager tell these people who came

16   into --

17             THE COURT:  Are you objecting?

18             MR. CANNON:  Just going to move to strike, Judge.

19             THE COURT:  No.  I'll allow it.

20             MR. KIYONAGA:  Your Honor, it's hearsay.

21             THE COURT:  She's discussing -- well, that's --

22             MR. KIYONAGA:  It's an out-of-court statement.  It's

23   offered for the truth.

24             THE COURT:  You want to --

25             MR. PATEL:  Goes to show state of mind and course of

1    conduct in terms of what happens next.

2            THE COURT:  I'll allow it.  Go ahead.

3    BY MR. PATEL:

4    Q.  During that conversation did the clinic manager tell that

5    individual who she was speaking with, as well as the other

6    people who were in the clinic without an appointment, to leave?

7    A.  Yes.

8    Q.  Did you ever tell the individuals who came into the clinic

9    without an appointment to leave?

10   A.  Yes.

11   Q.  Did one of those individuals include the lady who

12   identified herself as Hazel Jenkins?

13   A.  Yes.

14           MR. PATEL:  Can you play the video, please.

15           (Video played.)

16           THE COURT:  Are you calling the clinic manager as a

17   witness?

18           MR. PATEL:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MR. PATEL:  Can you pause it there.

21   BY MR. PATEL:

22   Q.  After some number of minutes, were you and the other clinic

23   employees able to get the real patients in through the interior

24   door within the clinic?

25   A.  Yes.

 1    Q.  What did you do with those patients once they were escorted

 2    further into the facility?

 3    A.  We tried to get them their paperwork, get them into the

 4    recovery room where there are more seats so they can fill out

 5    their pre-op checklist; apologize for the situation also.

 6    Q.  Did you and the clinic manager, the other employees, lock

 7    those doors that lead back into the waiting room from further

 8    in the facility?

 9    A.  Yes.

10    Q.  After you were able to get the patients situated, did you

11    then go to the area where the receptionist's window is?

12    A.  I may have came back out one time to open the door or crack

13    it, but I don't think I fully came out -- back out after

14    this -- after we went in to get the patients settled.

15    Q.  Okay.  Within minutes after the patients were settled, did

16    you or the clinic manager attempt to do anything to get these

17    individuals who forced their way into the clinic to leave?

18    A.  No.  We then waited for law enforcement to come and see if

19    maybe they can get them out.  But once we already had that

20    first encounter with them and they were already in the waiting

21    room, law enforcement started to come, and we no longer had to

22    be out there.

23          I don't recall myself coming back out after going

24    back in.

25                MR. PATEL:  Can we continue playing the video,

 1    please.

 2              (Video played.)

 3              MR. PATEL:  Pause it right there, please.

 4    BY MR. PATEL:

 5    Q.  During these next few moments after you had gotten the

 6    clinic patients further into the clinic, did you have the

 7    opportunity to see what those individuals were doing in the

 8    waiting room?

 9    A.  I did.

10    Q.  What were they doing?

11    A.  They were preparing to start closing off the door, chaining

12    theirself up.

13    Q.  Thank you.

14              MR. PATEL:  Can you play the video.

15              (Video played.)

16              MR. PATEL:  Pause it right there.  Thank you.

17    BY MR. PATEL:

18    Q.  Do you see anybody behind the receptionist's window?

19    A.  Yes.

20    Q.  Whose arm is that?

21    A.  That is the office manager.

22    Q.  Were you in the office when this moment on the video was

23    occurring?

24    A.  Yes.  I'm behind her.

25    Q.  I'm sorry?

1     A.   I'm behind her.

2     Q.   What was the office manager doing?

3     A.   She was using, like, a blowhorn to kind of cover up the

4     sounds, the singing, the derogatory remarks that they were

5     saying.  She was using that to kind of tone out the sound.

6     Q.   What were you able to hear in terms of what was coming from

7     the waiting room?  What did you hear these people --

8     A.   That we should go to pro-choice.org, get new jobs, we don't

9     have to work here, we're killing babies; just slander, a lot of

10    slander.

11    Q.   Thank you.

12              MR. PATEL:  Can you play the video, please.

13              (Video played.)

14              MR. PATEL:  Can you pause it right there.

15    BY MR. PATEL:

16    Q.   Do you see yourself now behind the receptionist's window?

17    A.   Uh-huh.

18    Q.   Is that a yes?

19    A.   Yes.

20    Q.   Is there an individual standing directly in front of the

21    receptionist's window in the waiting room?

22    A.   Yes.

23    Q.   He's got his hands covering his ears?

24    A.   Yes.

25    Q.   Was there a conversation being had between yourself, the

```
 1   clinic manager, and this individual?

 2   A.  Well, I wasn't having a conversation with him.

 3   Q.  Was the clinic manager?

 4   A.  She may have.  I don't -- I don't remember what was being

 5   said at that time.

 6   Q.  Okay.

 7            MR. PATEL:  Can you play the video, please.

 8            (Video played.)

 9            MR. PATEL:  Can you pause it right there.

10   BY MR. PATEL:

11   Q.  Did you see in the video there were three people who kind

12   of walked out of the clinic's waiting room and into the

13   hallway?

14   A.  Yes.

15   Q.  Were you in the receptionist's office still at this time

16   when these individuals were either in the clinic waiting room

17   or exiting into the hallway?

18   A.  Yes.

19   Q.  Were you watching on the clinic security cameras and seeing

20   what they were doing in the hallway?

21   A.  Yes.

22   Q.  Can you describe what you saw the individuals doing?

23   A.  So they were talking, and then they were orchestrated to go

24   to the other door, which is the employee door, and that's where

25   they were at.
```

1          MR. KIYONAGA:  Your Honor, objection to hearsay.

2     Also, it's inviting speculation.

3          THE COURT:  Well, these are, presumably, the -- those

4     that are being charged with co-conspirator statements.  So I

5     don't see -- she hasn't said much in terms of what they said

6     specifically.

7          MR. KIYONAGA:  Your Honor, it's also speculation.  We

8     don't know that there was an audio component to this --

9          THE COURT:  All she can do is testify as to what it

10    is that she heard and what she considered.  Overruled.

11         MR. KIYONAGA:  She characterized it --

12         THE COURT:  Overruled.

13         MR. KIYONAGA:  Orchestrating, Your Honor.

14         THE COURT:  Overruled.

15         MR. KIYONAGA:  Orchestrating.

16         THE COURT:  Overruled.  Go ahead.

17         MR. PATEL:  Thank you.  Can you play the video,

18    please.

19         (Video played.)

20         MR. PATEL:  Can you pause it right there.

21    BY MR. PATEL:

22    Q.  Do you see a lady dressed in all black in the video?

23    A.  Yes.

24    Q.  Who is that?

25    A.  She identified as Hazel Jenkins is what I know her as.

```
1    Q.  That's the same person you identified in court?

2    A.  Yes.

3              MR. PATEL:  Can you play the video.

4              (Video played.)

5              MR. PATEL:  Can you pause it right there.

6    BY MR. PATEL:

7    Q.  While this part of the video plays, were you still in that

8    receptionist area?

9    A.  I may have been.  I don't --

10   Q.  Can you -- I'm sorry.  Go ahead.

11   A.  I may have been with the patients.  I was on and off with

12   the patients.  Getting them prepared was very vital, so I was

13   back and forth to the front and to the back with the patients

14   at the same time.

15             So there was times when I were up here.  This

16   particular time, yes, when he was here, yes, I was there when

17   he was at the window.

18   Q.  When you say "he," who are you talking about?

19   A.  The guy with the hoodie jacket on standing directly at the

20   glass window.

21   Q.  Can you describe what was happening in the clinic's waiting

22   room at that time?

23   A.  Right now, the individuals are chaining theirself up

24   together.  The gentleman with the hoodie on at the window, he

25   was talking to ████, and this conversation was the same
```

1    conversation that they were having as far as religion and her

2    being a faithful woman of God and him just being here as a man,

3    judging these women, and him telling her that she shouldn't be

4    doing this and she knows better.

5    Q.  And what are the other individuals in the waiting room

6    doing?

7    A.  I don't know what -- I don't know what they're saying, but

8    they are chaining theirself up.

9    Q.  And you saw that?

10   A.  Yes.

11   Q.  Thank you.

12           (Video played.)

13           MR. PATEL:  Can you pause it right there.

14   BY MR. PATEL:

15   Q.  Ms. Proctor, do you remember some of the things that you

16   heard or -- things that you heard coming from the clinic's

17   waiting room during this time period?

18   A.  Prayers, singing, and chanting.

19   Q.  Do you remember what they were chanting?

20   A.  It was like hymns; like hymns from, like, church.

21   Q.  Thank you.

22   A.  They was, like, doing hymns.

23           THE COURT:  You have to keep your voice up.

24           THE WITNESS:  Okay.  I will.

25           (Video played.)

1    MR. PATEL:  Can you pause it right there.

2    BY MR. PATEL:

3    Q.  Ms. Proctor, did you ever see that rope or any sort of rope

4    tied blocking the front door, the main entrance into the

5    clinic's waiting room?

6    A.  Yes, I did.

7    Q.  Did you see when that was -- when that rope was tied?

8    A.  I'm sorry.  What was the last part of your question?

9    Q.  Did you see when that rope was tied across the door?

10   A.  Yes.

11   Q.  When did that happen?

12   A.  I'm not sure what time, but I was standing -- like, I can

13   see everything on the camera here at the door, so I was able to

14   see when they had tied the door up to the chair, to wedge it

15   open.  That was a little after the individuals had went out to

16   block the other door.

17   Q.  Okay.  Thank you.

18        (Video played.)

19   BY MR. PATEL:

20   Q.  Ms. Proctor, were any of your co-employees injured during

21   that initial entry into the clinic by the individuals who had

22   forced their way in?

23   A.  Yes.

24   Q.  What was the injury that your fellow employee sustained?

25   A.  From my understanding, she sprained her ankle.

1   Q.  Did you see her in the back after the patients were

2   escorted back and the interior doors were locked?

3   A.  Yes.

4   Q.  Can you describe what you saw her doing.

5   A.  Crying and limping, so I consoled her at that time.

6   Q.  Did you ever see her with an ice pack on her ankle?

7   A.  Yes.

8   Q.  Now, during the time this incident was occurring, was there

9   ever a patient who had difficulty getting into the clinic?

10  A.  Yes.

11  Q.  Did that patient -- she had an appointment for that

12  morning?

13  A.  Yes.

14  Q.  And why was she -- was she able to get into the clinic?

15  A.  She was able to get into the clinic, but she was unable to

16  reach the treatment area in a timely manner that she would have

17  expected to get to the back.  So it was delayed.

18          MR. KIYONAGA:  Objection, Your Honor.

19          THE COURT:  Excuse me.  No.  I'll allow it.

20  BY MR. PATEL:

21  Q.  You can finish your answer.

22  A.  I was saying that she was able to get into the clinic but

23  unable to reach the treatment area in a timely fashion that she

24  had anticipated.

25  Q.  So when she arrived at the clinic, was she able to get in

1    through the doors?

2    A.  It was difficult, but she got in.

3    Q.  Was there another patient who subsequently came after her

4    who was unable to get into the clinic doors?

5    A.  Yes.

6    Q.  How was she able to manage to get into the clinic?

7    A.  She did not get in at all.  So that patient, she was ran to

8    the eighth floor.  So her partner had parked the car.  He met

9    her there on the fourth floor, but he couldn't find her because

10   she end up just keeping straight on the elevator because when

11   you get off the elevator, they were right there.

12          So she just kept going to the eighth floor; never

13   came back that day.  She just rescheduled for another day.

14   Q.  Was there a patient who had to climb in through a window to

15   get into the clinic?

16   A.  Yes.

17   Q.  Could you tell us about that.

18   A.  With that patient, she was met with yelling in her face.

19   This was a patient that was on her third day and --

20          MR. CANNON:  Objection, Your Honor.  I think we have

21   a foundation issue here.  It needs to be established.

22          THE COURT:  Can you indicate a better foundation for

23   this.

24          MR. PATEL:  Sure.

25   BY MR. PATEL:

1    Q.  Were you aware that there were patients scheduled

2    that morning for -- there were appointments scheduled for

3    patients that morning?

4    A.  Yes.

5    Q.  Were these patients all on the third-day course of

6    treatment that was being administered by the clinic?

7    A.  Not all of them.  But we had a few patients who were on

8    their third day.  And then the appointments was just there for

9    their first-day appointment, regular appointment.

10   Q.  This patient who had to climb in through the window, do you

11   remember whether or not she was a third-day appointment

12   patient?

13   A.  Yes.

14   Q.  Okay.  Could you describe the circumstances around which

15   she had to climb in through the window.

16   A.  So she climbed through the window because the waiting room,

17   all of the doors, of course, were locked and the individuals

18   were not allowing her to get in to get her treatment.

19           It's very important that the women on the third day

20   receive their treatment because by this time their cervix is

21   dilated, and they're in a lot of pain.  So that was the lady.

22   She had to throw her bag through the window, and I assisted her

23   as she climbed through the window.

24           We were able to accommodate her, but during that time

25   of her even trying to even get through the window, she was met

```
 1    with someone yelling at her, telling her that that's life,

 2    that's being an adult; not knowing what her circumstances was

 3    and while she -- while she traveled so many miles or hours away

 4    from where she lived to D.C.

 5                MR. CANNON:  Objection, Your Honor.

 6                THE COURT:  What's your objection?

 7                MR. CANNON:  Relevance and it's --

 8                THE COURT:  If it's relevance, I'm overruling it.

 9                MR. CANNON:  It's also hearsay, and it's not

10    related --

11                THE COURT:  No.  Is this -- in terms of her

12    knowledge, she's not repeating a conversation.  She's either

13    indicating information that she has personally.  She's not --

14    the yelling person is the protestor.  The rest of it she's

15    talking about that she's coming from a distance.  She either

16    knows that or doesn't know.

17                Did you know that at the time, that this alleged

18    patient was coming from a distance that she testified to?

19                THE WITNESS:  Yes.  I know that she's coming from a

20    distance.  A lot of our patients come from a distance.

21                MR. CANNON:  Your Honor, I --

22                THE COURT:  What else is it?

23                MR. CANNON:  I continue with the relevance and

24    foundation.  There's no indication that this is one of the

25    defendants that's talking.
```

1          THE COURT:  Well, we're not -- the focus at this

2    point is on the patient, in terms of the patient.  In terms of

3    other people yelling, it can be the -- all of the individuals.

4    It's a conspiracy.  It doesn't have to be the specific people.

5    There could be others that are involved in it as well that are

6    not necessarily in this particular indictment.

7          So that isn't going to work as an objection either.

8    She's not repeating anything.  It's knowledge that she has that

9    the patient came from some distance, period, is what she said

10   and what you seem to be objecting to.

11         Go ahead.  We're at 1:00, so I don't know where you

12   are, if you want to stop at this point, if you have more.

13             MR. PATEL:  I do have more, Your Honor.

14             THE COURT:  All right.  Then let's stop at this

15   point.

16         Members of the jury, it's 1:00.  I'm going to excuse

17   you for lunch.  I'm going to ask you to come back to the jury

18   room, and we'll come get you at 2:00.

19         Have a good lunch.  Don't talk about the case, think

20   about it or anything else.  We'll see you back then.

21         (The following proceedings were had out of the

22   presence and hearing of the jury:)

23             THE COURT:  You are also excused.  But since you're

24   in the middle of your direct, you should not discuss your

25   testimony with anybody.

1              THE WITNESS:  Yes, ma'am.

2              THE COURT:  You can go to lunch.  Be available for

3    2:00, but you should not be discussing any future testimony of

4    what you've already said.  All right?

5              THE WITNESS:  Okay.

6              THE COURT:  Thank you.  You're excused.

7    Mr. Kiyonaga, you have something?

8              MR. KIYONAGA:  Yes, Your Honor.  I'll wait until the

9    witness has left.

10             (The following proceedings were had out of the

11   presence and hearing of the witness:)

12             MR. KIYONAGA:  Your Honor, I move that the Court

13   declare a mistrial.  The government has revealed to the jury

14   the use of pseudonymous witnesses.

15             THE COURT:  The use of what?

16             MR. KIYONAGA:  Pseudonyms for the witnesses.

17             THE COURT:  Well, the witness came out and said

18   something, but I don't know why this would be a mistrial.

19             MR. KIYONAGA:  Because the Court went on to explain

20   to the jury that the use of the pseudonym --

21             THE COURT:  Because, otherwise, it would sound very

22   strange not to have it.  I don't know that it's particularly

23   unusual to have other people use other names.

24             You didn't object at the point that I suggested doing

25   it.  I looked at everybody to see whether they wanted -- we

1    could just leave it, that she had two different names and give

2    an explanation.  You said nothing in terms of any objection

3    that you had concerns about.

4          Obviously, it was inadvertent in terms of her

5    indicating what it is.  It's not grounds for a mistrial.  I'll

6    deny it.

7          MR. KIYONAGA:  May I please make a record, Your

8    Honor?  Under 30 seconds.  You keep cutting me off.

9          THE COURT:  Mr. Kiyonaga, I don't have problems, but

10   you've already indicated what it is that you have -- is the

11   problem.

12         MR. KIYONAGA:  I have not, ma'am.

13         THE COURT:  You had filed something in the materials

14   that -- relating to why you didn't want it revealed.  So you

15   already have something on the record.

16         I do not think it's particularly prejudicial to have

17   them, having been there to have -- not have personal

18   information or other information out there.  It doesn't relate

19   specifically to the defendants.  It relates just generally.

20         They've been watching all these people out there.

21   They certainly know all of the protestors.  As far as I'm

22   concerned, I do not see any particular prejudice to your

23   clients.

24         I can give an additional instruction, if you wish, to

25   not have it reflect in any way on your clients, if that's what

1      you're concerned about.  The question would have been to have

2      objected at the point that I looked at everybody to see if

3      something should be said.  You did not say anything.  If you

4      thought it was a problem, you should have.

5              But I'm happy to make a comment to them that it's not

6      a reflection on the defendants, and they should not infer

7      anything that the defendants would do anything.  I'm happy to

8      do that.

9              Is that what you want, Mr. Kiyonaga?

10             MR. KIYONAGA:  Your Honor, you specifically said

11     safety of the witness was a concern.

12             THE COURT:  Right.

13             MR. KIYONAGA:  That creates a suggestion that there's

14     a concern for safety on the part of the defendants' supporters

15     or, by extension, the defendants themselves.

16             THE COURT:  No.  I'm happy to do an additional

17     instruction that it's not the defendants.  But they've

18     certainly been coming into the courthouse, seeing all of the

19     other people outside.  Okay?  In terms of what's been happening

20     out there.  You don't necessarily have to conclude that it's

21     anything to do, frankly, with the defendants.  But I'm happy to

22     clarify that.

23             As I said, it would have been helpful if -- it seemed

24     odd to just leave it that way and not give some explanation.

25     If you wanted to say something, that would have been the time

```
 1        to do it.  But I'm happy to clarify that they're not -- this is
 2        not intended as any reflection on the defendants and completely
 3        leave any issue with that.
 4               Is that what the rest of the group would like me to
 5        say?  If it is, I will.
 6               MR. DUNN:  You okay with that?  Judge, while you were
 7        making your ruling, before we took the break, at one point you
 8        said, "this is a conspiracy" rather than "this is a conspiracy
 9        charge."  I just want to make sure you're aware of that.
10               THE COURT:  I misspoke.  It's a conspiracy charge.
11        There's a conspiracy, so there's co-conspirator statements.
12        Okay.
13               MR. KIYONAGA:  Your Honor, I'm not conceding that a
14        curative instruction would be sufficient.
15               THE COURT:  I'm sure you're not, and I'm not taking
16        it, nor would the record reflect that.
17               So I will go ahead and make a statement when we come
18        back.  I probably will do it -- I'll see whether to do it at
19        the beginning or to do it later.
20               Court is excused.
21               (The trial adjourned at 1:05 p.m.)
22
23
24
25
```

```
 1                 CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3           I, TAMARA M. SEFRANEK, do hereby certify that the

 4      above and foregoing constitutes a true and accurate transcript

 5      of my stenographic notes and is a full, true, and complete

 6      transcript of the proceedings to the best of my ability.

 7               Dated this 17th day of August, 2023.

 8

 9                        /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/s** [1] - 145:9

## 1

**100** [4] - 89:23, 90:6, 90:8, 90:10
**1001** [2] - 97:6, 119:9
**1004** [1] - 72:16
**1008** [7] - 3:12, 64:14, 64:17, 70:7, 70:13, 72:17, 97:7
**1011** [1] - 80:4
**1016** [5] - 3:12, 65:5, 70:8, 70:13, 80:5
**102** [3] - 3:13, 3:14, 3:14
**1050** [1] - 1:24
**107** [1] - 3:9
**11:00** [1] - 52:10
**1350** [1] - 2:3
**1413** [1] - 2:6
**15-minute** [1] - 52:9
**16** [1] - 1:6
**16983** [1] - 1:18
**17th** [1] - 145:7
**1:00** [3] - 52:6, 140:11, 140:16
**1:05** [1] - 144:21
**1:22-CR-096** [1] - 1:3

## 2

**20001** [2] - 2:23, 145:11
**20004** [1] - 1:16
**20036** [2] - 1:25, 2:4
**2007** [6] - 3:13, 102:12, 102:18, 102:24, 102:25, 103:3
**2010** [6] - 3:14, 102:12, 102:15, 102:24, 102:25, 103:14
**2016** [7] - 3:14, 91:3, 102:12, 102:20, 102:24, 102:25, 103:21
**2017** [1] - 108:23
**202-354-3246** [1] - 2:23
**2020** [12] - 58:25, 59:2, 59:19, 64:15, 70:24, 89:10, 96:12, 105:1, 110:10, 111:13, 112:2, 116:8
**2022** [1] - 91:3
**2023** [2] - 1:6, 145:7

**20530** [1] - 1:13
**20815** [1] - 2:9
**2112** [2] - 90:23, 108:21
**22** [1] - 64:15
**22-096** [1] - 4:4
**22314** [1] - 2:11
**22nd** [10] - 70:24, 89:10, 94:15, 94:19, 95:25, 96:12, 104:25, 112:2, 116:8, 117:12
**27** [1] - 58:11
**2:00** [2] - 140:18, 141:3

## 3

**30** [1] - 142:8
**308** [1] - 2:4
**333** [2] - 2:22, 145:11
**370th** [1] - 1:18
**3712** [1] - 2:8
**38803** [1] - 1:21
**3:00** [2] - 86:4, 86:6

## 4

**4506** [1] - 1:21
**48708** [1] - 2:7

## 5

**500** [1] - 1:24
**5053** [8] - 3:13, 92:23, 93:2, 93:7, 93:8, 93:14, 117:6, 117:10
**51525** [1] - 1:19
**57** [1] - 3:4

## 6

**600** [1] - 2:10
**601** [1] - 1:13
**6714** [2] - 2:22, 145:10

## 7

**70** [2] - 3:12, 3:12

## 8

**88** [1] - 3:6
**8:00** [1] - 5:10
**8:50** [1] - 112:11

## 9

**93** [1] - 3:13
**950** [1] - 1:16

## 9

**9:00** [8] - 96:4, 96:6, 112:9, 112:11, 113:3, 117:14, 118:14
**9:10** [1] - 1:6

## A

**a.m** [4] - 96:4, 96:6, 112:9, 112:11
**A.M** [1] - 1:6
**abbreviated** [1] - 55:12
**ability** [1] - 145:6
**able** [36] - 60:13, 60:17, 60:22, 60:25, 63:21, 64:10, 74:15, 77:1, 77:2, 78:6, 79:5, 79:15, 79:19, 79:23, 81:6, 81:8, 83:16, 83:23, 85:9, 85:15, 113:13, 113:15, 114:21, 118:10, 125:17, 125:22, 127:23, 128:10, 130:6, 135:13, 136:14, 136:15, 136:22, 136:25, 137:6, 138:24
**abortion** [4] - 60:2, 60:3, 91:11, 109:10
**abusive** [1] - 53:1
**access** [2] - 110:22, 116:1
**accommodate** [1] - 138:24
**accurate** [3] - 65:9, 116:9, 145:4
**accurately** [1] - 56:2
**Action** [1] - 1:2
**actions** [1] - 69:6
**actual** [3] - 60:9, 72:9, 108:9
**addition** [1] - 104:1
**additional** [5] - 7:25, 110:19, 120:22, 142:24, 143:16
**adds** [1] - 7:24
**adjourned** [1] - 144:21
**administered** [2] - 91:12, 138:6
**administrator** [1] - 111:17
**admissibility** [5] - 65:13, 65:24, 67:11, 67:13, 68:11
**admission** [2] - 64:17, 65:8
**admit** [4] - 69:25,

80:9, 93:7, 102:24
**admitted** [21] - 64:22, 64:23, 65:3, 65:10, 70:10, 70:13, 70:22, 72:17, 72:25, 80:4, 92:24, 93:8, 93:13, 97:6, 97:7, 102:13, 103:1, 103:14, 103:21, 117:7, 119:9
**ADMITTED** [1] - 3:11
**admitting** [1] - 66:8
**adult** [1] - 139:2
**advance** [2] - 7:22, 66:16
**afoul** [1] - 53:3
**age** [2] - 92:13, 95:4
**agency** [1] - 59:12
**aggression** [2] - 124:25, 125:2
**aggressive** [2] - 76:9, 125:7
**ago** [3] - 58:24, 64:6, 108:24
**agree** [4] - 6:6, 53:11, 53:18, 108:7
**agreement** [1] - 67:6
**ahead** [18] - 10:12, 56:24, 57:17, 68:19, 70:12, 72:25, 88:18, 106:23, 107:2, 117:8, 119:10, 122:24, 126:4, 127:2, 132:16, 133:10, 140:11, 144:17
**aim** [1] - 120:7
**air** [1] - 102:9
**ajar** [1] - 113:11
**Alexandria** [1] - 2:11
**ALFRED** [1] - 2:2
**Alfred** [2] - 2:3, 4:17
**alleged** [1] - 139:17
**allergic** [1] - 95:19
**allergies** [2] - 6:22, 95:19
**allow** [9] - 7:25, 57:6, 88:7, 97:8, 107:7, 126:4, 126:19, 127:2, 136:19
**allowed** [10] - 6:25, 7:5, 83:10, 83:13, 83:15, 83:19, 84:2, 122:9, 122:12
**allowing** [1] - 116:17, 138:18
**almost** [3] - 62:13, 62:15, 67:2
**alone** [1] - 63:25
**AMERICA** [1] - 1:2
**amount** [2] - 109:12,

116:17
**anesthesia** [2] - 91:7, 91:9
**Angel** [1] - 113:2
**ankle** [13] - 101:23, 101:25, 102:3, 103:8, 103:9, 103:11, 103:16, 103:18, 103:24, 104:16, 104:20, 135:25, 136:6
**answer** [21] - 53:21, 57:7, 57:8, 57:12, 57:13, 57:14, 82:2, 82:4, 88:8, 88:10, 88:11, 88:14, 88:15, 88:16, 92:3, 92:7, 107:8, 107:9, 107:12, 107:13, 136:21
**answered** [1] - 123:15
**anti** [1] - 102:9
**anti-inflammatory** [1] - 102:9
**anticipate** [1] - 5:22
**anticipated** [1] - 136:24
**apologize** [7] - 53:3, 70:18, 77:25, 93:1, 95:23, 125:20, 128:5
**appearing** [2] - 4:14, 4:25
**appointment** [38] - 59:13, 60:16, 76:13, 77:24, 81:7, 81:20, 83:23, 92:15, 92:23, 93:16, 93:25, 94:7, 94:10, 94:16, 94:18, 94:23, 95:24, 96:3, 96:4, 96:5, 110:1, 110:2, 113:2, 114:14, 117:3, 117:11, 117:14, 117:18, 122:10, 122:13, 122:14, 123:2, 127:6, 127:9, 136:11, 138:9, 138:11
**appointments** [14] - 92:1, 92:4, 92:19, 109:6, 109:20, 109:22, 109:23, 109:24, 109:25, 110:3, 117:2, 123:9, 138:2, 138:8
**appreciate** [1] - 9:25
**approach** [1] - 118:14
**approached** [1] - 114:7
**area** [21] - 63:19,

72:11, 73:19, 74:7, 76:25, 78:18, 78:25, 79:11, 79:14, 79:15, 80:18, 81:9, 99:25, 110:17, 110:20, 118:4, 118:7, 128:11, 133:8, 136:16, 136:23
**argue** [1] - 55:11
**argued** [1] - 54:24
**argument** [3] - 53:9, 54:16, 69:15
**arguments** [1] - 53:14
**arm** [2] - 63:2, 129:20
**arrival** [1] - 69:21
**arrive** [2] - 95:3, 98:11
**arrived** [4] - 75:18, 112:12, 112:19, 136:25
**arriving** [1] - 69:3
**Ashley** [3] - 52:14, 56:17, 58:9
**ASHLEY** [2] - 3:3, 57:21
**asleep** [2] - 91:9, 91:11
**assist** [2] - 10:11, 109:7
**assistant** [3] - 108:14, 108:16, 109:5
**assisted** [1] - 138:22
**assume** [1] - 87:12
**assuming** [6] - 5:25, 6:16, 7:18, 65:9, 102:23, 126:6
**asthma** [1] - 95:16
**attempt** [1] - 128:16
**attention** [3] - 7:5, 53:21, 112:2
**Attorney's** [1] - 1:12
**audience** [1] - 6:12
**audio** [2] - 80:14, 132:8
**August** [2] - 1:6, 145:7
**authentic** [1] - 65:19
**authenticity** [11] - 64:16, 64:19, 64:25, 65:7, 65:13, 65:21, 66:25, 67:2, 67:8, 67:10, 68:10
**available** [2] - 116:17, 141:2
**Avenue** [6] - 1:16, 1:24, 2:3, 2:6, 2:22, 145:11
**awake** [1] - 91:7
**aware** [5] - 92:11, 95:15, 119:4, 138:1, 144:9

**B**

**babies** [2] - 62:1, 130:9
**backgrounds** [1] - 109:13
**bag** [2] - 104:15, 138:22
**base** [1] - 101:6
**based** [5] - 8:23, 54:23, 55:22, 92:18, 105:2
**basis** [1] - 112:21
**bathroom** [1] - 110:22
**Bay** [1] - 2:7
**become** [1] - 59:2
**BEFORE** [1] - 1:9
**beforehand** [1] - 69:11
**began** [1] - 105:5
**begin** [2] - 57:18, 107:19
**beginning** [2] - 61:8, 144:19
**behalf** [3] - 4:18, 4:25, 5:4
**behavior** [1] - 118:12
**behind** [8] - 8:15, 84:23, 118:4, 121:12, 129:18, 129:24, 130:1, 130:16
**belief** [13] - 54:10, 54:17, 54:18, 54:21, 54:22, 54:23, 55:16, 55:17, 55:21, 55:22, 55:24
**below** [10] - 94:10, 94:23, 95:3, 95:4, 95:9, 95:12, 95:14, 95:17, 95:18, 95:20
**beside** [1] - 95:10
**best** [1] - 145:6
**better** [4] - 101:7, 101:8, 134:4, 137:22
**between** [1] - 130:25
**bible** [1] - 7:7
**bibles** [1] - 7:2
**big** [2] - 7:8, 61:15
**bigger** [4] - 61:17, 62:8, 62:13, 63:8
**births** [2] - 54:9, 54:11
**bit** [6] - 7:25, 63:12, 84:5, 101:4, 120:4, 125:25
**black** [4] - 114:9, 114:11, 115:6, 132:22
**bleeding** [2] - 89:22, 92:12

**Blerina** [1] - 4:14
**BLERINA** [1] - 1:23
**block** [6] - 63:4, 63:5, 72:9, 100:22, 123:3, 135:16
**blocked** [2] - 77:12, 78:12
**blocking** [7] - 63:8, 72:11, 80:18, 80:20, 83:21, 85:13, 135:4
**blood** [1] - 99:1
**blowhorn** [1] - 130:3
**blue** [3] - 75:8, 84:14, 100:8
**bodily** [1] - 116:21
**body** [3] - 65:6, 100:23, 114:10
**body-worn** [1] - 65:6
**bombarding** [1] - 61:21
**bottom** [2] - 125:13, 125:23
**Box** [1] - 1:21
**boyfriend** [4] - 59:21, 61:10, 61:21, 62:9
**BOYLE** [1] - 1:22
**Boyle** [2] - 1:23, 4:14
**break** [10] - 51:23, 51:25, 52:1, 52:2, 52:5, 52:9, 52:10, 52:19, 144:7
**briefly** [4] - 52:21, 68:18, 86:20, 94:21
**bring** [3] - 8:4, 8:6, 8:18
**bringing** [1] - 8:9
**broomstick** [1] - 100:9
**brown** [1] - 97:20
**bruising** [1] - 104:1
**building** [14] - 61:12, 61:15, 63:4, 63:5, 63:21, 63:23, 63:24, 64:9, 64:11, 71:9, 73:20, 98:3, 110:6, 110:24
**bunch** [1] - 61:11
**burly** [1] - 55:13
**business** [2] - 108:15, 108:17
**BY** [64] - 57:22, 61:22, 71:4, 73:5, 73:13, 74:14, 75:5, 75:24, 76:19, 78:5, 78:17, 78:23, 80:11, 81:13, 82:9, 83:3, 84:8, 84:13, 85:3, 85:20, 88:22, 93:12, 97:14, 99:8, 99:17, 100:7, 100:17, 101:11, 103:5, 103:15,

103:22, 104:5, 104:11, 104:19, 107:24, 108:12, 115:2, 115:13, 117:9, 119:11, 119:17, 120:10, 120:19, 121:4, 122:25, 123:16, 124:4, 124:21, 125:12, 125:21, 126:14, 127:3, 127:21, 129:4, 129:17, 130:15, 131:10, 132:21, 133:6, 134:14, 135:2, 135:19, 136:20, 137:25

**C**

**camera** [6] - 65:6, 111:25, 119:14, 119:19, 119:25, 135:13
**cameras** [6] - 62:21, 111:19, 111:22, 118:8, 119:22, 131:19
**Cameron** [1] - 2:10
**campus** [1] - 63:16
**CANNON** [21] - 1:17, 4:13, 61:13, 68:17, 68:20, 82:23, 86:20, 86:22, 93:4, 102:14, 105:20, 115:10, 123:13, 126:3, 126:18, 137:20, 139:5, 139:7, 139:9, 139:21, 139:23
**Cannon** [7] - 4:13, 54:12, 54:24, 55:8, 56:2, 68:17, 105:18
**car** [6] - 61:18, 62:3, 62:25, 75:18, 137:8
**card** [5] - 92:23, 93:16, 109:24, 117:3, 117:11
**Cardiff** [1] - 2:8
**careful** [2] - 96:19, 97:2
**carefully** [2] - 54:15, 56:4
**Carson** [1] - 1:19
**Case** [1] - 4:4
**case** [11] - 7:12, 8:1, 8:10, 52:8, 52:17, 56:14, 69:1, 69:12, 95:16, 140:19
**cast** [1] - 102:9
**center** [9] - 60:5, 72:4,

87:20, 91:25, 92:24, 96:14, 97:20, 100:18, 106:18
**Center** [8] - 2:6, 90:19, 91:5, 94:19, 98:19, 99:3, 99:12, 100:12
**certain** [2] - 90:8, 90:11
**certainly** [5] - 66:18, 69:21, 69:22, 142:21, 143:18
**CERTIFICATE** [1] - 145:1
**certify** [1] - 145:3
**cervix** [1] - 138:20
**chain** [1] - 80:19
**chained** [2] - 80:20, 80:21
**chaining** [3] - 129:11, 133:23, 134:8
**chair** [5] - 56:25, 79:7, 88:3, 106:24, 135:14
**chairs** [7] - 72:7, 72:9, 74:4, 81:3, 98:12, 98:15, 110:15
**change** [1] - 6:9
**changed** [1] - 79:5
**chanting** [6] - 61:19, 62:22, 80:19, 134:18, 134:19
**chaos** [3] - 72:5, 78:11, 79:22
**chaotic** [1] - 79:21
**characterized** [1] - 132:11
**charge** [2] - 144:9, 144:10
**charged** [1] - 132:4
**Chase** [1] - 2:9
**check** [4] - 98:11, 109:6, 110:16, 117:24
**check-in** [1] - 110:16
**checked** [2] - 77:22, 83:23
**checklist** [1] - 128:5
**checkups** [2] - 91:15
**chemical** [1] - 91:11
**Chevy** [1] - 2:9
**children** [1] - 109:15
**choice.org** [1] - 130:8
**choose** [1] - 10:7
**church** [2] - 6:24, 134:20
**circumstances** [3] - 109:18, 138:14, 139:2
**City** [1] - 2:7
**Civil** [1] - 1:15
**claim** [1] - 55:23

**clarify** [2] - 143:22, 144:1
**clear** [2] - 55:21, 107:4
**clearly** [1] - 78:2
**client** [4] - 8:14, 55:10, 69:19, 110:3
**clients** [6] - 68:25, 69:4, 69:5, 69:18, 142:23, 142:25
**climb** [3] - 137:14, 138:10, 138:15
**climbed** [2] - 138:16, 138:23
**Clinic** [3] - 89:8, 97:19, 108:18
**clinic** [110] - 54:20, 55:3, 55:24, 59:8, 59:11, 60:10, 60:13, 60:22, 60:25, 61:4, 64:15, 65:22, 69:8, 69:17, 69:22, 73:19, 73:24, 74:3, 77:1, 77:20, 81:1, 86:1, 89:24, 92:19, 95:4, 95:21, 95:22, 96:21, 96:22, 96:23, 96:24, 96:25, 98:4, 98:11, 98:25, 108:20, 108:22, 108:25, 109:4, 109:8, 109:11, 109:22, 110:6, 110:8, 110:10, 110:23, 111:1, 111:5, 111:10, 111:12, 111:16, 111:17, 111:23, 112:5, 112:12, 112:13, 112:16, 113:10, 113:24, 114:1, 114:15, 115:15, 115:16, 115:18, 115:19, 115:23, 116:11, 116:13, 116:22, 117:1, 118:3, 119:25, 121:9, 121:12, 122:9, 122:12, 122:15, 124:7, 124:10, 124:23, 125:13, 125:15, 125:22, 126:15, 127:4, 127:6, 127:8, 127:16, 127:22, 127:24, 128:6, 128:16, 128:17, 129:6, 131:1, 131:3, 131:16, 131:19, 135:21, 136:9, 136:14, 136:15,

136:22, 136:25, 137:4, 137:6, 137:15, 138:6
**Clinic's** [1] - 105:1
**clinic's** [14] - 110:12, 111:2, 111:19, 111:25, 114:2, 117:19, 119:18, 121:12, 124:6, 124:24, 131:12, 133:21, 134:16, 135:5
**clip** [2] - 80:1, 97:6
**close** [3] - 58:1, 121:20, 123:22
**closed** [1] - 121:15
**closer** [1] - 120:6
**closeup** [1] - 104:22
**closing** [2] - 121:21, 129:11
**co** [7] - 99:11, 99:13, 100:2, 100:11, 132:4, 135:20, 144:11
**co-conspirator** [2] - 132:4, 144:11
**co-employees** [1] - 135:20
**co-worker** [2] - 99:13, 100:2
**co-workers** [2] - 99:11, 100:11
**coerced** [1] - 90:16
**COLLEEN** [1] - 1:9
**college** [1] - 58:13
**collegiality** [1] - 67:1
**COLUMBIA** [1] - 1:1
**comfortable** [11] - 57:1, 58:3, 79:9, 79:22, 88:4, 89:2, 89:20, 90:7, 90:14, 106:24, 107:3
**coming** [14] - 5:10, 67:25, 68:1, 75:17, 87:19, 121:17, 122:4, 128:23, 130:6, 134:16, 139:15, 139:18, 139:19, 143:18
**comment** [1] - 143:5
**commenting** [1] - 6:17
**comments** [4] - 61:21, 62:2, 71:19, 78:11
**commotion** [4] - 62:21, 63:20, 76:25, 78:11
**companion** [1] - 116:18
**complete** [1] - 145:5
**completely** [3] - 61:6,

81:6, 144:2
**completeness** [2] - 66:12, 67:17
**complicated** [1] - 7:13
**complies** [2] - 75:4, 77:19
**component** [1] - 132:8
**COMPTON** [2] - 3:5, 88:21
**Compton** [19] - 87:19, 88:23, 89:6, 89:25, 90:17, 91:25, 93:13, 96:7, 96:11, 97:15, 98:12, 99:18, 100:18, 101:12, 101:18, 103:6, 103:16, 104:14, 104:25
**conceding** [1] - 144:13
**concern** [2] - 143:11, 143:14
**concerned** [3] - 68:20, 142:22, 143:1
**concerns** [2] - 108:10, 142:3
**conclude** [1] - 143:20
**condition** [2] - 8:14, 8:24
**conditions** [2] - 9:1, 61:4
**conduct** [1] - 127:1
**confer** [1] - 7:22
**conferences** [1] - 7:24
**configuration** [1] - 98:18
**configured** [1] - 74:4
**confirm** [3] - 73:8, 90:12, 91:13
**confirmed** [1] - 117:17
**confusing** [1] - 98:1
**connected** [1] - 54:22
**Connecticut** [2] - 1:24, 2:3
**considered** [1] - 132:10
**considering** [1] - 86:20
**consoled** [1] - 136:5
**conspiracy** [5] - 140:4, 144:8, 144:10, 144:11
**conspirator** [2] - 132:4, 144:11
**constitutes** [1] - 145:4
**Constitution** [2] - 2:22, 145:11
**Cont** [1] - 2:1
**context** [1] - 69:3
**continue** [8] - 99:14,

100:4, 100:14, 101:2, 105:11, 125:8, 128:25, 139:23
**conversation** [13] - 125:14, 125:17, 125:22, 125:25, 126:1, 126:2, 126:7, 127:4, 130:25, 131:2, 133:25, 134:1, 139:12
**corner** [1] - 94:2
**correct** [11] - 54:24, 67:8, 70:2, 70:17, 70:20, 72:20, 80:7, 90:2, 90:21, 94:20, 96:1
**correctly** [1] - 55:9
**counsel** [10] - 4:7, 9:3, 9:15, 52:22, 52:24, 57:6, 88:7, 89:18, 90:1, 107:7
**counselor** [1] - 89:7
**countries** [1] - 109:16
**couple** [4] - 58:24, 77:14, 89:12, 96:11
**course** [6] - 6:7, 84:5, 91:20, 126:25, 138:5, 138:17
**COURT** [158] - 1:1, 4:11, 4:16, 4:20, 4:22, 4:24, 5:2, 5:6, 5:9, 6:8, 8:20, 8:25, 9:8, 9:13, 9:18, 9:23, 51:20, 52:13, 52:15, 53:7, 54:1, 54:5, 55:17, 56:10, 56:13, 56:18, 56:24, 57:5, 57:17, 57:19, 64:18, 64:21, 64:25, 65:9, 65:14, 65:20, 65:25, 66:4, 66:7, 66:14, 67:4, 67:12, 67:18, 67:23, 68:3, 68:19, 69:2, 69:25, 70:4, 70:9, 70:12, 70:15, 70:19, 70:25, 71:2, 72:18, 72:22, 73:3, 73:11, 74:23, 75:2, 78:3, 80:2, 80:6, 80:9, 82:2, 82:4, 86:15, 86:18, 86:21, 86:23, 86:25, 87:3, 87:5, 87:8, 87:10, 87:12, 87:17, 87:20, 88:2, 88:7, 88:18, 92:25, 93:3, 93:6, 93:11, 97:8, 101:3, 101:8, 102:15, 102:17, 102:19,

102:21, 102:23, 105:15, 105:18, 105:21, 105:23, 105:25, 106:3, 106:6, 106:8, 106:12, 106:15, 106:17, 106:23, 107:7, 107:16, 107:20, 108:4, 108:7, 114:20, 114:24, 115:9, 115:11, 117:8, 119:10, 119:16, 120:3, 122:22, 123:14, 125:19, 126:4, 126:6, 126:17, 126:19, 126:21, 126:24, 127:2, 127:16, 127:19, 132:3, 132:9, 132:12, 132:14, 132:16, 134:23, 136:19, 137:22, 139:6, 139:8, 139:11, 139:22, 140:1, 140:14, 140:23, 141:2, 141:6, 141:15, 141:17, 141:21, 142:9, 142:13, 143:12, 143:16, 144:10, 144:15, 145:1
**court** [4] - 115:8, 126:22, 133:1, 144:20
**Court** [10] - 2:8, 2:20, 2:21, 6:7, 8:22, 53:3, 53:5, 141:12, 141:19, 145:10
**Court's** [1] - 6:18
**Courthouse** [1] - 2:22
**courthouse** [1] - 143:18
**courtroom** [5] - 6:12, 6:13, 6:23, 114:18, 115:4
**COURTROOM** [6] - 4:4, 56:20, 56:23, 87:23, 88:1, 106:22
**cover** [2] - 114:10, 130:3
**covered** [1] - 114:9
**covering** [1] - 130:23
**COVID** [2] - 116:8, 116:19
**crabb** [2] - 3:4, 3:6
**Crabb** [3] - 4:9, 66:19, 70:2
**CRABB** [116] - 1:12,

4:9, 6:6, 52:14, 52:20, 56:16, 57:18, 57:22, 61:22, 64:14, 64:20, 64:23, 65:4, 65:11, 65:18, 66:21, 68:1, 70:3, 70:6, 70:10, 70:14, 70:18, 70:21, 71:1, 71:4, 72:15, 72:21, 73:1, 73:4, 73:5, 73:8, 73:13, 74:10, 74:13, 74:14, 75:5, 75:21, 75:23, 75:24, 76:16, 76:18, 76:19, 77:25, 78:4, 78:5, 78:13, 78:16, 78:17, 78:21, 78:23, 79:25, 80:3, 80:8, 80:10, 80:11, 81:11, 81:13, 82:7, 82:9, 83:1, 83:3, 84:6, 84:8, 84:13, 85:1, 85:3, 85:17, 85:19, 85:20, 86:14, 86:16, 87:14, 87:18, 88:19, 88:22, 92:22, 93:1, 93:9, 93:12, 97:5, 97:10, 97:13, 97:14, 99:7, 99:8, 99:14, 99:16, 99:17, 100:4, 100:6, 100:7, 100:14, 100:16, 100:17, 101:2, 101:6, 101:10, 101:11, 102:11, 102:16, 102:18, 102:20, 103:2, 103:5, 103:13, 103:15, 103:20, 103:22, 104:3, 104:5, 104:10, 104:11, 104:18, 104:19, 105:13, 105:16
**crack** [1] - 128:12
**cracked** [1] - 115:24
**CRAMPTON** [1] - 1:20
**Crampton** [1] - 4:13
**crawled** [1] - 79:14
**CRC** [2] - 2:21, 145:6
**creates** [1] - 143:13
**Criminal** [2] - 1:2, 1:15
**criminal** [1] - 4:4
**cross** [3] - 68:6, 86:18, 86:19
**cross-examination** [2] - 68:6, 86:18
**cross-examine** [1] - 86:19
**crowd** [7] - 61:15, 62:8, 62:10, 62:13,

63:8, 63:25, 68:23
**crowded** [1] - 113:22
**CRR** [2] - 2:21, 145:9
**CRT** [1] - 1:15
**crutches** [1] - 102:9
**crying** [1] - 136:5
**curative** [1] - 144:14
**cutting** [1] - 142:8

## D

**D.C** [11] - 1:5, 59:7, 59:9, 59:15, 59:20, 59:22, 59:24, 90:24, 108:21, 139:4, 145:11
**date** [7] - 92:14, 94:10, 94:15, 94:23, 94:25, 95:24
**Dated** [1] - 145:7
**days** [14] - 59:25, 60:8, 71:23, 71:24, 72:2, 72:8, 74:4, 77:23, 79:10, 79:11, 81:6, 84:21, 91:23, 96:15
**DC** [5] - 1:13, 1:16, 1:25, 2:4, 2:23
**deal** [3] - 109:17, 122:2, 122:3
**decide** [2] - 56:6, 59:4
**decided** [2] - 54:6, 120:25
**declare** [1] - 141:13
**Defendant** [6] - 1:17, 2:2, 2:5, 2:8, 2:10, 115:8
**defendants** [15] - 7:4, 9:2, 10:7, 56:6, 68:2, 68:22, 72:23, 139:25, 142:19, 143:6, 143:7, 143:15, 143:17, 143:21, 144:2
**Defendants** [1] - 1:7
**defendants'** [1] - 143:14
**defense** [9] - 9:15, 10:10, 52:8, 52:24, 55:25, 64:16, 65:6, 65:19, 66:24
**defines** [1] - 56:4
**delayed** [1] - 136:17
**delivering** [1] - 9:11
**delivery** [1] - 55:13
**Dennis** [1] - 4:13
**DENNIS** [1] - 1:22
**deny** [1] - 142:6
**Department** [1] - 65:6
**depict** [1] - 70:23

**depicted** [3] - 80:15, 85:4, 97:17
**depiction** [1] - 119:22
**depicts** [1] - 73:17
**DEPUTY** [6] - 4:4, 56:20, 56:23, 87:23, 88:1, 106:22
**derogatory** [1] - 130:4
**describe** [15] - 55:7, 56:2, 92:5, 109:11, 110:12, 114:8, 115:3, 120:20, 121:11, 123:21, 124:22, 131:22, 133:21, 136:4, 138:14
**described** [7] - 55:9, 72:19, 75:12, 93:17, 101:19, 114:7, 118:4
**describes** [1] - 54:14
**deter** [1] - 62:19
**determined** [1] - 94:24
**develop** [3] - 54:17, 54:23, 55:23
**difference** [1] - 54:13
**different** [16] - 61:4, 61:7, 61:9, 72:6, 76:23, 79:17, 79:18, 79:21, 80:1, 80:14, 90:18, 96:15, 109:13, 109:17, 109:18, 142:1
**difficult** [1] - 137:2
**difficulty** [1] - 136:9
**dilated** [1] - 138:21
**DIRECT** [3] - 57:20, 88:20, 107:22
**Direct** [3] - 3:4, 3:6, 3:9
**direct** [1] - 140:24
**directing** [1] - 112:2
**directions** [1] - 77:21
**directly** [7] - 67:3, 75:8, 101:4, 110:24, 111:2, 130:20, 133:19
**discovery** [1] - 67:3
**discuss** [5] - 52:7, 55:6, 56:7, 69:15, 140:24
**discussed** [2] - 66:15, 69:16
**discussing** [2] - 126:21, 141:3
**discussion** [3] - 8:5, 67:4
**disrespectful** [1] - 8:22
**disrupt** [1] - 7:8
**disrupting** [1] - 6:16

**disruptive** [2] - 7:5, 52:25
**distance** [5] - 139:15, 139:18, 139:20, 140:9
**distinctions** [1] - 55:1
**distracted** [1] - 9:4
**distracting** [3] - 6:16, 7:1, 76:14
**distractions** [1] - 62:23
**DISTRICT** [3] - 1:1, 1:1, 1:9
**diverse** [1] - 109:12
**Division** [1] - 1:15
**doable** [1] - 73:4
**doctor** [3] - 101:25, 109:7, 111:15
**doctors** [1] - 79:23
**document** [1] - 109:23
**documents** [1] - 67:8
**dogs** [1] - 95:20
**DOJ** [1] - 1:15
**DOJ-CRT** [1] - 1:15
**done** [3] - 59:6, 83:17, 91:24
**door** [82] - 57:3, 63:13, 72:1, 72:4, 73:22, 73:25, 74:1, 77:7, 77:10, 80:23, 80:24, 81:7, 81:8, 85:4, 85:6, 85:9, 88:5, 97:20, 97:23, 97:24, 98:2, 98:3, 98:21, 98:24, 98:25, 99:4, 99:18, 100:1, 100:22, 101:12, 101:19, 107:5, 110:17, 110:19, 110:21, 111:6, 111:7, 111:9, 112:23, 112:24, 113:5, 113:11, 113:16, 113:20, 115:24, 116:3, 116:4, 116:24, 117:19, 117:22, 117:25, 118:3, 118:11, 118:14, 118:21, 118:22, 119:5, 119:25, 120:16, 120:21, 120:23, 121:12, 121:15, 121:20, 121:21, 123:18, 123:22, 123:23, 124:10, 127:24, 128:12, 129:11, 131:24, 135:4, 135:9, 135:13,

135:14, 135:16
**doors** [21] - 63:19, 71:22, 71:24, 72:9, 72:11, 74:17, 79:6, 80:18, 80:21, 81:2, 81:5, 83:21, 116:5, 118:13, 121:6, 124:6, 128:7, 136:2, 137:1, 137:4, 138:17
**dot** [1] - 75:1
**down** [15] - 56:25, 63:11, 63:12, 63:20, 83:23, 85:6, 87:13, 87:20, 88:4, 94:22, 100:18, 106:8, 106:18, 106:24, 113:22
**dragged** [1] - 69:12
**drape** [1] - 114:10
**draw** [1] - 53:5
**drawn** [1] - 99:2
**dressed** [1] - 132:22
**dropping** [1] - 125:19
**due** [1] - 116:18
**DUNN** [11] - 2:5, 4:21, 4:23, 4:25, 8:12, 8:21, 9:7, 87:9, 105:24, 106:2, 144:6
**Dunn** [5] - 2:6, 4:25, 8:11, 87:8, 105:23
**during** [7] - 71:18, 91:5, 101:18, 101:20, 108:25, 116:8, 127:4, 129:5, 134:17, 135:20, 136:8, 138:24
**duties** [4] - 90:1, 90:18, 92:3, 109:19

## E

**ears** [2] - 75:25, 130:23
**easy** [1] - 116:1
**effect** [2] - 53:4, 90:5
**eighth** [2] - 137:8, 137:12
**either** [4] - 131:16, 139:12, 139:15, 140:7
**elbow** [2] - 82:15, 82:18
**elevator** [20] - 63:25, 64:2, 64:13, 71:12, 71:15, 71:17, 71:18, 75:16, 76:6, 77:9, 96:16, 96:19, 96:20, 112:16, 112:20, 112:22, 113:9, 137:10, 137:11

**elevators** [2] - 113:22, 116:6
**eliciting** [1] - 122:20
**emergency** [3] - 102:8, 112:23, 113:21
**employee** [10] - 77:6, 111:6, 111:9, 116:4, 116:5, 123:24, 124:5, 125:6, 131:24, 135:24
**employee-only** [1] - 77:6
**employees** [4] - 77:10, 127:23, 128:6, 135:20
**empty** [1] - 71:24
**encounter** [1] - 128:20
**encountered** [3] - 70:23, 75:10, 114:2
**end** [8] - 8:13, 10:2, 53:8, 53:20, 83:11, 92:8, 110:19, 137:10
**endure** [1] - 121:25
**enforcement** [2] - 128:18, 128:21
**ensure** [5] - 89:19, 89:20, 89:23, 90:6, 91:24
**enter** [4] - 64:10, 77:12, 79:5, 99:9
**entered** [5] - 64:10, 79:11, 112:16, 113:10, 114:1
**entering** [2] - 75:1, 113:1
**entire** [1] - 66:11
**entitlement** [1] - 124:25
**entrance** [19] - 61:12, 61:14, 62:6, 62:12, 63:8, 63:12, 63:18, 72:10, 77:5, 77:6, 78:7, 79:4, 81:7, 110:23, 111:1, 111:4, 114:2, 114:4, 135:4
**entries** [1] - 94:22
**entry** [2] - 101:18, 135:21
**environment** [1] - 122:7
**erase** [1] - 78:1
**escape** [1] - 112:24
**escorted** [2] - 128:1, 136:2
**established** [2] - 53:3, 137:21
**esthetician** [1] - 108:15

**eventually** [4] - 79:15, 85:23, 86:1, 117:19
**evidence** [6] - 6:17, 10:9, 10:11, 52:8, 119:9, 122:20
**exact** [2] - 86:5, 92:8
**exactly** [2] - 89:18, 113:3
**Examination** [3] - 3:4, 3:6, 3:9
**EXAMINATION** [3] - 57:20, 88:20, 107:22
**examination** [2] - 68:6, 86:18
**examine** [1] - 86:19
**examined** [1] - 101:25
**exception** [1] - 96:7
**excerpt** [1] - 80:6
**excuse** [4] - 65:12, 65:20, 136:19, 140:16
**excused** [6] - 87:16, 106:9, 106:11, 140:23, 141:6, 144:20
**exhibit** [4] - 5:15, 70:6, 70:7, 104:4
**Exhibit** [22] - 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 64:14, 64:17, 65:5, 70:7, 70:8, 72:16, 80:4, 92:23, 93:2, 93:8, 97:6, 103:14, 103:21, 117:6, 117:10, 119:9
**Exhibits** [3] - 70:13, 102:12, 102:25
**exhibits** [4] - 8:8, 67:1, 67:2, 70:5
**EXHIBITS** [1] - 3:11
**exit** [1] - 81:8
**exiting** [1] - 131:17
**expected** [1] - 136:17
**expecting** [2] - 117:21, 117:23
**explain** [7] - 79:2, 90:4, 92:8, 94:21, 123:5, 141:19
**explaining** [1] - 71:7
**explanation** [3] - 108:4, 142:2, 143:24
**extended** [1] - 86:12
**extension** [1] - 143:15
**extra** [3] - 8:1, 116:21, 121:16
**eye** [1] - 97:2

**F**

**face** [7] - 83:4, 83:8, 114:11, 120:24, 122:1, 122:6, 137:18
**facility** [2] - 128:2, 128:8
**fact** [1] - 54:8
**facts** [1] - 122:20
**fair** [6] - 111:9, 112:12, 116:5, 123:11, 123:12, 123:14
**faith** [1] - 55:16
**faithful** [1] - 134:2
**familiar** [4] - 79:10, 111:19, 119:14, 120:24
**fanfare** [1] - 9:6
**far** [5] - 53:11, 58:12, 68:9, 134:1, 142:21
**fashion** [2] - 74:4, 136:23
**fault** [1] - 78:2
**February** [1] - 91:3
**fee** [1] - 95:1
**feelings** [1] - 7:6
**fellow** [1] - 135:24
**felt** [4] - 79:9, 84:4, 97:2
**female** [1] - 81:14
**few** [3] - 64:24, 129:5, 138:7
**fifth** [1] - 58:18
**figure** [2] - 7:10, 7:22
**figured** [1] - 7:19
**filed** [1] - 142:13
**fill** [1] - 128:4
**fine** [3] - 9:18, 70:25, 81:25
**finger** [1] - 74:23
**finish** [7] - 57:6, 57:8, 88:8, 88:10, 107:7, 107:9, 136:21
**finished** [2] - 58:18, 89:21
**first** [23] - 8:18, 52:13, 52:19, 56:15, 60:8, 60:10, 60:11, 70:6, 75:18, 77:14, 93:16, 100:22, 103:23, 112:21, 117:2, 122:21, 123:5, 123:6, 123:8, 128:20, 138:9
**first-come** [3] - 112:21, 122:21, 123:5
**first-day** [1] - 138:9
**first-serve** [3] -

112:21, 122:21, 123:6
**five** [3] - 52:10, 54:1, 58:17
**five-year** [1] - 58:17
**floor** [9] - 71:18, 71:21, 99:25, 100:8, 110:8, 110:9, 137:8, 137:9, 137:12
**fluids** [1] - 116:21
**flushed** [1] - 77:7
**focus** [1] - 140:1
**follow** [5] - 6:7, 53:24, 77:14
**follow-ups** [1] - 77:14
**followed** [6] - 53:18, 63:25, 64:1, 71:12, 71:21, 96:18
**following** [11] - 4:2, 9:21, 52:11, 54:3, 56:11, 63:1, 66:2, 69:23, 72:3, 140:21, 141:10
**food** [1] - 5:13
**foot** [4] - 9:24, 104:6, 104:8, 104:12
**footage** [1] - 119:22
**FOR** [1] - 1:1
**force** [5] - 124:14, 124:16, 124:22, 125:3, 125:5
**forced** [2] - 105:2, 128:17, 135:22
**forceful** [1] - 125:7
**foregoing** [1] - 145:4
**form** [2] - 54:12, 54:16
**format** [1] - 5:16
**forth** [2] - 56:25, 133:13
**forward** [2] - 7:18, 106:18
**foundation** [3] - 137:21, 137:22, 139:24
**four** [1] - 58:13
**fourth** [4] - 71:17, 71:21, 110:9, 137:9
**frankly** [6] - 6:22, 7:9, 53:10, 53:21, 68:11, 143:21
**front** [21] - 7:7, 53:5, 62:6, 62:17, 62:19, 62:20, 63:6, 74:17, 75:8, 98:10, 105:3, 117:19, 118:11, 118:14, 119:25, 120:21, 123:18, 123:22, 130:20, 133:13, 135:4
**full** [3] - 52:9, 108:17,

145:5
**full-time** [1] - 108:17
**fully** [2] - 55:7, 128:13
**furniture** [1] - 6:23
**future** [1] - 141:3

**G**

**gardening** [2] - 63:17, 63:19
**gates** [1] - 106:18
**gather** [1] - 96:22
**general** [6] - 58:21, 61:23, 73:17, 89:17, 91:9, 95:14
**generally** [4] - 80:15, 92:5, 118:21, 142:19
**gentleman** [1] - 133:24
**gentlemen** [6] - 58:8, 83:14, 89:5, 89:16, 94:4, 102:6
**Geraghty** [4] - 4:6, 5:6, 5:8, 52:23
**GERAGHTY** [2] - 1:6, 2:10
**Geraghty's** [1] - 55:16
**girl** [1] - 62:25
**given** [5] - 52:16, 56:7, 96:17, 102:8, 108:5
**glass** [1] - 133:20
**glasses** [2] - 114:9, 115:5
**God** [4] - 126:9, 126:10, 126:12, 134:2
**Goodman** [3] - 4:6, 5:3, 5:5
**GOODMAN** [2] - 1:6, 2:8
**Google** [1] - 95:8
**government** [15] - 4:8, 5:15, 5:18, 7:19, 8:4, 8:5, 10:6, 10:12, 52:8, 52:13, 56:15, 56:16, 67:3, 106:13, 141:13
**Government's** [27] - 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 64:14, 64:17, 65:5, 70:7, 70:13, 72:16, 72:17, 80:3, 92:23, 93:8, 93:14, 97:6, 97:7, 102:12, 102:25, 103:14, 103:21, 117:6, 117:10, 119:8
**government's** [5] - 9:12, 52:23, 56:14,

66:25, 93:1
**grass** [1] - 95:20
**gray** [2] - 74:18, 74:20
**green** [1] - 98:12
**grounds** [1] - 142:5
**group** [13] - 5:11, 9:2,
61:17, 61:18, 61:20,
62:18, 62:21, 62:22,
96:17, 114:4, 114:6,
122:17, 144:4
**groups** [1] - 123:3
**guide** [1] - 53:2
**GUILLAUME** [4] - 2:2,
4:17, 87:7, 105:22
**Guillaume** [4] - 2:3,
4:18, 87:5, 105:21
**guy** [1] - 133:19
**gynecology** [2] -
91:15, 109:10

## H

**hair** [2] - 114:10,
115:5
**hall** [1] - 85:7
**hallway** [20] - 76:24,
77:4, 77:7, 78:6,
79:4, 87:19, 97:24,
98:3, 110:23, 111:1,
111:4, 111:22,
112:20, 112:23,
113:5, 120:1,
120:22, 131:13,
131:17, 131:20
**hand** [7] - 52:3, 56:21,
87:24, 106:20,
109:25, 119:15,
121:16
**handle** [1] - 86:13
**hands** [2] - 75:25,
130:23
**handwriting** [3] -
93:19, 93:21, 93:24
**HANDY** [2] - 1:5, 1:18
**Handy** [6] - 4:5, 4:11,
4:14, 115:8, 115:12,
115:14
**happily** [1] - 7:17
**happy** [5] - 143:5,
143:7, 143:16,
143:21, 144:1
**harassing** [1] - 83:20
**hard** [1] - 125:1
**harder** [1] - 75:2
**HARIVADAN** [1] - 1:14
**Hazel** [14] - 94:6,
94:18, 96:8, 113:2,
114:13, 114:19,
115:14, 117:3,
117:11, 117:18,

118:25, 127:12,
132:25
**head** [1] - 118:1
**health** [3] - 92:11,
95:14, 95:15
**hear** [28] - 4:23, 57:10,
57:13, 58:5, 61:19,
66:4, 66:6, 81:14,
81:25, 82:5, 82:10,
82:23, 83:11, 84:9,
88:4, 88:13, 88:15,
88:25, 93:6, 102:23,
106:25, 107:11,
107:13, 119:2,
125:17, 125:22,
130:6, 130:7
**heard** [8] - 52:22,
68:18, 76:4, 100:2,
125:25, 132:10,
134:16
**hearing** [9] - 4:3, 9:22,
52:12, 54:4, 56:12,
66:2, 69:24, 140:22,
141:11
**hearsay** [3] - 126:20,
132:1, 139:9
**Heather** [2] - 4:5, 4:25
**HEATHER** [2] - 1:6,
2:6
**heavy** [1] - 114:9
**heavy-set** [1] - 114:9
**height** [1] - 116:8
**hell** [1] - 62:1
**hello** [2] - 71:6, 113:1
**help** [7] - 10:9, 62:1,
63:14, 83:16, 84:24,
100:3, 121:14
**helpful** [6] - 5:19,
5:22, 5:24, 53:18,
76:10, 143:23
**helping** [1] - 84:22
**helps** [1] - 53:11
**HERB** [2] - 1:6, 2:10
**Herb** [3] - 4:6, 5:6,
52:23
**hereby** [1] - 145:3
**herself** [4] - 96:10,
114:19, 115:14,
127:12
**hi** [1] - 58:9
**high** [1] - 10:2
**highlighted** [1] - 55:12
**Hinshaw** [4] - 4:5,
4:16, 4:18
**HINSHAW** [2] - 1:5,
2:3
**hold** [5] - 7:1, 7:2, 7:4,
109:3, 115:24
**holding** [1] - 55:19
**holy** [1] - 6:21

**home** [3] - 86:7, 86:9,
86:11
**Honor** [86] - 4:9, 4:17,
5:7, 6:6, 9:11, 52:14,
52:20, 52:21, 56:9,
56:16, 57:18, 64:14,
64:20, 65:4, 65:11,
65:12, 65:18, 65:24,
66:6, 66:10, 66:21,
66:23, 67:15, 67:21,
68:1, 68:17, 70:3,
70:6, 70:14, 70:18,
70:21, 71:1, 72:15,
72:21, 73:8, 77:25,
79:25, 80:8, 86:14,
86:16, 86:24, 87:2,
87:7, 87:14, 87:18,
88:19, 92:22, 93:1,
93:10, 97:5, 97:10,
102:11, 102:16,
103:2, 105:13,
105:16, 105:20,
105:22, 106:7,
106:13, 107:19,
108:3, 108:6,
114:22, 115:7,
117:5, 119:8,
119:15, 122:19,
125:20, 126:20,
127:18, 132:1,
132:7, 132:13,
136:18, 137:20,
139:5, 139:21,
140:13, 141:8,
141:12, 142:8,
143:10, 144:13
**HONORABLE** [1] - 1:9
**hoodie** [2] - 133:19,
133:24
**hopeful** [1] - 7:21
**hopefully** [2] - 7:19,
53:12
**hospital** [1] - 105:4
**hot** [1] - 10:3
**hours** [1] - 139:3
**housekeeping** [1] -
8:12
**HOWARD** [1] - 2:8
**Howard** [1] - 5:4
**hurly** [1] - 55:13
**hurly-burly** [1] - 55:13
**husband** [2] - 96:16,
97:1
**husher** [1] - 66:1
**hymns** [3] - 134:20,
134:22

## I

**IA** [1] - 1:19

**ice** [2] - 104:15, 136:6
**idea** [1] - 6:23
**identification** [2] -
65:15, 115:8
**identified** [6] - 94:17,
115:12, 115:14,
127:12, 132:25,
133:1
**identify** [2] - 4:7, 65:2
**identifying** [1] -
114:19
**Idoni** [7] - 4:5, 4:20,
4:21, 4:23, 4:24, 5:1,
8:14
**IDONI** [2] - 1:6, 2:6
**III** [3] - 2:2, 2:3, 2:8
**impact** [1] - 7:13
**important** [1] - 138:19
**importantly** [1] - 7:11
**impossible** [2] -
62:13, 62:15
**IN** [1] - 1:1
**in-court** [1] - 115:8
**inadvertent** [1] - 142:4
**inappropriate** [1] -
53:11
**incident** [3] - 89:6,
89:9, 136:8
**inclined** [1] - 6:4
**include** [1] - 127:11
**indefinitely** [1] - 69:12
**indicate** [5] - 8:25,
94:7, 94:14, 114:14,
137:22
**indicated** [8] - 67:23,
94:15, 95:24,
109:19, 113:10,
115:18, 119:18,
142:10
**indicating** [3] - 64:18,
139:13, 142:5
**indication** [1] - 139:24
**indictment** [1] - 140:6
**individual** [5] -
117:18, 125:18,
127:5, 130:20, 131:1
**individuals** [13] -
125:14, 127:8,
127:11, 128:17,
129:7, 131:16,
131:22, 133:23,
134:5, 135:15,
135:21, 138:17,
140:3
**infection** [1] - 91:14
**infer** [1] - 143:6
**inflammatory** [1] -
102:9
**influence** [1] - 7:9
**information** [7] - 5:12,

9:1, 94:22, 96:8,
139:13, 142:18
**informs** [1] - 54:18
**inhaler** [1] - 95:18
**initial** [1] - 135:21
**injured** [5] - 101:20,
103:24, 104:8,
125:6, 135:20
**injury** [4] - 101:22,
102:2, 102:4, 135:24
**inside** [17] - 63:21,
63:23, 63:24, 64:9,
64:11, 76:25, 79:8,
80:17, 83:22, 96:24,
111:25, 112:24,
116:12, 117:1,
118:15, 122:12
**instead** [2] - 72:10,
83:24
**instructed** [1] - 102:10
**instruction** [5] -
52:16, 54:6, 142:24,
143:17, 144:14
**instructions** [3] -
5:23, 8:13, 56:7
**intend** [1] - 70:21
**intended** [2] - 55:14,
144:2
**intent** [8] - 53:4,
54:18, 54:19, 54:22,
54:23, 55:2, 55:4,
55:23
**intentions** [1] - 54:19
**interacting** [1] - 68:2
**interest** [1] - 6:20
**interfered** [1] - 105:1
**interior** [4] - 121:6,
124:10, 127:23,
136:2
**interrupt** [2] - 72:13,
113:8
**interrupted** [4] - 55:5,
55:10, 56:3, 60:17
**interruptions** [1] -
53:13
**intervene** [1] - 8:10
**introduce** [3] - 58:7,
107:25, 108:13
**introduced** [1] - 6:2
**introducing** [1] - 89:4
**intruders** [1] - 105:12
**investigate** [1] -
115:19
**inviting** [1] - 132:2
**involved** [4] - 69:5,
69:20, 92:1, 140:5
**issue** [6] - 54:8, 65:20,
65:23, 66:7, 137:21,
144:3
**issues** [6] - 5:22,

92:11, 92:12, 95:15, 122:4
**itself** [4] - 54:17, 55:3, 55:17, 55:25

## J

**jacket** [1] - 133:19
**JASARI** [1] - 1:23
**Jasari** [2] - 1:23, 4:14
**Jenkins** [14] - 94:6, 94:18, 95:5, 96:8, 96:10, 113:2, 114:13, 114:19, 115:15, 117:3, 117:12, 117:18, 127:12, 132:25
**Jenkins'** [1] - 94:23
**job** [2] - 109:1, 109:3
**jobs** [1] - 130:8
**JOHN** [4] - 1:5, 1:12, 2:3, 2:10
**John** [8] - 4:5, 4:9, 4:16, 4:18, 5:7, 52:22, 66:5, 66:23
**JONES** [2] - 3:3, 57:21
**Jones** [31] - 52:14, 56:17, 57:23, 58:9, 58:10, 58:23, 64:6, 70:16, 70:19, 70:23, 71:5, 72:19, 73:6, 73:15, 74:15, 75:6, 75:7, 75:25, 76:20, 78:6, 78:24, 80:1, 80:12, 83:4, 84:3, 84:9, 84:14, 85:4, 85:21, 86:22, 86:24
**jones** [1] - 81:14
**JR** [1] - 1:12
**Judge** [3] - 86:20, 126:18, 144:6
**JUDGE** [1] - 1:9
**judging** [3] - 122:5, 126:11, 134:3
**judgment** [1] - 121:25
**juncture** [1] - 52:25
**juror** [1] - 119:15
**jurors** [4] - 5:9, 6:3, 7:9, 73:10
**jury** [56] - 4:3, 5:11, 6:1, 6:5, 7:9, 8:2, 8:21, 8:23, 9:22, 9:23, 52:12, 52:16, 52:17, 53:6, 54:4, 56:10, 56:12, 58:8, 61:8, 65:3, 66:3, 66:13, 69:24, 70:16, 70:20, 71:7, 72:16, 73:1, 73:8, 73:17, 75:13, 79:2, 83:14,

89:5, 89:16, 92:5, 93:10, 93:17, 94:4, 94:21, 97:11, 97:17, 101:19, 102:6, 103:3, 107:25, 108:7, 108:13, 112:18, 117:6, 120:20, 140:16, 140:17, 140:22, 141:13, 141:20
**JURY** [2] - 1:4, 1:8

## K

**keep** [13] - 52:7, 62:11, 83:20, 97:2, 107:16, 120:3, 121:15, 121:16, 122:7, 123:18, 124:23, 134:23, 142:8
**keeping** [1] - 137:10
**kept** [1] - 137:12
**key** [1] - 115:25
**killing** [2] - 62:1, 130:9
**kind** [14] - 61:23, 63:6, 63:9, 63:16, 63:19, 72:5, 77:4, 79:19, 79:21, 91:4, 97:20, 130:3, 130:5, 131:11
**Kiyonaga** [10] - 5:8, 52:22, 66:5, 66:23, 67:23, 87:10, 106:6, 141:7, 142:9, 143:9
**KIYONAGA** [40] - 2:10, 5:7, 9:17, 52:21, 53:25, 55:11, 56:9, 65:12, 65:24, 66:5, 66:10, 66:23, 67:10, 67:15, 67:21, 87:2, 87:4, 87:11, 93:5, 102:22, 106:5, 106:7, 122:19, 126:20, 126:22, 132:1, 132:7, 132:11, 132:13, 132:15, 136:18, 141:8, 141:12, 141:16, 141:19, 142:7, 142:12, 143:10, 143:13, 144:13
**knowing** [2] - 7:21, 139:2
**knowledge** [3] - 105:5, 139:12, 140:8
**knows** [3] - 126:9, 134:4, 139:16
**KOLLAR** [1] - 1:9
**KOLLAR-KOTELLY**

[1] - 1:9
**KOTELLY** [1] - 1:9

## L

**lack** [1] - 67:16
**ladies** [13] - 58:8, 62:10, 64:1, 71:12, 72:3, 77:3, 81:24, 83:14, 85:12, 89:5, 89:16, 94:4, 102:6
**lady** [5] - 63:1, 115:14, 127:11, 132:22, 138:21
**laid** [1] - 63:16
**landscaping** [1] - 63:17
**lapel** [2] - 9:9, 9:12
**large** [2] - 9:2, 96:17
**larger** [2] - 62:21, 62:22
**last** [6] - 7:17, 94:24, 94:25, 103:20, 122:5, 135:8
**latter** [1] - 66:21
**LAUREN** [2] - 1:5, 1:18
**Lauren** [2] - 4:5, 4:14
**Law** [1] - 2:3
**law** [2] - 128:18, 128:17
**layout** [1] - 110:12
**lead** [4] - 97:23, 110:24, 111:1, 128:7
**leads** [7] - 97:24, 97:25, 110:17, 110:20, 111:4, 120:1
**leaned** [1] - 8:16
**least** [4] - 7:13, 64:1, 83:23, 119:21
**leave** [16] - 9:18, 10:1, 60:16, 81:9, 86:1, 86:13, 89:23, 100:24, 100:25, 127:6, 127:9, 128:17, 142:1, 143:24, 144:3
**leaving** [1] - 107:3
**led** [1] - 73:25
**left** [19] - 61:17, 71:7, 72:1, 73:21, 77:9, 80:24, 87:21, 94:2, 95:6, 98:15, 98:21, 100:19, 101:23, 102:3, 105:4, 105:5, 106:19, 110:15, 141:9
**leg** [2] - 104:20, 104:22
**length** [4] - 91:13,

91:22, 92:9, 110:4
**letting** [2] - 61:15, 64:4
**life** [2] - 109:13, 139:1
**light** [1] - 6:19
**limit** [1] - 116:16
**limping** [1] - 136:5
**line** [2] - 55:20, 71:22
**lined** [2] - 81:3, 81:4
**link** [2] - 55:3, 55:24
**linked** [1] - 55:18
**list** [4] - 5:15, 5:17, 5:20, 53:12
**listen** [1] - 7:15
**listening** [1] - 84:9
**live** [3] - 54:9, 54:11, 58:21
**lived** [2] - 95:10, 139:4
**living** [1] - 59:9
**LLC** [1] - 2:3
**LLP** [1] - 1:23
**lobby** [3] - 64:12, 64:13, 71:8
**local** [1] - 91:7
**located** [6] - 90:22, 108:20, 110:6, 110:8, 111:22, 116:5
**lock** [1] - 128:6
**locked** [5] - 110:18, 111:7, 118:17, 136:2, 138:17
**look** [3] - 7:2, 7:7, 114:17
**looked** [2] - 141:25, 143:2
**looking** [2] - 54:10, 117:10
**loud** [1] - 107:4
**louder** [1] - 76:9
**lunch** [3] - 140:17, 140:19, 141:2

## M

**ma'am** [10] - 9:17, 53:25, 55:11, 87:4, 87:11, 93:5, 102:22, 108:2, 141:1, 142:12
**main** [4] - 98:25, 110:23, 111:1, 135:4
**man** [2] - 125:23, 134:2
**manage** [1] - 137:6
**management** [1] - 91:8
**manager** [21] - 96:25, 111:16, 113:5, 113:23, 115:16, 115:18, 115:22, 116:23, 117:24,

124:7, 125:13, 125:23, 126:15, 127:4, 127:16, 128:6, 128:16, 129:21, 130:2, 131:1, 131:3
**manner** [1] - 136:16
**March** [1] - 91:3
**marked** [1] - 80:3
**Marshals** [1] - 6:20
**MARTIN** [1] - 1:17
**Martin** [2] - 4:13, 68:17
**mask** [4] - 88:2, 106:25, 114:11, 114:23
**masks** [2] - 114:20, 116:20
**mass** [1] - 126:11
**materials** [1] - 142:13
**matter** [2] - 8:12, 69:2
**MD** [1] - 2:9
**mean** [9] - 55:11, 63:14, 76:10, 77:22, 90:3, 90:10, 94:17, 94:22, 125:5
**means** [2] - 95:7, 95:21
**meant** [2] - 83:14, 123:5
**medical** [6] - 8:23, 8:25, 89:14, 108:14, 108:16, 109:5
**medication** [2] - 91:12, 102:9
**medications** [1] - 95:17
**members** [3] - 9:23, 84:19, 140:16
**men** [3] - 122:17, 123:19, 125:14
**menstrual** [1] - 94:24
**mental** [1] - 121:23
**mentally** [1] - 83:24
**mentioned** [5] - 64:6, 77:15, 84:19, 85:6, 91:17
**met** [8] - 118:22, 118:24, 124:23, 125:2, 125:3, 137:8, 137:18, 138:25
**Metropolitan** [1] - 65:5
**MI** [1] - 2:7
**mic** [1] - 9:12
**microphone** [7] - 57:1, 57:25, 88:4, 101:3, 107:4, 119:1, 120:6
**mics** [1] - 9:9

**middle** [5] - 57:13, 88:14, 98:6, 107:12, 140:24
**might** [2] - 8:21, 90:5
**miles** [1] - 139:3
**mind** [2] - 52:7, 126:25
**minute** [1] - 106:1
**minutes** [3] - 64:24, 127:22, 128:15
**missed** [1] - 95:23
**missives** [1] - 7:17
**misspoke** [1] - 144:10
**mistrial** [3] - 141:13, 141:18, 142:5
**mixture** [4] - 118:22, 119:4, 122:17, 123:19
**moment** [14] - 58:17, 58:20, 64:6, 72:13, 75:10, 86:14, 87:2, 104:25, 105:14, 105:24, 106:4, 108:3, 121:11, 129:22
**moments** [1] - 129:5
**monitor** [2] - 89:22
**monitored** [1] - 91:10
**monitors** [2] - 118:7, 118:10
**morning** [26] - 4:9, 4:11, 4:17, 4:20, 5:2, 5:4, 5:7, 5:13, 9:23, 52:1, 52:5, 52:9, 56:13, 57:23, 57:24, 71:5, 88:23, 88:24, 114:15, 114:19, 117:12, 117:15, 121:9, 136:12, 138:2, 138:3
**MORNING** [2] - 1:7, 1:8
**most** [3] - 7:11, 63:1, 75:17
**move** [16] - 8:1, 9:3, 9:14, 57:8, 80:21, 85:13, 85:14, 88:3, 88:4, 101:3, 101:6, 105:25, 106:24, 107:9, 126:18, 141:12
**moved** [2] - 72:7, 72:9
**moves** [1] - 56:25
**moving** [1] - 51:22
**MPD** [1] - 65:21
**MR** [264] - 4:9, 4:13, 4:17, 4:21, 4:23, 4:25, 5:4, 5:7, 6:6, 8:12, 8:21, 9:7, 9:11, 9:17, 52:14, 52:20,

52:21, 53:25, 55:11, 56:9, 56:16, 57:18, 57:22, 61:13, 61:22, 64:14, 64:20, 64:23, 65:4, 65:11, 65:12, 65:18, 65:24, 66:5, 66:10, 66:21, 66:23, 67:10, 67:15, 67:21, 68:1, 68:17, 68:20, 70:3, 70:6, 70:10, 70:14, 70:18, 70:21, 71:1, 71:4, 72:15, 72:21, 73:1, 73:4, 73:5, 73:8, 73:13, 74:10, 74:13, 74:14, 75:5, 75:21, 75:23, 75:24, 76:16, 76:18, 76:19, 77:25, 78:4, 78:5, 78:13, 78:16, 78:17, 78:21, 78:23, 79:25, 80:3, 80:8, 80:10, 80:11, 81:11, 81:13, 82:7, 82:9, 82:23, 83:1, 83:3, 84:6, 84:8, 84:13, 85:1, 85:3, 85:17, 85:19, 85:20, 86:14, 86:16, 86:20, 86:22, 86:24, 87:2, 87:4, 87:7, 87:9, 87:11, 87:14, 87:18, 88:19, 88:22, 92:22, 93:1, 93:4, 93:5, 93:9, 93:12, 97:5, 97:10, 97:13, 97:14, 99:7, 99:8, 99:14, 99:16, 99:17, 100:4, 100:6, 100:7, 100:14, 100:16, 100:17, 101:2, 101:6, 101:10, 101:11, 102:11, 102:14, 102:16, 102:18, 102:20, 102:22, 103:2, 103:5, 103:13, 103:15, 103:20, 103:22, 104:3, 104:5, 104:10, 104:11, 104:18, 104:19, 105:13, 105:16, 105:20, 105:22, 105:24, 106:1, 106:2, 106:4, 106:5, 106:7, 106:13, 106:16, 107:19, 107:21, 107:24, 108:3, 108:6, 108:11, 108:12, 114:22, 115:2, 115:7, 115:10,

115:13, 117:5, 117:9, 119:8, 119:11, 119:15, 119:17, 120:6, 120:9, 120:10, 120:18, 120:19, 121:4, 122:19, 122:25, 123:13, 123:16, 124:1, 124:3, 124:4, 124:18, 124:20, 124:21, 125:8, 125:11, 125:12, 125:20, 125:21, 126:3, 126:14, 126:18, 126:20, 126:22, 126:25, 127:3, 127:14, 127:18, 127:20, 127:21, 128:25, 129:3, 129:4, 129:14, 129:16, 129:17, 130:12, 130:14, 130:15, 131:7, 131:9, 131:10, 132:1, 132:7, 132:11, 132:13, 132:15, 132:17, 132:20, 132:21, 133:3, 133:5, 133:6, 134:13, 134:14, 135:1, 135:2, 135:19, 136:18, 136:20, 137:20, 137:24, 137:25, 139:5, 139:7, 139:9, 139:21, 139:23, 140:13, 141:8, 141:12, 141:16, 141:19, 142:7, 142:12, 143:10, 143:13, 144:6, 144:13
**MS** [1] - 1:21
**multiple** [2] - 90:12, 113:7
**multistory** [1] - 110:6
**must** [1] - 110:1

---

## N

**N.W** [1] - 145:11
**name** [9] - 6:2, 74:2, 89:6, 94:2, 108:1, 108:14, 111:13, 113:2, 114:12
**named** [1] - 117:18
**names** [6] - 6:3, 6:8, 108:8, 108:9, 141:23, 142:1

**near** [4] - 61:12, 61:14, 62:25, 63:20
**necessarily** [3] - 63:5, 140:6, 143:20
**need** [26] - 8:1, 8:3, 8:10, 10:4, 51:23, 51:25, 52:2, 52:3, 55:18, 56:19, 57:1, 69:11, 81:19, 81:21, 82:13, 87:21, 88:9, 91:23, 99:4, 100:24, 100:25, 107:2, 107:3, 107:16, 114:20, 122:5
**needed** [2] - 60:13, 60:22
**needle** [1] - 54:13
**needs** [5] - 9:5, 52:16, 68:7, 100:24, 137:21
**negative** [1] - 71:20
**net** [1] - 53:4
**never** [5] - 58:18, 113:20, 113:22, 137:12
**new** [2] - 118:24, 130:8
**next** [14] - 5:5, 51:22, 57:9, 60:20, 64:24, 87:17, 87:18, 104:3, 104:10, 104:18, 106:12, 110:5, 127:1, 129:5
**nice** [3] - 76:5, 76:6, 107:4
**nicely** [1] - 54:13
**night** [4] - 7:17, 86:7, 86:9, 86:11
**nine** [1] - 94:24
**nippy** [1] - 10:1
**nobody** [2] - 53:5, 114:21
**nonjudgment** [1] - 126:10
**noon** [3] - 105:4, 105:7, 105:10
**norm** [1] - 90:6
**normal** [4] - 60:15, 81:7, 98:18, 118:12
**normally** [6] - 63:9, 72:2, 77:23, 81:5, 92:7, 112:20
**northwest** [1] - 90:23
**Northwest** [1] - 108:21
**noted** [1] - 96:2
**notes** [1] - 145:5
**nothing** [9] - 54:8, 71:16, 79:5, 83:17, 87:4, 87:11, 106:5, 106:7, 142:2

**notice** [1] - 96:15
**noticed** [4] - 8:16, 72:4, 112:22, 120:22
**nowhere** [1] - 54:18
**nuanced** [1] - 54:13
**nudging** [1] - 83:20
**number** [3] - 95:11, 116:12, 127:22
**numbing** [1] - 91:8
**nurse** [7] - 89:7, 89:15, 89:17, 90:18, 101:24, 112:25, 121:5
**nurses** [3] - 111:14, 111:16, 121:8
**NW** [4] - 1:13, 1:16, 2:3, 2:22

---

## O

**object** [8] - 52:22, 52:23, 53:8, 57:11, 66:12, 67:11, 67:16, 141:24
**objected** [1] - 143:2
**objecting** [5] - 52:24, 88:13, 107:11, 126:17, 140:10
**objection** [23] - 57:10, 57:14, 66:8, 66:9, 67:12, 67:14, 68:13, 88:13, 88:15, 102:14, 107:11, 107:13, 115:9, 122:19, 122:23, 126:3, 132:1, 136:18, 137:20, 139:5, 139:6, 140:7, 142:2
**objections** [7] - 53:10, 53:17, 53:22, 69:13, 93:3, 93:6, 102:21
**obviously** [5] - 6:12, 7:25, 56:5, 79:17, 142:4
**occupational** [2] - 58:15, 58:16
**occurred** [1] - 103:11
**occurring** [2] - 129:23, 136:8
**October** [14] - 59:19, 64:15, 70:24, 89:10, 94:15, 94:19, 95:25, 96:12, 104:25, 110:10, 111:13, 112:2, 116:8, 117:12
**odd** [1] - 143:24
**OF** [7] - 1:1, 1:2, 1:8, 57:20, 88:20, 107:22, 145:1

**offer** [2] - 109:8, 109:9
**offered** [2] - 66:24, 126:23
**office** [13] - 72:11, 97:25, 98:10, 110:20, 113:4, 113:5, 117:24, 118:3, 118:7, 129:21, 129:22, 130:2, 131:15
**Office** [1] - 1:12
**officer** [3] - 72:3, 83:16, 85:13
**officer's** [1] - 65:6
**officers** [1] - 74:7
**Offices** [1] - 2:3
**offices** [1] - 79:4
**Official** [2] - 2:21, 145:10
**OFFICIAL** [1] - 145:1
**oil** [1] - 6:21
**old** [3] - 58:10, 94:25, 95:5
**once** [8] - 64:11, 71:8, 79:14, 89:21, 105:6, 124:9, 128:1, 128:19
**one** [46] - 6:1, 7:6, 8:12, 9:14, 52:3, 55:9, 55:12, 60:5, 62:25, 66:25, 68:24, 69:4, 75:12, 75:15, 84:19, 87:2, 89:25, 91:21, 92:3, 92:25, 96:20, 99:11, 100:11, 104:14, 104:18, 104:22, 106:1, 106:4, 108:3, 109:19, 111:16, 111:24, 113:1, 114:5, 116:18, 119:22, 120:24, 121:5, 121:8, 124:5, 125:14, 127:11, 128:12, 139:24, 144:7
**online** [4] - 59:12, 95:7, 95:8
**op** [1] - 128:5
**open** [24] - 6:12, 98:8, 98:24, 112:5, 112:13, 112:23, 112:24, 113:3, 113:6, 113:16, 113:20, 113:22, 115:24, 117:1, 117:19, 117:20, 118:13, 118:14, 120:23, 123:23, 124:6, 128:12, 135:15

**opened** [9] - 71:22, 71:25, 81:6, 98:22, 117:25, 118:3, 118:11, 119:6, 120:21
**opening** [6] - 7:18, 9:12, 10:6, 10:8, 51:21, 117:22
**opens** [2] - 98:10, 98:25
**operations** [1] - 105:1
**opportunity** [1] - 129:7
**options** [1] - 90:15
**orchestrated** [1] - 131:23
**orchestrating** [2] - 132:13, 132:15
**order** [9] - 7:20, 8:5, 9:19, 54:14, 55:7, 55:13, 99:3, 123:9, 123:10
**ostensibly** [1] - 7:1
**ostentatiously** [1] - 7:3
**otherwise** [3] - 7:5, 114:21, 141:21
**out-of-court** [1] - 126:22
**outcomes** [1] - 95:13
**outside** [16] - 64:7, 68:24, 72:5, 75:16, 75:17, 90:6, 90:15, 96:22, 98:4, 111:22, 114:2, 114:4, 115:18, 115:22, 119:5, 143:19
**overflow** [1] - 6:13
**overnight** [1] - 59:22
**overrule** [1] - 122:23
**overruled** [4] - 132:10, 132:12, 132:14, 132:16
**overruling** [1] - 139:8
**overwhelmed** [1] - 84:4
**own** [5] - 5:12, 54:9, 55:21, 81:17, 122:4
**owner** [1] - 108:15

**P**

**p.m** [1] - 144:21
**P.O** [1] - 1:21
**pack** [2] - 104:15, 136:6
**PAGE** [2] - 3:2, 3:11
**page** [2] - 104:3, 104:10
**pain** [3] - 8:14, 91:8,

138:21
**pamphlets** [1] - 64:3
**pandemic** [1] - 116:9
**Pap** [1] - 91:15
**paperwork** [1] - 128:3
**paranoid** [1] - 6:4
**parked** [1] - 137:8
**parking** [1] - 61:16
**parsing** [1] - 66:12
**part** [10] - 80:4, 80:23, 81:24, 98:25, 104:16, 104:20, 108:16, 133:7, 135:8, 143:14
**part-time** [1] - 108:16
**partially** [1] - 98:22
**particular** [8] - 55:4, 59:11, 65:23, 69:5, 72:24, 133:16, 140:6, 142:22
**particularly** [2] - 141:22, 142:16
**partner** [1] - 137:8
**parts** [1] - 66:13
**past** [1] - 92:10
**Patel** [2] - 3:9, 4:10
**PATEL** [74] - 1:14, 9:11, 106:13, 106:16, 107:19, 107:21, 107:24, 108:3, 108:6, 108:11, 108:12, 114:22, 115:2, 115:7, 115:13, 117:5, 117:9, 119:8, 119:11, 119:15, 119:17, 120:6, 120:9, 120:10, 120:18, 120:19, 121:4, 122:25, 123:16, 124:1, 124:3, 124:4, 124:18, 124:20, 124:21, 125:8, 125:11, 125:12, 125:20, 125:21, 126:14, 126:25, 127:3, 127:14, 127:18, 127:20, 127:21, 128:25, 129:3, 129:4, 129:14, 129:16, 129:17, 130:12, 130:14, 130:15, 131:7, 131:9, 131:10, 132:17, 132:20, 132:21, 133:3, 133:5, 133:6, 134:13, 134:14, 135:1, 135:2,

135:19, 136:20, 137:24, 137:25, 140:13
**patient** [20] - 95:21, 95:22, 99:4, 101:16, 101:17, 110:3, 116:18, 136:9, 136:11, 137:3, 137:7, 137:14, 137:18, 137:19, 138:10, 138:12, 139:18, 140:2, 140:9
**patients** [36] - 79:19, 89:18, 90:1, 91:4, 92:2, 92:19, 98:10, 109:6, 109:11, 109:12, 110:21, 113:1, 116:16, 118:12, 118:23, 118:24, 118:25, 119:5, 120:24, 123:1, 123:2, 127:23, 128:1, 128:10, 128:14, 128:15, 129:6, 133:11, 133:12, 133:13, 136:1, 138:1, 138:3, 138:5, 138:7, 139:20
**patients'** [1] - 116:21
**Patterson** [2] - 5:16, 78:3
**pause** [25] - 74:13, 75:23, 76:18, 78:16, 78:21, 97:13, 99:7, 99:16, 100:6, 100:16, 101:10, 120:9, 120:18, 124:3, 124:20, 125:11, 127:20, 129:3, 129:16, 130:14, 131:9, 132:20, 133:5, 134:13, 135:1
**paused** [3] - 77:3, 82:15, 119:21
**pay** [1] - 53:21
**paying** [1] - 95:1
**PC** [1] - 2:6
**Pennsylvania** [3] - 1:16, 58:22, 86:7
**people** [47] - 6:13, 6:22, 9:3, 10:2, 53:19, 55:5, 57:11, 61:23, 62:23, 63:25, 68:9, 68:23, 69:1, 71:23, 72:6, 75:3, 78:10, 78:12, 96:18, 96:22, 101:18, 105:2, 109:15,

111:12, 112:20, 113:7, 114:4, 114:6, 114:20, 116:12, 119:5, 120:22, 121:24, 121:25, 122:4, 123:17, 124:24, 125:4, 126:15, 127:6, 130:7, 131:11, 140:3, 140:4, 141:23, 142:20, 143:19
**per** [1] - 116:18
**percent** [4] - 89:23, 90:6, 90:8, 90:10
**perhaps** [3] - 8:23, 108:4, 119:5
**period** [5] - 94:24, 94:25, 101:20, 134:17, 140:9
**permission** [1] - 114:22
**persistent** [2] - 71:13, 71:19
**person** [14] - 84:17, 92:7, 94:7, 94:17, 96:8, 96:20, 99:21, 100:8, 114:5, 114:7, 114:18, 120:11, 133:1, 139:14
**personal** [2] - 9:1, 142:17
**personally** [1] - 139:13
**phlebotomy** [2] - 99:1, 109:5
**phone** [5] - 92:7, 95:11, 96:17, 97:1, 109:23
**phones** [1] - 65:25
**photograph** [2] - 103:16, 103:23
**photographs** [1] - 102:13
**photos** [1] - 103:20
**physical** [2] - 125:3, 125:5
**pick** [1] - 65:25
**piece** [1] - 68:13
**piecemeal** [1] - 68:12
**place** [1] - 116:11
**Plaintiff** [2] - 1:3, 1:12
**plan** [2] - 10:10, 66:11
**planned** [2] - 59:24, 86:9
**planning** [1] - 65:17
**plans** [1] - 5:18
**platform** [2] - 63:12, 63:15
**play** [10] - 74:10,

124:1, 124:18,
125:8, 127:14,
129:14, 130:12,
131:7, 132:17, 133:3
**played** [34] - 74:12,
75:22, 76:17, 78:15,
78:20, 81:12, 82:8,
83:2, 84:7, 84:12,
85:2, 85:18, 97:12,
99:6, 99:15, 100:5,
100:15, 101:9,
120:8, 120:17,
121:3, 124:2,
124:19, 125:10,
127:15, 129:2,
129:15, 130:13,
131:8, 132:19,
133:4, 134:12,
134:25, 135:18
**playing** [2] - 73:14,
128:25
**plays** [1] - 133:7
**plenty** [1] - 76:7
**plus** [1] - 6:22
**podium** [1] - 9:10
**point** [39] - 8:9, 10:5,
52:1, 55:12, 55:18,
56:1, 59:4, 63:3,
64:21, 66:7, 67:16,
67:18, 67:19, 68:8,
68:10, 68:14, 70:16,
70:20, 71:11, 72:15,
76:1, 77:4, 79:25,
80:16, 81:19, 82:25,
83:17, 83:22, 84:3,
102:11, 115:3,
116:23, 125:6,
140:2, 140:12,
140:15, 141:24,
143:2, 144:7
**pointed** [2] - 69:19,
119:25
**Police** [1] - 65:6
**police** [4] - 72:2, 74:7,
83:15, 85:13
**portion** [6] - 64:22,
64:24, 66:20, 68:14,
72:16, 72:18
**portions** [4] - 66:22,
67:14, 67:24, 70:22
**position** [2] - 109:3,
111:13
**positioned** [1] - 72:8
**possible** [2] - 55:13,
124:15
**possibly** [1] - 90:5
**practice** [2] - 5:14,
52:24
**prayers** [1] - 134:18
**pre** [1] - 128:5

**pre-op** [1] - 128:5
**precautions** [1] -
116:21
**preceding** [1] - 74:4
**precipitates** [1] -
54:21
**prefer** [1] - 8:25
**preference** [1] - 92:18
**pregnancies** [4] -
91:6, 92:10, 95:12,
109:14
**pregnancy** [7] - 59:4,
91:13, 91:14, 91:18,
91:23, 92:9, 110:4
**pregnant** [2] - 59:2,
95:14
**prejudice** [1] - 142:22
**prejudicial** [1] -
142:16
**premature** [1] - 54:6
**prep** [2] - 60:8, 109:6
**prepared** [2] - 67:15,
133:12
**preparing** [1] - 129:11
**presence** [8] - 4:3,
9:21, 52:12, 54:4,
56:11, 69:23,
140:22, 141:11
**present** [4] - 4:15,
4:19, 5:1, 5:8,
116:12
**presenting** [1] - 10:10
**preserved** [1] - 53:23
**presumably** [9] - 56:6,
65:14, 67:13, 67:25,
69:16, 69:18, 70:15,
72:22, 132:3
**pretty** [5] - 92:15,
116:20, 121:14,
124:13, 126:7
**previous** [11] - 62:7,
71:23, 72:2, 72:8,
77:23, 79:10, 79:11,
81:1, 81:5, 84:21,
95:12
**previously** [9] - 72:17,
74:1, 75:12, 77:11,
80:4, 80:18, 97:7,
112:25, 122:4
**price** [3] - 92:15,
92:17, 96:7
**privacy** [1] - 108:9
**pro** [1] - 130:8
**pro-choice.org** [1] -
130:8
**probative** [3] - 55:4,
55:22, 69:22
**problem** [8] - 9:6,
51:25, 68:13, 68:15,
69:10, 72:23,

142:11, 143:4
**problems** [1] - 142:9
**procedure** [19] - 59:6,
59:16, 60:7, 60:9,
89:7, 89:19, 90:7,
90:8, 90:13, 90:14,
90:15, 90:16, 91:10,
91:24, 92:18, 95:2,
95:4, 95:16, 99:2
**procedures** [7] -
89:21, 90:4, 91:6,
91:8, 91:17, 91:20,
105:11
**proceed** [8] - 10:5,
52:4, 56:14, 65:1,
85:1, 107:14,
108:10, 108:11
**proceeding** [1] - 53:19
**proceedings** [10] -
4:2, 9:21, 52:11,
54:3, 56:11, 66:2,
69:23, 140:21,
141:10, 145:6
**process** [3] - 60:2,
92:6, 92:15
**PROCTOR** [2] - 3:8,
107:23
**Proctor** [4] - 106:14,
108:14, 117:10,
134:15
**proctor** [8] - 108:13,
108:18, 113:8,
119:12, 119:18,
120:11, 135:3,
135:20
**program** [1] - 58:17
**prolong** [1] - 7:12
**prompt** [1] - 5:11
**protestor** [1] - 139:14
**protestors** [13] -
61:11, 61:14, 71:23,
71:25, 72:8, 78:10,
80:17, 81:4, 81:23,
85:12, 117:25,
121:19, 142:21
**protocols** [1] - 116:11
**provided** [3] - 5:12,
91:4, 96:9
**pseudonym** [1] -
141:20
**pseudonymous** [1] -
141:14
**pseudonyms** [2] -
5:25, 141:16
**publish** [4] - 93:11,
97:9, 117:6, 119:8
**pull** [1] - 120:6
**pulled** [6] - 57:25,
61:10, 61:18, 64:7,
79:7

**pulling** [5] - 62:19,
62:24, 63:2, 83:20,
126:8
**purported** [1] - 96:8
**push** [2] - 124:16,
125:4
**pushing** [1] - 123:23
**put** [8] - 9:4, 52:3,
54:14, 54:25, 55:7,
56:3, 65:25, 124:14
**putting** [2] - 69:3,
75:25

### Q

**questions** [12] - 58:23,
58:25, 86:17, 86:22,
86:24, 89:13, 89:20,
96:11, 105:17,
105:18, 106:2, 107:7
**quietly** [1] - 9:5
**quite** [1] - 54:13

### R

**rails** [1] - 53:2
**raise** [3] - 56:20,
87:23, 106:20
**raising** [1] - 119:15
**ran** [2] - 53:3, 137:7
**rape** [1] - 109:15
**rather** [1] - 144:8
**reach** [3] - 67:6,
136:16, 136:23
**read** [2] - 53:12, 53:15
**ready** [7] - 7:18, 8:11,
9:8, 10:5, 56:14,
83:24, 96:16
**real** [2] - 6:3, 127:23
**really** [5] - 55:4, 63:11,
64:4, 76:12, 83:18
**reason** [5] - 8:18,
65:1, 69:7, 69:9,
92:8
**reasonable** [1] - 55:16
**rebuke** [1] - 53:5
**receive** [3] - 101:22,
102:4, 138:20
**received** [2] - 5:17,
102:7
**reception** [11] - 73:19,
74:7, 76:25, 77:3,
78:18, 78:25, 79:8,
80:18, 81:9, 84:15,
99:25
**receptionist** [2] -
77:16, 133:8
**receptionist's** [8] -
79:14, 85:23, 118:4,
128:11, 129:18,

130:16, 130:21,
131:15
**recess** [1] - 54:2
**recognize** [6] - 80:15,
84:17, 93:21, 99:21,
114:18, 120:11
**recognized** [1] - 84:21
**record** [8] - 4:8, 53:22,
57:2, 115:7, 115:11,
142:7, 142:15,
144:16
**recording** [1] - 118:8
**recovery** [2] - 89:7,
128:4
**red** [1] - 115:5
**redactions** [1] - 8:8
**reference** [1] - 126:8
**referral** [1] - 59:11
**referred** [1] - 95:7
**referring** [2] - 77:17,
84:1
**reflect** [4] - 115:7,
115:11, 142:25,
144:16
**reflection** [2] - 143:6,
144:2
**registered** [5] - 89:15,
89:17, 90:18,
101:24, 111:14
**regular** [2] - 109:10,
138:9
**reinforce** [1] - 121:15
**relate** [6] - 66:22,
67:14, 67:20, 68:4,
72:19, 142:18
**related** [1] - 139:10
**relates** [10] - 66:17,
66:20, 68:8, 68:15,
68:21, 68:22, 70:1,
70:16, 70:19, 142:19
**relating** [2] - 72:19,
142:14
**relation** [1] - 82:20
**relevance** [5] - 126:3,
126:6, 139:7, 139:8,
139:23
**relevant** [2] - 68:25,
69:2
**religion** [2] - 126:8,
134:1
**remain** [2] - 56:19,
87:22
**remains** [1] - 110:17
**remarks** [1] - 130:4
**remember** [11] -
59:18, 59:19, 61:23,
75:17, 86:3, 112:3,
112:5, 131:4,
134:15, 134:19,
138:11

**remind** [1] - 10:8
**remove** [2] - 80:21, 125:1
**removed** [1] - 105:6
**repeat** [1] - 109:2
**repeating** [4] - 76:4, 76:8, 139:12, 140:8
**replay** [1] - 83:12
**report** [1] - 115:15
**reported** [2] - 113:23, 115:19
**REPORTER** [1] - 145:1
**Reporter** [3] - 2:20, 2:21, 145:10
**reprimanding** [1] - 62:11
**reproductive** [1] - 109:9
**require** [1] - 92:19
**rescheduled** [1] - 137:13
**research** [1] - 95:8
**reservations** [1] - 59:13
**resolve** [2] - 8:6, 69:11
**respiratory** [1] - 92:12
**rest** [4] - 56:2, 102:17, 139:14, 144:4
**restart** [1] - 75:21
**restrictions** [1] - 116:18
**restroom** [1] - 96:20
**return** [1] - 116:23
**revealed** [2] - 141:13, 142:14
**ride** [3] - 71:18, 96:16, 96:19
**Rights** [1] - 1:15
**RMR** [2] - 2:21, 145:9
**ROBERT** [1] - 2:5
**Robert** [2] - 2:6, 4:25
**role** [1] - 109:1
**Room** [2] - 2:22, 145:10
**room** [37] - 5:11, 73:17, 75:1, 76:20, 79:20, 89:7, 97:19, 97:25, 98:18, 102:8, 105:12, 110:13, 110:14, 110:21, 110:24, 111:2, 111:25, 119:18, 119:23, 121:6, 121:13, 124:6, 124:24, 128:4, 128:7, 128:21, 129:8, 130:7, 130:21, 131:12, 131:16, 133:22,

134:5, 134:17, 135:5, 138:16, 140:18
**rooms** [2] - 99:2, 109:6
**rope** [4] - 135:3, 135:7, 135:9
**rosaries** [1] - 6:25
**rosary** [2] - 7:1, 126:8
**rules** [3] - 53:13, 53:16, 116:13
**ruling** [2] - 55:8, 144:7
**rulings** [2] - 6:18, 53:22
**run** [3] - 52:18, 66:11, 108:16

---

## S

**safe** [4] - 89:23, 95:15, 105:11, 122:7
**safely** [1] - 91:24
**safety** [3] - 108:9, 143:11, 143:14
**same-week** [1] - 110:3
**SANJAY** [1] - 1:14
**Sanjay** [1] - 4:10
**Sara** [2] - 87:18, 89:6
**SARA** [2] - 3:5, 88:21
**Sasha** [2] - 106:13, 108:14
**SASHA** [2] - 3:8, 107:23
**saw** [15] - 61:11, 61:14, 62:12, 71:22, 71:25, 77:3, 79:2, 79:8, 79:9, 113:10, 114:19, 117:11, 131:22, 134:9, 136:4
**schedule** [2] - 92:4, 123:3
**scheduled** [10] - 79:16, 85:24, 110:1, 112:5, 112:13, 117:2, 123:2, 123:7, 138:1, 138:2
**school** [1] - 58:12
**screaming** [1] - 122:6
**screen** [27] - 73:6, 73:18, 73:21, 74:18, 74:24, 77:15, 77:17, 78:1, 80:12, 80:15, 80:23, 82:16, 82:21, 82:25, 83:5, 97:15, 97:18, 97:21, 98:6, 98:13, 98:16, 98:21, 99:19, 100:18, 119:22, 125:13, 125:24
**screens** [2] - 71:3,

73:12
**seat** [1] - 57:25
**seated** [5] - 5:5, 56:23, 88:1, 106:22, 115:4
**seats** [2] - 116:17, 128:4
**second** [4] - 60:8, 60:23, 70:7, 93:19
**secondly** [1] - 8:21
**seconds** [2] - 77:2, 142:8
**Section** [1] - 1:15
**security** [8] - 6:5, 64:15, 111:19, 111:20, 118:7, 119:14, 119:19, 131:19
**see** [77] - 8:6, 54:16, 57:10, 65:1, 68:15, 69:9, 71:2, 73:6, 73:9, 73:15, 73:21, 74:15, 74:17, 74:19, 75:3, 75:7, 76:23, 77:12, 78:24, 80:12, 80:20, 80:23, 82:15, 83:4, 84:14, 85:4, 88:12, 93:13, 93:19, 94:2, 94:10, 97:15, 97:20, 98:6, 98:12, 98:21, 99:9, 99:18, 100:8, 103:6, 104:18, 106:16, 107:10, 110:5, 110:14, 113:13, 113:15, 114:18, 115:1, 117:2, 118:10, 119:16, 123:8, 123:10, 123:11, 123:14, 125:13, 128:18, 129:7, 129:18, 130:16, 131:11, 132:5, 132:22, 135:3, 135:7, 135:9, 135:13, 135:14, 136:1, 136:6, 140:20, 141:25, 142:22, 143:2, 144:18
**seeing** [5] - 55:15, 113:15, 119:21, 131:19, 143:18
**seek** [3] - 64:17, 64:24, 65:7
**seem** [2] - 69:13, 140:10
**sees** [1] - 109:11
**SEFRANEK** [1] - 145:3
**Sefranek** [3] - 2:21,

145:9, 145:9
**selection** [1] - 8:2
**sense** [2] - 68:12, 69:14
**separate** [1] - 66:12
**separated** [1] - 62:9
**seriatim** [1] - 9:20
**series** [2] - 7:23, 103:20
**serve** [3] - 112:21, 122:21, 123:6
**serves** [1] - 126:9
**Service** [1] - 6:20
**services** [6] - 91:4, 109:8, 109:9, 109:10
**SESSION** [2] - 1:7, 1:8
**sessions** [1] - 60:8
**set** [4] - 5:16, 9:10, 53:2, 114:9
**settled** [2] - 128:14, 128:15
**several** [1] - 91:17
**severe** [1] - 102:3
**sex** [1] - 109:16
**sexually** [1] - 91:14
**shift** [1] - 112:10
**shirt** [1] - 75:8
**shop** [1] - 108:15
**shortcomings** [1] - 78:1
**shorter** [1] - 63:1
**shoulder** [1] - 74:21
**shoving** [2] - 123:23, 123:24
**show** [34] - 54:10, 66:13, 66:14, 66:17, 67:13, 67:17, 67:22, 67:24, 68:3, 68:14, 69:4, 69:5, 69:17, 69:18, 70:21, 72:15, 73:1, 74:24, 79:25, 93:9, 97:10, 103:3, 103:10, 103:18, 104:1, 104:14, 117:5, 118:7, 123:8, 126:25
**showed** [1] - 85:22
**showing** [5] - 66:19, 67:18, 67:19, 68:4, 70:15
**shown** [6] - 65:3, 68:7, 68:8, 69:9, 70:1, 70:20
**shows** [4] - 67:19, 69:10, 103:11, 117:14
**shy** [1] - 52:3
**sic** [9] - 80:9, 90:20, 91:5, 94:19, 94:25, 98:19, 99:4, 99:12,

100:12
**sick** [1] - 84:5
**side** [15] - 10:2, 61:11, 63:6, 79:23, 90:5, 95:1, 98:2, 98:3, 98:8, 98:13, 98:15, 110:15, 110:16
**sides** [1] - 69:12
**signs** [2] - 89:22, 91:10
**similar** [1] - 93:16
**similarly** [1] - 65:4
**simply** [4] - 6:11, 9:19, 53:18, 54:7
**singing** [3] - 80:19, 130:4, 134:18
**sit** [4] - 7:14, 56:24, 83:23, 106:23
**situated** [1] - 128:10
**situation** [2] - 79:22, 128:5
**skip** [3] - 63:11, 63:15, 104:22
**slander** [2] - 130:9, 130:10
**small** [1] - 108:15
**smaller** [5] - 61:17, 61:20, 62:9, 62:18, 63:25
**smart** [1] - 7:9
**smears** [1] - 91:16
**Society** [2] - 1:18, 1:20
**someone** [9] - 62:24, 77:20, 84:9, 99:9, 99:18, 101:14, 122:2, 122:5, 139:1
**somewhere** [1] - 53:16
**sonograms** [1] - 91:13
**soon** [1] - 110:1
**sorry** [19] - 4:22, 60:15, 60:17, 68:1, 82:3, 82:6, 82:23, 92:16, 92:25, 98:1, 108:2, 109:2, 110:25, 122:11, 122:19, 126:2, 129:25, 133:10, 135:8
**sort** [4] - 10:1, 90:5, 109:8, 135:3
**sound** [2] - 130:5, 141:21
**sounds** [1] - 130:4
**speaking** [6] - 57:2, 64:4, 66:24, 81:24, 88:3, 127:5
**specific** [5] - 55:1, 55:2, 55:23, 72:23,

140:4
**specifically** [6] - 90:22, 90:23, 99:1, 132:6, 142:19, 143:10
**speculate** [1] - 52:6
**speculation** [2] - 132:2, 132:7
**spirit** [1] - 67:1
**sprain** [2] - 101:23, 102:3
**sprained** [2] - 103:12, 135:25
**spread** [1] - 79:19
**sprinkling** [1] - 6:21
**staff** [6] - 68:2, 77:20, 84:19, 111:10, 116:24, 124:23
**stairwell** [5] - 113:7, 113:11, 113:14, 113:21, 117:24
**stand** [3] - 57:11, 88:12, 107:10
**standing** [9] - 56:19, 75:8, 82:20, 87:22, 113:7, 119:5, 130:20, 133:19, 135:12
**stands** [1] - 95:13
**start** [19] - 8:7, 10:6, 52:1, 57:6, 58:7, 73:14, 75:7, 76:16, 78:13, 81:11, 83:1, 84:6, 85:17, 88:12, 89:4, 103:2, 103:23, 107:8, 129:11
**started** [8] - 5:10, 5:13, 57:12, 61:20, 85:21, 88:14, 107:12, 128:21
**starting** [4] - 4:8, 9:24, 61:8, 96:22
**Starts** [1] - 112:11
**state** [3] - 95:9, 126:25
**statement** [3] - 10:8, 126:22, 144:17
**statements** [6] - 7:18, 10:6, 51:21, 52:7, 132:4, 144:11
**STATES** [3] - 1:1, 1:2, 1:9
**States** [3] - 2:22, 4:5, 4:10
**station** [1] - 99:1
**stay** [3] - 59:22, 86:12, 102:10
**stays** [1] - 110:21
**Stenographic** [1] - 2:20
**stenographic** [1] -

145:5
**step** [5] - 56:18, 87:13, 87:21, 106:8, 106:19
**STEPHEN** [1] - 1:20
**steps** [3] - 63:10, 63:18, 63:20
**Steve** [1] - 4:13
**stick** [1] - 53:15
**still** [10] - 62:25, 64:3, 69:2, 72:3, 74:15, 78:12, 79:22, 85:14, 131:15, 133:7
**stipulate** [2] - 66:25, 67:2
**stipulated** [6] - 64:16, 65:7, 65:13, 65:19, 68:10
**stipulation** [2] - 64:19, 67:7
**stomach** [1] - 84:5
**stood** [1] - 115:24
**stop** [9] - 53:9, 53:19, 57:13, 81:19, 81:21, 88:15, 107:13, 140:12, 140:14
**stopped** [2] - 62:14, 62:16, 108:23
**stopping** [2] - 62:18, 76:7
**straight** [2] - 96:2, 137:10
**strange** [1] - 141:22
**strap** [1] - 74:20
**Street** [5] - 1:13, 1:18, 2:10, 90:23, 108:21
**strike** [1] - 126:18
**struggles** [1] - 121:23
**struggling** [2] - 100:2, 109:14
**stubbornness** [1] - 124:25
**study** [1] - 58:14
**stuff** [1] - 6:23
**subsequently** [1] - 137:3
**sufficient** [1] - 144:14
**suggested** [1] - 141:24
**suggestion** [2] - 7:15, 143:13
**Suite** [2] - 1:24, 2:4
**summary** [2] - 54:12, 54:16
**support** [1] - 69:8
**supporters** [1] - 143:14
**supports** [1] - 54:8
**supposed** [1] - 83:22
**surgery** [1] - 60:5
**Surgi** [12] - 59:7, 89:8,

90:19, 91:5, 94:19, 97:19, 98:19, 99:3, 99:12, 100:12, 105:1, 108:18
**surgi** [4] - 59:7, 91:25, 92:24, 96:14
**Surgi-Center** [7] - 90:19, 91:5, 94:19, 98:19, 99:3, 99:12, 100:12
**surgi-center** [3] - 91:25, 92:24, 96:14
**Surgi-Clinic** [3] - 89:8, 97:19, 108:18
**Surgi-Clinic's** [1] - 105:1
**surgi-tech** [1] - 59:7
**surveillance** [1] - 65:22
**suspended** [2] - 105:8, 105:10
**suspicious** [1] - 96:18
**sustained** [1] - 135:24
**swear** [3] - 56:19, 87:22, 106:20
**swelling** [3] - 103:11, 103:18, 104:1
**sworn** [3] - 56:22, 87:25, 106:21
**system** [1] - 111:20

**T**

**table** [1] - 8:15
**tables** [3] - 57:11, 88:12, 107:10
**TAMARA** [1] - 145:3
**Tamara** [2] - 2:21, 145:9, 145:9
**tart** [6] - 73:4, 74:10, 74:13, 78:13, 78:22, 80:10
**tech** [1] - 59:7
**technological** [1] - 78:1
**telephone** [2] - 92:4, 96:10
**terminate** [2] - 59:4, 91:18
**terminated** [1] - 91:6
**terms** [21] - 5:25, 6:22, 6:25, 51:21, 54:18, 66:8, 67:5, 69:3, 110:12, 116:11, 125:4, 127:1, 130:6, 132:5, 139:11, 140:2, 142:2, 142:4, 143:19
**terrific** [1] - 9:13
**testified** [3] - 68:9,

69:7, 139:18
**testify** [3] - 56:6, 69:17, 132:9
**testifying** [1] - 68:9
**testimony** [4] - 51:24, 68:22, 140:25, 141:3
**testing** [1] - 91:14
**THE** [189] - 1:1, 1:1, 1:9, 4:4, 4:11, 4:16, 4:20, 4:22, 4:24, 5:2, 5:6, 5:9, 6:8, 8:20, 8:25, 9:8, 9:13, 9:18, 9:23, 51:20, 52:13, 52:15, 53:7, 54:1, 54:5, 55:17, 56:10, 56:13, 56:18, 56:20, 56:23, 56:24, 57:4, 57:5, 57:16, 57:17, 57:19, 61:14, 64:18, 64:21, 64:25, 65:9, 65:14, 65:20, 65:25, 66:4, 66:7, 66:14, 67:4, 67:12, 67:18, 67:23, 68:3, 68:19, 69:2, 69:25, 70:4, 70:9, 70:12, 70:15, 70:19, 70:25, 71:2, 72:18, 72:22, 73:3, 73:11, 74:23, 74:25, 75:2, 75:4, 78:3, 80:2, 80:6, 80:9, 82:2, 82:3, 82:4, 82:6, 82:24, 86:15, 86:18, 86:21, 86:23, 86:25, 87:3, 87:5, 87:8, 87:10, 87:12, 87:15, 87:17, 87:20, 87:23, 88:1, 88:2, 88:6, 88:7, 88:17, 88:18, 92:25, 93:3, 93:6, 93:11, 97:8, 101:3, 101:7, 101:8, 102:15, 102:17, 102:19, 102:21, 102:23, 105:15, 105:18, 105:21, 105:23, 105:25, 106:3, 106:6, 106:8, 106:10, 106:12, 106:15, 106:17, 106:22, 106:23, 107:6, 107:7, 107:15, 107:16, 107:18, 107:20, 108:4, 108:7, 114:20, 114:24, 115:1, 115:9, 115:11, 117:8, 119:10, 119:16, 120:3, 120:5,

122:22, 123:14, 125:19, 126:4, 126:5, 126:6, 126:7, 126:17, 126:19, 126:21, 126:24, 127:2, 127:16, 127:19, 132:3, 132:9, 132:12, 132:14, 132:16, 134:23, 134:24, 136:19, 137:22, 139:6, 139:8, 139:11, 139:19, 139:22, 140:1, 140:14, 140:23, 141:1, 141:2, 141:5, 141:6, 141:15, 141:17, 141:21, 142:9, 142:13, 143:12, 143:16, 144:10, 144:15
**theirself** [3] - 129:12, 133:23, 134:8
**themselves** [3] - 94:17, 123:24, 143:15
**therapy** [2] - 58:15, 58:16
**they've** [2] - 142:20, 143:17
**third** [12] - 60:9, 61:2, 61:4, 61:6, 61:9, 61:10, 71:24, 137:19, 138:5, 138:8, 138:11, 138:19
**third-day** [2] - 138:5, 138:11
**Thomas** [1] - 1:18
**thomas** [1] - 1:20
**thoughts** [1] - 62:12
**threaded** [1] - 54:12
**three** [8] - 59:25, 60:2, 62:10, 91:23, 118:24, 124:9, 124:11, 131:11
**three-day** [2] - 60:2, 118:24
**throw** [1] - 138:22
**tied** [4] - 135:4, 135:7, 135:9, 135:14
**timely** [3] - 9:24, 136:16, 136:23
**today** [1] - 113:3
**toes** [1] - 104:8
**together** [3] - 80:21, 124:14, 133:24
**tone** [1] - 130:5
**took** [4] - 62:17, 94:22, 116:20, 144:7

**top** [4] - 74:18, 74:20, 84:14, 95:1
**touch** [4] - 74:23, 75:2, 77:15, 77:17
**touched** [1] - 74:25
**toward** [2] - 100:1, 100:19
**towards** [3] - 77:10, 82:22, 82:24
**trafficked** [1] - 109:16
**training** [1] - 89:14
**transcript** [2] - 145:4, 145:6
**TRANSCRIPT** [1] - 1:8
**transmitted** [1] - 91:14
**traveled** [1] - 139:3
**treatment** [16] - 79:11, 79:15, 79:16, 79:24, 85:24, 99:3, 102:4, 102:7, 104:16, 110:17, 110:20, 136:16, 136:23, 138:6, 138:18, 138:20
**treatments** [3] - 105:5, 105:7, 105:10
**triaging** [1] - 109:6
**trial** [1] - 144:21
**TRIAL** [1] - 1:4, 1:8
**tried** [6] - 63:24, 71:13, 76:5, 85:6, 85:14, 128:3
**true** [2] - 145:4, 145:5
**truth** [1] - 126:23
**try** [2] - 7:8, 124:14
**trying** [34] - 7:4, 7:10, 53:19, 55:18, 56:1, 62:6, 62:11, 62:19, 63:2, 64:3, 66:17, 76:13, 76:23, 77:12, 83:15, 84:23, 100:21, 100:22, 121:16, 121:18, 121:20, 122:7, 122:15, 122:18, 123:17, 123:18, 123:22, 123:23, 124:13, 124:14, 124:16, 124:23, 125:4, 138:25
**Tuesday** [1] - 110:4
**Tupelo** [1] - 1:21
**two** [19] - 9:13, 55:24, 62:10, 64:1, 67:8, 67:9, 68:4, 69:12, 71:12, 74:3, 77:23, 79:9, 81:5, 81:24, 82:20, 85:12, 91:23, 111:14, 142:1
**type** [7] - 62:2, 91:16,

101:22, 109:11, 124:22, 125:3, 125:5

# U

**U.S** [1] - 1:12
**ultimately** [2] - 59:15, 63:21
**unable** [3] - 136:15, 136:23, 137:4
**under** [2] - 91:9, 142:8
**understood** [2] - 90:13, 90:14
**UNITED** [3] - 1:1, 1:2, 1:9
**United** [3] - 2:22, 4:4, 4:10
**unless** [2] - 68:12, 68:24
**unlock** [2] - 118:19, 120:16
**unlocked** [3] - 110:21, 118:21, 118:22
**unsure** [1] - 120:23
**unusual** [6] - 96:15, 112:15, 113:17, 117:21, 117:23, 141:23
**unwilling** [1] - 67:5
**up** [45] - 7:1, 7:4, 8:6, 8:9, 8:15, 8:16, 8:18, 8:24, 51:23, 52:3, 55:16, 55:19, 57:25, 61:10, 61:11, 65:25, 69:10, 74:24, 75:17, 79:7, 81:3, 81:4, 83:17, 87:21, 88:3, 98:8, 98:10, 106:19, 106:24, 107:16, 113:1, 113:3, 116:16, 117:20, 120:3, 123:8, 129:12, 130:3, 133:15, 133:23, 134:8, 134:23, 135:14, 137:10
**upper** [1] - 94:2
**ups** [1] - 77:14

# V

**VA** [1] - 2:11
**value** [2] - 55:5, 55:22
**via** [1] - 95:9
**victims** [1] - 109:15
**video** [54] - 54:7, 54:8, 54:17, 55:15, 64:15, 64:16, 65:5, 65:7, 65:16, 65:22, 67:24, 68:21, 68:24, 69:4,

69:8, 73:14, 74:11, 74:15, 75:7, 75:21, 76:16, 78:13, 80:1, 80:14, 81:11, 84:6, 85:17, 85:22, 99:9, 100:4, 100:14, 101:2, 101:10, 119:12, 119:21, 120:11, 120:15, 124:1, 124:18, 125:8, 125:24, 127:14, 128:25, 129:14, 129:22, 130:12, 131:7, 131:11, 132:17, 132:22, 133:3, 133:7
**Video** [34] - 74:12, 75:22, 76:17, 78:15, 78:20, 81:12, 82:8, 83:2, 84:7, 84:12, 85:2, 85:18, 97:12, 99:6, 99:15, 100:5, 100:15, 101:9, 120:8, 120:17, 121:3, 124:2, 124:19, 125:10, 127:15, 129:2, 129:15, 130:13, 131:8, 132:19, 133:4, 134:12, 134:25, 135:18
**videos** [4] - 62:22, 67:9, 68:4, 70:22
**Virginia** [1] - 95:10
**visitors** [1] - 7:13
**visits** [3] - 73:24, 74:3, 81:1
**vital** [3] - 89:22, 91:10, 133:12
**voice** [9] - 81:14, 81:16, 81:17, 84:11, 107:4, 107:16, 120:3, 125:19, 134:23
**volume** [1] - 81:25
**vs** [1] - 1:4

# W

**wait** [7] - 53:8, 53:19, 57:8, 79:20, 88:10, 107:8, 141:8
**waited** [1] - 128:18
**waiting** [33] - 55:20, 76:20, 79:20, 97:19, 97:25, 98:18, 105:12, 110:13, 110:14, 110:24, 111:2, 111:25, 112:20, 118:12,

118:13, 119:18, 119:23, 121:6, 121:13, 124:6, 124:24, 128:7, 128:20, 129:8, 130:7, 130:21, 131:12, 131:16, 133:21, 134:5, 134:17, 135:5, 138:16
**waiting/reception** [1] - 72:10
**walk** [11] - 8:15, 60:16, 63:2, 63:10, 63:18, 63:20, 64:2, 76:20, 110:14, 123:11, 123:15
**walk-in** [2] - 123:11, 123:15
**walked** [4] - 62:7, 63:7, 113:1, 131:12
**walking** [4] - 62:10, 63:6, 63:7, 63:9
**walks** [1] - 109:13
**walkway** [2] - 63:9, 63:10, 63:18
**wall** [4] - 8:16, 71:25, 77:8, 81:4
**WALSH** [5] - 2:8, 5:4, 86:24, 106:1, 106:4
**Walsh** [4] - 5:4, 87:8, 105:25, 106:3
**wants** [1] - 53:5
**Washington** [23] - 1:5, 1:13, 1:16, 1:25, 2:4, 2:23, 59:7, 59:9, 59:15, 60:3, 89:8, 90:19, 90:24, 91:5, 94:19, 97:19, 98:19, 99:3, 99:11, 100:11, 108:18, 108:21, 145:11
**watching** [2] - 131:19, 142:20
**water** [1] - 6:21
**wear** [1] - 116:20
**wearing** [2] - 74:17, 115:3
**website** [1] - 95:9
**wedge** [2] - 123:23, 135:14
**wedged** [2] - 112:23, 112:24
**week** [2] - 5:18, 110:3
**weeks** [1] - 94:24
**welcome** [2] - 100:24, 100:25
**whole** [7] - 7:23, 64:2, 66:16, 67:17, 67:19, 68:11, 79:21, 83:16,

84:23
**WILLIAM** [2] - 1:6, 2:8
**William** [2] - 4:5, 5:2
**willing** [1] - 8:10
**window** [24] - 77:4, 77:15, 79:8, 79:18, 84:15, 84:23, 85:23, 98:6, 110:16, 118:4, 128:11, 129:18, 130:16, 130:21, 133:17, 133:20, 133:24, 137:14, 138:10, 138:15, 138:16, 138:22, 138:23, 138:25
**wish** [4] - 7:20, 9:19, 86:25, 142:24
**Witness** [1] - 106:11
**WITNESS** [25] - 3:2, 57:4, 57:16, 61:14, 74:25, 75:4, 82:3, 82:6, 82:24, 87:15, 88:6, 88:17, 101:7, 106:10, 107:6, 107:15, 107:18, 115:1, 120:5, 126:5, 126:7, 134:24, 139:19, 141:1, 141:5
**witness** [31] - 7:24, 52:2, 52:13, 55:19, 56:15, 56:22, 66:22, 68:21, 70:2, 72:24, 73:2, 75:4, 77:19, 87:13, 87:16, 87:17, 87:18, 87:25, 93:9, 97:11, 103:4, 106:12, 106:21, 115:12, 117:5, 122:20, 127:17, 141:9, 141:11, 141:17, 143:11
**witnesses** [8] - 5:17, 5:20, 6:18, 7:21, 51:22, 108:8, 141:14, 141:16
**woman** [7] - 64:6, 64:9, 74:17, 75:8, 75:10, 84:14, 134:2
**woman's** [1] - 83:4
**women** [11] - 75:12, 82:21, 109:9, 109:13, 109:17, 121:22, 122:17, 123:19, 126:11, 134:3, 138:19
**women's** [2] - 59:8, 73:19
**wondering** [2] - 8:21, 8:22
**wooden** [1] - 106:18

**word** [5] - 52:24,
  57:10, 88:13,
  107:11, 126:12
**words** [1] - 54:23
**worker** [3] - 79:9,
  99:13, 100:2
**workers** [2] - 99:11,
  100:11
**worn** [1] - 65:6
**wrap** [1] - 10:4
**write** [2] - 94:12,
  109:24
**writing** [1] - 109:24

## Y

**year** [3] - 58:17, 58:18,
  108:24
**years** [2] - 58:13,
  58:24
**yelling** [7] - 61:20,
  83:20, 122:1,
  137:18, 139:1,
  139:14, 140:3
**yellow** [1] - 74:25
**yesterday** [1] - 8:12
**you-all** [3] - 7:19,
  7:21, 53:17
**young** [1] - 125:23
**yourself** [12] - 4:7,
  56:25, 58:7, 59:20,
  78:24, 82:10, 89:4,
  106:24, 107:25,
  108:13, 130:16,
  130:25

## Z

**zero** [2] - 95:13, 95:21