```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
       UNITED STATES OF AMERICA,      )  Criminal Action
 3                                    )  No. 1:22-CR-096
                        Plaintiff,    )
 4                                    )  JURY TRIAL
       vs.                            )
 5                                    )  Washington, D.C.
       LAUREN HANDY, JOHN HINSHAW,    )
 6     HEATHER IDONI, WILLIAM         )  August 24, 2023
       GOODMAN, HERB GERAGHTY,        )  Time:  9:20 A.M.
 7                                    )  MORNING SESSION
                        Defendants.   )
 8
              TRANSCRIPT OF JURY TRIAL - MORNING SESSION
 9           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                   UNITED STATES DISTRICT JUDGE
10
                       A P P E A R A N C E S
11

12     For Plaintiff:      JOHN CRABB, JR.
                           U.S. Attorney's Office
13                         601 D Street NW
                           Washington, DC 20530
14
                           SANJAY HARIVADAN PATEL
15                         DOJ-CRT
                           Civil Rights Division, Criminal Section
16                         950 Pennsylvania Avenue NW
                           Washington, DC 20004
17
       For Defendant       MARTIN A. CANNON
18     LAUREN HANDY:       Thomas More Society
                           16983 370th Street
19                         Carson, IA 51525

20                         STEPHEN M. CRAMPTON
                           Thomas More Society
21                         P.O. Box 4506
                           Tupelo, MS 38803
22
                           DENNIS E. BOYLE
23                         BLERINA JASARI
                           Boyle & Jasari, LLP
24                         1050 Connecticut Avenue
                           Suite 500
25                         Washington, DC 20036
```

A P P E A R A N C E S - (Cont.)

```
 1

 2

 3   For Defendant          ALFRED GUILLAUME, III
     JOHN HINSHAW:          Law Offices of Alfred Guillaume, III, LLC
 4                          1350 Connecticut Avenue NW
                            Suite 308
 5                          Washington, DC 20036

 6   For Defendant          ROBERT J. DUNN
     HEATHER IDONI:         Robert J. Dunn, PC
 7                          1413 Center Avenue
                            Bay City, MI 48708

 8   For Defendant          HOWARD J. WALSH, III
     WILLIAM GOODMAN:       3712 Cardiff Court
 9                          Chevy Chase, MD 20815

10   For Defendant          JOHN C. KIYONAGA
     HERB GERAGHTY:         600 Cameron Street
11                          Alexandria, VA 22314

12

13

14

15

16

17

18

19

20   Stenographic Court Reporter:

21                          Tamara M. Sefranek, RMR, CRR, CRC
                            Official Court Reporter
22                          United States Courthouse, Room 6714
                            333 Constitution Avenue, NW
23                          Washington, DC  20001
                            202-354-3246
24

25
```

1                    I N D E X

2    CLOSING ARGUMENT                                    PAGE

3    By Mr. Crabb                                        12

4    By Mr. Cannon                                       41

5    By Mr. Guillaume                                    62

6    By Mr. Dunn                                         78

7    By Mr. Kiyonaga                                     91

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              (The following proceedings were had out of the

3    presence and hearing of the jury:)

4              THE COURT:  Good morning, everyone.  All right.

5    Let's call the case.

6              THE COURTROOM DEPUTY:  Criminal Case 22-096, the

7    United States v. Lauren Handy, John Hinshaw, Heather Idoni,

8    William Goodman, Herb Geraghty.

9              Counsel, would you please identify yourself for the

10   record, starting with the government.

11             MR. CRABB:  Good morning, Your Honor.  John Crabb and

12   Sanjay Patel for the United States.

13             THE COURT:  Good morning.

14             MR. CANNON:  Good morning.  Martin Cannon, appearing

15   with Steve Crampton, Dennis Boyle, and Lauren Handy.

16             THE COURT:  All right.  For Mr. Hinshaw.

17             MR. GUILLAUME:  Good morning, Your Honor.  Alfred

18   Guillaume for Mr. John Hinshaw, who is seated at trial [sic]

19   table.

20             Your Honor, I have a brief request of the Court.  I

21   don't know if you want me to make it now or wait until everyone

22   introduces themselves.  It's with respect to closing arguments.

23             THE COURT:  In terms of -- okay.  All right.  For

24   Ms. Idoni.

25             MR. DUNN:  Robert Dunn appearing for Heather Idoni,
```

1    who is present in the courtroom.

2            THE COURT:  All right.  Good morning.  Mr. Goodman.

3            MR. WALSH:  Good morning, Your Honor.  Howard Walsh

4    on behalf of Mr. Goodman, who is seated here with me.

5            THE COURT:  Good morning.

6            MR. KIYONAGA:  Good morning, Your Honor.  John

7    Kiyonaga for Mr. Geraghty, who is present.

8            THE COURT:  All right.  Good morning, all of you.  I

9    sent you a verdict form.  We can talk about it at a later

10   point.  The jury is here.  I want to make sure we can do our

11   closing arguments and get them all done today.

12           We do have an overflow courtroom; it's No. 19.  We've

13   set up that before.  We had stopped it because we had room in

14   here.  But if there's anybody additionally that needs to go

15   anyplace, we do have another place that they can watch on the

16   video.

17           If there's something related to the -- how we're

18   going to go about the closings -- Mr. Guillaume, is that what

19   it is or something else?

20           MR. GUILLAUME:  Yes, Your Honor.  Just very briefly.

21           THE COURT:  Sure.

22           MR. GUILLAUME:  Your Honor, my understanding is that

23   Mr. Cannon is not going to use technology for his opening.  I

24   am.  So I was hoping that maybe the Court could take a brief

25   break between -- after Mr. Cannon's.  Because I think the

1    government would go, Mr. Cannon would go, then I would go,

2    because I'm second on the indictment; just so I can have a

3    chance to set up, and I'm not bumbling around.

4            THE COURT:  Not a problem.

5            MR. GUILLAUME:  Thank you.

6            THE COURT:  What I can do, depending -- what I plan

7    on doing is having the government go, and then if you --

8    whoever is going to argue for Ms. Handy, and then take a

9    break at -- I'll do breaks at points or they're not going to

10   pay attention to the argument.

11           MR. CANNON:  Of course, I have no objection to his

12   request, but I do plan to use at least the ELMO.

13           THE COURT:  Okay.  That's fine.  Not a problem.

14           MR. CANNON:  I'm not sure if that qualifies as

15   technology.  It's pretty old.

16           THE COURT:  It does.  It still works.  Mr. Dunn?

17           MR. DUNN:  Your Honor, may I address the verdict form

18   that we got this morning?

19           THE COURT:  Not right now.  We're going to have time

20   to -- because we're not going to be -- the likelihood of doing

21   jury instructions at the end of the day is pretty slim.  If we

22   do, certainly, we'll talk about the verdict form.

23           They've been waiting.  I'd rather get moving on the

24   closings, unless there's something about the verdict form that

25   is a problem for your closing.

```
 1              MR. DUNN:  Yes.  The only problem with not addressing

 2    it now is, if it does change later, perhaps some of the

 3    arguments that may be addressing the verdict form wouldn't be

 4    correct.

 5              THE COURT:  Okay.  So tell me what the problem is.

 6              MR. DUNN:  The statute elevates the six-month

 7    misdemeanor to the one-year misdemeanor based upon violent

 8    physical obstruction.  The verdict form simply is between

 9    obstruction and force.

10              THE COURT:  So what would you like to suggest in

11    terms of a difference?

12              MR. DUNN:  The jury choice should be between physical

13    obstruction and violent physical obstruction.

14              THE COURT:  Okay.  Do people have an opinion, or do

15    you need to think about it?

16              MR. PATEL:  Your Honor, that's incorrect.  That's a

17    misstatement of what the statute says.

18              The statute penalty provision clearly states that if

19    the conduct in question was exclusively nonviolent physical

20    obstruction, then the maximum penalty is six months.

21              In this case there is an allegation that the

22    defendants used force, so that would clearly take it out of the

23    exclusively nonviolent physical obstruction.  So the special

24    verdict form is correct the way it is.

25              THE COURT:  Okay.  So you have physical -- violent
```

 1   physical obstruction.  I'm not going to decide it right now.

 2   You need to be accurate about it.

 3          I would look at the jury instructions because those

 4   are the words they're going to be told.  They're not going to

 5   be looking at the statute.  Use the jury instructions if you're

 6   going to -- in terms of describing things, and don't go off on

 7   something that we may have a disagreement about, about how to

 8   do it.

 9          MR. DUNN:  Well, I won't talk about this at all as

10   long as -- we're going to address it later, you say?

11          THE COURT:  We'll take a look at what it has.  But it

12   does sound like both of them are using force as a practical

13   matter.  One is supposed to be the force, and the other one is

14   supposed to be a less violent obstruction.

15          MR. DUNN:  See, we get into Sixth Amendment issues

16   regarding the jury deciding the facts that cause an enhancement

17   of the sentence, and we go back to those Supreme Court cases.

18          My concern is, based on that verdict --

19          THE COURT:  Mr. Dunn, let me cut you off at this

20   point.  We're going to get into a long argument.  They are

21   sitting back there patiently.  So let me do this at a later

22   point.

23          MR. DUNN:  Okay.

24          THE COURT:  It's not going to make a difference for

25   the argument, and I will -- they're not going to be deciding

1    misdemeanor and felony.  That's not going to be something that

2    you should talk to them about.  Okay?  They're not going to

3    know that.

4            I will go back and look at the statute, and we'll

5    take a look at it.  All right?

6            Are we now ready to go to the closing arguments?  Can

7    you tell me the pecking order of everybody speaking.

8    Mr. Cannon, are you next?

9            MR. CANNON:  After the government, yes.

10           THE COURT:  Who is after that?

11           MR. GUILLAUME:  I will be, Your Honor.

12           THE COURT:  Mr. Guillaume.  Okay.  Who is going after

13   that?  Are we doing the regular order or a different order?

14           MR. KIYONAGA:  Regular order, ma'am.

15           THE COURT:  All right.  So it would be Mr. Dunn,

16   Mr. Walsh, and Mr. Kiyonaga?

17           MR. KIYONAGA:  Correct, ma'am.

18           THE COURT:  That's fine.  All right.  Let's get the

19   jury in.  Let's get moving.  We're already half an hour late.

20           (The following proceedings were had in the presence

21   and hearing of the jury:)

22           THE COURT:  Good morning, members of the jury.

23           (All say, "Good morning")

24           THE COURT:  So we're going to have closing arguments.

25   We'll start with the government, and then each of the defense

1    counsel can make their argument on behalf of their client, and

2    then the government does have an opportunity to do a rebuttal.

3            Okay.  We will take breaks along the way.  I try and

4    break not in the middle of somebody's closing, but between the

5    closings.  If you need a break, however, don't be hesitant.

6    Put your hand up.  I want to make sure everybody's attention is

7    on the arguments.

8            All right.  Government.

9            MR. CRABB:  Thank you, Your Honor.  Your Honor, may I

10   begin?

11           THE COURT:  Yes.

12           MR. CRABB:  Sorry, Your Honor.  I think we're set

13   now.

14           THE COURT:  Okay.  Go ahead.

15           MR. CRABB:  I apologize, Your Honor.  May we speak to

16   you by the phones for a moment?

17           THE COURT:  Sure.

18           (The following proceedings were had at bench

19   conference out of the hearing of the jury:)

20           THE COURT:  What seems to be happening?

21           MR. CRABB:  Sorry, Your Honor.  It's unclear to me

22   for sure.  We did test it earlier, but there seems to be a

23   problem as soon as it's piped into the system.  Could we please

24   ask John Cramer to come to assist?

25           THE COURT:  He's in Courtroom 19, I believe; the

1   overflow courtroom.  He said he was going to be there this

2   morning.

3            THE LAW CLERK:  Your Honor, would you like me to walk

4   over there to ask him to come here?

5            THE COURT:  Yes.  My law clerk will go there.  We'll

6   call, but we'll also go; see if we can catch him.

7            THE LAW CLERK:  I will do that.  Thank you, Your

8   Honor.

9            MR. CRABB:  I'm sorry, Your Honor.  We tried to test

10  this first.

11           THE COURT:  We had problems.  This is supposed to be

12  the upgrades, but there's problems with upgrades.  Maybe what

13  I'll do is have the jury go back.  There's no point in having

14  them sit here, and we'll get this technology thing going.

15  Thanks.

16           MR. CRABB:  Thank you.

17           (The following proceedings were had in the presence

18  and hearing of the jury:)

19           THE COURT:  As you can see, we have a technology

20  glitch.  So I'm going to have you go back to the -- so you can

21  sit in the jury room in peace.  We're getting somebody to come

22  up and fix it.  Everybody is using some technology; want to

23  make sure it works for everybody going through.

24           Sorry about the delay.  They tried it this morning,

25  as did the court reporter, and then -- I don't know whether the

 1    poltergeists are in here or what, but anyway, we'll come and

 2    get you as soon as we've got it fixed.

 3              (The following proceedings were had out of the

 4    presence and hearing of the jury:)

 5              THE COURT:  Okay.  He was supposed to be in

 6    Courtroom 19, so hopefully we can catch him.  No?

 7              THE LAW CLERK:  No.

 8              THE COURT:  Somebody is going to come; may not be

 9    Mr. Cramer, but somebody from IT.

10              MR. CRABB:  Thank you, Your Honor.

11              (Recess taken.)

12              MR. CRABB:  Thank you, Your Honor.

13              THE COURT:  All right.  You all set?

14              MR. CRABB:  I'm sure it's perfect now.

15              THE COURT:  As long as we can get moving.

16              (The following proceedings were had in the presence

17    and hearing of the jury:)

18              THE COURT:  All right.  I think we're ready to go

19    this time.  We had somebody check.  Mr. Crabb?

20              MR. CRABB:  Thank you, Your Honor.  May I begin?

21              THE COURT:  Yes.

22                          CLOSING ARGUMENT

23                            BY MR. CRABB

24              (Video played.)

25              "What are they doing to me?  What are they doing to

 1      me?"  You heard those words, those scared, anguished words a

 2      woman uttered on October 22nd, 2020, at the surgi-clinic here

 3      in Washington, D.C.  What were they doing to her?

 4              They were trying to stop her from exercising her

 5      rights.  They were trying to obstruct her access to

 6      reproductive health services.

 7              The defendant, Ms. Handy, she organized it, she

 8      planned it.  Ms. Idoni blocked the entrance that the employees

 9      go into.  Mr. Goodman was right there with Ms. Idoni blocking

10      that entrance.  Mr. Hinshaw in the back was roped and chained

11      to others blocking the entrance to the treatment area.  And

12      Mr. Geraghty, one of the first ones in, helped plan it, helped

13      block.  These five defendants tried to block Ashley Jones'

14      access to reproductive health care.

15              This conspiracy began in the fall of 2020.  The

16      defendants and the other co-conspirators planned their crime

17      carefully; their scheme to block access to reproductive health

18      services, their scheme to interfere with others' rights, their

19      scheme to take over the clinic.  They met in person to organize

20      the scheme and plan this conspiracy.  They communicated by

21      text.  They used social media.  They planned each detail, and

22      they worked together.

23              In fact, this conspiracy was hatched on social media.

24      Remember this message from Jonathan Darnel to Lauren Handy,

25      September 2020:  "If you've figured out how to incorporate

1    telephone calls to the Zoom, make sure you mention that on the

2    invite.  Also, I would use the word rescue."

3          Remember, ladies and gentlemen, what does the word

4    rescue mean?  You know from several sources.  Primarily, you

5    know from Caroline Davis, who testified here before you.  She

6    was a member of this conspiracy.

7          Rescue means to go to a clinic that provides

8    reproductive health services and block women's access.  From

9    the beginning, they labeled this a rescue.

10          They talk about civil disobedience.  Not too many

11    people understand what is meant by direct action, but the idea

12    of deliberately breaking the law is sexy.  The idea of

13    deliberately breaking the law is sexy.  So any of this business

14    you might have heard from Ms. Handy, from Ms. Idoni, from

15    Mr. Geraghty that this wasn't about breaking the law, from the

16    beginning that was baked in.  That's what this was about.

17          Ms. Handy began to recruit others.  When

18    Judge Kotelly instructs you later, she'll tell you that in the

19    conspiracy everyone doesn't have to be there at the beginning;

20    others can join as it goes along.  Mr. Darnel and Ms. Handy

21    began things, but others began to join.  You know this.  They

22    actually talked about people joining.

23          Here's the message, the texts, to Ms. Handy, sent to

24    Mr. Geraghty in the fall of 2020 while they were planning this

25    conspiracy.  Ms. Handy told Mr. Geraghty, "There are people

1    coming from Michigan, from New York, from Boston."  Others

2    would join in this conspiracy as it formed in the fall of 2020.

3            While Ms. Handy was planning the conspiracy, she kept

4    her co-conspirator, Jonathan Darnel, the man who started this

5    scheme with her, the man you saw who was live streaming on

6    October 22, 2020, she kept him up to date on what they were

7    doing.  You remember this series of messages between Ms. Handy

8    and Mr. Darnel.  Look at the first one.

9            "Will" -- that's a reference to Defendant William

10   Goodman.  "Will, Matt, and Patty want to risk arrest."  You've

11   heard about that.  Risk arrest, that means blocking access to

12   the clinic.

13           Look at the next message.  "Also, Joan has two people

14   who might risk arrest."  You know who Joan is.  That's Joan

15   Bell, one of the co-conspirators; a woman you saw, actually,

16   block the access in the waiting area of the surgi-center.

17           Then the message on the bottom of the page, "I'm

18   calling Heather" -- that's a reference to Defendant Heather

19   Idoni -- "and seeing if there's any updates from her because I

20   think she's been trying to get people to block."

21           I think she's been trying to get people to block.

22   Think about what this tells you, ladies and gentlemen.  This

23   tells you Ms. Handy is organizing this conspiracy.  She's

24   recruiting others to join her, Mr. Goodman, Joan Bell, Heather

25   Idoni.  And what are they planning to do?  What are people

1    joining Ms. Handy to do?  To block the clinic.

2          Ms. Handy left nothing to chance.  She planned this

3    scheme to block the clinic carefully.  Remember something she

4    did.  She made a fake appointment.  She called the

5    surgi-clinic.  She told them her name was Hazel Jenkins.  She

6    made an appointment for October 22nd, 2020, at 9:00.

7          Think about that.  One, it tells you how much thought

8    and planning went into this.  Also, ask yourself, if Ms. Handy

9    wanted to go to the surgi-center, stand out on the sidewalk, if

10   she wanted to protest, would she need an appointment, a fake

11   appointment, to try to get in?  Of course not.  This was part

12   of the scheme to invade the clinic; to go inside and block

13   women's access.

14         People came from around the country to join

15   Ms. Handy's conspiracy.  You've heard people came from

16   Michigan, Boston, New York.  You heard from Caroline Davis who

17   testified here.  You heard Ms. Davis was involved in this

18   conspiracy.  She was involved in this movement.

19         You heard that she pleaded guilty in court in

20   Michigan and agreed to come here and testify.  And she told

21   you -- she gave you an insider's view of how this worked.  The

22   first thing she told you, she was in Michigan in the fall of

23   2020.  She was with Ms. Idoni.

24         They got in a car and with a third person drove all

25   the way from Michigan here to Washington.  Ask yourself, why

1    did they do that?  Did they come here to Washington to meet and

2    have some snacks?  Unlikely.  You heard they came here to meet,

3    to plan the conspiracy.  They met on the evening of

4    October 21st, the night before they took over the clinic.

5            Remember what you know about the night of

6    October 21st.  There's this message.  The day before, Jonathan

7    Darnel, the man who is out there live streaming the conspiracy

8    as it happens, forwarded this message to Lauren Handy.  "It's

9    set up."  They have a place to meet the evening before to plan

10   it.

11           Look what this person said.  "We are very excited

12   about having you and the rescuers over tomorrow."  Again, you

13   and the rescuers over.  Everything you see shows you what this

14   was about.  This was a meeting with the rescuers.

15           And you heard from Ms. Davis, they met on the evening

16   of October 21st somewhere here in the Washington area.  She's

17   not familiar with the area; she didn't know precisely where,

18   but they met.  They talked about what they were going to do.

19   They talked about how they would block the clinic.

20           They talked about different walls; people had

21   different ideas.  Some people wanted to bind themselves with

22   chains and ropes.  Some people wanted to go limp.  You heard

23   about that as a method.  You go limp.  It takes longer for the

24   police officers to move you.  That means the clinic is shut

25   down longer.

1    There were different methodologies discussed.  But

2    what you know is, the goal was the same; one goal.  Going to

3    the Washington Surgi-Center [sic] the morning of October 22nd,

4    2020; block access.  That's what they were there to do.  That's

5    what they talked about that night.

6    Remember what else Ms. Davis told you.  Everyone went

7    their separate ways, went to bed that night.  The next morning

8    they got up, they drove here to Washington, D.C.  They parked

9    somewhere near the surgi-center.

10   They went through a final run-through; went through

11   the plans; made sure they had the ropes and chains.  The ropes

12   and chains that that man, William Goodman, carried into the

13   clinic.  You saw the video from the hallway.

14   This group, before they took over the clinic, stopped

15   and took a selfie of each other.  They were all there.

16   Remember, Mr. Hinshaw in the back waving.  They took their

17   selfie, they marched to the clinic, they went inside, and they

18   took it over.

19   Let's stop here a moment and talk about the

20   Washington surgi-center.  You know it's a medical facility

21   located at 2112 F Street here in the District of Columbia.

22   It's on the fourth floor of a building.  You've seen the

23   videos.  You know the layout.

24   You come off the elevators, there's an entrance into

25   the clinic.  You go in, there's a waiting area.  There's a

1    receptionist's window.  There's a door to go back to the

2    treatment area.  You also know that if you go down the hall,

3    there's another entrance; the entrance that the employees use.

4         You also know that on the morning of October 22nd,

5    2020, there were three employees at the surgi-center:  Sasha

6    Proctor, Sara Compton, Tina Smith.  All three of those women

7    work at the surgi-center; all three of those women were there

8    that morning; all three of those women came here -- came right

9    here, took an oath, and told you what happened that morning.

10        Remember what they told you.  Ms. Handy led the

11   conspirators in.  Remember what Sasha Proctor said.  When she

12   came to work that morning and got on the fourth floor, she

13   noticed something odd.  She noticed the door to the fire escape

14   was open.

15        You know now what Ms. Proctor didn't know then.  What

16   you know is that Mr. Geraghty and others were hiding in the

17   stairwell waiting to take over the clinic.  But what

18   Ms. Proctor knew was, one, the fire escape door was open, which

19   she found odd.

20        And, two, she encountered this woman, Lauren Handy,

21   who identified herself as Hazel Jenkins -- that's the name on

22   the appointment card you just saw -- and said she had her

23   appointment at 9:00.  That's what Ms. Proctor told you.

24        Ms. Proctor went in.  About the same time that

25   Ms. Proctor had this encounter with Ms. Handy in the hallway

1    outside the surgi-center, Jonathan Darnel made a post.  He

2    posted this right about the same time that Lauren Handy, a/k/a

3    Hazel Jenkins, had run into Sasha Proctor.  "Starting soon.

4    Tune in."  That's how well-organized this conspiracy was.

5          In real time Jonathan Darnel was telling the world

6    what they were doing.

7          You know what happened next, ladies and gentlemen.

8    You've seen it with your own eyes.  Lauren Handy and others, at

9    first it was her co-conspirator, Mr. Smith -- they forced their

10   way into the clinic.  Remember what Sasha Proctor told you.

11   She went to the door to open it for patients.  Two patients got

12   in.  And Lauren Handy led the others as they forcibly entered.

13          (Video played.)

14          MR. CRABB:  You saw that, ladies and gentlemen.

15   Sasha Proctor opened the door and all hell broke loose.  First,

16   it was Ms. Handy and Smith; they came through.  Then the others

17   followed in.  Mr. Geraghty came in.  You see Mr. Hinshaw come

18   in.  You see Mr. Goodman come in.  You see Ms. Idoni come in.

19   And the other conspirators you've heard about, Joan Bell, Jean

20   Marshall, Paulette Harlow, they all came in.  You saw what

21   happened.

22          First, Sara Compton, one of the women you heard

23   from, rushed across the reception area, the waiting room to try

24   to help her colleague.  She was pushed so hard, you heard she

25   sprained her ankle.  She had to wear a walking boot and use

1    crutches for several days.

2              You also saw Tina Smith, who testified here, went to

3    assist her colleagues.  She brought a broom to try to stop

4    these people and their co-conspirators from coming into their

5    clinic to shut it down.  But you saw the staff was overwhelmed,

6    they couldn't keep the defendants and the other co-conspirators

7    out of the reception area.

8              So they came in, they began to blockade the facility.

9    You saw that happen.  They moved chairs, they took those green

10   leather chairs; they moved them across the reception area.

11   They moved them to block the door that led to the treatment

12   area.

13             Ms. Harlow, the woman who was on the ground, she got

14   up, and with others she began to bind herself with chains.

15   Mr. Hinshaw, sitting back there against the wall, you saw he

16   went and sat in a chair right in front of the door that led to

17   the treatment area, and he bound himself to Ms. Harlow, to

18   Ms. Bell, and to Mr. Smith so no one could get through.

19             That is a physical obstruction.  That also shows you

20   that the defendants and others were working together.  They

21   planned this.  That's the conspiracy.

22             They didn't just physically obstruct.  They also

23   worked to intimidate patients.  You heard, you saw, they

24   harangued patients, they yelled at patients, they screamed at

25   patients.  You saw one of the defendants' co-conspirators

1    scream at Ashley Jones.  She screamed, "Welcome, welcome to the

2    adult world."  That, ladies and gentlemen, is intimidation.

3          About the same time that Mr. Hinshaw and others were

4    blocking the entrance to the treatment area, Mr. Goodman, the

5    man who came into the back with chains, Ms. Idoni, they walked

6    out of the clinic, went down the hall; they didn't leave.  They

7    walked right down the hall and stood in front of the employee

8    entrance and blocked the employee entrance.  They wouldn't let

9    anyone in that way.  That is another example of a physical

10   obstruction.

11         As soon as Ms. Handy and her co-conspirators had

12   successfully breached the clinic, taken over the clinic and

13   blocked access to the clinic's facilities, what did Ms. Handy

14   do?  She made this post right here that you see shortly after

15   9:00 on the morning of October 22nd.  And what she said is

16   important.

17         Look at what she said.  "Traditional lock-and-block

18   rescue."  She announced to the world they were in a

19   lock-and-block.  They weren't there to just talk to people.

20   They were there to block in a traditional fashion, and it was a

21   "rescue"; the same word you hear over and over; the word that

22   she and Mr. Darnel used in the first post we looked at earlier;

23   the same word that Ms. Davis explained to you what that means.

24   This is clear what this was about.

25         And do you remember this business that when --

1    Ms. Handy tried to tell you when she testified that the only

2    reason she was at the clinic is that she has some theory that

3    there were murders happening, somehow -- I think she calls it

4    live-birth abortions.  And she told you right there under oath,

5    that's the only reason she was there.

6         But what does she say in real time?  What did she say

7    when it was happening?  She was there to stop the killing of

8    preborn, to stop abortions.  So ask yourself.  Do you believe

9    what Ms. Handy said in real time to the world or what she came

10   here and told you?  Think about that.

11        Now, shortly after Ms. Handy made that post, you saw

12   what happened next.  Metropolitan Police officers arrived on

13   the scene.  You met Officer Whyte.  He came here and testified.

14   He was one of the first officers on the scene.  He was wearing

15   a body-worn camera, and he actually filmed his encounter with

16   Ms. Handy.  You saw that here in court.

17        And Ms. Handy said to Officer Whyte some very

18   important things that morning on tape.  You've seen it.  You'll

19   have access to it again if you'd like.  Remember some of the

20   things that Ms. Handy said to Officer Whyte.

21        She said -- and I quote -- "Today we're doing a

22   rescue."  Those were her words.  She said to Officer Whyte,

23   "It's an abortion facility on the fourth floor."  An abortion

24   facility.  She said, "Today people are blocking it."  She told

25   Officer Whyte, "Do not allow people to go inside."  And,

1    finally, she said to Officer Whyte, "Basically, to stop

2    abortions today."

3          Ms. Handy told you through that video why she and the

4    others were there and what October 22nd, 2020, was all about.

5          Now, after Officer Whyte spoke to Ms. Handy for a few

6    minutes, he and his colleagues went upstairs.  You saw they got

7    in the elevator, they went up to the fourth floor.  They

8    encountered Mr. Hinshaw and others who were blocking the

9    reception area.  They encountered Ms. Idoni and Mr. Goodman who

10   were blocking the employee entrance.

11         The officers were calm.  They were professional.  You

12   saw them.  They tried to get Mr. Hinshaw to move.  He refused.

13   You see he's sitting in front of the door; he wouldn't let Tina

14   Smith out -- you saw that on video -- despite Officer Whyte

15   asking him to move.

16         You saw Officer Whyte walk down the hall and ask

17   Ms. Idoni to move.  She refused to move from where she was,

18   blocking the employee entrance into the clinic.

19         Now, at about this same time, other patients began to

20   arrive.  Ashley Jones, who you met, the first witness in this

21   trial; you heard from Ms. Jones.  She said she arrived that

22   morning for her appointment.  It was the third day in her

23   three-day process, and it was very different from the prior

24   days.

25         The first two days she'd come in, no problem.  She

1    told you, when she arrived October 20th -- excuse me --

2    October 22nd, she was accosted from the beginning.  It was hard

3    for her to actually get in the building.  Then when she got to

4    the fourth floor, she was blocked from getting into the

5    reception area.  You've seen this video.

6          She went back out into the hall.  She was blocked by

7    Ms. Idoni and Mr. Goodman from getting into the employee

8    entrance.  You saw her pace around in the hall.  She was

9    blocked.  Then you know what happened.

10          Ms. Jones went back into the clinic, into the

11    reception area.  She was so desperate to get her treatment --

12    the treatment she needed, the treatment that's her legal right

13    to have that these defendants were blocking -- that she pulled

14    a chair up to the reception window.  She climbed up on the

15    chair, then she climbed through the reception window.  That's

16    the only way she could get access to her treatment that day

17    because of these defendants' actions.

18          You met another patient who arrived about this same

19    time, a woman named Shampy Holler.  She came here and testified

20    to you.  Ms. Holler told you that she and her husband

21    desperately wanted another child but, tragically, they learned

22    that her pregnancy had serious complications.  They made --

23    Ms. Holler and her husband -- the heartrending decision that

24    they had to terminate that pregnancy.

25          They came here to Washington, D.C.  Ms. Holler came

1    here for the abortion she did not want, but that she needed.

2    And what happened when she got here?  These defendants and

3    their co-conspirators blocked her from getting that treatment.

4    You saw what happened.  She was in so much pain, she collapsed

5    on the floor.

6              (Video played.)

7              MR. CRABB:  You see, that's Mr. Geraghty.

8              (Video played.)

9              MR. CRABB:  You know where Mr. Geraghty stands; his

10   back's at the main entrance to the clinic.

11             MR. KIYONAGA:  Objection, Your Honor.  That's not

12   what it shows.  He's standing against the wall.  It's

13   misstating the evidence, ma'am.

14             THE COURT:  The jury can decide what it is.  We've

15   had testimony as to the location.

16             (Video played.)

17             MR. CRABB:  Ladies and gentlemen, you can see to the

18   right the legs; you know those are Ms. Holler's legs.  You see

19   Mr. Geraghty interacting with her and her husband.  That's

20   Ms. Holler.  She just collapsed in pain.

21             Would you pause, please.

22             Ms. Holler just collapsed in pain in the hallway

23   outside the clinic because she wasn't allowed access by

24   Mr. Geraghty and his co-conspirators.

25             Now, do you remember what Mr. Geraghty told you about

1    this interaction, about what he said to Ms. Holler as she

2    collapsed in pain on the floor?  He sat right here and told you

3    that he told Ms. Holler, "They aren't performing abortions

4    today in there right now."  And that she should go to the

5    emergency room.  He told her they're not providing the service

6    that she came for, and she should go to the emergency room; the

7    audacity of that.

8          They weren't providing the service because he and his

9    co-conspirators were blocking it.  Think about the audacity of

10   Mr. Geraghty's statement to Ms. Holler.

11         Mr. Geraghty and his co-conspirators ended up

12   blockading the clinic for about three hours.  Finally,

13   Metropolitan Police officers were able to clear the clinic.

14   You know what it took; you saw the video.  They had to actually

15   cut bike locks off of Jean Harlow [sic] and Joan Bell's neck.

16   They had to actually take the chains and the ropes from

17   Mr. Hinshaw.

18         But, finally, after the clinic had been closed for

19   about three hours, MPD was able to clear the clinic and arrest

20   the defendants.

21         What this evidence shows you, ladies and gentlemen,

22   is that the defendants and others joined in a conspiracy to

23   obstruct patients' rights and to interfere with their access to

24   reproductive health services.  You know that they did this.

25   You know this from the planning, the meetings, the social

1    media, the meeting that happened right before when they took

2    the selfie.

3              All of this shows you that they met together, they

4    planned, and they agreed.  That, as Judge Kotelly will tell

5    you, is what a conspiracy is all about.

6              But in addition to all of this planning, all of this

7    communication, what you saw on October 20, 2022, [sic] the

8    actions of Ms. Handy, Ms. Idoni, Mr. Goodman, Mr. Hinshaw, and

9    Mr. Geraghty, their actions alone, their coordinated, concerted

10   activity that day, that alone proves to you they were in a

11   conspiracy.

12             (Video played.)

13             MR. CRABB:  The way they interacted, the way they

14   worked, the way they were directed, the way they did their

15   roles, that shows you they had agreed to do this.  Watch.  This

16   is shortly after they breached the clinic and had taken over

17   the waiting room.  Watch.  You see Mr. Goodman, Ms. Handy, Ms.

18   Idoni, Mr. Hinshaw, Mr. Geraghty.  Just this one snapshot shows

19   you how they worked together; that they had an agreement among

20   themselves to shut down that clinic.

21             (Video played.)

22             MR. CRABB:  Watch Ms. Handy begin to give directions.

23   What's she doing?  Look at Mr. Geraghty taking her directions.

24   Mr. Hinshaw moving the chair in front of the door, putting

25   himself there.  Ms. Handy continuing to direct the

1    conspirators.  Ms. Harlow and Ms. Bell chaining themselves.

2    They're showing you this in real time working together.

3           Now, ladies and gentlemen, I'd like to take just a

4    moment to talk to you about the charges in this case.  Now,

5    when we're done with closings, Judge Kotelly will give you

6    instructions.  I'd just like to mention a couple things.

7           One thing I ask of you, when Judge Kotelly is giving

8    you instructions about the offenses in this count, the

9    conspiracy against rights, the obstruction of access to

10   reproductive health services, I ask you, please listen; please

11   see if Judge Kotelly says a single thing about either of these

12   crimes requiring that a police officer give some type of

13   instruction or tell someone to leave or give warnings before

14   the crime is committed.  See if you hear anything like that.

15          Now, you heard from Mr. Geraghty.  Mr. Geraghty seems

16   to think that interfering with women's rights is a big game.

17   He seems to think it's like a game of "Mother, May I."  But

18   listen to Judge Kotelly's instructions and see if there's

19   anything like that in there.

20          Now, Judge Kotelly's instructions are binding.  She

21   will tell you what the law is.  There are just a couple things

22   about that I'd like to discuss with you now.

23          The first count that the defendants are charged with

24   is conspiracy against rights.  When you're thinking about this,

25   please consider what we have to prove to you is that they tried

1    to intimidate and they tried to hinder, interfere, or prevent

2    patients from receiving reproductive health services.

3           Now, when you're thinking about this count, there are

4    a couple things I'd ask you to keep in mind.  Judge Kotelly

5    will tell you that a conspiracy doesn't have to be a formal

6    detailed agreement.  Everyone doesn't have to sit down together

7    and agree to every detail, nor do all the conspirators have to

8    know one another.  She'll tell you that's not necessary.

9           Also -- I think I've mentioned this before -- Judge

10   Kotelly will tell you all the conspirators don't have to join

11   at the same time.  Some are there at the beginning, some can

12   join later.  That's beside the point.  And also, someone can

13   join the conspiracy even if that person has a minor role.

14          One other thing I'd ask you to consider and remember

15   about conspiracies.  As Judge Kotelly has told you, there's no

16   requirement that every conspirator be brought before you in one

17   trial.  That's not required.

18          The second count, you've heard this referred to as

19   the FACE Act; clinic access obstruction.  This requires that

20   the defendants used force or they physically obstructed

21   patients' access to reproductive health care; and Judge Kotelly

22   will define for you what reproductive health services are.

23          It means reproductive health services provided in a

24   hospital or clinic -- that's what you have here -- a

25   physician's office, or other facility.  It includes medical,

1    surgical, counseling, or referral services relating to the

2    human reproductive system, including services relating to

3    pregnancy or the termination of a pregnancy.

4             You have evidence that shows you beyond any doubt

5    reproductive health services were being offered at the

6    surgi-center on October 22nd, 2020.

7             Now, while you're thinking about this count, there

8    are two things here I'd ask you to keep in mind.  When

9    Judge Kotelly gives you her instructions, she's going to tell

10   you about something called aiding and abetting.  That's aiding

11   and abetting.  And as I've said, Judge Kotelly's instructions

12   are what's binding.

13            But, in summary, what you're going to hear is that if

14   there's a crime committed and someone else helped that person

15   commit the crime, even if that person didn't do each part of

16   the crime himself, if that person helped someone else commit a

17   crime intentionally, that person is just as guilty of the crime

18   because that person is an aider and abettor.  Let's talk about

19   an example.

20            Mr. Geraghty, you saw his activities in the hall with

21   Ms. Holler when she fell -- or, excuse me -- when she passed

22   out in pain on the floor.  When he walked away, when he went

23   back and got Mr. Goodman, when he went back and got

24   Ms. Marshall and they got in her face.  You saw Ms. Marshall

25   actually push her back --

1          MR. KIYONAGA:  There's no evidence that he got

2     Mr. Goodman.  He's misstating the evidence again.

3          MR. CRABB:  That's exactly what the video shows, Your

4     Honor.

5          THE COURT:  All right.  The jury's recollection of

6     the evidence controls, not what either lawyer has to say.

7          Go ahead.

8          MR. CRABB:  So after Mr. Geraghty got Mr. Goodman, he

9     also got Ms. Marshall.

10          You see on the video, after Ms. Holler slumped to the

11     floor in pain, at one point she tried to get up, Ms. Marshall

12     pushed her back down.  That's a good example of aiding and

13     abetting.

14          A second thing I ask you to consider when you think

15     about Count 2, Judge Kotelly will tell you about something

16     called co-conspirator liability.  And in a nutshell, the judge

17     is going to tell you that if the defendant is a member of a

18     conspiracy and the crime is committed during that person's

19     membership in the conspiracy and that crime was foreseeable to

20     that defendant, that defendant is guilty of the crime; guilty

21     of the substantive crime.

22          So when you think about Count 2, please keep in mind

23     aiding and abetting and co-conspirator liability.

24          Ladies and gentlemen, I'd like now to take a minute

25     and talk to you about each of the five charged defendants and

1      the evidence that you have that each of them is guilty beyond a

2      reasonable doubt of the two charges which they face today.

3      Let's start with the leader.  Let's start with Lauren Handy.

4              You have her social media messages.  You have her

5      text messages to Mr. Geraghty.  You have the evidence to show

6      she planned this, she organized this.  You have video -- what I

7      referred to earlier -- where she told Officer Whyte they were

8      there to block the clinic to stop abortions that day.  You have

9      her post she did in real time talking about this being a

10     traditional lock-and-block rescue.  You have all of that

11     evidence.

12             You have the evidence from Caroline Davis, who told

13     you that when she went to the meeting the night before, it was

14     Ms. Handy who was the leader, who was the organizer.

15             You also have evidence that Ms. Handy has blocked

16     clinics before three times.  Judge Kotelly has told you that

17     evidence is to be used in a certain way.  That evidence shows

18     you that on October 22nd, 2020, Ms. Handy had the intent to

19     block the surgi-center.

20             That evidence also shows you her association with

21     other co-conspirators, because you heard on one or more of

22     these earlier occasions, she worked with Joan Bell and Jonathan

23     Darnel; two of her co-conspirators from the incident here in

24     Washington.

25             There's one other thing I ask you to think about with

1    respect to Ms. Handy.  Ms. Handy testified before you, and as

2    I've already alluded to, she told you she wasn't there to stop

3    abortion.  She told you she was there to stop what she called

4    live-birth abortion; children who were born and then later

5    killed.

6         She told you she wasn't trying to block anything.  In

7    fact, when I asked her questions, I asked her, I said, "You

8    also said people were trying to block access," and then I refer

9    to the gesture she makes with Officer Whyte.  I showed her that

10   video.  She said, "Correct."

11        I then asked her, I said, "So were you trying to

12   block access that day?"  She said, "Personally, I wasn't."  She

13   said, "Personally, I wasn't."

14        Well, let's look at a little video, and you judge for

15   yourself whether Ms. Handy told you the truth when she told you

16   right here under oath that she was not trying to block anyone's

17   access.  Watch Ms. Handy.  She's going to take a chair, she's

18   going to put it in the door, and she's going to tie it down.

19        (Video played.)

20        MR. CRABB:  There she goes.  She's got the cord now;

21   tying a cord around a bigger chair.

22        Ms. Handy came right here, took an oath to tell you

23   the truth, sat in this chair, looked you in the eyes, and told

24   you that she did not personally try to block anything.  You saw

25   what she did.

1          You ask yourself:  Was she credible?  Did she tell

2     you the truth?  Ask yourself whether anything she told you when

3     she testified was true.  Can you trust her testimony?

4          Let's go to Ms. Idoni now.  You know Ms. Idoni is

5     guilty of these charges.  You saw on the video she actually

6     walked down the hall and blocked with her body the entrance

7     that the employees use.  She blocked it despite Officer Whyte's

8     request that she move.  She blocked it despite patients in

9     agony; Ashley Jones, Ms. Holler.  You saw her do it.

10          You know she drove all the way here from Michigan

11     with Caroline Davis to join this conspiracy.  You've seen the

12     texts talking about Heather looking for people who are willing

13     to block.  You know that Ms. Idoni is guilty of this

14     conspiracy.

15          Let's also talk for a minute about Ms. Idoni's

16     testimony and whether you can credit anything she said.

17     Remember the double-talk she gave you about blocking when

18     Mr. Patel was asking her questions.

19          He said, "So you're going to stand in front of the

20     door but not block it?  It's that door right there.  You see it

21     with your own eyes."

22          Ms. Idoni said, "Correct."

23          Mr. Patel asked her, "You're going to let people come

24     in and out of the door freely?"

25          Her answer, "No."

 1                "You're going to let people come in and out of the

 2       door freely?"  "No."

 3                Mr. Patel said, "So that means you're going to block

 4       it?"

 5                Ms. Idoni said, "You're putting words in my mouth."

 6                You think about that.  Was she blocking the door?

 7       You saw it with your own eyes when she said she was going to

 8       stand in front of the door and not let people come in and out.

 9       Is that putting words in someone's mouth, or was she blocking

10       that door?

11                Let's move to Mr. Goodman.  You know Mr. Goodman's

12       guilty.  Again, you see him on the video standing in front of

13       the employee entrance blocking it with Ms. Idoni.  You see on

14       the video it's Mr. Goodman who brings the locks and the chains

15       and the ropes into the clinic so that his co-conspirators,

16       Mr. Hinshaw, Ms. Harlow, and others can bind themselves and

17       block access.

18                You heard from Caroline Davis, you heard from

19       Ms. Handy that Mr. Goodman was at the planning meetings.  You

20       know that Mr. Goodman was part of this conspiracy.  You also

21       know that because, again, you heard about another incident

22       where Mr. Goodman was involved in blocking a reproductive

23       health services institution, just like before.

24                That shows you Mr. Goodman's intent that on

25       October 22nd of 2020 he intended to block people's access to

1      reproductive health services.

2              Let's move to Mr. Hinshaw.  Again, you know

3      Mr. Hinshaw is guilty because you saw it with your own eyes.

4      You saw the video.  Mr. Hinshaw pulled that green chair in

5      front of the door that leads to the reception area into the

6      treatment area.  He didn't just sit in that chair.  He wrapped

7      a cord around himself.  He attached himself to Ms. Harlow,

8      Ms. Bell, Mr. Smith.

9              He sat there while Tina Smith was on the other side

10     of the door -- Tina Smith, a staff member -- pushing the door

11     trying to get through.  Mr. Hinshaw sat there and blocked it.

12             And you know that he didn't just happen to show up

13     that day.  He wasn't a stray.  Because you also know, when they

14     met that morning, the pre-meet for when they took over the

15     clinic, and they took a selfie.  Who is sitting in the back

16     waving?  That man right there, Mr. Hinshaw.  He's part of this

17     conspiracy.  He blocked access.

18             Lastly, let's go to Mr. Geraghty.  You know he's

19     guilty of this, again, because you see it on the video.  You

20     see he's one of the first people to breach the clinic.  You see

21     him in the reception area working with Ms. Handy to organize

22     the blockade.  You see him when he interacts with Ms. Holler,

23     when he gets Mr. Goodman, when he gets Ms. Marshall to come

24     in --

25             MR. KIYONAGA:  Same objection, Your Honor.  He's

1    misstating the evidence as to Mr. Goodman.

2             THE COURT:  I'll leave it to the jury to determine

3    what the evidence shows.

4             MR. CRABB:  Thank you, Your Honor.

5             You see it on the video when he gets Mr. Goodman and

6    gets Ms. Marshall to stop Ms. Holler, after she's collapsed on

7    the floor, from getting into the clinic.

8             You have from Mr. Geraghty his text messages with

9    Ms. Handy.  He was interacting with her planning this, talking

10   about who would be involved, would they block.  Mr. Geraghty

11   was such an enthusiastic member of this conspiracy that, when

12   Ms. Handy told him how many people she lined up to block this

13   clinic, he had a one-word response.  "Wow."  That shows you

14   Mr. Geraghty was part of this conspiracy.

15            Mr. Geraghty also got up here and took an oath and

16   testified to you.  And there's one thing I ask you to keep in

17   mind when you think about his credibility.  Do you remember

18   Mr. Geraghty said that he didn't want to go into the clinic.

19   He had no intention of entering the reception area.  Remember

20   he told you that?

21            So his first excuse was, well, I got pushed in.  I

22   got pushed in by my co-conspirators.  I didn't want to be

23   there.  So I left.  But the problem with Mr. Geraghty was he

24   went back in again.

25            So what did he tell you then?  He goes, oh, no, no,

1    no.  The reason I went in the second time wasn't to block

2    anyone's access.  I was worried about Paula Harlow, who was on

3    the ground.  Remember, she was on the ground wrapping chains

4    around herself so she could blockade the clinic.

5            So Mr. Geraghty sat right here under oath and told

6    you the reason he went back in the reception area was to render

7    assistance to Paula Harlow, who was on the ground.  You saw the

8    video.  What did he do?  He walked into the clinic, and he

9    stepped over her -- he didn't even stop to look at her -- and

10   went about his business.  Think about that when you consider

11   Mr. Geraghty's credibility.

12           Ladies and gentlemen, I would like to finish where I

13   began, with Ashley Jones.  "What are you doing to me?  What are

14   you doing to me?"  The defendants were trying to block her

15   access to reproductive health services.  They were trying to

16   block services that she had a right to.

17           I want to mention something else that Ms. Jones said

18   that morning as she was standing in the reception area of the

19   clinic.  She said -- you heard it on tape; you can go back and

20   listen if you wish.  She said, "How is this allowed?"

21   Ms. Jones said -- and I repeat -- while she was being blocked

22   from the clinic, she said, "How is this allowed?"

23           Ladies and gentlemen, you know many people have

24   strong feelings about abortion.  Having strong feelings and

25   expressing those views is entirely proper.  The freedom of

1    thought and the freedom of expression are bedrock principles of

2    this country.  That's what America is all about.  Everyone has

3    a right to their opinion.  Everyone has a right to express

4    their opinion, to debate people, even to argue, to vote, to get

5    involved in politics, to try to change the law legally.

6         But no one, no one, not those defendants, not anyone

7    else has the right to impinge on someone else's rights.  No one

8    has the right to break the law because they don't like it.  No

9    one has the right to ignore a law and try to impose their

10   personal views on others.  No one has the right to obstruct

11   someone else's right.

12        That's just not how America works, and that's what

13   these defendants did.  They tried to interfere with others'

14   rights.  And when they did that, they broke two laws.

15        Ladies and gentlemen, Ms. Handy, Mr. Goodman,

16   Ms. Idoni, Mr. Geraghty, and Mr. Hinshaw are guilty of both

17   counts.  We have proven that to you beyond a reasonable doubt.

18   That's our job, myself and Mr. Patel.  That's a job we embrace.

19        Now, based on the evidence that we have presented to

20   you, we ask that you do your duty and that you hold the

21   defendants accountable; that you find them guilty.  Thank you.

22        THE COURT:  All right.  Mr. Cannon, I think you're

23   next.

24        MR. CANNON:  I'm wondering about a bathroom break.

25        THE COURT:  Okay.  We can take a short break here.

1    What I'd like to do is to do some short ones between some of

2    these and then do a longer one, like, your full -- our full

3    morning break, but we'll take ten minutes.  So it should be,

4    say, at quarter to 11:00.

5            Okay.  I'll be doing more than one.  This isn't the

6    only one you're going to get for this morning.  And don't talk

7    about the case.

8            (The following proceedings were had out of the

9    presence and hearing of the jury:)

10            THE COURT:  I'll be back in ten minutes.  You'll have

11    yourself set up and ready to go.

12            (Recess taken.)

13            (The following proceedings were had in the presence

14    and hearing of the jury:)

15            THE COURT:  All right.  We're ready to proceed with

16    counsel for Ms. Handy.

17                      CLOSING ARGUMENT

18                      BY MR. CANNON

19            Good morning, ladies and gentlemen, Court, opposing

20    counsel.  Get my notes in order here.  These will work.

21            On behalf of Ms. Handy -- and I'm sure everybody -- I

22    want to express very sincerely how much we appreciate your time

23    and attention in a lengthy and sometimes, I'm sure, frustrating

24    trial.  Be assured that both sides and the Court worked very

25    hard to streamline the process.

1          The bumps in the road, perhaps, are an unavoidable

2     symptom of the divergent ways in which people of good faith in

3     a very polarized society view this fundamental issue, but

4     that's where your challenge begins.

5          Now, before I get to my own comments, I'd like to go

6     through kind of a little shopping list of things I'd like to

7     address from the government's closing statements.

8          And I want you to pay attention to how often you

9     don't hear accusations against Ms. Handy.  Mr. Crabb indicated

10    that Ms. Handy organized and planned this event.  He never said

11    she blocked.  He said Jonathan Darnel sent a post talking about

12    how breaking the law is sexy.  But it's sexy to Jonathan.  The

13    government never showed you Ms. Handy's response.  We don't

14    know what, if any, response there was.

15         Mr. Crabb talked about how many people were thinking

16    about risking arrest.  They hammer and hammer and hammer on

17    risking arrest because, of course, risking arrest must mean a

18    willingness to violate FACE.  But if you look at the FACE

19    statute and all of its elements and you consider other things

20    that you know just because you're people in this society and if

21    you listen to the testimony about what risking arrest really

22    was, risking arrest was about not wanting to leave.

23         Not wanting to leave a clinic or a hallway, even

24    outside that clinic is not the same as blocking a person's

25    access into the clinic; nothing about refusing to leave.  When

1    somebody says, this is my building, get out of it means that

2    you're violating FACE, that's huge.

3            Again, he talked to you about Heather Idoni,

4    suggesting she's trying to get people to block.  That's not

5    Lauren talking.  He talked about the fake appointment.  She

6    made a fake appointment.  She must be planning to violate FACE.

7    But a fake appointment gets you in the door.  It doesn't mean

8    you're going to block anything.

9            The government talks about Jonathan Darnel's post.

10   Now, as I sit here, I'm not sure I can remember exactly which

11   one it was, but he's saying stuff.  It's Jonathan talking, not

12   Lauren.

13           Mr. Crabb talked to you about the fact that somebody

14   might have been injured.  He didn't say by whom.  It wasn't

15   Lauren.

16           He talked to you about the intimidation idea, which

17   is part of FACE.  And he gave you some examples of statements

18   and conduct, but those were statements and conduct of others,

19   not Lauren.

20           He did point out her own post that says there's a

21   lock-and-block rescue happening now.  Now, that's important

22   when you come to the conspiracy thing because she's saying this

23   after everything has kind of started to happen.  Now, for the

24   first time perhaps, she knows what people are doing.  She

25   couldn't have said it before.

 1          And, very importantly, even though it's her own post

 2   and she's telling you what people are doing in there -- some,

 3   not all -- nothing about the post to indicate that she is doing

 4   it.

 5          They point out to you that Ms. Handy spoke to Officer

 6   Whyte and said there's a rescue going on; don't allow people

 7   in.  She's asking the officer not to allow people in.

 8   Obviously, she is assisting or hoping for some assistance in

 9   saving babies from born-alive abortions.

10          Now, when he got -- when Mr. Crabb got to the

11   specific defendant, he talked about Ms. Handy's texts, her

12   conversation with Officer Whyte, her post.  And we've already

13   addressed those.  I'm not going to talk about them again.

14          But the government also said she's done it before;

15   look at her prior event; it proves her intent on this case.

16   Apart from the logical fallacy there, what I did some prior

17   time tells you everything you need to know about what I'm

18   intending when I do something today is very, very attenuated.

19   Very importantly, look at the event that they point to.  You

20   saw it on video.  She's not blocking anything.

21          There was practically no way to make a FACE violation

22   out of that prior event.  And if that's the case, how can it be

23   proved that she intended to violate FACE this time?

24          Mr. Crabb says you should question her credibility

25   because she, on the one hand, admitted blocking access and, on

1    the other hand, said, personally, I wasn't.  Now, some of you

2    might be old enough to remember the old rock song.  I always

3    chuckle when I hear it.  When somebody says "I shot the

4    sheriff," probably entitled to believe -- to be believed when

5    he says, "but I did not shoot the deputy."

6         You saw Lauren on the stand and talking to the

7    officer.  She's entitled to some credibility when she says,

8    "But I didn't do these other things."

9         They point out the fact that she did some kind of

10   thing where she put a chair over by the door and then used a

11   cord or something and tied something off to something on the

12   other side.  You don't know what that was about, but look at

13   its effect.

14        The cords are, like, ground level.  People are

15   stepping back and forth over them like stepping over a curb.

16   The chair involved is actually holding the door open.  If it

17   was an attempt to obstruct, it didn't happen.  And you can't

18   look at that and say this was an attempt to obstruct.  What

19   reasonable person would do something so ineffectual?  Was it

20   symbolic?

21        The door is open.  The chair is off to the side of

22   it, much like the police officer was off to the other side of

23   the door at about the same location, just on the other side.

24   Nobody says he's blocking anything.  And the chair itself keeps

25   the door from swinging shut.

1          Mr. Geraghty's credibility is important to Ms. Handy

2     on one point, which I'll get to later.  But the government

3     attacked it, so I'd like to address something.  The government

4     attacks Mr. Geraghty for saying he went into the clinic because

5     the one lady was on the ground, and he was checking on her or

6     worried about her, something like that.

7          And then they point out that he must be lying about

8     that because, actually, he stepped over her like, you know,

9     there's nothing to be concerned with.  This is an important

10    observation to see the change that occurred in Mr. Geraghty.

11    It's important to notice; he didn't know why she was on the

12    ground because it hadn't been discussed with him.

13         He didn't know what she was doing.  She's an elderly

14    lady.  Maybe something happened.  When he figures out that

15    she's there of her own free will, then he leaves her alone.

16    He's not lying to you.  He's speaking truthfully, and you can

17    see the change that happened in his level of awareness.  This

18    goes to the conspiracy thing.

19         It's really evidence, among others, that the

20    conspiracy thing is just too half-baked.

21         If somebody said -- if somebody said, you know, those

22    pro-lifers, they're true believers -- they just want to save

23    babies.  They're very nice people, wouldn't hurt anybody -- you

24    can't convict them.  I trust -- I hope you would agree that you

25    would say, wait a minute, we have laws.  And what the law says,

1    exactly what the law says, matters.

2           On the other hand, if somebody were to say to you,

3    those pro-lifers are a pain.  They show up where they're not

4    wanted, they create a scene, they add to the anxiety of people

5    that are already having some, and then they don't want to

6    leave.  Forget what the law exactly says -- you get the basic

7    idea -- just convict them.  I trust you would agree that's

8    equally inappropriate.

9           So this process starts and ends with the law and what

10   it actually says.  Especially being in this city, I'm sure you

11   understand the way laws get made.  The FACE Act, before it was

12   passed, was presumably stitched together with words.  They were

13   debated, maybe modified, debated some more, modified some more,

14   debated until finally we had a statute that had been agreed

15   upon by both halls of Congress, everybody in them or a

16   sufficient majority, both halls of Congress at the same time

17   and then passed -- or signed, I should say, by the President.

18          Some people might have thought it was too broad; some

19   might have thought it was not broad enough.  But those

20   arguments would have been had and voted upon, and this is what

21   we have, the FACE Act as it's written.  Like it or not, love

22   FACE, hate FACE, doesn't matter.  You must recognize that it's

23   a product of a civil process that must be respected.

24          When you pull it out and look at it, you'll see, I

25   think, a big picture, and I want you to step back and look at

1    it.  FACE prohibits a range of actions.  They are defined.  It

2    leaves untouched the bulk of predictable, perhaps unpopular,

3    even intrusive activism that can be engaged in by people on

4    either side of this issue.

5            Can you see that all right?  If you look at the

6    instructions -- you're going to have them -- the FACE Act is

7    broken down -- essentially, what it requires the government to

8    prove is broken down into three categories, and it has to be

9    proven as to each defendant.

10           The first category, whoever by force, threat of

11   force, or physical obstruction intentionally -- that's the

12   second category -- intentionally injures, intimidates, or

13   interferes with a person.  Third category, because that person

14   is seeking or providing reproductive health services.

15           Now, some of those terms are defined, and I've

16   written those definitions.  Of course, don't take my notes as

17   gospel.  You're going to have the instructions.

18           Physical obstruction is defined as rendering ingress

19   and egress impassable or unreasonably difficult or hazardous.

20   Intimidates means putting a person in reasonable fear of bodily

21   harm.  Interferes with means restrict a person's freedom of

22   movement.  And, of course, reproductive health services talk

23   about the reproductive health system, the bodily system, and

24   revolves around pregnancy and the termination of pregnancy.

25           So if you want to boil it down for yourselves, you

1     can put the definitions in place of some of the words, and it
2     helps you sort of streamline your own trip through the
3     statutes.  So what it comes down to is that whoever by force,
4     threat of force, or rendering ingress or egress impassable or
5     unreasonably difficult or hazardous, intentionally injures,
6     intentionally intimidates, let's say, intentionally puts a
7     person in reasonable fear of bodily harm, or intentionally
8     restricts a person's freedom of movement because the person is
9     seeking or providing services related to the termination of
10    pregnancy.

11          Now, very importantly, the government must prove at
12    least one thing from each of these categories.  If the
13    government proves something in number two and number three, but
14    not number one, the case fails.  If they prove something in one
15    or two, but not three, the case fails.  They have to prove
16    something from each category.

17          So when you see that, it's very easy to imagine --
18    and I'll leave it up to you to imagine -- conduct like what
19    we've seen ourselves or heard about through history that is the
20    conduct of activists that doesn't come close to violating FACE.

21          Obviously, let's start with the sidewalk.  We all
22    know this.  I think Mr. Crabb suggested it himself.  A person
23    can be out on the sidewalk handing out pamphlets, holding
24    signs, maybe calling out to women offering assistance or
25    information.  And if they're not blocking or threatening or

1    using force, nobody would say that's a violation of FACE.

2            Even inside a typical office building or a shopping

3    mall, people going into the common area hallways, talking to

4    people in the elevators, handing out pamphlets, nobody would

5    suggest that's a violation of FACE.

6            Now, some people might not like it.  And the owner of

7    the building might say, hey, get out of here.  You can't do

8    that here; it's my building, get out.  And if you don't, maybe

9    you'll get arrested.  If you have some principled reason for

10   not walking out on your own two feet, make them drag you out,

11   you chose arrest.  It doesn't mean you violated FACE.

12           Even inside the clinic lobby itself, a person might

13   go in, put down some pamphlets, maybe even lean down or sit

14   down next to a lady and talk to her, maybe sit in the chair

15   against a wall that isn't blocking anything and sing songs or

16   pray; maybe not even want to leave.  But a person sitting in a

17   chair up against a wall, is not blocking anything, singing a

18   song is not violating FACE, even if they have to get dragged

19   out.

20           So it's very possible that all the things I've

21   suggested could be done without violating this law.  The whole

22   reason I've been talking about that is because of this big

23   picture of the events in question that I think the government

24   misses, and I want you to step back and see, and that is this.

25   This case involves some conduct by some people that might be

1    prohibited by FACE.

2              It involves a whole lot of conduct by more people

3    that simply isn't.  The government wants you to throw them all

4    in the same bucket.  Your duty is to look at them separately.

5              So let's look at the FACE statute.  Category 1,

6    force.  You've heard how Ms. Handy feels about force and

7    violence.

8              The only place it really looks to be an issue is when

9    the group of people are coming through the doorway.  But

10   remember the evidence.  Ms. Handy got in ahead of them.  She's

11   already in the lobby.  She's not part of this group that's

12   coming through the door.  You can look at the video a hundred

13   times, as focused on the question as you want to be.  You will

14   never see Ms. Handy pushing.  You won't see her, really, even

15   moving.

16             And when things got or looked a little messy, Lauren

17   explained to you that, not only was she not pushing, she was

18   saying, don't push.  It's totally consistent with her views on

19   passivity.

20             Category 1 continued, the next item, threat of force.

21   Not even a question.  Nobody suggests any threats were made

22   here.  The evidence doesn't support it.  The government doesn't

23   tell you the evidence supports it.

24             Next item, physical obstruction.  Rendering ingress

25   or egress impassable or unreasonably difficult or hazardous.

1      Look at the videos.  Ms. Handy never blocks anything.  The

2      government might say, well, but she was in the doorway.  Well,

3      she's around the doorway a few times in the video, of course.

4      So is the police officer.  Would the government tell you he's

5      blocking?

6              Either of them could step aside, if necessary, but

7      nothing in the videos indicates it would even have been

8      necessary.  Anybody could have walked through that door.  Now,

9      the government might say, but if somebody would have come

10     along, Ms. Handy's in the way.  Apart from the fact, the same

11     thing would be true of the officer.

12              It's very important to understand that you can't

13     block somebody who is not there.  We don't block hypothetical

14     people.  You have to block an actual person.  And if there's

15     not a person there, there's no blockage.  No video shows Lauren

16     blocking anybody's in and out through that door.

17              Now, let's go to Category 2.  Do I still have it up?

18     I think I do.  All right.  A person by one of the things listed

19     in Category 1 has to do at least one of the things listed in

20     Category 2.  Intentionally injure or attempt to injure.

21              The government, of course, will point to the lady

22     with the injured ankle.  First of all, an injury, or even the

23     attempted injury, must be intentional.  It's the predicate to

24     every item in Category 2.  Must be intentional.  Look at the

25     video.  There's kind of a fracas going on.  Ms. Handy is not in

1     it.  She's kind of off to the side.

2            She was already in the room when that group came

3     through the door.  She's not pushing.  She's saying, don't

4     push.  There is no way to make that injury something that was

5     intended by Ms. Handy.

6            Next item in Category 2, intentionally intimidates.

7     Now, we already heard about intimidation.  It requires that you

8     put a person in reasonable fear of bodily harm.  So boiling

9     down those two sentences -- two things down into one sentence,

10    the person must intentionally place a person in reasonable fear

11    of bodily harm, kind of like the threatening in the first

12    category.

13           Intimidation in this category just won't fly.  The

14    evidence doesn't support it.  And there's no serious argument

15    for it.

16           The next item in Category 2, intentionally

17    interferes; interfere meaning restrict some person's freedom of

18    movement.  Look at the videos.  They show Ms. Handy engaging in

19    no interference of any kind with any person.

20           So we need to look at Category 3.  And, remember, if

21    the evidence fails in either of the first two categories --

22    which I submit it does -- you don't even get to Category 3.

23    But Category 3 requires that, in order for you to convict, you

24    have to find that a person did what he did because the other

25    person was providing or obtaining reproductive health services,

1    and those involve the person's reproductive health system and

2    pregnancy or the termination of pregnancy.

3            There is -- obviously, these people are not at that

4    clinic because of Pap smears or STD tests or even pregnancy

5    tests.  It's all about abortion.  But when it comes to this

6    clinic, there's kind of a big wrinkle in the thing that you

7    have to pay attention to because it goes to this third element

8    of the case.

9            Ms. Handy had seen a video that hugely impacted her

10   life.  She quit school, sold her book collection, told her mom

11   and dad she was going, and she shipped off to California to

12   join a pro-life group.

13           There is no available argument that a living baby

14   outside the womb at any stage of gestation is a pregnancy.

15   This video convinced her that little boys and girls who are not

16   pregnancies anymore -- location matters -- are being born alive

17   and left to die.  If that's going on -- and, very importantly,

18   it doesn't have to be going on.  She just has to reasonably

19   believe it.  If she reasonably believes it and that's the

20   reason she goes into a clinic -- and, by the way, I don't know

21   if I said it, if they're being born alive and left to die, that

22   conduct in that clinic by that doctor is not protected by FACE.

23           If she's going in there to save babies from that,

24   she's not violating FACE.  And she can do all kinds of things

25   that any of us can do to help a person who needs defense.  The

1     unborn child who winds up outside the womb has moved from a

2     place of no protection to a place of legal protection, and

3     Lauren is entitled to act upon that.

4            So the question is whether she really believed that.

5     I started to mention it.  We saw the impact it had on her.

6     Quit school.  What did she say?  Four-day train ride or

7     something out to California.  Sold her collection.  Goes to

8     work for this outfit.  Starts studying the incidents of

9     live-birth abortions.

10           Yes, the video also affected her in entering the

11    pro-life business, generally.  And she's been doing things

12    generally that aren't focused on this clinic or this doctor.

13    But the fact is, it always haunted her.  And she came all the

14    way across the country back to this clinic twice.  Plainly,

15    there was something different and special about this clinic.

16           Did she do it only because of that belief?  Did she

17    go into this clinic partly because she just doesn't like

18    abortion and partly because she's trying to save babies from

19    live-birth abortions?  The belief itself is, obviously, deep.

20    I already talked about that.  I'm not going to talk about it

21    more.  But was the belief the sole reason?  And I think it has

22    to be the sole reason.

23           Don't be confused by the idea that babies of any

24    gestational age might be getting aborted in that clinic or the

25    people might be there for other reasons.  That doesn't matter.

1                 First of all, the born-alive problem isn't a

2      problem just associated with late-term abortions and not

3      others.  This is not the -- this isn't about the legality of

4      late-term abortions.  It's not about the legality of abortions

5      at all.  It is about the fact that a baby born alive and left

6      to die has not been aborted.  He's just been killed or

7      neglected to death.  Once he's outside the womb, this is not an

8      abortion case.

9                 And that problem can arise at, perhaps, any

10     gestational age.  So don't be confused by the idea that it's

11     hooked onto some gestational age.  Doesn't matter.  Don't be

12     confused by the idea that other people might be coming into

13     that clinic for other things.  Doesn't matter.  What matters is

14     what Lauren is trying to stop and why she's trying to do it.

15                In Lauren's mind, any person who she can convince not

16     to go into that clinic is a person whose baby is not going to

17     be born alive and left to die.

18                And, remember, too, this event is not like any

19     previous ones Lauren had ever been involved in.  It's distinct

20     from the others, just as Santangelo is distinct from the

21     others.  This is a big one; biggest one in 25 years.  Going to

22     get more and more people.  Why are they putting on this big

23     event at that clinic?  For one single compelling reason.

24                He talked briefly about the conspiracy.  Maybe I

25     touched on it when I was addressing Mr. Crabb's comments.  The

1    government puts on all kinds of evidence about the texts and

2    the posts and all this kind of communication that's going on

3    between the people involved.  But if you're planning a backyard

4    barbecue or a high school camping trip, you're going to have

5    all the same kind of communications.  There's nothing nefarious

6    about the fact that there's a lot of conversation going on.

7         The government subpoenas the witnesses -- sorry --

8    the records from Verizon or Google or whoever it is.  They get

9    a lot of stuff.  Just think of yourselves.  If they subpoenaed

10   your records, they'd show all kinds of communications you had

11   between yourselves and other people, all kinds of planning of

12   God knows what.  There's nothing hostile or nefarious about it.

13        In order to be guilty of conspiracy, you can't just

14   plan an event.  You have to have an agreement that involves

15   breaking the law.  How can we have a conspiracy to violate FACE

16   when most of the parties to the so-called agreement aren't

17   going to do it?

18        They're going to do conventional sit-in kind of

19   stuff -- just like Martin Luther King has a federal holiday

20   for -- that doesn't necessarily break FACE.  How do you have a

21   conspiracy to violate FACE when the supposed organizers don't

22   even know what people are going to be doing?  How do you have a

23   conspiracy to violate FACE when everyone is told to just follow

24   his conscience; when people are told to risk arrest or don't

25   risk arrest?  It's up to you.  How do you have a conspiracy to

1   violate FACE when the performance of the so-called agreement

2   could result in everybody blocking or nobody blocking?

3            There was only one thing around which these people

4   were unified, and that was nonviolence.  They conspired to be

5   peaceful.

6            The government made a big deal both during the

7   testimony and in their argument just a few minutes ago about

8   Mr. Geraghty pointing at things like this in the lobby and

9   Lauren pointing at things in the lobby.  They said, surely,

10  there's direction going on; surely, these pointing events prove

11  the conspiracy.

12           But they asked Mr. Geraghty what's he pointing to.

13  And he answers without a bit of hesitation -- and you might

14  have found him to be a very credible witness.  He answers

15  without a bit of hesitation.  "I was pointing to the businesses

16  on either side and saying something about getting pamphlets to

17  them."

18           The government knew better than to ask Mr. Geraghty

19  what Lauren Handy was doing when she was pointing.  You never

20  heard it.  You don't get to assume it.

21           Finally, your presence here is a reminder that we are

22  a free people and that we govern ourselves.  Those things are

23  linked.  Every branch of the government is represented in this

24  courtroom.  The executive branch, with the prosecutors; the

25  judicial branch, obviously, right here; the legislative branch

1    is represented in the various laws, like the FACE Act that

2    we're here to talk about, and also the laws that govern how

3    these proceedings are conducted and what rules you follow.

4          But those are branches.  You are the trunk.  Every

5    one of those three branches gets its authority from you.  The

6    legislators are, obviously, elected by you.  The executive, the

7    President, is, obviously, elected by you.  The judge is

8    nominated by the executive you elect and confirmed by the

9    legislators you elect.

10         But when you're done voting, you are not done with

11   the crucial role that you play in our self-governance, because

12   you walk out of the voting booth, down the steps, around the

13   corner, down the street, and you come into this courtroom, and

14   you see to the application of laws made in your name.

15         Nothing happens to Ms. Handy or any of these other

16   defendants unless you feel it is just; every one of you; every

17   single one of you.  There's a reason there are 12 of you; not 6

18   or 10 or even 11.

19         So when you are deliberating, don't fall in just to

20   go along.  That is not part of your duty.  In fact, it would be

21   a violation of it.  If you can't get to conviction when other

22   people on the jury have, maybe all the other people on the jury

23   have, it is not because you're just being stodgy and

24   bullheaded.  It is because the government hasn't met its

25   burden.  The burden is not most; the burden is all.

1          This case involves a fundamental issue that raises

2     passions on both sides, but we have laws.  We have the

3     FACE Act, which has carefully chosen words that prescribe

4     specific conduct and leaves much of what we see in this case

5     unaffected.

6          We also have the presumption of innocence and the

7     burden of proof; those last two being important to protect the

8     weak from the powerful.  That's not just important to Lauren

9     Handy; it's important to all of us.

10         Hold those laws close, and we trust you to make the

11    right decision.  Thank you.

12         THE COURT:  All right.  I believe counsel for the

13    next defendant needs to set things up.  We said we would take a

14    five-minute break.

15         MR. GUILLAUME:  Yes, Your Honor.

16         THE COURT:  Instead of sitting here while they fiddle

17    around with the mechanics, I'll give you a break.

18         (The following proceedings were had out of the

19    presence and hearing of the jury:)

20         THE COURT:  The government said they would do -- what

21    did you say, 40 minutes, originally?

22         MR. CRABB:  Yes, Your Honor.

23         THE COURT:  They did 45.  You all said you'd do 30,

24    and you did 45.

25         I don't cut people off.  But as a practical matter,

1    what's going to happen, they're going to get a longer rebuttal

2    because you're spending more time.  And we may have more

3    trouble getting all of this done in the rebuttal tomorrow

4    morning.  So make sure that you are focused in our comments.

5            I would also ask that you not use your client's first

6    name only.  I asked you not to do that.  They're not friends;

7    they're clients.

8            All right.  We're on a break.  How much time --

9    Mr. Guillaume, why don't you let Ms. Patterson -- she's right

10   here.  Let us know exactly when you're -- or are you going to

11   be fast enough that I should just sit here?

12            MR. GUILLAUME:  Maybe a short break, Your Honor.

13            THE COURT:  All right.  As soon as he's ready, let me

14   know.

15            (Recess taken.)

16            (The following proceedings were had out of the

17   presence and hearing of the jury:)

18            THE COURT:  Is everybody back?

19            MR. KIYONAGA:  We have a couple people still in the

20   restroom, Your Honor.

21            MR. CRAMPTON:  They're on their way.

22            THE COURT:  Let me just point out, if you take 10

23   minutes or 15 minutes between each of these, it's going to be

24   hard to get it done in time.  We stop at 5:00 because somebody

25   in the jury has a daycare issue.

1        (The following proceedings were had in the presence

2    and hearing of the jury:)

3        THE COURT:  I'd ask that you be silent in the

4    courtroom, please, when you come in.

5        All right.  We're proceeding.  Mr. Guillaume is

6    representing Mr. Hinshaw, and he'll be proceeding with his

7    closing argument.

8                      CLOSING ARGUMENT

9                     BY MR. GUILLAUME:

10       May it please this Honorable Court, opposing counsel,

11   good almost afternoon.

12       As you are aware, I represent Mr. John Hinshaw.  And

13   before I get started, I want to thank you all again for your

14   time and for your service, for your attentiveness, for your

15   patience.  It is really not going unnoticed by any of the

16   lawyers and the judge in this case.  So I do thank you for your

17   time and for your service.

18       I am going to, before I start, talk about some of the

19   things that I mentioned in my opening statement, which now you

20   know to be true.  That this case has views -- you've been

21   exposed to views that you may disagree with or not share.  Also

22   conduct that you may or may not agree with or share.  But also,

23   that every person in this case, especially my client, Mr. John

24   Hinshaw, is presumed innocent.

25       Now, there's two laws, the definitions of which you

1   have not been provided.  The judge will provide you those

2   definitions today at the conclusion of all arguments.  She'll

3   instruct you as to all the necessary laws you need to consider

4   in this case.  I'm going to talk about them in a general sense.

5         The government's already talked about some of them,

6   and Mr. Cannon talked about some as well.  I'm not going to go

7   through as much detail.  But I do want to point out some

8   important factors that I want you to be made aware of.

9         I also want to promise you that I'm going to argue

10  strictly from the evidence, as I said in my opening statement.

11  Evidence is testimony that you've heard on the witness stand

12  and/or exhibits that you've been shown.  I'm going to base my

13  argument only on the evidence, and I'm going to ask you to find

14  my client not guilty.

15        And every person here has their own counsel.  My

16  argument will be focused strictly on Mr. Hinshaw.  To the

17  extent that someone else's name comes up, I try to avoid that

18  and focus my argument on Mr. Hinshaw.  So if anyone else brings

19  up Mr. Hinshaw, if it's not me, don't listen.

20        You all are here because you have agreed that you can

21  be fair and impartial.  We had a very long selection process,

22  and you-all were chosen because you indicated you can be fair

23  and impartial, and I am confident that you can be.

24        There's some important points, though, that I want to

25  point out at the outset.  As I've said a moment ago, the

1    government has the absolute burden of proof, and that burden of

2    proof is what's called beyond a reasonable doubt.  That

3    definition will be given to you as well by the judge as to what

4    exactly that means.  There's also other things that she will

5    tell you; specifically, definitions that she will give you

6    about things that you are to consider or not to consider.

7            But some of the highlights in my mind, the things

8    that are important, are your collective recollection of the

9    evidence controls.  So what I say to you, what another attorney

10   says to you, you may disagree with, and if your collective

11   recollection disagrees with that and that's what you-all agree

12   on, then that's the case.

13           I've worked very hard, though, to talk about things

14   that have just been introduced into this case.  There are

15   multiple defendants and multiple counts.  So, again, my focus

16   is going to be on Mr. Hinshaw.  And as much as this has been

17   presented to you in the arguments thus far as a case about

18   certain rights or issues that you may or may not feel

19   passionate about, I'm going to do my best -- and I hope you as

20   well -- hope you do as well to focus on the evidence and the

21   nature of the charges are usually -- are not to be considered

22   by you; just the evidence in the case.

23           I want to start off with the incident in question and

24   get right to it.  I'm going to play this video for you in a

25   moment.  And I think one thing that's going to become very

 1     clear throughout this argument that I make as a common theme

 2     is -- and it's been touched on a little bit as well by the

 3     other attorneys -- is the level of force, the level of

 4     violence.  And that is extremely important when you're given

 5     the definitions of these laws and how to apply it to these

 6     laws.

 7            I think it goes without saying that the employees at

 8     the surgi-clinic, the first reaction was violent towards the

 9     persons that were entering into the clinic that day.  Now, I'm

10     not here to tell you who had or didn't have a right to be

11     there.

12            As Mr. Cannon touched on in his argument, there's a

13     difference between entering somewhere and talking to someone,

14     whether you find it offensive or not, versus using force or

15     physical violence against them.  And I think in this case we

16     can agree that remembering the testimony of, particularly,

17     Ms. Smith, who is one of the employees, Tina Smith, I think she

18     was the last employee to testify, she was not a fan is my

19     interpretation of the people that were there that day for

20     whatever reason.

21            She did not like them, want them to be there.  That's

22     not really relevant in the grand scheme of things, but it is as

23     far as it controls her reaction.  So I'm going to play a little

24     snippet of this video to show you this reaction, which I'm

25     terming as the employee's violent reaction.

1          Remember, that Sasha Proctor, who was the first

2     employee -- the second employee to testify in the case -- opens

3     the door, and as you can see from the still here, there's a

4     person waiting outside the door.  There are multiple people in

5     the hallway; we all understand that, one of whom is

6     Mr. Hinshaw, who is at the end of the hallway.

7          Now, one of the persons enters the door, and then

8     I'll play the video and then give you my take on the rest.

9     Bear with me for one moment, please.  As the video plays, you

10    can see patients entering and then confusion.

11          (Video played.)

12          MR. GUILLAUME:  The doors are trying to be closed.

13    Ms. Smith runs out of the back with a broom, handle pointed

14    outward, jabbing at the persons who are trying to enter the

15    clinic.  Now, that is an extreme reaction to someone trying to

16    enter a clinic who has not done anything to that point other

17    than try to enter.

18          You'll see wrestling -- Sasha Proctor physically

19    takes her body and pushes two people out of the door.  She's

20    wrestling with those people to the point where one of the

21    women, one of the older women, falls on the floor.  That is a

22    violent reaction.

23          There was no force as far as -- and, again, you'll

24    have these videos.  You'll be able to make your own

25    determinations as to the level of force or lack of force.  But

1  in my, what I consider, objective view of this videotape, is

2  that the entry into this facility was met with violence.  The

3  most extreme of -- the most extreme of violence being a broom

4  handle being pointed outwards and jabbed in the direction of

5  the persons that were there.

6          So in the hallway, my client is there, as I said a

7  moment ago.  He doesn't speak with, touch, or interact with any

8  patient or employee in the hallway.  As you can see from this

9  video, he has someone that's pushed into him before he then

10  tries to enter into the facility.

11          So just to kind of sum up the reaction of the

12  employees that we've seen on these videos, you see that

13  Ms. Proctor and Ms. Smith both use physical violence to

14  confront the persons who they feel don't have a right to be

15  there, and maybe their opinion is correct.  But it doesn't --

16  you may think that someone doesn't belong there; doesn't give

17  you the right to hit them, to touch them, to assault them.  But

18  that's exactly what happened.

19          Now, you remember Ms. Smith's testimony.  She

20  testified that the women were too old to be there, they were

21  overweight.  She also testified initially -- you may remember

22  this when I cross-examined her.  On direct examination, she was

23  asked by the government whether my client, Mr. Hinshaw, pushed

24  her, and she couldn't really remember on cross.  I don't know

25  if you remember; it's been a few days now.

1          I said, ma'am, this is important that we get this

2     distinction right because that changes everything if he did use

3     force.  I submit to you that he did not.  I'll show you a video

4     in a second of him not using any force.  She actually pushed

5     him, and he turns his back to her.  He doesn't engage with her

6     physically at all.

7          So, again, in the context of what's charged here,

8     these two charges, force is a very important factor for you to

9     consider.  And you'll be explained that by the judge at the

10     appropriate time.  But my client used zero force the entire

11     time he was there.

12          Now, if we go back to the -- I want to just go back

13     to the time stamp on the first video.  You see that initial

14     entry by all parties was made -- it's 9:05 a.m.  That's

15     important to remember that.

16          (Video played.)

17          MR. GUILLAUME:  I want to focus on my client,

18     Mr. Hinshaw's entry into the clinic.  As I said a moment ago,

19     he was pushed by Ms. Smith; he turned his back to her.  He

20     doesn't at any time speak to, touch, or otherwise communicate

21     with a patient or any employee.  He never raises his hands, not

22     even in self-defense.

23          And we can take a brief look at the video, and you

24     can judge yourself.  You'll see Mr. Hinshaw is one of the last

25     people in the door.

1          (Video played.)

2          MR. GUILLAUME:  He has someone pushed into him.  He

3     waits for a second, tries to come back in.  He avoids another

4     person that's being pushed.  He stands towards the window, at

5     which point Ms. Smith puts her hands on him, he turns his back

6     to her.  He doesn't raise his hands at all.  It's a very, very

7     important factor.

8          He then goes to the side window.  And at some point

9     he proceeds to sit in the chair, as we've all seen.  I'll talk

10    about that too.  There's been -- there's a video of that in a

11    second.

12         There's been testimony about chains that were

13    brought.  Okay?  It's no secret -- you saw from the police

14    officer's body-worn camera -- there were chains there, there

15    are even chains around my client's feet.  If you remember from

16    the larger video, my client didn't put the chains on himself,

17    one.  But he allowed them to be put on.  I'm not going to sit

18    here and say, oh, he didn't know the chains were on him; of

19    course he did.

20         It's important to note that the chains were not

21    locked at any time, that it was more symbolic -- this is my

22    term -- than anything because there was no effective use of the

23    chains.  It's a chain -- if I had a chain now, what good does

24    it do if you can't lock it?

25         You remember a very dramatic moment in the trial was

1    when the government played a video of a woman who had chained a

2    bicycle rack lock -- excuse me -- or a large bicycle lock

3    around her neck.  Now, that was done -- now, we know everyone

4    who was there got arrested that day.  Those women that had the

5    bicycle locks around their neck were seated to the left of the

6    room where there were closets.

7           You remember Ms. Smith even testified -- and I think

8    you just saw a video in the government's case -- in the

9    government's closing -- of my client opening a closet door.

10   There were closet doors there.  The only entrances to the

11   clinic were the one entrance where my client's chair was and

12   the one entrance in the hallway.  I think that was the staff

13   entrance, as I remember from the testimony.

14          Now, we know that if -- well, we can assume that you

15   can't be brought to jail with a chain -- a locked bike -- bike

16   lock around your neck, so they had to cut it off.  When I asked

17   Officer Whyte, he talked about a breach kit, he was going to

18   call for a breach kit; you even heard him say it in the video

19   to the staff when he first arrives.  He says, "I'm going to

20   have to call for a breach kit."  He's speaking to Ms. Smith at

21   that time.

22          When I asked him -- then he didn't say anything else

23   about it.  When I asked him on cross whether a breach kit was

24   needed to cut the chains, he says no, because there was no

25   locking of the chains.  No saw or other tool was used to remove

1    the chains.  They simply were just taken off when my client was

2    arrested.

3           There's no evidence that's been presented, no proof

4    beyond a reasonable doubt or otherwise that my client knew

5    these chains were even there.  If you look at the larger video,

6    you'll see that they were placed on him.  And, again, he

7    accepted it -- but he didn't bring it -- once it was put on

8    him.

9           So about -- we hear -- and, again, we hear three

10   hours, three hours, three hours as like a time that's been kind

11   of -- the government is really saying this clinic was shut down

12   for three hours.  I'm not here to tell you there wasn't any

13   disturbance of some sort for that amount of time.

14          But as far as -- excuse me.  When police got this

15   under control, it seems to be pretty quickly.  Approximately 30

16   minutes after people first entered, you see from the time stamp

17   on the video, 9:37 a.m., it was 9:05 when people first entered.

18   Police Officer Whyte, who is pictured in that photo, removes my

19   client from the chair.

20          My client's feet are not chained to anyone or any

21   object.  He's not chained to any of the other people that are

22   sitting there.  There's three people sitting next to him.  He's

23   not chained to any one of them.  And a breach kit, again, was

24   not necessary to remove anything.

25          The door was again accessible at this point.  So I'm

1    just going to play the video so you can see for yourself.  When

2    I do play it, I want you to notice my client's feet.  You can

3    see that the chains are no longer around his legs.  So they

4    were just removed.

5                    (Video played.)

6                    MR. GUILLAUME:  You'll see as he's being lifted --

7    excuse me.  Technological difficulties here.

8                    You'll see, as he's being removed from the chair,

9    look at his legs, look at his feet.  There's nothing

10   prohibiting or binding him to anyone or anybody.  He has

11   this -- I think it's a rope or something or another around his

12   waist, but it's not -- it doesn't stop them from removing him

13   from the chair.

14                   So the officers are, presumably, trying to get ahold

15   of things.  And the door, the chair -- though it's not in this

16   picture -- could be removed at that point.

17                   So you're going to be given an instruction about

18   one of -- both charges, the first being -- I want to talk

19   about, conspiracy.  There's three elements that the government

20   has to prove beyond a reasonable doubt.

21                   This, which appears in front of you on your screen,

22   is not the entire instruction.  They're snippets of what I

23   consider the important parts.  You will have the opportunity to

24   review the instruction.  The judge will read it to you.  You'll

25   have your own copy.

1          In any of these cases, we want you -- the lawyers on

2     all sides -- to apply -- although for different reasons --

3     apply the facts that do -- and the evidence to the law.  If the

4     evidence supports the facts, you do what you have to do.  If

5     the evidence does not support the facts, you do what you have

6     to do as your role as jurors.

7          But with respect to a conspiracy, the three

8     elements -- components of those three elements are that my

9     client reached an agreement.  No, it doesn't have to be a

10    formal written contract.  When is it --

11         MR. CRABB:  Your Honor, we object.  This is legally

12    incorrect, what he's showing to the jury.

13         THE COURT:  I think you're --

14         MR. GUILLAUME:  Your Honor, I'll move on.  I'll move

15    on.

16         THE COURT:  You have not explained it correctly.

17    That's the problem of just doing excerpts out of a longer

18    instruction.

19         MR. GUILLAUME:  As you can see, the judge's

20    instructions rule.  What I say is not evidence.  It's only

21    argument.  You will have to make your own mind up,

22    collectively.  So I'm going to move on.

23         So one of the ways the government has attempted to

24    prove conspiracy with respect to this case, and my client in

25    particular, is they talk about what's been termed as a

1    gathering, a meeting, a party.  You've heard all kinds of

2    different words.  But there was, undoubtedly, an event that

3    happened the day before this incident.

4           They talked to -- three witnesses testified about my

5    client's presence at that event, and you have verbatim the

6    quotes of which they responded to when asked questions.

7    Ms. Caroline Davis was the government's witness.  She's the

8    person that signed a cooperation agreement and agreed to

9    testify in this case, who was on the elevator and outside.  She

10   says, when asked about whether Mr. Hinshaw was present at that

11   meeting, her direct quote was, "I can't remember if he was at

12   the meeting, but I know he was there the next day wearing a

13   green jacket."

14          Well, we know it was a green shirt, but, yes, there's

15   no dispute about that.  Ms. Idoni testified and says, "I don't

16   remember seeing Mr. Hinshaw there."  And Mr. Geraghty, he

17   testified, says, "I think so."  He's not sure.

18          This is not, one, proof beyond a reasonable doubt

19   that my client attended the event.  But even if he had, his

20   attendance at an event is not, in and of itself, a conspiracy.

21   You'll be given an instruction which will say that people can

22   meet, be together, and talk about like-minded things, and

23   that's not evidence of a conspiracy.

24          I have it as a next slide, but I'll just let the

25   judge instruct you on that so there's no more objections to my

1    closing.

2            Now, there's also another way the government is going

3    to try to show that my client somehow conspired to commit this

4    offense.  There's testimony about a message or messaging that

5    occurred between Mr. Geraghty and other people.  This is from

6    his testimony yesterday.

7            The government referenced participants from the

8    event, specifically -- I think the term that they used was up

9    and down the Eastern Seaboard.  I don't know if you remember

10   that.  That was yesterday.  People traveling.  It was just

11   mentioned in the government's closing a moment ago.  Michigan,

12   New York, Massachusetts, Pennsylvania; all places that were

13   mentioned.

14           Now, again, on any of these messages, John Hinshaw's

15   name is not there.  He's not referenced by name anywhere, ever.

16           Now, also yesterday, in response to a question,

17   Mr. Geraghty -- Mr. Patel asked -- excuse me -- you know that

18   Mr. Hinshaw is from New York; that was the question.  Mr.

19   Geraghty's response was, I learned that now.

20           The point is, he doesn't know.  There's no proof

21   beyond a reasonable doubt where Mr. Hinshaw lived, traveled to,

22   whether he's from D.C., whether he's from Alaska; doesn't

23   matter.  They're using all these things to try to link some

24   sort of a -- tie him to a conspiracy that doesn't exist, that

25   he's not a part of.

1          So there is no evidence that was presented to you

2     beyond a reasonable doubt that my client, Mr. Hinshaw, is

3     involved in any sort of conspiracy.  So you look to certain

4     factors to influence that decision.  You're not going to have a

5     written formal contract sometimes -- most of the time.  There's

6     no evidence of any agreement such as that.

7          There are no text messages between Mr. Hinshaw and

8     any other co-defendant or anyone.  There's no social media

9     messages between Mr. Hinshaw and anyone; no phone records of

10    Mr. Hinshaw.  You get the point.  No testimony of Mr. Hinshaw

11    speaking with anyone at all.

12         I'm not going to -- Mr. Cannon talked at great length

13    about the FACE Act.  I'm not going to go over that again.  I'm

14    going to talk about and ask you to look at with respect to my

15    particular client, when you are given the elements of the

16    charge and you are asked to apply the facts that are as you've

17    been presented in court and the evidence that you've been given

18    and apply that to the law, I'm going to submit to you that the

19    prosecution fails.

20         Mr. Hinshaw did not use force.  He -- it's clear from

21    the videos that you saw, you have access to these videos, and

22    it's clear, and it's very relevant with respect to both charges

23    in different ways -- and, again, I'm not going to tell you --

24    because I'm not the judge -- what the law is.  But I'm going to

25    reference it, and I hope you remember this.

1          I hope you remember my client's lack of force is very

2     relevant in your determination in this case.  And, please,

3     please, please remember that.

4          As far as the two offenses that are at play here,

5     there are two separate offenses.  As I said a moment ago, the

6     use of force is important, or the lack --

7          MR. CRABB:  Again, objection, Your Honor.  This slide

8     misstates the law.

9          MR. GUILLAUME:  Your Honor, I'll remove the slide.

10          THE COURT:  I think you need to be careful about

11     this.  Once you start getting into the law, if you pick apart

12     things, you're going to have problems.  I'm going to give you

13     the instructions.

14          MR. GUILLAUME:  The judge will give you the

15     instructions, as she said.

16          But I still want to make my point that the lack of

17     force or the use of force is relevant to your determination as

18     to both counts.  And you will collectively talk about why.

19          And it's extremely important that you remember, with

20     respect to John Hinshaw, his lack of the use of force; it will

21     be a determinative factor in your deliberations.  And once you

22     have the law which will be provided, you'll be able to apply

23     that.  And if his conduct does not fit the elements of any of

24     these offenses, then you must find him not guilty.

25          I am asking you to apply the law to the facts and to

 1      the evidence that you have been given.  I'm going to ask you to

 2      make a determination based solely on the evidence and not on

 3      any bias, implicit or otherwise, that any of us carry in our

 4      day-to-day lives.  I am 100 percent confident that you-all can

 5      do that.

 6              And I, again, thank you for your time and for your

 7      service.  My client thanks you for your time and for your

 8      service.  Because without your service, our system of justice

 9      would come to a grinding halt and no one, no matter what they

10      are accused of, could ever receive a fair trial.

11              Thank you again, and I, again, implore you to find my

12      client not guilty.

13              THE COURT:  All right.  I'll allow Mr. Guillaume to

14      remove things.

15              MR. GUILLAUME:  If I can help out counsel.

16                      CLOSING ARGUMENT

17                      BY MR. DUNN:

18              Hello again, ladies and gentlemen.  If my wife just

19      saw that, she'd be unhappy with me if I let somebody hook me up

20      that way.  So thank you.

21              I'll join the others in thanking you for your service

22      and your time.  This trial was very contentious at times.  If I

23      did anything to annoy you, I'm sorry.  Sometimes we get a

24      little caught up in what we're doing.

25              Remember the things from my opening statement that

1    are important.  Keep an open mind.  And we're not done yet.

2    We're not done until the judge gives you your final

3    instructions before you go into the jury deliberation room.

4          Two other things.  Just because you're a member of a

5    group, you're not guilty of everything every other member of

6    the group did.  And words have meaning.  Don't let people

7    stretch words beyond what they -- what you really know they

8    mean and the obvious meaning and the meaning, of course, that

9    is defined for you in the instructions that the judge will give

10   you.

11         I want to make one correction from a lawyer that

12   stood before me here.  The charge -- the conspiracy charge is

13   the conspiracy against rights.  And it will be instructed to

14   you, and Mr. Crabb had all of the elements correctly up on the

15   screen, and it's a conspiracy against rights, not strictly a

16   conspiracy against the FACE Act.  I just want to make sure you

17   understand that.

18         I want to talk about Count 2 first and go back to

19   Count 1.  But I want to first -- I made some notes while

20   Mr. Crabb was giving his opening statement, and I wanted to

21   respond to a couple of those things in particular, and then

22   we'll go back.

23         I don't believe the evidence shows the police didn't

24   come for three hours.  I don't know if he intended to say that,

25   but that's the way it came out.  Actually, the clinic employees

1    testified that after they called the police, they were there

2    fairly soon after the call.  So it wasn't three hours before

3    the police got there.

4         So it wasn't a conspiracy to shut down the clinic.

5    It wasn't a conspiracy to violate the FACE Act.  Those were two

6    references I heard during arguments.  It's a conspiracy to

7    violate rights.  We'll get back to that when I get into

8    Count 1, but I want to start with Count 2.

9         I'm not here to kid anybody.  We all saw the video.

10   The video shows my client in front of that door; no question

11   about it.  And she says she was there about 45 minutes in that

12   position.  You also saw from the video her at one point in the

13   waiting room and that she was sitting, I believe, in a chair

14   near the -- right by the window where that poor lady had to

15   climb through.

16        She was there -- she said -- Heather testified she

17   was only in there for a few minutes.  She didn't stay in the

18   waiting room.  Her main presence there was by the clinic door;

19   standing there at one time, I think, with one person and

20   another time you saw in the video she was actually standing

21   with somebody else.  Another time on the video you saw two

22   other people there at the door.

23        And you've seen video after video after video after

24   video, and I'm not going to show you any video.  I think you've

25   seen it.  You probably are going to see it some more during the

1    arguments.  I just want to use this opportunity for a chance to

2    talk to you.

3              So is she guilty of violating FACE for standing in

4    front of that door?  Well, I'm here to tell you yes, if you

5    believe from the evidence somebody tried to get in that door

6    while she was standing there or somebody tried to get out of

7    that door while she was standing there.  I'm here to tell you,

8    you'd be correct in convicting her of FACE.

9              Now, we don't see in the video anybody -- we don't

10   see the door kind of rattling or we don't see somebody's hand

11   reaching in to try to open the door.  We don't see the

12   door getting -- in the hallway getting pushed from behind, like

13   somebody is trying to get out.  We don't see that.

14             Now, Tina Smith, the clinic coordinator, in the

15   morning when she testified, she said she didn't try to get out

16   of that door until the police arrived.  She wanted the police

17   to arrive before anything like that was going to happen.  I

18   asked her about it on cross-examination in the afternoon, and

19   she didn't remember having said that.

20             But the video doesn't show somebody trying to get in.

21   The video doesn't show Heather Idoni standing by the door and

22   somebody walking right up to the door like they want to get in.

23   That poor suffering lady arrived, got off the elevator, and

24   collapsed by the door.  It doesn't show -- the video doesn't

25   show her trying to get in that door before she collapsed.

1          So is she guilty of Count 2?  If you think from the

2    evidence -- and I didn't hear it.  But, you know, I'm not

3    perfect; the only one that's perfect is up there.  I missed it.

4    But if you -- if a witness testified that while she was

5    standing there they tried to get in that door, I think that's a

6    violation -- it's a violation of FACE if she wouldn't allow her

7    in.

8          So I think from the evidence, it's reasonable to

9    conclude one of two things.  She's either guilty or not guilty

10   depending upon your view of the evidence.  If you didn't get

11   any evidence while she was standing there, anybody trying to

12   get in or out of that door, it would be reasonable for you to

13   conclude that she's not guilty.

14         MR. CRABB:  Objection, Your Honor.  That's a

15   misstatement of the law.

16         THE COURT:  I'll sustain that.  That is incorrect.

17         MR. DUNN:  We have --

18         THE COURT:  It is incorrect.  I will be giving them

19   instructions.  So they'll be able to tell in terms of what is

20   correct or not.

21         MR. DUNN:  Okay.  So let's move on to the conspiracy,

22   Count 1.  This is what has to be proven.  You'll have it in

23   your instructions.  In fact, Mr. Crabb had it up on the screen.

24   Two or more persons reached an agreement or came to an

25   understanding to injure, oppress, threaten, or intimidate the

1    patients or employees of this clinic.

2            So it isn't just we know other people that are

3    pro-life and like to go to the clinics, and so we'll just show

4    up and go.  No.  In fact, one of the instructions that you're

5    going to get says that merely because people have common

6    interests and associate with others who are like-minded and --

7    that does not make them guilty of a conspiracy.  Conspiracy

8    requires an agreement.

9            Like I said in my opening statement, it doesn't have

10   to be an official agreement.  I think Mr. -- I think Mr. Crabb

11   mentioned that as well.  It doesn't have to be anything

12   official.  It could be two guys nodding their heads with each

13   other as long as each one knew what the other one was intending

14   to want to agree to and then they carry it out.  But there must

15   be an agreement.

16           So what do we have?  Somebody contacts Heather Idoni

17   and mentions the Washington clinic.  People are going to be

18   there.  Heather Idoni testified that she has been involved in

19   the movement for a very long time, but never had gone inside a

20   clinic before; that she decided to go.

21           Caroline Davis says she wanted to go because Joan

22   Bell was going to be there, and Joan Bell was one of her

23   heroes.  So she wanted to go.  So they ride down together.

24           Now, you might wonder why I asked her on the stand if

25   she had a cell phone with her when she went and whether she

1    still has that cell phone.  You heard Agent Biscardi's

2    testimony.  The FBI has access to subpoenas.  They can get

3    Facebook information.

4              MR. CRABB:  Your Honor, this is improper missing

5    evidence argument.

6              MR. DUNN:  I don't understand his objection.  What is

7    it?

8              THE COURT:  Yes.  That's what it sounds like.

9    Somehow they should have had evidence that's not appropriate,

10   if that's what your intention is.

11             He can't argue that the government should have found

12   something or done something more, which is what you're arguing.

13   That's not appropriate to consider, that they somehow should

14   have gotten something else.  Okay?

15             MR. DUNN:  We already had that in one of the other

16   arguments, Judge.

17             THE COURT:  Move on.  Move on.  That's not a correct

18   statement.

19             MR. DUNN:  There's no evidence to show on a Facebook

20   post or telephone calls between Heather Idoni and anybody else

21   that's involved, or media or social media or anything like

22   that, Instagram, whatever they may be.  Nothing, except one

23   that Mr. Crabb referenced.  Somebody mentioned her name in one

24   of their posts that she may be coming and recruiting people to

25   come.  And, of course, she did.  She came down with Caroline

1    Davis and Eva Zastrow.

2           They're not going -- there was nothing -- there was

3    no post or anything sent by Heather Idoni.  She said she wasn't

4    sure what she was going to do when she got there.  Caroline

5    Davis said she wasn't sure what she was going to do when they

6    got there.

7           The only thing Heather could remember about --

8    whether it was a social gathering or a meeting, depends on who

9    you talk to.  Some of the witnesses said social gathering and

10   one or two said a meeting, I think, or the government has been

11   referring to it as a meeting, rather.

12          The only thing my client remembered is there was talk

13   about the doctor at that clinic and some of his practices.

14   That was all she could really remember.  So they're then there

15   and they go.

16          So Heather Idoni -- you heard her testimony, observed

17   her demeanor, how she is -- would make an agreement to injure

18   somebody?  Is there any evidence to show that she made an

19   agreement to injure somebody?  Any talk about that?  She maybe

20   would want to bump off the clinic manager?  Nothing like that.

21   Nothing like that whatsoever.

22          Do you think she -- you observed -- again, you

23   observed her on the stand.  Do you think she made -- would make

24   an agreement to threaten somebody?  There isn't any evidence

25   that she made an agreement to threaten anybody.  Did she make

1    any agreement with anybody to intimidate?  Intimidate anybody?

2    I asked Caroline Davis on the stand, did you make an agreement

3    to -- and I read all those verbs.  Did you make any agreement

4    with Heather Idoni to do any of those things?  And she answered

5    no every time.  And there's no evidence of it.

6          That's what they have to show beyond a reasonable

7    doubt.  And they don't have any evidence to show any of that.

8    Now, maybe if they had -- maybe if -- so the crime is in the --

9    it's at the beginning of the -- it's at the beginning.  You can

10   either make a new agreement with somebody to commit crimes

11   or --

12         THE COURT:  Your microphone.  You were losing your

13   microphone.  That's all.

14         MR. DUNN:  Or you can join an agreement that's

15   already been made.  You can join in.  There's an ongoing

16   conspiracy and you can join in if you want to.  But there has

17   to be a meeting of the minds.

18         That's what an agreement is, like entering into a

19   contract.  Meeting of the minds.  There has to be an agreement

20   or understanding as to what are we trying to do here.  We don't

21   have that in Heather Idoni.

22         So just saying I'm going, just showing up, just

23   appearing in a picture is not proof of a criminal agreement.

24   Everybody decides what they're going to do Heather Idoni says.

25   Just because you're a member of a group, ladies and gentlemen,

1    do you have to do what somebody else in the group says you have

2    to do?  Would you do that?  Some go in, some stay out.  For the

3    first time she went in and stood by the door.

4             Now, why did I ask the witness who was driving the

5    car on the way from Michigan to Washington, D.C.?  I'll tell

6    you why.  Because Eva Zastrow drove, according to my client,

7    and Caroline Davis says she drove part of the way.  So Caroline

8    and Heather are sitting in the car together.  I don't know

9    about you, but if I'm driving out of my area, I don't like to

10   do a whole lot of talking on the highway if I'm driving.

11            But there's two passengers in the car together for a

12   very long trip.  If they'd already decided what they were going

13   to do, wouldn't they have talked about it?  If they had a

14   really good idea about what -- everything there was that was

15   going to happen, wouldn't they have talked about it?

16            So the element that Mr. Cannon told you about on the

17   FACE Act -- that's Count 2 -- is they have to prove that it was

18   unreasonably difficult for somebody to get in through the door

19   or factually -- just very difficult and threatening for

20   somebody to try to get into a door when they couldn't.  I don't

21   think we have that at all in the clinic door in the hallway.

22   We don't have any evidence of that.

23            I want to talk a little bit about some jury

24   instructions.  Your aiding and abetting instruction that

25   Mr. Crabb brought up.  You've got to remember -- again, you've

1    been told this, but it's very important to just remind you that

2    it only goes to Count 2.  You can't aid and abet a conspiracy.

3    Legally, you're either in the conspiracy or you're not; you're

4    either joining the agreement or you're not.  The aiding and

5    abetting goes to Count 2.

6         I don't think that really affects Heather Idoni

7    because we all saw her by the door.  You've got to decide

8    whether somebody couldn't get in or out of that door while she

9    was there, and if you decide there is somebody that was in that

10   position, then it would be appropriate for you to convict her

11   of Count 2.

12        MR. CRABB:  Objection, Your Honor.  The Court has

13   already sustained.

14        THE COURT:  I think we need to clarify something.  As

15   a practical matter, the -- you can violate the FACE Act in

16   blocking the door -- and it has to be a physical obstruction --

17   that isn't being used at the time or that a patient is trying

18   to use, as long as they have the requisite intent to physically

19   obstruct it.

20        I will give you a fuller instruction.  But I don't

21   want you to be left with the impression that somebody has to be

22   actually trying at the door in order to have a violation.  But

23   the intent is very important.

24        Go ahead.

25        MR. DUNN:  Yes.  So there's a very presence -- the

1    mere fact that somebody is present at what turns out to be a

2    crime scene doesn't make them guilty of any offense.

3          What credibility to give to Caroline Davis, that's up

4    to you to decide.  She eliminated a ten-year prison exposure to

5    testify in the deal that she got, the plea agreement that she

6    had.  It's up to you to decide whether you think that affects

7    her credibility.

8          So, again, because you're in a group doesn't make you

9    guilty with what the group does.  Give words their real

10   meaning.  Keep an open mind.  Reasonable doubt is a difficult

11   standard for the government to satisfy.

12         Can you -- have you concluded beyond all reasonable

13   doubt at this point that Heather Idoni is guilty of the crimes

14   that she's charged?

15         I want to conclude with a story that reminds me of a

16   reasonable doubt standard.  And it involves --

17         THE COURT:  Your microphone is sort of going in and

18   out.  Be careful.  Want to make sure we can hear you.

19         MR. DUNN:  This right here?  Okay.

20         People who have to hesitate before making one of the

21   most important decisions in their life have reasonable doubt.

22   I don't know that this will be one of the most important

23   decisions in your life, but it's a very important decision that

24   you're going to have to make in this case.

25         There was this ten-year-old boy who didn't think he

1    was getting enough attention from his father, and so, finally,

2    he got the lead in the play at the school.  And he thought now

3    he'll get the attention of his father.  And so he prepared, he

4    was excited, and it came the night of the show.  And the show

5    started early, started at about 7:00.

6           His dad forgot about it.  His dad stayed in his

7    office.  He decided he had to work late that night, but about

8    8:00 he suddenly remembered; he missed his son's big moment.

9    So he didn't go home right away.  He waited until they got

10   home.  He then called home.  His wife answered the phone.  And

11   he said -- he knew how upset they'd be because he hadn't

12   called -- "Can I come home now?"  His wife said, "You better

13   ask him."  His wife put the boy on the phone.  And the dad said

14   to the son, "Can I come home now?"

15          And the son hesitated for what seemed like an

16   eternity, long, long, long time on the phone.  He finally said,

17   "Yeah, Dad.  You can come home."  That boy had a reasonable

18   doubt.  He had to hesitate before making that important

19   decision.

20          So I'm asking you to be careful in the decision that

21   you make.  Follow the judge's instructions.  Thank you.

22          THE COURT:  All right.  Mr. Walsh.

23          MR. KIYONAGA:  Your Honor, I think my closing will be

24   substantially shorter than Mr. Walsh's.

25          THE COURT:  I'll leave it to the two of you if you

1    wish to trade.

2              MR. KIYONAGA:  Does my mic work?

3              THE COURT:  Not as well as it could.

4              MR. KIYONAGA:  Can you hear me?

5              THE COURT:  That's better.

6              MR. KIYONAGA:  Is that a yes?

7              THE COURT:  I think you could pull the mic up just a

8    little bit on the tie.

9              MR. KIYONAGA:  Is that better?

10             THE COURT:  I think so.

11                          CLOSING ARGUMENT

12                          BY MR. KIYONAGA:

13             Good afternoon, ladies and gentlemen.  Three and a

14   half hours, that's how long the government cross-examined

15   Herb Geraghty.  They came at him from every direction,

16   hammering him with all sorts of different questions for three

17   and a half hours, seeking his admission to joining a

18   conspiracy.

19             They wanted Mr. Geraghty to admit to planning or to

20   assisting this, quote-unquote, blockade.  He didn't admit; he

21   couldn't admit because he hadn't done it.  Ask yourselves why

22   the government was so desperate for his admission.  The answer

23   is because they don't have any other evidence.

24             Absolutely no evidence of an agreement by

25   Mr. Geraghty to injure, to oppress, to threaten, or to

1    intimidate anyone.  No participant testified, no witness

2    testified about any sort of agreement entered into by

3    Mr. Geraghty.

4           Caroline Davis, a government witness, testified that

5    she saw Mr. Geraghty at the pre-rescue get-together the night

6    before and said that he had reservations.  He didn't want to

7    blockade.  He didn't want to block anybody.  That's the

8    antithesis of an agreement to block.

9           No witness testified -- no witness testified about

10   any conduct on the scene indicative of any sort of agreement to

11   impede anyone with force, with threat of force, or with

12   physical obstruction.  And physical obstruction means a real

13   obstruction.  It means to render impassable.  This lectern

14   stands between myself and yourselves.  It's not a physical

15   obstruction.  I can step around it and walk to you.

16          Only one witness who was on the scene mentioned

17   Mr. Geraghty by name.  That was Tina Smith, the clinic manager.

18   She only mentioned Mr. Smith [sic] to say that she had beaten

19   him with a stick.  This was after she brandished her crucifix

20   and told you that she had used her broomstick only to push

21   back, only to hold the line.

22          Of all the other witnesses, not a one said a word

23   about what, if anything, Mr. Geraghty did at the scene.  Sasha

24   Proctor, Sara Compton, Shandy [sic] Holler, Officer Whyte,

25   Officer Alemian, Special Agent Biscardi.  Not a word from any

1    of them.

2              The judge is going to tell you, she's going to

3    instruct you on the law here.  And as you've been told by

4    everybody, you need to follow the judge's instructions.  But

5    her instructions are going to tell you, along with the elements

6    of the charged crimes, what a conspiracy is not.

7              A conspiracy is not merely getting together to talk

8    about common interests, merely getting together to do similar

9    things, merely being present at the scene of an agreement,

10   merely being present at the scene of a crime, merely knowing

11   about an agreement.

12             At best, the sum total of the government's evidence

13   indicates no more than that on the part of Mr. Geraghty.

14   Receiving texts from a friend who might be organizing something

15   is not the same as planning the event in question.  Attending a

16   get-together does not equal planning, nor does it indicate an

17   agreement to block; especially since the only evidence

18   pertaining to Mr. Geraghty about that get-together was that he

19   did not want to block, and he said as much.

20             He simply cannot be said to have used force, threat

21   of force, or physical obstruction when the only adjective to be

22   found in his description of the action that he envisioned to

23   Lauren Handy was nonviolent.  Putting his, quote-unquote, body

24   on the line meant only resisting -- I'm sorry -- only risking

25   arrest.  That's what he told you, and no witness has said

1    otherwise.

2            And arrest -- risking arrest, as counsel for Mr. --

3    Ms. Handy pointed out to you, does not remotely equate to

4    blocking.  Caroline Davis told you that they used to get

5    arrested for trespass and that rescuers worked on ways to

6    conduct a rescue without violating the FACE Act.

7            Three and a half hours of very intensive

8    cross-examination did not change Mr. Geraghty's insistence,

9    uncontradicted by any of the evidence, that he never agreed to

10   block, he never agreed to help others block, he never helped

11   others block, and he never blocked himself.

12           At 248, the FACE Act itself, will cause force or

13   physical obstruction -- which means an impassable obstacle in

14   practical terms -- to injure, intimidate, or interfere with

15   somebody seeking or providing reproductive health services.

16           You've seen a lot of video.  You're going to have a

17   lot of video in the deliberating room with you.  Look at it.

18   You will not see a single instance of Mr. Geraghty touching

19   anyone, trying to touch anyone, threatening or intimidating

20   anyone, yelling, creating a physical obstruction, or impeding

21   passage.

22           What the videos do show is him being pushed, or at

23   least impelled, into the waiting room.  Is that a trespass?

24   Perhaps.  He's not charged with trespass.  The government chose

25   to charge him with FACE, which is a far more serious and a far

1       more particularized crime.

2               You see him impelled into the waiting area, being

3       jostled by all the people around him, and you see him being

4       beaten by Tina Smith.  Then you see him being shoved out of the

5       waiting area with equal force.  After that, he's milling about

6       almost aimlessly.  He's filming, he's standing around.  His

7       physical persona is the antithesis of assertive, much less

8       intimidating.

9               He's got his hands in front of himself.  He's got an

10      almost bemused, confused look on his FACE as if he's thinking

11      to himself, what in the hell is going on?

12              He never stood in a doorway while anyone else was

13      trying to get through.  He never sat in a chair, never touched

14      a chain, and he left.  He told you that the police explained

15      that they would issue three warnings.

16              You'll see in the video he's standing in front of a

17      police officer who is speaking.  You don't have the audio, but

18      he's speaking, and then he's writing in his notepad.  That

19      happens twice.  Mr. Geraghty turns around, enters the elevator

20      and leaves.  That's why he wasn't arrested at the scene.  That

21      came much later.

22              His demeanor throughout, from start to finish, was

23      absolutely diffident, not forceful in any remote way.  Now, the

24      government tells you that he blocked Shandy [sic] Holler.

25      Yesterday, one of the government counsel described him as

1       having accosted Shandy [sic] Holler.

2               The government also said that he stood in front of

3       the door blocking Shandy Holler as she came off the elevator.

4       I objected because he was standing to his left of the door.  If

5       you look at the video, you will see the doorjamb off his right

6       shoulder.  Throughout that period, when he was standing still

7       at all, he was standing against the wall, not against the door.

8               Shandy Holler testified.  She sat ten yards from Mr.

9       Geraghty.  She never said he accosted her or blocked her or did

10      anything else.  She didn't even mention him.  Look at the

11      video.  It shows Mr. Geraghty standing nearby while Shandy

12      Holler and her husband come off the elevator.  He's standing in

13      such a way as to respect their space.  At a certain point he

14      appears to be talking calmly to him.  You don't see gestures,

15      you don't see leaning in.  No invasion of the privacy of space

16      that most people come to expect in polite society.  Not in

17      front of any door.

18              At a certain point, she collapses to the floor.  At

19      that point Mr. Geraghty goes back into the waiting room to

20      fetch Jean Marshall who is a nurse.  Now, I need to correct

21      myself.  I misstated in one of my three objections to the

22      government's argument.  I was informed afterwards that

23      Mr. Goodman may, in fact, be on the video as having emerged

24      into the hall from the waiting room after Mr. Geraghty went in.

25              I'm like Blanche Dubois; I depend on the kindness of

1     strangers.  Be that as it may, it doesn't change the fact of

2     his uncontradicted testimony that he went in to get a nurse.

3                MR. CRABB:  Objection, Your Honor.  There's no

4     evidence she's a nurse.  There's no evidence in the record at

5     all.

6                THE COURT:  We don't have any evidence of that except

7     her name.  That's -- that's something that's not in --

8                MR. KIYONAGA:  I believe Mr. Geraghty testified she

9     was a nurse.

10                THE COURT:  I don't believe so.  But I'll leave it to

11    the jury to decide whether she was described that way.

12                MR. KIYONAGA:  Look at the way Jean Marshall treats

13    the prostrate Shandy [sic] Holler on the floor.  She's tender.

14    She's got her hand on her cheek.  She's trying to care for her.

15                Mr. Geraghty told Ms. Holler she needed an ER, and

16    then she left to ask Lauren Handy to call an ambulance.  She

17    did tell Ms. Holler that there were no procedures being

18    performed that day.  That's not impeding her.  That's telling

19    the truth.

20                There's no evidence that Dr. Santangelo was even in

21    the clinic at that time.  In fact, Mr. Handy [sic] testified

22    that he believed he was not.  Does it help Ms. Holler to leave

23    her in distress on the floor?  Does it help her to suggest that

24    she call an ER -- an ambulance and then go speak to someone

25    else about seeking to get one?

1          The government has told you that Mr. Geraghty was

2     coordinating with Ms. Handy when he pointed to opposite walls

3     inside the waiting room.  He's testified that he was talking

4     about other businesses on the corridor and distributing flyers.

5          The government says that Mr. Geraghty was callous

6     about Paulette falling to the ground.  Paulette is an older

7     woman.  If you look at the video, she was grievously manhandled

8     when she came in.

9          Are you still getting me?

10         She fell to the floor.  So Mr. Geraghty went in to

11    see if she was all right.  When he saw that she was, he moved

12    along.

13         The government tells you that this is a game to

14    Mr. Geraghty.  It's not a game.  Mr. Geraghty understood that

15    the cops would give -- the police would give three warnings.

16    She waited for -- he waited for two and he left.  That's what

17    happened.

18         There's no need to distort evidence if you have

19    evidence that proves the case.  The government does not.  What

20    was Mr. Geraghty's purpose?  He acknowledged a deep-seated

21    personal opposition to abortion, as one of many forms of

22    reprehensible violence; against people in police custody,

23    against victims of war, against immigrants.

24         He also testified as to his personal belief that the

25    doctor who ran that clinic, Cesare Santangelo, presented a

1    particular danger.  He saw the same video that Lauren Handy had

2    seen.  And as a consequence of that video, he believed -- Herb

3    Geraghty believed that Dr. Santangelo would perform live-birth

4    abortions; denial of care to a child born alive after a failed

5    abortion.

6           That's why he chose on that day to go to the

7    surgi-clinic out of some 20 clinics that are in the D.C. Metro

8    area.  His purpose was swayed gently.  Mothers, that they do,

9    in fact, have a choice and that it should be an informed

10   choice; that an option to abortion is adoption.  That there's

11   assistance available to mothers of unplanned pregnancies and to

12   their children.

13          Physically impelling in any way a mother's assent to

14   his point of view is utterly alien to his persona, utterly

15   absent from the videos, and utterly antithetical to his

16   realization that these mothers were undergoing, perhaps, the

17   worst day of their lives.  In an agony of anguish, all too

18   often alone, because it's too easy for the fathers of these

19   unborn babies to ignore what they've done, to discard the baby

20   and often the mother.

21          Herb Geraghty was there to entreat, not to bludgeon;

22   to express his belief, his opinion gently.  And that's not

23   unlike what we run into, probably all of us, in some -- with

24   some frequency in this city.  Not infrequently, as I walk along

25   a sidewalk -- I know they're very common out in Alexandria in

1    front of the state courthouse -- you'll be approached by

2    somebody soliciting charitable donations on the sidewalk.

3    It's -- normally, it's a youngster with a smile on his or her

4    face in a T-shirt that says Doctors Without Borders or Special

5    Olympics.  And they'll walk up to you and say, sir, do you have

6    a minute to talk about children with special needs?  And you

7    either talk to them or you don't.  They don't stand in your way

8    and impede your passage.

9         Another example that might resonate with some or most

10   of you is airlines.  Traveling by airline is not as much fun as

11   it used to be.  Consider somebody that develops a deep-seated

12   opposition to the airlines because the seats are too narrow,

13   there's not enough leg room, and they've developed a disturbing

14   habit of canceling flights willy-nilly, leaving you stranded in

15   the city of your connection.

16        Imagine somebody goes to an airport, goes out to the

17   departure gate, and sees that the departure gate people

18   standing in a phalanx at the -- the point where the passengers

19   leave the gate and board the plane; and perhaps the passengers

20   cannot get by those people.  You may even know them.  But all

21   he's doing is going up to passengers and saying, excuse me,

22   sir, are you aware that they're going to put you in a seat that

23   is far too narrow for your rear end, there's not going to be

24   any room for your knees, and you might end up in Des Moines

25   instead of your destination in San Francisco because they seem

1    to cancel flights without any -- any real reason.

2            Well, at that point the person who is being spoken to

3    can choose to ignore them, can choose to listen and do

4    something about it, but he hasn't -- the speaker has not forced

5    his view and has not impeded his progress.  Well, that's

6    exactly analogous to what Mr. Geraghty had in mind.

7            I said during my opening when first we all met that

8    abortion is perhaps the most divisive issue in our public

9    square.  Almost no one is indifferent.  And almost everybody's

10   view on the issue is very deeply and closely held because it

11   goes to the heart of how we see ourselves, our relationships

12   with the people around us, our place in the cosmos.

13           For women, it's a question of dominion over their

14   bodies, over the question of a new life within their bodies.

15   For men, it implicates questions of the responsibilities that

16   come with intimacy.  And these are naturally contemplative

17   questions that lead to very strongly held beliefs, and it's

18   hard to put these beliefs aside.

19           I'm reminded by this case of an old friend of mine

20   who 50 years ago was called a baby killer.  He was a very

21   distinguished veteran of the Vietnam War, and like everybody or

22   almost everybody that went over there, he spent his entire tour

23   thinking about going home.  With each passing day of this tour,

24   home loomed larger in his mind.  His folks, his girlfriend.  He

25   was from Hawaii, so the beach.

1          And his was very, very hazardous duty.  He was a

2    medic with what were known as long-range reconnaissance

3    platoons, the LRRPs.  He spent almost all of his time in very

4    hazardous missions in denied areas.  It was hot, buggy.  He had

5    a rucksack that was impossibly heavy, and he was scared almost

6    all the time.

7          So finally came the day when his tour ended.  He came

8    home.  And the airport terminal in Hawaii is unusual.  It's

9    open to the air, so you get the combination of the sea breeze

10   and the wonderful scent of all the flowers of the leis that

11   they drape on the shoulders of returning passengers.

12         So he steps off the plane into this beautiful

13   bouquet, and the first thing that happens, this scrawny kid

14   with a scrawny beard shrieking in his face that he's a baby

15   killer.  He was a medic.  His job was to stitch people up.

16         But at a stroke, what should have been one of the

17   best days of his life was awful, something that he'll never

18   forget.

19         Today, half the country regards the other half as

20   baby killers because they condone abortion.  The second half

21   regards the first half as callous deniers of women's rights.

22         The amazing thing about my friendship with -- my

23   friend Allen, he and I hold diametrically opposed opinions on

24   abortion, yet we're still very, very close friends.  He's an

25   hanai uncle to my children, which means -- in Hawaii, that's a

1    nonbiological adult who takes responsibility for someone else's

2    children.  But that capacity to disagree without disapproving

3    is in very, very short supply today, and it's not a good thing.

4          As Americans, we should learn to see our way through

5    every issue, even one as divisive as this one.  But that's why

6    it took five days to select the 15 of you as jurors.  It took

7    that long to find 15 people who would promise the Court to be

8    impartial in considering this evidence, and that's exactly what

9    the 15 of you have done, made that promise.

10         And an impartial review of this evidence, in fact,

11   any review of this evidence, will show Mr. Geraghty to be

12   nothing more than a concerned citizen seeking to share

13   peacefully his belief, his opinion with the mothers in these

14   clinics.

15         Now, the government has said twice -- they said it in

16   opening and they said it today -- that in this country we are

17   entitled to hold our opinions.  And I asked you at the

18   closing -- at the opening, rather, whether the government

19   really believed that.  And I ask again now -- you've seen and

20   heard the evidence -- why is Mr. Geraghty here?

21         He told you on the stand that it was worth it to him

22   to risk confinement, jail -- in this case prison -- merely for

23   the chance to reach just one of those women.  Ask yourselves,

24   please, if that is the sort of conduct that these laws were

25   intended to punish.

```
 1                 THE COURT:  All right.  We're going to break for
 2      lunch at this point.  It's ten of 1:00.  Let me ask you to come
 3      back at 2:00, and then we'll continue with the closing
 4      arguments.  All right?
 5                 Don't talk about the case, think about it.  Have a
 6      good lunch.
 7                 (The following proceedings were had out of the
 8      presence and hearing of the jury:)
 9                 THE COURT:  Hopefully, people will be careful about
10      discussing the law.  What I would ask is, I know that some of
11      you have transcripts.  Be careful about acting as if you're
12      reading from a transcript because we tell them they don't get
13      them.  And the problem -- you can always write down what
14      somebody says or whatever.  I don't have a problem using the
15      statements because it's more accurate than your memory.
16                 But I just want to make sure that it doesn't appear
17      that you're -- got this from a transcript specifically, so that
18      they're not asking for them at a later point.  For one thing,
19      that raises a whole different issue.
20                 All right?  Mr. Walsh, you want to say something or
21      not?
22                 MR. WALSH:  No.
23                 MR. KIYONAGA:  Your Honor, I honestly did think that
24      was going to be ten minutes.  I apologize.  Apparently, I ran
25      considerably over.
```

 1                THE COURT:  I've learned that lawyers are not good at

 2     counting on the time.  Keeping in mind that I'm a lawyer as

 3     well.  All right.  Everybody is excused.

 4                (A lunch recess was taken at 12:55 p.m. until

 5     2:00 p.m. this same date.)

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true, and complete

6      transcript of the proceedings to the best of my ability.

7                 Dated this 24th day of August, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 106:9

## 1

**1** [6] - 51:5, 51:20, 52:19, 79:19, 80:8, 82:22
**10** [2] - 59:18, 61:22
**100** [1] - 78:4
**1050** [1] - 1:24
**11** [1] - 59:18
**11:00** [1] - 41:4
**12** [2] - 3:3, 59:17
**12:55** [1] - 105:4
**1350** [1] - 2:3
**1413** [1] - 2:6
**15** [4] - 61:23, 103:6, 103:7, 103:9
**16983** [1] - 1:18
**19** [3] - 5:12, 10:25, 12:6
**1:00** [1] - 104:2
**1:22-CR-096** [1] - 1:3

## 2

**2** [14] - 32:15, 32:22, 52:17, 52:20, 52:24, 53:6, 53:16, 79:18, 80:8, 82:1, 87:17, 88:2, 88:5, 88:11
**20** [2] - 28:7, 99:7
**20001** [2] - 2:23, 106:11
**20004** [1] - 1:16
**20036** [2] - 1:25, 2:4
**202-354-3246** [1] - 2:23
**2020** [14] - 13:2, 13:15, 13:25, 14:24, 15:2, 15:6, 16:6, 16:23, 18:4, 19:5, 24:4, 31:6, 33:18, 36:25
**2022** [1] - 28:7
**2023** [2] - 1:6, 106:7
**20530** [1] - 1:13
**20815** [1] - 2:9
**20th** [1] - 25:1
**2112** [1] - 18:21
**21st** [3] - 17:4, 17:6, 17:16
**22** [1] - 15:6
**22-096** [1] - 4:6
**22314** [1] - 2:11
**22nd** [10] - 13:2, 16:6, 18:3, 19:4, 22:15, 24:4, 25:2, 31:6, 33:18, 36:25

## 24

**24** [1] - 1:6
**248** [1] - 94:12
**24th** [1] - 106:7
**25** [1] - 56:21
**2:00** [2] - 104:3, 105:5

## 3

**3** [3] - 53:20, 53:22, 53:23
**30** [2] - 60:23, 71:15
**308** [1] - 2:4
**333** [2] - 2:22, 106:11
**370th** [1] - 1:18
**3712** [1] - 2:8
**38803** [1] - 1:21

## 4

**40** [1] - 60:21
**41** [1] - 3:4
**45** [3] - 60:23, 60:24, 80:11
**4506** [1] - 1:21
**48708** [1] - 2:7

## 5

**50** [1] - 101:20
**500** [1] - 1:24
**51525** [1] - 1:19
**5:00** [1] - 61:24

## 6

**6** [1] - 59:17
**600** [1] - 2:10
**601** [1] - 1:13
**62** [1] - 3:5
**6714** [2] - 2:22, 106:10

## 7

**78** [1] - 3:6
**7:00** [1] - 90:5

## 8

**8:00** [1] - 90:8

## 9

**91** [1] - 3:7
**950** [1] - 1:16
**9:00** [3] - 16:6, 19:23, 22:15
**9:05** [2] - 68:14, 71:17
**9:20** [1] - 1:6
**9:37** [1] - 71:17

## A

**A.M** [1] - 1:6
**a.m** [2] - 68:14, 71:17
**a/k/a** [1] - 20:2
**abet** [1] - 88:2
**abetting** [6] - 31:10, 31:11, 32:13, 32:23, 87:24, 88:5
**abettor** [1] - 31:18
**ability** [1] - 106:6
**able** [5] - 27:13, 27:19, 66:24, 77:22, 82:19
**aborted** [2] - 55:24, 56:6
**abortion** [5] - 23:23, 26:1, 34:3, 34:4, 39:24, 54:5, 55:18, 56:8, 98:21, 99:5, 99:10, 101:8, 102:20, 102:24
**abortions** [12] - 23:4, 23:8, 24:2, 27:3, 33:8, 44:9, 55:9, 55:19, 56:2, 56:4, 99:4
**absent** [1] - 99:15
**absolute** [1] - 64:1
**absolutely** [2] - 91:24, 95:23
**accepted** [1] - 71:7
**access** [28] - 13:5, 13:14, 13:17, 14:8, 15:11, 15:16, 16:13, 18:4, 22:13, 23:19, 25:16, 26:23, 27:27, 29:9, 30:19, 30:21, 34:8, 34:12, 34:17, 36:17, 36:25, 37:17, 39:2, 39:15, 42:25, 44:25, 76:21, 84:2
**accessible** [1] - 71:25
**according** [1] - 87:6
**accosted** [3] - 25:2, 96:1, 96:9
**accountable** [1] - 40:21
**accurate** [3] - 8:2, 104:15, 106:4
**accusations** [1] - 42:9
**accused** [1] - 78:10
**acknowledged** [1] - 98:20
**Act** [13] - 30:19, 47:11, 47:21, 48:6, 59:1, 60:3, 76:13, 79:16, 80:5, 87:17, 88:15, 94:6, 94:12
**act** [1] - 55:3
**acting** [1] - 104:11

**action** [2] - 14:11, 93:22
**Action** [1] - 1:2
**actions** [4] - 25:17, 28:8, 28:9, 48:1
**activism** [1] - 48:3
**activists** [1] - 49:20
**activities** [1] - 31:20
**activity** [1] - 28:10
**actual** [1] - 52:14
**add** [1] - 47:4
**addition** [1] - 28:6
**additionally** [1] - 5:14
**address** [4] - 6:17, 8:10, 42:7, 46:3
**addressed** [1] - 44:13
**addressing** [3] - 7:1, 7:3, 56:25
**adjective** [1] - 93:21
**admission** [2] - 91:17, 91:22
**admit** [3] - 91:19, 91:20, 91:21
**admitted** [1] - 44:25
**adoption** [1] - 99:10
**adult** [2] - 22:2, 103:1
**affected** [1] - 55:10
**affects** [2] - 88:6, 89:6
**afternoon** [3] - 62:11, 81:18, 91:13
**afterwards** [1] - 96:22
**age** [3] - 55:24, 56:10, 56:11
**Agent** [2] - 84:1, 92:25
**ago** [7] - 58:7, 63:25, 67:7, 68:18, 75:11, 77:5, 101:20
**agony** [2] - 35:9, 99:17
**agree** [7] - 30:7, 46:24, 47:7, 62:22, 64:11, 65:16, 83:14
**agreed** [8] - 16:20, 28:4, 28:15, 47:14, 63:20, 74:8, 94:9, 94:10
**agreement** [33] - 28:19, 30:6, 57:14, 57:16, 58:1, 73:9, 74:8, 76:6, 82:24, 83:8, 83:10, 83:15, 85:17, 85:19, 85:24, 85:25, 86:1, 86:2, 86:3, 86:10, 86:14, 86:18, 86:19, 86:23, 88:4, 89:5, 91:24, 92:2, 92:8, 92:10, 93:9, 93:11, 93:17
**ahead** [6] - 10:14, 32:7, 51:10, 88:24
**ahold** [1] - 72:14

**aid** [1] - 88:2
**aider** [1] - 31:18
**aiding** [6] - 31:10, 32:12, 32:23, 87:24, 88:4
**aimlessly** [1] - 95:6
**air** [1] - 102:9
**airline** [1] - 100:10
**airlines** [2] - 100:10, 100:12
**airport** [2] - 100:16, 102:8
**Alaska** [1] - 75:22
**Alemian** [1] - 92:25
**Alexandria** [2] - 2:11, 99:25
**ALFRED** [1] - 2:2
**Alfred** [2] - 2:3, 4:17
**alien** [1] - 99:14
**alive** [7] - 44:9, 54:16, 54:21, 56:1, 56:5, 56:17, 99:4
**allegation** [1] - 7:21
**Allen** [1] - 102:23
**allow** [5] - 23:25, 44:6, 44:7, 78:13, 82:16
**allowed** [4] - 26:23, 39:20, 39:22, 69:17
**alluded** [1] - 34:2
**almost** [8] - 62:11, 95:6, 95:10, 101:9, 101:22, 102:3, 102:5
**alone** [4] - 28:9, 28:10, 46:15, 99:18
**amazing** [1] - 102:22
**ambulance** [2] - 97:16, 97:24
**Amendment** [1] - 8:15
**America** [2] - 40:2, 40:12
**AMERICA** [1] - 1:2
**Americans** [1] - 103:4
**amount** [1] - 71:13
**analogous** [1] - 101:6
**anguish** [1] - 99:17
**anguished** [1] - 13:1
**ankle** [2] - 20:25, 52:22
**announced** [1] - 22:18
**annoy** [1] - 78:23
**answer** [2] - 35:25, 91:22
**answered** [2] - 86:4, 90:10
**answers** [2] - 58:13, 58:14
**antithesis** [2] - 92:8, 95:7
**antithetical** [1] - 99:15

**anxiety** [1] - 47:4
**anyplace** [1] - 5:15
**anyway** [1] - 12:1
**apart** [3] - 44:16, 52:10, 77:11
**apologize** [2] - 10:15, 104:24
**appear** [1] - 104:16
**appearing** [3] - 4:14, 4:25, 86:23
**application** [1] - 59:14
**apply** [7] - 65:5, 73:2, 73:3, 76:16, 76:18, 77:22, 77:25
**appointment** [10] - 16:4, 16:6, 16:10, 16:11, 19:22, 19:23, 24:22, 43:5, 43:6, 43:7
**appreciate** [1] - 41:22
**approached** [1] - 100:1
**appropriate** [4] - 68:10, 84:9, 84:13, 88:10
**area** [26] - 13:11, 15:16, 17:16, 17:17, 18:25, 19:2, 20:23, 21:7, 21:10, 21:12, 21:17, 22:4, 24:9, 25:5, 25:11, 37:5, 37:6, 37:21, 38:19, 39:6, 39:18, 50:3, 87:9, 95:2, 95:5, 99:8
**areas** [1] - 102:4
**argue** [4] - 6:8, 40:4, 63:9, 84:11
**arguing** [1] - 84:12
**argument** [16] - 6:10, 8:20, 8:25, 10:1, 53:14, 54:13, 58:7, 62:7, 63:13, 63:16, 63:18, 65:1, 65:12, 73:21, 84:5, 96:22
**ARGUMENT** [6] - 3:2, 12:22, 41:17, 62:8, 78:16, 91:11
**arguments** [13] - 4:22, 5:11, 7:3, 9:6, 9:24, 10:7, 47:20, 63:2, 64:17, 80:6, 81:1, 84:16, 104:4
**arise** [1] - 56:9
**arrest** [15] - 15:10, 15:11, 15:14, 27:19, 42:16, 42:17, 42:21, 42:22, 50:11, 57:24, 57:25, 93:25, 94:2
**arrested** [5] - 50:9,

70:4, 71:2, 94:5, 95:20
**arrive** [2] - 24:20, 81:17
**arrived** [6] - 23:12, 24:21, 25:1, 25:18, 81:16, 81:23
**arrives** [1] - 70:19
**Ashley** [5] - 13:13, 22:1, 24:20, 35:9, 39:13
**aside** [2] - 52:6, 101:18
**assault** [1] - 67:17
**assent** [1] - 99:13
**assertive** [1] - 95:7
**assist** [2] - 10:24, 21:3
**assistance** [4] - 39:7, 44:8, 49:24, 99:11
**assisting** [2] - 44:8, 91:20
**associate** [1] - 83:6
**associated** [1] - 56:2
**association** [1] - 33:20
**assume** [2] - 58:20, 70:14
**assured** [1] - 41:24
**attached** [1] - 37:7
**attacked** [1] - 46:3
**attacks** [1] - 46:4
**attempt** [3] - 45:17, 45:18, 52:20
**attempted** [2] - 52:23, 73:23
**attendance** [1] - 74:20
**attended** [1] - 74:19
**attending** [1] - 93:15
**attention** [7] - 6:10, 10:6, 41:23, 42:8, 54:7, 90:1, 90:3
**attentiveness** [1] - 62:14
**attenuated** [1] - 44:18
**attorney** [1] - 64:9
**Attorney's** [1] - 1:12
**attorneys** [1] - 65:3
**audacity** [2] - 27:7, 27:9
**audio** [1] - 95:17
**August** [2] - 1:6, 106:7
**authority** [1] - 59:5
**available** [2] - 54:13, 99:11
**Avenue** [6] - 1:16, 1:24, 2:3, 2:6, 2:22, 106:11
**avoid** [1] - 63:17
**avoids** [1] - 69:3
**aware** [3] - 62:12,

63:8, 100:22
**awareness** [1] - 46:17
**awful** [1] - 102:17

## B

**babies** [6] - 44:9, 46:23, 54:23, 55:18, 55:23, 99:19
**baby** [7] - 54:13, 56:5, 56:16, 99:19, 101:20, 102:14, 102:20
**back's** [1] - 26:10
**backyard** [1] - 57:3
**baked** [2] - 14:16, 46:20
**barbecue** [1] - 57:4
**base** [1] - 63:12
**based** [4] - 7:7, 8:18, 41:9, 78:2
**basic** [1] - 47:6
**bathroom** [1] - 40:24
**Bay** [1] - 2:7
**beach** [1] - 101:25
**bear** [1] - 66:9
**beard** [1] - 102:14
**beaten** [2] - 92:18, 95:4
**beautiful** [1] - 102:12
**become** [1] - 64:25
**bed** [1] - 18:7
**bedrock** [1] - 40:1
**BEFORE** [1] - 1:9
**began** [8] - 13:15, 14:17, 14:21, 21:8, 21:14, 24:19, 39:13
**begin** [3] - 10:10, 12:20, 28:22
**beginning** [7] - 14:9, 14:16, 14:19, 25:2, 30:11, 86:9
**begins** [1] - 42:4
**behalf** [3] - 5:4, 10:1, 41:21
**behind** [1] - 81:12
**belief** [6] - 55:16, 55:19, 55:21, 98:24, 99:22, 103:13
**beliefs** [2] - 101:17, 101:18
**believers** [1] - 46:22
**believes** [1] - 54:19
**bell** [3] - 21:18, 29:1, 37:8
**Bell** [6] - 15:15, 15:24, 20:19, 33:22, 83:22
**Bell's** [1] - 27:15
**belong** [1] - 67:16
**bemused** [1] - 95:10

**bench** [1] - 10:18
**beside** [1] - 30:12
**best** [4] - 64:19, 93:12, 102:17, 106:6
**better** [4] - 58:18, 90:12, 91:5, 91:9
**between** [15] - 5:25, 7:8, 7:12, 10:4, 15:7, 41:1, 57:3, 57:11, 61:23, 65:13, 75:5, 76:7, 76:9, 84:20, 92:14
**beyond** [12] - 31:4, 33:1, 40:17, 64:2, 71:4, 72:20, 74:18, 75:21, 76:2, 79:7, 86:6, 89:12
**bias** [1] - 78:3
**bicycle** [3] - 70:2, 70:5
**big** [8] - 29:16, 47:25, 50:22, 54:6, 56:21, 56:22, 58:6, 90:8
**bigger** [1] - 34:21
**biggest** [1] - 56:21
**bike** [3] - 27:15, 70:15
**bind** [3] - 17:21, 21:14, 36:16
**binding** [3] - 29:20, 31:12, 72:10
**birth** [5] - 23:4, 34:4, 55:9, 55:19, 99:3
**Biscardi** [1] - 92:25
**Biscardi's** [1] - 84:1
**bit** [5] - 58:13, 58:15, 65:2, 87:23, 91:8
**Blanche** [1] - 96:25
**BLERINA** [1] - 1:23
**block** [47] - 13:13, 13:17, 14:8, 15:16, 15:20, 15:21, 16:1, 16:3, 16:12, 17:19, 18:4, 21:11, 22:17, 22:19, 22:20, 33:8, 33:10, 33:19, 34:6, 34:8, 34:12, 34:16, 34:24, 35:13, 35:20, 36:3, 36:17, 36:25, 38:10, 38:12, 39:1, 39:14, 39:16, 43:4, 43:8, 43:21, 52:13, 52:14, 92:7, 92:8, 93:17, 93:19, 94:10, 94:11
**blockade** [5] - 21:8, 37:22, 39:4, 91:20, 92:7
**blockading** [1] - 27:12
**blockage** [1] - 52:15
**blocked** [18] - 13:8, 22:8, 22:13, 25:4,

25:6, 25:9, 26:3, 33:15, 35:6, 35:7, 35:8, 37:11, 37:17, 39:21, 42:11, 94:11, 95:24, 96:9
**blocking** [29] - 13:9, 13:11, 15:11, 22:4, 23:24, 24:8, 24:10, 24:18, 25:13, 27:9, 35:17, 36:6, 36:9, 36:13, 36:22, 42:24, 44:20, 44:25, 45:24, 49:25, 50:15, 50:17, 52:5, 52:16, 58:2, 88:16, 94:4, 96:3
**blocks** [1] - 52:1
**bludgeon** [1] - 99:21
**board** [1] - 100:19
**bodies** [2] - 101:14
**bodily** [5] - 48:20, 48:23, 49:7, 53:8, 53:11
**body** [5] - 23:15, 35:6, 66:19, 69:14, 93:23
**body-worn** [2] - 23:15, 69:14
**boil** [1] - 48:25
**boiling** [1] - 53:8
**book** [1] - 54:10
**boot** [1] - 20:25
**booth** [1] - 59:12
**Borders** [1] - 100:4
**born** [8] - 34:4, 44:9, 54:16, 54:21, 56:1, 56:5, 56:17, 99:4
**born-alive** [2] - 44:9, 56:1
**Boston** [2] - 15:1, 16:16
**bottom** [1] - 15:17
**bound** [1] - 21:17
**bouquet** [1] - 102:13
**Box** [1] - 1:21
**boy** [3] - 89:25, 90:13, 90:17
**BOYLE** [1] - 1:22
**Boyle** [2] - 1:23, 4:15
**boys** [1] - 54:15
**branch** [1] - 58:23, 58:24, 58:25
**branches** [2] - 59:4, 59:5
**brandished** [1] - 92:19
**breach** [6] - 37:20, 70:17, 70:18, 70:20, 70:23, 71:23
**breached** [2] - 22:12, 28:16
**break** [14] - 5:25, 6:9, 10:4, 10:5, 40:8,

40:24, 40:25, 41:3, 57:20, 60:14, 60:17, 61:8, 61:12, 104:1
**breaking** [5] - 14:12, 14:13, 14:15, 42:12, 57:15
**breaks** [2] - 6:9, 10:3
**breeze** [1] - 102:9
**brief** [3] - 4:20, 5:24, 68:23
**briefly** [2] - 5:20, 56:24
**bring** [1] - 71:7
**brings** [2] - 36:14, 63:18
**broad** [2] - 47:18, 47:19
**broke** [2] - 20:15, 40:14
**broken** [2] - 48:7, 48:8
**broom** [3] - 21:3, 66:13, 67:3
**broomstick** [1] - 92:20
**brought** [5] - 21:3, 30:16, 69:13, 70:15, 87:25
**bucket** [1] - 51:4
**buggy** [1] - 102:4
**building** [6] - 18:22, 25:3, 43:1, 50:2, 50:7, 50:8
**bulk** [1] - 48:2
**bullheaded** [1] - 59:24
**bumbling** [1] - 6:3
**bump** [1] - 85:20
**bumps** [1] - 42:1
**burden** [6] - 59:25, 60:7, 64:1
**business** [4] - 14:13, 22:25, 39:10, 55:11
**businesses** [2] - 58:15, 98:4
**BY** [5] - 12:23, 41:18, 62:9, 78:17, 91:12

## C

**California** [2] - 54:11, 55:7
**callous** [2] - 98:5, 102:21
**calm** [1] - 24:11
**calmly** [1] - 96:14
**camera** [2] - 23:15, 69:14
**Cameron** [1] - 2:10
**camping** [1] - 57:4
**cancel** [1] - 101:1
**canceling** [1] - 100:14
**CANNON** [7] - 1:17,

4:14, 6:11, 6:14, 9:9, 40:24, 41:18
**Cannon** [10] - 3:4, 4:14, 5:23, 6:1, 9:8, 40:22, 63:6, 65:12, 76:12, 87:16
**Cannon's** [1] - 5:25
**cannot** [2] - 93:20, 100:20
**capacity** [1] - 103:2
**car** [4] - 16:24, 87:5, 87:8, 87:11
**card** [1] - 19:22
**Cardiff** [1] - 2:8
**care** [4] - 13:14, 30:21, 97:14, 99:4
**careful** [5] - 77:10, 89:18, 90:20, 104:9, 104:11
**carefully** [3] - 13:17, 16:3, 60:3
**Caroline** [15] - 14:5, 16:16, 33:12, 35:11, 36:18, 74:7, 83:21, 84:25, 85:4, 86:2, 87:7, 89:3, 92:4, 94:4
**carried** [1] - 18:12
**carry** [2] - 78:3, 83:14
**Carson** [1] - 1:19
**case** [32] - 4:5, 7:21, 29:4, 41:7, 44:15, 44:22, 49:14, 49:15, 50:25, 54:8, 56:8, 60:1, 60:4, 62:16, 62:20, 62:23, 63:4, 64:12, 64:14, 64:17, 64:22, 65:15, 66:2, 70:8, 73:24, 74:9, 77:2, 89:24, 98:19, 101:19, 103:22, 104:5
**Case** [1] - 4:6
**cases** [2] - 8:17, 73:1
**catch** [2] - 11:6, 12:6
**categories** [3] - 48:8, 49:12, 53:21
**Category** [9] - 52:17, 52:19, 52:20, 52:24, 53:6, 53:16, 53:20, 53:22, 53:23
**category** [8] - 48:10, 48:12, 48:13, 49:16, 51:5, 51:20, 53:12, 53:13
**caught** [1] - 78:24
**cell** [2] - 83:25, 84:1
**center** [5] - 15:16, 16:9, 18:9, 18:20, 19:5, 19:7, 20:1,

31:6, 33:19
**Center** [2] - 2:6, 18:3
**certain** [5] - 33:17, 64:18, 76:3, 96:13, 96:18
**certainly** [1] - 6:22
**CERTIFICATE** [1] - 106:1
**certify** [1] - 106:3
**Cesare** [1] - 98:25
**chain** [4] - 69:23, 70:15, 95:14
**chained** [5] - 13:10, 70:1, 71:20, 71:21, 71:23
**chaining** [1] - 29:1
**chains** [20] - 17:22, 18:11, 18:12, 21:14, 22:5, 27:16, 36:14, 39:3, 69:12, 69:14, 69:15, 69:16, 69:18, 69:20, 69:23, 70:24, 70:25, 71:1, 71:5, 72:3
**chair** [23] - 21:16, 25:14, 25:15, 28:24, 34:17, 34:21, 34:23, 37:4, 37:6, 45:10, 45:16, 45:21, 45:24, 50:14, 50:17, 69:9, 70:11, 71:19, 73:9, 73:24, 74:19, 75:3, 76:2, 76:15, 78:7, 78:12, 80:10, 85:12, 87:6
**chairs** [2] - 21:9, 21:10
**challenge** [1] - 42:4
**chance** [4] - 6:3, 16:2, 81:1, 103:23
**change** [6] - 7:2, 40:5, 46:10, 46:17, 94:8, 97:1
**changes** [1] - 68:2
**charge** [4] - 76:16, 79:12, 94:25
**charged** [6] - 29:23, 32:25, 68:7, 89:14, 93:6, 94:24
**charges** [7] - 29:4, 33:2, 35:5, 64:21, 68:8, 72:18, 76:22
**charitable** [1] - 100:2
**Chase** [1] - 2:9
**check** [1] - 12:19
**checking** [1] - 46:5
**cheek** [1] - 97:14
**Chevy** [1] - 2:9
**child** [3] - 25:21, 55:1, 99:4
**children** [5] - 34:4, 99:12, 100:6,

102:25, 103:2
**choice** [3] - 7:12, 99:9, 99:10
**choose** [1] - 101:3
**chose** [3] - 50:11, 94:24, 99:6
**chosen** [2] - 60:3, 63:22
**chuckle** [1] - 45:3
**citizen** [1] - 103:12
**City** [1] - 2:7
**city** [3] - 47:10, 99:24, 100:15
**Civil** [1] - 1:15
**civil** [2] - 14:10, 47:23
**clarify** [1] - 88:14
**clear** [6] - 22:24, 27:13, 27:19, 65:1, 76:20, 76:22
**clearly** [2] - 7:18, 7:22
**CLERK** [3] - 11:3, 11:7, 12:7
**clerk** [1] - 11:5
**client** [23] - 10:1, 62:23, 63:14, 67:6, 67:23, 68:10, 68:17, 69:16, 70:9, 71:1, 71:4, 71:19, 73:9, 73:24, 74:19, 75:3, 76:2, 76:15, 78:7, 78:12, 80:10, 85:12, 87:6
**client's** [7] - 61:5, 69:15, 70:11, 71:20, 72:2, 74:5, 77:1
**clients** [1] - 61:7
**climb** [1] - 80:15
**climbed** [2] - 25:14, 25:15
**clinic** [83] - 13:2, 13:19, 14:7, 15:12, 16:1, 16:3, 16:5, 16:12, 17:4, 17:19, 17:24, 18:13, 18:14, 18:17, 18:25, 19:17, 20:10, 21:5, 22:6, 22:12, 23:2, 24:18, 25:10, 26:10, 26:23, 27:12, 27:13, 27:18, 27:19, 28:16, 28:20, 30:19, 30:24, 33:8, 36:15, 37:15, 37:20, 38:7, 38:13, 38:18, 39:4, 39:8, 39:19, 39:22, 42:23, 42:24, 42:25, 46:4, 50:12, 54:4, 54:6, 54:20, 54:22, 55:12, 55:14, 55:15, 55:17, 55:24, 56:13, 56:16, 56:23,

65:8, 65:9, 66:15, 66:16, 68:18, 70:11, 71:11, 79:25, 80:4, 80:18, 81:14, 83:1, 83:17, 83:20, 85:13, 85:20, 87:21, 92:17, 97:21, 98:25, 99:7
**clinic's** [1] - 22:13
**clinics** [4] - 33:16, 83:3, 99:7, 103:14
**close** [3] - 49:20, 60:10, 102:24
**closed** [2] - 27:18, 66:12
**closely** [1] - 101:10
**closet** [2] - 70:9, 70:10
**closets** [1] - 70:6
**CLOSING** [5] - 3:2, 12:22, 41:17, 62:8, 78:16, 91:11
**closing** [14] - 4:22, 5:11, 6:25, 9:6, 9:24, 10:4, 42:7, 62:7, 70:9, 75:1, 75:11, 90:23, 103:18, 104:3
**closings** [4] - 5:18, 6:24, 10:5, 29:5
**co** [19] - 13:16, 15:4, 15:15, 20:9, 21:4, 21:6, 21:25, 22:11, 26:3, 26:24, 27:9, 27:11, 32:16, 32:23, 33:21, 33:23, 36:15, 38:22, 76:8
**co-conspirator** [4] - 15:4, 20:9, 32:16, 32:23
**co-conspirators** [14] - 13:16, 15:15, 21:4, 21:6, 21:25, 22:11, 26:3, 26:24, 27:9, 27:11, 33:21, 33:23, 36:15, 38:22
**co-defendant** [1] - 76:8
**collapsed** [7] - 26:4, 26:20, 26:22, 27:2, 38:6, 81:24, 81:25
**collapses** [1] - 96:18
**colleague** [1] - 20:24
**colleagues** [2] - 21:3, 24:6
**collection** [2] - 54:10, 55:7
**collective** [2] - 64:8, 64:10
**collectively** [2] - 73:22, 77:18
**COLLEEN** [1] - 1:9
**Columbia** [1] - 18:21

**COLUMBIA** [1] - 1:1
**combination** [1] - 102:9
**coming** [6] - 15:1, 21:4, 51:9, 51:12, 56:12, 84:24
**comments** [3] - 42:5, 56:25, 61:4
**commit** [4] - 31:15, 31:16, 75:3, 86:10
**committed** [2] - 29:14, 31:14, 32:18
**common** [5] - 50:3, 65:1, 83:5, 93:8, 99:25
**communicate** [1] - 68:20
**communicated** [1] - 13:20
**communication** [2] - 28:7, 57:2
**communications** [2] - 57:5, 57:10
**compelling** [1] - 56:23
**complete** [1] - 106:5
**complications** [1] - 25:22
**components** [1] - 73:8
**Compton** [3] - 19:6, 20:22, 92:24
**concern** [1] - 8:18
**concerned** [2] - 46:9, 103:12
**concerted** [1] - 28:9
**conclude** [3] - 82:9, 82:13, 89:15
**concluded** [1] - 89:12
**conclusion** [1] - 63:2
**condone** [1] - 102:20
**conduct** [14] - 7:19, 43:18, 49:18, 49:20, 50:25, 51:2, 54:22, 60:4, 62:22, 77:23, 92:10, 94:6, 103:24
**conducted** [1] - 59:3
**conference** [1] - 10:19
**confident** [2] - 63:23, 78:4
**confinement** [1] - 103:22
**confirmed** [1] - 59:8
**confront** [1] - 67:14
**confused** [4] - 55:23, 56:10, 56:12, 95:10
**confusion** [1] - 66:10
**Congress** [2] - 47:15, 47:16
**Connecticut** [2] - 1:24, 2:3
**connection** [1] -

100:15
**conscience** [1] - 57:24
**consequence** [1] - 99:2
**consider** [13] - 29:25, 30:14, 32:14, 39:10, 42:19, 63:3, 64:6, 67:1, 68:9, 72:23, 84:13, 100:11
**considerably** [1] - 104:25
**considered** [1] - 64:21
**considering** [1] - 103:8
**consistent** [1] - 51:18
**conspiracies** [1] - 30:15
**conspiracy** [63] - 13:15, 13:20, 13:23, 14:6, 14:19, 14:25, 15:2, 15:3, 15:23, 16:15, 16:18, 17:3, 17:7, 20:4, 21:21, 27:22, 28:5, 28:11, 29:9, 29:24, 30:5, 30:13, 32:18, 32:19, 35:11, 35:14, 36:20, 37:17, 38:11, 38:14, 43:22, 46:18, 46:20, 56:24, 57:13, 57:15, 57:21, 57:23, 57:25, 58:11, 72:19, 73:7, 73:24, 74:20, 74:23, 75:24, 76:3, 79:12, 79:13, 79:15, 79:16, 80:4, 80:5, 80:6, 82:21, 83:7, 86:16, 88:2, 88:3, 91:18, 93:6, 93:7
**conspirator** [5] - 15:4, 20:9, 30:16, 32:16, 32:23
**conspirators** [19] - 13:16, 15:15, 19:11, 20:19, 21:4, 21:6, 21:25, 22:11, 26:3, 26:24, 27:9, 27:11, 29:1, 30:7, 30:10, 33:21, 33:23, 36:15, 38:22
**conspired** [2] - 58:4, 75:3
**constitutes** [1] - 106:4
**Constitution** [2] - 2:22, 106:11
**Cont** [1] - 2:1
**contacts** [1] - 83:16
**contemplative** [1] - 101:16

**contentious** [1] - 78:22
**context** [1] - 68:7
**continue** [1] - 104:3
**continued** [1] - 51:20
**continuing** [1] - 28:25
**contract** [3] - 73:10, 76:5, 86:19
**control** [1] - 71:15
**controls** [3] - 32:6, 64:9, 65:23
**conventional** [1] - 57:18
**conversation** [2] - 44:12, 57:6
**convict** [4] - 46:24, 47:7, 53:23, 88:10
**convicting** [1] - 81:8
**conviction** [1] - 59:21
**convince** [1] - 56:15
**convinced** [1] - 54:15
**cooperation** [1] - 74:8
**coordinated** [1] - 28:9
**coordinating** [1] - 98:2
**coordinator** [1] - 81:14
**cops** [1] - 98:15
**copy** [1] - 72:25
**cord** [4] - 34:20, 34:21, 37:7, 45:11
**cords** [1] - 45:14
**corner** [1] - 59:13
**correct** [8] - 7:4, 7:24, 9:17, 67:15, 81:8, 82:20, 84:17, 96:20
**Correct** [2] - 34:10, 35:22
**correction** [1] - 79:11
**correctly** [2] - 73:16, 79:14
**corridor** [1] - 98:4
**cosmos** [1] - 101:12
**counsel** [10] - 4:9, 10:1, 41:16, 41:20, 60:12, 62:10, 63:15, 78:15, 94:2, 95:25
**counseling** [1] - 31:1
**count** [5] - 29:8, 29:23, 30:3, 30:18, 31:7
**Count** [12] - 32:15, 32:22, 79:18, 79:19, 80:8, 82:1, 82:22, 87:17, 88:2, 88:5, 88:11
**counting** [1] - 105:2
**country** [5] - 16:14, 40:2, 55:14, 102:19, 103:16

**counts** [3] - 40:17, 64:15, 77:18
**couple** [5] - 29:6, 29:21, 30:4, 61:19, 79:21
**course** [10] - 6:11, 16:11, 42:17, 48:16, 48:22, 52:3, 52:21, 69:19, 79:8, 84:25
**court** [4] - 11:25, 16:19, 23:16, 76:17
**Court** [12] - 2:8, 2:20, 2:21, 4:20, 5:24, 8:17, 41:19, 41:24, 62:10, 88:12, 103:7, 106:10
**COURT** [79] - 1:1, 4:4, 4:13, 4:16, 4:23, 5:2, 5:5, 5:8, 5:21, 6:4, 6:6, 6:13, 6:16, 6:19, 7:5, 7:10, 7:14, 7:25, 8:11, 8:19, 8:24, 9:10, 9:12, 9:15, 9:18, 9:22, 9:24, 10:11, 10:14, 10:17, 10:20, 10:25, 11:5, 11:11, 11:19, 12:5, 12:8, 12:13, 12:15, 12:18, 12:21, 26:14, 32:5, 38:2, 40:22, 40:25, 41:10, 41:15, 60:12, 60:16, 60:20, 60:23, 61:13, 61:18, 61:22, 62:3, 73:13, 73:16, 77:10, 78:13, 82:16, 82:18, 84:8, 84:17, 86:12, 88:14, 89:17, 90:22, 90:25, 91:3, 91:5, 91:7, 91:10, 97:6, 97:10, 104:1, 104:9, 105:1, 106:1
**Courthouse** [1] - 2:22
**courthouse** [1] - 100:1
**courtroom** [6] - 5:1, 5:12, 11:1, 58:24, 59:13, 62:4
**Courtroom** [2] - 10:25, 12:6
**COURTROOM** [1] - 4:6
**CRABB** [30] - 1:12, 4:11, 10:9, 10:12, 10:15, 10:21, 11:9, 11:16, 12:10, 12:12, 12:14, 12:20, 12:23, 20:14, 26:7, 26:9, 26:17, 28:13, 28:22, 32:3, 32:8, 34:20,

38:4, 60:22, 73:11, 77:7, 82:14, 84:4, 88:12, 97:3
**Crabb** [15] - 3:3, 4:11, 12:19, 42:9, 42:15, 43:13, 44:10, 44:24, 49:22, 79:14, 79:20, 82:23, 83:10, 84:23, 87:25
**Crabb's** [1] - 56:25
**Cramer** [2] - 10:24, 12:9
**CRAMPTON** [2] - 1:20, 61:21
**Crampton** [1] - 4:15
**CRC** [2] - 2:21, 106:9
**create** [1] - 47:4
**creating** [1] - 94:20
**credibility** [7] - 38:17, 39:11, 44:24, 45:7, 46:1, 89:3, 89:7
**credible** [2] - 35:1, 58:14
**credit** [1] - 35:16
**crime** [15] - 13:16, 29:14, 31:14, 31:15, 31:16, 31:17, 32:18, 32:19, 32:20, 32:21, 86:8, 89:2, 93:10, 95:1
**crimes** [4] - 29:12, 86:10, 89:13, 93:6
**Criminal** [2] - 1:2, 1:15
**criminal** [2] - 4:6, 86:23
**cross** [6] - 67:22, 67:24, 70:23, 81:18, 91:14, 94:8
**cross-examination** [2] - 81:18, 94:8
**cross-examined** [2] - 67:22, 91:14
**CRR** [2] - 2:21, 106:9
**CRT** [1] - 1:15
**crucial** [1] - 59:11
**crucifix** [1] - 92:19
**crutches** [1] - 21:1
**curb** [1] - 45:15
**custody** [1] - 98:22
**cut** [5] - 8:19, 27:15, 60:25, 70:16, 70:24

## D

**D.C** [8] - 1:5, 13:3, 18:8, 25:25, 75:22, 87:5, 99:7, 106:11
**dad** [4] - 54:11, 90:6, 90:13
**Dad** [1] - 90:17

**danger** [1] - 99:1
**Darnel** [10] - 13:24,
14:20, 15:4, 15:8,
17:7, 20:1, 20:5,
22:22, 33:23, 42:11
**Darnel's** [1] - 43:9
**date** [2] - 15:6, 105:5
**Dated** [1] - 106:7
**Davis** [18] - 14:5,
16:16, 16:17, 17:15,
18:6, 22:23, 33:12,
35:11, 36:18, 74:7,
83:21, 85:1, 85:5,
86:2, 87:7, 89:3,
92:4, 94:4
**day-to-day** [1] - 78:4
**daycare** [1] - 61:25
**days** [6] - 21:1, 24:24,
24:25, 67:25,
102:17, 103:6
**DC** [5] - 1:13, 1:16,
1:25, 2:4, 2:23
**deal** [2] - 58:6, 89:5
**death** [1] - 56:7
**debate** [1] - 40:4
**debated** [3] - 47:13,
47:14
**decide** [7] - 8:1, 26:14,
88:7, 88:9, 89:4,
89:6, 97:11
**decided** [3] - 83:20,
87:12, 90:7
**decides** [1] - 86:24
**deciding** [2] - 8:16,
8:25
**decision** [6] - 25:23,
60:11, 76:4, 89:23,
90:19, 90:20
**decisions** [2] - 89:21,
89:23
**deep** [3] - 55:19,
98:20, 100:11
**deep-seated** [2] -
98:20, 100:11
**deeply** [1] - 101:10
**Defendant** [7] - 1:17,
2:2, 2:5, 2:8, 2:10,
15:9, 15:18
**defendant** [8] - 13:7,
32:17, 32:20, 44:11,
48:9, 60:13, 76:8
**defendants** [18] -
7:22, 13:13, 13:16,
21:6, 21:20, 25:13,
26:2, 27:20, 27:22,
29:23, 30:20, 32:25,
39:14, 40:6, 40:13,
40:21, 59:16, 64:15
**Defendants** [1] - 1:7
**defendants'** [2] -

21:25, 25:17
**defense** [3] - 9:25,
54:25, 68:22
**define** [1] - 30:22
**defined** [4] - 48:1,
48:15, 48:18, 79:9
**definition** [1] - 64:3
**definitions** [6] - 48:16,
49:1, 62:25, 63:2,
64:5, 65:5
**delay** [1] - 11:24
**deliberately** [2] -
14:12, 14:13
**deliberating** [2] -
59:19, 94:17
**deliberation** [1] - 79:3
**deliberations** [1] -
77:21
**demeanor** [2] - 85:17,
95:22
**denial** [1] - 99:4
**denied** [1] - 102:4
**deniers** [1] - 102:21
**Dennis** [1] - 4:15
**DENNIS** [1] - 1:22
**departure** [2] - 100:17
**deputy** [1] - 45:5
**DEPUTY** [1] - 4:6
**Des** [1] - 100:24
**described** [2] - 95:25,
97:11
**describing** [1] - 8:6
**description** [1] - 93:22
**desperate** [2] - 25:11,
91:22
**desperately** [1] -
25:21
**despite** [3] - 24:14,
35:7, 35:8
**destination** [1] -
100:25
**detail** [3] - 13:21, 30:7,
63:7
**detailed** [1] - 30:6
**determination** [3] -
77:2, 77:17, 78:2
**determinations** [1] -
66:25
**determinative** [1] -
77:21
**determine** [1] - 38:2
**developed** [1] -
100:13
**develops** [1] - 100:11
**diametrically** [1] -
102:23
**die** [4] - 54:17, 54:21,
56:6, 56:17
**difference** [3] - 7:11,
8:24, 65:13

**different** [7] - 9:13,
17:20, 17:21, 18:1,
24:23, 55:15, 73:2,
74:2, 76:23, 91:16,
104:19
**difficult** [6] - 48:19,
49:5, 51:25, 87:18,
87:19, 89:10
**difficulties** [1] - 72:7
**diffident** [1] - 95:23
**direct** [4] - 14:11,
28:25, 67:22, 74:11
**directed** [1] - 28:14
**direction** [3] - 58:10,
67:4, 91:15
**directions** [2] - 28:22,
28:23
**disagree** [3] - 62:21,
64:10, 103:2
**disagreement** [1] - 8:7
**disagrees** [1] - 64:11
**disapproving** [1] -
103:2
**discard** [1] - 99:19
**discuss** [1] - 29:22
**discussed** [2] - 18:1,
46:12
**discussing** [1] -
104:10
**disobedience** [1] -
14:10
**dispute** [1] - 74:15
**distinct** [2] - 56:19,
56:20
**distinction** [1] - 68:2
**distinguished** [1] -
101:21
**distort** [1] - 98:18
**distress** [1] - 97:23
**distributing** [1] - 98:4
**DISTRICT** [3] - 1:1,
1:1, 1:9
**District** [1] - 18:21
**disturbance** [1] -
71:13
**disturbing** [1] -
100:13
**divergent** [1] - 42:2
**Division** [1] - 1:15
**divisive** [2] - 101:8,
103:5
**doctor** [4] - 54:22,
55:12, 85:13, 98:25
**Doctors** [1] - 100:4
**DOJ** [1] - 1:15
**DOJ-CRT** [1] - 1:15
**dominion** [1] - 101:13
**donations** [1] - 100:2
**done** [16] - 5:11, 29:5,
44:14, 50:21, 59:10,

61:3, 61:24, 66:16,
70:3, 79:1, 79:2,
84:12, 91:21, 99:19,
103:9
**door** [66] - 19:1, 19:13,
19:18, 20:11, 20:15,
21:11, 21:16, 24:13,
28:24, 34:18, 35:20,
35:24, 36:2, 36:6,
36:8, 36:10, 37:5,
37:10, 43:7, 45:10,
45:16, 45:21, 45:23,
45:25, 51:12, 52:8,
52:16, 53:3, 66:3,
66:4, 66:7, 66:19,
68:25, 70:9, 71:25,
72:15, 80:10, 80:18,
80:22, 81:4, 81:5,
81:7, 81:10, 81:11,
81:12, 81:16, 81:21,
81:22, 81:24, 81:25,
82:5, 82:12, 87:3,
87:18, 87:20, 87:21,
88:7, 88:8, 88:16,
88:22, 96:3, 96:4,
96:7, 96:17
**doorjamb** [1] - 96:5
**doors** [2] - 66:12,
70:10
**doorway** [4] - 51:9,
52:2, 52:3, 95:12
**double** [1] - 35:17
**double-talk** [1] - 35:17
**doubt** [15] - 31:4,
33:2, 40:17, 64:2,
71:4, 72:20, 74:18,
75:21, 76:2, 86:7,
89:10, 89:13, 89:16,
89:21, 90:18
**down** [28] - 17:25,
19:2, 21:5, 22:6,
22:7, 24:16, 28:20,
30:6, 32:12, 34:18,
35:6, 48:7, 48:8,
48:25, 49:3, 50:13,
50:14, 53:9, 59:12,
59:13, 71:11, 75:9,
80:4, 83:23, 84:25,
104:13
**Dr** [2] - 97:20, 99:3
**drag** [1] - 50:10
**dragged** [1] - 50:18
**dramatic** [1] - 69:25
**drape** [1] - 102:11
**driving** [3] - 87:4,
87:9, 87:10
**drove** [5] - 16:24,
18:8, 35:10, 87:6,
87:7
**Dubois** [1] - 96:25

**DUNN** [18] - 2:5, 4:25,
6:17, 7:1, 7:6, 7:12,
8:9, 8:15, 8:23,
78:17, 82:17, 82:21,
84:6, 84:15, 84:19,
86:14, 88:25, 89:19
**Dunn** [6] - 2:6, 3:6,
4:25, 6:16, 8:19,
9:15
**during** [5] - 32:18,
58:6, 80:6, 80:25,
101:7
**duty** [4] - 40:20, 51:4,
59:20, 102:1

**E**

**early** [1] - 90:5
**Eastern** [1] - 75:9
**easy** [2] - 49:17, 99:18
**effect** [1] - 45:13
**effective** [1] - 69:22
**egress** [3] - 48:19,
49:4, 51:25
**either** [11] - 29:11,
32:6, 48:4, 52:6,
53:21, 58:16, 82:9,
86:10, 88:3, 88:4,
100:7
**elderly** [1] - 46:13
**elect** [2] - 59:8, 59:9
**elected** [2] - 59:6, 59:7
**element** [2] - 54:7,
87:16
**elements** [8] - 42:19,
72:19, 73:8, 76:15,
77:23, 79:14, 93:5
**elevates** [1] - 7:6
**elevator** [6] - 24:7,
74:9, 81:23, 95:19,
96:3, 96:12
**elevators** [2] - 18:24,
50:4
**eliminated** [1] - 89:4
**ELMO** [1] - 6:12
**embrace** [1] - 40:18
**emerged** [1] - 96:23
**emergency** [2] - 27:5,
27:6
**employee** [11] - 22:7,
22:8, 24:10, 24:18,
25:7, 36:13, 65:18,
66:2, 67:8, 68:21
**employee's** [1] - 65:25
**employees** [9] - 13:8,
19:3, 19:5, 35:7,
65:7, 65:17, 67:12,
79:25, 83:1
**encounter** [2] - 19:25,
23:15

**encountered** [3] - 19:20, 24:8, 24:9
**end** [4] - 6:21, 66:6, 100:23, 100:24
**ended** [2] - 27:11, 102:7
**ends** [1] - 47:9
**engage** [1] - 68:5
**engaged** [1] - 48:3
**engaging** [1] - 53:18
**enhancement** [1] - 8:16
**enter** [4] - 66:14, 66:16, 66:17, 67:10
**entered** [4] - 20:12, 71:16, 71:17, 92:2
**entering** [6] - 38:19, 55:10, 65:9, 65:13, 66:10, 86:18
**enters** [2] - 66:7, 95:19
**enthusiastic** [1] - 38:11
**entire** [3] - 68:10, 72:22, 101:22
**entirely** [1] - 39:25
**entitled** [4] - 45:4, 45:7, 55:3, 103:17
**entrance** [18] - 13:8, 13:10, 13:11, 18:24, 19:3, 22:4, 22:8, 24:10, 24:18, 25:8, 26:10, 35:6, 36:13, 70:11, 70:12, 70:13
**entrances** [1] - 70:10
**entreat** [1] - 99:21
**entry** [3] - 67:2, 68:14, 68:18
**envisioned** [1] - 93:22
**equal** [2] - 93:16, 95:5
**equally** [1] - 47:8
**equate** [1] - 94:3
**ER** [2] - 97:15, 97:24
**escape** [2] - 19:13, 19:18
**especially** [3] - 47:10, 62:23, 93:17
**essentially** [1] - 48:7
**eternity** [1] - 90:16
**Eva** [2] - 85:1, 87:6
**evening** [3] - 17:3, 17:9, 17:15
**event** [13] - 42:10, 44:15, 44:19, 44:22, 56:18, 56:23, 57:14, 74:2, 74:5, 74:19, 74:20, 75:8, 93:15
**events** [2] - 50:23, 58:10
**evidence** [70] - 26:13,

27:21, 31:4, 32:1, 32:2, 32:6, 33:1, 33:5, 33:11, 33:12, 33:15, 33:17, 33:20, 38:1, 38:3, 40:19, 46:19, 51:10, 51:22, 51:23, 53:14, 53:21, 57:1, 63:10, 63:11, 63:13, 64:9, 64:20, 64:22, 71:3, 73:3, 73:4, 73:5, 73:20, 74:23, 76:1, 76:6, 76:17, 78:1, 78:2, 79:23, 81:5, 82:2, 82:8, 82:10, 82:11, 84:5, 84:9, 84:19, 85:18, 85:24, 86:5, 86:7, 87:22, 91:23, 91:24, 93:12, 93:17, 94:9, 97:4, 97:6, 97:20, 98:18, 98:19, 103:8, 103:10, 103:11, 103:20
**exactly** [9] - 32:3, 43:10, 47:1, 47:6, 61:10, 64:4, 67:18, 101:6, 103:8
**examination** [3] - 67:22, 81:18, 94:8
**examined** [2] - 67:22, 91:14
**example** [4] - 22:9, 31:19, 32:12, 100:9
**examples** [1] - 43:17
**except** [2] - 84:22, 97:6
**excerpts** [1] - 73:17
**excited** [2] - 17:11, 90:4
**exclusively** [2] - 7:19, 7:23
**excuse** [8] - 25:1, 31:21, 38:21, 70:2, 71:14, 72:7, 75:17, 100:21
**excused** [1] - 105:3
**executive** [3] - 58:24, 59:6, 59:8
**exercising** [1] - 13:4
**exhibits** [1] - 63:12
**exist** [1] - 75:24
**expect** [1] - 96:16
**explained** [5] - 22:23, 51:17, 68:9, 73:16, 95:14
**exposed** [1] - 62:21
**exposure** [1] - 89:4
**express** [3] - 40:3, 41:22, 99:22
**expressing** [1] - 39:25

**expression** [1] - 40:1
**extent** [1] - 63:17
**extreme** [3] - 66:15, 67:3
**extremely** [2] - 65:4, 77:19
**eyes** [5] - 20:8, 34:23, 35:21, 36:7, 37:3

## F

**FACE** [42] - 30:19, 42:18, 43:2, 43:6, 43:17, 44:21, 44:23, 47:11, 47:21, 47:22, 48:1, 48:6, 49:20, 50:1, 50:5, 50:11, 50:18, 51:1, 51:5, 54:22, 54:24, 57:15, 57:20, 57:21, 57:23, 58:1, 59:1, 60:3, 76:13, 79:16, 80:5, 81:3, 81:8, 82:6, 87:17, 88:15, 94:6, 94:12, 94:25, 95:10
**face** [4] - 31:24, 33:2, 100:4, 102:14
**Facebook** [2] - 84:3, 84:19
**facilities** [1] - 22:13
**facility** [7] - 18:20, 21:8, 23:23, 23:24, 30:25, 67:2, 67:10
**fact** [17] - 13:23, 34:7, 43:13, 45:9, 52:10, 55:13, 56:5, 57:6, 59:20, 82:23, 83:4, 89:1, 96:23, 97:1, 97:21, 99:9, 103:10
**factor** [2] - 68:8, 69:7, 77:21
**factors** [2] - 63:8, 76:4
**facts** [6] - 8:16, 73:3, 73:4, 73:5, 76:16, 77:25
**factually** [1] - 87:19
**failed** [1] - 99:4
**fails** [4] - 49:14, 49:15, 53:21, 76:19
**fair** [3] - 63:21, 63:22, 78:10
**fairly** [1] - 80:2
**faith** [1] - 42:2
**fake** [5] - 16:4, 16:10, 43:5, 43:6, 43:7
**fall** [5] - 13:15, 14:24, 15:2, 16:22, 59:19
**fallacy** [1] - 44:16
**falling** [1] - 98:6
**falls** [1] - 66:21

**familiar** [1] - 17:17
**fan** [1] - 65:18
**far** [8] - 64:17, 65:23, 66:23, 71:14, 77:4, 94:25, 100:23
**fashion** [1] - 22:20
**fast** [1] - 61:11
**father** [2] - 90:1, 90:3
**fathers** [1] - 99:18
**FBI** [1] - 84:2
**fear** [4] - 48:20, 49:7, 53:8, 53:10
**federal** [1] - 57:19
**feelings** [2] - 39:24
**feet** [5] - 50:10, 69:15, 71:20, 72:2, 72:9
**fell** [2] - 31:21, 98:10
**felony** [1] - 9:1
**fetch** [1] - 96:20
**few** [5] - 24:5, 52:3, 58:7, 67:25, 80:17
**fiddle** [1] - 60:16
**figured** [1] - 13:25
**figures** [1] - 46:14
**filmed** [1] - 23:15
**filming** [1] - 95:6
**final** [2] - 18:10, 79:2
**finally** [8] - 24:1, 27:12, 27:18, 47:14, 58:21, 90:1, 90:16, 102:7
**fine** [2] - 6:13, 9:18
**finish** [2] - 39:12, 95:22
**fire** [2] - 19:13, 19:18
**first** [34] - 11:10, 13:12, 15:8, 16:22, 20:9, 20:15, 20:22, 22:22, 23:14, 24:20, 24:25, 29:23, 37:20, 38:21, 43:24, 48:10, 52:22, 53:11, 53:21, 56:1, 61:5, 65:8, 66:1, 68:13, 70:19, 71:16, 71:17, 72:18, 79:18, 79:19, 87:3, 101:7, 102:13, 102:21
**fit** [1] - 77:23
**five** [4] - 13:13, 32:25, 60:14, 103:6
**five-minute** [1] - 60:14
**fix** [1] - 11:22
**fixed** [1] - 12:2
**flights** [2] - 100:14, 101:1
**floor** [15] - 18:22, 19:12, 23:23, 24:7, 25:4, 26:5, 27:2, 31:22, 32:11, 38:7,

66:21, 96:18, 97:13, 97:23, 98:10
**flowers** [1] - 102:10
**fly** [1] - 53:13
**flyers** [1] - 98:4
**focus** [4] - 63:18, 64:15, 64:20, 68:17
**focused** [4] - 51:13, 55:12, 61:4, 63:16
**folks** [1] - 101:24
**follow** [4] - 57:23, 59:3, 90:21, 93:4
**followed** [1] - 20:17
**following** [12] - 4:2, 9:20, 10:18, 11:17, 12:3, 12:16, 41:8, 41:13, 60:18, 61:16, 62:1, 104:7
**FOR** [1] - 1:1
**force** [34] - 7:9, 7:22, 8:12, 8:13, 30:20, 48:10, 48:11, 49:3, 49:4, 50:1, 51:6, 51:20, 65:3, 65:14, 66:23, 66:25, 68:3, 68:4, 68:8, 68:10, 76:20, 77:1, 77:6, 77:17, 77:20, 92:11, 93:20, 93:21, 94:12, 95:5
**forced** [2] - 20:9, 101:4
**forceful** [1] - 95:23
**forcibly** [1] - 20:12
**foregoing** [1] - 106:4
**foreseeable** [1] - 32:19
**forget** [2] - 47:6, 102:18
**forgot** [1] - 90:6
**form** [7] - 5:9, 6:17, 6:22, 6:24, 7:3, 7:8, 7:24
**formal** [3] - 30:5, 73:10, 76:5
**formed** [1] - 15:2
**forms** [1] - 98:21
**forth** [1] - 45:15
**forwarded** [1] - 17:8
**four** [1] - 55:6
**four-day** [1] - 55:6
**fourth** [5] - 18:22, 19:12, 23:23, 24:7, 25:4
**fracas** [1] - 52:25
**Francisco** [1] - 100:25
**free** [2] - 46:15, 58:22
**freedom** [5] - 39:25, 40:1, 48:21, 49:8, 53:17

**freely** [2] - 35:24, 36:2
**frequency** [1] - 99:24
**friend** [3] - 93:14, 101:19, 102:23
**friends** [2] - 61:6, 102:24
**friendship** [1] - 102:22
**front** [16] - 21:16, 22:7, 24:13, 28:24, 35:19, 36:8, 36:12, 37:5, 72:21, 80:10, 81:4, 95:9, 95:16, 96:2, 96:17, 100:1
**frustrating** [1] - 41:23
**full** [3] - 41:2, 106:5
**fuller** [1] - 88:20
**fun** [1] - 100:10
**fundamental** [2] - 42:3, 60:1

### G

**game** [4] - 29:16, 29:17, 98:13, 98:14
**gate** [3] - 100:17, 100:19
**gathering** [3] - 74:1, 85:8, 85:9
**general** [1] - 63:4
**generally** [2] - 55:11, 55:12
**gentlemen** [16] - 14:3, 15:22, 20:7, 20:14, 22:2, 26:17, 27:21, 29:3, 32:24, 39:12, 39:23, 40:15, 41:19, 78:18, 86:25, 91:13
**gently** [2] - 99:8, 99:22
**Geraghty** [66] - 4:8, 5:7, 13:12, 14:15, 14:24, 14:25, 19:16, 20:17, 26:7, 26:9, 26:19, 26:24, 26:25, 27:11, 28:9, 28:18, 28:23, 29:15, 31:20, 32:8, 33:5, 37:18, 38:8, 38:10, 38:14, 38:15, 38:18, 38:23, 39:5, 40:16, 46:4, 46:10, 58:8, 58:12, 58:18, 74:16, 75:5, 75:17, 91:15, 91:19, 91:25, 92:3, 92:5, 92:17, 92:23, 93:13, 93:18, 94:18, 95:19, 96:9, 96:11, 96:19, 96:24, 97:8, 97:15, 98:1, 98:5, 98:10, 98:14, 99:3, 99:21, 101:6, 103:11,
103:20
**GERAGHTY** [2] - 1:6, 2:10
**Geraghty's** [6] - 27:10, 39:11, 46:1, 75:19, 94:8, 98:20
**gestation** [1] - 54:14
**gestational** [3] - 55:24, 56:10, 56:11
**gesture** [1] - 34:9
**gestures** [1] - 96:14
**get-together** [3] - 92:5, 93:16, 93:18
**girlfriend** [1] - 101:24
**girls** [1] - 54:15
**given** [7] - 64:3, 65:4, 72:17, 74:21, 76:15, 76:17, 78:1
**glitch** [1] - 11:20
**goal** [2] - 18:2
**God** [1] - 57:12
**goodman** [1] - 5:2
**Goodman** [25] - 4:8, 5:4, 13:9, 15:10, 15:24, 18:12, 20:18, 22:4, 24:9, 25:7, 28:8, 28:17, 31:23, 32:2, 32:8, 36:11, 36:14, 36:19, 36:20, 36:22, 37:23, 38:1, 38:5, 40:15, 96:23
**GOODMAN** [2] - 1:6, 2:8
**Goodman's** [2] - 36:11, 36:24
**Google** [1] - 57:8
**gospel** [1] - 48:17
**govern** [2] - 58:22, 59:2
**governance** [1] - 59:11
**government** [53] - 4:10, 6:1, 6:7, 9:9, 9:25, 10:2, 10:8, 42:13, 43:9, 44:14, 46:2, 46:3, 48:7, 49:11, 49:13, 50:23, 51:3, 51:22, 52:2, 52:4, 52:9, 52:21, 57:1, 57:7, 58:6, 58:18, 58:23, 59:24, 60:20, 64:1, 67:23, 70:1, 71:11, 72:19, 73:23, 75:2, 75:7, 84:11, 85:10, 89:11, 91:14, 91:22, 92:4, 94:24, 95:24, 95:25, 96:2, 98:1, 98:5, 98:13, 98:19, 103:15, 103:18

**government's** [8] - 42:7, 63:5, 70:8, 70:9, 74:7, 75:11, 93:12, 96:22
**grand** [1] - 65:22
**great** [1] - 76:12
**green** [4] - 21:9, 37:4, 74:13, 74:14
**grievously** [1] - 98:7
**grinding** [1] - 78:9
**ground** [8] - 21:13, 39:3, 39:7, 45:14, 46:5, 46:12, 98:6
**group** [11] - 18:14, 51:9, 51:11, 53:2, 54:12, 79:5, 79:6, 86:25, 87:1, 89:8, 89:9
**GUILLAUME** [18] - 2:2, 4:17, 5:20, 5:22, 6:5, 9:11, 60:15, 61:12, 62:9, 66:12, 68:17, 69:2, 72:6, 73:14, 73:19, 77:9, 77:14, 78:15
**Guillaume** [18] - 2:3, 3:5, 4:18, 5:18, 9:12, 61:9, 62:5, 78:13
**guilty** [26] - 16:19, 31:17, 32:20, 33:1, 35:5, 35:13, 36:12, 37:3, 37:19, 40:16, 40:21, 57:13, 63:14, 77:24, 78:12, 79:5, 81:3, 82:1, 82:9, 82:13, 83:7, 89:2, 89:9, 89:13
**guys** [1] - 83:12

### H

**habit** [1] - 100:14
**half** [9] - 9:19, 46:20, 91:14, 91:17, 94:7, 102:19, 102:20, 102:21
**half-baked** [1] - 46:20
**hall** [9] - 19:2, 22:6, 22:7, 24:16, 25:6, 25:8, 31:20, 35:6, 96:24
**halls** [2] - 47:15, 47:16
**hallway** [11] - 18:13, 19:25, 26:22, 42:23, 66:5, 66:6, 67:6, 67:8, 70:12, 81:12, 87:21
**hallways** [1] - 50:3
**halt** [1] - 78:9
**hammer** [3] - 42:16

**hammering** [1] - 91:16
**hanai** [1] - 102:25
**hand** [6] - 10:6, 44:25, 45:1, 47:2, 81:10, 97:14
**handing** [2] - 49:23, 50:4
**handle** [2] - 66:13, 67:4
**hands** [4] - 68:21, 69:5, 69:6, 95:9
**Handy** [75] - 4:7, 4:15, 6:8, 13:7, 13:24, 14:14, 14:17, 14:20, 14:23, 14:25, 15:3, 15:7, 15:23, 16:1, 16:2, 16:8, 17:8, 19:10, 19:20, 19:25, 20:2, 20:8, 20:12, 20:16, 22:11, 22:13, 23:1, 23:9, 23:11, 23:16, 23:17, 23:20, 24:3, 24:5, 28:8, 28:17, 28:22, 28:25, 33:3, 33:14, 33:15, 33:18, 34:1, 34:15, 34:17, 34:22, 36:19, 37:21, 38:9, 38:12, 40:15, 41:16, 41:21, 42:9, 42:10, 44:5, 46:1, 51:6, 51:10, 51:14, 52:1, 52:25, 53:5, 53:18, 54:9, 58:19, 59:15, 60:9, 93:23, 94:3, 97:16, 97:21, 98:2, 99:1
**HANDY** [2] - 1:5, 1:18
**Handy's** [4] - 16:15, 42:13, 44:11, 52:10
**harangued** [1] - 21:24
**hard** [6] - 20:24, 25:2, 41:25, 61:24, 64:13, 101:18
**HARIVADAN** [1] - 1:14
**Harlow** [9] - 20:20, 21:13, 21:17, 27:15, 29:1, 36:16, 37:7, 39:2, 39:7
**harm** [4] - 48:21, 49:7, 53:8, 53:11
**hatched** [1] - 13:23
**hate** [1] - 47:22
**haunted** [1] - 55:13
**Hawaii** [3] - 101:25, 102:8, 102:25
**hazardous** [5] - 48:19, 49:5, 51:25, 102:1, 102:4
**Hazel** [3] - 16:5, 19:21, 20:3

**heads** [1] - 83:12
**health** [20] - 13:6, 13:14, 13:17, 14:8, 27:24, 29:10, 30:2, 30:21, 30:22, 30:23, 31:5, 36:23, 37:1, 39:15, 48:14, 48:22, 48:23, 53:25, 54:1, 94:15
**hear** [10] - 22:21, 29:14, 31:13, 42:9, 45:3, 71:9, 82:2, 89:18, 91:4
**heard** [33] - 13:1, 14:14, 15:11, 16:15, 16:16, 16:17, 16:19, 17:2, 17:15, 17:22, 20:19, 20:22, 20:24, 21:23, 24:21, 29:15, 30:18, 33:21, 36:18, 36:21, 39:19, 49:19, 51:6, 53:7, 58:20, 63:11, 70:18, 74:1, 80:6, 84:1, 85:16, 103:20
**hearing** [12] - 4:3, 9:21, 10:19, 11:18, 12:4, 12:17, 41:9, 41:14, 60:19, 61:17, 62:2, 104:8
**heart** [1] - 101:11
**heartrending** [1] - 25:23
**HEATHER** [2] - 1:6, 2:6
**Heather** [21] - 4:7, 4:25, 15:18, 15:24, 35:12, 43:3, 80:16, 81:21, 83:16, 83:18, 84:20, 85:3, 85:7, 85:16, 86:4, 86:21, 86:24, 87:8, 88:6, 89:13
**heavy** [1] - 102:5
**held** [2] - 101:10, 101:17
**hell** [2] - 20:15, 95:11
**hello** [1] - 78:18
**help** [6] - 20:24, 54:25, 78:15, 94:10, 97:22, 97:23
**helped** [5] - 13:12, 31:14, 31:16, 94:10
**helps** [1] - 49:2
**Herb** [4] - 4:8, 91:15, 99:2, 99:21
**HERB** [2] - 1:6, 2:10
**hereby** [1] - 106:3
**heroes** [1] - 83:23
**herself** [3] - 19:21,

21:14, 39:4
**hesitant** [1] - 10:5
**hesitate** [2] - 89:20, 90:18
**hesitated** [1] - 90:15
**hesitation** [2] - 58:13, 58:15
**hiding** [1] - 19:16
**high** [1] - 57:4
**highlights** [1] - 64:7
**highway** [1] - 87:10
**himself** [10] - 21:17, 28:25, 31:16, 37:7, 49:22, 69:16, 94:11, 95:9, 95:11
**hinder** [1] - 30:1
**HINSHAW** [2] - 1:5, 2:3
**Hinshaw** [42] - 4:7, 4:16, 4:18, 13:10, 18:16, 20:17, 21:15, 22:3, 24:8, 24:12, 27:17, 28:8, 28:18, 28:24, 36:16, 37:2, 37:3, 37:4, 37:11, 37:16, 40:16, 62:6, 62:12, 62:24, 63:16, 63:18, 63:19, 64:16, 66:6, 67:23, 68:24, 74:10, 74:16, 75:18, 75:21, 76:2, 76:7, 76:9, 76:10, 76:20, 77:20
**Hinshaw's** [2] - 68:18, 75:14
**history** [1] - 49:19
**hit** [1] - 67:17
**hold** [5] - 40:20, 60:10, 92:21, 102:23, 103:17
**holding** [2] - 45:16, 49:23
**holiday** [1] - 57:19
**Holler** [11] - 25:19, 92:24, 95:24, 96:1, 96:3, 96:8, 96:12, 97:13, 97:15, 97:17, 97:22
**holler** [13] - 25:20, 25:23, 25:25, 26:20, 26:22, 27:1, 27:3, 27:10, 31:21, 32:10, 35:9, 37:22, 38:6
**holler's** [1] - 26:18
**home** [9] - 90:9, 90:10, 90:12, 90:14, 90:17, 101:23, 101:24, 102:8
**honestly** [1] - 104:23
**Honor** [39] - 4:11,

4:17, 4:20, 5:3, 5:6, 5:20, 5:22, 6:17, 7:16, 9:11, 10:9, 10:12, 10:15, 10:21, 11:3, 11:8, 11:9, 12:10, 12:12, 12:20, 26:11, 32:4, 37:25, 38:4, 60:15, 60:22, 61:12, 61:20, 73:11, 73:14, 77:7, 77:9, 82:14, 84:4, 88:12, 90:23, 97:3, 104:23
**Honorable** [1] - 62:10
**HONORABLE** [1] - 1:9
**hook** [1] - 78:19
**hooked** [1] - 56:11
**hope** [5] - 46:24, 64:19, 64:20, 76:25, 77:1
**hopefully** [2] - 12:6, 104:9
**hoping** [2] - 5:24, 44:8
**hospital** [1] - 30:24
**hostile** [1] - 57:12
**hot** [1] - 102:4
**hour** [1] - 9:19
**hours** [11] - 27:12, 27:19, 71:10, 71:12, 79:24, 80:2, 91:14, 91:17, 94:7
**HOWARD** [1] - 2:8
**Howard** [1] - 5:3
**huge** [1] - 43:2
**hugely** [1] - 54:9
**human** [1] - 31:2
**hundred** [1] - 51:12
**hurt** [1] - 46:23
**husband** [4] - 25:20, 25:23, 26:19, 96:12
**hypothetical** [1] - 52:13

## I

**IA** [1] - 1:19
**idea** [8] - 14:11, 14:12, 43:16, 47:7, 55:23, 56:10, 56:12, 87:14
**ideas** [1] - 17:21
**identified** [1] - 19:21
**identify** [1] - 4:9
**IDONI** [2] - 1:6, 2:6
**Idoni** [36] - 4:7, 4:24, 4:25, 13:8, 13:9, 14:14, 15:19, 15:25, 16:23, 20:18, 22:5, 24:9, 24:17, 25:7, 28:8, 28:18, 35:4, 35:13, 35:22, 36:5, 36:13, 40:16, 43:3,

74:15, 81:21, 83:16, 83:18, 84:20, 85:3, 85:16, 86:4, 86:21, 86:24, 88:6, 89:13
**Idoni's** [1] - 35:15
**ignore** [3] - 40:9, 99:19, 101:3
**III** [3] - 2:2, 2:3, 2:8
**imagine** [3] - 49:17, 49:18, 100:16
**immigrants** [1] - 98:23
**impact** [1] - 55:5
**impacted** [1] - 54:9
**impartial** [4] - 63:21, 63:23, 103:8, 103:10
**impassable** [5] - 48:19, 49:4, 51:25, 92:13, 94:13
**impede** [2] - 92:11, 100:8
**impeded** [1] - 101:5
**impeding** [1] - 94:20, 97:18
**impelled** [2] - 94:23, 95:2
**impelling** [1] - 99:13
**impinge** [1] - 40:7
**implicates** [1] - 101:15
**implicit** [1] - 78:3
**implore** [1] - 78:11
**important** [29] - 22:16, 23:18, 43:21, 46:1, 46:9, 46:11, 52:12, 60:7, 60:8, 60:9, 63:8, 63:24, 64:8, 65:4, 68:1, 68:8, 68:15, 69:7, 69:20, 72:23, 77:6, 77:19, 79:1, 88:1, 88:23, 89:21, 89:22, 89:23, 90:18
**importantly** [4] - 44:1, 44:19, 49:11, 54:17
**impose** [1] - 40:9
**impossibly** [1] - 102:5
**impression** [1] - 88:21
**improper** [1] - 84:4
**IN** [1] - 1:1
**inappropriate** [1] - 47:8
**incident** [4] - 33:23, 36:21, 64:23, 74:3
**incidents** [1] - 55:8
**includes** [1] - 30:25
**including** [1] - 31:2
**incorporate** [1] - 13:25
**incorrect** [4] - 7:16, 73:12, 82:16, 82:18

**indicate** [2] - 44:3, 93:16
**indicated** [2] - 42:9, 63:22
**indicates** [2] - 52:7, 93:13
**indicative** [1] - 92:10
**indictment** [1] - 6:2
**indifferent** [1] - 101:9
**ineffectual** [1] - 45:19
**influence** [1] - 76:4
**information** [2] - 49:25, 84:3
**informed** [2] - 96:22, 99:9
**infrequently** [1] - 99:24
**ingress** [3] - 48:18, 49:4, 51:24
**initial** [1] - 68:13
**injure** [7] - 52:20, 82:25, 85:17, 85:19, 91:25, 94:14
**injured** [2] - 43:14, 52:22
**injures** [2] - 48:12, 49:5
**injury** [3] - 52:22, 52:23, 53:4
**innocence** [1] - 60:6
**innocent** [1] - 62:24
**inside** [7] - 16:12, 18:17, 23:25, 50:2, 50:12, 83:19, 98:3
**insider's** [1] - 16:21
**insistence** [1] - 94:8
**Instagram** [1] - 84:22
**instance** [1] - 94:18
**instead** [2] - 60:16, 100:25
**institution** [1] - 36:23
**instruct** [3] - 63:3, 74:25, 93:3
**instructed** [1] - 79:13
**instruction** [8] - 29:13, 72:17, 72:22, 72:24, 73:18, 74:21, 87:24, 88:20
**instructions** [23] - 6:21, 8:3, 8:5, 29:6, 29:8, 29:18, 29:20, 31:9, 31:11, 48:6, 48:17, 73:20, 77:13, 77:15, 79:3, 79:9, 82:19, 82:23, 83:4, 87:24, 90:21, 93:4, 93:5
**instructs** [1] - 14:18
**intended** [5] - 36:25, 44:23, 53:5, 79:24,

103:25
**intending** [2] - 44:18, 83:13
**intensive** [1] - 94:7
**intent** [5] - 33:18, 36:24, 44:15, 88:18, 88:23
**intention** [2] - 38:19, 84:10
**intentional** [2] - 52:23, 52:24
**intentionally** [11] - 31:17, 48:11, 48:12, 49:5, 49:6, 49:7, 52:20, 53:6, 53:10, 53:16
**interact** [1] - 67:7
**interacted** [1] - 28:13
**interacting** [2] - 26:19, 38:9
**interaction** [1] - 27:1
**interacts** [1] - 37:22
**interests** [2] - 83:6, 93:8
**interfere** [6] - 13:18, 27:23, 30:1, 40:13, 53:17, 94:14
**interference** [1] - 53:19
**interferes** [3] - 48:13, 48:21, 53:17
**interfering** [1] - 29:16
**interpretation** [1] - 65:19
**intimacy** [1] - 101:16
**intimidate** [7] - 21:23, 30:1, 82:25, 86:1, 92:1, 94:14
**intimidates** [4] - 48:12, 48:20, 49:6, 53:6
**intimidating** [2] - 94:19, 95:8
**intimidation** [4] - 22:2, 43:16, 53:7, 53:13
**introduced** [1] - 64:14
**introduces** [1] - 4:22
**intrusive** [1] - 48:3
**invade** [1] - 16:12
**invasion** [1] - 96:15
**invite** [1] - 14:2
**involve** [1] - 54:1
**involved** [11] - 16:17, 16:18, 36:22, 38:10, 40:5, 45:16, 56:19, 57:3, 76:3, 83:18, 84:21
**involves** [5] - 50:25, 51:2, 57:14, 60:1, 89:16

**issue** [10] - 42:3, 48:4, 51:8, 60:1, 61:25, 95:15, 101:8, 101:10, 103:5, 104:19
**issues** [2] - 8:15, 64:18
**IT** [1] - 12:9
**item** [5] - 51:20, 51:24, 52:24, 53:6, 53:16
**itself** [5] - 45:24, 50:12, 55:19, 74:20, 94:12

## J

**jabbed** [1] - 67:4
**jabbing** [1] - 66:14
**jacket** [1] - 74:13
**jail** [2] - 70:15, 103:22
**JASARI** [1] - 1:23
**Jasari** [1] - 1:23
**Jean** [4] - 20:19, 27:15, 96:20, 97:12
**Jenkins** [3] - 16:5, 19:21, 20:3
**Joan** [9] - 15:13, 15:14, 15:24, 20:19, 27:15, 33:22, 83:21, 83:22
**job** [3] - 40:18, 102:15
**JOHN** [4] - 1:5, 1:12, 2:3, 2:10
**John** [9] - 4:7, 4:11, 4:18, 5:6, 10:24, 62:12, 62:23, 75:14, 77:20
**join** [14] - 14:20, 14:21, 15:2, 15:24, 16:14, 30:10, 30:12, 30:13, 35:11, 54:12, 78:21, 86:14, 86:15, 86:16
**joined** [1] - 27:22
**joining** [4] - 14:22, 16:1, 88:4, 91:17
**Jonathan** [10] - 13:24, 15:4, 17:6, 20:1, 20:5, 33:22, 42:11, 42:12, 43:9, 43:11
**Jones** [8] - 22:1, 24:20, 24:21, 25:10, 35:9, 39:13, 39:17, 39:21
**Jones'** [1] - 13:13
**jostled** [1] - 95:3
**JR** [1] - 1:12
**Judge** [16] - 14:18, 28:4, 29:5, 29:7, 29:11, 29:18, 29:20,

30:4, 30:9, 30:15, 30:21, 31:9, 31:11, 32:15, 33:16, 84:16
**JUDGE** [1] - 1:9
**judge** [15] - 32:16, 34:14, 59:7, 62:16, 63:1, 64:3, 68:9, 68:24, 72:24, 74:25, 76:24, 77:14, 79:2, 79:9, 93:2
**judge's** [3] - 73:19, 90:21, 93:4
**judicial** [1] - 58:25
**jurors** [2] - 73:6, 103:6
**jury** [31] - 4:3, 5:10, 6:21, 7:12, 8:3, 8:5, 8:16, 9:19, 9:21, 9:22, 10:19, 11:13, 11:18, 11:21, 12:4, 12:17, 26:14, 38:2, 41:9, 41:14, 59:22, 60:19, 61:17, 61:25, 62:2, 73:12, 79:3, 87:23, 97:11, 104:8
**JURY** [2] - 1:4, 1:8
**jury's** [1] - 32:5
**justice** [1] - 78:8

## K

**keep** [7] - 21:6, 30:4, 31:8, 32:22, 38:16, 79:1, 89:10
**keeping** [1] - 105:2
**keeps** [1] - 45:24
**kept** [2] - 15:3, 15:6
**kid** [2] - 80:9, 102:13
**killed** [2] - 34:5, 56:6
**killer** [2] - 101:20, 102:15
**killers** [1] - 102:20
**killing** [1] - 23:7
**kind** [14] - 42:6, 43:23, 45:9, 52:25, 53:1, 53:11, 53:19, 54:6, 57:2, 57:5, 57:18, 67:11, 71:10, 81:10
**kindness** [1] - 96:25
**kinds** [5] - 54:24, 57:1, 57:10, 57:11, 74:1
**King** [1] - 57:19
**kit** [5] - 70:17, 70:18, 70:20, 70:23, 71:23
**KIYONAGA** [17] - 2:10, 5:6, 9:14, 9:17, 26:11, 32:1, 37:25, 61:19, 90:23, 91:2, 91:4, 91:6, 91:9, 91:12, 97:8, 97:12, 104:23

**Kiyonaga** [3] - 3:7, 5:7, 9:16
**knees** [1] - 100:24
**knowing** [1] - 93:10
**known** [1] - 102:2
**knows** [2] - 43:24, 57:12
**KOLLAR** [1] - 1:9
**KOLLAR-KOTELLY** [1] - 1:9
**Kotelly** [12] - 14:18, 28:4, 29:5, 29:7, 29:11, 30:4, 30:10, 30:15, 30:21, 31:9, 32:15, 33:16
**KOTELLY** [1] - 1:9
**Kotelly's** [3] - 29:18, 29:20, 31:11

## L

**labeled** [1] - 14:9
**lack** [5] - 66:25, 77:1, 77:6, 77:16, 77:20
**ladies** [16] - 14:3, 15:22, 20:7, 20:14, 22:2, 26:17, 27:21, 29:3, 32:24, 39:12, 39:23, 40:15, 41:19, 78:18, 86:25, 91:13
**lady** [6] - 46:5, 46:14, 50:14, 52:21, 80:14, 81:23
**large** [1] - 70:2
**larger** [3] - 69:16, 71:5, 101:24
**last** [3] - 60:7, 65:18, 68:24
**lastly** [1] - 37:18
**late** [4] - 9:19, 56:2, 56:4, 90:7
**late-term** [2] - 56:2, 56:4
**Lauren** [25] - 4:7, 4:15, 13:24, 17:8, 19:20, 20:2, 20:8, 20:12, 33:3, 43:5, 43:12, 43:15, 43:19, 45:6, 51:16, 52:15, 55:3, 56:14, 56:19, 58:9, 58:19, 60:8, 93:23, 97:16, 99:1
**LAUREN** [2] - 1:5, 1:18
**Lauren's** [1] - 56:15
**LAW** [3] - 11:3, 11:7, 12:7
**Law** [1] - 2:3
**law** [25] - 11:5, 14:12, 14:13, 14:15, 29:21,

40:5, 40:8, 40:9, 42:12, 46:25, 47:1, 47:6, 47:9, 50:21, 57:15, 73:3, 76:18, 76:24, 77:8, 77:11, 77:22, 77:25, 82:15, 93:3, 104:10
**laws** [13] - 40:14, 46:25, 47:11, 59:1, 59:2, 59:14, 60:2, 60:10, 62:25, 63:3, 65:5, 65:6, 103:24
**lawyer** [3] - 32:6, 79:11, 105:2
**lawyers** [3] - 62:16, 73:1, 105:1
**layout** [1] - 18:23
**lead** [2] - 90:2, 101:17
**leader** [2] - 33:3, 33:14
**leads** [1] - 37:5
**lean** [1] - 50:13
**leaning** [1] - 96:15
**learn** [1] - 103:4
**learned** [3] - 25:21, 75:19, 105:1
**least** [4] - 6:12, 49:12, 52:19, 94:23
**leather** [1] - 21:10
**leave** [13] - 22:6, 29:13, 38:2, 42:22, 42:23, 42:25, 47:6, 49:18, 50:16, 90:25, 97:10, 97:22, 100:19
**leaves** [4] - 46:15, 48:2, 60:4, 95:20
**leaving** [1] - 100:14
**lectern** [1] - 92:13
**led** [4] - 19:10, 20:12, 21:11, 21:16
**left** [12] - 16:2, 38:23, 54:17, 54:21, 56:5, 56:17, 70:5, 88:21, 95:14, 96:4, 97:16, 98:16
**leg** [1] - 100:13
**legal** [2] - 25:12, 55:2
**legality** [2] - 56:3, 56:4
**legally** [3] - 40:5, 73:11, 88:3
**legislative** [1] - 58:25
**legislators** [2] - 59:6, 59:9
**legs** [4] - 26:18, 72:3, 72:9
**leis** [1] - 102:10
**length** [1] - 76:12
**lengthy** [1] - 41:23
**less** [2] - 8:14, 95:7
**level** [5] - 45:14,

46:17, 65:3, 66:25
**liability** [2] - 32:16, 32:23
**life** [8] - 54:10, 54:12, 55:11, 83:3, 89:21, 89:23, 101:14, 102:17
**lifers** [2] - 46:22, 47:3
**lifted** [1] - 72:6
**like-minded** [2] - 74:22, 83:6
**likelihood** [1] - 6:20
**limp** [2] - 17:22, 17:23
**line** [2] - 92:21, 93:24
**lined** [1] - 38:12
**link** [1] - 75:23
**linked** [1] - 58:23
**list** [1] - 42:6
**listed** [2] - 52:18, 52:19
**listen** [6] - 29:10, 29:18, 39:20, 42:21, 63:19, 101:3
**live** [7] - 15:5, 17:7, 23:4, 34:4, 55:9, 55:19, 99:3
**live-birth** [5] - 23:4, 34:4, 55:9, 55:19, 99:3
**lived** [1] - 75:21
**lives** [2] - 78:4, 99:17
**living** [1] - 54:13
**LLC** [1] - 2:3
**LLP** [1] - 1:23
**lobby** [4] - 50:12, 51:11, 58:8, 58:9
**located** [1] - 18:21
**location** [3] - 26:15, 45:23, 54:16
**lock** [8] - 22:17, 22:19, 33:10, 43:21, 69:24, 70:2, 70:16
**lock-and-block** [4] - 22:17, 22:19, 33:10, 43:21
**locked** [2] - 69:21, 70:15
**locking** [1] - 70:25
**locks** [3] - 27:15, 36:14, 70:5
**logical** [1] - 44:16
**long-range** [1] - 102:2
**look** [38] - 8:3, 8:11, 9:4, 9:5, 15:8, 15:13, 17:11, 22:17, 28:23, 34:14, 39:9, 42:18, 44:15, 44:19, 45:12, 45:18, 47:24, 47:25, 48:5, 51:4, 51:5, 51:12, 52:1, 52:24,

53:18, 53:20, 68:23,
71:5, 72:9, 76:3,
76:14, 94:17, 95:10,
96:5, 96:10, 97:12,
98:7
**looked** [3] - 22:22,
34:23, 51:16
**looking** [2] - 8:5,
35:12
**looks** [1] - 51:8
**loomed** [1] - 101:24
**loose** [1] - 20:15
**losing** [1] - 86:12
**love** [1] - 47:21
**LRRPs** [1] - 102:3
**lunch** [1] - 104:2,
104:6, 105:4
**Luther** [1] - 57:19
**lying** [2] - 46:7, 46:16

## M

**ma'am** [4] - 9:14, 9:17,
26:13, 68:1
**main** [2] - 26:10, 80:18
**majority** [1] - 47:16
**mall** [1] - 50:3
**man** [6] - 15:4, 15:5,
17:7, 18:12, 22:5,
37:16
**manager** [2] - 85:20,
92:17
**manhandled** [1] - 98:7
**marched** [1] - 18:17
**Marshall** [3] - 20:20,
96:20, 97:12
**marshall** [6] - 31:24,
32:9, 32:11, 37:23,
38:6
**Martin** [2] - 4:14,
57:19
**MARTIN** [1] - 1:17
**Massachusetts** [1] -
75:12
**Matt** [1] - 15:10
**matter** [9] - 8:13,
47:22, 55:25, 56:11,
56:13, 60:25, 75:23,
78:9, 88:15
**matters** [3] - 47:1,
54:16, 56:13
**maximum** [1] - 7:20
**MD** [1] - 2:9
**mean** [5] - 14:4, 42:17,
43:7, 50:11, 79:8
**meaning** [5] - 53:17,
79:6, 79:8, 89:10
**means** [14] - 14:7,
15:11, 17:24, 22:23,
30:23, 36:3, 43:1,

48:20, 48:21, 64:4,
92:12, 92:13, 94:13,
102:25
**meant** [2] - 14:11,
93:24
**mechanics** [1] - 60:17
**media** [7] - 13:21,
13:23, 28:1, 33:4,
76:8, 84:21
**medic** [2] - 102:2,
102:15
**medical** [2] - 18:20,
30:25
**meet** [5] - 17:1, 17:2,
17:9, 37:14, 74:22
**meeting** [11] - 17:14,
28:1, 33:13, 74:1,
74:11, 74:12, 85:8,
85:10, 85:11, 86:17,
86:19
**meetings** [2] - 27:25,
36:19
**member** [7] - 14:6,
32:17, 37:10, 38:11,
79:4, 79:5, 86:25
**members** [1] - 9:22
**membership** [1] -
32:19
**memory** [1] - 104:15
**men** [1] - 101:15
**mention** [5] - 14:1,
29:6, 39:17, 55:5,
96:10
**mentioned** [8] - 30:9,
62:19, 75:11, 75:13,
83:11, 84:23, 92:16,
92:18
**mentions** [1] - 83:17
**mere** [1] - 89:1
**merely** [7] - 83:5, 93:7,
93:8, 93:9, 93:10,
103:22
**message** [7] - 13:24,
14:23, 15:13, 15:17,
17:6, 17:8, 75:4
**messages** [7] - 15:7,
33:4, 33:5, 38:8,
75:14, 76:7, 76:9
**messaging** [1] - 75:4
**messy** [1] - 51:16
**met** [12] - 13:19, 17:3,
17:15, 17:18, 23:13,
24:20, 25:18, 28:3,
37:14, 59:24, 67:2,
101:7
**method** [1] - 17:23
**methodologies** [1] -
18:1
**Metro** [1] - 99:7
**metropolitan** [1] -

23:12
**Metropolitan** [1] -
27:13
**MI** [1] - 2:7
**mic** [2] - 91:2, 91:7
**Michigan** [8] - 15:1,
16:16, 16:20, 16:22,
16:25, 35:10, 75:11,
87:5
**microphone** [3] -
86:12, 86:13, 89:17
**middle** [1] - 10:4
**might** [20] - 14:14,
15:14, 43:14, 45:2,
47:18, 47:19, 50:6,
50:7, 50:12, 50:25,
52:2, 52:9, 55:24,
55:25, 56:12, 58:13,
83:24, 93:14, 100:9,
100:24
**milling** [1] - 95:5
**mind** [12] - 30:4, 31:8,
32:22, 38:17, 56:15,
64:7, 73:21, 79:1,
89:10, 101:6,
101:24, 105:2
**minded** [2] - 74:22,
83:6
**minds** [2] - 86:17,
86:19
**mine** [1] - 101:19
**minor** [1] - 30:13
**minute** [5] - 32:24,
35:15, 46:25, 60:14,
100:6
**minutes** [11] - 24:6,
41:3, 41:10, 58:7,
60:21, 61:23, 71:16,
80:11, 80:17, 104:24
**misdemeanor** [3] -
7:7, 9:1
**missed** [2] - 82:3, 90:8
**misses** [1] - 50:24
**missing** [1] - 84:4
**missions** [1] - 102:4
**misstated** [1] - 96:21
**misstatement** [2] -
7:17, 82:15
**misstates** [1] - 77:8
**misstating** [3] - 26:13,
32:2, 38:1
**modified** [2] - 47:13
**Moines** [1] - 100:24
**mom** [1] - 54:10
**moment** [12] - 10:16,
18:19, 29:4, 63:25,
64:25, 66:9, 67:7,
68:18, 69:25, 75:11,
77:5, 90:8
**month** [1] - 7:6

**months** [1] - 7:20
**MORNING** [2] - 1:7,
1:8
**morning** [31] - 4:4,
4:11, 4:13, 4:14,
4:17, 5:2, 5:3, 5:5,
5:6, 5:8, 6:18, 9:22,
9:23, 11:2, 11:24,
18:3, 18:7, 19:4,
19:8, 19:9, 19:12,
22:15, 23:18, 24:22,
37:14, 39:18, 41:3,
41:6, 41:19, 61:4,
81:15
**most** [10] - 57:16,
59:25, 67:3, 76:5,
89:21, 89:22, 96:16,
100:9, 101:8
**Mother** [1] - 29:17
**mother** [1] - 99:20
**mother's** [1] - 99:13
**mothers** [4] - 99:8,
99:11, 99:16, 103:13
**mouth** [2] - 36:5, 36:9
**move** [14] - 17:24,
24:12, 24:15, 24:17,
35:8, 36:11, 37:2,
73:14, 73:22, 82:21,
84:17
**moved** [5] - 21:9,
21:10, 21:11, 55:1,
98:11
**movement** [5] - 16:18,
48:22, 49:8, 53:18,
83:19
**moving** [5] - 6:23,
9:19, 12:15, 28:24,
51:15
**MPD** [1] - 27:19
**MR** [89] - 4:11, 4:14,
4:17, 4:25, 5:3, 5:6,
5:20, 5:22, 6:5, 6:11,
6:14, 6:17, 7:1, 7:6,
7:12, 7:16, 8:9, 8:15,
8:23, 9:9, 9:11, 9:14,
9:17, 10:9, 10:12,
10:15, 10:21, 11:9,
11:16, 12:10, 12:12,
12:14, 12:20, 12:23,
20:14, 26:7, 26:9,
26:11, 26:17, 28:13,
28:22, 32:1, 32:3,
32:8, 34:20, 37:25,
38:4, 40:24, 41:18,
60:15, 60:22, 61:12,
61:19, 61:21, 62:9,
66:12, 68:17, 69:2,
72:6, 73:11, 73:14,
73:19, 77:7, 77:9,
77:14, 78:15, 78:17,

82:14, 82:17, 82:21,
84:4, 84:6, 84:15,
84:19, 86:14, 88:12,
88:25, 89:19, 90:23,
91:2, 91:4, 91:6,
91:9, 91:12, 97:3,
97:8, 97:12, 104:22,
104:23
**MS** [1] - 1:21
**multiple** [3] - 64:15,
66:4
**murders** [1] - 23:3
**must** [12] - 42:17,
43:6, 46:7, 47:22,
47:23, 49:11, 52:23,
52:24, 53:10, 77:24,
83:14

## N

**N.W** [1] - 106:11
**name** [10] - 16:5,
19:21, 59:14, 61:6,
63:17, 75:15, 84:23,
92:17, 97:7
**named** [1] - 25:19
**narrow** [2] - 100:12,
100:23
**naturally** [1] - 101:16
**nature** [1] - 64:21
**near** [2] - 18:9, 80:14
**nearby** [1] - 96:11
**necessarily** [1] - 57:20
**necessary** [5] - 30:8,
52:6, 52:8, 63:3,
71:24
**neck** [4] - 27:15, 70:3,
70:5, 70:16
**need** [12] - 7:15, 8:2,
10:5, 16:10, 44:17,
53:20, 63:3, 77:10,
88:14, 93:4, 96:20,
98:18
**needed** [4] - 25:12,
26:1, 70:24, 97:15
**needs** [4] - 5:14,
54:25, 60:13, 100:6
**nefarious** [2] - 57:5,
57:12
**neglected** [1] - 56:7
**never** [16] - 42:10,
42:13, 51:14, 52:1,
58:19, 68:21, 83:19,
94:9, 94:10, 94:11,
95:12, 95:13, 96:9,
102:17
**new** [2] - 86:10,
101:14
**New** [4] - 15:1, 16:16,
75:12, 75:18

**next** [15] - 9:8, 15:13, 18:7, 20:7, 23:12, 40:23, 50:14, 51:20, 51:24, 53:6, 53:16, 60:13, 71:22, 74:12, 74:24
**nice** [1] - 46:23
**night** [8] - 17:4, 17:5, 18:5, 18:7, 33:13, 90:4, 90:7, 92:5
**nilly** [1] - 100:14
**nobody** [5] - 45:24, 50:1, 50:4, 51:21, 58:2
**nominated** [1] - 59:8
**nonbiological** [1] - 103:1
**nonviolence** [1] - 58:4
**nonviolent** [3] - 7:19, 7:23, 93:23
**normally** [1] - 100:3
**note** [1] - 69:20
**notepad** [1] - 95:18
**notes** [4] - 41:20, 48:16, 79:19, 106:5
**nothing** [14] - 16:2, 42:25, 44:3, 46:9, 52:7, 57:5, 57:12, 59:15, 72:9, 84:22, 85:2, 85:20, 85:21, 103:12
**notice** [2] - 46:11, 72:2
**noticed** [2] - 19:13
**number** [3] - 49:13, 49:14
**nurse** [4] - 96:20, 97:2, 97:4, 97:9
**nutshell** [1] - 32:16
**NW** [4] - 1:13, 1:16, 2:3, 2:22

## O

**oath** [6] - 19:9, 23:4, 34:16, 34:22, 38:15, 39:5
**object** [2] - 71:21, 73:11
**objected** [1] - 96:4
**objection** [8] - 6:11, 26:11, 37:25, 77:7, 82:14, 84:6, 88:12, 97:3
**objections** [2] - 74:25, 96:21
**objective** [1] - 67:1
**observation** [1] - 46:10
**observed** [3] - 85:16,

85:22, 85:23
**obstacle** [1] - 94:13
**obstruct** [7] - 13:5, 21:22, 27:23, 40:10, 45:17, 45:18, 88:19
**obstructed** [1] - 30:20
**obstruction** [23] - 7:8, 7:9, 7:13, 7:20, 7:23, 8:1, 8:14, 21:19, 22:10, 29:9, 30:19, 48:11, 48:18, 51:24, 88:16, 92:12, 92:13, 92:15, 93:21, 94:13, 94:20
**obtaining** [1] - 53:25
**obvious** [1] - 79:8
**obviously** [7] - 44:8, 49:21, 54:3, 55:19, 58:25, 59:6, 59:7
**occasions** [1] - 33:22
**occurred** [2] - 46:10, 75:5
**October** [16] - 13:2, 15:6, 16:6, 17:4, 17:6, 17:16, 18:3, 19:4, 22:15, 24:4, 25:1, 25:2, 28:7, 31:6, 33:18, 36:25
**odd** [2] - 19:13, 19:19
**OF** [4] - 1:1, 1:2, 1:8, 106:1
**offense** [2] - 75:4, 89:2
**offenses** [4] - 29:8, 77:4, 77:5, 77:24
**offensive** [1] - 65:14
**offered** [1] - 31:5
**offering** [1] - 49:24
**office** [3] - 30:25, 50:2, 90:7
**Office** [1] - 1:12
**Officer** [18] - 23:13, 23:17, 23:20, 23:22, 23:25, 24:1, 24:5, 24:14, 24:16, 33:7, 34:9, 35:7, 44:5, 44:12, 70:17, 71:18, 92:24, 92:25
**officer** [7] - 29:12, 44:7, 45:7, 45:22, 52:4, 52:11, 95:17
**officer's** [1] - 69:14
**officers** [6] - 17:24, 23:12, 23:14, 24:11, 27:13, 72:14
**Offices** [1] - 2:3
**OFFICIAL** [1] - 106:1
**official** [2] - 83:10, 83:12
**Official** [2] - 2:21,

106:10
**often** [3] - 42:8, 99:18, 99:20
**old** [6] - 6:15, 45:2, 67:20, 89:25, 101:19
**older** [2] - 66:21, 98:6
**Olympics** [1] - 100:5
**once** [4] - 56:7, 71:7, 77:11, 77:21
**one** [93] - 7:7, 8:13, 13:12, 15:8, 15:15, 16:7, 18:2, 19:18, 20:22, 21:18, 21:25, 23:14, 28:18, 29:7, 30:8, 30:14, 30:16, 32:11, 33:21, 33:25, 37:20, 38:13, 38:16, 40:6, 40:7, 40:9, 40:10, 41:2, 41:5, 41:6, 43:11, 44:25, 46:2, 46:5, 49:12, 49:14, 52:18, 52:19, 53:9, 56:21, 56:23, 58:3, 59:5, 59:16, 59:17, 64:25, 65:17, 66:5, 66:7, 66:9, 66:20, 66:21, 68:24, 69:17, 70:11, 70:12, 71:23, 72:18, 73:23, 74:18, 78:9, 79:11, 80:12, 80:19, 82:3, 82:9, 83:4, 83:13, 83:22, 84:15, 84:22, 84:23, 85:10, 89:20, 89:22, 92:16, 92:22, 95:25, 96:21, 97:25, 98:21, 101:9, 102:16, 103:5, 103:23, 104:18
**one-word** [1] - 38:13
**one-year** [1] - 7:7
**ones** [3] - 13:12, 41:1, 56:19
**ongoing** [1] - 86:15
**open** [9] - 19:14, 19:18, 20:11, 45:16, 45:21, 79:1, 81:11, 89:10, 102:9
**opened** [1] - 20:15
**opening** [10] - 5:23, 62:19, 63:10, 70:9, 78:25, 79:20, 83:9, 101:7, 103:16, 103:18
**opens** [1] - 66:2
**opinion** [6] - 7:14, 40:3, 40:4, 67:15, 99:22, 103:13
**opinions** [2] - 102:23, 103:17

**opportunity** [3] - 10:2, 72:23, 81:1
**opposed** [1] - 102:23
**opposing** [2] - 41:19, 62:10
**opposite** [1] - 98:2
**opposition** [2] - 98:21, 100:12
**oppress** [2] - 82:25, 91:25
**option** [1] - 99:10
**order** [8] - 9:7, 9:13, 9:14, 41:20, 53:23, 57:13, 88:22
**organize** [2] - 13:19, 37:21
**organized** [4] - 13:7, 20:4, 33:6, 42:10
**organizer** [1] - 33:14
**organizers** [1] - 57:21
**organizing** [2] - 15:23, 93:14
**originally** [1] - 60:21
**others'** [2] - 13:18, 40:13
**otherwise** [4] - 68:20, 71:4, 78:3, 94:1
**ourselves** [2] - 49:19, 58:22, 101:11
**outfit** [1] - 55:8
**outset** [1] - 63:25
**outside** [8] - 20:1, 26:23, 42:24, 54:14, 55:1, 56:7, 66:4, 74:9
**outward** [1] - 66:14
**outwards** [1] - 67:4
**overflow** [2] - 5:12, 11:1
**overweight** [1] - 67:21
**overwhelmed** [1] - 21:5
**own** [14] - 20:8, 35:21, 36:7, 37:3, 42:5, 43:20, 44:1, 46:15, 49:2, 50:10, 63:15, 66:24, 72:25, 73:21
**owner** [1] - 50:6

## P

**p.m** [2] - 105:4, 105:5
**P.O** [1] - 1:21
**pace** [1] - 25:8
**PAGE** [1] - 3:2
**page** [1] - 15:17
**pain** [7] - 26:4, 26:20, 26:22, 27:2, 31:22, 32:11, 47:3
**pamphlets** [4] - 49:23,

50:4, 50:13, 58:16
**Pap** [1] - 54:4
**parked** [1] - 18:8
**part** [11] - 16:11, 31:15, 36:20, 37:16, 38:14, 43:17, 51:11, 59:20, 75:25, 87:7, 93:13
**participant** [1] - 92:1
**participants** [1] - 75:7
**particular** [4] - 73:25, 76:15, 79:21, 99:1
**particularized** [1] - 95:1
**particularly** [1] - 65:16
**parties** [2] - 57:16, 68:14
**partly** [2] - 55:17, 55:18
**parts** [1] - 72:23
**party** [1] - 74:1
**passage** [2] - 94:21, 100:8
**passed** [3] - 31:21, 47:12, 47:17
**passengers** [5] - 87:11, 100:18, 100:19, 100:21, 102:11
**passing** [1] - 101:23
**passionate** [1] - 64:19
**passions** [1] - 60:2
**passivity** [1] - 51:19
**PATEL** [1] - 1:14, 7:16
**Patel** [6] - 4:12, 35:18, 35:23, 36:3, 40:18, 75:17
**patience** [1] - 62:15
**patient** [4] - 25:18, 67:8, 68:21, 88:17
**patiently** [1] - 8:21
**patients** [11] - 20:11, 21:23, 21:24, 21:25, 24:19, 30:2, 35:8, 66:10, 83:1
**patients'** [2] - 27:23, 30:21
**Patterson** [1] - 61:9
**Patty** [1] - 15:10
**Paula** [2] - 39:2, 39:7
**Paulette** [3] - 20:20, 98:6
**pause** [1] - 26:21
**pay** [3] - 6:10, 42:8, 54:7
**PC** [1] - 2:6
**peace** [1] - 11:21
**peaceful** [1] - 58:5
**peacefully** [1] - 103:13
**pecking** [1] - 9:7

**penalty** [2] - 7:18, 7:20
**Pennsylvania** [2] - 1:16, 75:12
**people** [88] - 7:14, 14:11, 14:22, 14:25, 15:13, 15:20, 15:21, 15:25, 16:14, 16:15, 17:20, 17:21, 17:22, 21:4, 22:19, 23:24, 23:25, 34:8, 35:12, 35:23, 36:1, 36:8, 37:20, 38:12, 39:23, 40:4, 42:2, 42:15, 42:20, 43:4, 43:24, 44:2, 44:6, 44:7, 45:14, 46:23, 47:4, 47:18, 48:3, 50:3, 50:4, 50:6, 50:25, 51:2, 51:9, 52:14, 54:3, 55:25, 56:12, 56:22, 57:3, 57:11, 57:22, 57:24, 58:3, 58:22, 59:22, 60:25, 61:19, 65:19, 66:4, 66:19, 66:20, 68:25, 71:16, 71:17, 71:21, 71:22, 74:21, 75:5, 75:10, 79:6, 80:22, 83:2, 83:5, 83:17, 84:24, 89:20, 95:3, 96:16, 98:22, 100:17, 100:20, 101:12, 102:15, 103:7, 104:9
**people's** [1] - 36:25
**percent** [1] - 78:4
**perfect** [3] - 12:14, 82:3
**perform** [1] - 99:3
**performance** [1] - 58:1
**performed** [1] - 97:18
**performing** [1] - 27:3
**perhaps** [9] - 7:2, 42:1, 43:24, 48:2, 56:9, 94:24, 99:16, 100:19, 101:8
**period** [1] - 96:6
**person** [37] - 13:19, 16:24, 17:11, 30:13, 31:14, 31:15, 31:16, 31:17, 31:18, 45:19, 48:13, 48:20, 49:7, 49:8, 49:22, 50:12, 50:16, 52:14, 52:15, 52:18, 53:8, 53:10, 53:19, 53:24, 53:25, 54:25, 56:15, 56:16, 62:23, 63:15, 66:4, 69:4, 74:8, 80:19,

101:2
**person's** [6] - 32:18, 42:24, 48:21, 49:8, 53:17, 54:1
**persona** [2] - 95:7, 99:14
**personal** [3] - 40:10, 98:21, 98:24
**Personally** [2] - 34:12, 34:13
**personally** [2] - 34:24, 45:1
**persons** [6] - 65:9, 66:7, 66:14, 67:5, 67:14, 82:24
**pertaining** [1] - 93:18
**phalanx** [1] - 100:18
**phone** [6] - 76:9, 83:25, 84:1, 90:10, 90:13, 90:16
**phones** [1] - 10:16
**photo** [1] - 71:18
**physical** [22] - 7:8, 7:12, 7:13, 7:19, 7:23, 7:25, 8:1, 21:19, 22:9, 48:11, 48:18, 51:24, 65:15, 67:13, 88:16, 92:12, 92:14, 93:21, 94:13, 94:20, 95:7
**physically** [6] - 21:22, 30:20, 66:18, 68:6, 88:18, 99:13
**physician's** [1] - 30:25
**pick** [1] - 77:11
**picture** [4] - 47:25, 50:23, 72:16, 86:23
**pictured** [1] - 71:18
**piped** [1] - 10:23
**place** [8] - 5:15, 17:9, 49:1, 51:8, 53:10, 55:2, 101:12
**placed** [1] - 71:12
**places** [1] - 75:12
**plainly** [1] - 55:14
**Plaintiff** [2] - 1:3, 1:12
**plan** [7] - 6:6, 6:12, 13:12, 13:20, 17:3, 17:9, 57:14
**plane** [2] - 100:19, 102:12
**planned** [8] - 13:8, 13:16, 13:21, 16:2, 21:21, 28:4, 33:6, 42:10
**planning** [14] - 14:24, 15:3, 15:25, 16:8, 27:25, 28:6, 36:19, 38:9, 43:6, 57:3, 57:11, 91:19, 93:15,

93:16
**plans** [1] - 18:11
**platoons** [1] - 102:3
**play** [8] - 59:11, 64:24, 65:23, 66:8, 72:1, 72:2, 77:4, 90:2
**played** [13] - 12:24, 20:13, 26:6, 26:8, 26:16, 28:12, 28:21, 34:19, 66:11, 68:16, 69:1, 70:1, 72:5
**plays** [1] - 66:9
**plea** [1] - 89:5
**pleaded** [1] - 16:19
**point** [35] - 5:10, 8:20, 8:22, 11:13, 30:12, 32:11, 43:20, 44:5, 44:19, 45:9, 46:2, 46:7, 52:21, 61:22, 63:7, 63:25, 66:16, 66:20, 69:5, 69:8, 71:25, 72:16, 75:20, 76:10, 77:16, 80:12, 89:13, 96:13, 96:18, 96:19, 99:14, 100:18, 101:2, 104:2, 104:18
**pointed** [4] - 66:13, 67:4, 94:3, 98:2
**pointing** [6] - 58:8, 58:9, 58:10, 58:12, 58:15, 58:19
**points** [2] - 6:9, 63:24
**polarized** [1] - 42:3
**Police** [2] - 23:12, 27:13
**police** [16] - 17:24, 29:12, 45:22, 52:4, 69:13, 71:14, 71:18, 79:23, 80:1, 80:3, 81:16, 95:14, 95:17, 98:15, 98:22
**polite** [1] - 96:16
**politics** [1] - 40:5
**poltergeists** [1] - 12:1
**poor** [2] - 80:14, 81:23
**position** [2] - 80:12, 88:10
**possible** [1] - 50:20
**post** [13] - 20:1, 22:14, 22:22, 23:11, 33:9, 42:11, 43:9, 43:20, 44:1, 44:3, 44:12, 84:20, 85:3
**posted** [1] - 20:2
**posts** [2] - 57:2, 84:24
**powerful** [1] - 60:8
**practical** [4] - 8:12, 60:25, 88:15, 94:14
**practically** [1] - 44:21

**practices** [1] - 85:13
**pray** [1] - 50:16
**pre** [2] - 37:14, 92:5
**pre-meet** [1] - 37:14
**pre-rescue** [1] - 92:5
**preborn** [1] - 23:8
**precisely** [1] - 17:17
**predicate** [1] - 52:23
**predictable** [1] - 48:2
**pregnancies** [2] - 54:16, 99:11
**pregnancy** [11] - 25:22, 25:24, 31:3, 48:24, 49:10, 54:2, 54:4, 54:14
**prepared** [1] - 90:3
**prescribe** [1] - 60:3
**presence** [15] - 4:3, 9:20, 11:17, 12:4, 12:16, 41:9, 41:13, 58:21, 60:19, 61:17, 62:1, 74:5, 80:18, 88:25, 104:8
**present** [6] - 5:1, 5:7, 74:10, 89:1, 93:9, 93:10
**presented** [6] - 40:19, 64:17, 71:3, 76:1, 76:17, 98:25
**President** [2] - 47:17, 59:7
**presumably** [2] - 47:12, 72:14
**presumed** [1] - 62:24
**presumption** [1] - 60:6
**pretty** [3] - 6:15, 6:21, 71:15
**prevent** [1] - 30:1
**previous** [1] - 56:19
**primarily** [1] - 14:4
**principled** [1] - 50:9
**principles** [1] - 40:1
**prison** [2] - 89:4, 103:22
**privacy** [1] - 96:15
**pro** [5] - 46:22, 47:3, 54:12, 55:11, 83:3
**pro-life** [3] - 54:12, 55:11, 83:3
**pro-lifers** [2] - 46:22, 47:3
**problem** [6] - 6:4, 6:13, 6:25, 7:1, 7:5, 10:23, 24:25, 38:23, 56:1, 56:2, 56:9, 73:17, 104:13, 104:14
**problems** [3] - 11:11, 11:12, 77:12

**procedures** [1] - 97:17
**proceed** [1] - 41:15
**proceeding** [2] - 62:5, 62:6
**proceedings** [14] - 4:2, 9:20, 10:18, 11:17, 12:3, 12:16, 41:8, 41:13, 59:3, 60:18, 61:16, 62:1, 104:7, 106:6
**proceeds** [1] - 69:9
**process** [5] - 24:23, 41:25, 47:9, 47:23, 63:21
**Proctor** [9] - 19:6, 19:11, 20:3, 20:10, 20:15, 66:1, 66:18, 67:13, 92:24
**proctor** [5] - 19:15, 19:18, 19:23, 19:24, 19:25
**product** [1] - 47:23
**professional** [1] - 24:11
**progress** [1] - 101:5
**prohibited** [1] - 51:1
**prohibiting** [1] - 72:10
**prohibits** [1] - 48:1
**promise** [3] - 63:9, 103:7, 103:9
**proof** [7] - 60:7, 64:1, 64:2, 71:3, 74:18, 75:20, 86:23
**proper** [1] - 39:25
**prosecution** [1] - 76:19
**prosecutors** [1] - 58:24
**prostrate** [1] - 97:13
**protect** [1] - 60:7
**protected** [1] - 54:22
**protection** [2] - 55:2
**protest** [1] - 16:10
**prove** [9] - 29:25, 48:8, 49:11, 49:14, 49:15, 58:10, 72:20, 73:24, 87:17
**proved** [1] - 44:23
**proven** [3] - 40:17, 48:9, 82:22
**proves** [4] - 28:10, 44:15, 49:13, 98:19
**provide** [1] - 63:1
**provided** [3] - 30:23, 63:1, 77:22
**provides** [1] - 14:7
**providing** [6] - 27:5, 27:8, 48:14, 49:9, 53:25, 94:15
**provision** [1] - 7:18

119

**public** [1] - 101:8
**pull** [2] - 47:24, 91:7
**pulled** [2] - 25:13, 37:4
**punish** [1] - 103:25
**purpose** [2] - 98:20, 99:8
**push** [4] - 31:25, 51:18, 53:4, 92:20
**pushed** [12] - 20:24, 32:12, 38:21, 38:22, 67:9, 67:23, 68:4, 68:19, 69:2, 69:4, 81:12, 94:22
**pushes** [1] - 66:19
**pushing** [4] - 37:10, 51:14, 51:17, 53:3
**put** [12] - 10:6, 34:18, 45:10, 49:1, 50:13, 53:8, 69:16, 69:17, 71:7, 90:13, 100:22, 101:18
**puts** [3] - 49:6, 57:1, 69:5
**putting** [6] - 28:24, 36:5, 36:9, 48:20, 56:22, 93:23

**Q**

**qualifies** [1] - 6:14
**quarter** [1] - 41:4
**questions** [6] - 34:7, 35:18, 74:6, 91:16, 101:15, 101:17
**quickly** [1] - 71:15
**quit** [2] - 54:10, 55:6
**quote** [4] - 23:21, 74:11, 91:20, 93:23
**quote-unquote** [2] - 91:20, 93:23
**quotes** [1] - 74:6

**R**

**rack** [1] - 70:2
**raise** [1] - 69:6
**raises** [3] - 60:1, 68:21, 104:19
**ran** [2] - 98:25, 104:24
**range** [2] - 48:1, 102:2
**rather** [3] - 6:23, 85:11, 103:18
**rattling** [1] - 81:10
**reach** [1] - 103:23
**reached** [2] - 73:9, 82:24
**reaching** [1] - 81:11
**reaction** [7] - 65:8, 65:23, 65:24, 65:25,

66:15, 66:22, 67:11
**read** [2] - 72:24, 86:3
**reading** [1] - 104:12
**ready** [5] - 9:6, 12:18, 41:11, 41:15, 61:13
**real** [8] - 20:5, 23:6, 23:9, 29:2, 33:9, 89:9, 92:12, 101:1
**realization** [1] - 99:16
**really** [14] - 42:21, 46:19, 51:8, 51:14, 55:4, 62:15, 65:22, 67:24, 71:11, 79:7, 85:14, 87:14, 88:6, 103:19
**rear** [1] - 100:23
**reason** [13] - 23:2, 23:5, 39:1, 39:6, 50:9, 50:22, 54:20, 55:21, 55:22, 56:23, 57:7, 65:20, 101:1
**reasonable** [21] - 33:2, 40:17, 45:19, 48:20, 49:7, 53:8, 53:10, 64:2, 71:4, 72:20, 74:18, 75:21, 76:2, 82:8, 82:12, 86:6, 89:10, 89:12, 89:16, 89:21, 90:17
**reasonably** [2] - 54:18, 54:19
**reasons** [2] - 55:25, 73:2
**rebuttal** [3] - 10:2, 61:1, 61:3
**receive** [1] - 78:10
**receiving** [2] - 30:2, 93:14
**reception** [13] - 20:23, 21:7, 21:10, 24:9, 25:5, 25:11, 25:14, 25:15, 37:5, 37:21, 38:19, 39:6, 39:18
**receptionist's** [1] - 19:1
**recess** [4] - 12:11, 41:12, 61:15, 105:4
**recognize** [1] - 47:22
**recollection** [3] - 32:5, 64:8, 64:11
**reconnaissance** [1] - 102:2
**record** [2] - 4:10, 97:4
**records** [3] - 57:8, 57:10, 76:9
**recruit** [1] - 14:17
**recruiting** [2] - 15:24, 84:24
**refer** [1] - 34:8
**reference** [3] - 15:9,

15:18, 76:25
**referenced** [3] - 75:7, 75:15, 84:23
**references** [1] - 80:6
**referral** [1] - 31:1
**referred** [2] - 30:18, 33:7
**referring** [1] - 85:11
**refused** [2] - 24:12, 24:17
**refusing** [1] - 42:25
**regarding** [1] - 8:16
**regards** [2] - 102:19, 102:21
**regular** [2] - 9:13, 9:14
**related** [2] - 5:17, 49:9
**relating** [2] - 31:1, 31:2
**relationships** [1] - 101:11
**relevant** [4] - 65:22, 76:22, 77:2, 77:17
**remember** [45] - 13:24, 14:3, 15:7, 16:3, 17:5, 18:6, 18:16, 19:10, 19:11, 20:10, 22:25, 23:19, 26:25, 30:14, 35:17, 38:17, 38:19, 39:3, 43:10, 45:2, 51:10, 53:20, 56:18, 66:1, 67:19, 67:21, 67:24, 67:25, 68:15, 69:15, 69:25, 70:7, 70:13, 74:11, 74:16, 75:9, 76:25, 77:1, 77:3, 77:19, 78:25, 81:19, 85:7, 85:14, 87:25
**remembered** [2] - 85:12, 90:8
**remembering** [1] - 65:16
**remind** [1] - 88:1
**reminded** [1] - 101:19
**reminder** [1] - 58:21
**reminds** [1] - 89:15
**remote** [1] - 95:23
**remotely** [1] - 94:3
**remove** [4] - 70:25, 71:24, 77:9, 78:14
**removed** [3] - 72:4, 72:8, 72:16
**removes** [1] - 71:18
**removing** [1] - 72:12
**render** [2] - 39:6, 92:13
**rendering** [3] - 48:18, 49:4, 51:24
**repeat** [1] - 39:21
**reporter** [1] - 11:25

**Reporter** [3] - 2:20, 2:21, 106:10
**REPORTER** [1] - 106:1
**reprehensible** [1] - 98:22
**represent** [1] - 62:12
**represented** [2] - 58:23, 59:1
**representing** [1] - 62:6
**reproductive** [21] - 13:6, 13:14, 13:17, 14:8, 27:24, 29:10, 30:2, 30:21, 30:22, 30:23, 31:2, 31:5, 36:22, 37:1, 39:15, 48:14, 48:22, 48:23, 53:25, 54:1, 94:15
**request** [3] - 4:20, 6:12, 35:8
**required** [1] - 30:17
**requirement** [1] - 30:16
**requires** [5] - 30:19, 48:7, 53:7, 53:23, 83:8
**requiring** [1] - 29:12
**requisite** [1] - 88:18
**rescue** [12] - 14:2, 14:4, 14:7, 14:9, 22:18, 22:21, 23:22, 33:10, 43:21, 44:6, 92:5, 94:6
**rescuers** [4] - 17:12, 17:13, 17:14, 94:5
**reservations** [1] - 92:6
**resisting** [1] - 93:24
**resonate** [1] - 100:9
**respect** [8] - 4:22, 34:1, 73:7, 73:24, 76:14, 76:22, 77:20, 96:13
**respected** [1] - 47:23
**respond** [1] - 79:21
**responded** [1] - 74:6
**response** [5] - 38:13, 42:13, 42:14, 75:16, 75:19
**responsibilities** [1] - 101:15
**responsibility** [1] - 103:1
**rest** [1] - 66:8
**restrict** [2] - 48:21, 53:17
**restricts** [1] - 49:8
**restroom** [1] - 61:20
**result** [1] - 58:2
**returning** [1] - 102:11

**review** [3] - 72:24, 103:10, 103:11
**revolves** [1] - 48:24
**ride** [2] - 55:6, 83:23
**Rights** [1] - 1:15
**rights** [13] - 13:5, 13:18, 27:23, 29:9, 29:16, 29:24, 40:7, 40:14, 64:18, 79:13, 79:15, 80:7, 102:21
**risk** [6] - 15:10, 15:11, 15:14, 57:24, 57:25, 103:22
**risking** [7] - 42:16, 42:17, 42:21, 42:22, 93:24, 94:2
**RMR** [2] - 2:21, 106:9
**road** [1] - 42:1
**ROBERT** [1] - 2:5
**Robert** [2] - 2:6, 4:25
**rock** [1] - 45:2
**role** [3] - 30:13, 59:11, 73:6
**roles** [1] - 28:15
**room** [18] - 5:13, 11:21, 20:23, 27:5, 27:6, 28:17, 53:2, 70:6, 79:3, 80:13, 80:18, 94:17, 94:23, 96:19, 96:24, 98:3, 100:13, 100:24
**Room** [2] - 2:22, 106:10
**rope** [1] - 72:11
**roped** [1] - 13:10
**ropes** [5] - 17:22, 18:11, 27:16, 36:15
**rucksack** [1] - 102:5
**rule** [1] - 73:20
**rules** [1] - 59:3
**run** [3] - 18:10, 20:3, 99:23
**run-through** [1] - 18:10
**runs** [1] - 66:13
**rushed** [1] - 20:23

**S**

**San** [1] - 100:25
**SANJAY** [1] - 1:14
**Sanjay** [1] - 4:12
**Santangelo** [4] - 56:20, 97:20, 98:25, 99:3
**Sara** [3] - 19:6, 20:22, 92:24
**Sasha** [8] - 19:5, 19:11, 20:3, 20:10, 20:15, 66:1, 66:18,

92:23

**sat** [8] - 21:16, 27:2, 34:23, 37:9, 37:11, 39:5, 95:13, 96:8
**satisfy** [1] - 89:11
**save** [3] - 46:22, 54:23, 55:18
**saving** [1] - 44:9
**saw** [47] - 15:5, 15:15, 18:13, 19:22, 20:14, 20:20, 21:2, 21:5, 21:9, 21:15, 21:23, 21:25, 23:11, 23:16, 24:6, 24:12, 24:14, 24:16, 25:8, 26:4, 27:14, 28:7, 31:20, 31:24, 34:24, 35:5, 35:9, 36:7, 37:3, 37:4, 39:7, 44:20, 45:6, 55:5, 69:13, 70:8, 70:25, 76:21, 78:19, 80:9, 80:12, 80:20, 80:21, 88:7, 92:5, 98:11, 99:1
**scared** [2] - 13:1, 102:5
**scene** [10] - 23:13, 23:14, 47:4, 89:2, 92:10, 92:16, 92:23, 93:9, 93:10, 95:20
**scent** [1] - 102:10
**scheme** [8] - 13:17, 13:18, 13:19, 13:20, 15:5, 16:3, 16:12, 65:22
**school** [4] - 54:10, 55:6, 57:4, 90:2
**scrawny** [2] - 102:13, 102:14
**scream** [1] - 22:1
**screamed** [2] - 21:24, 22:1
**screen** [3] - 72:21, 79:15, 82:23
**sea** [1] - 102:9
**Seaboard** [1] - 75:9
**seat** [1] - 100:22
**seated** [5] - 4:18, 5:4, 70:5, 98:20, 100:11
**seats** [1] - 100:12
**second** [10] - 6:2, 30:18, 32:14, 39:1, 48:12, 66:2, 68:4, 69:3, 69:11, 102:20
**secret** [1] - 69:13
**Section** [1] - 1:15
**see** [66] - 8:15, 11:6, 11:19, 17:13, 20:17, 20:18, 22:14, 24:13, 26:7, 26:17, 26:18,

28:17, 29:11, 29:14, 29:18, 32:10, 35:20, 36:12, 36:13, 37:19, 37:20, 37:22, 38:5, 46:10, 46:17, 47:24, 48:5, 49:17, 50:24, 51:14, 59:14, 60:4, 66:3, 66:10, 66:18, 67:8, 67:12, 68:13, 68:24, 71:6, 71:16, 72:1, 72:3, 72:6, 72:8, 73:19, 80:25, 81:9, 81:10, 81:11, 81:13, 94:18, 95:2, 95:3, 95:4, 95:16, 96:5, 96:14, 96:15, 98:11, 101:11, 103:4
**seeing** [2] - 15:19, 74:16
**seeking** [6] - 48:14, 49:9, 91:17, 94:15, 97:25, 103:12
**seem** [1] - 100:25
**sees** [1] - 100:17
**SEFRANEK** [1] - 106:3
**Sefranek** [3] - 2:21, 106:9, 106:9
**select** [1] - 103:6
**selection** [1] - 63:21
**self** [2] - 59:11, 68:22
**self-defense** [1] - 68:22
**self-governance** [1] - 59:11
**selfie** [4] - 18:15, 18:17, 28:2, 37:15
**sense** [1] - 63:4
**sent** [4] - 5:9, 14:23, 42:11, 85:3
**sentence** [2] - 8:17, 53:9
**sentences** [1] - 53:9
**separate** [2] - 18:7, 77:5
**separately** [1] - 51:4
**September** [1] - 13:25
**series** [1] - 15:7
**serious** [3] - 25:22, 53:14, 94:25
**service** [6] - 27:5, 27:8, 62:14, 62:17, 78:7, 78:8, 78:21
**services** [20] - 13:6, 13:18, 14:8, 27:24, 29:10, 30:2, 30:22, 30:23, 31:1, 31:2, 31:5, 36:23, 37:1, 39:15, 39:16, 48:14, 48:22, 49:9, 53:25,

94:15
**SESSION** [2] - 1:7, 1:8
**set** [7] - 5:13, 6:3, 10:12, 12:13, 17:9, 41:11, 60:13
**several** [2] - 14:4, 21:1
**sexy** [4] - 14:12, 14:13, 42:12
**Shampy** [1] - 25:19
**Shandy** [7] - 92:24, 95:24, 96:1, 96:3, 96:8, 96:11, 97:13
**share** [3] - 62:21, 62:22, 103:12
**sheriff** [1] - 45:4
**shipped** [1] - 54:11
**shirt** [2] - 74:14, 100:4
**shoot** [1] - 45:5
**shopping** [2] - 42:6, 50:2
**short** [4] - 40:25, 41:1, 61:12, 103:3
**shorter** [1] - 90:24
**shortly** [3] - 22:14, 23:11, 28:16
**shot** [1] - 45:3
**shoulder** [1] - 96:6
**shoulders** [1] - 102:11
**shoved** [1] - 95:4
**show** [22] - 33:5, 37:12, 47:3, 53:18, 57:10, 65:24, 68:3, 75:3, 80:24, 81:20, 81:21, 81:24, 81:25, 83:3, 84:19, 85:18, 86:6, 86:7, 90:4, 94:22, 103:11
**showed** [2] - 34:9, 42:13
**showing** [3] - 29:2, 73:12, 86:22
**shown** [1] - 63:12
**shows** [18] - 17:13, 21:19, 26:12, 27:21, 28:3, 28:15, 28:18, 31:4, 32:3, 33:17, 33:20, 36:24, 38:3, 38:13, 52:15, 79:23, 80:10, 96:11
**shrieking** [1] - 102:14
**shut** [6] - 17:24, 21:5, 28:20, 45:25, 71:11, 80:4
**sic** [10] - 4:18, 18:3, 27:15, 28:7, 92:18, 92:24, 95:24, 96:1, 97:13, 97:21
**side** [9] - 37:9, 45:12, 45:21, 45:22, 45:23, 48:4, 53:1, 58:16,

69:8
**sides** [3] - 41:24, 60:2, 73:2
**sidewalk** [5] - 16:9, 49:21, 49:23, 99:25, 100:2
**signed** [2] - 47:17, 74:8
**signs** [1] - 49:24
**silent** [1] - 62:3
**similar** [1] - 93:8
**simply** [4] - 7:8, 51:3, 71:1, 93:20
**sincerely** [1] - 41:22
**sing** [1] - 50:15
**singing** [1] - 50:17
**single** [4] - 29:11, 56:23, 59:17, 94:18
**sit** [11] - 11:14, 11:21, 30:6, 37:6, 43:10, 50:13, 50:14, 57:18, 61:11, 69:9, 69:17
**sit-in** [1] - 57:18
**sitting** [10] - 8:21, 21:15, 24:13, 37:15, 50:16, 60:16, 71:22, 80:13, 87:8
**six** [2] - 7:6, 7:20
**six-month** [1] - 7:6
**Sixth** [1] - 8:15
**slide** [3] - 74:24, 77:7, 77:9
**slim** [1] - 6:21
**slumped** [1] - 32:10
**smears** [1] - 54:4
**smile** [1] - 100:3
**Smith** [21] - 19:6, 20:9, 20:16, 21:2, 21:18, 24:14, 37:8, 37:9, 37:10, 65:17, 66:13, 67:13, 68:19, 69:5, 70:7, 70:20, 81:14, 92:17, 92:18, 95:4
**Smith's** [1] - 67:19
**snacks** [1] - 17:2
**snapshot** [1] - 28:18
**snippet** [1] - 65:24
**snippets** [1] - 72:22
**so-called** [2] - 57:16, 58:1
**social** [8] - 13:21, 13:23, 27:25, 33:4, 76:8, 84:21, 85:8, 85:9
**Society** [2] - 1:18, 1:20
**society** [3] - 42:3, 42:20, 96:16
**sold** [2] - 54:10, 55:7
**sole** [2] - 55:21, 55:22

**solely** [1] - 78:2
**soliciting** [1] - 100:2
**someone** [14] - 29:13, 30:12, 31:14, 31:16, 40:7, 40:11, 63:17, 65:13, 66:15, 67:9, 67:16, 69:2, 97:24, 103:1
**sometimes** [3] - 41:23, 76:5, 78:23
**somewhere** [3] - 17:16, 18:9, 65:13
**son** [2] - 90:14, 90:15
**son's** [1] - 90:8
**song** [2] - 45:2, 50:18
**songs** [1] - 50:15
**soon** [6] - 10:23, 12:2, 20:3, 22:11, 61:13, 80:2
**sorry** [7] - 10:12, 10:21, 11:9, 11:24, 57:7, 78:23, 93:24
**sort** [8] - 49:2, 71:13, 75:24, 76:3, 89:17, 92:2, 92:10, 103:24
**sorts** [1] - 91:16
**sound** [1] - 8:12
**sounds** [1] - 84:8
**sources** [1] - 14:4
**space** [2] - 96:13, 96:15
**speaker** [1] - 101:4
**speaking** [6] - 9:7, 46:16, 70:20, 76:11, 95:17, 95:18
**Special** [2] - 92:25, 100:4
**special** [3] - 7:23, 55:15, 100:6
**specific** [2] - 44:11, 60:4
**specifically** [3] - 64:5, 75:8, 104:17
**spending** [1] - 61:2
**spent** [2] - 101:22, 102:3
**spoken** [1] - 101:2
**sprained** [1] - 20:25
**square** [1] - 101:9
**staff** [4] - 21:5, 37:10, 70:12, 70:19
**stage** [1] - 54:14
**stairwell** [1] - 19:17
**stamp** [2] - 68:13, 71:16
**stand** [10] - 16:9, 35:19, 36:8, 45:6, 63:11, 83:24, 85:23, 86:2, 100:7, 103:21
**standard** [2] - 89:11,

89:16

**standing** [19] - 26:12, 36:12, 39:18, 80:19, 80:20, 81:3, 81:6, 81:7, 81:21, 82:5, 82:11, 95:6, 95:16, 96:4, 96:6, 96:7, 96:11, 96:12, 100:18
**stands** [3] - 26:9, 69:4, 92:14
**start** [9] - 9:25, 33:3, 49:21, 62:18, 64:23, 77:11, 80:8, 95:22
**started** [6] - 15:4, 43:23, 55:5, 62:13, 90:5
**starting** [2] - 4:10, 20:3
**starts** [2] - 47:9, 55:8
**state** [1] - 100:1
**statement** [7] - 27:10, 62:19, 63:10, 78:25, 79:20, 83:9, 84:18
**statements** [4] - 42:7, 43:17, 43:18, 104:15
**STATES** [3] - 1:1, 1:2, 1:9
**states** [1] - 7:18
**States** [3] - 2:22, 4:7, 4:12
**statute** [8] - 7:6, 7:17, 7:18, 8:5, 9:4, 42:19, 47:14, 51:5
**statutes** [1] - 49:3
**stay** [2] - 80:17, 87:2
**stayed** [1] - 90:6
**STD** [1] - 54:4
**stenographic** [1] - 106:5
**Stenographic** [1] - 2:20
**step** [4] - 47:25, 50:24, 52:6, 92:15
**STEPHEN** [1] - 1:20
**stepped** [2] - 39:9, 46:8
**stepping** [2] - 45:15
**steps** [2] - 59:12, 102:12
**Steve** [1] - 4:15
**stick** [1] - 92:19
**still** [9] - 6:16, 52:17, 61:19, 66:3, 77:16, 84:1, 96:6, 98:9, 102:24
**stitch** [1] - 102:15
**stitched** [1] - 47:12
**stodgy** [1] - 59:23
**stood** [5] - 22:7, 79:12, 87:3, 95:12,

96:2
**stop** [14] - 13:4, 18:19, 21:3, 23:7, 23:8, 24:1, 33:8, 34:2, 34:3, 38:6, 39:9, 56:14, 61:24, 72:12
**stopped** [2] - 5:13, 18:14
**story** [1] - 89:15
**stranded** [1] - 100:14
**strangers** [1] - 97:1
**stray** [1] - 37:13
**streaming** [2] - 15:5, 17:7
**streamline** [2] - 41:25, 49:2
**Street** [4] - 1:13, 1:18, 2:10, 18:21
**street** [1] - 59:13
**stretch** [1] - 79:7
**strictly** [3] - 63:10, 63:16, 79:15
**stroke** [1] - 102:16
**strong** [1] - 39:24
**strongly** [1] - 101:17
**studying** [1] - 55:8
**stuff** [3] - 43:11, 57:9, 57:19
**submit** [3] - 53:22, 68:3, 76:18
**subpoenaed** [1] - 57:9
**subpoenas** [2] - 57:7, 84:2
**substantially** [1] - 90:24
**substantive** [1] - 32:21
**successfully** [1] - 22:12
**suddenly** [1] - 90:8
**suffering** [1] - 81:23
**sufficient** [1] - 47:16
**suggest** [3] - 7:10, 50:5, 97:23
**suggested** [2] - 49:22, 50:21
**suggesting** [1] - 43:4
**suggests** [1] - 51:21
**Suite** [2] - 1:24, 2:4
**sum** [2] - 67:11, 93:12
**summary** [1] - 31:13
**supply** [1] - 103:3
**support** [3] - 51:22, 53:14, 73:5
**supports** [2] - 51:23, 73:4
**supposed** [5] - 8:13, 8:14, 11:11, 12:5, 57:21
**Supreme** [1] - 8:17

**surely** [2] - 58:9, 58:10
**Surgi** [1] - 18:3
**surgi** [13] - 13:2, 15:16, 16:5, 16:9, 18:9, 18:20, 19:5, 19:7, 20:1, 31:6, 33:19, 65:8, 99:7
**surgi-center** [9] - 15:16, 16:9, 18:9, 18:20, 19:5, 19:7, 20:1, 31:6, 33:19
**Surgi-Center** [1] - 18:3
**surgi-clinic** [4] - 13:2, 16:5, 65:8, 99:7
**surgical** [1] - 31:1
**sustain** [1] - 82:16
**sustained** [1] - 88:13
**swayed** [1] - 99:8
**swinging** [1] - 45:25
**symbolic** [2] - 45:20, 69:21
**symptom** [1] - 42:2
**system** [6] - 10:23, 31:2, 48:23, 54:1, 78:8

**T**

**T-shirt** [1] - 100:4
**table** [1] - 4:19
**talks** [1] - 43:9
**TAMARA** [1] - 106:3
**Tamara** [3] - 2:21, 106:9, 106:9
**tape** [2] - 23:18, 39:19
**technological** [1] - 72:7
**technology** [5] - 5:23, 6:15, 11:14, 11:19, 11:22
**telephone** [2] - 14:1, 84:20
**ten** [7] - 41:3, 41:10, 89:4, 89:25, 96:8, 104:2, 104:24
**ten-year** [1] - 89:4
**ten-year-old** [1] - 89:25
**tender** [1] - 97:13
**term** [4] - 56:2, 56:4, 69:22, 75:8
**termed** [1] - 73:25
**terminal** [1] - 102:8
**terminate** [1] - 25:24
**termination** [4] - 31:3, 48:24, 49:9, 54:2
**terming** [1] - 65:25
**terms** [6] - 4:23, 7:11, 8:6, 48:15, 82:19,

94:14
**test** [2] - 10:22, 11:9
**testified** [30] - 14:5, 16:17, 21:2, 23:1, 23:13, 25:19, 34:1, 35:3, 38:16, 67:20, 67:21, 70:7, 74:4, 74:15, 74:17, 80:1, 80:16, 81:15, 82:4, 83:18, 92:1, 92:2, 92:4, 92:9, 96:8, 97:8, 97:21, 98:3, 98:24
**testify** [5] - 16:20, 65:18, 66:2, 74:9, 89:5
**testimony** [16] - 26:15, 35:3, 35:16, 42:21, 58:7, 63:11, 65:16, 67:19, 69:12, 70:13, 75:4, 75:6, 76:10, 84:2, 85:16, 97:2
**tests** [2] - 54:4, 54:5
**text** [4] - 13:21, 33:5, 38:8, 76:7
**texts** [5] - 14:23, 35:12, 44:11, 57:1, 93:14
**thanking** [1] - 78:21
**THE** [84] - 1:1, 1:1, 1:9, 4:4, 4:6, 4:13, 4:16, 4:23, 5:2, 5:5, 5:8, 5:21, 6:4, 6:6, 6:13, 6:16, 6:19, 7:5, 7:10, 7:14, 7:25, 8:11, 8:19, 8:24, 9:10, 9:12, 9:15, 9:18, 9:22, 9:24, 10:11, 10:14, 10:17, 10:20, 10:25, 11:3, 11:5, 11:7, 11:11, 11:19, 12:5, 12:7, 12:8, 12:13, 12:15, 12:18, 12:21, 26:14, 32:5, 38:2, 40:22, 40:25, 41:10, 41:15, 60:12, 60:16, 60:20, 60:23, 61:13, 61:18, 61:22, 62:3, 73:13, 73:16, 77:10, 78:13, 82:16, 82:18, 84:8, 84:17, 86:12, 88:14, 89:17, 90:22, 90:25, 91:3, 91:5, 91:7, 91:10, 97:6, 97:10, 104:1, 104:9, 105:1
**theme** [1] - 65:1
**themselves** [5] - 4:22, 17:21, 28:20, 29:1, 36:16

**theory** [1] - 23:2
**they've** [3] - 6:23, 99:19, 100:13
**thinking** [6] - 29:24, 30:3, 31:7, 42:15, 95:10, 101:23
**third** [4] - 16:24, 24:22, 48:13, 54:7
**Thomas** [1] - 1:18
**thomas** [1] - 1:20
**threat** [5] - 48:10, 49:4, 51:20, 92:11, 93:20
**threaten** [4] - 82:25, 85:24, 85:25, 91:25
**threatening** [4] - 49:25, 53:11, 87:19, 94:19
**threats** [1] - 51:21
**three** [29] - 19:5, 19:6, 19:7, 19:8, 24:23, 27:12, 27:19, 33:16, 48:8, 49:13, 49:15, 59:5, 71:9, 71:10, 71:12, 71:22, 72:19, 73:7, 73:8, 74:4, 79:24, 80:2, 91:13, 91:16, 94:7, 95:15, 96:21, 98:15
**three-day** [1] - 24:23
**throughout** [3] - 65:1, 95:22, 96:6
**throw** [1] - 51:3
**tie** [3] - 34:18, 75:24, 91:8
**tied** [1] - 45:11
**Tina** [9] - 19:6, 21:2, 24:13, 37:9, 37:10, 65:17, 81:14, 92:17, 95:4
**today** [9] - 5:11, 24:2, 27:4, 33:2, 44:18, 63:2, 102:19, 103:3, 103:16
**Today** [2] - 23:21, 23:24
**together** [16] - 13:22, 21:20, 28:3, 28:19, 29:2, 30:6, 47:12, 74:22, 83:23, 87:8, 87:11, 92:5, 93:7, 93:8, 93:16, 93:18
**tomorrow** [2] - 17:12, 61:3
**took** [15] - 17:4, 18:14, 18:15, 18:16, 18:18, 19:9, 21:9, 27:14, 28:1, 34:22, 37:14, 37:15, 38:15, 103:6
**tool** [1] - 70:25

**total** [1] - 93:12
**totally** [1] - 51:18
**touch** [4] - 67:7,
67:17, 68:20, 94:19
**touched** [4] - 56:25,
65:2, 65:12, 95:13
**touching** [1] - 94:18
**tour** [3] - 101:22,
101:23, 102:7
**towards** [2] - 65:8,
69:4
**trade** [1] - 91:1
**Traditional** [1] - 22:17
**traditional** [2] - 22:20,
33:10
**tragically** [1] - 25:21
**train** [1] - 55:6
**TRANSCRIPT** [1] - 1:8
**transcript** [4] - 104:12,
104:17, 106:4, 106:6
**transcripts** [1] -
104:11
**traveled** [1] - 75:21
**traveling** [2] - 75:10,
100:10
**treatment** [11] - 13:11,
19:2, 21:11, 21:17,
22:4, 25:11, 25:12,
25:16, 26:3, 37:6
**treats** [1] - 97:12
**trespass** [3] - 94:5,
94:23, 94:24
**trial** [7] - 4:18, 24:21,
30:17, 41:24, 69:25,
78:10, 78:22
**TRIAL** [2] - 1:4, 1:8
**tried** [12] - 11:9, 11:24,
13:13, 23:1, 24:12,
29:25, 30:1, 32:11,
40:13, 81:5, 81:6,
82:5
**tries** [2] - 67:10, 69:3
**trip** [3] - 49:2, 57:4,
87:12
**trouble** [1] - 61:3
**true** [6] - 35:3, 46:22,
52:11, 62:20, 106:4,
106:5
**trunk** [1] - 59:4
**trust** [4] - 35:3, 46:24,
47:7, 60:10
**truth** [4] - 34:15,
34:23, 35:2, 97:19
**truthfully** [1] - 46:16
**try** [14] - 10:3, 16:11,
20:23, 21:3, 34:24,
40:5, 40:9, 63:17,
66:17, 75:3, 75:23,
81:11, 81:15, 87:20
**trying** [29] - 13:4, 13:5,

15:20, 15:21, 34:6,
34:8, 34:11, 34:16,
37:11, 39:14, 39:15,
43:4, 55:18, 56:14,
66:12, 66:14, 66:15,
72:14, 81:13, 81:20,
81:25, 82:11, 86:20,
88:17, 88:22, 94:19,
95:13, 97:14
**tune** [1] - 20:4
**Tupelo** [1] - 1:21
**turned** [1] - 68:19
**turns** [4] - 68:5, 69:5,
89:1, 95:19
**twice** [3] - 55:14,
95:19, 103:15
**two** [30] - 15:13,
19:20, 20:11, 24:25,
31:8, 33:2, 33:23,
40:14, 49:13, 49:15,
50:10, 53:9, 53:21,
60:7, 62:25, 66:19,
68:8, 77:4, 77:5,
79:4, 80:5, 80:21,
82:9, 82:24, 83:12,
85:10, 87:11, 90:25,
98:16
**tying** [1] - 34:21
**type** [1] - 29:12
**typical** [1] - 50:2

## U

**U.S** [1] - 1:12
**unaffected** [1] - 60:5
**unavoidable** [1] - 42:1
**unborn** [2] - 55:1,
99:19
**uncle** [1] - 102:25
**unclear** [1] - 10:21
**uncontradicted** [2] -
94:9, 97:2
**under** [4] - 23:4,
34:16, 39:5, 71:15
**undergoing** [1] -
99:16
**understood** [1] -
98:14
**undoubtedly** [1] -
74:2
**unhappy** [1] - 78:19
**unified** [1] - 58:4
**UNITED** [3] - 1:1, 1:2,
1:9
**United** [3] - 2:22, 4:7,
4:12
**unless** [2] - 6:24,
59:16
**unlike** [1] - 99:23
**unlikely** [1] - 17:2

**unnoticed** [1] - 62:15
**unplanned** [1] - 99:11
**unpopular** [1] - 48:2
**unquote** [2] - 91:20,
93:23
**unreasonably** [4] -
48:19, 49:5, 51:25,
87:18
**untouched** [1] - 48:2
**unusual** [1] - 102:8
**up** [45] - 5:13, 6:3,
10:6, 11:22, 15:6,
17:9, 18:8, 21:14,
24:7, 25:14, 27:11,
32:11, 37:12, 38:12,
38:15, 41:11, 47:3,
49:18, 50:17, 52:17,
55:1, 57:25, 60:13,
63:17, 63:19, 67:11,
73:21, 75:8, 78:19,
78:24, 79:14, 81:22,
82:3, 82:23, 83:4,
86:22, 87:25, 89:3,
89:6, 91:7, 100:5,
100:21, 100:24,
102:15
**updates** [1] - 15:19
**upgrades** [2] - 11:12
**upset** [1] - 90:11
**upstairs** [1] - 24:6
**uttered** [1] - 13:2
**utterly** [3] - 99:14,
99:15

## V

**VA** [1] - 2:11
**various** [1] - 59:1
**verbatim** [1] - 74:5
**verbs** [1] - 86:3
**verdict** [8] - 5:9, 6:17,
6:22, 6:24, 7:3, 7:8,
7:24, 8:18
**Verizon** [1] - 57:8
**versus** [1] - 65:14
**veteran** [1] - 101:21
**victims** [1] - 98:23
**Video** [10] - 12:24,
20:13, 26:6, 26:8,
26:16, 28:12, 34:19,
68:16, 69:1, 72:5
**video** [67] - 5:16,
18:13, 24:3, 24:14,
25:5, 27:14, 28:21,
32:3, 32:10, 33:6,
34:10, 34:14, 35:5,
36:12, 36:14, 37:4,
37:19, 38:5, 39:8,
44:20, 51:12, 52:3,
52:15, 52:25, 54:9,

54:15, 55:10, 64:24,
65:24, 66:8, 66:9,
66:11, 67:9, 68:3,
68:13, 68:23, 69:10,
69:16, 70:1, 70:8,
70:18, 71:5, 71:17,
72:1, 80:9, 80:10,
80:12, 80:20, 80:21,
80:23, 80:24, 81:9,
81:20, 81:21, 81:24,
94:16, 94:17, 95:16,
96:5, 96:11, 96:23,
98:7, 99:1, 99:2
**videos** [10] - 18:23,
52:1, 52:7, 53:18,
66:24, 67:12, 76:21,
94:22, 99:15
**videotape** [1] - 67:1
**Vietnam** [1] - 101:21
**view** [7] - 16:21, 42:3,
67:1, 82:10, 99:14,
101:5, 101:10
**views** [5] - 39:25,
40:10, 51:18, 62:20,
62:21
**violate** [10] - 42:18,
43:6, 44:23, 57:15,
57:21, 57:23, 58:1,
80:5, 80:7, 88:15
**violated** [1] - 50:11
**violating** [7] - 43:2,
49:20, 50:18, 50:21,
54:24, 81:3, 94:6
**violation** [7] - 44:21,
50:1, 50:5, 59:21,
82:6, 88:22
**violence** [7] - 51:7,
65:4, 65:15, 67:2,
67:3, 67:13, 98:22
**violent** [7] - 7:7, 7:13,
7:25, 8:14, 65:8,
65:25, 66:22
**vote** [1] - 40:4
**voted** [1] - 47:20
**voting** [2] - 59:10,
59:12
**vs** [1] - 1:4

## W

**waist** [1] - 72:12
**wait** [2] - 4:21, 46:25
**waited** [3] - 90:9,
98:16
**waiting** [15] - 6:23,
15:16, 18:25, 19:17,
20:23, 28:17, 66:4,
80:13, 80:18, 94:23,
95:2, 95:5, 96:19,
96:24, 98:3

**waits** [1] - 69:3
**walk** [6] - 11:3, 24:16,
59:12, 92:15, 99:24,
100:5
**walked** [6] - 22:5,
22:7, 31:22, 35:6,
39:8, 52:8
**walking** [3] - 20:25,
50:10, 81:22
**wall** [5] - 21:15, 26:12,
50:15, 50:17, 96:7
**walls** [2] - 17:20, 98:2
**Walsh** [4] - 5:3, 9:16,
90:22, 104:20
**WALSH** [3] - 2:8, 5:3,
104:22
**Walsh's** [1] - 90:24
**wants** [1] - 51:3
**war** [1] - 98:23
**War** [1] - 101:21
**warnings** [2] - 29:13,
95:15, 98:15
**Washington** [18] - 1:5,
1:13, 1:16, 1:25, 2:4,
2:23, 13:3, 16:25,
17:1, 17:16, 18:3,
18:8, 18:20, 25:25,
33:24, 83:17, 87:5,
106:11
**watch** [5] - 5:15,
28:15, 28:17, 28:22,
34:17
**waving** [2] - 18:16,
37:16
**ways** [5] - 18:7, 42:2,
73:23, 76:23, 94:5
**weak** [1] - 60:8
**wear** [1] - 20:25
**wearing** [2] - 23:14,
74:12
**Welcome** [1] - 22:1
**welcome** [1] - 22:1
**well-organized** [1] -
20:4
**whatsoever** [1] -
85:21
**whole** [4] - 50:21,
51:2, 87:10, 104:19
**Whyte** [16] - 23:13,
23:17, 23:20, 23:22,
23:25, 24:1, 24:5,
24:14, 24:16, 33:7,
34:9, 44:6, 44:12,
70:17, 71:18, 92:24
**Whyte's** [1] - 35:7
**wife** [4] - 78:18, 90:10,
90:12, 90:13
**William** [3] - 4:8, 15:9,
18:12
**WILLIAM** [2] - 1:6, 2:8

**willing** [1] - 35:12
**willingness** [1] - 42:18
**willy** [1] - 100:14
**willy-nilly** [1] - 100:14
**window** [6] - 19:1, 25:14, 25:15, 69:4, 69:8, 80:14
**winds** [1] - 55:1
**wish** [2] - 39:20, 91:1
**witness** [12] - 24:20, 58:14, 63:11, 74:7, 82:4, 87:4, 92:1, 92:4, 92:9, 92:16, 93:25
**witnesses** [4] - 57:7, 74:4, 85:9, 92:22
**woman** [7] - 13:2, 15:15, 19:20, 21:13, 25:19, 70:1, 98:7
**womb** [3] - 54:14, 55:1, 56:7
**women** [11] - 19:6, 19:7, 19:8, 20:22, 49:24, 66:21, 67:20, 70:4, 101:13, 103:23
**women's** [4] - 14:8, 16:13, 29:16, 102:21
**wonder** [1] - 83:24
**wonderful** [1] - 102:10
**wondering** [1] - 40:24
**word** [8] - 14:2, 14:3, 22:21, 22:23, 38:13, 92:22, 92:25
**words** [13] - 8:4, 13:1, 23:22, 36:5, 36:9, 47:12, 49:1, 60:3, 74:2, 79:6, 79:7, 89:9
**works** [3] - 6:16, 11:23, 40:12
**world** [4] - 20:5, 22:2, 22:18, 23:9
**worn** [2] - 23:15, 69:14
**worried** [2] - 39:2, 46:6
**worst** [1] - 99:17
**worth** [1] - 103:21
**wow** [1] - 38:13
**wrapped** [1] - 37:6
**wrapping** [1] - 39:3
**wrestling** [2] - 66:18, 66:20
**wrinkle** [1] - 54:6
**write** [1] - 104:13
**writing** [1] - 95:18
**written** [4] - 47:21, 48:16, 73:10, 76:5

## Y

**yards** [1] - 96:8
**year** [3] - 7:7, 89:4, 89:25
**years** [2] - 56:21, 101:20
**yelled** [1] - 21:24
**yelling** [1] - 94:20
**yesterday** [4] - 75:6, 75:10, 75:16, 95:25
**York** [4] - 15:1, 16:16, 75:12, 75:18
**you-all** [3] - 63:22, 64:11, 78:4
**youngster** [1] - 100:3
**yourself** [10] - 4:9, 16:8, 16:25, 23:8, 34:15, 35:1, 35:2, 41:11, 68:24, 72:1
**yourselves** [6] - 48:25, 57:9, 57:11, 91:21, 92:14, 103:23

## Z

**Zastrow** [2] - 85:1, 87:6
**zero** [1] - 68:10
**Zoom** [1] - 14:1