# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL NO. 22-CR-96 (CKK) |
| | : | |
| JOHN HINSHAW, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, hereby, submits this memorandum in support of its recommendation for the sentencing of Defendant Hinshaw.

### I.      Introduction

As set forth more fully below, Hinshaw participated in the Clinic blockade by chaining himself to his co-conspirators and blocking the patients' access to the Clinic's treatment area.   His actions at the Clinic contributed to the victim's pain and suffering.   Hinshaw's Adjusted Guidelines Range is 18, and his Criminal History Category is I, providing for a Guidelines Sentencing Range of 27-33 months.   The government recommends that the Court impose a sentence at the low end of the Guidelines range.   This sentence is supported by the Sec. 3553 factors, in particular, it reflects the gravity of the offense (to include vindicating the rights of those whom Hinshaw victimized), the need for deterrence, and the absence of any mitigating factors.

### II.      Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging the defendant with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (clinic access obstruction).   These charges stemmed from the defendant's scheme to obstruct

access to a women's reproductive health clinic (the "Clinic") located in the District of Columbia, and [his/her] blockade of that facility on October 22, 2020.   After a jury trial, on August 29, 2023, the defendant was found guilty of both charges.   ECF # 413.   The jury also determined that the defendant had committed clinic access obstruction by both force and physical obstruction.   *Id*.

## III.   Overview of the Crimes

During trial, the Government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence. This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the blockade of the clinic was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel ("Darnel").   Handy and Darnel advertised a call-to-action on social media, and invited participants to join the planned blockade.   *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, Surgi-clinic blockade.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services.   *Id.*   In planning the blockade, Handy also scheduled a fake patient

appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility. *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Heather Idoni ("Idoni") from Michigan; Joan Bell ("Bell") from New Jersey; and Jean Marshall ("Marshall") and Harlow from Massachusetts. *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091.  Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Geraghty who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade. *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and Darnel – discussed the plan for and execution of the blockade. *See, e.g.*, 10/24/23 Trial Tr. at 22:11-23:24.  At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade. *Id.*, at 25:21-24.  The group further discussed using locks and chains to block the Surgi-clinic doors, and the consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses. *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade. *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Co-defendant Joan Bell brought to this final meetup a bag containing the chains, locks, and ropes.

*Id.*, at 27:23-24.   After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.   *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.   While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.   *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.   Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.   Moments later, Darnel's co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.   *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.   *Id.*   Bell retrieved a bicycle lock from that bag and forcefully entered the clinic.   *Id.*   Harlow picked the bag up and forcefully entered the clinic behind Bell.   Harlow wore a bicycle lock around her neck in anticipation of using it to chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.   *See, e.g.*, Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's building - announced an imminent reproductive health clinic blockade on social media and prepared to livestream the event.   *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.   Darnel used one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it, "Starting soon!   Tune in!"   *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients with scheduled appointments.   At that time, the co-defendants (with the exception of Darnel who was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's entrance.   *See, e.g.*, Exhibit Nos. 1008, 1079A.   Co-defendant Smith, who stood at the door when it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to prevent the co-defendants from entering.   *Id.*   The co-defendants collectively pushed and shoved their way in and against the clinic staff who attempted to keep the co-defendants from entering. *Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara Compton" causing her to sprain her ankle and suffer bodily injury.   *See e.g.*, Exhibit No. 1001; 10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against Ms. Proctor.   And, as Harlow intentionally pushed her way into the clinic, she caused "Tina Smith," the clinic's administrator, to fall backwards and into a chair.   *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors.   *See e.g.*, Exhibit No. 1001.   Handy directed the blockaders on what to do.   *Id.*   Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting room to block doors that led to the clinic's treatment areas.   *Id.*   Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors.   *Id.*   Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together.   *Id.*   Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as

an employee entrance.   *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's doors.   *See, e.g.*, Exhibit Nos. 1008, 1016.   Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade.   *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade.   *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25.   Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because the co-defendants refused to allow her and her husband to enter.   *Id.*, at 15:1-2.   At one point as Mrs. Holler lay on the ground, she was accosted by Marshall.   *See, e.g.*, Exhibit No. 1079B.   As Mrs. Holler attempted to get up from the floor, Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the facility.   *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9.   After a short time, the clinic staff managed to open the staff entrance briefly and were able to get Mrs. Holler into the clinic.   *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media.   *See, e.g.*, Exhibit Nos. 1017-1019, 1022-1024, 1026.   Additionally, he assisted his co-defendants in prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading co-defendants together to an unindicted co-conspirator who was outside of the clinic building.   *See* Exhibit No. 1024.   Darnel did this in order to delay the blockading co-defendants' inevitable arrests by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours

blocking the doors in an effort to interfere with the provision of abortion services. They refused to move or leave the clinic when asked by the clinic's staff and responding police officers. *See, e.g.*, Exhibit No. 1016. The co-defendants were very vocal about their blockade, and their reasons for preventing access to the Surgi-clinic. For example, Handy explained to the first responding MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . . [t]o stop abortions today." *See* Exhibit No. 1009. Similarly, while sitting in a chair blocking access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We have permanent locks." *Id.* Harlow then further lectured that same officer, telling him that he "ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save lives." *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the defendants were advised that they would be arrested. With the exception of Darnel and Geraghty – who left the clinic moments before arrests were made, the remaining defendants were arrested. They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest. *See, e.g.*, Exhibit No. 1016. The arrested defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services. The defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health

services.

## IV.     Defendant's Criminal Conduct

Prior to the breach of the clinic, Hinshaw hid in the stairwell with his co-conspirators. 8/16/23 a.m. Trial Trans at 114; at 39-40.   He then entered the clinic's reception area.   During the course of the blockade Hinshaw, along with Goodman, and other coconspirators, blocked Ms. Holler, a Clinic patient, from accessing the Clinic (Exhibit No 1079B).   Specifically, Hinshaw and three coconspirators binding themselves together with ropes and chains to block entry to the Clinic's treatment area.   (Exhibit No. 2015; 8/23/23 a.m. Trial Trans. at 38 (Geraghty acknowledge Hinshaw sitting in front of door)).

## V.     Statutory Penalties

The two counts, for which the defendant was convicted, carry the following statutory penalties:

Count 1:   Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum sentence of 10 years' incarceration;

Count 2:   Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a maximum sentence of one year's incarceration.

## VI.     Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 45 (2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) (""'[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."'").   "[T]e Guidelines remain the foundation of federal sentencing decisions."   *Hughes v. United States*, 584 U.S. 675, 685 (2018).   "As a matter of administration and to secure

8

nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR") (ECF # 529). Hinshaw's Base Offense level for both of his counts of conviction is 12. PSR at 12-14. And his Base Offense Level is adjusted as follows:

| Guideline | Description | Adjustments |
|---|---|---|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[1] | 2 |
| § 3A1.3 | Restraint of victim[2] | 2 |
| § 3D1.4 | Combined Offense Level | 2 |
| **Combined Adjusted Offense Level** | | **18** |

---

[1] This adjustment is applicable because Ashley Jones and Shampy Holler were pregnant and unusually vulnerable due to their physical condition. *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[2] "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up. U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added). The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint. *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

*See* PSR at 13-14.   Hinshaw has no Criminal History Points, producing a Criminal History Category I.   *See* PSR at 15, ¶ 96.   Accordingly, Hinshaw's Guidelines sentencing range is 27-33 months.

## VII.   Section 3553(a) Sentencing Factors

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.   That Section provides that Court consider the following:   (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id.*; (C) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

## A.    Nature and Circumstances of the Offenses

The nature and circumstances of the offense and Hinshaw's role support the imposition of a sentence at the low end of the Guidelines.   Hinshaw and his co-defendants orchestrated a blockade of a reproductive health clinic.   The blockade involved extensive planning and numerous participants.   It was conducted with the goal to prevent patients from obtaining, and providers from providing, abortion services.   In addition to interfering with the patients' right to receive reproductive health care, Hinshaw and his co-defendants' actions inflicted physical and mental pain on patients:   Ms. Jones was forced to climb through a window to receive her care and Ms. Holler collapsed in pain, while being blocked from access to the clinic.   Both Ms. Jones and Ms. Holler had already begun their procedures, so denying them access to the clinic was especially

egregious.    Additionally, while blockading the clinic, a coconspirator "live streamed" the blockage in an attempt to induce others to undertake similar efforts to deny women reproductive health care.   Hinshaw chained himself to his co-conspirators, blocking the patients' access to the Clinic's treatment area.

**B.      The History and Characteristics of the Defendant**

The defendant is 69 years old.   He has a college degree.   Hinshaw is retired; prior to retirement, he worked as a part-time residential counselor.   *See generally* PSR ¶¶ 103-131. Although Hinshaw only has one Criminal History Point, he has a history of blocking access to reproductive health care.   PSR ¶¶ 96-97.   Hinshaw's history of blocking access to reproductive health case supports imposition of a sentence at the mid-point of the Guidelines, and they are no mitigating factors that would support imposition of a lesser sentence.

**C.      Promotion of Respect for the Law**

In light of the gravity of the offenses, a significant sentence in this matter is necessary to promote respect for the law.   *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law").   A significant sentence is particularly necessary to promote respect for the law in a case like this, where the defendants purposely violated the law in an attempt to impose their views on others.   Hinshaw demonstrated no respect for the actual law; instead, he flouted it.   Accordingly, the imposition of a sentence at the low end of the Guidelines is appropriate here.

**D.      General and Specific Deterrence**

Imposition of a sentence at the mid-point of the Guidelines is necessary to provide for both general and specific deterrence.

First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. 3553(a)(2)(B).  "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); *United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence);   *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).   General deterrence is particularly important here, as the defendants tried to recruit others to join their cause as the blockade was actually being executed.

Second, a significant sentence is also necessary for specific deterrence because Hinshaw has a history of blocking access to reproductive health care.  *See* PSR ¶¶ 96-97.  He is, therefore, likely to repeat the offense conduct unless he is properly deterred.

### E.     The Sentencing Guidelines

While a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'"   *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   Accordingly, a sentence at the low end of the Guidelines is appropriate here.

## F.    Unwarranted Sentencing Disparities

Imposing a Guidelines sentence here would avoid any unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6).   *See, e.g., Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant

role in sentencing.").   As the D.C. Circuit has stated:   "'[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'" *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024); *see also United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (same).

Although Hinshaw and his codefendants in this case, along with defendants from one other recently charged unrelated case from the Middle District of Tennessee (*see United States v. Gallagher*, et al., 22-cr-327 (M.D.Tenn.)), will be the first groups of defendants sentenced for conspiring to violate reproductive health rights, they all are similarly situated to other defendants, who have been convicted of violating Section 241, where the objects of their civil rights conspiracy targeted other federally protected rights.   *See*, *e.g.*, *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976) (defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995) (imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42 U.S.C. § 3631 housing rights at issue); *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines sentence for Section 241 conviction with right at issue was denial of public accommodations because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242).   Therefore, a Guidelines sentence here avoid any unwarranted sentencing disparities.

## VIII.   Requested Sentence

The advisory Guidelines Sentencing range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs

sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6.   Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.   "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347.   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[3]

As set forth above, Hinshaw breached the Clinic and then bound himself to others to physically block access to the Clinic.   Specifically, due in large part to Hinshaw's blocking the patient's entrance to the Clinic's treatment area, Ms. Jones was forced to climb through the window to reach the treatment area.   Accordingly, the government recommends that the Court impose a

---

[3]   We respectfully disagree with Probation's recommendation for a downward variance. ECF # 530.   Their recommendation is based on the following:   (1) Hinshaw's role in the offense and (2) to avoid unwarranted sentence disparities.   *Id.* at 3.   As set forth above, the government believes that Hinshaw's role in the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

sentence at the low end of the Guidelines.   This sentence is supported by the Sec. 3553 factors, in particular it reflects the gravity of the offense (to include vindicating the rights of those whom Hinshaw victimized), the need for deterrence, and the absence of any mitigating factors.

Respectfully submitted,

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ John Crabb Jr.*
JOHN CRABB JR.
NY Bar No. 2367670
REBECCA G. ROSS
NY Bar No. 5590666
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
john.d.crabb@usdoj.gov

16