# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Case N. 22-CR-00096** |
| | : | |
| **LAUREN HANDY,** *et al.*, | : | |
| | : | |
| **Defendant.** | : | |

### SENTENCING MEMORANDUM ON BEHALF OF LAUREN HANDY

Lauren Handy ("Ms. Handy") submits this sentencing memorandum in support of her request for a sentence of 12 months' incarceration.

Ms. Handy is an activist who cares deeply for the vulnerable communities she serves. As referenced by letters from family, friends, and other individuals whose lives she touched in a positive way, Ms. Handy is a profoundly compassionate and genuinely kind individual. Her goal in life is to protect those who cannot protect themselves, and to empower those who do not feel that they have any power. Her mission is to accomplish this goal peacefully and without the use of violence. Her charitable services and work throughout her adult life are a testament to these goals and mission and to who Ms. Handy is—a thoughtful, empathetic, and gracious woman. This is the woman who stands before this Court today.

For the reasons set forth in greater detail below, we request a 12-month sentence because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Ms. Handy's sentencing guideline range, as calculated by the Probation Officer, is 63 months to 78 months. However, this is a case where the Guidelines themselves should be discarded since they fail to take into account Ms. Handy's

unique personal attributes.  The defense suggests that, pursuant to all of the 18 U.S.C. 3553(a) factors, a sentence of 12 months' incarceration would be appropriate in this case.

## I.  FACTUAL BACKGROUND

Ms. Handy's life prior to the instant offense and to this present day is characterized by caring for the people she loves and serving vulnerable communities.  Ms. Handy has centered her life around community, family, and religion.  Prior to her detention, Ms. Handy had lived in the District of Columbia, where she intends to return after serving her sentence in this matter.

### A.  Lauren Handy's Family Background.

Ms. Handy was born on November 16, 1993, in Fürth, Germany, PSR ¶ 114, but has lived in Virginia for most of her life. *Id*. ¶ 120.  Ms. Handy's mother, Holly Handy, and her father, Anthony Handy, lived in Germany at the time of Ms. Handy's birth because her father was in the military and stationed there. *Ibid*.  Ms. Handy's parents have been married for 34 years and live in Alexandria, Virginia. *Ibid*.  Anthony Handy is 57 years old and works as a military contractor. *Ibid*.  Holly Handy is 56 years old and works for social services. *Ibid*.  Ms. Handy has one sister, Kristin Sapperstein, who is 32 years old and works as a legislative aide to a United States senator. *Ibid*.[1]  She also lives in Alexandria, Virginia. *Ibid*.

Ms. Handy is very close to her parents and her sister. *See Id*. ¶ 115.  During her childhood years, Ms. Handy lived in a middle-class neighborhood and her parents ensured that Ms. Handy and her sister had everything they needed. *Ibid*. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[1] The presentence report mistakenly notes that Ms. Sapperstein is 22 years old.
[2] █████████████████████████████████████



**B.      Lauren Handy's Educational and Professional Background.**

In 2012, Ms. Handy received a high school diploma from Gloucester High School in Gloucester, Virginia. PSR ¶ 134.  Afterwards, she attended Central Virginia Community College in Lynchburg, Virginia, from 2012 until 2013. *Ibid*.  Ms. Handy planned to transfer to Mary Washington University in Fredericksburg, Virginia, to obtain a bachelor's degree in art museum restoration. *Ibid*.  However, she interrupted her studies after she watched a disturbing video about abortions performed at the Washington Surgi-Clinic and decided to become an advocate for underserved communities. *See id.* ¶ 134.

For approximately seven years, from 2013 until 2020, Ms. Handy worked at Survivors, a non-profit organization dedicated to educating and activating high school and college age individuals based in Riverside, California. *Id*. ¶ 136.  She also performed graphic design work for Survivors as well as other non-profit organizations during this time. *Id*. ¶ 137.  For the most part, Ms. Handy was not paid for her work, but she would sometimes receive donations to support her missionary work. *Ibid*.  Ms. Handy founded and operated the non-profit organization,

Mercy Missions, which helps families and mothers in crisis pregnancies and provides survival aid for the homeless. *Id*. ¶ 139.

In 2021, Ms. Handy joined the Progressive Anti-Abortion Uprising ("PAAU"), a non-profit organization committed to progressive feminist values of equality, non-violence, and non-discrimination.  Ms. Handy currently holds the title of Director of Activism and Mutual Aid at PAAU.

### C.    Lauren Handy's Arrest.

On March 30, 2022, Ms. Handy was arrested for the present offense and placed on personal recognizance. PSR ¶ 11.  On October 22, 2020, Ms. Handy visited the Washington Surgi-Clinic to attend a so-called "rescue"—an attempt to rescue preborn children from imminent death at the hands of an abortionist who Ms. Handy believed performed illegal late-term procedures and who also, Ms. Handy believed, allowed children born alive to die by failing to render aid as required by law.  The rescue was intended to be a peaceful, nonviolent sit-in at the abortion clinic.  Ms. Handy attended this rescue alongside her co-defendants who, like her, are pro-life activists.  On March 24, 2022, Ms. Handy was indicted for the present offense, and on August 29, 2023, she was found guilty by a jury trial and remanded into custody. *Id*. ¶ 12.

### D.    Lauren Handy is a Pillar in her Community.

Ms. Handy is an exceptional woman who has positively impacted many people in her life, and who continues to counsel and support other inmates during her incarceration at the Alexandria Detention Center in Alexandria, Virginia, where she is currently incarcerated.

Ms. Handy's parents, Anthony and Holly Handy, provide insight into the kind of person Ms. Handy is. *See* Exhibit "A", pp. 1-2.  Ms. Handy's "life has been marked by a profound commitment to kindness, compassion, and community service." *Id*. p. 1.  Her philanthropic

4

activities began when she was 18 years old, and when she was 20 years old, she embarked on a journey to Port-au-Prince, the Republic of Haiti, to work at an orphanage "helping nuns with disabled and abandoned infants". *Ibid.* "In the afternoons she assisted in the wound clinic helping machete wounds to reduce infection." *Ibid.* When Ms. Handy returned to the United States, she created the nonprofit, Mercy Mission, which is a testament to "her deep empathy and understanding of the struggles faced by others." *Ibid.* Her parents state that "[b]eyond just providing supplies, [Ms. Handy] has been a beacon of hope for many." *Ibid.* "She has actively engaged in finding housing and resources for people in need, going beyond the call of duty to ensure that others have a safe place to call home." *Ibid.* She has also gone above and beyond to organize baby showers for unwed mothers who cannot afford them. *See ibid.* "These events, often taken for granted, are moments of joy and support that she has lovingly facilitated." *Ibid.* Ms. Handy "is a person who has dedicated her life to serving and uplifting others, particularly those in dire need." *Ibid.*

Ms. Handy's friends and colleagues, Dana DiMattia, Monica Miller, and Sister Deirdre Byrne provide further details on Ms. Handy's activism. *Id.*, pp. 3-7. Ms. Bukovinac, in her letter, emphasizes Ms. Handy's commitment to non-violence and her devotion to serving the marginalized. *Id.*, p. 3. She explains that Ms. Handy was key in developing many policies within an activist group founded by Ms. Bukovinac, including the policy of total non-violence. *Ibid.* She further describes Ms. Handy's lengthy humanitarian work and recalls a time when Ms. Handy "drain[ed] her bank account to help an incarcerated pregnant woman, and a houseless family. *Ibid.* Moreover, Ms. Handy "herself cared for a little boy [] for the first year of his life so his mom could get back on her feet, which she did." *Ibid.* Ms. Handy "possesses a rare kindness and an extraordinary level of solidarity with those who are suffering." *Ibid.*

Ms. DiMattia describes how, "[f]or several years, [Ms. Handy] walked the streets of Louisiana, providing wound care and basic needs to marginalized groups overlooked and forgotten by society.  She did all of this while simultaneously raising babies to support mothers who could not afford childcare and needed to work.  Over the years [Ms. DiMattia has] seen her offer monetary, social and emotional support to those in need without judgement or hesitation." *Id.*, p. 5.  "Lauren's vision of a better world is inspiring because she reaches out to the darkest corners of humanity by transforming them with love." *Ibid.*  Sister Deirdre Byrnes expresses that she "was deeply touched by [Ms. Handy's] profound faith in Christ, which is her *only* inspiration and explanation as to why she extends herself in a non-violent fashion and with prayer to serve all vulnerable people especially mothers and the unborn, *even though she puts herself last* when considering the consequences. *Id.*, p. 6.  Finally, Ms. Miller describes Ms. Handy as "deeply sensitive to the needs of the weak, the vulnerable and the unwanted—and motivated by her Catholic faith she believes in conscience she has a duty to make herself available to others." *Id.*, p. 7.

Caroline Smith, ███████████████ similarly emphasizes Ms. Handy's generous and loving nature. *Id.*, p. 8.  "[S]he is gentle, kind, and loves deeper than anyone [Ms. Smith has] ever met." *Ibid.* ████████████████████████

████████████████████████████████████

████████████████████████████████

███ Ms. Smith further describes the toll Ms. Handy's absence has taken on her and Ms. Handy's family's lives.  Due to Ms. Handy's incarceration, she has missed valuable time with her 4-year-old niece, who "simply adores" Ms. Handy, as well as the birth and first few months of Ms. Handy's nephew. *Ibid.*  Ms. Smith also expresses concern about Ms. Handy's vulnerable

position in prison as a queer person. *Ibid*.[3]

Employee and friend, Constance Becker, describes that her and Ms. Handy's mutual concern regarding "societal injustices, particularly concerning racism and neglect of marginalized communities, the poor, the houseless, those on the margins of society" caused Ms. Becker and Ms. Handy to become friends instantaneously. *Id*., p. 9.  Ms. Handy introduced Ms. Becker to "concepts like mutual aid and intersectionality." *Ibid*.  "She challenged [Ms. Becker's] previous skepticisms as she offered practical and empathetic solutions beyond charity or government intervention." *Ibid*.  However, beyond Ms. Handy's impact on Ms. Becker's perspective on social action, it is Ms. Handy's kindness that bonded their friendship.  "When I need to be understood, truly understood, I go to her", reveals Ms. Becker. *Ibid*.  She continues: "She's a safe space for me, a confidant and rock that holds me up and takes my grief when I can't bear it." *Ibid*.

Even during Ms. Handy's incarceration, she continues to inspire and give guidance to her friends.  Her friend Melanie Salazar recalls a letter Ms. Handy wrote to her friends in which she described the concept of doing something "afraid". *Id*., p. 11.  "What this means to [Ms. Salazar] is that sometimes when wanting to stand up for what is right, it does not mean you have no fear, but that you choose to do the right thing even while you are still afraid." *Ibid*.  She also provided guidance to Ms. Salazar on the phone when Ms. Salazar was confronted with racial insensitivity. *Ibid*.  Ms. Handy encouraged Ms. Salazar "to take time to learn and to love who [she is] as a leader and [her] vision for [her] work going forward." *Ibid*.

---

[3] ████████████████████████████████████████████████

19-year-old college student Paityn Bowen begins her letter with a quote by Ms. Handy: "I am just one person in the patterns of history trying in small ways to make the world an easier place to love our neighbors and build community." *Id*., p. 12.  Ms. Bowen has looked up to Ms. Handy since she learned about her work when she was 16 years old. *Ibid*.  Ms. Bowen describes the positive impact Ms. Handy has had on her fellow inmates at the Alexandria Detention Facility. *Ibid*.  She recalls one particular inmate who was Ms. Bowen's age at the time and who was severely underweight. *Ibid*.  "Lauren shared her love with this young woman and became her mentor until her release." *Ibid*.  Ms. Bowen asks that Ms. Handy be permitted to "continue her good deeds in our society which needs more people like her." *Ibid*.

Finally, Assistant Professor of Practice at the Busch School of Business, at the Catholic University of America, Michael J. New, Ph.D., submits a letter on Ms. Handy's behalf. *Id*., p. 13. He has known Ms. Handy through their involvement with a pro-life sidewalk counseling ministry outside the Washington, D.C., Planned Parenthood.  Ms. Handy "would come to the Planned Parenthood facility several times a week to prayerfully and peacefully offer life affirming alternatives to women seeking abortions." *Ibid*.  He attests that Ms. Handy "has literally devoted her entire life to helping the weak and vulnerable. She does not take a salary and lives off donations.  She does an excellent job staying in touch with the women that she assists— helping them with finances, shelter, and health care." *Ibid*.  Professor New recalls one situation in particular:

> Lauren and I were in touch with a woman named Roxy who was pregnant with twins.  Roxy was unsure whether she wanted to continue her pregnancy and was open to receiving assistance from local pro-lifers.  In the end, Roxy decided to obtain an abortion. However, even though Lauren disagreed with this decision, she still agreed to assist Roxy afterwards.  Lauren helped Roxy move to Texas and continued to stay in touch with her.  Even though

> Lauren is currently in jail, she is still likely in touch with many of the women she has assisted.

*Ibid.* These letters from family members, friends, and supporters, show that Ms. Handy is not an activist who places her agenda above the needs of the people she serves, it is because of the people that she serves that her agenda is formed—"to make the world an easier place to love our neighbors and build community." *Id.*, p. 12.

## II.        ADVISORY GUIDELINE RANGE

Ms. Handy previously filed objections to the presentence investigation report which she incorporates fully herein.  In addition to the objections she previously raised, Ms. Handy submits that the probation officer, in her final presentence investigation report, erred in applying a victim related adjustment, pursuant to U.S.S.G. §3A1.3, on the basis that the victim was physically restrained during the offense. *See* PSR, ¶ 77.  "Physically restrained" means "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 3A1.3, Application Note 1; U.S.S.G. § 1B1.1, Application Note 1(L).  Absent a finding that Ms. Handy tied, bound, locked up, or physically confined or threatened an individual with injury such that they had no alternative but to comply, Ms. Handy did not physically restrain anyone and the victim related adjustment should not be applied. *See, e.g., United States v. Drew*, 200 F.3d 871, 880 (DC Cir. 2000) (victim was not subject to physical restraint when defendant ordered victim to leave bedroom and walk down the stairs at gunpoint); *United States v. Anglin*, 169 F.3d 154, 163 (2nd Cir. 1999) (bank tellers were not physically restrained during robbery where defendant brandished a gun, defendant told tellers to get down on the floor and not move, and they did so); *United States v. Bell*, 947 F.3d 49, 60 (3rd Cir. 2020) (defendant did not physically restrain victim by grabbing employee's neck, pointing what appeared to be gun at employee's neck, and

throwing employee to the ground, and when employee grabbed defendant's arm in attempt to prevent him from opening cash register, by striking employee with the alleged gun and revealing that it was plastic, as breaking upon impact).

Furthermore, the probation officer erred when she applied a victim related adjustment, pursuant to U.S.S.G. §3A1.1(b)(1), because "the victim of the offense [Ms. Holler] was a vulnerable victim". PSR ¶¶ 78, 84.  A "vulnerable victim" is someone "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, Application Note 2.  The victim related adjustment should not be applied because a victim is not unusually vulnerable by virtue of their pregnancy alone. *See, e.g., United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) ("The district court did not classify the [victim] as unusually vulnerable simply because she was pregnant."  The district court affirmed the adjustment in that case because the victim's "pregnancy created a potential vulnerability which [the defendant] acknowledged and exploited when he expressly threatened to kill her unborn child.").  The adjustment is only available in cases where the victim is uniquely vulnerable as compared to the typical victim of the offense. *See, e.g., United States v. Caballero*, 277 F.3d 1235, 1251 (10th Cir. 2002) ("the evidence must ... distinguish the victim as atypical of the usual targets of the relevant criminal conduct"); *United States v. Feldman*, 83 F.3d 9, 15 (1st Cir. 1996) ("[I]n order to warrant a finding of unusual vulnerability, there must be some evidence, above and beyond mere membership in a large class, that the victim possessed a special weakness that the defendant exploited."); *United States v. Malone*, 78 F.3d 518, 522 (11th Cir. 1996) ("Enhancing a defendant's sentence solely based on the victim's membership in an arguably 'vulnerable' class does not comport with the purposes of § 3A1.1, because the 'vulnerable victim' adjustment 'focuses chiefly on the conduct of the defendant' and should be

applied only where 'the defendant selects the victim' due to the victim's perceived vulnerability to the offense.").

Moreover, the probation officer also erred when she applied an adjustment for Ms. Handy's role in the offense, pursuant to U.S.S.G. §3B1.1(a), because Ms. Handy was "an organizer or leader of a criminal activity that involved five or more participants". PSR ¶¶ 79, 85. "'Mere control over a scheme rather than over a *participant* in a scheme' is not enough to warrant an aggravating role enhancement." *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016 (quoting *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997)); *see also United States v. Quigley*, 373 F.3d 133, 130-131 (D.C. Cir. 2004) (Defendant operated a scheme wherein she helped co-conspirators buy and sell properties by helping them qualify for mortgages through the Federal Housing Administration by obtaining false income records, misrepresenting their ability to pay the mortgage, and at times give them money for the down-payment.  The D.C. Circuit found that there was no evidence that the defendant "had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates" and reversed the Court's imposition of an enhancement under § 3B1.1(a)).

 Instead "the defendant must have been the organizer, leader, manager, or supervisor of one or more *participants.*" *Guidelines Manual,* § 3B1.1 application note 2 (emphasis added). The evidence presented at trial did not show that Ms. Handy had any control over any participants in the instant offense, let alone five or more participants in the offense.  Her activities in organizing the rescue may present control over a *scheme*, *i.e.* the planning, organizing, and recruiting for the rescue, but not that she had control over five or more *participants*.

Finally, the probation officer erred when she applied an adjustment for obstruction of

justice, pursuant to U.S.S.G. §3C1.1, because Ms. Handy "testified falsely at trial". PSR ¶¶ 80, 86.  Ms. Handy testified at trial and was later found guilty by the jury.  However, testimony is not automatically deemed untruthful with a guilty verdict; testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. *See, e.g., United States v. Dunnigan*, 507 U.S. 87, 95 (1993) (a defendant's testimony "may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. … [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [the Supreme Court has] set out.").  Here, Ms. Handy testified truthfully and there was no willful impediment to obstructing justice by her.[4] *See United States v. Thompson*, 962 F.2d 1069, 1071 (D.C. Cir. 1992) (quoting *United States v. Lofton*, 905 F.2d 1315, 1317 (9th Cir.1990) ("'willfully' requires that the defendant consciously act with the purpose of obstructing justice").  The adjustment should not be applied.

---

[4] In its sentencing memorandum, the Government argues that Ms. Handy committed perjury because she testified "that she believed the clinic, in offering abortion services, was performing feticide", "that she did not counsel, direct, or encourage any of her co-defendants to use force or to restrict anyone's 'freedom of movement'", and "that she did not block anyone's access to the clinic." Gov. Sent. Memo. at 11-12 [ECF 543].  The Government further argues that because the jury rejected Ms. Handy's testimony she must have testified falsely.  A jury verdict alone, however, is insufficient to show that a defendant testified falsely. *See Dunnigan*, 507 U.S. at 95. Furthermore, the Government acknowledges that during cross-examination Ms. Handy admitted to advertising the event on social media and making certain comments to MPD officers when confronted with video footage of their interaction. *See* Gov. Sent. Memo. at 12.  Ms. Handy's testimony regarding her motivation for being at the clinic on October 22, 2020, does not conflict with any other evidence presented at trial, and certainly, does not show that Ms. Handy made any efforts to obstruct justice.  Similarly, Ms. Handy's testimony "that she did not counsel, direct, or encourage any of her co-defendants to use force or to restrict anyone's 'freedom of movement'" and "that she did not block anyone's access to the clinic" was truthful as reflected by the evidence the Government presented at trial.

The Probation Officer has calculated an advisory guideline range of 63 months to 78 months, resulting from a total offense level of 24 and Criminal History Category III. The guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) would result in unwarranted disparity as compared with sentences for similarly situated defendants; and (3) is far greater than necessary to promote the goals of sentencing in this case. The guideline range, however, is only one of the factors the Court must consider under 18 U.S.C. 3553(a).

## III. A SENTENCE OF 12 MONTHS' INCARCERATION WOULD BEST SATISFY THE GOALS OF §3553(a).

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op.*, 2010 WL

3940724, *1 (E.D.N.Y. 2010).  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

A.   **The Guidelines are not Based on Empirical Evidence or National Experience and Fail to Promote any Purpose of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the purposes of sentencing are met, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m).  The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra  L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve § 3553(a)'s objectives."  First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  Second, the Commission can review and revise the guidelines

14

based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007).  When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

The guideline regarding offenses involving obstruction of official proceedings is not based on empirical data of past practice or on national experience since then.   Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2D1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

**B.      Need for Just Punishment in Light of Seriousness of the Offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Ms. Handy's degree

of culpability.

Moreover, the underlying offense here is categorized as a Class A misdemeanor. It is almost universally recognized that "Class A misdemeanors are one of the least serious offenses prosecuted in federal court."[5] *United States v. Dawson*, No. 1:22-CR-00107-SAB-1, 2022 WL 3327463, at *2 (E.D. Cal. 2022); *accord*, *United States v. Lambson*, No. CR 17-27-M-DLC, 2018 WL 443453, at *2 (D. Mont. 2018); *United States v. Fawster*, No. 1:12-MJ-364PAS, 2013 WL 4047120, at *4 (D.R.I. 2013); *United States v. Montecalvo*, 861 F. Supp. 2d 110, 115 (E.D.N.Y. 2012); *United States v. Nash*, No. 2:08-MJ-00678-RJJ-RJ, 2010 WL 702438, at *2 (D. Nev. Feb. 19, 2010).

### C.  Need for Deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Id*.; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better

---

[5]  That the Government characterizes the offense as "serious" (Govt. Sent. Mem. at 16) may say more about the Government's hostility toward Ms. Handy and her religious convictions than it does about the law. (*Cf.* Govt. Sent. Mem. at 15, singling our Ms. Handy's "strongly held anti-abortion beliefs" as grounds for harsh sentence). Curiously, the lone case the Government cites to support its view of the seriousness of this offense, *United States v. Gall*, 552 U.S. 38 (2007), concerned the propriety of imposing a sentence of 36 months' probation where the defendant was found guilty of conspiring to distribute ecstasy. The Supreme Court found no abuse of discretion in imposing such a light sentence.

deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*., at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Ibid*. While significant, "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id*. at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id*. at 1.

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

**D.**   **Need to Avoid Unwarranted Disparities and Unwarranted Similarities.**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v.*

17

*Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

Below is a table which includes cases in which defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range of 63 months to 78 months the probation officer has calculated here.  This Court should take into account the sentencing trend exemplified by this list.[6]

---

[6] In its sentencing memorandum, the Government lists five cases in support of its recommendation of a sentence of 78 months' imprisonment for Ms. Handy. *See* Gov. Sent. Memo. at 20-21.  However, these cases further support the fact that a sentence of 12 months' imprisonment is a reasonable sentence in this case:

- *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976): the defendant was sentenced to one to three years' imprisonment for his role in the Watergate scandal during the Nixon administration.  Liddy, acting in the capacity of an officer and employee of the U.S. Government as Staff Assistant to the President of the United States, was one of the principal organizers in the scheme.

- *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995): the defendant, a member of the Ku Klux Klan, was sentenced to five years' imprisonment for his role in burning a cross in the yard of the victims who were black. One of the co-defendants subsequently fired at least three shots into the air from a .22 caliber pistol in front of the victims' home.

- *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000): the defendant was sentenced to 21 months' imprisonment for his role in burning a cross in the yard of the victims who were black. One week prior to this incident, the defendant alongside his co-defendants yelled racial epithets at a black teenager who passed by them on the sidewalk.

- *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003): the defendant, a member of a white supremacist, neo-Nazi group, was sentenced to 120 months' imprisonment for his role in conducting a so-called "park patrol" to "clean out all the minorities", if necessary through violence.  The defendants were armed with axe handles, flat bars, chains, and broomsticks, to use during the "patrol".  They yelled racial slurs at several individuals, threatened that they would kill them, and chased them out of the park.

- *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012): the defendant, a correctional officer, was sentenced to 120 months' imprisonment for using excessive force on non-aggressive, compliant pre-trial detainees, effectively assaulting them by slamming them into walls or metal counters, striking them, or placing them in painful wrist locks.

| Case | Conviction | Sentence |
|------|-----------|----------|
| *United States v. Colton Partin*, Case No.: 11-cr-00100 (E.D. Tn. 2012) | 18 U.S.C. § 241 Conspiracy Against Rights | 18 months' probation with 6 months in home detention 300 hours community service $24.47 restitution $100 Special Assessment |
| *United States v. Raymond Parisi*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241 Conspiracy Against Rights | 5 years' probation $100 Special Assessment |
| *United States v. James Bradley Weems*, Case No.: 06-cr-40012 (W.D. Ar. 2007) | 18 U.S.C. § 241 Conspiracy Against Rights, Including the Burning of a Cross | 1 month imprisonment 2 years supervised release with first 5 months in home detention $2,000 fine $100 Special Assessment |
| *United States v. Jason Branum*, Case No.: 13-cr-00573 (C.D. Ca. 2016) | 18 U.S.C. § 241 Conspiracy Against Rights, 18 U.S.C. § 242 Deprivation of Rights Under Color of Law, 18 U.S.C. § 1519 Falsification of Records, Aiding and Abetting | 5 months' imprisonment 2 years supervised release $300 Special Assessment |
| *United States v. Douglass Mackey*, Case No.: 21-cr-00080 (E.D.N.Y. 2023) | 18 U.S.C. § 241 Conspiracy Against Rights | 7 months' imprisonment 2 years supervised release $15,000 fine $100 Special Assessment |
| *United States v. Christopher Brown*, Case No.: 13-cr-00017 (E.D. Ok. 2017) | 18 U.S.C. § 241 Conspiracy Against Rights, 18 U.S.C. § 242 Deprivation of Rights Under Color of Law, 18 U.S.C. § 1001 False Statement | 12 months' imprisonment 3 years supervised release $300 Special Assessment |
| *United States v. James Smiley*, Case No.: 11-cr- | 18 U.S.C. § 241 Conspiracy Against Rights | 12 months' imprisonment 3 years supervised release |

| | | |
|---|---|---|
| 00100 (E.D. Tn. 2012) | | 300 hours community service<br>$24.47 restitution<br>$100 Special Assessment |
| *United States v. Kyle Montgomery*, Case No.: 11-cr-00100 (E.D. Tn. 2012) | 18 U.S.C. § 241<br>Conspiracy Against Rights | 12 months' imprisonment<br>3 years supervised release<br>300 hours community service<br>$24.47 restitution<br>$100 Special Assessment |
| *United States v. Gary Wilkins*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241<br>Conspiracy Against Rights | 12 months' imprisonment<br>3 years supervised release<br>$100 Special Assessment |
| *United States v. Richard Tobin*, Case No.: 21-cr-00173 (D.N.J. 2021) | 18 U.S.C. § 241<br>Conspiracy Against Rights | 12 months and 1 day imprisonment<br>3 years supervised release<br>$7,000 restitution<br>$100 Special Assessment |
| *United States v. Joseph Downen*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241<br>Conspiracy Against Rights,<br>18 U.S.C. § 371<br>Conspiracy,<br>18 U.S.C. § 1001<br>False Statement | 15 months' imprisonment<br>3 years supervised release<br>$5,500 restitution<br>$300 Special Assessment |

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id*. at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of

the applicable guideline range. *Id*. at 745.

Here, Probation is recommending a sentence between 63 months to 78 months.  Ms. Handy's conduct and her unique circumstances, as compared to the sentences other defendants have received, warrant a sentence in the lower range of sentences imposed.  The Court should impose a sentence of 12 months' incarceration which would be consistent with sentences other defendants received who were found guilty of similar conduct.

E.      **Kinds of Sentences Available.**

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11.  According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines.  Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009).  Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious

offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).  Ms. Handy is not a "violent and serious offender" who "pose[s] the most dangerous threat to society".

## IV.      CONCLUSION

At the time of Ms. Handy's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101.  This bedrock principle of sentencing law cannot be fulfilled in Ms. Handy's case if she is sentenced at or near the range proposed by the probation officer, pursuant to her calculation of the Guidelines.  Rather, as reflected by the data and analogous case law above, a sentence of 12 months is more appropriate in this case.

Date: April 19, 2024                    Respectfully Submitted,


                              /s/ Martin A. Cannon
                              Martin A. Cannon, Esquire (Admitted *Pro Hac Vice*)
                              Stephen Crampton, Esquire (Admitted *Pro Hac Vice*)
                              Thomas More Society
                              10506 Burt Circle, Suite 110
                              Omaha, Nebraska 68114
                              Email: mcannon@thomasmoresociety.org
                                      scrampton@thomasmoresociety.org
                              Phone: (402) 690-1484


                              /s/ Dennis E. Boyle
                              Dennis E. Boyle, Esquire
                              Blerina Jasari, Esquire
                              Boyle & Jasari
                              1050 Connecticut Ave, NW
                              Suite 500
                              Washington, D.C., 20036
                              Email: dboyle@boylejasari.com
                                      bjasari@boylejasari.com
                              Phone: (202) 430-1900

                              *Counsel for Defendant Lauren Handy*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of April 2024, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system, which will send an electronic

notification of such filing to all counsel of record.


*/s/ Dennis E. Boyle*
_____
Dennis E. Boyle, Esquire