**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| **LAUREN HANDY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S REPLY TO DEFENDANT HANDY'S SENTENCING MEMORANDUM**

The United States of America hereby replies to Defendant Handy's Sentencing Memorandum (ECF No. 560) (Handy's Mem.).

## I. Introduction

Handy argues that her Sentencing Guidelines Offense level, as set forth in her Presentence Investigation Report (PSR), is inaccurate. Specifically, she claims the following adjustments were incorrectly applied: (1) § 3A1.3 (Restraint); (2) § 3A1.1(b)(1) (Vulnerable Victim); (3) § 3B1.1(a) (Leader/Organizer); and (4) § 3C1.1 (Obstruction). Handy also argues that the Court should vary downward and impose a below Guidelines sentence of 12-months incarceration. Handy's objections to the Offense Level calculations are baseless, and consideration of the Section 3553(a) sentencing factors establishes that a top-end Guidelines prison sentence is appropriate here.

## II. Handy's Offense Level calculation as determined by the PSR is correct

As set forth in the PSR, Handy's Combined Adjusted Offense Level is 24. (*See* PSR at ⁋

94). Each of the four adjustments that Handy complains about were properly applied.

*A. Restraint*

Handy's first argument that her offense level was improperly adjusted pursuant to § 3A1.3 is without merit because her conduct caused the victims of her offenses to be confined inside of the clinic. "Physically restrained" means the forcible restraint of the victim such as being tied, bound, or locked up. U.S.S.G. §1B1.1, App. No. 1(L). The use of "such as" in the definition indicates that the terms are merely illustrative examples and does not limit the type of conduct that may constitute a physical restraint. *See, e.g.*, *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) ("We agree that 'the use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1, Application Note 1(i) [sic], indicates that the illustrations of physical restraint are listed by way of example rather than limitation."). Handy and her co-defendants' blockade caused the clinic staff and patients to be "locked up" inside of the facility.

Handy was convicted for "interfere[ing] with" staff and patients as a principal, thereby restraining them within the clinic. *See* 18 U.S.C. § 248(2)(2) (defining "interfere with" to mean "restrict a person's freedom of movement."). She is also substantively responsible for her co-conspirators' conduct in doing the same.[1] *See Pinkerton v. United States*, 320 U.S. 640, 646-47

---

[1] Of course, Handy did not have to personally perform all the actions necessary to establish this adjustment; based on Relevant Conduct, she is responsible for her co-conspirators' actions:

> A defendant is responsible for
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,

(1946); *United States v. Khatallah*, 41 F.4th 608 (D.C. Cir. 2022) ("[A] conspirator can be found guilty of a substantive offense based upon acts of his coconspirator so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."). Handy and her co-defendants' use of force and physical obstructions caused the clinic staff to be effectively imprisoned within the facility. This conduct—whether committed by Handy or her co-defendants—was reasonably foreseeable and a natural consequence of the conspiracy Handy led from the very beginning, which was to blockade the facility and prevent patients from entering the facility (and consequently preventing the clinic staff from leaving). *See United States v. Ballestas*, 795 F.3d 138, 146 (D.C. Cir. 2015) ("[A]s long as a substantive offense was done in furtherance of the conspiracy, and was reasonably foreseeable as a 'necessary or natural consequence of the unlawful agreement,' then a conspirator will be held vicariously liable for the offense committed by his or her coconspirators.") (*citing United States v. Washington*, 106 F.3d 983, 1012 (D.C.Cir.1997)). Handy's argument that this adjustment is inapplicable because "[she] did not physically restrain anyone" ignores the jury's verdict, which found beyond a reasonable doubt that Handy violated the FACE Act by both force and physical obstruction. *See* Minute

---

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

U.S.S.G. § 1B1.3 (a)(1).

Entry, Sept. 15, 2023.

The evidence at trial proved that several victims were "restrained" as a result of Handy and her co-defendants' blockade. As part of that physical obstruction, clinic patients and staff were barricaded behind closed doors—co-defendants Paulette Harlow and Joan Bell chained themselves together, and along with John Hinshaw, Jay Smith, and Jean Marshall sat in chairs and refused to move; and Heather Idoni and Will Goodman locked their arms and blocked the employee entrance door. As one example, the defendants' actions prevented clinic employee Sarah Compton from leaving, delaying care for her badly sprained ankle. *See* 09/09/2023 Trial Tr. at 102 (Sarah Compton testifying, "I couldn't leave to go to the hospital until they were gone"); *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (finding no error in physical restraint enhancement where defendant confined victims to a room); *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir.1989) (finding no error in applying physical restraint enhancement, noting "a victim need not be tied or bound up so that his movement is completely restricted. . . "). As another example, Handy and her co-defendants' blockade "physically restrained" Shampy Holler. Upon arriving for her scheduled appointment, Mrs. Holler collapsed in the hallway from pain she experienced because of the procedure she had started the day prior. She was forced to lay on the floor and remain there for a period of time because the defendants physically obstructed her from entering into the clinic. Even while knowing that Mrs. Holler was experiencing a medical emergency related to her pregnancy, the defendants refused to allow her access to a reproductive health clinic. Instead, they confined her to the hallway while she was in distress. Coupled with co-defendant Jean Marshall's use of force, which prevented Mrs. Holler from getting up from the floor, the defendants' blockade physically restrained Mrs. Holler.

Accordingly, Handy's offense level was properly increased pursuant to the physical restraint adjustment.

*B. Vulnerable Victim*

Next, Handy argues that adjustment § 3A1.1(b)(2) does not apply. She claims the fact that her victims (Ashley Jones and Mrs. Holler) were pregnant does not render them "vulnerable." Handy's Mem. at 10-11. This argument also fails based upon prevailing case law supporting application of this adjustment to Ms. Jones and Mrs. Holler.

The Sentencing Guidelines require an upward offense level adjustment "if the defendant knew or should have known that the victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). "[V]ulnerable victim means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 App. N. 2; *see, e.g., United States v. Cline*, 986 F.3d 873, 880 (5th Cir. 2021) (affirming vulnerable victim adjustment where defendant knew the victim was pregnant; thus "particularly susceptible to [defendant's] conduct"). Courts have applied the vulnerable victim adjustment when the evidence established that the vulnerability had a nexus to the crime. *See, e.g.*, *United States v. Luca*, 183 F.3d 1018, 1026 (9th Cir. 1999) ("We have enunciated two means of determining whether a defendant's victim is 'otherwise particularly susceptible' for purposes of the vulnerable victim enhancement . . . . [W]e directed the district courts to analyze 'the characteristics of the defendant's victim, the victim's reaction to the criminal conduct, . . . the circumstances surrounding the criminal act [and] whether the defendant could reasonably have anticipated the victim's reaction.") (citations

omitted).

Both Ms. Jones and Mrs. Holler qualify as vulnerable victims. Both patients were pregnant and had already started their termination procedures, which made them even more vulnerable to Handy's efforts to block their access to reproductive health care. *See* 8/16/23 a.m. Trial Tr. at 60:3-24, 84:3-5 (Ms. Jones explaining that her termination procedure had been started the day before the blockade, and that she was not feeling well on October 22); 8/17/23 a.m. Trial Tr. at 133:8-20 (Mrs. Holler explaining the same); s*ee also, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery); *United States v. Stover*, 93 F.3d 1379, 1386 (8th Cir. 1996) ("The victims to whom § 3A1.1 applies are those who are in need of greater societal protection . . . They are the persons who, when targeted by a defendant, render the defendant's conduct more criminally depraved.").

Moreover, Handy and her co-defendants particularly knew that Ms. Jones and Mrs. Holler were "vulnerable." First, the evidence at trial established that Handy knew the clinic performed late term abortions, and that those procedures were routinely scheduled for Thursdays. *See, e.g.*, 8/16/23 a.m. Trial Tr. at 91-96:20-10 (Sara Compton explaining that later term abortion procedures were two to three days, and that "Hazel Jenkins" had scheduled a pregnancy termination for [Thursday] October 22); *id.*, at 110-117:1-16 (Sasha Proctor explaining the same); 8/21/23 a.m. Trial Tr. at 74-78:25-8, 56-57:3-18 (Tina Smith explaining that the clinic performed abortion procedures on Thursdays, and identifying Handy as "Hazel Jenkins" who had a scheduled appointment on Thursday October 22). Rule 404(b) evidence established that Handy was familiar with the clinic's operations based upon her 2019 invasion, and she scheduled her fake abortion

appointment for October 22, which informed Handy and her co-defendants that the clinic would be servicing pregnant patients that day. Next, Handy and her co-defendants knew that Ms. Jones and Mrs. Holler were pregnant and particularly vulnerable. Video footage showed that Ms. Jones appeared to be in her second or third trimester. When Ms. Jones arrived at the clinic, she cried and pleaded with the defendants to allow her access into the clinic because she had an appointment. *See, e.g.*, USA Ex. No. 1011. When the defendants refused to move, Ms. Jones, in an act of desperation to access reproductive health care, was forced to climb onto a chair and through a small receptionist window because Handy and her co-defendants had blocked all the doors, which made access especially difficult for Ms. Jones because she was pregnant and had begun the procedure to terminate her pregnancy. Moreover, Mrs. Holler collapsed on the floor outside of the clinic while she was locked out, because she suffered from complications with her procedure that had already begun. The defendants knew Mrs. Holler was experiencing a medical emergency related to her pregnancy, just as they knew Ms. Jones was forced to climb through a window to complete the procedure she had started. *See, e.g.*, 8/22/23 a.m. Trial Tr. at 84-86:22-15 (Handy explaining that she was aware that Ms. Jones was pregnant and attempting to access the clinic; and while Mrs. Holler was experiencing labor pains, Handy told her co-conspirators to call 9-1-1); 8/22/23 p.m. Trial Tr. at 19-21:21-1 (Idoni admitting that she saw Mrs. Holler experiencing medical complications and Idoni advising Mr. Holler to call 9-1-1 or go to a hospital); *id.*, at 60-63:14-7 (Idoni admitting that Ms. Jones was prevented from accessing the clinic for a termination procedure and was forced to climb through a window); *id.*, at 99-101:16-1 (Geraghty admitting Mrs. Holler was experiencing a medical emergency and that Geraghty advised her to seek hospital care). Handy and her co-defendants' blockade was especially egregious because they knew Ms.

Jones and Mrs. Holler were more susceptible than others, such as the clinic staff, to the defendants' criminal activity.

Handy's reliance on authority holding that this adjustment does not apply because Ms. Holler and Mrs. Jones are "typical victims" of this offense (Handy Mem. at 10-11) is misplaced. Ms. Holler and Mrs. Jones are uniquely vulnerable because one does not have to be pregnant to be a victim of the charged offenses (*e.g*., the Clinic staff); and, as noted above, because their termination procedures had started, Ms. Jones and Mrs. Holler were particularly vulnerable. Accordingly, this Court should reject Handy's objection and apply this adjustment.

*C. Leader/Organizer*

Handy also takes issue with the PSR's findings that she was an organizer or leader of the criminal activity, thus applying the § 3B1.1(a) adjustment. Specifically, she incorrectly argues that "[t]he evidence at trial did not show that Ms. Handy had any control over any participants in the instant offense, let alone five or more participants in the offense." Handy Mem. at 11. However, it is clear from the evidence, the jury's verdict, and this Court's conclusions that Handy was a leader, and the § 3B1.1(a) adjustment is appropriate.

Handy organized the "lock-and block," led the pre-invasion meeting, and directed her co-defendants during the blockade. She takes an incredulous position given the copious amounts of evidence establishing her and co-defendant Jonathan Darnel's (Darnel) roles as co-leaders of the October 22, 2023, clinic invasion, and this Court's previous findings. *See* ECF No. 474 ("The conspiracy to disrupt the clinic began with the conspiracy's leaders, Defendants Lauren Handy and Jonathan Darnel.").

From the very beginning, Facebook communications proved that Handy and Darnel

planned, organized, advertised, and recruited participants for the clinic blockade with the single mission of preventing women from accessing reproductive health care. *See e.g.*, Exhibit Nos.: 5066 (Facebook posts advertising the importance of "rescues" and an "important event"); 4001A (Handy text messages with co-defendant Herb Geraghty discussing recruiting participants from Michigan, New York, Boston, Pennsylvania; and how Handy "keep[s] getting phone calls and more and more people are joining [the blockade]"); 5072 (Darnel providing a "tip" about 15 arrests related to "civil disobedience" the day before the clinic invasion); 5091 (Handy soliciting money from unindicted co-conspirator Michael New for "[t]he [r]escue"); 5083 (Darnel advising Handy to use the words "civil disobedience" because "the idea of deliberately breaking the law is sexy").

Furthermore, co-conspirator Caroline Davis ("Davis") testified clearly that Handy was a conspiracy and blockade leader based upon her actions at the pre-invasion meeting. *See* 8/17/23 AM Session Trial. Trans. at 36:16-17 (Davis testifying that Handy was "leading the meeting"); 9/12/23 Trial. Trans. 54:20-21 (Davis stating that "[i]t was mostly Lauren Handy" who led the meeting). This Court should reject Handy's misguided attempt to distort the record.

Lastly, Handy's claim that she had no "control over any participants in the instant offense" is belied by this Court findings. As this Court recognized from the evidence presented at trial, "Handy orchestrated this conspiracy, directing her co-defendants to undertake various preparations to blockade the clinic" and, during the clinic incursion, "Handy ordered various co-conspirators to block certain doors." *See* ECF 478, Mem. Opinion, at 2, 6. The PSR is correct—Handy was the conspiracy and blockade leader and organizer, and the § 3B1.1(a) adjustment was properly applied.

*D. Obstruction*

Handy further misses the mark when she argues that her offense level should not be

increased by two levels pursuant to U.S.S.G. § 3C1.1, because she "testified truthfully and there was no willful impediment to obstructing justice by her," and that her testimony did not conflict any other evidence presented at trial. Handy Mem. at 12, and n. 4. But, as set forth in the PSR, Handy's adjustment for obstruction is based on the fact that she testified falsely about her role and "participation in the offense." PSR at ¶ 86. Specifically, Handy lied about why she organized and was present at the blockade. *See* Government's Sentencing Memorandum (ECF No. 543) ("Gov. Mem.") at 11-12. Inasmuch as Handy falsely claimed that she was at the Surgi-clinic to prevent feticide, her lies were material. *See* U.S.S.G. § § 3C1.1 App. N. 6 ("'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."). Handy's claim that her motivation for being at the clinic does not conflict with the evidence at trial is wrong. Her purported motivation to prevent feticide, which is not a form of protected reproductive health care, was material to the FACE Act offense. Her attempt to influence the jury's determination of an element of the FACE Act offense is precisely the obstructive conduct that § 3C1.1 was intended to reflect. Handy's false testimony directly conflicted with the evidence, which showed that Handy organized and led the blockade to "stop abortions," and not feticide. *See, e.g.*, Exhibit No. 1009. The adjustment for obstruction was properly applied.

## III. Handy should be sentenced to a term of imprisonment at the high-end of her Sentencing Guidelines range

Handy's argument that "[a] substantial variance is needed" because the Sentencing Guidelines fail to account for several applicable mitigating factors is misplaced. The Sentencing Guidelines "serve as 'a meaningful benchmark' in the initial determination of a sentence."

*Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) (quoting *Peugh v. United States*, 569 U.S. 530, 541 (2013)). The Sentencing Guidelines "ensure 'certainty and fairness.'" *Id*. (quoting *United States v. Booker*, 543 U.S. 220, 264 (2005)). Handy's arguments that the Sentencing Guidelines do not satisfy the Section 3553(a) factors is flatly wrong.

*A. The Sentencing Guidelines properly promote and serve the § 3553(a) sentencing factors.*

Handy's arguments that her Sentencing Guidelines yield a sentence greater than necessary to achieve the objectives of Section 3553 is unfounded. She fails to articulate precisely how the Sentencing Guidelines do not embody the sentencing factors this Court must consider. Instead, she merely asks this Court to disagree with Guidelines recommended sentencing range because it "failed to rely on empirical data or national experience in promulgating or amending § 2D1.1," a provision of the Sentencing Guidelines that are inapplicable to Handy.[2] Handy Mem. At 14-15. She further claims that the "guidelines include none of the factors bearing on [her] degree of culpability" without further argument and against the backdrop of her role as a leader/organizer. *Id*., at 15-16. And, Handy makes an unpersuasive reference to the "marginal deterrent effects" of imprisonment without any argument. *Id*., at 16-17. These objections can be easily dismissed.

As discussed in the government's memorandum, the Sentencing Guidelines should be given considerable weight because Section 3553(a)(4) requires so, and because the Guidelines embody the Section 3553(a) considerations in both principle and practice. *See* Gov. Mem. at 20-21. The Sentencing Guidelines should be an initial benchmark for determining Handy's sentence because it is the "product of careful study based upon extensive empirical evidence derived from

[2] § 2D1.1 applies to drug offenses.

the review of thousands of sentencing decisions." *Id.*, at 13 (citing *Hughes v. United States*, 584 U.S. 675, 685 (2018)).

Handy has not demonstrated how the Sentencing Guidelines as determined in the PSR fail to achieve sentencing objectives. Rather, the Guidelines "remain the foundation of federal sentencing decisions." *Hughes*, 584 U.S. at 685. A high-end Sentencing Guidelines prison sentence for Handy would sufficiently comply with the basic aims of Section 3553(a).

*B. A Guidelines sentence would avoid sentencing disparities*

Handy's final argument that "[t]his Court should take into account the sentencing trend exemplified by" her table of cases supporting her requested 12-month prison sentence is unavailing. Handy Mem. at 19-20. Handy incorrectly asserts that her table of cases include defendants who "received sentences substantially below the guidelines ranges." *Id.*, at 20. That is wrong. Nearly all of those courts imposed a Guidelines range sentence or varied downward because a defendant pleaded guilty and cooperated with the government. This Court can rely on Handy's citations as well as those referenced in the government's brief to impose a high-end Guidelines prison sentence in this case. "'The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'" *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024); *see also United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (same). Each case cited, both by Handy and the government, demonstrates how a Guidelines sentence here would avoid any sentencing disparities.

Handy's citations in support of her claim that a downward variance is necessary to avoid unwarranted sentencing disparities should be rejected because a review of those cases demonstrate

that they do not support her position.[3] First, in three of Handy's cases, the court imposed a Guidelines sentence. *See United States v. Mackey*, 21-cr-00080 (E.D.N.Y. 2023), ECF No. 169 at 3 (Guidelines sentence imposed; government's sentencing memorandum requested a modified guidelines sentence range of 6 to 12 months); *United States v. Smiley and Montgomery*, 11-cr-100 (E.D.TN. 2012), ECF No. 44 (Guidelines sentence imposed); *United States v. Tobin*, 21-cr-173 (D.N.J. 2021), ECF No. 49 (Guidelines sentence imposed). Second, Handy cites *United States v. Weems*, 06-cr-40012 (W.D.AR. 2007), but that sentence was vacated. *See United States v. Weems*, 517 F.3d 1027 (8th Cir. 2008). Third, Handy cites two inapposite cases, as they appear to have involved downward departures due to the defendants' cooperation. *See United States v. Partin*, 11-cr-100 (E.D.TN. 2012), ECF Nos. 15, 52-54; *United States v. Parisi, Wilkins, and Downen*, 98-cr-407 (D.AZ. 1999), ECF Nos. 31, 50, 104, 114, 136, 159-161 (based on the available record, it is unclear whether Parisi's co-defendants, Wilkins and Downen, received Guidelines sentences). Last, in *United States v. Barnes*, the Tenth Circuit held that the district court did not abuse its discretion in varying downward, where – unlike here – there was nothing "suggest[ing] that a sentence within the advisory guideline range is needed to deter him from any further law violations." 890 F.3d 910, 919-20 (10th Cir. 2018). And, in *United States v. Jason Branum*, Case No.: 13-cr-00573 (C.D.CA. 2016), the court's downward departure created a disparity among defendants, who had committed similar offenses. *See* ECF 140 (Gov. Sent. Mem.), at 7-9.

Handy's attempt to distinguish the government's case citations is also misplaced because

[3] Handy lists 11 cases, four of which were companion cases involving co-defendants.

those cases further support the government's request for imposition of a Guidelines prison sentence. Handy's argument that a 12-month sentence is consistent with the government's cited cases is wrong because those courts imposed Guidelines range sentences. *See* Gov. Mem. at 20-21. Those cases demonstrate how a Guidelines sentence would avoid sentencing disparities because each case recognizes that the Sentencing Guidelines impute the Section 3553(a) factors, which necessarily differ from case to case, particularly in Section 241 prosecutions where the right in question often result in different Guidelines and sentencing factor analyses. Given factual differences that distinguish nearly all Section 241 prosecutions, imposition of a Guidelines sentence is the most reliable way to avoid *unwarranted* disparities. Therefore, as demonstrated by both the cases Handy and the government relies on, this Court should sentence Handy at the top-end of the Sentencing Guidelines.

## IV. Conclusion

Here, a sentence at the high-end of the Guidelines will achieve a sentence that reflects the Section 3553 sentencing factors. In particular, such a sentence reflects the gravity of the offense (to include vindicating the rights of those whom Handy victimized), the need for deterrence, and the absence of any mitigating factors.

Respectfully submitted,

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ John Crabb Jr.*
JOHN CRABB JR.
NY Bar No. 2367670
REBECCA G. ROSS
NY Bar No. 5590666
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
John.D.Crabb@usdoj.gov
Rebecca.Ross2@usdoj.gov