**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA,

    v.

LAUREN HANDY, *et al.*

          Defendants.

Criminal No. 22-96 (CKK)

---

## MEMORANDUM OPINION AND ORDER
(May 13, 2024)

Defendants Lauren Handy, John Hinshaw, and William Goodman are set for sentencing before this Court on May 14, 2024. Defendants Herb Geraghty, Jonathan Darnel, Jean Marshall, and Joan Bell are set for sentencing on May 15, 2024. Defendants Heather Idoni and Paula Harlow are set for sentencing before this Court on May 21, 2024 and May 31, 2024, respectively. At the conclusion of their respective trials, all nine co-defendants were found guilty of one count of Conspiracy Against Rights, in violation of 18 U.S.C. §241, and one count of violating the Freedom of Access to Clinic Entrances ("FACE") Act, in violation of 18 U.S.C. § 248(a)(1), by both force and physical obstruction, stemming from participation at a violent blockade at a local abortion clinic. *See* Verdict Forms, ECF Nos. 413 (Defendants Handy, Hinshaw, Idoni, Goodman, and Geraghty), 427 (Defendants Darnell, Marshall, and Bell); Judgment and Verdict, ECF No. 476 (Defendant Harlow).

In connection with the Defendants' upcoming sentencings, Defendants are contesting the accuracy of their Sentencing Guidelines Offense levels, as calculated in their Presentence Reports. More specifically, the following adjustments are contested by one or more Defendants, as explained herein: (1) a 4-level increase for role as an organizer or leader of a criminal activity

1

involving 5 or more participants; (2) a 2-level increase for physical restraint of a victim; (3) a 2-level increase for a vulnerable victim; (4) a 2-level increase for obstruction of justice; and (5) an increase attributable to multiple count adjustment.  These sentencing adjustments are discussed in turn below.[1]

### 1. Role as an Organizer or Leader (Handy, Darnel)

The Probation Office calculated a 4-level "role in the offense" enhancement, pursuant to §3B1.1(a), as follows: The defendant was "an organizer or leader of a criminal activity that involved five or more participants (to wit: defendants Lauren Handy and Jonathan Darnel organized the blockade, recruited participants, advertised and broadcasted their crime over social media, made lodging and planning arrangements for the out-of-town participants, and directed the codefendants on what to do)."  Handy PSR, ECF No. 523, ¶¶79, 85; Darnel PSR, ECF No. 514, ¶¶ 79, 85.

In her Sentencing Memorandum, ECF No. 560, at 11, Defendant Handy asserts that "'[m]ere control over a scheme rather than over a *participant* in a scheme' is not enough to warrant an aggravating role enhancement."  *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (quoting *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997)); *see also United States v. Quigley*, 373 F.3d 133, 134 (D.C. Cir. 2004) (where defendant operated a scheme to help co-conspirators buy and sell properties by helping them qualify for mortgages through use of false

---

[1] The Court has reviewed each Defendant's objections to the Presentence Report ("PSR") (if any); the Presentence Reports; the Sentencing Memoranda submitted by the Government and the Defendants; the Government's Replies; and any rebuttals filed by Defendants. In the case of a sentencing adjustment that applies to all Defendants, the Court cites to the language from one PSR, if the language used to describe that adjustment is the same in each PSR.  In discussing arguments in favor and against each adjustment, the Court will not cite to arguments that are virtually the same (whether proffered by Defendants or the Government) but will attempt to cite to the cumulative arguments for each sentencing adjustment discussed herein.

income records and sometimes giving them money for the down payment). In *Quigley*, the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") found no evidence that defendant "had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates" and reversed the court's imposition of an enhancement under Section 3B1.1(a). *Id.* at 140. Ms. Handy contends that the evidence presented at trial did not demonstrate that she had any control over any participants in the instant offense. In turn, Mr. Darnel contests the application of this enhancement, claiming that he "exercised no control over anyone in this case," as he "videotaped and posted on social media, but clearly people took their marching orders from Lauren Handy, including [him]." Darnel Sent Mem., ECF No 537, at 2.

The Government asserts however that Ms. Handy "organized the 'lock-and-block,' led the pre-invasion meeting, and directed her co-defendants during the blockade," and furthermore, there were "copious amounts of evidence establishing [Handy] and co-defendant Johnathan Darnel's roles as co-leaders of the October 22, 2023 clinic invasion, and this Court's previous findings" also support this enhancement. Govt. [Handy] Reply, ECF No. 563, at 8; Findings of Facts and Conclusions of Law, ECF No. 474, at 3 ("The conspiracy to disrupt the clinic began with the conspiracy's leaders, Defendants Lauren Handy and Jonathan Darnel."); *see also United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (affirming sentencing enhancement under Section 3B1.1(a) because the trial court correctly determined the defendant had a "leadership role" and an "organizational [role]" and that defendant had to "organize [the conspiracy] to make it work").

More specifically, the Government asserts that:

From the very beginning, Facebook communications proved that Handy and Darnel planned, organized, advertised, and recruited participants for the clinic blockade with the single mission of preventing women from accessing reproductive health care. *See e.g.*, Exhibit Nos.: 5066 (Facebook posts advertising the importance of "rescues" and an "important event"); 4001A (Handy text messages with co-defendant Herb Geraghty discussing recruiting participants from Michigan, New York, Boston, Pennsylvania and

> how Handy "keep[s] getting phone calls and more and more people are joining [the blockade]"); 5072 (Darnel providing a "tip" about 15 arrests related to "civil disobedience" the day before the clinic invasion); 5091 (Handy soliciting money from unindicted co-conspirator Michael New for "[t]he [r]escue"); 5083 (Darnel advising Handy to use the words "civil disobedience" because "the idea of deliberately breaking the law is sexy").

Govt. [Handy] Reply, ECF No. 563, at 8-9.

Regarding Mr. Darnel, the Government also cites to Exhibit No. 5070, where Darnel was recruiting James Kershner to participate in a "big event." Govt. [Darnel] Reply, ECF No. 553, at 2. Additionally, the Government cites testimony by Caroline Davis, an unindicted co-conspirator, regarding Handy "leading the [pre-invasion] meeting." *Id.* at 9; *see* 8/17/23 AM Session Trial Tr. at 36:16-17, 9/12/23 Trial Tr. at 54:20-21; at 54:23-23 (Davis testifying that Darnel was giving "leadership vibes); at 55:4-9 (describing how Darnel passed around a paper for the volunteers to write down their contact information in anticipation of being arrested).

Moreover, in its Omnibus Memorandum Opinion, ECF No. 478, at 2-3, this Court explained that "Defendant Handy orchestrated this conspiracy, directing her co-defendants to undertake various preparations to blockade the clinic" and noted that the "conspiracy began with messages exchanged between the conspiracy's leaders, Defendants Lauren Handy and Jonathan Darnel" who planned and promoted the blockade and led the initial meeting to discuss the plan).[2] Accordingly, upon consideration of the record evidence in this case, as well as the arguments of the parties, and the applicable case law, this Court finds that the "role as an organizer or leader" enhancement is applicable to Defendants Handy and Darnel.

---

[2] The Court incorporates by reference its Findings of Fact and Conclusions of Law, ECF No. 474, and its Omnibus Memorandum Opinion, ECF No. 478.

### 2. Physical Restraint of a Victim (all Defendants)

The Probation Office applied a 2-level victim related adjustment to the computation for the charge of Conspiracy Against Rights because "the victim was physically restrained in the course of the offense (to wit: Shampy Holler was forced to lay on the floor because the defendants refused to allow her into the clinic)."  Handy PSR, ECF No. 523, ¶77; U.S.S.G. §3A1.3.  "Physically restrained" means "the forcible restraint of the victim such as being tied, bound, or locked up." U.S.S.G. §1B1.1, App. No. 1(L).  The D.C. Circuit has "agree[d] that the use of the modifier 'such as' in the definition of 'physical restraint' found in §1B1.1, Application Note 1(i) [sic], indicates that the illustrations of physical restraint are listed by way of example rather than limitation." *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) (citation omitted); *see e.g., United States v. Stokely,* 881 F.2d 114, 116 (4th Cir. 1989) (finding no error in applying physical restraint enhancement, "noting a victim need not be tied or bound up so that his movement is completely restricted . . .").

Ms. Handy argues that she did not physically restrain anyone, and in support thereof, she cites to three cases, the first involving a woman who was ordered at gunpoint to walk down stairs; the second involving a robbery where bank tellers were told to get down on the floor by a defendant who was brandishing a gun; and a third involving a victim who grabbed a defendant's arm in an attempt to stop defendant from opening a cash register and who was struck by the defendant, upon which the alleged gun that had been brandished was revealed to be plastic.  *See* Handy Sent. Mem., ECF No. 560, at 9-10 (citations omitted); Goodman Sent. Mem., ECF No. 555, at 4-5 (relying on these three cases); Bell Sent. Mem., ECF No. 556, at 1-2 (noting the same); Geraghty Sent. Mem., ECF No. 548, at 4-5 (same).  The Court finds none of these cases cited to be instructive as to the situation in this case.

The Government argues that "Handy and her co-defendants' blockade [of the facility] caused the clinic staff and patients to be "locked up" inside the facility."  Govt. [Handy] Reply, ECF No. 563, at 2.  The Government contends that "Handy was convicted for 'interfer[ing] with' staff and patients . . . , thereby restraining them within the clinic."  *Id.*; *see* 18 U.S.C. §248(e)(2) (defining "interfere with" to mean "to restrict a person's freedom of movement" in the context of the Defendants' charges for Clinic Access Obstruction).  Furthermore, as noted previously, the jury verdicts/judgment for all nine co-Defendants found beyond a reasonable doubt that they violated the FACE Act by both force and physical obstruction.  *See* Verdict Forms, ECF Nos. 413 (Defendants Handy, Hinshaw, Idoni, Goodman, and Geraghty), 427 (Defendants Darnell, Marshall, and Bell); Judgment and Verdict, ECF No. 476 (Defendant Harlow).[3]

The Government explains that "as part of that physical obstruction [for which Defendants were found guilty], clinic patients and staff were barricaded behind closed doors - -  Harlow and Bell chained themselves together, and along with Hinshaw and Marshall sat in chairs and refused to move, thus blocking egress to the Clinic's treatment area, and Idoni and Goodman locked their arms and blocked the employees' entrance."  Govt. [Hinshaw] Reply, ECF No. 562, at 3 n.1; Findings of Fact and Conclusions of Law, ECF No. 474, at 6-7.  The Government explains that "[a]s one example [of restraint], the defendants' actions prevented clinic employee Sarah Compton from leaving, delaying care for her badly sprained ankle."  Govt. [Handy] Reply, ECF No. 653, at 4 (referencing 09/09/2023 Trial Transcript ("Tr.") at 102 (where Ms. Compton testified that: "I couldn't leave to go to the hospital until they were gone.")).

---

[3] By way of example, this Court recognized that Ms. Harlow "purposefully fell on top of the clinic manager, forcefully shoving the clinic manager into a waiting-room chair."  Findings of Fact and Conclusions of Law, ECF No. 474, at 6.

"It is the perpetrator's act of enclosing or confining the victim in a space or with a barrier, actual or threatened, that constitutes the action meriting enhancement of the offense level." *United States v. Copenhaver,* 185 F.3d 178, 183 (3d Cir. 1999); *see Arcoren v. United States*, 929 F.,2d 1235, 1246 (8th Cir. 1991) (finding no error in applying physical restraint enhancement where defendant confined victims to a room). And in this case, the record evidence demonstrates that the victims (clinic patients and staff) were confined in a space, as they were denied access to the treatment area and/or egress from the clinic.

The evidence at trial demonstrated that Shampy Holler was "physically restrained" insofar as when she arrived for her scheduled appointment, she collapsed in the hallway from pain she experienced because of the procedure she had started the day prior, and she was forced to lay on the floor and remain there for a period because Defendants physically obstructed her from accessing entry to the clinic.[4] Ms. Holler was confined to the hallway while in distress, and co-Defendant Marshall used force, which prevented Ms. Holler from getting up off the floor, while the blockade physically restrained her.

Regarding the use of force, Ms. Marshall acknowledges that she "put[ ] her hand on Ms. Shampy Holler's shoulder" but alleges that there was no "improper or malicious intent [re:] Ms. Holler when she touched her on the shoulder for about a second[.]" Marshall Sent. Mem., ECF No. 567, at 3.[5] The Government disputes this characterization by Ms. Marshall and asserts instead that Ms. Marshall "pushed Ms. Holler down to the ground when she was experiencing intense

---

[4] Mr. Geraghty asserts that "[d]enial of entry, without more, does not connote 'forc[ing] Ms. Holler to [lie] on the floor.'" Geraghty Sent. Mem., ECF No. 548, at 4. As explained in more detail herein, this case involves more than a mere "denial of entry."

[5] Ms. Marshall notes also that "the examples given in the defendant under USSG §1B1.1(L) involve an external physical item being used so as to cause restriction." Marshall Sent. Mem., ECF No. 567, at 3. The Court notes that the examples are not exhaustive.

labor pains to prevent (*i.e.,* restrain) Ms. Holler from entering the clinic.  Govt. [Marshall] Reply, ECF No. 568, at 3; referencing Exhibit 1079B.  In fact, co-Defendant Harlow explained that Marshall "pushed [Ms. Holler] back down" to the floor "to prevent her from entering the facility as clinic staff attempted to allow her access."  Govt. [Marshall] Reply, ECF No. 568, at 3 (citing Harlow Sent. Mem., ECF No. 554, at 3).[6]  The Government points also to Ms. Marshall's actions [along with Defendants Harlow, Bell, Smith, and Hinshaw] of blocking the door to the treatment area by rearranging furniture and using locks and chains, which trapped clinic staff and patients inside.  Govt. [Marshall] Reply, ECF No. 568, at 3 (referencing Exhibit Nos. 1001, 1008, 1016).

Mr. Darnell argues that "[a]ny acts of violence were beyond the scope of [the] conspiratorial agreement" nor was he "present" [for these acts] nor was there a "special verdict with a finding that he planned or was aware of behavior like this."  Darnell Sent. Mem., ECF No. 537, at 2.[7]  During the Defendants' blockade of the clinic, "Darnel narrated the unfolding blockade on a Facebook livestream," whereby he explained that his "coconspirators were conducting a 'block and lock rescue' in which 'ten pro-life people [were] bonding together physically to prevent the murder of preborn babies.'"  Findings of Fact and Conclusions of Law, ECF No. 474, at 7; *see* Govt. Ex. 1017.   The "purpose of this collective endeavor was 'to prevent women from entering the clinic to murder their children.'"  *Id.*

---

[6] Mr. Hinshaw asserts that Ms. Holler "was not forced by [him] or [his] codefendants to get on the ground" and while he acknowledges that Ms. Marshall "pushed her back down," he states that Ms. Holler was "free to leave, and argues that the conduct of codefendant Marshall could only be considered simple assault and does not equate to" the definition for being physically restrained. Hinshaw Sent. Mem., ECF No. 551-1, at 4; Harlow Sent. Mem., ECF No. 554, at 3 (stating that Ms. Holler "chose to lay on the floor").  Defendants' assertions that Ms. Holler was "free to leave" and "chose to lay on the floor" are absurd given the fact that it was obvious that Ms. Holler was experiencing severe labor pains and the Defendants recognized it was a medical emergency.
[7] Ms. Idoni asserts that she "never touched [Ms. Holler]."  Idoni Objections to PSR, ECF No. 513, at 1.

The Government notes that a Defendant does not have to personally perform all the actions necessary to establish this adjustment, and furthermore, based on relevant conduct, such Defendant is substantively responsible for their co-conspirators' conduct in doing the same.[8]  Govt. [Handy] Reply, ECF No. 563, at 2, n.1.   A conspirator "can be found guilty of a substantive offense based upon acts of his coconspirator so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."  *United States v. Khatallah*, 41 F.4th 608, 625 (D.C. Cir. 2022); *Pinkerton v. United States*, 328 U.S. 640, 646-647 (1946).  If these conditions are met, then "a conspirator will be held vicariously liable for the offense committed by his or her coconspirators."  *United States v. Ballestas*, 795 F.3d 138, 146 (D.C. Cir. 2015) (citing *United States v. Washington*, 106 F.3d 983, 1012 (D.C. Cir. 1997)).  In this case, whether the conduct was committed by Handy or Darnel and/or any of their co-Defendants, it was reasonably foreseeable, and a natural consequence of the facility blockade that patients would be prevented from entering the treatment area at the facility (and consequently clinic staff would be prevented from entering or leaving).  Furthermore, as the evidence establishes, Ms. Holler was forced to lay on the floor and remain there because [along with the use of force by Ms. Marshall], the Defendants physically obstructed her from entering the clinic, *see* Ex. No. 1079B, and even while Ms. Holler was experiencing a medical emergency, which Defendants recognized, she was instead confined to the hallway.  Accordingly, for the reasons explained in detail herein, and based on  the reasoning in

---

[8] A defendant is responsible for (B) in the case of a jointly undertaken criminal activity. . . (whether or not charged as a conspiracy), all acts and omissions of others that were - - (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. . . . U.S.S.G. § 1B1.3(a)(1).

*Pinkerton* and *Khatallah*, which is applicable throughout this Memorandum Opinion, the Court finds that all Defendants warrant an enhancement for physical restraint of a victim.

### 3. Vulnerable Victim (all Defendants)

The Probation Office applied a victim related adjustment because the "defendant knew or should have known the victim of the offense was a vulnerable victim (patient Shampy Holler was pregnant); therefore, two levels are added.  USSG §3A1.1(b)(1)."  Handy PSR, ECF No. 523, at ¶¶78, 84.  A "vulnerable victim" is a person who is (A) "a victim of the offense of conviction and any conduct for which the defendant is accountable" and (B) "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. §3A1.1(b)(1), Application Note 2; *see United States v. Cline*, 986 F.3d 873, 880 (5th Cir. 2021) (affirming vulnerable victim adjustment where defendant knew that victim was pregnant and thus "particularly susceptible to [defendant's] criminal conduct").

In his Sentencing Memorandum, ECF No. 551-1, at 4, Mr. Hinshaw argues that the adjustment is applied only where the victim was particularly vulnerable to criminal conduct, defendant knew of the vulnerability, and the vulnerability facilitated the crime in some manner. *United States v. Zats,* 298 F.3d 182, 186-190 (3d Cir. 2002).  The Court addresses those three 'factors' below.

#### a. Particularly Vulnerable

Ms. Handy argues that this adjustment should not be applied because "a victim is not unusually vulnerable by virtue of their pregnancy alone."  Handy Sent. Mem., ECF No. 560, at 10; Harlow Sent. Mem., ECF No. 554, at 4 ("Ms. Harlow does not believe that a person being pregnant makes them a 'vulnerable victim.'"); *see United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) ("The district court did not classify the [victim] as unusually vulnerable simply because she was

pregnant."  The district court instead applied the adjustment because the victim's "pregnancy created a potential vulnerability which [the defendant] acknowledged and exploited when he expressly threatened to kill her unborn child.")  "[I]n order to warrant a finding of unusual vulnerability, there must be some evidence, above and beyond mere membership in a large class, that the victim possessed a special weakness that the defendant exploited."  *United States v. Feldman*, 83 F.3d 9, 15 (1st Cir. 1996) (cited in Handy Sent. Mem., ECF No. 560, at 10).[9]

Mr. Hinshaw asserts that "[t]he fact that patients Ashley Jones and Shampy Holler were pregnant did not make them uniquely vulnerable or susceptible to having their rights to enter the abortion clinic violated any more than Nurse K, Medical Specialist H, and Clinic Administrator B having their rights denied providing medical services to the patients."  Hinshaw Sent. Mem., ECF No. 551-1, at 5; *compare* Handy Sent. Mem., ECF No. 560, at 10-11 (asserting that the adjustment does not apply because Ms. Holler and Ms. Jones are "typical victims" of the offense) (citing *United States v. Caballero*, 277 F.3d 1235, 1251(10th Cir. 2002) (finding that the victim must be "atypical of the usual targets of the relevant criminal conduct"); Geraghty Sent. Mem., ECF No. 548, at 5 (noting that the "typical victim" of a FACE violation is pregnant).

The Court notes that one does not have to be pregnant to be a victim of the charged offenses (e.g., the clinic staff), but, in this case, due to their pregnancies and the status of their medical procedures and the circumstances of the criminal activity, Ms. Jones and Ms. Holler were particularly vulnerable victims.  The Government explains that both patients were pregnant and had already started their termination procedures, which made them even more vulnerable to Defendants' efforts to block their access to health care.  Govt. [Handy] Reply, ECF No. 563, at 6

---

[9] Several of the other Defendants relied upon the cases cited in Ms. Handy's Sentencing Memorandum.

(citing testimony by both women that their termination procedures had started the prior day, and neither was feeling well on the day of the blockade).  "Video footage showed that Ms. Jones appeared to be in her second or third trimester," and she was crying and pleading with defendants for entry into the clinic.  Govt. [Marshall] Reply, ECF No. 568, at 6; Ex. 1011.  In an act of desperation to access health care, Ms. Jones was forced to climb onto a chair and through a small receptionist window.  *Id.* at 6, Ex. 1004, Govt. [Handy] Reply, ECF No. 563, at 7.  Ms. Holler collapsed on the floor outside the clinic, due to labor pains, while she was locked out and restrained in the hallway.  *Id.* at 6, Ex. 1079B.  The Court finds that in the case of Ms. Jones and Ms. Holler, they were not vulnerable simply because they were pregnant but rather because their pregnancies <u>and</u> the fact that they had started the termination proceedings and needed medical attention created a vulnerability, which was acknowledged and exploited by the Defendants. "The victims to whom §3A1.1 applies are those in need of greater societal protection . . . They are the persons who, when targeted by a defendant, render the defendant's conduct more criminally depraved."  *United States v. Stover*, 93 F.3d 1379, 1386 (8th Cir. 1996). (citation omitted).

### b. Knowledge of Vulnerability

With regard to defendants' knowledge of the "vulnerability," Ms. Marshall argues that the co-defendants "did not have any advance information as to the reasons that the patients were present at Washington Surgi-Clinic" and they "could have been there for [ ]medical purposes other than for [pregnancy termination] services," such as "a gynecological examination, which does not require a person to be pregnant."   Marshall Sent. Mem., ECF No. 567, at 4.  This argument fails for several reasons, insofar as it was reasonable to anticipate that there would be persons seeking termination of pregnancy services, and indeed, Ms. Handy "knew the clinic performed late term abortions, and that those procedures were routinely scheduled for Thursdays."  Govt. [Handy]

Reply, ECF No. 563, at 6 (citing testimony from clinic staff and indicating that Ms. Handy, as "Hazel Jenkins," had set an appointment for a fake abortion on Thursday, October 22, the date of the blockade).

Furthermore, the goal of the criminal activity was to hinder the provision of abortion services.  In the instant case, Ms. Marshall testified that the reason she traveled from Massachusetts to Washington D.C., was to participate in a "rescue" at a clinic with "late-term abortions."  *See* 10/25/23 Trial Tr. at 237:18-21.  Ms. Davis testified that a "rescue" means "blockading abortion clinics, to keep patients from entering," 10/24/23 Trial Tr. at 10:15-16.

Moreover, during the criminal activity, Defendants were aware that the vulnerable victims at issue in this case – Ms. [Ashley] Jones and Ms. Holler – were pregnant.  The evidence demonstrates that Ms. Marshall approached Ms. Jones and shouted at her to delay her appointment, Ex. No. 1011, and saw Ms. Holler on the floor in labor pains.  Exhibit No. 179B.  Accordingly, Ms. Marshall (and the other defendants present) knew (or should have known) that Ms. Jones and Ms. Holler were pregnant at that point in time and required access to medical services.  *See* Govt. [Marshall] Reply, ECF No. 568, at 5-6 (citing testimony by Handy, Idoni and Geraghty, indicating awareness of the pregnancies and the ongoing medical complications/medical emergency during the blockade).

### c. Vulnerability Facilitated the Crime in Some Manner

Finally, Ms. Handy argues that "the 'vulnerable victim' adjustment 'focuses chiefly on the conduct of the defendant' and [therefore,] should be applied only where 'the defendant selects the victim' due to the victim's perceived vulnerability to the offense."  Handy Sent. Mem., ECF No. 560, at 10 (quoting *United States v. Malone*, 78 F.3d 518, 522 (11th Cir. 1996)).  "[C]ourts have applied the vulnerable victim adjustment when the evidence established that the vulnerability had

a nexus to the crime." Govt. [Handy] Reply, ECF No. 563, at 5. In support of this proposition, the Government relies on *United States v. Luca*, 183 F.3d 1018 (9th Cir. 1991), where the Court of Appeals for the Ninth Circuit stated that:

> We have enunciated two means of determining whether a defendant's victim is otherwise particularly susceptible for purposes of the vulnerable victim enhancement . . . [W]e directed the district courts to analyze the characteristics of the defendant's victim, the victim's reaction to the criminal conduct, . . . the circumstances surrounding the criminal act [and] whether the defendant could reasonably have anticipated the victim's reaction.

*Id.* at 1027 (citations and internal quotation marks omitted).

Upon review of the circumstances surrounding the Defendants' criminal activity, as discussed previously herein, and the physical conditions of Ms. Jones and Ms. Holler when they entered and were restrained at the clinic, this Court finds that Ms. Jones and Ms. Holler's reactions could reasonably have been anticipated by the Defendants, and as such, their vulnerabilities had a nexus to the criminal conduct.

Accordingly, upon consideration of the record evidence in this case, as well as the arguments of the parties, and the applicable case law, this Court finds that the "vulnerable victim" enhancement is applicable to all nine Defendants.

### 4. Obstruction of Justice (Handy, Harlow, Marshall, Idoni, Bell, and Geraghty)

The Probation Office applied an adjustment for obstruction of justice, namely that:

> The Defendant willfully obstructed or impeded, or attempted to obstruct and impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and any relevant conduct; or a closely related offense (to wit: the defendant testified falsely at trial about her reasons for being at the clinic, about her participation in the offense, and [that] testimony was determined to be incredible by the Court); therefore, two levels are added. USSG §3C1.1.

Handy PSR, ECF No. 523, ¶80, 86.

Ms. Handy asserts that "testimony is not automatically deemed untruthful with a guilty verdict; testimony may be truthful, but the jury may nonetheless find the testimony insufficient to

excuse criminal liability or prove lack of intent."  Handy Sent. Mem., ECF No. 560, at 12 (citing *United States v. Dunnigan*, 507 U.S. 87, 94-95) (1993) (recognizing that an enhancement is only appropriate when there is false testimony given with a "willful intent to provide false testimony" as opposed to "due to confusion, mistake or faulty memory").  Further, "willfully requires that the defendant consciously act with the purpose of obstructing justice," *United States v. Thompson*, 962 F.2d 1069, 1071 (D.C. Cir. 1992) (quotation omitted).[10]

Ms. Marshall draws this Court's attention to U.S.S.G. §3C1.1, Commentary Application Note 2, which states that, in applying this provision regarding false testimony or statements, "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  Marshall Sent. Mem., ECF No. 567, at 6; *see also* Bell Sent. Mem., ECF No. 556, at 2 (noting that it is "not unusual for people's memory of an event to be different than the actual facts of that event").  Ms. Marshall argues that "the court should give [her] the benefit of the doubt" that any inconsistency was an "unintentional misrecollection by [ ] an older woman about a traumatic event that happened 3 years before[.]"  Marshall Sent. Mem., ECF No. 567, at 6; *see also* Bell Sent. Mem., ECF No. 556, at 3 (noting that Ms. Bell "is 76 years old, and while she is not in any way demented or otherwise mentally

---

[10] Defendants Harlow and Idoni cite *United States v. Montague*, 40 F.3d 1251, 1256 (D.C. Cir. 1994), which applied an enhanced standard for evaluating application of the enhancement.  Harlow Sent. Mem., ECF No. 554, at 5; Idoni Obj. to PSR, ECF No. 513, at 3.  In that case, the D.C. Circuit indicated that "cases that cause a district court pause require separate and clear findings and careful attention to the evaluating standard in supporting the determination." *Id.* at 1256.  In contrast, "[e]asy cases, in which the evidence of perjury is weighty and indisputable may require less in the way of factual findings[.]"  *Id.* Although not expressly overruling *Montague*, a subsequent opinion by the D.C. Circuit noted that the Sentencing Commission [in 1997] deleted language from the commentary to Section 3C1.1 so that the Application Note "no longer suggests a heightened standard of proof."  *United States v. Dozier*, 162 F.3d 120, 124 n.1 (D.C. Cir. 1998) (quoting U.S.S.G. App. C, amend. 566 (Nov. 1997)).

impaired, it would not be unusual for her memory to be less reliable than it was when she was younger").

In *Dunnigan,* 507 U.S. at 95, the Supreme Court found that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [the Supreme Court] set out." Accordingly, below is a summary of the Court's findings regarding the Defendants' testimony that establishes the applicability of obstruction of justice enhancements for Defendants Handy, Harlow, Marshall, Idoni, Bell, and Geraghty.

### a. Lauren Handy

The Government argues that "Handy lied about why she organized and was present at the blockade," Govt. [Handy] Reply, ECF No. 563, at 10, because she believed that the clinic, in offering abortion services, was performing feticide.    8/22/23 A.M. Trial Tr. at 20.    More specifically, in its Sentencing Memorandum, ECF No. 543, at 11-12, the Government contends that Ms. Handy stated that she organized an "event" at the Surgi-clinic, where she "talked" to participants about "following their conscience" and being "passive" or "nonviolen[t]" to protest against the practice of feticide.  *Id.* 71, 80.  Handy claimed that she did not counsel, direct, or encourage anyone to use force or to restrict anyone's "freedom of movement." *Id.* at 81-82.   She claimed that she did not block anyone's access to the clinic.  *Id.* at 86.  On cross-examination, however, Ms. Handy admitted that the October 22, 2020 "event" she promoted was a "traditional lock-and-block," and that her co-defendants were acting as "human shields to prevent pre-born siblings from being killed." *Id.* at 90-91.  Furthermore, even after being confronted with video of

her interaction with MPD officers where she admitted an attempt to stop abortions, she persisted in her claim that her motivation at the clinic was to prevent feticide.  *Id.* at 98-102.

In the instant case, Ms. Handy alleges that her "testimony regarding her motivation for being at the clinic on October 22, 2020, does not conflict with any other evidence presented at trial, and certainly, does not show that Ms. Handy made any efforts to obstruct justice."  Handy Sent. Mem., ECF No. 560, at 12, n. 4.  The Court notes however that there is absolutely no evidence to support Ms. Handy's allegations about the clinic engaging in feticide, while, to the contrary, there is evidence that Ms. Handy organized the blockade to protest against and hinder the clinic from performing abortions, *see* Ex. No. 1009.[11]  Furthermore, this Court agrees with the Government's contention that Ms. Handy's false claims about being at the Surgi-clinic to prevent feticide are material.  Govt. [Handy] Reply, ECF No. 563, at 10; *see* U.S.S.G. Section 3C1.1 App. n.6 ("Material" evidence, fact, statement, or information, as used in this section means evidence, fact, statement, or information that, if believed, would tend to influence, or affect the issue under determination.")  In this case, Ms. Handy's allegations about her motivation to prevent feticide – which is not a form of protected reproductive health care – were material to the FACE Act offense and the jury's consideration of that offense.  Upon review of the record in this case, the Court finds that the obstruction of justice enhancement applies to Ms. Handy.

---

[11] Ms. Handy provided the D.C. Medical Examiner's Office with fetuses allegedly from the clinic. The report by the Medical Examiner's Office did not support her assertion.  The video of her undercover appointment with the Clinic's Medical Director also did not support a claim that there were live births.  Defendants did not request that the entire video of the interview be admitted into evidence, which the Court indicated would be admissible.  Defendants wanted to admit a "propaganda" version of the video, which only had excerpts of the interview, which the Court found inadmissible.

**b. Paula Harlow**

Ms. Harlow asserts that the enhancement should not be applied to her as "nothing in her testimony, especially when taken in the light most favorable to her, establishes that she willfully [engaged in] perjury to obstruct justice[.]" Harlow Sent. Mem., ECF No. 554, at 6, *see United States v. Thompson*, 962 F.2d 1069, 1071(D.C. Cir. 1002) (quoting *United States v. Lofton*, 905 F.2d 1315, 1317 (9th Cir. 1990)) (when considering an obstruction enhancement, "[a] defendant's testimony and statements should be evaluated in the light most favorable to the defendant"). Ms. Harlow explains that she was "exercising her constitutional right to explain to the Court her personal conduct and actions." Harlow Sent. Mem., ECF No. 554, at 4.

The Government notes correctly that this Court found previously that Defendants Marshall, Bell, and Harlow (testifying as witnesses in the Harlow trial) "lied on the stand." Findings of Fact and Conclusions of Law, ECF No. 474, at 8. Because "[e]ach [of them] provided testimony utterly belied by video evidence, the Court was unable to "find any of their self-serving testimony credible, and instead credit[ed] only their inculpatory testimony or testimony supported by other documentary evidence." *Id.* By way of example, Ms. Harlow testified that she did not enter the clinic with a bike lock, *see* 10/26/2023 Trial Tr. at 143:21-151:5, despite contrary evidence, *see* Ex. No. 1079A. Furthermore, Ms. Harlow refused to acknowledge responsibility for carrying the bag of locks into the clinic, *see* 10/26/2023 Trial Tr. at 154:14-156:3, even when faced with clear video evidence to the contrary, *see* Ex. 1001. Upon review of the record in this case, the Court finds that the obstruction of justice enhancement applies to Ms. Harlow.

**c. Jean Marshall**

Ms. Marshall suggests that "any basis for [her] testimony that varied from the presentation by the government witnesses and/or the videos presented, was not in any way for the purpose of

obstructing justice" but instead, she "testified truthfully under oath to the best of her recollection." Marshall Sent. Mem., ECF No. 567, at 6-7.  As with Ms. Harlow, this Court found that Marshall's testimony concerning the blockade was "utterly belied by video evidence."  Findings of Fact and Conclusions of Law, ECF No. 474, at 8.  For example, when Marshall was confronted with video evidence that showed her moving chairs to block access to the clinic entrances, she claimed to not remember doing that.  *Id.* (internal citations omitted).  She also refused to identify Ms. Handy, despite video evidence that depicted her standing only a few feet away from her in the clinic waiting room.  *Id.*  Furthermore, she refused to identify herself as the one pushing and shoving a clinic staff member, even when she was confronted with video evidence.  *See* 10/25/23 Trial Tr. at 271:19-272:22.  The video evidence served as impeachment of her testimony of a lack of memory.  Upon review of the record in this case, the Court finds that the obstruction of justice enhancement applies to Ms. Marshall.

### d. Heather Idoni

Ms. Idoni acknowledges that "[t]he facts of what happened at the clinic were not in dispute" and that the video showed that "at least during a portion of the time that she was in the building, she was blocking the employee entrance," but she contests talking about what her co-defendants were going to do once they got to the clinic, or communicating with her co-defendants in the period prior to the blockade.  Idoni Obj. to PSR, ECF No. 513, at 3.

In its Sentencing Memorandum, ECF No. 549, at 10, the Government provides examples of Ms. Idoni's testimony that support the imposition of an obstruction of justice enhancement.  Ms. Idoni testified that she was at the clinic on October 22, 2020, to "counsel" women against abortions.  8/22/23 P.M. Trial Tr. at 5.  She denied "physically do[ing] anything" to prevent patients from accessing the clinic.  *Id.* at 20.  She claimed not to remember the events clearly, but

attempted to explain the video that showed her blocking access, stating that she was praying in the hallway outside the clinic's main entrance. *Id.* at 21. Ms. Idoni denied blocking any clinic doors. *Id.* at 24. When confronted with video evidence, Ms. Idoni admitted that it was her understanding that she had participated in a planned blockade of the clinic. *Id.* at 35. She admitted also that she was arrested for physically blocking a clinic door, a decision she affirmatively made. *Id.* at 34-35. She drove from Michigan to the District of Columbia to attend a meeting to discuss the blockade, *id.* at 41-42, and at that meeting, the group discussed Ms. Handy's false appointment. *Id.* at 53. On October 22, 2020, Ms. Idoni showed up at the clinic with her co-defendants and others, *id.* at 50, and she hid in the stairwell and waited for the clinic to open its doors for morning appointments. *Id.* at 52. Ms. Idoni admitted entering the clinic following forced entry, *id.* at 56, but she refused to admit blocking the clinic's staff entrance, instead claiming that she merely "stood in front of it." *Id.* at 60. Ms. Idoni denied preventing Ms. Jones from accessing the clinic, *id.* at 62-63, and she denied blocking Ms. Holler despite video showing Ms. Idoni obstructing Ms. Holler's access. *Id.* at 68. The record evidence in this case supports application of the obstruction of justice enhancement to Ms. Idoni.

### e. Joan Bell

Ms. Bell acknowledges that "this Court has already determined that [she] did not tell the truth during portions of her testimony" at the trial of Paula Harlow, Bell Sent. Mem., ECF No. 556, at 2 (referencing ECF No. 474, at 8), but Ms. Bell challenges the fact that she "knowingly" lied. She goes on to explain that, while she was shown video recordings taken inside the clinic on the day of the blockade, she did not believe them to be accurate. *Id.* at 3. Accordingly, she asserts that, when she testified at Ms. Harlow's trial, "she was merely testifying, under oath, as to her

recollection of the events," and while she could have agreed with the recordings, "that was not what she recalled, and ironically, she did not want to lie." *Id.*

The Government contends that Ms. Bell's "false testimony was an intentional effort to influence this Court's determination of whether co-defendant Harlow violated the FACE Act." Govt. [Bell] Reply, ECF No. 565, at 2; *see* U.S.S.G. §3C1.1 App. n.6 (defining "material"; *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) ("an enhancement for perjury at trial under Section 3C1.1 of the Guidelines can be imposed only if the district court finds that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of . . . faulty memory") (internal quotations and citations omitted).  The Government argues that "despite uncontroverted video footage showing intentional uses of force and physical obstructions, [Bell's] testimony based upon a supposed fault memory was self-serving and intended to exculpate Harlow."  Govt. [Bell] Reply, ECF No. 565, at 3.  This Court agrees that Ms. Bell's "unsupported belief that the video footage was altered is insufficient to relieve her of this Court's finding that she committed perjury."  *Id.*, *see also* Findings of Fact and Conclusions of Law, ECF No. 474, at 8 ("Bell . . . [p]rovided testimony utterly belied by video evidence . . . . Because [Bell] lied on the stand, the Court cannot find any of [her] self-serving testimony credible, and instead only credits [her] inculpatory testimony.").  Accordingly, this Court finds that the obstruction of justice enhancement is warranted for Ms. Bell.

### f. Herb Geraghty

Defendant claims that he "testified truthfully that he is opposed to abortion," and that he "participated in the rescue because he believed that partial birth abortions were being performed at the clinic," and further, that he had "no intention to physically 'block' anyone."  Geraghty Sent. Mem., ECF No. 548, at 2.  Mr. Geraghty asserts that when a court considers an obstruction

enhancement, "[a] defendant's testimony and statements should be evaluated in a light most favorable to the defendant." *Id.* at 3 (quoting Application Note 1 for Guideline Sec. 3C1.1).  The Application Note "instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." *United States v. Onumonu*, 999 F.2d 43, 45 (2nd Cir. 1993) (citations omitted).  Defendant relies upon this case and cases cited by other Defendants (as discussed herein) to conclude that "[n]othing in Mr. Geraghty's uncontroverted testimony, especially when taken in the light most favorable to him, establishes that he willfully committed perjury to obstruct justice."  Geraghty Sent. Mem., ECF No. 548, at 3.  The Government asserts however that Ms. Geraghty lied about both initially entering the Clinic (claiming that he was forced in by his coconspirators) and why he entered a second time (claiming that he entered to attend to Defendant Harlow).  Govt. [Geraghty] Sent. Mem., ECF No. 546, at 8-11; *see* 8/23/23 a.m. Trial Tr. at 30, 62 (claiming he was pushed in against his will, even though he acknowledged hiding in the stairwell), *compare* Ex. 1001 (video showing Ms. Geraghty's initial entrance), Omnibus Mem. Op., ECF No. 478, at 5 (noting that "[v]ideo evidence demonstrates Geraghty, standing between Harlow and Marshall, "forcibly" pushing forward at the same time."); *see* 8/23/23 a.m. Trial Tr. at 30, 60 (claiming Geraghty went in to aid Ms. Harlow); *compare*  Ex. 1001 (showing his entry and stepping over Ms. Harlow without offering any assistance).  During the trial, this Court noted that Geraghty testified falsely at trial: "I would also point out that all of [Geraghty's] answers when asked in different ways are not all necessarily consistent. So this isn't like he's harping on the same thing getting the same answers." 8/23/23 a.m. Trial Tr. at 72.  The Government concludes that Mr. Geraghty's false testimony – that he did not enter the clinic intentionally or with intent to further the offenses for which he was convicted – was material.  Govt. [Geraghty] Reply, ECF No. 552, at 2; U.S.S.G. §3C1.1, App. n.6

(referencing the definition of "material").  This Court finds that, upon review of the record evidence and relevant case law, Mr. Geraghty is subject to an "obstruction of justice" enhancement.

In sum, because of multiple willful inconsistencies in testimony by Defendants Handy, Harlow, Marshall, Idoni, Bell and Geraghty, as evidenced by contradictory video and other record evidence, the Court finds the "obstruction of justice" enhancement applicable to these Defendants.

### 5. Multiple Count Adjustment (applied to all Defendants)

The Probation Office used a multiple count adjustment for all Defendants, as follows, to assign units pursuant to U.S.S.G. §3D1.4(a), (b), and (c):

> One unit is assigned to the group with the highest offense level.  One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.  One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

Darnell PSR, ECF No. 514, at ¶¶88-90.  Without citing any authority, Mr. Darnel "objects to the double counting for the conspiracy (Count 1) and the goal of the conspiracy (Count 2), [and] [h]e also objects to the skewed result that comes about from scoring these offenses as was done in the PSR, resulting in two points being added to his calculation."  Darnel Sent. Mem., ECF No. 537, at 2 (argument joined by Ms. Marshall, Marshall Sent. Mem., ECF No. 567, at 7-8 ); Harlow Sent. Mem., ECF No. 554, at 6 (same); Goodman Sent. Mem., ECF No. 555, at 6 (relied upon by Defendant Bell) (noting that this alleged "double counting" has the "inordinate effect of creating a guidelines range of imprisonment for a violation of 18 U.S.C. §248(a)(1) at greater than the statutory maximum of 1 year" and concluding that this adjustment "should also be discarded") (citing no authority); Idoni Obj. to PSR, ECF No. 513, at 4 (arguing that "[t]he multiple count adjustment should not apply for the reason that the less serious offense is only a misdemeanor and Defendant could not receive more than six or 12 months, depending upon how this court rules at

sentencing.") (citing no authority); Hinshaw Sent. Mem., ECF No. 551-1, at 6 (challenging the adjustment, without providing any legal or statutory authority).

The Government indicates that the PSR is correct in applying a multi-count adjustment, and notes that Mr. Darnel concedes that U.S.S.G. §2H1.1(a)(1) applies to both counts and recognizes note 8 to U.S.S.G. §2D1.2. Govt. [Darnel] Reply, ECF No. 553, at 6 (referencing Darnel Sent. Mem.). Pursuant to U.S.S.G. §2H1.1(a)(1), a base offense level of 12 is applied for offenses involving individual rights and involving two or more participants) and note 8 to U.S.S.G. §2D1.2 indicates that one "appl[ies] the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature."

The Government notes, and this Court agrees, that Mr. Darnel "does not and cannot support his argument that the multi-count adjustment is unwarranted." Govt. [Darnel] Reply, ECF No. 553, at 6. Nor do any of the Defendants provide legal or statutory authority supporting this proffer. Accordingly, this Court finds that the multi-count adjustment applies to each Defendant.

It is hereby this 13th day of May, 2024

ORDERED that the sentencing calculations by the Probation Office regarding enhancements for physical restraint (applicable to all Defendants), vulnerable victim (all Defendants), obstruction of justice (Defendants Handy, Harlow, Marshall, Idoni, Bell, and Geraghty), role as organizer or leader and organizer (Defendants Handy and Darnel), and the multiple count adjustment (all Defendants) are AFFIRMED by this Court and the Defendants' objections thereto are DENIED.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE